**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                                    : Chapter 11
:
MILLENNIUM LAB HOLDINGS II, LLC, <u>et al.</u>,        : Case No. 15-12284 (____)
:
Debtors.[1]                                                           : Joint Administration Pending
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF WILLIAM BROCK HARDAWAY IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, William Brock Hardaway, being duly sworn, depose and say:

1.      I am the Chief Executive Officer of Millennium Lab Holdings II, LLC ("<u>Holdings</u>"), a limited liability company organized under the laws of the state of Delaware and the ultimate parent of the other debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively with Holdings, the "<u>Debtors</u>" and, together with the non-debtor affiliates and subsidiaries of Holdings, the "<u>Company</u>"). I am also the Chief Executive Officer of Millennium Health, LLC, a limited liability company organized under the laws of the state of California ("<u>Millennium</u>"), which is a wholly-owned subsidiary of Holdings and the direct parent of Debtor RxAnte, LLC ("<u>RxAnte</u>"). To minimize any disruption to the Debtors' business and ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "<u>First Day Pleadings</u>") in connection with these chapter 11 cases (the "<u>Chapter 11 Cases</u>").[2] I submit this declaration in support of the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings filed contemporaneously herewith.

Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and the relief requested in the First Day Pleadings. I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

    2.  I have been Chief Executive Officer since February 2013. Prior to joining the Company in February 2013, I served as regional vice president of operations at Select Medical Corporation, president and chief operating officer of Triumph HealthCare, LLC, executive vice president and hospital division president of RehabCare, and most recently served as executive vice president of operations for Kindred Healthcare. In total, I have over 20 years of experience in the health care industry. I received a bachelor's degree in hospital administration from Southwest Texas State University and a master's degree in business administration from St. Edward's University Executive Program in Austin, Texas.

    3.  As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or my opinion, based upon my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## PART I.

## BACKGROUND

**A.       The Debtors' Business**

4.       The Company is a leading provider in the growing specialty market of laboratory-based diagnostic testing focused on drugs of abuse and clinical medication monitoring. The diagnostic testing is aimed at providing medication intelligence to healthcare professionals in order to help their patients achieve better outcomes. Through its various service offerings, comprised of urine and saliva-based drug testing ("DT"), pharmacogenetic testing ("PGT"), and predictive analytics, the Company provides its customers with personalized solutions to monitor and manage their patients' utilization of both prescription and non-prescription drugs. Substantially all of the Company's revenue derives from its analytics and laboratory testing services, received in large part through Medicare and Medicaid reimbursements, as well as payments from commercial payors.

5.       The Company was founded in December 2007 by James Slattery, who currently serves as the sole manager and Chairman of the Board of Managers of Millennium Lab Holdings II, LLC. The Company's DT services employ proprietary methods to deliver fast turn-around times for requested testing, and also offer "a la carte" testing to pinpoint the presence or absence of specific substances. In 2012, the Company launched its PGT services, which utilize a genetic analysis of a patient's metabolism to allow clinicians to more accurately anticipate the most effective drug therapy for each individual patient. PGT assists providers in identifying situations in which patients may experience reduced efficacy or potential adverse reactions to proposed medications in order to maximize the safety and efficacy of proposed treatment regimens. Finally, the Company built upon its DT and PGT offerings with the December 2013

acquisition of RxAnte, Inc.[3] RxAnte employs an analytic model that uses risk-stratification and predictive targeting to help clinicians improve medication adherence programs, driving additional effectiveness and cost savings for clinicians and payors.

6.    Today, the Company is based in San Diego, California. The Company also operates additional facilities in Ann Arbor, Michigan; McLean, Virginia; and Portland, Maine. Of the Debtors' 1,199 employees, approximately 511 form a dedicated sales and service team, and approximately 352 scientists, PhDs, PharmDs, and laboratory personnel work in laboratories, laboratory support, and research and development. The Company provides support to more than 8,000 clinicians, medical centers, and other healthcare providers across the United States. In 2014, the Company generated total revenue of $687 million, and tested approximately 2.7 million specimens.

**B.    The Debtors' Corporate and Capital Structure**

7.    The Debtors in the Chapter 11 Cases are Holdings, Millennium, and RxAnte. Holdings is the parent of Millennium, which in turn is the parent of RxAnte. Millennium is also the parent of its wholly-owned, direct and indirect non-Debtor subsidiaries Pain in the Air, LLC, Raven Aeronautical Holdings, LLC, and Jet Air Systems, LLC. A corporate organization chart depicting the Company's ownership structure is attached hereto as Exhibit 1.

8.    As of the Petition Date, the Debtors had two material debt obligations outstanding:[4] (a) obligations arising under the Credit Agreement dated as of April 16, 2014 (as amended, supplemented, or otherwise modified, including amendment by the Solicitation

---

3    RxAnte is the successor to RxAnte, Inc.

4    The Debtors also have approximately $206 million plus accrued interest and fees and costs in obligations arising under the USA Settlement Agreements (defined below).

Amendment (defined below), the "2014 Credit Agreement") by and among Millennium, as borrower, Holdings, Wilmington Savings Fund Society, FSB, as successor administrative agent (the "Administrative Agent")[5], and the lenders from time to time a party thereto (the "Prepetition Lenders") and (b) obligations arising under Credit Agreement dated as of November 9, 2015 (as amended, supplemented, or otherwise modified, the "Early Commitment Facility") by and among Millennium, as borrower, Holdings, Wilmington Savings Fund Society, FSB, as agent, and the lenders from time to time a party thereto.

9.      2014 Credit Agreement Facility. In connection with the April 2014 Transaction (as described below), the Company borrowed $1.775 billion under a senior secured credit facility by entering into the 2014 Credit Agreement. The 2014 Credit Agreement initially also provided for a revolving loan in a principal amount not to exceed $50 million, which was to terminate on April 16, 2019. The Debtors terminated the revolving loan commitments in full, which were not utilized, as of June 30, 2015. The original term loan terms contemplated consecutive quarterly installments equal to $4,437,500 commencing on September 30, 2014, with the remaining outstanding amount payable on the maturity date on April 16, 2021. The loans and other obligations under the 2014 Credit Agreement and certain swap obligations and cash management obligations are guaranteed by Holdings and RxAnte and secured by substantially all of the assets of Millennium, Holdings and RxAnte, subject to customary exceptions. As of the Petition Date, there was an outstanding principal balance of $1,752,812,500 under the 2014 Credit Agreement.

10.      Early Commitment Facility. Pursuant to the RSA (defined below), each Prepetition Lender that (i) consented to the out-of-court restructuring transaction described in the

---

[5]      Wilmington Savings Fund Society, FSB is successor to JPMorgan Chase Bank, N.A. as Administrative Agent.

Master Restructuring Agreement attached to the Disclosure Statement (defined below) as Exhibit B (the "Master Restructuring Agreement") and the releases thereunder, (ii) voted in favor of the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. dated October 29, 2015 (the "Plan"), and (iii) consented to the Solicitation Amendment (defined below) (each a "Consenting Lender") by 12:00 p.m. (prevailing Eastern Time) on November 6, 2015 (the "Early Commitment Deadline"), was paid an early commitment fee in the form of such Prepetition Lender's *pro rata* share of a $50.0 million facility. In connection with solicitation of the votes on the Master Restructuring Agreement and the Plan, the Company solicited consents to an amendment to the 2014 Credit Agreement to (i) permit incurrence of the Early Commitment Facility as of the Early Commitment Deadline and (ii) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the 2014 Credit Agreement to the liens under the Early Commitment Facility (the "Solicitation Amendment"). The Solicitation Amendment became effective on November 9, 2015. As a result, the Early Commitment Facility is secured on a first priority basis and such security interests rank senior in priority to the security interests under the 2014 Credit Agreement. As of the Petition Date, the Early Commitment Facility had an outstanding principal balance of $46,626,404.14.

11.    Equity Interests. As of the Petition Date, there were three members of Holdings (collectively, the "Members"), each holding a different class of Holdings' membership interests with differing consent, distribution, and voting rights as set forth in Holdings' Second Amended and Restated Limited Liability Company Agreement. TA Millennium, Inc. ("TA"), a Delaware corporation, holds all 450 outstanding Class A Units. Millennium Lab Holdings, Inc.

