IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :   Chapter 11
                                            :
MILLENNIUM LAB HOLDINGS II, LLC, et al.,    :   Case No. 15-12284 (____)
                                            :
          Debtors.[1]                       :   Joint Administration Pending
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PREPACKAGED JOINT PLAN OF REORGANIZATION
## OF MILLENNIUM LAB HOLDINGS II, LLC, et al.

Dated:  October 29, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
T: (302) 651-3000
F: (302) 651-3001

– and –

Kenneth S. Ziman (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
T: (212) 735-3000
F: (212) 735-2000

– and –

Felicia Gerber Perlman (*pro hac vice admission pending*)
Matthew Kriegel (*pro hac vice admission pending*)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors and Debtors in Possession*

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219).  The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

ARTICLE I RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS.................................................1
      A.     Rules of Interpretation, Computation of Time and Governing Law..................1
      B.     Definitions.........................................................................................................2

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .......................................................19
      A.     Administrative Claims ......................................................................................19
      B.     Priority Tax Claims...........................................................................................20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED
        CLAIMS AND EQUITY INTERESTS.............................................................21
      A.     Introduction......................................................................................................21
      B.     Summary of Classification and Treatment of Classified Claims and
            Equity Interests ................................................................................................21
      C.     Classification and Treatment of Claims and Equity Interests.........................21
      D.     Special Provision Governing Unimpaired Claims ...........................................27
      E.     Discharge of Claims.........................................................................................27
      F.     Alternative Treatment ......................................................................................27

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ............................................27
      A.     Presumed Acceptance of Plan..........................................................................27
      B.     Deemed Rejection of Plan ................................................................................28
      C.     Voting Classes ..................................................................................................28
      D.     Acceptance by Impaired Classes of Claims.....................................................28
      E.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ...............28

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................28
      A.     General Settlement of Claims ..........................................................................28
      B.     Corporate Existence ..........................................................................................29
      C.     Vesting of Assets in the Reorganized Debtors .................................................30
      D.     New Term Loan; Sources of Consideration for Plan Distributions .................30
      E.     New Holdco Common Stock Issued Under the Plan ........................................31
      F.     Millennium Corporate Claim Trust .................................................................31
      G.     Millennium Lender Claim Trust ......................................................................33
      H.     Issuance of New Securities and Related Documentation .................................34
      I.     Release of Liens, Claims and Equity Interests.................................................35
      J.     Reservation of Certain Claims of Governmental Units ....................................35
      K.     New Holdco and Reorganized Debtors Organizational Documents.................36
      L.     Directors and Officers of Reorganized Debtors...............................................36
      M.    Restructuring Transactions ...............................................................................37
      N.     Corporate Action...............................................................................................37

O.    Cancellation of Notes, Certificates and Instruments.......................................38
P.    Preservation and Maintenance of Debtor Causes of Action .......................38
Q.    Exemption from Certain Transfer Taxes .....................................................39
R.    Certain Tax Matters ....................................................................................40
S.    Further Transactions ...................................................................................42

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES .........................................................................42
A.    Assumed Contracts and Leases....................................................................42
B.    Assignment of Executory Contracts or Unexpired Leases ............................43
C.    Rejection of Executory Contracts or Unexpired Leases ...............................44
D.    Cure of Defaults for Assumed Executory Contracts and Unexpired
    Leases..........................................................................................................44
E.    Assumption of Officer Insurance Policies ...................................................44
F.    Indemnification Provisions ..........................................................................45
G.    Compensation and Benefit Programs............................................................45
H.    Workers' Compensation Benefits.................................................................46
I.    Third Party Payer Contracts.........................................................................46
J.    Medicare and Medicaid Agreements ...........................................................46

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS...............................47
A.    Distribution Record Date .............................................................................47
B.    Dates of Distributions ..................................................................................47
C.    Distribution Agent .......................................................................................47
D.    Cash Distributions........................................................................................48
E.    Rounding of Payments .................................................................................48
F.    Distributions on Account of Allowed Claims................................................48
G.    General Distribution Procedures...................................................................49
H.    Address for Delivery of Distributions...........................................................49
I.    Undeliverable Distributions and Unclaimed Distributions............................49
J.    Withholding Taxes.......................................................................................49
K.    Setoffs .........................................................................................................50
L.    Surrender of Cancelled Instruments or Securities .........................................50
M.    Lost, Stolen, Mutilated or Destroyed Securities ...........................................50

ARTICLE VIII CONDITIONS PRECEDENT TO THE PLAN'S
    CONFIRMATION AND EFFECTIVE DATE ...............................................51
A.    Conditions to Confirmation .........................................................................51
B.    Conditions to Effective Date........................................................................51
C.    Conditions to the Equity Transfer Date .......................................................52
D.    Waiver of Conditions...................................................................................53
E.    Effect of Non Occurrence of Conditions to the Effective Date .....................53

ARTICLE IX RETENTION OF JURISDICTION.................................................................53
A.    Retention of Jurisdiction ..............................................................................53
B.    Lack of Bankruptcy Court Jurisdiction.........................................................55
C.    Failure of Bankruptcy Court to Exercise Jurisdiction....................................55

ARTICLE X EFFECTS OF CONFIRMATION ..................................................................55
    A.      Binding Effect................................................................................55
    B.      Subordination Rights ......................................................................56
    C.      Discharge of the Debtors ................................................................56
    D.      Exculpation and Limitation of Liability ........................................56
    E.      Releases by Debtor .........................................................................57
    F.      Releases by TA and MLH................................................................58
    G.      Releases by Lender Releasing Parties..............................................59
    H.      Releases by Third Party Releasing Parties......................................60
    I.      Waiver of Limitations on Releases of Unknown Claims..................61
    J.      Bar Order ......................................................................................61
    K.      Injunction .....................................................................................62
    L.      Retained Claims ............................................................................62
    M.      Other Obligations With Respect To Released Parties .....................65

ARTICLE XI MISCELLANEOUS PROVISIONS .........................................................66
    A.      Dissolution of the Committee .........................................................66
    B.      Payment of Statutory Fees .............................................................66
    C.      Modification of Plan ......................................................................66
    D.      Revocation of Plan ........................................................................67
    E.      Severability of Plan Provisions......................................................67
    F.      Successors and Assigns...................................................................67
    G.      Term of Injunctions or Stays..........................................................67
    H.      Reservation of Rights.....................................................................68
    I.      Further Assurances.........................................................................68
    J.      Notices to Debtors.........................................................................68
    K.      Governing Law ..............................................................................71
    L.      Exhibits ........................................................................................71
    M.      No Strict Construction ...................................................................71
    N.      Conflicts........................................................................................71

PLAN EXHIBITS

Exhibit A       Millennium Corporate Claim Trust Agreement
Exhibit B       Millennium Lender Claim Trust Agreement
Exhibit C       New Holdco Charter
Exhibit D       New Holdco Bylaws
Exhibit F       New Term Loan Agreement

JOINT PLAN OF REORGANIZATION OF
MILLENNIUM LAB HOLDINGS II, LLC, et al.

## INTRODUCTION

Millennium Lab Holdings II, LLC, a Delaware limited liability company, together with the above-captioned debtors (each a "Debtor" and collectively, the "Debtors") hereby proposes this prepackaged joint plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, events leading up to Solicitation of the Plan, projections, and for a summary and analysis of this Plan and the treatment provided for herein.  The Debtors urge all Holders of Impaired Claims (as defined below) to review the Disclosure Statement and Plan in full.  There also are other agreements and documents that will be filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits.  All such Exhibits are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions set forth in the RSA (as defined herein), this Plan, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date.

If the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the RSA, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required.  The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

## ARTICLE I

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or

supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Definitions

1.1    "Ad Hoc Group" means the members of the ad hoc group of Prepetition Lenders represented by Brown Rudnick LLP and listed on Exhibit A to the RSA term sheet, as amended from time to time as provided for in the RSA.

1.2    "Ad Hoc Group Majority" has the meaning set forth in the RSA.

1.3    "Administrative Agent" means Wilmington Savings Fund Society, FSB as successor administrative agent under the Existing Credit Agreement.

1.4    "Administrative Agent Fees" means the fees, expenses, and indemnities payable to the Administrative Agent, in its capacity as administrative agent, under the terms of the Existing Loan Documents.

1.5    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

1.6    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.7    "Allowed" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that the Debtors have assented to the validity of or that has been (a) allowed by an order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Plan, (c) allowed by agreement between the Holder of such Claim and the Debtors or Reorganized Debtors, or (d) allowed by an order of a court in which such Claim could have

been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" or an Equity Interest as an "Allowed Equity Interest," the Debtors do not waive their rights to contest the amount and validity of such Claim or Equity Interest to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim or Allowed Equity Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

1.8     "Approved Plan" has the meaning set forth in the RSA.

1.9     "Assumed Agreement" means an Executory Contract or Unexpired Lease which has been assumed by the Debtors.

1.10     "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

1.11     "Backstop MLH Shareholder" means any Contributing MLH Shareholder that funds a Non-Contributing MLH Shareholder's Pro Rata portion of the MLH Contribution.

1.12     "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan and consent to the releases, exculpations and related provisions provided for in this Plan, including the ballots cast on or before the Solicitation Termination Date.

1.13     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

1.14     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.15     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, the Local Rules, and the Federal Rules of Civil Procedure, in each case as amended from time to time and as applicable to the Chapter 11 Cases or proceedings therein.

1.16     "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.17     "Cash" means legal tender of the United States of America.

1.18     "Cause of Action" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability,

damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtors, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) any state law fraudulent transfer claim.

1.19    "Chapter 11 Cases" means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

1.20    "CIA" means that certain Corporate Integrity Agreement between Millennium and OIG dated October 15, 2015.

1.21    "Claim" means a "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

1.22    "Class" means one of the classes of Claims or Equity Interests listed in Article III of the Plan.

1.23    "CMS" means the Centers for Medicare and Medicaid Services.

1.24    "Company" means the Debtors, collectively.