("MLH"), a Delaware corporation, holds all 550 outstanding Class B Units. Finally, MLHCU, LLC, a Delaware limited liability company, holds all 58.4194 outstanding Class C Units.[6]

C.    **Events Leading to Chapter 11 Filing**

The Reorganization and Dividend Recapitalization Transaction

12.    On March 29, 2012, the Company entered into a Credit Agreement (as amended, supplemented, or otherwise modified, the "2012 Credit Agreement"), by and among MLH and Millennium as borrowers, JPMorgan Chase Bank, N.A. as prior administrative agent, and the lenders party thereto, which provided for a $310 million term loan facility and a $20 million revolving credit facility. The 2012 Credit Agreement was subsequently amended and restated in December 2013 to provide for an additional term loan of approximately $52 million and an increase of the revolving credit facility to $30 million (the term loan and revolver facilities collectively, as so amended and restated, the "2013 Credit Facility"). The proceeds from the 2013 Credit Facility were used to consummate the Company's purchase of 100% of the outstanding stock of RxAnte. The 2013 Credit Facility was scheduled to mature on March 29, 2017.

13.    In April 2014, the Company undertook a reorganization of its corporate structure in conjunction with a dividend recapitalization transaction (collectively, the "April 2014 Transaction"). These transactions, as described in further detail herein, ultimately resulted in the present corporate and capital structure of the Debtors.

14.    On April 16, 2014, the Company entered into the Existing Credit Agreement, as detailed above. The proceeds from the Existing Credit Agreement were primarily utilized to satisfy all of the Company's outstanding obligations under the 2013 Credit Facility

---

[6]    Class C Units reflect profits interests for certain management employees of the Company.

and to pay a special dividend to stockholders. Millennium Laboratories, Inc. (predecessor-in-interest to Millennium), RxAnte, Inc., and non-Debtor subsidiary Pain In the Air, Inc. each converted to a limited liability company, Holdings was formed, and MLH (the parent company to Millennium Laboratories, Inc.) exchanged its equity interests in Millennium Laboratories, Inc. for 100% of the membership interests in Holdings. Next, MLH remitted 45% of its membership interests in Holdings to TA in satisfaction of certain debt securities previously issued by MLH and all obligations outstanding under such debt securities, including accrued but unpaid interest and the redemption of stock purchase warrants in MLH.

USA Investigation and Lawsuit

15.     The Company, like other clinical laboratory companies, participates in the Medicare and Medicaid programs, and is subject to regulation and oversight by various federal, state, and local government agencies. These agencies regulate and oversee a wide variety of subjects, including licensure and operation of clinical laboratories, payment for laboratory services, healthcare fraud and abuse, and various safety issues, including quality, environmental, and occupational safety.

16.     Beginning in early 2012, the Company's business became subject to an investigation by the Office of the United States Attorney for the District of Massachusetts, operating as an arm of the United States Department of Justice (the "DOJ"). The DOJ's investigation continued through 2014. The Company cooperated in the investigation, producing nearly 11 million pages of documents and meeting with the DOJ on numerous occasions to discuss, among other things, document productions and the general subject areas under investigation.

17.    In late December 2014, the DOJ informed the Company that the DOJ would be pursuing certain civil claims against the Company. Shortly thereafter in early 2015, the DOJ, on behalf of the USA, commenced negotiations and settlement discussions with the Company regarding the USA's claims. On March 19, 2015, the DOJ, on behalf of the United States of America ("USA"), filed a civil complaint in intervention in several already pending *qui tam* lawsuits against the Company. That complaint, like the relator complaints in the pending *qui tam* suits, was filed under seal.

<u>CMS Notices of Revocation</u>

18.    By letter dated February 9, 2015, Noridian Healthcare Solutions, LLC ("Noridian"), a Medicare Administrative Contractor ("MAC") of the Centers for Medicare and Medicaid Services ("CMS") notified the Debtors that, effective as of March 11, 2015, Millennium's Medicare billing privileges would be revoked on account of alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries. On February 19, 2015, the Debtors provided Noridian with notice that it was seeking reconsideration of Noridian's findings that a basis existed for revoking the Company's Medicare privileges.

19.    Medicare reimbursement is the Debtors' largest single source of revenue by a considerable margin. Additionally, a revocation of the Company's Medicare billing privileges could trigger defaults under and/or termination of many of the Debtors' commercial payor contracts. Thus, termination of these billing privileges could cause an immediate and potentially near-complete loss of revenue and be fatal to the Debtors' business.

20.    The Company met with CMS on March 4, 2015 to discuss the revocation action. Following the March 4th meeting with CMS, counsel for Millennium contacted DOJ and

advised it that the pending revocation action would effectively put the Company out of business and impede any effort to resolve the USA's pending claims. The Company requested that DOJ coordinate an effort among the pertinent government entities to resolve the USA's pending claims and CMS administrative matters, including the revocation, as part of a global resolution.

21.     The DOJ contacted the Company on March 6, 2015, and told the Company to expect a letter from CMS extending the effective date of the pending revocation. Later that same day, CMS's Center for Program Integrity ("CPI") sent the Debtors a letter extending the date upon which CMS would revoke Millennium's Medicare billing privileges until April 30, 2015.

22.     On March 23, 2015, the Debtors submitted a response regarding the 59 individual instances of administrative billing abuses alleged. By letter dated May 4, 2015, Noridian notified the Company that, in addition to the reasons outlined in the earlier revocation notice, the Debtors' Medicare billing privileges would also be revoked or terminated on account of CPI's determination that Millennium had allegedly submitted claims for services without a valid order from a physician. The revocation or termination would be lifted, however, upon receipt of a satisfactory Corrective Action Plan. On July 2, 2015, the Company submitted a response to CMS, presented a Corrective Action Plan, and formally requested reconsideration and withdrawal of the pending revocation action.

23.     During negotiations with the USA, CMS extended the revocation effective date on numerous occasions.

### CMS Overpayment Determination

24.     On March 6, 2015, CMS's MAC issued an overpayment determination. That overpayment determination was rescinded and then later reissued on October 15, 2015.

Additionally, on April 27, 2015, the CMS MAC issued an appeal decision finding that Millennium had been underpaid for certain claims that were part of a claims review separate from the review that resulted in the overpayment determination.

<u>Settlement Discussions with DOJ, CMS, and the Office of Inspector General</u>

25.     As noted above, beginning in March 2015, the Debtors were involved in negotiations and settlement discussions with the DOJ, on behalf of the USA, and certain plaintiff states (the "<u>Plaintiff States</u>" and together with the USA, the "<u>USA Settlement Parties</u>"). The settlement discussions led to the execution of a Terms Sheet (the "<u>USA Terms Sheet</u>").

26.     In conjunction with a potential settlement with USA, on April 30, 2015, the Debtors sent a letter to OIG to begin discussions regarding a Corporate Integrity Agreement ("<u>CIA</u>"). The Debtors then met with OIG on May 5, 2015 to initiate the process of agreeing upon the CIA's terms. The Debtors and OIG continued discussing the terms of the CIA while the Company continued its settlement discussions with the USA Settlement Parties.

27.     On May 20, 2015, Millennium entered into the USA Terms Sheet with the USA and certain Plaintiff States, which contemplated, among other things, the resolution of the pending investigative and administrative matters. The USA Terms Sheet provided, in relevant part, that the Company would pay $256 million[7] to the USA Settlement Parties to settle the USA's and Plaintiff States' allegations. The settlement payment was conditioned upon, among other things, the resolution of the CMS revocation proceeding and OIG's agreement to not exercise its permissive exclusion authority against the Debtors. The USA Terms Sheet also outlined certain releases and dismissals to be granted by the USA Settlement Parties.

---

[7]   The settlement initially provided that the Company would pay $250 million in total consideration and was later amended to provide for a payment by the Company of $256 million in total consideration to resolve the alleged outstanding Noridian overpayment amount.

<u>Restructuring Negotiations With Prepetition Lenders</u>

28.     Immediately following the Company's May 20, 2015 execution of the USA Terms sheet, the Company disclosed the primary terms of the proposed settlement to the Prepetition Lenders. An ad hoc group of Prepetition Lenders (the "<u>Ad Hoc Group</u>") organized in June 2015 and retained advisors. At the same time, the Company and its advisors prepared an updated five-year forecast which reflected the expected impact on the Company's business of, among other things, (a) changes in reimbursement trends, (b) the proposed settlement with the USA Settlement Parties, (c) projected post-settlement operational adjustments required under a CIA, and (d) additional regulatory pressures. The Company concluded that its capacity to service its debt had diminished. Accordingly, the Company, the Ad Hoc Group, and the Members engaged in discussions to develop and implement a transaction to satisfy the Company's monetary obligations under the proposed settlement with the USA Settlement Parties and restructure the financial obligations of the Company.