1.25    "Comparative Fault Reduction" has the meaning set forth in Article X.L(i).

1.26    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order subject to all conditions specified in Article VIII.A having been satisfied, or waived as provided for in Article VIII.

1.27    "Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order on its docket, within the meanings of Bankruptcy Rules 5003 and 9021.

1.28    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.29    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan entered pursuant to section 1129 of the Bankruptcy Code and in the form and with the provisions as required herein.

1.30    "Consenting Lenders" has the meaning set forth in the RSA.

1.31    "Consistent With The Restructuring Term Sheet" has the meaning set forth in the RSA.

1.32    "Consummation Deadline" has the meaning set forth in Article V.S of this Plan.

1.33    "Contributing MLH Shareholder" means an MLH Shareholder that has contributed to funding the MLH Contribution.

1.34    "Core Released Claims" means, collectively, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or Causes of Action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Effective Date arising out of, or in any way related to in any manner, the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, and the Restructuring Transactions and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto.  For the avoidance of doubt, Core Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agent as provided in Article V.O and Article VI.F of this Plan, any Retained Claims or claims against Excluded Parties.

1.35    "Cure" means the payment of Cash by the Debtors, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors may assume under section 365(a) of the Bankruptcy Code.  For the avoidance of doubt, the cure of all Medicare and Medicaid Agreements is set forth in Article VI.J of this Plan.

1.36    "Debtor Releasing Parties" means the Debtors and the Reorganized Debtors, each in their individual capacities and as debtors in possession.

1.37    "Debtors" means Holdings, Millennium, and RxAnte, LLC, as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.38    "Disclosure Statement" means that certain Disclosure Statement for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. under Chapter 11 of the Bankruptcy Code,  as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.39    "Distribution Agent" means New Holdco or any party designated by New Holdco to serve as distribution agent under this Plan.  Except for distributions of New Holdco Common Stock, which shall be effected by book entry by New Holdco, for purposes of distributions under this Plan to Holders of Allowed Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent.  For purposes of

distributions under this Plan to Holders of Early Commitment Facility Claims, the Early Commitment Facility Agent shall act as the Distribution Agent.

1.40    "D&O Liability Insurance Policies" means all insurance policies for officers' liability maintained by the Debtors as of the Petition Date.

1.41    "DHA" means the Defense Health Agency of the United States Department of Defense.

1.42    "Distribution Record Date" means the date of entry of the Confirmation Order.

1.43    "Early Commitment Deadline" means 12:00 p.m. (prevailing Eastern Time) on November 5, 2015.

1.44    "Early Commitment Facility" means that senior secured term loan, which is senior in lien priority to the Existing Credit Agreement Claims, dated as of November 5, 2015 among Millennium, as borrower, the Early Commitment Facility Agent, as administrative agent, and the Consenting Lenders that voted to approve a Qualified Out-of-Court Transaction and this Plan and the releases thereunder or hereunder by the Early Commitment Deadline, and which was distributed Pro Rata to the Consenting Lenders. Each Consenting Lender that participates in the Early Commitment Facility shall receive its Pro Rata share (based on all Existing Credit Agreement Claims held by Prepetition Lenders) of $50.0 million.

1.45    "Early Commitment Facility Agent" means Wilmington Savings Fund Society, FSB as administrative agent under the Early Commitment Facility and related loan documents.

1.46    "Early Commitment Facility Agent Fees" means the fees, expenses, and indemnities payable to the Early Commitment Facility Agent, in its capacity as administrative agent, under the terms of the Early Commitment Facility and loan documents related thereto.

1.47    "Early Commitment Facility Claim" means a Claim or obligation arising under or relating to the Early Commitment Facility other than the Early Commitment Facility Agent Fees. The aggregate of all Early Commitment Facility Claims shall be Allowed in an aggregate principal amount not to exceed $50.0 million, plus any and all accrued interest, fees, and other amounts due and payable under the Early Commitment Facility.

1.48    "Effective Date" means the date on which the Plan shall take effect, which date shall be a Business Day on which (a) all conditions in Article VIII.B of the Plan have been satisfied or waived as provided for in Article VIII and (b) consummation of the Restructuring Transactions has commenced.

1.49    "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.50    "Equity Defendants" has the meaning set forth in Article X.F(iii) hereof.

1.51    "Equity Interest" means all outstanding ownership interests in any of the Debtors, including any interest evidenced by common or preferred stock, membership interest, option, or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

1.52    "Equity Transfer Date" means the date on which the Equity Interests in Reorganized Millennium are (i) transferred from the Holders of the Existing Equity Interests of Millennium to the Holders of Allowed Existing Credit Agreement Claims and (ii) immediately thereafter, transferred from the Holders of Allowed Existing Credit Agreement Claims to New Holdco, which date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA, and in any event shall be no later than December 31, 2015.

1.53    "Estates" means the estates of the Debtors in the Chapter 11 Cases, as created under section 541 of the Bankruptcy Code.

1.54    "Excluded Parties" means any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to
(a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan Chase Bank, N.A., in its individual corporate capacity and in its capacity as Prior Administrative Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) Suntrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i).

1.55    "Exculpated Parties" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Settling Members, (d) the Ad Hoc Group, (e) the Participating Lenders, (f) the Administrative Agent, (g) the Early Commitment Facility Agent, and (h) each such party's Related Parties; provided, however, that, for the avoidance of doubt, no Excluded Party shall be an Exculpated Party.

1.56    "Exculpation" means the exculpation provided in Article X.C hereof.

1.57    "Executory Contract" means a contract to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.58    "Exhibit" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified, or otherwise supplemented from time to time).

1.59    "Existing Credit Agreement" means that certain Credit Agreement, dated as of April 16, 2014, as amended by the Existing Credit Agreement Solicitation Amendment (as amended, supplemented, or otherwise modified from time to time), among Millennium, Holdings, the Administrative Agent, and the lenders from time to time party thereto.

1.60    "Existing Credit Agreement Claim" means a Claim or obligation arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement,

other than the Prior Agent Indemnity Claims.  The aggregate of all Existing Credit Agreement Claims shall be Allowed in the aggregate amount of $1,752,812,500 in outstanding principal, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents other than the Prior Agent Indemnity Claims.

        1.61    "Existing Credit Agreement Solicitation Amendment" means that certain amendment to the Existing Credit Agreement that, among other things, allows the issuance of the Early Commitment Facility consistent with the terms of the RSA.

        1.62    "Existing Equity Interest" means an Equity Interest in any Debtor that is authorized, issued, and outstanding prior to the Effective Date.

        1.63    "Existing Loan Documents" means the Existing Credit Agreement together with all related loan documentation.

        1.64    "Federal Administrative Settlement Agreement" means that certain Millennium Health, LLC Settlement Agreement to Resolve Administrative Denial and Overpayment Claims, as amended, supplemented, or modified from time to time, between and among HHS, acting through CMS and its officers and agents, including its contractors, and Millennium dated October 15, 2015.

        1.65    "Federal PGT Settlement Agreement" means that certain Settlement Agreement – Pharmacogenetic Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

        1.66    "Federal Settlement Parties" means the United States Parties, and the USA on behalf of HHS and CMS.

        1.67    "Federal UDT Settlement Agreement" means that certain Settlement Agreement – Urine Drug Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

        1.68    "Final Order" means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction as to which no stay has been entered and either the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

1.69    "General Unsecured Claim" means any Claim against any Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Early Commitment Facility Claim, Existing Credit Agreement Claim, Prior Agent Indemnity Claim, Other Secured Claim, Government Claim, MLH Tax Note Claim, or Intercompany Claim.

1.70    "Government Claim" means a Claim by any of the USA Settlement Parties against any of the Debtors, as described in, and restricted by, the respective USA Settlement Agreements.  The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision.  The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

1.71    "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.72    "Gross Damages" has the meaning set forth in has the meaning set forth in Article X.L(i).

1.73    "HHS" means the United States Department of Health and Human Services.

1.74    "Holder" means an Entity holding a Claim against, or Equity Interest in, any Debtor as of the applicable date of determination.

1.75    "Holdings" means Millennium Lab Holdings II, LLC, a Delaware limited liability company.

1.76    "Holdings LLC Agreement" means that certain Second Amended and Restated Limited Liability Agreement of Millennium Lab Holdings II, LLC.

1.77    "Impaired" refers to being impaired within the meaning of section 1124 of the Bankruptcy Code.

1.78    "Indemnification Agreement" means that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and W. Brock Hardaway, that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and Martin A. Price, and any other indemnification agreement between any of the Debtors and a Senior Executive not applicable to other executive officers.

1.79    "Initial USA Settlement Deposit" means the irrevocable $50 million ($50,000,000.00) initial deposit paid to the USA Settlement Parties upon execution of the USA Settlement Agreements in partial satisfaction of Millennium's settlement obligations under the USA Settlement Agreements.

1.80    "Intercompany Claim" means any Claim by a Debtor against another Debtor.

1.81    "JS Real Estate Leases" means the four (4) leases by and among Millennium, as lessee, and Pain In San Diego, LLC, a California limited liability company, as lessor relating to Millennium's headquarters facilities at 16980 Via Tazon, San Diego, California 92127, in each case, as amended, supplemented, or otherwise modified from time to time.

1.82    "Lender Releasing Parties" means, collectively, the Consenting Lenders, the Administrative Agent, and the Early Commitment Facility Agent.

1.83    "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.84    "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.85    "Medicare and Medicaid Agreements" means any and all agreements or documentation necessary and required to enable the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, to participate in, and seek reimbursement from, the Medicare programs and Medicaid programs pursuant to 42 U.S.C. §§ 1395 et seq. and 42 U.S.C. §§ 1396 et seq., including, but not limited to, the Debtors' and Reorganized Debtors' (as applicable) enrollment agreements required under 42 C.F.R. §§ 424.500 et seq., and evidenced by their execution of the appropriate CMS 855 forms.

1.86    "Millennium" means Millennium Health, LLC, a California limited liability company.