29.     In the course of negotiations, the Ad Hoc Group articulated claims and causes of action against the Members in connection with the April 2014 Transaction. The Members deny any liability. Accordingly, the scope of the negotiations expanded to encompass a resolution of these issues as well.

<u>Negotiations Leading to the RSA and USA Settlement Agreements</u>

30.     Following the execution of the USA Terms Sheet, the Company continued to negotiate with the DOJ on behalf of the USA, the Plaintiff States and other parties in interest. On July 22, 2015, the Company informed the DOJ that (1) it would not be able to pay the lump sum settlement amount originally negotiated due to the financial state of the Company and its debt burden; and (2) a restructuring of the Company would be necessary to facilitate the

settlement payment. On July 22, 2015, DOJ set a mid-September 2015 deadline for the Company

to present a payment plan that could be approved by the USA's financial analysts at DOJ. By

mid-August 2015, the respective counsel to MLH, TA and the Ad Hoc Group were involved in

negotiations with the DOJ.

31.    On September 21, 2015, the parties informed the DOJ that they had the

framework for a proposal that would allow the Company to satisfy its monetary obligations

under the Terms Sheet. Subsequently, the DOJ, on behalf of the USA, set October 2, 2015 as the

deadline (the "USA Deadline") by which the Company was required to finalize its proposal

supported by the Prepetition Lenders, MLH, and TA for funding the Company's monetary

obligations under the settlement embodied in the USA Terms Sheet.

32.    During a September 30, 2015 meeting between the DOJ, on behalf of the

USA, the Company and its counsel, counsel to the Ad Hoc Group, counsel to MLH, and counsel

to TA, the USA agreed to extend its USA Deadline to October 16, 2015 (and CMS agreed to

extend the revocation effective date to the same date) in exchange for, among other things, the

Company's promise to pay an initial $50 million deposit toward its obligations under the USA

Terms Sheet. Specifically, by October 16, 2015, the Company was required to (i) execute

definitive settlement agreements with the USA Settlement Parties, including CMS, (ii) fund the

$50 million deposit, and (iii) establish irrevocable support of a restructuring of the Company's

financial obligations evidenced by a restructuring support agreement between the Company,

Prepetition Lenders holding at least a majority in number and 66 2⁄3% in amount of outstanding

principal under the 2014 Credit Agreement, and TA and MLH.

33.    After nearly four months of intense settlement discussions and

negotiations among the various parties in interest, the parties were ultimately successful in

reaching a negotiated resolution embodied in the USA Settlement Agreements (defined below) and the RSA (described in further detail below). The RSA was signed on October 15, 2015 and the USA Settlement Agreements were executed commencing on October 16, 2015.

**D.      The USA Settlement Agreements**

34.      The settlement agreements with the USA Settlement Parties (collectively, including the CIA, the "USA Settlement Agreements") resolved certain issues between the USA Settlement Parties and the Debtors.[8] Upon the execution of the USA Settlement Agreements, Millennium paid the USA the $50 million deposit, which was credited toward Millennium's total settlement obligations. As a result, on October 16, 2015, CMS lifted its suspension of Medicare payments. As part of the USA Settlement Agreements and pursuant to the RSA, TA and MLH severally guaranteed any avoidance risk associated with the $50 million deposit to the USA pursuant to a Guarantee Agreement entered into on October 16, 2015 (the "Guarantee Agreement"). However, in the event that TA and MLH are required to make payment to the USA of such $50 million pursuant to such Guarantee Agreement, TA and MLH will have a subrogation claim (the "Subrogation Claim") against Millennium for the full amount so paid, which Millennium and the Prepetition Lenders that voted in favor of the Plan agree will be an allowed claim in the Chapter 11 Cases. The terms of the Subrogation Claim, including the sources of recovery therefor, are further set forth in the RSA. As described in further detail below, pursuant to the Solicitation Motion (defined below), the Debtors are seeking authority to assume the USA Settlement Agreements.

---

[8]      The USA Settlement Agreements and the Plan preserve certain claims of governmental units.

E.      **The Restructuring Support Agreement**

35.     As set forth above, on October 15, 2015, the Company entered into the Restructuring Support Agreement (the "RSA") with the Prepetition Lenders party thereto (the "Participating Lenders"), MLH and TA. Pursuant to the RSA, the Participating Lenders agreed to (i) enter into the Master Restructuring Agreement to implement and consummate the Out-of-Court Transaction (as defined in the RSA), (ii) vote in favor of the Plan, and (iii) consent to the Solicitation Amendment.

36.     The transactions contemplated by the RSA represent a global resolution of numerous issues relating to the Debtors, including the satisfaction of the Debtors' obligations under the USA Settlement Agreements and the Prepetition Lenders' claims against MLH and TA. Specifically, pursuant to the RSA and the Plan, MLH and TA have agreed to contribute $325 million to or for the benefit of the Company (the "Settlement Contribution"), which sum is comprised of (i) approximately $206 million plus interest to be paid to the USA in connection with the USA Settlement Agreements (the "USA Settlement Funding Contribution") and (ii) the an amount equal to $325 million less the USA Settlement Funding Contribution (the "Millennium Funding Contribution") to be paid to Millennium to reimburse Millennium for the $50 million initial deposit, for fees and costs owed to the USA in connection with the USA Settlement Agreements, for working capital purposes, and as otherwise set forth in the RSA. MLH has agreed to pay $178.75 million of the Settlement Contribution and TA has agreed to pay $146.25 million of the Settlement Contribution.

37.     Further, in exchange for the Settlement Contribution, and pursuant to the RSA, MLH and TA and certain related parties will receive full releases as further described in the Plan. Parties will also be subject to a bar order, an injunction and related protective provisions as further described in the Plan.

38.     In addition, the transactions contemplated by the RSA and the Plan will restructure the Debtors' balance sheet to reduce its funded debt obligations. The $1.75 billion of obligations under the 2014 Credit Agreement (the "Existing Credit Agreement Claims") will be converted into $600 million of new term loans and 100% of the beneficial ownership of Millennium. In addition, two trusts will be established and vested with the right to prosecute and settle certain claims retained by the reorganized Debtors or contributed by the Consenting Lenders for the benefit of the Prepetition Lenders or Consenting Lenders, as applicable. All other classes of claims and interests under the plan will be unimpaired, unless that class agreed to lesser treatment under the RSA. In particular, general unsecured creditors will be treated in the ordinary course of business.

39.     The RSA contemplated that the restructuring transactions embodied therein would be implemented out-of-court pursuant to the Master Restructuring Agreement in the event that the Prepetition Lenders holding at least 97% of the Existing Credit Agreement Claims consented to the restructuring transactions. Although the Debtors have received overwhelming support for the restructuring, the Debtors did not achieve a 97% or higher acceptance rate and, accordingly, are seeking to implement the restructuring transactions embodied in the RSA through the Plan.

**F.      Solicitation, Voting Results, Consent Solicitation Results, and the Need for Prompt Confirmation of the Debtors' Plan of Reorganization**

40.     The proposed restructuring transactions embodied in the RSA and the Plan are described in detail in the Offering Memorandum and Solicitation Statement For Out-Of-Court Transaction and Disclosure Statement For Prepackaged Plan of Reorganization, dated October 29, 2015, which has been filed concurrently herewith (the "Disclosure Statement").

Under the Plan, the impaired creditors entitled to vote on the Plan are the holders of Existing

Credit Agreement Claims.

41.    Voting on the Plan closed on November 8, 2015. According to the official

vote tabulation prepared by the Debtors' voting and information agent, holders of Existing Credit

Agreement Claims have voted overwhelmingly to accept the Plan. In particular, approximately

99% of all Existing Credit Agreement Claims were voted. The Plan was accepted by

approximately 93.25% in amount of all Existing Credit Agreement Claims, which represents

approximately 93.02% in number and 93.74% in amount of Existing Credit Agreement Claims

that voted on the Plan.