1.87    "Millennium Claim Trusts" means the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust.

1.88    "Millennium Corporate Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Corporate Claim Trust Agreement.

1.89    "Millennium Corporate Claim Trust Advisory Board" means that certain three-member board of the Millennium Corporate Claim Trust appointed by an Ad Hoc Group Majority.

1.90    "Millennium Corporate Claim Trust Agreement" means that certain trust agreement by and among the Millennium and Millennium Corporate Claim Trust Trustee, in substantially in the form attached as Exhibit A hereto.

1.91    "Millennium Funding Contribution" means the cash payment to be made by MLH and TA collectively to Millennium in an amount equal to $325 million less the amount comprising the USA Settlement Funding Contribution to Millennium.

1.92    "Millennium Lender Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Lender Claim Trust Agreement.

1.93    "Millennium Lender Claim Trust Advisory Board" means that certain three-member board of the Millennium Lender Claim Trust appointed by an Ad Hoc Group Majority.

1.94    "Millennium Lender Claim Trust Agreement" means that certain trust agreement by and among the Company and Millennium Lender Claim Trust Trustee, in substantially in the form attached as Exhibit B hereto.

1.95    "MLH" means Millennium Lab Holdings, Inc., a Delaware Corporation.

1.96    "MLH and/or TA Liability" has the meaning set forth in Article X.L(ii) of this Plan.

1.97    "MLH Contribution" means fifty five percent (55%) of the Settlement Contribution, or $178.75 million, to be funded by MLH.

1.98    "MLH Shareholders" means the holders of equity interests in MLH.

1.99    "MLH Tax Note" means that certain Promissory Note dated as of May 1, 2014, issued by Millennium to MLH in the original principal sum of $19,755,547.00, as amended, supplemented or modified from time to time.

1.100    "MLH Tax Note Claims" means any Claims or obligations arising under or pursuant to the MLH Tax Note.

1.101    "New Board" means the initial board of directors of New Holdco as designated pursuant to Article V.L of this Plan.

1.102    "New Holdco" means a Delaware corporation to be formed by the Prepetition Lenders on or prior to the Equity Transfer Date which shall be the parent holding company of Reorganized Millennium pursuant to the transactions contemplated herein.

1.103    "New Holdco Common Stock" means the shares of common stock of New Holdco with a par value of $0.01 and that shall be fully paid and non-assessable upon issuance.

1.104    "New Holdco Organizational Documents" means the charter of incorporation of New Holdco in substantially the form contained in Exhibit C of this Plan, the bylaws of New Holdco in substantially the form contained in Exhibit D of this Plan, or any other applicable organizational documents of New Holdco.

– 11 –

1.105  "New Securities and Debt Documents" means collectively, the New Holdco Common Stock, the New Term Loan Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

1.106  "New Term Loan" means that certain secured term loan in the aggregate principal amount of $600 million to be made under the terms of the New Term Loan Agreement.

1.107  "New Term Loan Agreement" means that certain agreement providing for the New Term Loan in the form attached as Exhibit F of this Plan to be included in the Plan Supplement.

1.108  "Non-Consenting Lender" means a Prepetition Lender that is not a Consenting Lender.

1.109  "Non-Contributing MLH Shareholder" means an MLH Shareholder that has not funded, in any part, the MLH Contribution.

1.110  "Non-Contributing MLH Shareholder Claim" means any known and unknown claims and causes of action against Non-Contributing MLH Shareholders.

1.111  "Non-Contribution Action" has the meaning set forth in Article X.L(ii) of this Plan.

1.112  "OIG" means the Office of the Inspector General of HHS.

1.113  "Operating Agreements" has the meaning set forth in Article VI.F of this Plan.

1.114  "OPM" means the United States Office of Personnel Management.

1.115  "Ordinary Course Professionals Order" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

1.116  "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.117  "Other Secured Claims" means all Secured Claims against the Debtors other than the Prior Agent Indemnity Claims or the Existing Credit Agreement Claims.

1.118  "Participating Lenders" has the meaning set forth in the RSA.

1.119  "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

1.120   "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.121   "Plaintiff States" means the plaintiff states that are party to the States UDT Settlement and the States PGT Settlement Agreement and any such states that may become a party thereto from time to time.

1.122   "Plan" has the meaning set forth in the Introduction and includes the Exhibits and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

1.123   "Plan Supplement" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.

1.124   "Post-Closing Tax Period" means any tax period beginning after the Equity Transfer Date and, with respect to any tax period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period beginning after the Equity Transfer Date.

1.125   "Pre-Closing Tax Period" means any taxable period ending on or before the Equity Transfer Date and, with respect to any taxable period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period ending on and including the Equity Transfer Date.

1.126   "Prepetition Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Existing Credit Agreement from time to time.

1.127   "Preserved Estate Claims" means all known and unknown claims and Causes of Action (including derivative claims) of Millennium against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.128   "Preserved Indemnified Parties" has the meaning set forth in Article VI.F of this Plan.

1.129   "Preserved Lender Claims" means all known and unknown direct and derivative claims and Causes of Action of the Lenders against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.130   "Prior Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as the prior administrative agent under the Existing Loan Documents.

1.131   "Prior Agent Indemnity Claims" means all indemnification claims of the Prior Administrative Agent arising under the Existing Loan Documents.

– 13 –

1.132 "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.133 "Pro Rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.134 "Professional" means: (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.135 "Professional Fee Claim" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

1.136 "Professional Fee Escrow Account" means an account to be funded by the Debtors pursuant to Article II.A(i)(3) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.137 "Professional Fee Reserve Amount" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Fee Claims pursuant to any compensation procedures order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article II.A(i)(3) of the Plan attributable to fees incurred as of the Confirmation Date.

1.138 "Proof of Claim" means a proof of Claim or Equity Interest filed against any Debtor in the Chapter 11 Cases.

1.139 "Qualified Out-of-Court Transaction" has the meaning set forth in the RSA.

1.140 "Reinstated" or "Reinstatement" means, with respect to any Claim: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss

– 14 –

incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

1.141   "Related Parties" means, with respect to an Entity, collectively, current and former affiliates of such Entity, and such Entity's such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holders' spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.  For the avoidance of doubt, none of the Excluded Parties shall be a Related Party to any of the Released Parties.

1.142   "Released Claims" means (a) solely with respect to the Released Parties, any and all Core Released Claims and (b) with respect to the Related Parties of the Released Parties, all Core Released Claims, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, the Restructuring Transactions and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement.  For the avoidance of doubt, Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agents as provided in Article V.O and Article VI.F of this Plan.

1.143   "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders and Consenting Lenders; (e) Wilmington Savings Fund Society, FSB, in its capacity as the Administrative Agent; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard Appel; (j) David Cohen; (k) Greg Stein; (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) Murray Rosenthal; (o) those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable, (p) the Early Commitment Facility Agent, and (q) Brown Rudnick, LLP and FTI; provided, however, that in the event that an Excluded Party is also a Prepetition Lender under the Existing Credit Agreement, its status as a Participating Lender or a Consenting Lender shall not make it a Released Party for any purpose.

1.144   "Reorganized" means, in reference to a Debtor, such Debtor from and after the Effective Date.

1.145   "Restructuring Transactions" means the restructuring transactions described in the RSA and herein, whether implemented pursuant to a Qualified Out-of-Court Transaction or an Approved Plan, in each case, which shall be implemented Consistent With The Restructuring Term Sheet and the tax provisions described therein.

1.146   "Retained Claim Judgment" has the meaning set forth in Article X.L of this Plan.

1.147    "Retained Claim Plaintiff" has the meaning set forth in Article X.L of this Plan.

1.148    "Retained Claims" means collectively, the Preserved Estate Claims and the Preserved Lender Claims.

1.149    "Retained Corporate Causes of Action" means any and all claims and Causes of Action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium and the Administrative Agent (in its capacity as agent under the Existing Loan Documents), including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action expressly released under this Plan, including, without limitation the claims subject to the bar order pursuant to Article X.J of this Plan and the injunction pursuant to Article X.K of this Plan.

1.150    "Retained Lender Causes of Action" means the individual claims and Causes of Action of each of the Consenting Lenders against any Person or Entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action that are released under this Plan and/or subject to the bar order and injunction provisions of this Plan.

1.151    "RSA" means that certain Restructuring Support Agreement dated October 15, 2015 by and among the Debtors, the Settling Members, and each of the Participating Lenders signatories thereto, attached as <u>Exhibit A</u> to the Disclosure Statement, as may be amended, supplemented, or modified from time to time, as provided for therein.

1.152    "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.153    "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

1.154    "Senior Executive" shall have the meaning set forth in the RSA.

1.155    "Settlement Contribution" means a cash payment of $325 million comprised of the USA Settlement Funding Contribution and the Millennium Funding Contribution, to be paid to, or for the benefit of, Millennium pursuant to the terms of the USA Settlement Agreements, the RSA, and this Plan.

1.156    "Settlement Letters of Credit" means (i) the irrevocable letters of credit in the amount, including interest, as required by the USA Settlement Agreements, posted by MLH and TA on or before November 9, 2015 for the benefit of the USA Settlement Parties pursuant to the terms of the USA Settlement Agreements; or (ii) the funds in the amount, including interest, as required by the USA Settlement Agreements to be placed into escrow by MLH and/or TA on or before November 9, 2015, pursuant to the terms of the USA Settlement Agreements and the

terms of escrow agreements mutually acceptable to the USA Settlement Parties and MLH and/or TA.

1.157   "Settlement Letters of Credit Funds" means the cash proceeds from a draw on the Settlement Letters of Credit by the USA, including a draw on the funds in escrow.

1.158   "Settling Members" means, collectively, MLH and TA.

1.159   "Solicitation" means the Debtors' formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

1.160   "Solicitation Termination Date" means November 8, 2015 at 5:00 p.m. (prevailing Eastern Time).