42.    Concurrently herewith, the Debtors have requested this Court to set a

combined hearing to approve the adequacy of the information contained in the Disclosure

Statement and confirm the Plan (the "Combined Hearing"). In addition, because the Debtors have

received substantial support for the Plan, the Debtors are requesting that the Court set only two

hearings in these Chapter 11 Cases: (i) the initial hearing to consider the relief requested in the

First Day Pleadings, as described more fully herein and (iii) the Combined Hearing at which the

Court will also consider all requests for final relief in connection with the First Day pleadings

and consider approval of the Disclosure Statement and Plan confirmation.

43.    It is important that these matters be considered, and that the Debtors bring

their formal restructuring to a successful conclusion quickly. The RSA and USA Settlement

Agreements require consummation of the Plan to occur no later than December 30, 2015.

*        *        *

17

## PART II.

## FIRST DAY PLEADINGS

44.      In furtherance of these objectives, the Debtors are filing concurrently herewith the First Day Pleadings,[9] and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings. I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## A.      <u>Administrative and Procedural Matters</u>

45.      The Debtors have filed three "administrative" pleadings that seek (a) joint administration of the Debtors' Chapter 11 Cases for procedural purposes only, (b) to retain Prime Clerk LLC ("<u>Prime Clerk</u>") as claims and noticing agent, and (c) a permanent waiver of the requirement to file the Schedules and Statements (defined below).

Joint Administration

46.      The Debtors are requesting that their chapter 11 cases be jointly administered, for procedural purposes only. As set forth above, the Debtors in these proceedings are Holdings, Millennium, and RxAnte. Holdings is the parent of Millennium, which in turn is the parent of RxAnte.

---

[9]      Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

47.     I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration. Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the United States Trustee for the District of Delaware (the "U.S. Trustee") in supervising these cases. Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk"), the U.S. Trustee, and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates. Furthermore, I believe that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of the Chapter 11 Cases inasmuch as the relief sought is purely procedural and is not intended to affect substantive rights.

<u>Application to Appoint Prime Clerk as Claims and Noticing Agent</u>

48.     It is my understanding that the Debtors are applying (the "Section 156(c) Application") for entry of an order appointing Prime Clerk as Claims and Noticing Agent in these Chapter 11 Cases. The Debtors anticipate that there will be in excess of 11,000 entities to be noticed. In view of the number of anticipated claimants and complexity of the Debtors' businesses, I understand that such appointment is required by the rules of this Court.

49.     I am informed that Prime Clerk has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and in other districts. Additionally, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement

proposals from two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process. The Debtors submit, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

50.     As more fully detailed in the Section 156(c) Application, I understand that Prime Clerk will engage in certain claims administration and noticing services as necessary, including, but not limited to, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases. I am informed that the Section 156(c) Application pertains only to the work to be performed by Prime Clerk under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).[10]

51.     I believe that by appointing Prime Clerk as the Claims and Noticing Agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Accordingly, I believe that retention of Prime Clerk is in the best interests of the Debtors and their estates and creditors.

Schedules and Statements

52.     The Debtors are seeking (i) an extension of time by which the Debtors must file their schedule of assets and liabilities, schedule of current income and current expenditures, schedule of executory contracts and unexpired leases, and statement of financial affairs (the "Schedules and Statements") to forty-six (46) days after the current deadline imposed by Local Rule 1007-1(b), until seventy-six (76) days after the Petition Date and (ii) a permanent

---

[10]    The Debtors also intend to file an application to retain Prime Clerk as administrative advisor in these Chapter 11 Cases pursuant to Bankruptcy Code section 327.

waiver of the requirement to file the Schedules and Statements if the Plan is confirmed during the extension period, without prejudice to the Debtors' ability to request additional time should it become necessary.

53.     The request for a final waiver of the requirement to file the Schedules and Statements is appropriate in a prepackaged case. It is my understanding that, in general, a debtor is required to file the Schedules and Statements in order to permit parties in interest to understand and assess the Debtors' assets and liabilities and thereafter negotiate and confirm a plan of reorganization. In these chapter 11 cases, the Debtors have already negotiated the Plan and solicited votes from those parties impaired under the Plan and entitled to vote thereon. Pursuant to the Plan, General Unsecured Creditors are unimpaired and, as such, are not required to file proofs of claim. Accordingly, the primary justifications for requiring the filing of Schedules and Statements do not exist in this case. Requiring the Schedules and Statements to be filed other than as requested in this Motion would only impose an additional administrative burden on and expense to the Debtors' estate, without any corresponding benefit to parties in interest.

54.     In addition, much of the information that would be contained in the Schedules and Statements is already available in the Disclosure Statement. I believe that to require the Debtors to file the Schedules and Statements would be impracticable, duplicative, and unnecessarily burdensome to the Debtors' estates.

55.     The Debtors are also requesting that the Court, under section 341(e) of the Bankruptcy Code, order the Office of the U.S. Trustee not convene a meeting of creditors or equity security holders in these chapter 11 cases (a "Section 341 Meeting"). It is my understanding that the purpose of a Section 341 Meeting is to provide parties in interest with a

meaningful opportunity to examine the debtor and obtain important information about the debtor. In these cases, however, the Plan has been negotiated and voted on. Therefore, I believe that parties are not likely to receive any significant benefit from a Section 341 Meeting. In addition, the notice and scheduling requirements associated with convening such a meeting during these chapter 11 cases may cause an unwarranted delay in consummating the Plan.

56.    The Debtors filed these chapter 11 cases to implement and effectuate the Plan and, as described above, the Debtors solicited the requisite acceptances of the Plan prior to commencing these chapter 11 cases. The Debtors intend to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible. Accordingly, I believe that cause exists for the U.S. Trustee not to convene a Section 341 Meeting unless a Plan is not confirmed in these cases by January 25, 2016.

**B.**    **Payment of Critical Business Expenditures and Continued Business Operations of the Debtors**

Motion to Pay Prepetition Claims in the Ordinary Course of Business

57.    The Debtors are seeking authority, in their sole discretion, to pay allowed prepetition claims, that are in unimpaired classes under the Plan, of certain general unsecured creditors, priority creditors, and creditors whose claims may give rise to liens under certain state and federal laws (collectively, the "Ordinary Course Creditors")[11] in the ordinary course of business.[12]

---

[11]    Ordinary Course Creditors may include attorneys, accountants, and other ordinary course professionals retained in matters unrelated to the Chapter 11 Cases, who are not separately retained pursuant to applications under section 327 of the Bankruptcy Code or otherwise, and who are not categorized as Professionals under the Plan.

[12]    The Debtors have filed separate motions seeking authority to pay certain other prepetition claims. The relief requested in the Motion to Pay Prepetition Claims in the Ordinary Course of Business only seeks authority to pay prepetition claims that are unimpaired under the Plan and that are not authorized pursuant to a separate order of this Court.

58.     The Debtors are proposing that the Court authorize aggregate payments in an amount of up to $11 million (the "Estimate"), subject to the Debtors' right to request authority to make additional payments. The Estimate is based upon the Debtors' regular monthly accrued and outstanding accounts payable. Therefore, I believe that the Estimate represents a reasonable estimate of amounts that would be payable in the ordinary course in just over one month, representing the majority of the anticipated duration of these Chapter 11 Cases. Although the Estimate does not necessarily reflect the actual amount of outstanding prepetition claims as of the Petition Date, I believe that the Estimate is a reasonable proxy for such outstanding amount under the circumstances. I believe that the Estimate includes postpetition claims that may be paid as administrative expenses in the ordinary course of business, and that the actual amount of outstanding prepetition claims as of the Petition Date could be significantly less than the Estimate.

59.     I believe that allowing for a seamless transition into and through bankruptcy will preserve the value upon which the Plan is based. A fundamental aspect of the Debtors' ability to maximize value is to minimize disruption of their operations. The Debtors' ability to minimize disruption turns on their ability to maintain their many relationships with their trade vendors and with suppliers of goods and services that are necessary for the Debtors' DT, PGT, and predictive analytics business lines.

60.     I believe that if the Ordinary Course Creditors are not paid in a timely manner, some Ordinary Course Creditors will be reluctant to continue doing business with the Debtors, and some will decline to provide the Debtors with acceptable postpetition credit terms. In some cases, alternative providers may not be available. In any case, delays associated with finding substitute vendors could result in significant lost revenues, irreparably harm the Debtors'

operations, and threaten the Debtors' ability to successfully implement the restructuring described in the Disclosure Statement, which would result in a lower reorganization value.