1.161   "States PGT Settlement Agreement" means those certain Millennium Genetic Testing State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.162   "States UDT Settlement Agreement" means those certain Millennium UDT State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.163   "Subrogation Claim" has the meaning set forth in the RSA, and includes the Liens and assignments described in the RSA to secure payment of such claim.

1.164   "TA" means TA Millennium, Inc., a Delaware corporation.

1.165   "TA Shareholders" means the holders of equity interests in TA.

1.166   "Tax Code" means the Internal Revenue Code of 1986, as amended.

1.167   "Third Party Payers" means, collectively, the Entities that pay or reimburse the Debtors for services rendered to a third party.

1.168   "Third Party Payer Contracts" means contracts between the Debtors and Third Party Payers.

1.169   "Third Party Releasing Parties" means, collectively, the Holders of Claims against or with respect to or Equity Interests in the Debtors, including Non-Consenting Lenders.

1.170   "Trust Delayed Draw Facility" means that $7,000,000 facility between Reorganized Millennium, the Millennium Corporate Claim Trust, and the Millennium Lender Claim Trust, pursuant to which Reorganized Millennium shall advance up to $7,000,000 in the aggregate to the Millennium Corporate Claim Trust and/or the Millennium Lender Claim Trust in respect of fees and costs thereof.

1.171  "Unexpired Lease" means a lease to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including, without limitation, the JS Real Estate Leases.

1.172  "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.173  "Unimpaired" means any Claim or Equity Interest that is not designated as Impaired.

1.174  "United States Parties" means collectively, the USA on behalf of the OIG, the DHA, and the OPM.

1.175  "USA" means the United States of America.

1.176  "USA Settlement Parties" means collectively, the Federal Settlement Parties and the Plaintiff States.

1.177  "USA Settlement Agreements" means, collectively, the Federal UDT Settlement Agreement, the States UDT Settlement Agreement, the Federal PGT Settlement Agreement, the States PGT Settlement Agreement, the Federal Administrative Settlement Agreement, and the CIA, and all respective exhibits thereto.

1.178  "USA Settlement Assumption Order" means the Final Order approving the assumption of the USA Settlement Agreements, which order may be the Confirmation Order.

1.179  "USA Settlement Funding Contribution" means the payment to be made by MLH and TA severally to or for the benefit of Millennium in the amount of $206 million plus accrued interest to be distributed to the USA as provided in the USA Settlement Agreements on account of the Government Claims.

1.180  "Voting Agent" means Prime Clerk LLC, and any successor.

1.181  "Voting Class" means the Class of Existing Credit Agreement Claims.

1.182  "Voting Record Date" means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is October 29, 2015 for all Holders of Claims.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**A.     Administrative Claims**

Subject to subparagraph (i) below, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Administrative Claim will (i) be Reinstated, (ii) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder, or (iii) will otherwise be left Unimpaired; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

(i)     Professional Fee Claims

1.     Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Confirmation Date must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; provided that the upon the Confirmation Date, any requirement that Professionals comply sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business for any work performed after the Confirmation Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtors of such hearing to the Reorganized Debtors.

2.      <u>Payment of Interim Amounts</u>.  Subject to the Professional Fee Reserve Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtor. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.

3.      <u>Professional Fee Escrow Account</u>.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

4.      <u>RSA Fees</u>.  The foregoing shall not apply to (x) the Debtors' obligations to pay the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group as professional advisors to the Ad Hoc Group pursuant to the RSA and this Plan or (y) the Administrative Agent's Fees under this Plan.

**B.     Priority Tax Claims**

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Priority Tax Claim will (i) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Priority Tax Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder or (ii) otherwise be left Unimpaired; <u>provided</u>, <u>however</u>, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases <u>provided</u>, <u>however</u>, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

– 20 –

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.    Introduction**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**B.    Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Early Commitment Facility Claims | Unimpaired | Presumed to Accept |
| 2 | Existing Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Prior Agent Indemnity Claims | Unimpaired | Presumed to Accept |
| 4 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Government Claims | Unimpaired | Presumed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | MLH Tax Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Existing Equity Interests in Holdings | Unimpaired | Presumed to Accept |
| 10 | Existing Equity Interests in Millennium | Impaired | Deemed to Reject |
| 11 | Existing Equity Interests in RxAnte, LLC | Unimpaired | Presumed to Accept |

**C.    Classification and Treatment of Claims and Equity Interests**

(i)    <u>Class 1 – Early Commitment Facility Claims</u>.

1.    <u>Classification</u>:  Class 1 consists of all Early Commitment Facility Claims.

2.    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Early Commitment Facility Claim shall be paid in full in Cash.  In addition, on or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility Agent shall receive payment in full in Cash of the Early Commitment Facility Agent Fees, and the Reorganized Debtors are authorized to pay

such Early Commitment Facility Agent Fees without the need for further Bankruptcy Court approval.

      3.    <u>Impairment and Voting</u>: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(ii)    <u>Class 2 – Existing Credit Agreement Claims</u>.

      1.    <u>Classification</u>: Class 2 consists of all Existing Credit Agreement Claims. The Existing Credit Agreement Claims are Allowed Claims in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims.

      2.    <u>Treatment</u>: On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, canceled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:

      (A)    on the Equity Transfer Date, such Holder's Pro Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V. D(iii) of this Plan;

      (B)    on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;

      (C)    on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of this Plan, such Holder's Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust; and

      (D)    to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.G of this Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing

Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.

In addition, on or as reasonably practicable after the Equity Transfer Date, the Administrative Agent shall receive payment in full in Cash of the Administrative Agent Fees, and Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group shall receive payment in full of any fees and expenses owed to them under the RSA as advisors to the Ad Hoc Group. New Holdco, Reorganized Millennium, and its subsidiaries are authorized to pay such fees without the need for further Bankruptcy Court approval or the filing of fee applications.

Collectively, the distributions of payments to the Holders of Existing Credit Agreement Claims and the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan, and the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group pursuant to the RSA shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Existing Credit Agreement, except as provided with respect to the Administrative Agent in Article V.O hereof.

3.    <u>Impairment and Voting</u>:  Class 2 is Impaired by the Plan.  Each Holder of an Allowed Existing Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(iii)    <u>Class 3 – Prior Agent Indemnity Claims</u>.

1.    <u>Classification</u>:  Class 3 consists of all Prior Agent Indemnity Claims.

2.    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; <u>provided</u>, <u>however</u> for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under this Plan, Reorganized Holdings shall be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty shall be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of the principal and interest outstanding under the Early Commitment Facility.

3.    <u>Impairment and Voting</u>:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(iv)    <u>Class 4 – Other Secured Claims</u>.

1.    <u>Classification</u>:  Class 4 consists of all Other Secured Claims.

2.    <u>Treatment</u>: With respect to each Other Secured Claim that becomes due or payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim (A) shall be paid in full in Cash, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be; (B) shall have its Allowed Other Secured Claim Reinstated, and paid in full, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later to occur of the Effective Date or when such Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) shall have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 4 Claim will have agreed upon in writing; <u>provided</u> that Class 4 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

3.    <u>Impairment and Voting</u>:  Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

(v)    <u>Class 5 – Government Claims</u>.

1.    <u>Classification</u>:    Class 5 consists of all Government Claims.    The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision.  The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

2.    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA

– 24 –

Settlement Agreements or (2) Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.

3.    <u>Impairment and Voting</u>:  Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(vi)    <u>Class 6 – General Unsecured Claims</u>.

1.    <u>Classification</u>:  Class 6 consists of all General Unsecured Claims.

2.    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall (A) be paid in full in Cash; (B) have its Allowed General Unsecured Claim Reinstated, and paid in full, including postpetition interest (which shall not accrue at a default rate), if any, on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 6 Claim will have agreed upon in writing.

3.    <u>Impairment and Voting</u>:  Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

(vii)    <u>Class 7 – MLH Tax Note Claims</u>.

1.    <u>Classification</u>:  Class 7 consists of all MLH Tax Note Claims.

2.    <u>Treatment</u>:  On the Effective Date, all of the Debtors' outstanding obligations under the MLH Tax Note shall be extinguished, canceled, and discharged, and each Holder of an MLH Tax Note Claim shall receive no distribution on account of such Claim.

3.    <u>Impairment and Voting</u>:  Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(viii)    <u>Class 8 – Intercompany Claims</u>.

1.    <u>Classification</u>: Class 8 consists of all Intercompany Claims.

– 25 –

2.      Treatment: On the Effective Date, all Allowed Intercompany Claims, at the sole option of the Debtors or Reorganized Debtors, shall be (A) Reinstated and treated  or paid in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (B) canceled, extinguished, and discharged.

3.      Impairment and Voting:  Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(ix)    Class 9 – Existing Equity Interests in Holdings.

1.      Classification: Class 9 consists of all Existing Equity Interests in Holdings.

2.      Treatment: On the Effective Date, all Allowed Existing Equity Interests in Holdings shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.      Impairment and Voting:  Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Equity Interests will not be entitled to vote to accept or reject the Plan.

(x)    Class 10 – Existing Equity Interests in Millennium.

1.      Classification: Class 10 consists of all Existing Equity Interests in Millennium.

2.      Treatment: On the Equity Transfer Date, all Existing Equity Interests in Millennium shall be presumed automatically cancelled, released, and extinguished without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors or the Reorganized Debtors thereunder shall be discharged.

3.      Impairment and Voting:  Class 10 is an Impaired Class, and the Holders of Class and the Holders of Class 10 Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests will not be entitled to vote to accept or reject the Plan.

(xi)    Class 11 – Existing Equity Interests in RxAnte LLC.

1.      Classification: Class 11 consists of all Existing Equity Interests in RxAnte LLC.

2.      Treatment: On the Effective Date, all Allowed Existing Equity Interests in RxAnte LLC shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.    <u>Impairment and Voting</u>:  Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 11 Equity Interests will not be entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

**E.    Discharge of Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, and effective as of the Effective Date or Equity Transfer Date, as applicable: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**F.    Alternative Treatment**

Notwithstanding any provision herein to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other less favorable distribution or treatment to which it and the Debtors or Reorganized Debtors may agree in writing.