61.     Furthermore, the Ordinary Course Creditors are to be paid in full under the terms of the Plan. Thus, granting the relief requested herein will affect only the timing of payment to holders of such claims, and I don't believe any prejudice should be suffered by any other parties in interest in these Chapter 11 Cases on account of the payment of such claims. Accordingly, I believe that the relief requested is reasonable and necessary, particularly under the circumstances of these Chapter 11 Cases, and that it is in the best interests of the Debtors' estates to pay these creditors and avoid the risk of business disruption.

Motion to Continue Cash Management System

62.     <u>Cash Management</u>. The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a cash management system, comprised of 14 bank accounts (collectively, the "<u>Bank Accounts</u>") held with two banks and one financial institution (collectively, the "<u>Banks</u>"), one of which is an authorized depository in the District of Delaware, and all of which are financially stable banking or financial institutions. I also understand that all of the Bank Accounts are insured by the FDIC (or, in the case of the Investment Account (defined below), the SIPC) up to any applicable limits. The Debtors' personnel located at the Debtors' headquarters in San Diego, California oversee all cash receipt and disbursement activity in the Cash Management System. The Debtors routinely deposit, withdraw and otherwise transfer money to, from and between the Bank Accounts by various methods. I believe that the Cash Management System is essential to enable the Debtors to monitor the collection and disbursement of funds, ensure cash availability and liquidity, and

reduce administrative expenses by facilitating the movement of funds, as well as cash forecasting and reporting.

63.    Receipts. The Debtors' cash receipts derive primarily from the provision of drug and pharmacogenetic testing and flow directly to a lockbox in a depository account maintained by Millennium at Bank of America (the "Receipts Account"). The Receipts Account is manually swept twice per week into an interest-bearing reserve account that is also maintained by Millennium at Bank of America (the "Reserve Account"). The Debtors' cash receipts reside in the Reserve Account until cash is needed, upon which cash is transferred from the Reserve Account into the Debtors' primary operating account maintained by Millennium at Opus Bank (the "Primary Operating Account").

64.    The Debtors also receive cash receipts as a result of the predictive analytics services provided by Millennium's subsidiary RxAnte. Cash generated by RxAnte flows directly to a checking account maintained by RxAnte at Bank of America (the "RxAnte Operating Account").[13]

65.    Disbursements. The Primary Operating Account is used to disburse funds to pay a substantial portion of the general corporate expenses of Millennium, which is the entity through which most of the Debtors' operations are conducted. Millennium also maintains various bank accounts in addition to the Primary Operating Account in order to make specific disbursements, including for payroll, payroll-related benefits, and customer refunds. In order to administer payroll, funds from the Primary Operating Account are transferred to a checking

---

[13]    RxAnte's business has historically not generated sufficient revenues to cover costs. Millennium therefore funds the RxAnte Operating Account with transfers from the Reserve Account approximately once per month (or less) to the extent that RxAnte's expenses exceed its available cash.

account maintained by Millennium at Opus Bank solely for payroll-related payments (the "Payroll Account"). From the Payroll Account, Millennium disburses funds every two weeks to ADP for third-party payroll services and taxes. Additional miscellaneous payroll-related items are paid out of the Payroll Account almost daily. Transfers from the Primary Operating Account are also made to Concur Technologies, Inc., which provides an online automated system to process reimbursements of business expenses for Millennium's employees. Further, the Primary Operating Account is used to fund an account that Millennium maintains at Opus Bank designated to administer payroll-related benefits (the "Benefits Account"). Millennium disburses funds out of the Benefits Account to, among other recipients, (i) HealthEquity, which administers the health savings and flexible spending accounts that the Debtors make available to their employees, (ii) Bank of Montreal, which funds Millennium's 401(k) program for the Debtors' employees, (iii) MetLife, through which the Debtors offer a dental plan to their employees, (iv) VSP Vision Care, through which the Debtors offer a vision plan to their employees, and (v) Conexus, which administers the flexible savings account that the Debtors offer to their employees to pay for qualified child care or other caregivers. In addition, Millennium maintains a checking account at Opus Bank in order to pay customer refunds that arise in connection with Millennium's customer billing processes (the "Refund Account"). Specifically, Millennium conducts its billing activity via software billing solutions platform provided by Xifin, Inc. ("Xifin"). At times, customer overpayments are refunded through Xifin. In order to complete customer refunds, Millennium transfers necessary funds from the Primary Operating Account to the Refund Account on a weekly basis. Millennium thereafter pays such refunds directly out of the Refund Account.

66.     In addition, RxAnte maintains its own bank accounts in order to make necessary payments in connection with its operations. With respect to RxAnte, general corporate expenses incurred by RxAnte are paid directly out of the RxAnte Operating Account. In order to administer payroll for RxAnte employees, funds from the RxAnte Operating Account are transferred to a checking account maintained by RxAnte at Bank of America solely for payroll-related payments (the "RxAnte Payroll Account"). From the RxAnte Payroll Account, RxAnte disburses funds every two weeks to ADP for third-party payroll services and taxes.

67.     Finally, Holdings maintains one operating account at Opus Bank (the "Holdings Account"). Cash is transferred from the Primary Operating Account to the Holdings Account on an as-needed basis in order for Holdings to pay certain corporate expenses such as legal and vendor expenses and also to pay periodic tax distributions to Holdings' members. Holdings does not have any employees and therefore the Holdings Account is not needed to administer payroll or pay for any employee benefits.

68.     Additional Accounts. In addition to the accounts described above, Millennium maintains two accounts at Opus Bank, two accounts at Bank of America, and one account at Charles Schwab (collectively, the "Additional Accounts"). The Additional Accounts were generally opened for discrete purposes and are now substantially inactive. The Additional Accounts that are maintained at Opus Bank are a reserve checking account and a secondary checking account both of which have minimal activity. The Additional Accounts that are maintained at Bank of America are an escrow account that was opened in connection with Millennium's acquisition of RxAnte in 2013 (the "Escrow Account") and a checking account that was opened when the Xifin billing solutions software was introduced in 2011 (the "Xifin Account"). Funds from the Escrow Account are distributed by notice from Millennium pursuant

to a distribution schedule. Millennium expects that the Escrow Account will be closed following

a final funding to take place on December 23, 2015. The Xifin Account has been inactive since it

was opened in 2011. The Additional Account that is maintained at Charles Schwab is an

investment account currently holding approximately $751,000 in money market funds (the

"Investment Account"). Other than investing the funds contained therein, the Investment

Account is inactive and is not subject to inflows or outflows.

        69.    Intercompany Transactions. As discussed above, in the ordinary course of

business Millennium transfers money from the Primary Operating Account or the Reserve

Account to bank accounts held by Holdings and RxAnte (the "Intercompany Transactions"). The

Debtors record any transfers of funds among their accounts pursuant to an automated system,

and such transfers are reflected on Millennium's trial balance. Although the Intercompany

Transactions involve the transfer of funds among bank accounts owned by the various Debtors,

because the Debtors operate on a consolidated basis and each of the Debtors is a disregarded

entity for tax purposes, the Debtors maintain their books and records on a consolidated basis.

The Debtors rely on the Intercompany Transactions to fund and engage in their day-to-day

operations. Accordingly, I strongly believe that absent the continuation of such Intercompany

Transactions, the Debtors' ability to operate their primary business during the Chapter 11 Cases

would be severely prejudiced, and their ability to maximize value for creditors would be

drastically reduced. Avoiding such potentially crippling hindrances by continuing the

Intercompany Transactions is, therefore, in the best interests of the estates.

        70.    Business Forms. In the ordinary course of business, the Debtors use a

number of checks, business letterhead, purchase orders, invoices, envelopes, promotional

materials and other business forms and correspondence (collectively, the "Business Forms").

Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

71.     <u>Waiver of Investment and Deposit Requirements</u>. I am advised by counsel that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions. I believe that the Debtors' cash investment practices substantially conform with the approved investment and deposit practices identified in section 345 of the Bankruptcy Code, and that all money deposits are safe, prudent, yield, under the circumstances, the maximum reasonable net return on such money, and satisfy the goal of protecting principal. Nonetheless, to the extent that such deposits do not strictly comply with the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived so as to allow the Company's Banks to accept and hold such funds in accordance with the Debtors' prepetition practices. In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

72.     It is my understanding that requiring the Debtors to alter their Cash Management System would impair the Debtors' efforts to maximize the value of their estates and disrupt their efforts to reorganize. Consequently, I believe that maintenance of the Cash Management System and the Debtors' other business and banking practices, as requested in certain of the First Day Pleadings, during the duration of the Chapter 11 Cases, is in the best interest of all creditors and other parties in interest.