**ARTICLE IV**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.    Presumed Acceptance of Plan**

Classes 1, 3, 4, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

– 27 –

**B.**    **Deemed Rejection of Plan**

Classes 7 and 10 are Impaired and Holders of Class 7 Claims and Class 10 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.**    **Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Class (Class 2) will be entitled to vote to accept or reject the Plan.

**D.**    **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.**    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Such modification shall not substantially alter the treatment of the Government Claims pursuant to the USA Settlement Agreements.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**    **General Settlement of Claims**

As set forth herein, this Plan embodies an overall negotiated settlement of numerous disputed Claims and issues pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

(i)    Settlements and Releases

In consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement between the Debtors, the Settling Members, and the Consenting Lenders regarding, inter alia, the Released Claims held by (or that could be asserted by or on behalf of) the Consenting Lenders, the Existing Credit Agreement Claims (including, without

– 28 –

limitation, the treatment of the Holders of Existing Credit Agreement Claims under the Plan and the releases provided for herein), and the treatment of the Settling Members under the Plan (including the releases and related provisions provided herein), and in partial consideration therefor, the Settlement Contribution.

In accordance with and subject to the terms of the RSA and the USA Settlement Agreements, and in exchange for the treatment of the Settling Members provided for in the RSA and this Plan (including the releases provided for herein), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Settling Members shall collectively make a Cash payment to, or for the benefit of, Millennium in the form of the Settlement Contribution. The Settlement Contribution shall be funded 55% by MLH, and 45% by TA as follows: (x) $178.75 million to be funded by MLH and (y) $146.25 million to be funded by TA. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

      (ii)    USA Settlement

The provisions of the USA Settlement Agreements constitute a good faith compromise and settlement between the Debtors and the USA Settlement Parties of the Government Claims as specifically described in, and restricted by, the USA Settlement Agreements. The Debtors shall continue to perform their obligations under the USA Settlement Agreements and the USA Settlement Assumption Order. To the extent the USA Settlement Assumption Order has not been entered on or before the Effective Date, the USA Settlement Agreements shall be assumed and the Subrogation Claim shall be approved under this Plan. Pursuant to Article III.C(v)(2), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors shall pay (or cause to be paid) the Government Claims in full from the proceeds of the USA Settlement Funding Contribution plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements. The Cash payment of the Initial USA Settlement Deposit shall be final and irrevocable and shall not be subject to any Avoidance Action or any other avoidance or recovery on any basis in law or equity. Any and all claims against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit shall be waived by the Debtors and their Estates and no Entity shall bring any claim against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit, and all such claims by any Entity are permanently and indefinitely prohibited, barred, and enjoined.

## B.    Corporate Existence

On or prior to the Effective Date, New Holdco will be formed, and pursuant to the transactions contemplated under this Plan, will become the parent entity of Reorganized

Millennium. The charter of incorporation and by-laws of New Holdco will be substantially in the form of the New Holdco Organizational Documents.  The Reorganized Debtors shall continue to exist as separate legal entities, pursuant to the applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Vesting of Assets in the Reorganized Debtors

Except as provided in Article V.F of the Plan with respect to the property and assets to be transferred to the Millennium Corporate Claim Trust, elsewhere in the Plan, in the USA Settlement Agreements, or in the Confirmation Order, on or after the Equity Transfer Date, all property and assets of the Estates (including, without limitation, Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of this Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Confirmation Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

## D.    New Term Loan; Sources of Consideration for Plan Distributions

(i)    New Term Loan

On the Equity Transfer Date, the applicable Reorganized Debtors will be authorized to execute and deliver the New Term Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the New Term Loan Agreement).

(ii)    Settlement Contribution

On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors will receive the benefit of the Settlement Contribution by reason of the funding of the USA Settlement Funding Contribution and receipt of the Millennium Funding

Contribution thereafter, and the USA Settlement Funding Contribution shall be paid to the USA. As set forth herein, the Settlement Contribution will be utilized (1) to make (or cause to be made) the required distributions to the Holders of Allowed Government Claims under the Plan; (2) to reimburse Millennium for the Initial USA Settlement Deposit; (3) for working capital needs in the Reorganized Debtors' operations; and (4) to pay the Early Commitment Facility Claims.  If the USA Settlement Funding Contribution is not paid to the USA as contemplated in this Plan, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

(iii)    Equity Interests in Reorganized Millennium

On the Equity Transfer Date, 100% of the Equity Interests of Reorganized Millennium shall be transferred and shall be deemed transferred, on behalf of Holders of Existing Credit Agreement Claims, to New Holdco in exchange for 100% of the New Holdco Common Stock.

(iv)    Cash Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' or Reorganized Debtors' Cash balances, including Cash from operations and the Millennium Funding Contribution.  Other than the USA Settlement Funding Contribution, Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**E.    New Holdco Common Stock Issued Under the Plan**

On the Equity Transfer Date, immediately following the transfer of 100% of the Equity Interests in Reorganized Millennium to New Holdco, in exchange therefor, New Holdco will distribute the New Holdco Common Stock Pro Rata to the Holders of Existing Credit Agreement Claims pursuant to the terms set forth in the Plan and the RSA.  The New Holdco Common Stock shall be subject to potential dilution from any equity incentive plan adopted in the future.

**F.    Millennium Corporate Claim Trust**

(i)    Formation of Millennium Corporate Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Corporate Claim Trust shall be created by Millennium and shall be funded by Reorganized Millennium in the amount of $1,000,000 in Cash (as provided below) plus such additional tangible or intangible assets of Millennium as Reorganized Millennium shall determine.   The Millennium Corporate Claim Trust shall be governed and administered in accordance with the Millennium Corporate Claim Trust Agreement substantially in the form attached as Exhibit A.  The Millennium Corporate Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Corporate Claim Trust, and if necessary, a replacement trustee therefor.

(ii)     Millennium Corporate Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Corporate Claim Trust, the Retained Corporate Causes of Action shall be automatically deemed to have been contributed to the Millennium Corporate Claim Trust.  The Millennium Corporate Claim Trust shall be funded by an initial Cash contribution by Reorganized Millennium of in the amount of $1,000,000.  Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust).  Once this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Corporate Claim Trust at the request of the Millennium Corporate Claim Trust Advisory Board.  Amounts advanced by Reorganized Millennium to the Millennium Corporate Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Corporate Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Corporate Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium).  The initial $1,000,000 cash contribution and subsequent payment of up to $10,000,000 of invoices shall not be required to be reimbursed.

(iii)     Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Corporate Claim Trust are the Holders of Existing Credit Agreement Claims.  Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution.  Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.F(iii), the Holders of Existing Credit Agreement Claims shall receive their Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust, as provided in Article III.C(ii)(2) of this Plan.

(iv)     Federal Income Tax Treatment of Millennium Corporate Claim Trust

The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.  The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and

– 32 –

consistent with, the liquidating purpose of the trust.  Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust.  For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party acting reasonably and in good faith to cooperate with one another to jointly determine such values.

## G.    Millennium Lender Claim Trust

(i)     Formation of Millennium Lender Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Lender Claim Trust shall be created and shall be funded by Reorganized Millennium in the amount of $2,000,000 Cash (as provided below), plus such additional tangible or intangible assets as the Reorganized Millennium shall determine.  The Millennium Lender Claim Trust shall be governed and administered in accordance with the Millennium Lender Claim Trust Agreement substantially in the form attached as Exhibit B.  The Millennium Lender Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Lender Claim Trust, and if necessary, a replacement trustee therefor.

(ii)    Millennium Lender Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Lender Claim Trust, the Consenting Lenders shall each be automatically deemed to have contributed the Retained Lender Causes of Action to the Millennium Lender Claim Trust.  The Millennium Lender Claim Trust shall be funded by an initial contribution by Reorganized Millennium of in the amount of $2,000,000.  Thereafter, Reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust).  Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Lender Claim Trust at the request of the Millennium Lender Claim Trust Advisory Board.  Amounts advanced by Reorganized Millennium to the Millennium Lender Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Lender Claim Trust (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Lender Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium).  The initial $2,000,000 cash

– 33 –

contribution and subsequent payment of up to $10,000,000 in payment of invoices shall not be required to be reimbursed.

      (iii)     Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution.  Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.G(iii), the Consenting Lenders shall receive their Pro Rata share, based on the aggregate principal amount of only those Existing Credit Agreement Claims held by all Consenting Lenders, of beneficial interests in the Millennium Lender Claim Trust, as provided in Article III.C(ii)2 of this Plan.

      (iv)     Federal Income Tax Treatment of Millennium Lender Claim Trust

The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.

## H.    Issuance of New Securities and Related Documentation

On the Equity Transfer Date, but after the transactions described in clause (i) of the definition of Equity Transfer Date, the Reorganized Debtors and New Holdco will be authorized to, and will issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance and distribution of the New Holdco Common Stock will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Equity Transfer Date contemplated by or in furtherance of the Plan, including, without limitation, the New Term Loan Agreement, the New Holdco Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Equity Transfer Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of New Holdco will be that number

of shares of New Holdco Common Stock as may be designated in the New Holdco Organizational Documents.