Payment of Employee and Payroll Obligations and Certain Taxes

73.    As of the Petition Date, the Debtors employed approximately 1,199 Employees. Of these, 567 are salaried Employees and 632 are hourly Employees.[14] Of the salaried Employees, approximately 350 are salespersons who receive commissions as a material portion of their compensation. The Employees provide a variety of essential functions, including: sales and marketing, lab services, research and development, and general and administrative (including executive, finance, legal, human resources, corporate communications, information technology and other operations matters). Their skills and understanding of the Debtors' operations, infrastructure and customer base are essential to the effective operation of the Debtors' businesses. Retaining the Employees is critical to the Debtors' ability to operate and maximize value in these Chapter 11 Cases.

74.    Wages, Salaries and Commissions. In the ordinary course of business, the Debtors pay all of their Employees on a bi-weekly basis, every other Friday, one week in arrears. For the month of August 2015, the Debtors' monthly payroll obligation (excluding any amounts paid in connection with the Debtors' commissions, bonus, and retention programs) was approximately $10,550,000, including payroll taxes and processing fees. On September 25, 2015, the Debtors made their most recent company-wide payroll for the 14 day period ending September 20, 2015. On September 29, 2015, the Debtors made their most recent commission payment for the month ending August 31, 2015. In addition, the Debtors made a special payroll payment on September 30, 2015 in order to pay approximately 90 commission-based Employees for commissions earned during the month of September 2015. On September 29, 2015, the

---

[14]    In addition, as of the Petition Date, the Debtors utilized the services of approximately 510 temporary employees and two direct hire independent contractors, which are discussed more fully herein.

Debtors made their most recent quarterly option payment for the quarter ending September 30, 2015. These amounts were disbursed by ADP to Employees through electronic funds transfer and checks. As such, I believe that, other than amounts sought to be paid pursuant to the Final Order, no Employee has a claim for payment against the Debtors in excess of the $12,475 Priority Cap set forth in section 507(a)(4) of the Bankruptcy Code on account of Prepetition Employee Obligations.[15]

75.     Commissions. Approximately 350 of the Debtors' field-based sales Employees receive commissions as a material portion of their compensation. Commissions are paid on a monthly basis one month in arrears under the Debtors' commission compensation plan ("Commission Plan"), meaning that commissions attributable to work performed in the current month are paid at the end of the following month. Amounts payable to Employees under the Commission Plan depend upon the Employees' performance, with various incentive components under the Commission Plan being designed to reward eligible Employees for business growth in their respective territories and to align such Employees' interests with the operational goals and objectives of the Debtors.[16] I believe that the Commissions paid under the Commission Plan are an integral part of the aggregate compensation package for eligible Employees and provide substantial value to the Debtors' estates because they encourage such Employees to achieve important performance goals. Furthermore, I believe that the Commission Plan is critical to

---

[15]   In the ordinary course of business the Debtors also pay referral bonuses (the "Referral Bonuses") to Employees who recommend candidates for hire. As of the Petition Date, the Debtors owed Referral Bonuses to five Employees in a total amount of approximately $5,000. The Debtors are seeking authority, but not direction, pursuant to pay the Referral Bonuses in the ordinary course of business.

[16]   Commissions are subject to downward adjustment under certain circumstances, including if commission-eligible Employees do not identify payors within two months of processing specimens, or, if payors are identified, such payors have been identified by the Debtors as non-paying plans.

maintaining the morale and productivity of the Debtors' sales force and to maximizing the value of the Debtors' estates.

76.     Other Employee Compensation: Paid Time Off and Expense Reimbursement. The Debtors also offer their Employees other forms of compensation, including paid time off and reimbursement of certain business expenses. The Debtors' Employees are eligible to receive paid time off (the "Paid Time Off"). Paid time off for vacation and paid sick leave are available to regular, full-time employees. As of August 31, 2015, the Debtors estimate that the value of accrued and unused or unpaid vacation time equals approximately $3.5 million. Additionally, in the ordinary course of business, the Debtors routinely reimburse Employees for certain approved, reasonable expenses incurred within the scope of their employment, including expenses for travel, lodging, long-distance calls, ground transportation, meals, supplies, miscellaneous business expenses and relocation expenses (collectively, the "Reimbursable Expenses"). Accordingly, the Reimbursable Expenses are incurred by Employees with the understanding that they will be reimbursed by the Debtors. The Debtors' ability to pay the Reimbursable Expenses has a significant effect on the Debtors' sales force, which is the life blood of the Debtors' business. Specifically, the sales force is on the road incurring expenses in order to increase specimen volume, the Debtors' primary source of revenue, and, thus, I believe that payment of the Reimbursable Expenses is important to the morale of the Debtors' workforce, which, in turn, is critical to maximizing the value of the estates. The Reimbursable Expenses represent a relatively minimal cost to the Debtors' estates in light of the overall benefits achieved. The average aggregate monthly amount expended by the Debtors for Reimbursable Expenses is approximately $800,000, which is primarily related to expenses incurred by Employees in sales-related functions. I believe that requiring Employees to personally bear the

cost of any approved, business-related expenses incurred in furtherance of their responsibilities to the Debtors would significantly impair Employee morale.

77.    These forms of compensation are usual and customary and necessary if the Debtors are to retain qualified Employees to maximize the value of the Debtors' business. Accordingly, the Debtors request authority, but not direction, to honor outstanding prepetition obligations with respect to the paid time off and expense reimbursement policies during and after the Interim Period in the ordinary course of business, and subject to the Debtors' discretion and applicable restrictions under the Debtors' policies.

78.    <u>Other Prepetition Employee Obligations: Temporary Employees and Independent Contractors</u>. The Debtors supplement their work force by utilizing the services of temporary employees (the "<u>Temporary Employees</u>") and independent contractors (the "<u>Independent Contractors</u>"). As of the Petition Date, approximately 510 Temporary Employees and two Independent Contractors were utilized by the Debtors. Temporary Employees may work outside of the Debtors' facilities in lab services positions with the Debtors' customers or at the Debtors' primary facilities. The Temporary Employees are employed through approximately nine third-party agencies whom the Debtors directly pay for the Temporary Employee services. As of the Petition Date, the Debtors estimate that approximately $490,000 is accrued with respect to the Temporary Employees. The Independent Contractors provide business technology services at the Debtors' primary facilities. As of the Petition Date, no amounts are accrued with respect to the Independent Contractors.

79.    I believe that failure to pay amounts due to Temporary Employees and Independent Contractors may jeopardize the Debtors' ability to maintain their services on a postpetition basis, which would be severely detrimental to the Debtors' business. Therefore, the

Debtors request authority, but not direction, to continue utilizing the services of the Temporary Employees (through the staffing agencies) and the Independent Contractors in the ordinary course of business and to pay any prepetition amounts with respect thereto.

80.    Medical and Insurance Benefit Plans. In the ordinary course of business, the Debtors have established various standard and customary plans and policies to provide their Employees with (a) health benefits, including medical, prescription drug, dental and vision benefits (collectively, the "Health Insurance Benefits"), and (b) insurance benefits, including short and long-term disability, life insurance and accidental death and dismemberment insurance (together with the Health Insurance Benefits, the "Medical and Insurance Benefits").

81.    The Debtors offer two fully-insured medical plans that are administered by Blue Shield of California ("Blue Shield"): a high-deductible PPO and a traditional PPO. With respect to the medical plans, the Debtors pay an average of approximately $800,000 per month to Blue Shield for premiums and administration fees. The Debtors also offer a dental plan administered by MetLife, Inc. ("MetLife"), under which the Debtors pay an average of approximately $110,000 per month to MetLife for premiums and administration fees. Further, the Debtors offer a vision plan administered by VSP Vision Care ("Vision"), under which the Debtors pay an average of approximately $15,000 per month to VSP for premiums and administration fees. I believe that each of these plans is important to the maintenance of Employee welfare and morale and is therefore critical to the uninterrupted operation of the Debtors' business.