## I.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Equity Transfer Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens, Claims, or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

## J.    Reservation of Certain Claims of Governmental Units

Notwithstanding any other provision of the Plan, the Bankruptcy Code, or the Confirmation Order, the Debtors  shall not be released from, property and assets shall not vest in the Reorganized Debtors free and clear of, and the USA Settlement Parties specifically reserve, the following claims:

(i)    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

(ii)    Any criminal liability;

(iii)    Except as explicitly stated in the USA Settlement Agreements, any administrative liability/action, including, without limitation, mandatory exclusion from federal health care programs;

(iv)    Any liability to the USA (or its agencies) for any conduct other than the (i) Covered Conduct in the Federal UDT Settlement Agreement, (ii) Covered Conduct in the States UDT Settlement Agreement, (iii) Covered Conduct in the Federal PGT Settlement Agreement, and (iv) Covered Conduct in the States PGT Settlement Agreement (in each case, as "Covered Conduct" is defined in each respective USA Settlement Agreement);

(v)    Any liability based upon obligations created by the USA Settlement Agreements;

(vi)    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(vii)    Any liability for failure to deliver goods or services due;

(viii)    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct (as defined in each respective USA Settlement Agreement); and

(ix)    Any liability of individuals as specifically reserved for in each respective USA Settlement Agreement related to the Covered Conduct (as defined in each respective USA Settlement Agreement);

(x)    Any right of HHS or CMS to reopen and deny claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for fraud or similar fault under 42 C.F.R. § 405.980; or

(xi)    Any liability for the claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for which payment is reduced pursuant to any Medicare coverage or payment law, regulation, or guidance, other than for submission of claims that were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

### K.    New Holdco and Reorganized Debtors Organizational Documents

The certificates of incorporation and bylaws or other organizational documents of the Reorganized Debtors shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code Consistent With The Restructuring Term Sheet.  The New Holdco Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall authorize the issuance of New Holdco Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan.  In each case, the applicable organizational documents of the Reorganized Debtors or New Holdco will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, and (iii) with respect to New Holdco, Millennium and its subsidiaries, include other provisions concerning corporate governance and shareholder rights as may be agreed upon by the Ad Hoc Group Majority.  After the Effective Date, New Holdco and the Reorganized Debtors may amend and restate their certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

### L.    Directors and Officers of Reorganized Debtors

On the Effective Date, the New Board shall be as selected by the Ad Hoc Group Majority and disclosed in the Plan Supplement.  To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer of Millennium and RxAnte will serve from and after the Effective Date pursuant to applicable law and the terms of the New

Holdco Organizational Documents and their other constituent and organizational documents and any employment agreements entered into with such Person.

## M.    Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors and/or the Reorganized Debtors shall enter into the Restructuring Transactions and any documents contemplated hereunder.  The Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization structure of the Reorganized Debtors Consistent With The Restructuring Term Sheet.  The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate.  The actions taken by the Debtors and/or the Reorganized Debtors to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan and any documents contemplated hereunder, and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and any documents contemplated hereunder, and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the Debtors and/or the Reorganized Debtors determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

## N.    Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the Restructuring Transactions, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, members, officers, or directors of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the equity holders, members,

officers, or directors, of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the equity holders, members, officers, or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, any appropriate officer of the Debtors or the Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, file, record, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or referenced in the Plan in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable, including but not limited to those items referenced specifically in Article V.M and this Article V.N, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

## O.    Cancellation of Notes, Certificates and Instruments

On the Equity Transfer Date, and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by New Holdco and the Reorganized Debtors, as applicable and delivered to the party or parties entitled thereto, except as provided below, all notes, stock, instruments, certificates, agreements and other documents evidencing the Existing Credit Agreement Claims and the Existing Equity Interests in Millennium will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  On the day following the date that the final distribution is made by Administrative Agent, the Administrative Agent will be released and discharged from any further responsibility under the Existing Loan Documents; provided, however, that any and all rights of indemnification applicable to the Administrative Agent (including, without limitation, any rights related to reimbursement of Administrative Agent Fees) or the Prior Administrative Agent, respectively, under the Existing Loan Documents and related documents shall survive and remain in full force and effect; provided further, however, until the Administrative Agent Fees have been paid in full, the Administrative Agent will retain its charging liens under the Existing Loan Documents with respect to any cash distributions to be made under the Plan by the Administrative Agent.

## P.    Preservation and Maintenance of Debtor Causes of Action

(i)    Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action that are not Released Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not Released Claims without notice to or approval from the Bankruptcy Court.  The Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) may pursue such retained claims, rights or Causes of Action, suits, or proceedings as appropriate, but for the avoidance of doubt, not any Released Claims, in accordance with the best interests of the Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) who hold such rights.

(ii)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article X.J of this Plan, Article X.K of this Plan, and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, other than with respect to Released Claims, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Corporate Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  Any Retained Corporate Causes of Action shall be transferred to the Millennium Corporate Claim Trust in accordance with Article V.F of this Plan for later adjudication by the Millennium Corporate Claim Trust.  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**Q.    Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by a Debtors to a Reorganized Debtors or any other Person or entity pursuant to the Plan shall

not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**R.    Certain Tax Matters**

(i)    Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to this Agreement shall be allocated in accordance with the Holdings LLC Agreement; (B) the acquisition by the Holders of Existing Credit Agreement Claims of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Holders of Existing Credit Agreement Claims and the acquisition of the assets of Millennium by the Holders of Existing Credit Agreement Claims; and (C) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

Subject to the preceding paragraph, for U.S. federal tax purposes (and for all other applicable tax purposes), the creation of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of assets to the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of beneficial interests in the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, and the transfer of 100% of the Equity Interests In Reorganized Millennium to the Holders of Existing Credit Agreement Claims shall be characterized as an integrated transaction. Such integrated transaction shall be treated as the receipt by each Holder of Existing Credit Agreement Claims, in full and final satisfaction of the Existing Credit Agreement Claims, of its Pro Rata share of and interest in (A) 100% of the Equity Interests in Reorganized Millennium and (B) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the characterization provided in this Article V.R, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

(ii)    USA Settlement Deduction

Any tax deduction with respect to amounts payable from the Settlement Contribution, whether under the USA Settlement Agreements or otherwise shall be deductions of Holdings attributable to a Pre-Closing Tax Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH Shareholders.

(iii)     Section 754 Election

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

(iv)     Cooperation; Amended Returns

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, and the historic TA Shareholders, and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any of the identified parties to any valuation of Millennium (except with respect to transfers to the Millennium Corporate Claim Trust, as identified in Article V.F(iv) hereof).  Neither New Holdco nor any Prepetition Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

(v)     Holdings Tax Returns

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH.  Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns.  Holdings will be liquidated for tax purposes no later than February 28, 2016.  MLH, TA and Holdings will make no claims against the Holders of Existing Credit Agreement Claims, Millennium or New Holdco for any taxes of Holdings.  The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be liable for any income or tax liabilities attributable to the Company's assets for a Pre-Closing Tax Period.  Holdings shall have no liability with respect to the debt owed to the Holders of Existing Credit Agreement Claims or the Prior Agent Indemnity Claims.  Holdings intends to treat any of the debt owed to the Holders of Existing Credit Agreement Claims and Prior Agent Indemnity Claims in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

(vi)     Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date.  No party (other than New Holdco or the Holders of Existing Credit Agreement Claims with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

(vii)     TA and MLH Taxes and Refunds

The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Prepetition Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Prepetition Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

(viii)   Post-Closing Taxes

New Holdco shall be responsible for all taxes of Reorganized Millennium and its subsidiaries attributable to Post-Closing Tax Periods, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to Post-Closing Tax Periods.

**S.     Further Transactions**

If the conditions to occurrence of the Effective Date set forth in Article VIII.B are not satisfied on or before December 30, 2015 (the "Consummation Deadline"), the Debtors shall not be authorized to proceed to consummate the Plan.   Subject to the consent of the Federal Settlement Parties, MLH, TA, and an Ad Hoc Group Majority, as determined in each such party's sole and absolute discretion, the Debtors may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**A.     Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption,

assignment or transfer.  Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be unenforceable.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## B.    Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable Cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed Cure amounts.  Any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related Cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or Cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option,

may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

## C.    Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law. Rejection damages claims are Class 6 Claims.

## D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged Cure amount, which may be asserted at any time. In the event of a dispute regarding (1) the amount of any payments to Cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

## E.    Assumption of Officer Insurance Policies

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an

Executory Contract that has been assumed by the Debtors under the Plan. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

## F.    Indemnification Provisions

The indemnification provisions currently in place under the Limited Liability Company Operating Agreement for Millennium dated as of April 11, 2014 (without regard to any amendments which may have been made thereto or any board resolutions which may have been adopted in respect of indemnification) (the "Operating Agreement") and the Existing Loan Documents solely for the following: (i) Prior Administrative Agent; (ii) the Administrative Agent; (iii) the Early Commitment Facility Agent; and (iv) the officers of Millennium who served in such capacity as of the Petition Date or any time thereafter through the Effective Date (collectively, the "Preserved Indemnified Parties") with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be) solely in respect to the Preserved Indemnified Parties, and will survive effectiveness of the Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying Operating Agreement and Existing Loan Documents. Notwithstanding anything in this Article VI.F to the contrary, no other claimed Indemnification Agreement regarding any Senior Executive shall be assumed or Reinstated unless mutually agreed upon by the Ad Hoc Group Majority and the respective Senior Executive with respect to any such indemnity terms (and such other Indemnification Agreements may be amended by the mutual agreement of the Ad Hoc Group Majority and the respective Senior Executive). If the Ad Hoc Group Majority and Senior Executive do not reach an agreement regarding the assumption or Reinstatement of such Senior Executive's other claimed Indemnification Agreements, all parties reserve their rights regarding such other claimed Indemnification Agreements. For the avoidance of doubt, nothing in this Article VI.F shall (i) expand the indemnification obligations owed by any of the Releasing Parties to the Released Parties beyond the limits set forth in Article X.M hereof; (ii) constitute a Reinstatement or assumption of any indemnification obligations which may be owed by Millennium or any other Debtor to Holdings or any other Person or Entity other than the Preserved Indemnified Parties solely with respect to the indemnification provisions set forth above,  or (iii) constitute a Reinstatement or assumption of any indemnification obligations of either Millennium to Holdings, or Holdings or any Debtor to any of the Preserved Indemnified Parties or any other Person or Entity except for Millennium.

## G.    Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to its employees, retirees, and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

H.      **Workers' Compensation Benefits**

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

I.      **Third Party Payer Contracts**

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all Third Party Payer Contracts are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any provision in the Third Party Payer Contracts that purports to declare a breach or default or to accelerate any payment obligations based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Nothing under the Plan shall affect the Debtors' or the applicable counterparty's rights, claims and defenses in respect of any Third Party Payer Contract, or the right of either party thereto to future adjudication of any disputes in respect thereto in accordance with the applicable provisions of such Third Party Payer Contract.