82.    The Debtors also provide or offer salaried and hourly Employees life and accident insurance (the "Life and AD&D Plan") and long-term disability insurance (the "LTD Plan"). Insurance under the Debtors' Life and AD&D Plan and LTD Plan is provided by CIGNA.

34

On average, the Debtors pay approximately $15,000 per month under the Life and AD&D Plan

and the LTD Plan. As of the Petition Date, the Debtors believe that no amounts are due with

respect to the Life and AD&D Plan and the LTD Plan. Like the Health Insurance Benefits, these

plans are critical to maintaining Employee morale.

83.     <u>Optional Insurance Benefits</u>. The Debtors also make available to

Employees, at the Employees' expense, certain additional insurance coverage. As of the Petition

Date, such optional coverage includes short-term disability insurance, specific accident

insurance, cancer and critical illness insurance, and term, universal and whole life insurance

plans (the "<u>Optional Plans</u>"). The Optional Plans, for which insurance is provided by Colonial

Life, are fully funded by Employees.

84.     <u>Other Benefit Plans and Programs</u>. <u>Savings Plan</u>. The Debtors also

maintain 401(k) Savings Plan for Employees (the "<u>Savings Plan</u>") administered by BMO

Retirement Services ("<u>BMO</u>"). The Savings Plan offers the options of contributing on a pre-tax

basis to a Traditional 401(k) or on a post-tax basis to a Roth 401(k). Eligible Employees may

elect to contribute up to the annual IRS dollar limit (which varies annually) to the Savings Plan,

and the Debtors match 100% of each Employee's contributions up to a maximum of 2% of such

Employee's annual compensation. For the year ended December 31, 2014, the Debtors'

contribution to the Savings Plan amounted to approximately $1,283,607. The Debtors pay an

annual service fee of $50,165.40 in $12,541.35 installments to BMO. The Debtors also pay an

annual fee of $25,000 in quarterly installments to Retirement Benefits Group, who the Debtors

have retained to advise Employees in connection with their individual decisions with respect to

the Savings Plan. The Debtors believe that no amounts are currently due on account of Employee

contributions, matching contributions, servicing or audit fees. I believe that the Debtors

performance of their obligations under the Savings Plan, including providing the prepetition

matching contributions, is essential to maintaining Employee morale.

85.     In the ordinary course of business, the Debtors also offer Employees that

have completed one full year of service the opportunity to participate in a profit sharing plan (the

"Profit Sharing Plan") pursuant to which Employees that meet certain eligibility requirements

may receive a payment into their 401(k) Savings Plan accounts of up to 3% of their annual

compensation up to $260,000 if the Debtors reach certain profitability thresholds. Employees'

participation in the Profit Sharing Plan is subject to a vesting schedule that fully vests upon

completion of three full years of employment. For the year ended December 31, 2014, the

Debtors' contribution to the Profit Sharing Plan amounted to approximately $2,386,952. The

Debtors believe that no amounts are currently due on account of the Profit Sharing Plan. I

believe that the Debtors' performance of their obligations under the Profit Sharing Plan is

essential to maintaining Employee morale.

86.     The Debtors provide a tuition reimbursement benefit to Employees (the

"Tuition Reimbursement Program"). Eligible Employees[17] may be reimbursed for tuition in

approved coursework, up to a maximum of $5,000 per Employee per year for undergraduate

level or graduate level coursework[18] that is job or career-related. As of the Petition Date, 30

Employees are participating in the Tuition Reimbursement Program. The Debtors are seeking

minimal relief in order to maintain a benefit that is customarily offered in the industry.

87.     The Debtors also offer a flexible savings account (the "Care FSA") to their

Employees related to dependent care. The Care FSA is used to pay for qualified child care or a

---

[17]  Eligible Employees must be scheduled to work at least 30 hours per week, be employed for at least three
      months prior to course start, and must be meeting performance expectations for their role at the Debtors.

[18]  Reimbursable expenses include tuition and related fees (such as registration fees, books and lab fees).

caregiver for a disabled family member. Conexus administers the Care FSA on behalf of the Debtors and charges the Debtors a monthly fee of approximately $200. The Debtors fund the Care FSA through an elective withholding from employees' paychecks once per month in an approximate total amount of $15,000. If eligible expenses deplete the monthly amount then additional transfers are made to cover the difference.

88.    I believe the Debtors' ability to maximize value depends, in large part, upon the motivation of the Employees. Most of the Debtors' Employees (and their families) are dependent upon the wages, salaries, commissions, reimbursements and other benefits they receive from the Debtors. Any disruption from Employee resignations or lack of morale could have devastating effects on the Debtors' restructuring efforts. Accordingly, it is critical that the Debtors be authorized to honor their Prepetition Employee Obligations during and after the Interim Period, subject to the limitations described in the motion.

<u>Insurance</u>

89.    The Debtors maintain various insurance policies providing coverage for, among other things, workers' compensation liability, directors and officers liability, and general/professional liability (collectively, the "<u>Insurance Policies</u>"). The Insurance Policies generally require: (a) payment of the entire premium upfront and at inception; (b) payment of the premium in quarterly installments; or (c) payment of the premium in monthly installments pursuant to a premium financing agreement ("<u>PFA</u>").

90.    I believe that the Insurance Policies are essential to the preservation of the value of the Debtors' business, property and assets. Not only are some of the Insurance Policies required by various regulations, laws and contracts that govern the Debtors' commercial activities, I understand that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for

mandatory conversion or dismissal of a chapter 11 case. Moreover, I have been advised by counsel that the Operating and Reporting Guidelines Issued for Debtors in Possession and Trustees by the U.S. Trustee require the Debtors to maintain insurance coverage throughout the pendency of the Chapter 11 Cases.

91.    If the Debtors are unable to make any outstanding payments that may be owed on account of the Insurance Policies, it is my understanding that the unpaid Insurance Providers may seek relief from the automatic stay to terminate such Insurance Policies, and First Insurance, with whom the Debtors have an outstanding PFA, may terminate the financed policies to recoup their losses. The Debtors would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates. If the Debtors were required to obtain replacement insurance, this payment likely would be greater than what the Debtors currently pay. Even if these Insurance Providers were not permitted to terminate the agreements, it is my opinion that any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

92.    In light of the importance of maintaining insurance coverage with respect to their business activities, I believe it is in the best interest of the Debtors' estates to receive Court approval to honor the Debtors obligations under the Insurance Policies and, as necessary, renew or enter into new such agreements.

<u>Taxes</u>

93.    The Debtors, in the ordinary course of their business, incur various tax liabilities, including sales and use taxes; franchise taxes; property taxes; gross receipts and business and occupation taxes; regulatory and licensing fees; business license fees; annual report taxes and other taxes and fees; and all other similar obligations (the "<u>Taxes</u>"), and have generally paid such tax liabilities as they become due. The Debtors' books and records reflect that, to the

Debtors' knowledge, they are substantially current on all Taxes, not otherwise subject to dispute, which were due and payable prior to the Petition Date. If applicable, however, the Taxing Authorities will continue to invoice the Debtors for Taxes relating to periods prior to the Petition Date following the commencement of the Chapter 11 Cases.

94.     The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting the Debtors' prospects for a successful restructuring. If such obligations are not timely paid, the Debtors will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including (a) whether the obligations are priority, secured or unsecured in nature, (b) whether they are proratable or fully prepetition or postpetition obligations, and (c) whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis, and if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured or unsecured in nature. The Debtors desire to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes.