J.      **Medicare and Medicaid Agreements**

The Medicare and Medicaid Agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; provided that, for the avoidance of doubt, Holdings is not assuming any Medicare and Medicaid Agreements.  Nothing under the Plan will affect the USA's, HHS's, or CMS's rights, claims, and defenses in respect of any Medicare and Medicaid Agreements for future adjudication in accordance with the applicable provisions of such Medicare and Medicaid Agreements.  The "cure" and adequate assurance of future performance under section 365 of the Bankruptcy Code for the assumption of the Medicare and Medicaid Agreements shall be: (a) the performance by the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, of their obligations under the USA Settlement Agreements; and (b) the continued participation of the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, in the Medicare and Medicaid programs in the ordinary course of business to be governed by and subject to, the terms and conditions of the Medicare and Medicaid Agreements and the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments other than the Determined Overpayments (as defined in the Federal Administrative Settlement Agreement) in the ordinary course of business.  In the event that any of the Medicare and Medicaid Agreements are subsequently

– 46 –

terminated and the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries re-enroll in the Medicare and Medicaid programs, such parties agree that they shall assume successor liability as to any liability arising under the Medicare Agreements and that such successor liability shall be governed by and subject to, the terms and conditions of the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments in the ordinary course of business.

**ARTICLE VII**

**PROVISIONS GOVERNING DISTRIBUTIONS**

### A.    Distribution Record Date

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Claims after the Distribution Record Date shall not be recognized for purposes of this Plan. On the Distribution Record Date, the Administrative Agent shall provide a true and correct copy of the registry for the Existing Credit Agreement Claims to the Debtors. The Distribution Agent, or any party responsible for making distributions pursuant to this Article VII.A shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

### B.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as otherwise provided in the Plan and in the USA Settlement Agreements, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Equity Transfer Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

### C.    Distribution Agent

Except as provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, New Holdco, or the Administrative Agent, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Debtors or New Holdco as a

Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  For purposes of distributions under this Plan to the Holders of Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent and in acting in such capacity shall be entitled to all of the rights, protections, and indemnities afforded to the Administrative Agent under the Existing Credit Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than a Reorganized Debtor or New Holdco, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

## D.    Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E.    Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.  To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as an Unclaimed Distribution under the Plan.

No fractional shares shall be issued or distributed under the Plan.  Each Person entitled to receive Equity Interests or New Holdco Common Stock shall receive the total number of whole shares of Equity Interests or New Holdco Common Stock, as applicable to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of Equity Interests or New Holdco Common Stock, the actual distribution of shares of such Equity Interests shall be rounded to the next lower whole number.

## F.    Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such

Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

**G.    General Distribution Procedures**

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

**H.    Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, or (4) in accordance with the Existing Credit Agreement.

**I.    Undeliverable Distributions and Unclaimed Distributions**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Unclaimed Distribution within one year from the date upon which a distribution is first made to such entity shall be deemed to forfeit all rights to such Unclaimed Distribution under the Plan.  Such Unclaimed Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert and vest in the Reorganized Debtor free of any restrictions thereon.  Entities which fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

**J.    Withholding Taxes**

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes.  As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and

– 49 –

certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of this Plan, to the Millennium Corporate Claim Trust, or the Millennium Lender Claim Trust.

**K.     Setoffs**

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.

**L.     Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

**M.     Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest. Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

# ARTICLE VIII

## CONDITIONS PRECEDENT TO THE PLAN'S
## CONFIRMATION AND EFFECTIVE DATE

**A.     Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(i)     The Plan and Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Federal Settlement Parties, the Ad Hoc Group, and the Settling Members and shall be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(ii)     The RSA shall not have been terminated by any of the parties thereto.

(iii)     The Debtors shall have filed a motion seeking assumption of the USA Settlement Agreements and approval of the Subrogation Claim.

**B.      Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)     The Effective Date shall not occur prior to December 15, 2015.

(ii)     The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order (1) shall (A) approve the releases (including the third party release) and exculpations provided for in Article X.E, Article X.F, Article X.G, and Article X.H of this Plan, but not approve the release of, and specifically reserve for the benefit of the USA and Plaintiff States, the claims and liabilities provided for in Article V.J of this Plan; (B) contain the contribution claim and Non-Contribution Claim protections provided for in Article X.L of this Plan and such other protections for the Released Parties and their respective Related Parties set forth in the RSA; and (C) contain the bar order provisions set forth in Article X.J of this Plan, in each case, in form, scope, and substance consistent in all material respects with the RSA; and (2) shall otherwise be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(iii)     The Confirmation Order shall be a Final Order; provided, however, that only the Settling Members may agree in writing, in their sole and absolute discretion, to waive the condition that the Confirmation Order be a final, non-appealable order.

(iv)     The RSA shall have been assumed pursuant to the Confirmation Order and shall not have been terminated by any of the parties thereto.

(v)    The USA Settlement Agreements shall have been assumed pursuant to the USA Settlement Assumption Order or Confirmation Order and shall not have been terminated by any of the parties thereto. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(vi)    Good faith efforts have been made for the organizational documents of the Reorganized Debtors to have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization.

(vii)    New Holdco shall have been formed and the New Holdco Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws.

(viii)    The Debtors shall have received any and all required regulatory approvals to consummate the transactions contemplated by the Plan, the Disclosure Statement, and any documents contemplated thereunder.

(ix)    The transactions contemplated by this Plan, the Disclosure Statement, and any other documents contemplated hereunder or thereunder shall have been approved to the extent required and shall not be subject to avoidance.

(x)    All other documents and agreements necessary to implement the Plan on the Effective Date to the extent required herein or in the RSA, including the without limitation the New Term Loan Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(xi)    All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

(xii)    The New Securities and Debt Documents shall be in form and substance reasonably satisfactory to the Debtors and an Ad Hoc Group Majority, and shall have been executed and delivered by all parties thereto to the extent required hereunder.

## C.    Conditions to the Equity Transfer Date

The occurrence of the Equity Transfer Date is subject to each of the following conditions precedent:

(i)    All conditions to the Effective Date of the Plan as provided in Article VIII.B above shall have been satisfied or waived.

(ii)    The Equity Transfer Date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA.

(iii)    The JS Real Estate Leases shall have been amended on the terms specified in the RSA and assumed by Millennium.

(iv)    The Debtors shall have paid or caused to be paid the USA Settlement Funding Contribution to the USA.

## D.    Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article VIII may be waived only if waived in writing by each of the Debtors, the Ad Hoc Group Majority, and the Settling Members (except as otherwise stated in this Article VIII or the RSA) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the RSA.  The failure to satisfy or waive a condition to the Effective Date may be asserted by any of the Debtors, the Ad Hoc Group Majority, and the Settling Members regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors, the Ad Hoc Group Majority, or the Settling Members to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

## E.    Effect of Non Occurrence of Conditions to the Effective Date

If the Effective Date of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE IX

## RETENTION OF JURISDICTION

## A.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; provided, however, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work

performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

(iv)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(ix)    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(x)    enforce the terms and condition of this Plan and the Confirmation Order;

(xi)    resolve any cases, controversies, suits or disputes with respect to the release, the Exculpation, the indemnification provisions and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xii)    to enforce the releases, bar order(s), and injunction(s) provided in Article X hereof;

(xiii)    resolve any cases, controversies, suits, or disputes with respect to the release of all claims against USA Settlement Parties on account of the payment of the Initial USA Settlement Deposit and the USA Settlement Funding Contribution;

– 54 –

(xiv)    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xv)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

(xvi)    enter an order concluding or closing the Chapter 11 Cases; and

(xvii)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

**B.      Lack of Bankruptcy Court Jurisdiction**

Notwithstanding any other provision of this Plan or the Confirmation Order, the Bankruptcy Court shall not have jurisdiction with respect to: (i) any actions or proceedings to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements; (ii) any claims, actions or proceedings for any of the liabilities provided for in Article V.J of this Plan; and (iii) any claims, actions or proceedings regarding regulation and administration of the participation in the Medicare and Medicaid programs by the Debtors, New Holdco, Reorganized Millennium, and all subsidiaries of Reorganized Millennium, as applicable.

**C.      Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Article IX.A of the Plan, the provisions of this Article IX shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X

## EFFECTS OF CONFIRMATION

**A.      Binding Effect**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

– 55 –

**B.      Subordination Rights**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

**C.      Discharge of the Debtors**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the occurrence of the Effective Date.  However, the foregoing provisions will have no effect on the Debtors' liabilities as reserved by the USA Settlement Agreements and as provided for in Article V.J of this Plan, whether such liabilities arose prior to or after the Confirmation Date.

**D.      Exculpation and Limitation of Liability**

The Exculpated Parties and the USA Settlement Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the RSA, or any other contract, instrument, release or other agreement or document created or

entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement including the Retained Claims.

E.    **Releases by Debtor**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN OR THE CONFIRMATION ORDER, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES (AND EACH SUCH RELEASED PARTY AND THEIR RESPECTIVE RELATED PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER, OR ON BEHALF OF ANOTHER PARTY AGAINST THE RELEASED PARTIES OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT, INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (IV) ANY CLAIMS OR DEFENSES AGAINST THIRD PARTY PAYERS UNDER ASSUMED CONTRACTS.

FURTHERMORE, EFFECTIVE AS OF THE EFFECTIVE DATE OF THE USA SETTLEMENT AGREEMENTS AND CONTINUING TO BE EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE USA SETTLEMENT PARTIES, THE ADEQUACY OF

WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER, AND RELEASE TO THE USA SETTLEMENT PARTIES AND THE USA SETTLEMENT PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED, AND DISCHARGED BY THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS RELEASED PURSUANT TO THE USA SETTLEMENT AGREEMENTS.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE. FOR PURPOSES OF THIS RELEASE, AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE DEBTORS ARE SPECIFICALLY ASSUMING CONTROL OF AND RELEASING ALL AVOIDANCE ACTIONS AGAINST THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND CAUSES OF ACTION THAT ARE COVERED OR THAT ARISE UNDER BANKRUPTCY CODE SECTION 544.