95.     I believe that the Debtors may suffer clear and irreparable harm if the prepetition Taxes are not paid when they become due and payable. Additionally, the Taxing Authorities may cause the Debtors to be audited if Taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from their efforts to maximize value. If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other remedies that will harm the estates. In all cases, I believe that the Debtors' failure to pay Taxes could have a

material adverse impact on their ability to operate in the ordinary course of business. Any

disputes that could impact the Debtors' ability to conduct business in a particular jurisdiction

could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

96.     Moreover, I understand that the federal government and many states in

which the Debtors operate have laws providing that the Debtors' officers, directors or other

responsible employees could, under certain circumstances, be held personally liable for the

payment of certain Taxes. To the extent any accrued Taxes of the Debtors were unpaid as of the

Petition Date in these jurisdictions, the Debtors' officers and directors could be subject to

lawsuits during the pendency of the Chapter 11 Cases. In such event, I believe that collection

efforts by the Taxing Authorities would be extremely distracting for the Debtors and their

directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

## Utilities

97.     In connection with the normal operations of their business and the

management of their property, the Debtors obtain electric, gas, water, sewer, telecommunications

and other similar services (collectively, the "Utility Services") from various utility companies

(the "Utility Companies"). The Debtors have filed a motion requesting that the Court approve the

Debtors' proposed form of adequate assurance of payment for postpetition services (the

"Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy

Code section 366, approving procedures for resolving any objections by the Utility Companies

relating to the Proposed Adequate Assurance, and prohibiting the Utility Companies from

altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

98.     Many of the Utility Services provided to the Debtors by the Utility

Companies are critical to the conduct of the Debtors' business, including their ability to offer DT,

PGT, and predictive analytic solutions, the Debtors' primary source of revenue. I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to operate their businesses. Accordingly, in my opinion, preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to preserving and maximizing the value of the estates. I also believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

**C.    Cash Collateral**

99.    While the Debtors' cash on hand is sufficient to administer the Chapter 11 Cases, much of the Debtors' cash constitutes Cash Collateral of the secured parties under the Early Commitment Credit Facility and the 2014 Credit Facility. The Debtors must have access to this Cash Collateral in order to maintain sufficient liquidity during the chapter 11 process. I understand from counsel that section 363 of the Bankruptcy Code forbids the use of Cash Collateral absent the consent of the affected prepetition secured parties or prior authorization from the bankruptcy court. I further understand that a prepetition secured party may condition the use of cash collateral on the debtor's provision of "adequate protection" on account of any diminution in value of such collateral after the petition date.

100.    Under the RSA, the Consenting Lenders have consented to the Debtors' use of Cash Collateral on reasonable terms and conditions, including a customary adequate protection. As adequate protection, the Debtors propose to grant the Prepetition Credit Parties, priming adequate protection on substantially all of the assets of the Debtors' estates; superpriority

administrative expense claims; current cash payments of interest, fees, and expenses under the Prepetition Credit Facilities; payment of the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases of the Prepetition Agents and the Ad Hoc Group; and certain information reporting. The Prepetition Credit Parties have also conditioned the use of Cash Collateral on certain other terms, including various termination events, prospective relief from the stay upon the occurrence of any such termination event, and waiver of the Debtors' right to "surcharge" collateral, among others. I believe the proposed terms and conditions reflected in the proposed order authorizing the Debtors' use of Cash Collateral are reasonable and that the use of Cash Collateral on such terms is in the Debtors' best interests.

101.     The RSA also requires that the Debtors file a motion on the Petition Date to grant MLH and TA an allowed Subrogation Claim and a superpriority lien to secure the same. As discussed above, MLH and TA have guaranteed the Debtors' payment of the initial $50 million deposit and, under the RSA, are entitled to a Subrogation Claim for the full amount actually paid under such guarantee. The RSA provides (a) that the Subrogation Claim will be an allowed claim in the Chapter 11 Cases; (b) that the Consenting Lenders under the RSA will severally and not jointly assign  to MLH and TA a portion of any cash distribution the Consenting Lenders receive from the Debtors' estates equal to 50% of any amounts paid by MLH and TA under the Guarantee Agreement, not to exceed $25 million in the aggregate; and (c) that the Subrogation Claim will be secured by a superpriority lien on the proceeds of any avoidance action recoveries from the United States, up to the lesser of $25 million or 50% of the Subrogation Claim. The Subrogation Claims and related superpriority lien are integral components of the compromises embodied in the RSA. I do not believe that the United States would have accepted the $50 million deposit absent the guarantee provided by MLH and TA;

and I likewise do not believe that MLH and TA would have provided that guarantee without the

Debtors' agreement concerning the Subrogation Claim and superpriority lien. I therefore believe

that prompt approval of both is in the best interests of the Debtors and their stakeholders.

**D.       Plan-Related Relief Sought In Solicitation Motion**

<u>Combined Hearing</u>

102.    As set forth above, the Debtors solicited votes on the Plan prior to

commencing these cases, and have received overwhelming support for the Plan. Accordingly, the

Debtors are requesting a combined hearing for approval of the Disclosure Statement and

confirmation of the Plan, to be set on or about December 11, 31 days after the Petition Date, as

well as deadlines associated with the requested combined hearing. I believe that such a combined

hearing in these chapter 11 cases will minimize business disruption, reduce administrative costs,

enhance outcome certainty, ensure prompt distributions to creditors, and generally promote an

efficient and value-maximizing restructuring. As noted above, the sole voting class voted

overwhelmingly to accept the Plan; the Plan was accepted by approximately 93.25% in amount

of all Existing Credit Agreement Claims. Because the Debtors are proposing a fully negotiated

chapter 11 Plan that has already been accepted by the sole voting class, the delay associated with

separate disclosure statement and confirmation hearings would produce no offsetting benefit.

103.    I understand from counsel that the Bankruptcy Rules 2002(b) and 3017(a)

and Local Rule 3017-1(a) require that the Debtors give 28 days' notice of a disclosure statement

or plan confirmation and that Local Rule 3017-1(a) requires that the hearing on the adequacy of

the disclosure statement occur at least 35 days following service of the disclosure statement.

104.    I believe cause exists to shorten the applicable notice periods to permit a

Combined Hearing on or about December 11. The proposed Combined Hearing date will permit

prompt consummation of the Plan, minimizing the disruption to the Debtors' business and

avoiding the costs associated with more protracted chapter 11 proceedings. An early December Combined Hearing would also permit entry of the Confirmation Order by December 15, 2015, as required by the RSA. At the same time, the proposed schedule affords interested parties ample notice of the confirmation proceedings. As noted above, holders of claims in the sole impaired class received a copy of the Plan and Disclosure Statement in advance of the Petition Date. All other parties in interest—who are not entitled to vote on the Plan—will receive notice of their treatment in these chapter 11 cases and will be provided an opportunity to obtain a copy of the Plan and Disclosure Statement with sufficient time to evaluate them well before the proposed Combined Hearing.

<u>Assumption of RSA and USA Settlement Agreements</u>

105.    The USA Settlement Agreements and the RSA are critical to the Debtors' restructuring efforts. Termination of any of them would place the Debtors' prospects for a successful restructuring in considerable doubt.

106.    In particular, the USA Settlement Agreements conclusively resolve claims asserted by the USA and Plaintiff States, and permit the Debtors' continued participation in the Medicare and other federal health programs. As noted above, Medicare reimbursement is the Debtors' largest single source of revenue by a considerable margin. Termination of the Debtors' Medicare billing privileges would cause a precipitous loss of revenue and would likely destroy Debtors' business. For these reasons, I believe that it is essential that the Debtors assume and honor their obligations under the USA Settlement Agreements. Moreover, the USA Settlement Agreements are integral to the restructuring transactions as a whole, as the Plan contemplates that MLH and TA will severally contribute the amount necessary to satisfy the remaining monetary obligations under the USA Settlement Agreements in exchange for, among other

things, full and complete releases. In that scenario, the USA could seek to terminate the Debtors' Medicare billing privileges, which could be fatal to the Debtors' business.

107.    The RSA was intensively negotiated among the Debtors, the Prepetition Lenders, and the Members at arms' length over a period of several months and provides the framework for an expeditious and value-enhancing restructuring and binds the Debtors' key stakeholders to support that restructuring. Again, as required by the RSA, sufficient holders of Existing Credit Agreement Claims have voted to accept the plan, thus positioning the Debtors for prompt consummation of a consensual Plan. Absent timely consummation of a Plan consistent with the RSA, the Debtors would have no practical means to satisfy their monetary obligations under the USA Settlement Agreements, which could result in termination of the Debtors' Medicare billing privileges. As stated above, I believe termination of Medicare billing privileges could be fatal to the Debtors' business. I believe that the RSA represents the Debtors' the best opportunity to successfully restructure and maximize the value of their estates.

108.    Additionally, assumption of the RSA and USA Settlement Agreements is required under the RSA. Accordingly, I believe that prompt assumption of all such agreements is in the best interests of stakeholders.

Dated: San Diego, California
            November 10, 2015

By:      */s/ William Brock Hardaway*_____
            Name: William Brock Hardaway

## **Exhibit 1**

# MILLENNIUM HEALTH
## ORGANIZATION CHART
## DECEMBER 1, 2014



4715819.1