**F.      Releases by TA and MLH**

(i)      SUBJECT TO (iii) BELOW, TA, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS, MLH, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT TA OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY, AND INCLUDING, FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS ARISING FROM MLH'S FAILURE TO MAINTAIN ITS STATUS AS AN S CORP), AGAINST HOLDINGS OR MLH OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(ii)      SUBJECT TO (iii) BELOW,  MLH, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS AND TA, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY

AND ALL CORE RELEASED CLAIMS THAT MLH OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY), AGAINST HOLDINGS OR TA OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(iii)    FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING SUBPARAGRAPHS (I) AND (II) ABOVE, IN ANY LAWSUIT OR OTHER LEGAL ACTION BY AN EXCLUDED PARTY AGAINST TA, MLH OR THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "EQUITY DEFENDANTS"), EACH EQUITY DEFENDANT PRESERVES AND DOES NOT WAIVE THE RIGHT TO DEFEND OR OTHERWISE RESPOND TO SUCH ACTION BY ASSERTING THAT ANOTHER EQUITY DEFENDANT IS RESPONSIBLE FOR ANY OR ALL CAUSES OF ACTION ASSERTED BY, OR DAMAGES CLAIMED BY, AN EXCLUDED PARTY; AND PROVIDED, FURTHER, HOWEVER, NOTHING IN THIS PARAGRAPH RELEASES ANY PERSON FROM ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN, INCLUDING THE PROVISIONS OF Article V.R OF THIS PLAN.

## G.    Releases by Lender Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE LENDER RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE LENDER RELEASING PARTIES OR THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY AND ITS RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH LENDER RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; AND/OR (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## H.    Releases by Third Party Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE THIRD PARTY RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES, AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT ANY OF THE THIRD PARTY RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH THIRD PARTY RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY LIABILITY EXPRESSLY RESERVED BY CERTAIN GOVERNMENTAL UNITS AS PROVIDED IN Article V.J OF THIS PLAN; AND/OR (IV) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## I.      Waiver of Limitations on Releases of Unknown Claims

Each of the Debtors, Lender Releasing Parties, and Third Party Releasing Parties agree and acknowledge that the releases contained in Article X.E, Article X.F, Article X.G, and Article X.H shall extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties shall be deemed to waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542.  The Parties also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts.  The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

However, nothing in this section shall affect the claims and liabilities specifically reserved for Governmental Units in the USA Settlement Agreements as provided for in Article V.J of this Plan.

## J.      Bar Order

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, of any claims or Causes of Action released pursuant to this Plan, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H.  For the avoidance of doubt, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on

any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Lenders arising out of or in connection with any Retained Claims.  The foregoing provision shall not operate to enjoin the commencement or prosecution by the USA Settlement Parties of any action or proceeding to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements.

In addition to the foregoing, to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the Pro Rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based multiplied by (y) the Settlement Contribution.

The Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Lenders with respect to any Retained Claims that are, immediately prior to the Effective Date, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties, and all such claims shall be barred, enjoined and released.

**K.    Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY AVOIDANCE ACTION (AS DEFINED IN THIS PLAN) OR ANY OTHER ACTION TO AVOID OR RECOVER THE INITIAL USA SETTLEMENT DEPOSIT.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

**L.    Retained Claims**

The Preserved Estate Claims are hereby expressly preserved and the Preserved Lender Claims are hereby expressly preserved.  The releases provided for herein do not preclude the

– 62 –

Prepetition Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Preserved Lender Claim or Preserved Estate Claim is assigned (the Prepetition Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Retained Claim Plaintiff") from prosecuting, and the Prepetition Lenders and Millennium retain the right, respectively, to bring, the Retained Claims against the Excluded Parties.  In the event that the Retained Claim Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Retained Claim Judgment"), the parties' rights shall be as follows:

(i)      where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then the Prepetition Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Retained Claim Plaintiff by the equitable share of Gross Damages attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Retained Claim Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and the Retained Claim Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Retained Claim Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Retained Claim Plaintiff equal to such excess so that the Retained Claim Plaintiff shall not recover in excess of its Gross Damages; and

(ii)      where the Retained Claim Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Retained Claim Plaintiff affirmatively consents to any such petition for intervention  by MLH and/or TA (or any of their Related Parties)), and where the Retained Claim Plaintiff successfully obtains a Retained Claim Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Retained Claim Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Retained Claim Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and the

Retained Claim Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).

In the event that, after one or more trustees are appointed to pursue Retained Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties in the forum selected by the Retained Claim Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties.  In any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Retained Claim Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA.  Moreover, in any litigation by the Retained Claim Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Retained Claim Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Retained Claim Plaintiff, the Prepetition Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required.  The Retained Claim Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted.  Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties).  In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Retained Claim Plaintiff, which shall be exercised in the sole discretion of the Retained Claim Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of the Retained Claim Plaintiff.  To the extent that any settlement of any Retained Claim between a Retained Claim Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon.  For the avoidance of doubt, the Prepetition Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

– 64 –

**M.      Other Obligations With Respect To Released Parties**

MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Retained Claim Plaintiff, the Prepetition Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium  insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Prepetition Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Retained Claim Plaintiff, Millennium or Prepetition Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

To the extent that the Released Parties do not obtain a full and complete release from the Third Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, or the Restructuring Transactions that any of the Third Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event, MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.   If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to

the extent that, all reimbursed costs, including those costs set forth in the preceding paragraph, shall not exceed an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third Party Releasing Parties or the Excluded Parties.  For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in Article X.J above shall be deemed to fall within the litigation-related costs that are covered in Article X.L and this Article X.M.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### A.    Dissolution of the Committee

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

### B.    Payment of Statutory Fees

All fees payable under Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid from funds otherwise available for distribution hereunder.

### C.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and in the RSA: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; provided that any such modification must be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements.  A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under this Plan.

### D.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the RSA and under the USA Settlement Agreements.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

### E.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, at their option may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.    Notwithstanding anything to the contrary in this Article XI.E, no alteration or interpretation can modify the conditions to the Effective Date set forth in Article VIII.B or compel the funding of Settlement Contribution if the conditions to such funding set forth in the RSA have not been satisfied.

### F.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

### G.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtors have made all distributions contemplated by this Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Cases.

**H.      Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred..  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

**I.      Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J.      Notices to Debtors**

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, (e) facsimile transmission or (f) email transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

**If to the Debtors:**

Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Facsimile:        (858) 217-1910
Attention:        Martin Price, Esq., President and General Counsel
                  (martin.price@millenniumhealth.com)

**with a copy to (which shall not constitute notice):**

Counsel to the Debtors

       Skadden, Arps, Slate, Meagher & Flom LLP
       One Rodney Square
       P.O. Box 636
       Wilmington, Delaware 19899-0636
       Facsimile:    (302) 651-3001
       Attention:    Anthony W. Clark (anthony.clark@skadden.com)
                      Jason M. Liberi (jason.liberi@skadden.com)

       - and -

       Skadden, Arps, Slate, Meagher & Flom LLP
       Four Times Square
       New York, New York 10036-6522
       Facsimile:    (212) 735-2000
       Attention:    Kenneth S. Ziman (ken.ziman@skadden.com)
                      Raquelle L. Kaye (raquelle.kaye@skadden.com)

       - and -

       Skadden, Arps, Slate, Meagher & Flom LLP
       155 N. Wacker Drive
       Chicago, Illinois 60606-1720
       Facsimile:    (312) 407-0411
       Attention:    Felicia Gerber Perlman (felicia.perlman@skadden.com)
                      Matthew Kriegel (matthew.kriegel@skadden.com)

**If to the Participating Lenders:**

       To each Participating Lender at the address identified in
       such Participating Lender's signature page

**with a copy to (which shall not constitute notice):**

       Brown Rudnick LLP
       7 Times Square
       New York, New York 10036
       Telephone:    (212) 209-4862
       Facsimile:    (212) 209-4801
       Attention:    Robert J. Stark (rstark@brownrudnick.com)
                      Sigmund S. Wissner-Gross
                      (swissnergross@brownrudnick.com)

- and -

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Telephone:    (617) 856-8200
Facsimile:    (617) 856-8201
Attention:    Steven B. Levine (slevine@brownrudnick.com)

**If to MLH:**

Millennium Lab Holdings, Inc.
James Slattery
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone:    (858) 451-3535
Facsimile:    (858) 217-1910
Attention:    Martin Price, Esq.

**with a copy to (which shall not constitute notice):**

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4750
Facsimile:    (212) 446-4900
Attention:    Paul M Basta, P.C. (paul.basta@kirkland.com)
              Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

TA Millennium, Inc.
c/o TA Associates
John Hancock Tower
200 Clarendon Street
56th Floor
Boston, MA 02116
Telephone:    (617) 574-6725
Facsimile:    (617) 574-6728
Attention:    Jeffrey C. Hadden

– 70 –

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:    (212) 813-8800
Facsimile:     (212) 409-8404
Attention:    Michael H. Goldstein (mgoldstein@goodwinprocter.com)
              William P. Weintraub (wweintraub@goodwinprocter.com)

## K.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

## L.    Exhibits

All exhibits and schedules to this Plan, including the Exhibits, are incorporated and are a part of this Plan as if set forth in full herein.

## M.    No Strict Construction

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Ad Hoc Group, the Participating Lenders, the Settling Members, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits, and the agreements and documents contemplated therein or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits, and the documents contemplated thereunder and related thereto.

## N.    Conflicts

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

[Remainder of page intentionally left blank]

Dated: Wilmington, Delaware
       October 29, 2015

                                          MILLENNIUM  LAB  HOLDINGS  II,  LLC,  on
                                          behalf of itself and its affiliates listed below


                                          /s/ W. Brock Hardaway
                                          Name:      W. Brock Hardaway
                                          Title:      Chief Executive Officer


                                          MILLENNIUM HEALTH LLC
                                          RXANTE LLC