IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :  Chapter 11

In re:                        :

                         :  Case No. 15-12284 (____)

MILLENNIUM LAB HOLDINGS II, LLC, et al.,   :

                         :  Joint Administration Pending

          Debtors.[1]         :

                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OFFERING MEMORANDUM AND SOLICITATION STATEMENT FOR OUT-OF-COURT TRANSACTION AND DISCLOSURE STATEMENT FOR PREPACKAGED PLAN OF REORGANIZATION**

**MILLENNIUM LAB HOLDINGS II, LLC
MILLENNIUM HEALTH, LLC
RXANTE, LLC**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

| Anthony W. Clark | Kenneth S. Ziman | Felicia Gerber Perlman |
|---|---|---|
| Jason M. Liberi | Raquelle L. Kaye | Matthew N. Kriegel |
| One Rodney Square | Four Times Square | 155 N. Wacker Drive |
| P.O. Box 636 | New York, NY 10036 | Chicago, IL 60606 |
| Wilmington, DE 19899 | Phone: (212) 735-3000 | Phone: (312) 407-0700 |
| Phone: (302) 651-3000 | | |

Proposed Counsel for Debtors and Debtors in Possession

Dated:  October 29, 2015

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

On October 15, 2015, Millennium Lab Holdings II, LLC ("Holdings"), certain lenders holding approximately 85.63% of the aggregate principal amount outstanding under the Existing Credit Agreement (as defined below) (the "Participating Lenders"), Millennium Lab Holdings, Inc. ("MLH") and TA Millennium, Inc. ("TA" and, together with MLH, the "Members") entered into a Restructuring Support Agreement (together with the term sheet attached thereto, and attached hereto as Exhibit A, the "RSA") relating to a proposed financial restructuring of Holdings and its subsidiaries, Millennium Health, LLC ("Millennium") and RxAnte, LLC ("RxAnte," and together with Holdings and Millennium, the "Company" or, in the context of a chapter 11 filing, the "Debtors"). Pursuant to the RSA and this offering memorandum, solicitation statement and disclosure statement (the "Disclosure Statement") and the Master Restructuring Agreement attached hereto as Exhibit B (the "Master Restructuring Agreement"), in consideration for the cancellation of up to all of the outstanding obligations (the "Existing Credit Agreement Claims") under that certain Credit Agreement, dated as of April 16, 2014, among Holdings, Millennium, Wilmington Savings Fund Society, FSB (as successor administrative agent to JPMorgan Chase Bank, N.A., the "Administrative Agent"), and the lenders from time to time party thereto (the "Prepetition Lenders") (as amended, modified, supplemented, and extended from time to time, the "Existing Credit Agreement" and, together with all related loan documentation, the "Existing Loan Documents"), subject to various conditions including such Prepetition Lenders' consent to the out-of-court releases contemplated by the RSA (the "Out-of-Court Releases"), the Company proposes to issue to each Prepetition Lender that consents to an out-of-court restructuring transaction (the "Out-of-Court Transaction") a pro rata share of and interest in (x) 100% of the post-restructuring equity interests in Millennium (the "Millennium Equity Interests"), (y) a new secured Term Loan in the aggregate principal amount of $600 million (the "New Term Loan") and (z) beneficial interests in certain trusts to be formed to hold certain claims and causes of action (the securities and interests described in clauses (x) through (z) are collectively referred to herein as the "Consideration").

The consummation of the Out-of-Court Transaction is conditioned upon, among other things, the Company's receipt of consents to the Out-of-Court Transaction from Prepetition Lenders holding all but $50 million of the Existing Credit Agreement Claims (the "Out-of-Court Requisite Lenders") by November 8, 2015 (the "Consenting and Voting Deadline"). However, MLH, TA, a supermajority of the members of the Ad Hoc Group of Prepetition Lenders (the "Ad Hoc Group") and the Company may agree in writing that the aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million, in each of their sole and respective absolute discretion.

The Company is simultaneously soliciting acceptances, upon the terms and subject to the conditions set forth in this Disclosure Statement, from all Prepetition Lenders of the Debtors' Prepackaged Plan of Reorganization attached hereto as Exhibit C (the "Plan"). Pursuant to the Plan, among other things, the Existing Credit Agreement Claims would be cancelled and the Debtors would issue to each Prepetition Lender its pro rata share of the Consideration. An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, bar order and injunction provisions. Unless otherwise noted, capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan. If the conditions to the Out-of-Court Transaction are not satisfied and are not waived, but Holders of a majority in number and no less than eighty-five percent (85%) in aggregate principal amount of Existing Credit Agreement Claims vote to approve the Plan (which threshold may be reduced by agreement of MLH and TA to no less than sixty-six and two-thirds percent (66 2/3%)) (the "Requisite Consenting Lenders"), the Debtors will commence their Chapter 11 Cases in the Bankruptcy Court to implement the Plan and the transactions described therein. If bankruptcy petitions are filed, the Debtors will seek confirmation of the Plan as soon as practicable. **If the Out-of-Court Transaction is not approved by the Out-of-Court Requisite Lenders and the Requisite Consenting Lenders fail to approve the Plan, the Company may file petitions under chapter 11 of the Bankruptcy Code and pursue confirmation**

**and consummation of an alternative plan of reorganization or liquidation or a sale of substantially all of the Debtors' assets.**

In connection with the Out-of-Court Transaction and the Plan, the Company is also soliciting consents to certain amendments to the Existing Credit Agreement (the "First Existing Credit Agreement Amendment"), to become effective as of the Consenting and Voting Deadline (defined below), and certain additional amendments to the Existing Credit Agreement (the "Second Existing Credit Agreement Amendment" and, together with the First Existing Credit Agreement Amendment, the "Existing Credit Agreement Amendments"), to become effective as of the date that the Out-of-Court Transaction closes as set forth in the Master Restructuring Agreement (the "Closing Date").  The purpose of the First Existing Credit Agreement Amendment is to (i) permit the incurrence of the Early Commitment Facility (defined below) as of the Early Commitment Deadline (defined below) and (ii) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the Early Commitment Facility.  The First Existing Credit Agreement Amendment will also contain a release of Holdings as a guarantor of the Existing Credit Agreement (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Approved Plan Effective Date (as defined in the Early Commitment Facility as in effect on the date thereof) and the payment in full in cash of the principal and interest outstanding under the Early Commitment Facility.  The Second Existing Credit Agreement Amendment will (i) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the New Term Loan, (ii) eliminate substantially all of the representations, covenants and prepayment obligations contained in the Existing Credit Agreement, (iii) permanently waive any existing defaults under the Existing Loan Documents, (iv) prevent any party to the Existing Credit Agreement from exercising any rights or remedies under the Existing Loan Documents for a period of ninety-one (91) days after the Closing Date, and (v) release and terminate Holdings' guarantee of the Existing Credit Agreement  (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Effective Date (as defined in the Second Existing Credit Agreement Amendment).  In addition, the Master Restructuring Agreement contemplates that the Guarantee and Collateral Agreement, dated as of April 16, 2014, among Holdings, Millennium and certain of its subsidiaries (the "Existing Guarantee and Collateral Agreement") will be amended to eliminate substantially all of the representations, covenants and related obligations contained therein (the "Existing Guarantee and Collateral Agreement Amendment").  As a result of the Existing Credit Agreement Amendments and the Existing Guarantee and Collateral Agreement Amendment, the rights and protections available to Non-Consenting Lenders under the Existing Loan Documents will be significantly reduced.

**Each Prepetition Lender that (i) consents to the Out-of-Court Transaction and the Out-of-Court Releases, (ii) votes in favor of the Plan and (iii) consents to the Existing Credit Agreement Amendments by 12:00 p.m. (prevailing Eastern Standard Time) on November 5, 2015 will receive its pro rata share of a new senior secured Term Loan in the aggregate principal amount of $50.0 million (the "Early Commitment Facility").  The Early Commitment Facility will be secured on a first priority perfected basis and such security interests will rank senior in priority to security interests securing the Existing Credit Agreement Claims.**

All Prepetition Lenders are urged to read this Disclosure Statement, the Master Restructuring Agreement and the Plan in full.  The Company, as well as the Ad Hoc Group, believe that the Out-of-Court Transaction and, alternatively, the Plan are in the best interests of the Company and all of its stakeholders, including the Prepetition Lenders.  Accordingly, Prepetition Lenders are urged to consent to the Out-of-Court Transaction, including the Out-of-Court Releases, to vote in favor of the Plan and to consent to the Existing Credit Agreement Amendments.

No person has been authorized to give any information or make any representation about the Out-of-Court Transaction or the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither this Disclosure Statement's distribution nor the Out-of-Court Transaction's or the Plan's consummation will, under any circumstance, create any implication that the information herein is correct as of any time after the date hereof. All summaries herein are qualified by reference to the Master Restructuring Agreement and the Plan as a whole. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability, but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Company has provided the factual information in this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Bankruptcy Code section 1125 and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of chapter 11 of the Bankruptcy Code. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "SEC") nor any state regulatory authority, nor has the SEC nor any state regulatory authority passed upon the accuracy or adequacy of the statements contained herein.

In making a decision in connection with the Out-of-Court Transaction or the Plan, Prepetition Lenders must rely on their own examinations of the Company and of the terms of the Out-of-Court Transaction or the Plan, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice, and each Holder should consult its own advisors with respect to those matters.

THE DEADLINE FOR PREPETITION LENDERS TO CONSENT TO THE OUT-OF-COURT TRANSACTION (INCLUDING THE OUT-OF-COURT RELEASES), VOTE IN FAVOR OF THE PLAN AND CONSENT TO THE EXISTING CREDIT AGREEMENT AMENDMENTS IN ORDER TO RECEIVE THEIR PRO RATA SHARE OF THE EARLY COMMITMENT FACILITY IS 12:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 5, 2015.

CONSENTS TO THE OUT-OF-COURT TRANSACTION, VOTES TO ACCEPT OR REJECT THE PLAN AND CONSENTS TO THE EXISTING CREDIT AGREEMENT AMENDMENTS WILL BE ACCEPTED UNTIL 5:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 8, 2015.

## CONSENTING AND VOTING INSTRUCTIONS

**FOR YOUR CONSENT AND/OR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER:**

**(1) IF YOU CONSENT TO THE OUT-OF-COURT TRANSACTION AND VOTE IN FAVOR OF THE PLAN:**

**(A) YOUR SIGNATURE PAGE TO THE MASTER RESTRUCTURING AGREEMENT,**

**(B) YOUR BALLOT VOTING IN FAVOR OF THE PLAN, AND**

**(C) YOUR SIGNATURE PAGES TO THE EXISTING CREDIT AGREEMENT AMENDMENTS**

**(2) IF YOU DO NOT CONSENT TO THE OUT-OF-COURT TRANSACTION AND VOTE AGAINST THE PLAN:**

**(A) YOUR BALLOT VOTING AGAINST THE PLAN**

**SO THAT EACH IS RECEIVED BY THE FOLLOWING VOTING AGENT (THE "VOTING AGENT") NO LATER THAN 5:00 P.M. (EASTERN TIME) ON NOVEMBER 8, 2015.**

**IN ORDER TO PROMPTLY TRANSMIT YOUR SIGNATURE PAGE AND/OR BALLOT, YOU MUST SEND IT VIA EMAIL OR OVERNIGHT DELIVERY TO THE FOLLOWING:**

**Millennium Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
Email:  millenniumballots@primeclerk.com
Telephone (toll free): (844) 276-3028
Telephone (international): (917) 962-8498**

## EARLY COMMITMENT FEE

**ONLY PREPETITION LENDERS THAT (1) CONSENT TO THE OUT-OF-COURT TRANSACTION AND OUT-OF-COURT RELEASES AND DELIVER THEIR SIGNATURE PAGES TO THE MASTER RESTRUCTURING AGREEMENT, (2) VOTE IN FAVOR OF THE PLAN AND DELIVER THEIR BALLOTS AND (3) DELIVER THEIR SIGNATURE PAGES TO THE EXISTING CREDIT AGREEMENT AMENDMENTS NO LATER THAN 12:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 5, 2015 WILL RECEIVE THEIR PRO RATA SHARE OF THE EARLY COMMITMENT FACILITY.**

**SECURITIES LAW MATTERS**

In the case of the Plan, the Debtors will rely on Bankruptcy Code section 1145(a)(1) to exempt the exchange, issuance, and distribution of Equity Interests in Millennium and New Holdco (defined below) from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and state securities and "blue sky" laws, insofar as, for each Debtor, (i) the securities are issued by the Debtor, an affiliate participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; (ii) the recipients of securities hold claims against, interests in, or claims for administrative expenses in the cases concerning, the Debtor or such affiliate; and (iii) the securities are issued entirely in exchange for a recipient's claim against or interest in the Debtor or such affiliate, or are issued "principally" in such exchange and "partly" in exchange for cash or property. The Out-of-Court Transaction, if consummated, will constitute a private placement and will be consummated without registration under the Securities Act. Accordingly, the securities issued pursuant to the Out-of-Court Transaction will not have been registered with the United States Securities and Exchange Commission and may only be offered and sold in compliance with the registration requirements of the Securities Act or in reliance on an exemption therefrom.

The Debtors also believe that the issuance and distribution of Equity Interests in Millennium and New Holdco pursuant to the Plan will be exempt from the registration requirements of the Securities Act, and any state or local laws requiring registration, by reason of one or more exemptions therefrom, including Section 4(a)(2) of the Securities Act, as a transaction not involving any public offering. Persons who receive equity securities under the Plan are urged to consult their own legal advisors with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

**FORWARD-LOOKING STATEMENTS**

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, the Company's future financial performance, or the Company's projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue," the negatives of these terms, or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those discussed in the section entitled "Risk Factors" and in other sections of this Disclosure Statement, including in any documents incorporated by reference herein. Although the Company believes that the expectations reflected in the forward-looking statements are reasonable, the Company cannot guarantee future results, events, levels of activity, performance, or achievements. The Company expressly disclaims a duty to update any forward-looking statements.

## TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY ................................................................................................. 1

    A.  Overview.............................................................................................................. 1

    B.  Summary of the Restructuring ........................................................................... 2

        1.  Purpose of the Restructuring................................................................. 2

        2.  Summary of the USA Settlement............................................................ 2

        3.  Summary of the Restructuring Support Agreement............................... 3

        4.  Summary of Out-of-Court Transaction.................................................. 4

        5.  Summary of the Plan.............................................................................. 6

    C.  Certain Bankruptcy Considerations ................................................................ 11

    D.  Notice to Prepetition Lenders ......................................................................... 11

    E.  Voting Procedures, Ballots, and Consenting and Voting Deadline ................. 12

    F.  Record Dates for Consents, Voting and Distributions..................................... 13

    G.  Confirmation Hearing and Deadline for Objections ....................................... 13

II. BACKGROUND TO THE OUT-OF-COURT TRANSACTION AND CHAPTER 11
    CASES ................................................................................................................... 15

    A.  The Company's Business.................................................................................. 15

        1.  Laboratory and Analytics Services ..................................................... 15

        2.  Government Regulation and Compliance............................................. 16

    B.  The Company's Corporate Structure ............................................................... 16

    C.  The Company's Capital Structure.................................................................... 16

        1.  Existing Credit Agreement ................................................................... 16

        2.  Equity Interests .................................................................................... 17

    D.  Events Leading to the Out-of-Court Transaction and the Chapter 11 Cases ... 17

        1.  Reorganization and Dividend Recapitalization ................................... 17

        2.  USA Investigation, CMS Revocation and Suspension, and Settlement ............. 18

3. Restructuring Support Agreement .............................................. 20

III. MASTER RESTRUCTURING AGREEMENT .......................................... 21

    A. Summary of Early Commitment Facility ............................................ 22

    B. Summary of Second Existing Credit Agreement Amendment ................. 22

    C. Summary of New Term Loan ............................................................ 24

    D. Summary of Equity Capitalization of New Holdco ............................. 29

    E. Summary of Millennium Claim Trusts .............................................. 32

    F. Summary of Out-of-Court Releases ................................................. 36

    G. Employee Arrangements ................................................................. 40

    H. JS Real Estate ............................................................................. 40

    I. Conversion of Millennium .............................................................. 40

    J. Certain Tax Matters .................................................................... 40

        1. Tax Characterization of the Restructuring ................................ 40

        2. USA Settlement Deduction ..................................................... 41

        3. Section 754 Election ............................................................. 41

        4. Cooperation; Amended Returns ............................................... 41

        5. Holdings Tax Returns ............................................................ 41

        6. Entity Classifications ............................................................ 42

        7. TA and MLH Taxes and Refunds ............................................ 42

        8. Post-Closing Taxes ............................................................... 42

        9. Distributions to any Consenting Lender ................................... 42

        10. Withholding ........................................................................ 42

IV. ANTICIPATED CHAPTER 11 CASES ............................................... 43

    A. Motions to be Filed on the Petition Date ......................................... 43

        1. Motion to Use Cash Collateral ............................................... 43

        2. Motion to Pay Unimpaired Claims in the Ordinary Course of Business ............ 43

3.      Motion to Approve (i) Combined Disclosure Statement and Confirmation Hearing and (ii) Assumption of the USA Settlement Agreements and the RSA................................................................................................ 43

4.      Motion to Continue Using Existing Cash Management Systems ........................ 44

5.      Motion for Authority to Pay Prepetition Employee Compensation and Associated Benefits.......................................................................................... 44

6.      Motion to Pay Taxes/Regulatory Expenses ........................................................ 44

7.      Motion to Maintain Insurance Policies ................................................................ 44

8.      Adequate Assurance of Utilities ......................................................................... 44

9.      Other "First Day" and "Second Day" Motions and Applications........................ 45

B.      Anticipated Timing of the Chapter 11 Cases .................................................................. 45

V.      THE PLAN .................................................................................................................................. 46

A.      TREATMENT OF UNCLASSIFIED CLAIMS................................................................ 46

1.      Administrative Claims ......................................................................................... 46

2.      Priority Tax Claims.............................................................................................. 47

B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ...................................................................................................... 47

1.      Introduction.......................................................................................................... 47

2.      Summary of Classification and Treatment of Classified Claims and Equity Interests ..................................................................................................... 48

3.      Classification and Treatment of Claims and Equity Interests............................... 48

4.      Special Provision Governing Unimpaired Claims ................................................ 54

5.      Discharge of Claims............................................................................................. 54

6.      Alternative Treatment .......................................................................................... 54

C.      ACCEPTANCE OR REJECTION OF THE PLAN .......................................................... 54

1.      Presumed Acceptance of Plan.............................................................................. 54

2.      Deemed Rejection of Plan ................................................................................... 55

3.      Voting Classes ..................................................................................................... 55

4.      Acceptance by Impaired Classes of Claims.......................................................... 55

5.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................... 55

D.      MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................... 55

1.      General Settlement of Claims ............................................................. 55

2.      Corporate Existence ............................................................................ 56

3.      Vesting of Assets in the Reorganized Debtors .................................... 56

4.      New Term Loan; Sources of Consideration for Plan Distributions .................... 57

5.      New Holdco Common Stock Issued Under the Plan ........................... 58

6.      Millennium Corporate Claim Trust .................................................... 58

7.      Millennium Lender Claim Trust .......................................................... 59

8.      Issuance of New Securities and Related Documentation ..................... 60

9.      Release of Liens, Claims and Equity Interests .................................... 61

10.     Reservation of Certain Claims of Governmental Units ....................... 61

11.     New Holdco and Reorganized Debtors Organizational Documents ................... 62

12.     Directors and Officers of Reorganized Debtors .................................. 62

13.     Restructuring Transactions ................................................................. 62

14.     Corporate Action ................................................................................ 63

15.     Cancellation of Notes, Certificates and Instruments ........................... 63

16.     Preservation and Maintenance of Debtor Causes of Action ................ 64

17.     Exemption from Certain Transfer Taxes ............................................. 65

18.     Certain Tax Matters ........................................................................... 65

19.     Further Transactions .......................................................................... 67

E.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 67

1.      Assumed Contracts and Leases ........................................................... 67

2.      Assignment of Executory Contracts or Unexpired Leases ................. 68

3.      Rejection of Executory Contracts or Unexpired Leases ..................... 68

4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .......................................................................................... 69

5.     Assumption of Officer Insurance Policies ............................................... 69

6.     Indemnification Provisions ..................................................................... 69

7.     Compensation and Benefit Programs ....................................................... 70

8.     Workers' Compensation Benefits ............................................................ 70

9.     Third Party Payer Contracts .................................................................... 70

10.    Medicare and Medicaid Agreements ....................................................... 71

F.     PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 71

1.     Distribution Record Date ........................................................................ 71

2.     Dates of Distributions ............................................................................. 71

3.     Distribution Agent .................................................................................. 72

4.     Cash Distributions................................................................................... 72

5.     Rounding of Payments ............................................................................ 72

6.     Distributions on Account of Allowed Claims.......................................... 72

7.     General Distribution Procedures.............................................................. 73

8.     Address for Delivery of Distributions...................................................... 73

9.     Undeliverable Distributions and Unclaimed Distributions....................... 73

10.    Withholding Taxes................................................................................... 73

11.    Setoffs .................................................................................................... 74

12.    Surrender of Cancelled Instruments or Securities ................................... 74

13.    Lost, Stolen, Mutilated or Destroyed Securities ..................................... 74

G.     CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION AND
       EFFECTIVE DATE.................................................................................... 74

1.     Conditions to Confirmation .................................................................... 74

2.     Conditions to Effective Date................................................................... 75

3.     Conditions to the Equity Transfer Date ................................................... 76

4.     Waiver of Conditions.............................................................................. 76

5.     Effect of Non Occurrence of Conditions to the Effective Date ............... 76

H.     EFFECTS OF CONFIRMATION ................................................................ 77

    1.     Binding Effect ................................................................. 77

    2.     Subordination Rights .................................................... 77

    3.     Discharge of the Debtors .............................................. 77

    4.     Exculpation and Limitation of Liability ...................... 78

    5.     Releases by Debtor ....................................................... 78

    6.     Releases by TA and MLH ............................................ 79

    7.     Releases by Lender Releasing Parties .......................... 80

    8.     Releases by Third Party Releasing Parties .................. 80

    9.     Waiver of Limitations on Releases of Unknown Claims ... 81

    10.    Bar Order ...................................................................... 82

    11.    Injunction ...................................................................... 82

    12.    Retained Claims ........................................................... 83

    13.    Other Obligations With Respect To Released Parties ......... 85

VI.    RISK FACTORS ........................................................................................... 86

    A.     Risk Factors Relating to the Bankruptcy Process ............................. 86

    B.     Risk Factors Relating to the New Holdco Common Stock Issued Under the Out-of-Court Transaction or the Plan ........................................... 88

    C.     Risk Factors Relating to the Indebtedness to be Issued Under the New Term Loan ......................................................................................... 90

    D.     Additional Risk Factors Relating to the Out-of-Court Transaction ... 94

    E.     Risk Factors Relating to Reorganized Millennium's Business ......... 95

VII.    CONFIRMATION OF THE PLAN ............................................................... 98

    A.     Voting Requirements ......................................................................... 99

    B.     Feasibility of the Plan ....................................................................... 99

    C.     Best Interests Test ........................................................................... 100

    D.     Confirmation Without Acceptance of All Impaired Classes – "Cramdown" ................. 101

VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............ 102

IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN AND THE OUT-OF-COURT TRANSACTION .......................................................... 103

    A.    Certain United States Federal Income Tax Consequences to the Debtors ..................... 104

    B.    Certain United States Federal Income Tax Consequences to Holders of Existing
Credit Agreement Claims ............................................................................................. 104

    C.    Importance of Obtaining Professional Tax Assistance ................................................. 108

X.    OTHER MATTERS ................................................................................................................. 108

RECOMMENDATION AND CONCLUSION ....................................................................................... 109

RESTRUCTURING SUPPORT AGREEMENT ..................................................................... EXHIBIT A
MASTER RESTRUCTURING AGREEMENT ........................................................................ EXHIBIT B
PREPACKAGED PLAN OF REORGANIZATION ................................................................ EXHIBIT C
EXISTING CREDIT AGREEMENT AMENDMENTS .......................................................... EXHIBIT D
USA SETTLEMENT AGREEMENTS ..................................................................................... EXHIBIT E
EARLY COMMITMENT FACILITY ...................................................................................... EXHIBIT F
ORGANIZATIONAL CHART ................................................................................................. EXHIBIT G
FINANCIAL PROJECTIONS ................................................................................................... EXHIBIT H
LIQUIDATION ANALYSIS ...................................................................................................... EXHIBIT I

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH SCHEDULE AND EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET
FORTH HEREIN.

I.      **EXECUTIVE SUMMARY**

A.      **Overview**

This Disclosure Statement is being provided to Prepetition Lenders to provide them with information regarding the Company and the proposed restructuring transactions to assist them in making a decision regarding whether or not to support the Out-of-Court Transaction, vote in favor of the Plan and consent to the Existing Credit Agreement Amendments.  The Company hereby transmits this Disclosure Statement in accordance with section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), for use in the solicitation of Prepetition Lenders to (x) participate in the Out-of-Court Transaction pursuant to the Master Restructuring Agreement, (y) vote to accept the Plan and (z) consent to the Existing Credit Agreement Amendments.  Copies of the Master Restructuring Agreement, the Plan and the Existing Credit Agreement Amendments are attached to this Disclosure Statement as Exhibits B, C and D, respectively.

This Executive Summary is being provided as an overview of the material items addressed herein and is qualified by reference to the entire Disclosure Statement and by the actual terms of the Master Restructuring Agreement, the Plan (and including all exhibits attached hereto and to thereto) and the Existing Credit Agreement Amendments, and should not be relied upon for a comprehensive discussion of the Disclosure Statement, the Master Restructuring Agreement, the Plan and/or the Existing Credit Agreement Amendments.  Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement includes, without limitation, information about:

- the Company's prepetition operating and financial history;

- the events leading up to the solicitation of the Company's restructuring;

- the settlement reached between the Company, the United States of America (the "USA") (represented by the Department of Justice (the "DOJ")) on behalf of certain federal governmental entities (the "Federal Settlement Parties") and certain plaintiff states (the "Plaintiff States" and, together with the Federal Settlement Parties, the "USA Settlement Parties"), as well as various qui tam relators relating to certain billing-related and other disputes (the "USA Settlement" and, the agreements relating thereto, the "USA Settlement Agreements") and the initial deposit payment of $50 million (the "Initial USA Settlement Deposit") made by the Company to the USA in connection therewith;

- the Company's entry into the RSA, which provides for (i) the contribution of $325 million by TA and MLH (the "Equityholder Contributions") to or for the benefit of the Company, comprised of approximately $206 million to be distributed to the USA on account of the Government Claims in connection with the USA Settlement, plus any accrued interest, to the extent required by the USA Settlement Agreements (the "USA Settlement Funding Contribution"), and an amount equal to $325 million less the USA Settlement Funding Contribution (the "Millennium Funding Contribution" and, together with the USA Settlement Funding Contribution, the "Settlement Contribution") to be paid to Millennium to reimburse Millennium for the Initial USA Settlement Deposit, for fees and costs owed to the USA in connection with the Government Claims, for working capital purposes, and as otherwise set forth in the RSA and (ii) the Company's financial restructuring through the Out-of-Court Transaction pursuant to the Master Restructuring Agreement or, in the event that the Out-of-Court Transaction is not consummated, but the

1

Requisite Consenting Lenders have approved the Plan, then through a pre-packaged chapter 11 filing pursuant to the Plan;

- the procedures that Prepetition Lenders must follow in order to consent to the Out-of-Court Transaction and the Plan;

- the Master Restructuring Agreement;

- the Plan;

- certain effects of consummation of the Out-of-Court Transaction or the Confirmation of the Plan, certain risk factors relating to the Company or the Reorganized Debtors, the Out-of-Court Transaction, the Plan and the securities and obligations to be issued under the Out-of-Court Transaction or the Plan and the manner in which distributions will be made under the Out-of-Court Transaction or the Plan;

- the proposed organization, operations and financing of the Reorganized Debtors if the Out-of-Court Transaction is consummated or the Plan is confirmed and becomes effective; and

- the terms of the consent solicitation with respect to the Existing Credit Agreement Amendments.

It is the judgment of the Company and its advisors and the Ad Hoc Group that the Out-of-Court Transaction and the transactions contemplated thereby afford the best opportunity for a restructuring that will maximize value for the Company and all of its stakeholders under the circumstances. The Out-of-Court Transaction will achieve a restructuring of the Company's balance sheet while avoiding the expenses and uncertainties inherent in a chapter 11 case. In the event that the Out-of-Court Transaction cannot be consummated, it is the judgment of the Company and its advisors and the Ad Hoc Group that the Plan and the transactions contemplated thereby are the best alternative for a restructuring that will maximize value for the Company and all of its stakeholders. The Out-of-Court Transaction and the Plan allow the Company to satisfy its obligations under the USA Settlement and to recapitalize and restructure the Company's capital structure in a manner designed to maximize recoveries for creditors and to enhance the financial stability of the Company.

### B.    Summary of the Restructuring

#### 1.    Purpose of the Restructuring

The purpose of the Company's restructuring is to (i) implement a settlement among the Company, the Prepetition Lenders, MLH, and TA as described more fully herein, (ii) effectuate the USA Settlement, (iii) effect a recapitalization of the Company's balance sheet on a consensual basis through either the Out-of-Court Transaction or the Plan and (iv) cause 100% of the existing equity of Millennium to be transferred to the Prepetition Lenders, who will form a new holding company that is classified as a corporation for tax purposes ("New Holdco"), to which the Millennium Equity Interests will be contributed by the Prepetition Lenders in exchange for 100% of the stock of New Holdco (the "New Holdco Common Stock"), subject to potential dilution for equity securities issued pursuant to any equity incentive plan adopted in the future and any other subsequent issuances of equity securities by New Holdco (collectively, the "Restructuring").

#### 2.    Summary of the USA Settlement

Beginning in early 2012, the Company's business became subject to an investigation by the United States Attorney for the District of Massachusetts, operating as an arm of the DOJ. In late December 2014, the DOJ informed the Company that the DOJ would be pursuing certain claims against the Company. On March 19, 2015, the DOJ, on behalf of the USA, filed a complaint against the Company asserting claims for violation of the Stark law and the Anti-Kickback Statute and violation of

the False Claims Act (the "USA Claims").  In February 2015, a Medicare Administrative Contractor ("MAC") of the Center for Medicare and Medicaid Services ("CMS") notified the Company that the Company's Medicare billing privileges would be revoked effective March 11, 2015.  On March 6, 2015, CMS issued an overpayment determination to the Company.  The Company requested that the USA Claims and the CMS administrative matters, including revocation, be resolved in a global fashion.  CMS periodically extended the effective date of the revocation, ultimately extending revocation until October 16, 2015.  Additionally, in conjunction with a potential settlement, the Company also entered into discussions with the United States Department of Health and Human Services Office of the Inspector General ("OIG") regarding a Corporate Integrity Agreement ("CIA").

On October 16, 2015, the Company entered into the USA Settlement Agreements with the USA Settlement Parties and various *qui tam* relators.  Copies of the USA Settlement Agreements are attached hereto as Exhibit E.[2]  The USA Settlement Agreements resolve certain issues as described in the USA Settlement Agreements[3] between the USA Settlement Parties (which include, among others, CMS and OIG) and the Company, including, among other matters, the USA Claims and the overpayment, and included finalization of the CIA.[4]  The USA Settlement Agreements require the payment of $256 million to the USA Settlement Parties to settle the USA Claims and the overpayment.  Pursuant to the USA Settlement Agreements and the RSA, the $256 million payment will be funded through (a) the irrevocable Initial USA Settlement Deposit of $50 million made by the Company (with a guarantee provided by MLH and TA), which was funded in part on October 16, 2015 and in part on October 19, 2015, and (b) a $206 million payment, including interest, by MLH and TA to be paid to or for the benefit of Millennium, which will be paid to the USA in full and final satisfaction of Millennium's monetary obligations under the USA Settlement Agreements.

### 3.        Summary of the Restructuring Support Agreement

In order to fund the payments under the USA Settlement Agreements and settlement of potential claims between the Participating Lenders and the Company's primary equity holders, MLH and TA, the parties negotiated and entered into the RSA on October 15, 2015.  The RSA contemplates that the Restructuring will be effectuated through either the Out-of-Court Transaction or, alternatively, the Plan. By executing the RSA, the Participating Lenders have agreed to (i) enter into the Master Restructuring Agreement that is attached hereto as Exhibit B to implement and consummate the Out-of-Court Transaction, (ii) vote in favor of the Plan attached hereto as Exhibit C and (iii) consent to the Existing Credit Agreement Amendments attached hereto as Exhibit D.  The transactions contemplated by the RSA represent a global resolution of numerous issues relating to the Debtors, including the satisfaction of the Debtors' obligations under the USA Settlement Agreements and the settlement of various claims.

Pursuant to this Disclosure Statement, the Company is soliciting consents and votes on the Out-of-Court Transaction, the Out-of-Court Releases, the Plan (including the releases, exculpation, bar order

---

[2]    Exhibit E includes the State UDT Settlement Agreement and the State PGT Settlement Agreement executed by the State of Florida.  The Florida agreements are representative of the State UDT Settlement Agreements and the State PGT Settlement Agreements that have been or are expected to be executed by other Plaintiff States.

[3]    The USA Settlement Agreements, and the Plan, preserve certain claims of governmental units.  These preserved claims shall survive discharge.

[4]    The revocation action was resolved as part of the Company-requested global resolution that culminated in the USA Settlement Agreements.  CMS's rights to seek revocation, among other rights, is preserved by the USA Settlement Agreements and the Plan.

and injunction provisions thereof) and the Existing Credit Agreement Amendments on the terms set forth herein and in the Plan and the RSA.

4.      **Summary of Out-of-Court Transaction**

Pursuant to the RSA and subject to certain exceptions set forth therein, the Company can only complete the Out-of-Court Transaction if it receives consents to the Out-of-Court Transaction from the Out-of-Court Requisite Lenders.  However, MLH, TA, a supermajority of the Ad Hoc Group and the Company may agree in writing that the aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million, in each of their sole and respective absolute discretion.  Each Prepetition Lender that consents to the Out-of-Court Transaction (each, a "Consenting Lender") will be required to execute the Master Restructuring Agreement, a form of which is attached hereto as Exhibit B.  Pursuant to the Master Restructuring Agreement, each Consenting Lender will consent to and approve:

- the terms of the Out-of-Court Transaction (including, without limitation, the Out-of-Court Releases, which, as described in more detail herein, include release and exculpation provisions providing for, among other things, the full and complete release of Holdings, MLH, TA, the Consenting Lenders, the Company's officers and certain additional parties);

- the Early Commitment Facility;

- the Existing Credit Agreement Amendments; and

- the New Term Loan.

In addition, each Consenting Lender that consents to the Out-of-Court Transaction is required to execute and deliver by the Consenting and Voting Deadline an executed signature page to the Existing Credit Agreement Amendments.  The First Existing Credit Agreement Amendment will (i) permit the incurrence of the Early Commitment Facility as of the Early Commitment Deadline and (ii) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the Early Commitment Facility.  The First Existing Credit Agreement Amendment will also contain a release of Holdings as a guarantor of the Existing Credit Agreement (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Approved Plan Effective Date (as defined in the Early Commitment Fee Facility as in effect on the date thereof) and the payment in full in cash of the principal and interest outstanding under the Early Commitment Facility. The Second Existing Credit Agreement Amendment will (i) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the New Term Loan, (ii) eliminate substantially all of the representations, covenants and prepayment obligations contained in the Existing Credit Agreement, (iii) permanently waive any existing defaults under the Existing Loan Documents, (iv) prevent any party to the Existing Credit Agreement from exercising any rights or remedies under the Existing Loan Documents for a period of ninety-one (91) days after the Closing Date, and (v) release and terminate Holdings' guarantee of the Existing Credit Agreement (including a release of the liens granted by Holdings under the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Effective Date (as defined in the  Second Existing Credit Agreement Amendment).

Pursuant to the RSA, at least one business day prior to the transfer by Holdings of 100% of the Millennium Equity, the Settlement Contribution will be paid by MLH and TA collectively to or for the benefit of Millennium and the USA Settlement Funding Contribution shall be paid over to the USA.  The

4

USA Settlement Funding Contribution will be paid to the USA (A) by the Settlement Letters of Credit Funds (as defined in the Master Restructuring Agreement) pursuant to (and subject to the terms of) the USA Settlement Agreement and the Settlement Letters of Credit (as defined in the Master Restructuring Agreement) or (B) in cash in the amount of $206 million plus all accrued interest.

In connection with the Out-of-Court Transaction, contingent upon approval and effectiveness of the Out-of-Court Releases by the Out-of-Court Requisite Lenders, and after payment of the Settlement Contribution and the USA Settlement Funding Contribution, control of Millennium will be transferred to the Consenting Lenders, and the debt owed to the Prepetition Lenders will be restructured, as follows:

- all of Millennium's outstanding obligations under the Existing Loan Documents will be extinguished as of the Closing Date, except to the extent applicable to any non-Consenting Lender (each, a "Non-Consenting Lender"), who will thereafter hold their Existing Credit Agreement Claims against Millennium and its subsidiaries (but not Holdings) subject to the Existing Credit Agreement Amendments as further described herein; and

- each Consenting Lender will receive on the Closing Date, in consideration for, and in full and final satisfaction of, its respective Existing Credit Agreement Claims that it holds as of the Consenting and Voting Deadline, its pro rata share of and interest in:

    1. 100% of the Millennium Equity Interests, all of which will be transferred to the Consenting Lenders by Holdings and subsequently transferred by the Consenting Lenders to New Holdco in exchange for 100% of the New Holdco Common Stock, subject to potential dilution for equity securities issued pursuant to any equity incentive plan adopted in the future and any other subsequent issuances of equity securities by New Holdco;

    2. the New Term Loan, which will be secured by and made to New Holdco and Millennium in the aggregate principal amount of $600 million;

    3. a trust that will hold any and all claims and causes of action belonging to Millennium (other than claims against certain released parties as described herein) and any and all claims and causes of action belonging to the Administrative Agent (other than claims against certain Released Parties as described herein) for the benefit of both Non-Consenting Lenders and Consenting Lenders (the "Millennium Corporate Claim Trust"), subject to the reimbursement rights of the certain shareholders of MLH that have contributed to and backstopped the funding of the MLH Contribution (defined below) (the "Backstop MLH Shareholders") as described herein; and

    4. to the extent a Consenting Lender held a directly owned Retained Lender Cause of Action prior to October 29, 2015 (the "Consenting and Voting Record Date"), a pro rata beneficial interest in a trust holding all of the Consenting Lenders' Retained Lender Causes of Action (the "Millennium Lender Claim Trust" and, together with the Millennium Corporate Claim Trust, the "Millennium Claim Trusts"), subject to the reimbursement rights of the Backstop MLH Shareholders as described herein.  By signing the Master Restructuring Agreement, each Consenting Lender shall be automatically deemed to have consented to the contribution of the Retained Lender Causes of Action to the Millennium Lender Claim Trust as of the Closing Date.

5

An early commitment fee will be payable to each Consenting Lender that consents to the Out-of-Court Transaction and the Out-of-Court Releases by 12:00 p.m. (prevailing Eastern Standard Time) on November 5, 2015 (the "Early Commitment Deadline") in the form of a pro rata share of the $50.0 million Early Commitment Facility (net of applicable withholding taxes). The Early Commitment Facility will be secured on a first priority perfected basis and such security interests will rank senior in priority to the security interests securing the Existing Credit Agreement. The Early Commitment Facility will continue in full force and effect in accordance with its terms until the earlier to occur of (i) the earlier of the closing of the Out-of-Court Transaction or the effective date of the Plan (the "Effective Date") and the consummation of the transactions contemplated by the Plan or (ii) until its stated maturity (in the event that the Out-of-Court Transaction does not close and the Plan is not consummated). The Existing Credit Agreement will be amended as of the Consenting and Voting Deadline by the First Existing Credit Agreement Amendment in order to, among other things, permit the Company to enter into the Early Commitment Facility.

In addition, the Master Restructuring Agreement contemplates a second amendment to the Existing Credit Agreement, effective as of the Closing Date, to provide for, among other things, (i) a permanent waiver of any defaults and/or events of default that have previously occurred thereunder and (ii) an agreement not to (and forbearance such that under the Existing Credit Agreement no party shall) declare any defaults, accelerate or otherwise exercise remedies for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction. In addition, pursuant to the Second Existing Credit Agreement Amendment, certain provisions of the Existing Credit Agreement will be deleted, including provisions related to mandatory prepayments, representations and warranties, affirmative covenants, negative covenants and events of default, and the Second Existing Credit Agreement Amendment will contain a release of Holdings as a guarantor of the Existing Credit Agreement (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Effective Date (as defined in the Second Existing Credit Agreement Amendment). The Existing Guarantee and Collateral Agreement Amendment will similarly eliminate substantially all of the representations, covenants and related obligations contained in the Existing Guarantee and Collateral Agreement. Non-Consenting Lenders that hold Existing Credit Agreement Claims following the Closing Date will be bound by the terms of the Existing Credit Agreement Amendments and the Existing Guarantee and Collateral Agreement even though such Non-Consenting Lenders did not approve such amendments. Therefore, following the Closing Date, the rights and protections available to Non-Consenting Lenders under the Existing Loan Documents will be significantly reduced.

Further, as required by the RSA, (i) the Company is working towards entering into employment agreements with certain senior executives on terms mutually acceptable to such senior executives and a majority of the Ad Hoc Group (the "Ad Hoc Group Majority") and (ii) Millennium's four (4) leases (the "JS Real Estate Leases") related to Millennium's headquarters facilities in San Diego will be amended to provide Millennium with two optional five-year extensions on the same terms (with annual CPI rate adjustments) and will be freely transferable by the tenant or landlord.

Please read the sections of this Disclosure Statement entitled "Master Restructuring Agreement," "Master Restructuring Agreement—Summary of Early Commitment Facility," "Master Restructuring Agreement—Summary of New Term Loan," and "Master Restructuring Agreement—Summary of Equity Capitalization of New Holdco" for additional information regarding the Out-of-Court Transaction, the Early Commitment Facility, the New Term Loan and the New Holdco Common Stock, respectively.

## 5.    Summary of the Plan

If the Company does not receive consents to the Out-of-Court Transaction from the Out-of-Court Requisite Lenders by the Consenting and Voting Deadline, it will not proceed with the Out-of-Court

Transaction.  However, pursuant to the terms of the RSA, if the Company receives the acceptance of the Plan by the Requisite Consenting Lenders (or, with the consent of MLH and TA, such lower amount not less than sixty-six and two-thirds percent (66 2/3%) in the aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement), the Company will commence chapter 11 cases under the Bankruptcy Code (the "Chapter 11 Cases") in order to effectuate the Plan.  In addition, the Early Commitment Facility and the First Existing Credit Agreement Amendment will remain in place in the case of the Plan.

The following table summarizes the treatment of certain classes under the Plan as of the Effective Date.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Pursuant to the Plan, distributions will be made to Prepetition Lenders holding Existing Credit Agreement Claims as of the date that the Bankruptcy Court confirms the Plan (the "Distribution Record Date").  Transfers of Existing Credit Agreement Claims after the Distribution Record Date will not be recognized for purposes of the Plan.  For a complete explanation of the Plan, please refer to the section of this Disclosure Statement entitled "The Plan."

| Class Description | Treatment |
|---|---|
| Administrative, Priority Tax and Other Priority Claims<br><br>Estimated Recovery: 100% | On or as soon as practicable after the Effective Date, each holder of an administrative, priority tax, or other priority claim shall receive cash equal to the full amount of its claim or otherwise be left Unimpaired.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 1: Early Commitment Facility<br><br>Estimated Recovery: 100% | On or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility shall be paid in full in cash.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 2: Existing Credit Agreement Claims<br><br>Estimated Recovery: > 34% (including the New Term Loan and additional consideration)[5] | On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, cancelled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:<br><br>(a)        on the Equity Transfer Date, such Holder's Pro |

---

[5]        In addition to the $600 million New Term Loan, representing a recovery of approximately 34%, holders of Class 2 Claims will receive the Millennium Equity (and thereafter the New Holdco Common Stock as set forth herein) and interests in the Millennium Corporate Claim Trust.

| | |
|---|---|
| | Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V.D(iii) of the Plan;<br><br>(b)      on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;<br><br>(c)      on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of the Plan, such Holder's Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust; and<br><br>(d)      to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to reimbursement rights of the Backstop MLH Shareholders as provided in Article V.G of the Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.<br><br>Impaired; entitled to vote. |
| Class 3: Prior Agent Indemnity Claims<br><br>Estimated Recovery: 100% | On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; provided, however, for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under the Plan, Reorganized Holdings will be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty will be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of |

| | |
|---|---|
| | the principal and interest outstanding under the Early Commitment Facility.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 4: Other Secured Claims<br><br>Estimated Recovery: 100% | On the Effective Date or as soon as practicable thereafter, all secured claims other than Existing Credit Agreement Claims shall be assumed or reinstated and paid in full in cash in the ordinary course as such claims become due or shall receive such other treatment as satisfies the requirements of section 1124 of the Bankruptcy Code.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 5: Government Claims<br><br>Estimated Recovery: 100% pursuant to the terms of the USA Settlement Agreements | On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements or (2) Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 6: General Unsecured Claims<br><br>Estimated Recovery: 100% | All general unsecured claims (other than the Government Claims and the MLH Tax Note Claims) shall be reinstated or paid in full in cash in the allowed amount of the claim or in the ordinary course as such claims become due, as applicable.<br><br>Unimpaired; not entitled to vote; conclusively presumed to |

| | |
|---|---|
| | accept. |
| Class 7: MLH Tax Note Claims<br><br>Estimated Recovery: 0% | MLH has agreed pursuant to the RSA to receive no distribution on account of the MLH Tax Note. Accordingly, on the Effective Date, the MLH Tax Note shall be deemed cancelled. All claims arising out of or pursuant to the MLH Tax Note (the "MLH Tax Note Claims") shall be cancelled and discharged and Holders of MLH Tax Note Claims shall receive no distribution on account of such claims.<br><br>Impaired; not entitled to vote; conclusively deemed to reject. |
| Class 8: Intercompany Claims<br><br>Estimated Recovery: 100% | All intercompany claims shall be (i) reinstated, in full or in part, and treated in the ordinary course of business or (ii) cancelled and discharged.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 9: Existing Equity Interests in Holdings<br><br>Estimated Recovery: 100% | On the Effective Date, all the Existing Equity Interests shall be Reinstated and otherwise rendered Unimpaired.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |
| Class 10: Existing Equity in Millennium<br><br>Estimated Recovery: 0% | The holder of Existing Equity Interests in Millennium has agreed to receive no distribution on account of such Equity Interests. Accordingly, on the Equity Transfer Date, all Existing Equity Interests in Millennium shall be cancelled, extinguished and discharged.<br><br>Impaired; not entitled to vote; conclusively deemed to reject. |
| Class 11: Existing Equity in RxAnte, LLC<br><br>Estimated Recovery: 100% | On the Effective Date, or as soon as practicable thereafter, all allowed Equity Interests in RxAnte shall be Reinstated and otherwise rendered Unimpaired.<br><br>Unimpaired; not entitled to vote; conclusively presumed to accept. |

Please read the section of this Disclosure Statement entitled "The Plan" for additional information regarding the Plan and the classification and treatment of Claims thereunder.

If neither the Out-of-Court Transaction nor the Plan can be consummated or confirmed as to some or all of the Debtors, then, subject to the terms of the RSA, (a) the Out-of-Court Transaction and the Plan may be revoked as to all of the Debtors or (b) the Debtors may revoke the Plan as to any Debtor (and

any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion).  The Debtors reserve the right to seek Confirmation of the Plan pursuant to the "cramdown" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.  However, even if neither the Out-of-Court Transaction nor the Plan are consummated, the Early Commitment Facility and the First Existing Credit Agreement Amendment will remain in place.

### C.    Certain Bankruptcy Considerations

In the case of the Plan, Claims other than Existing Credit Agreement Claims are Unimpaired or Impaired and entitled to no recovery as set forth in the Plan; the creditors holding those Claims are therefore presumed to accept or deemed to reject the Plan and their votes will not be solicited.

### D.    Notice to Prepetition Lenders

This Disclosure Statement is being transmitted to Prepetition Lenders for the purpose of soliciting Prepetition Lenders to (x) consent to the Out-of-Court Transaction and Out-of-Court Releases, (y) vote to accept the Plan (and consent to the releases, exculpations, bar order and injunctions therein) and (z) consent to the Existing Credit Agreement Amendments.  The primary purpose of this Disclosure Statement is to provide adequate information to enable those deciding whether to support and consent to the Out-of-Court Transaction, vote in favor of the Plan and consent to the Existing Credit Agreement Amendments to make reasonably informed decisions with respect to the Out-of-Court Transaction, the Plan and the Existing Credit Agreement Amendments prior to exercising their rights to support and participate in the Out-of-Court Transaction, to vote to accept or to reject the Plan and to consent to the Existing Credit Agreement Amendments.  Subject to receiving requisite participation in the Out-of-Court Transaction or acceptances of the Plan by the Requisite Consenting Lenders, the Company expects to consummate the Out-of-Court Transaction or file chapter 11 petitions as promptly as practicable.  As soon as practicable after commencement of the Chapter 11 Cases, if applicable, the Debtors will request Bankruptcy Court approval of this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the parties voting on the Plan to make informed judgments about the Plan.  The Debtors simultaneously will request that the Bankruptcy Court confirm the Plan.

WHEN AND IF CONFIRMED BY THE COURT, THE PLAN (INCLUDING THE RELEASES, EXCULPATIONS, BAR ORDER AND INJUNCTION INCLUDED THEREIN) WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  IN PARTICULAR, PREPETITION LENDERS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT AND TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.  ONLY THE HOLDERS OF EXISTING CREDIT AGREEMENT CLAIMS AS OF THE CONSENTING AND VOTING RECORD DATE WILL BE ALLOWED TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT IS THE PRIMARY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF CONSENTS TO THE OUT-OF-COURT TRANSACTION (INCLUDING THE OUT-OF-COURT RELEASES) AND VOTES ON THE PLAN (INCLUDING THE RELEASES, EXCULPATIONS, BAR ORDER AND INJUNCTION INCLUDED THEREIN).  NO SOLICITATION OF CONSENTS OR VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN

AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTORS OTHER THAN THE INFORMATION CONTAINED HEREIN.

**E.      Voting Procedures, Ballots, and Consenting and Voting Deadline**

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of (i) the Master Restructuring Agreement (Exhibit B), (ii) the Plan (Exhibit C), (iii) the Existing Credit Agreement Amendments (Exhibit D), and (iv) the Ballot.  The Solicitation Package will also be posted by the Administrative Agent on Intralinks.  Any party who desires additional paper copies of these documents may request copies by writing to Millennium Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022, Email: millenniumballots@primeclerk.com.

After carefully reviewing this Disclosure Statement, the Master Restructuring Agreement, the Plan, the Existing Credit Agreement Amendments and the instructions on the enclosed Ballot, each Holder of an Existing Credit Agreement Claim should: (1) if it consents to the Out-of-Court Transaction, execute a copy of the Master Restructuring Agreement, (2) indicate by checking the appropriate box on the applicable Ballot whether it votes its Existing Credit Agreement Claim in Class 2 in acceptance or rejection of the Plan, and (3) if it consents to the Out-of-Court Transaction or votes to accept the Plan, execute a copy of the Existing Credit Agreement Amendments. Prepetition Lenders must execute the Master Restructuring Agreement, complete and sign their Ballots and/or execute the Existing Credit Agreement Amendments and return them so that they are RECEIVED by the Consenting and Voting Deadline (as defined below).

FOR YOUR CONSENT AND/OR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER (1) IF YOU CONSENT TO THE OUT-OF-COURT TRANSACTION, YOUR SIGNATURE PAGE TO THE MASTER RESTRUCTURING AGREEMENT, (2) IN ANY CASE, YOUR BALLOT, AND (3) IF YOU CONSENT TO THE OUT-OF-COURT TRANSACTION OR VOTE IN FAVOR OF THE PLAN, YOUR SIGNATURE PAGE TO THE EXISTING CREDIT AGREEMENT AMENDMENTS SO THAT EACH IS RECEIVED BY THE FOLLOWING VOTING AGENT NO LATER THAN **5:00 P.M. (EASTERN TIME) ON NOVEMBER 8, 2015**.  IN ORDER TO PROMPTLY TRANSMIT YOUR SIGNATURE PAGES AND/OR BALLOT, YOU MUST **SEND THEM VIA EMAIL OR OVERNIGHT DELIVERY** TO THE FOLLOWING:

**Millennium Ballot Processing**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**
**Email:  millenniumballots@primeclerk.com**
**Telephone (toll free): (844) 276-3028**
**Telephone (international): (917) 962-8498**

---

**ONLY PREPETITION LENDERS THAT (1) CONSENT TO THE OUT-OF-COURT TRANSACTION AND OUT-OF-COURT RELEASES AND DELIVER THEIR SIGNATURE PAGES TO THE MASTER RESTRUCTURING AGREEMENT, (2) VOTE IN FAVOR OF THE PLAN AND DELIVER THEIR BALLOTS AND (3) DELIVER THEIR SIGNATURE PAGES TO THE EXISTING CREDIT AGREEMENT AMENDMENTS NO LATER THAN 12:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 5, 2015 WILL RECEIVE THEIR PRO RATA SHARE OF THE EARLY COMMITMENT FACILITY.**

---

You may obtain additional copies of the Plan, the Disclosure Statement, or other material in the Solicitation Package from the Voting Agent.

### F.    Record Dates for Consents, Voting and Distributions

Only the Prepetition Lenders holding Existing Credit Agreement Claims as of the Consenting and Voting Record Date shall be allowed to consent to the Out-of-Court Transaction, vote on the Plan and consent to the Existing Credit Agreement Amendments. In addition, distributions to be made under the Out-of-Court Transaction will be made only to Prepetition Lenders holding Existing Credit Agreement Claims as of the Consenting and Voting Deadline. Distributions to be made under the Plan will be made only to the Prepetition Lenders holding Existing Credit Agreement Claims as of the Distribution Record Date.

### G.    Confirmation Hearing and Deadline for Objections

If the Debtors commence the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to consider (i) the adequacy of this Disclosure Statement and (ii) confirmation of the Plan at a hearing (the "Confirmation Hearing") to be held as soon as practicable at such time that the Bankruptcy Court may allow, before the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. At the Confirmation Hearing, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b). The Debtors may modify the Plan, to the extent permitted by Bankruptcy Code section 1127(a) and Bankruptcy Rule 3019, as necessary to confirm the Plan. Any such modification shall not substantially alter the rights of the USA under the USA Settlement Agreements.

Notice of the Confirmation Hearing and of the time to present objections will be provided in accordance with the instructions to be provided by the Bankruptcy Court. The Debtors will request that the Bankruptcy Court, among other things, require that any objections to confirmation of the Plan or related matters be filed with the Bankruptcy Court and served so that they are RECEIVED on or before the objection deadline fixed by the Bankruptcy Court by the following:

**The Debtors**

Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, California 92127
Telephone:        (858) 451-3535
Facsimile:        (858) 217-1910
Attention:        Martin Price, Esq., President and General Counsel
                  (martin.price@millenniumhealth.com)

**Proposed Counsel for Debtors and Debtors in Possession**

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone:        (302) 651-3000
Facsimile:        (302) 651-3001
Attention:        Anthony W. Clark (anthony.clark@skadden.com)
                  Jason M. Liberi (jason.liberi@skadden.com)

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Telephone:      (212) 735-3000
Facsimile:      (212) 735-2000
Attention:      Kenneth S. Ziman (ken.ziman@skadden.com)
                Raquelle L. Kaye (raquelle.kaye@skadden.com)

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone:      (312) 407-0700
Facsimile:      (312) 407-0411
Attention:      Felicia Gerber Perlman (felicia.perlman@skadden.com)
                Matthew N. Kriegel (matthew.kriegel@skadden.com)

**Counsel to the Participating Lenders**

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone:      (212) 209-4800
Facsimile:      (212) 209-4801
Attention:      Robert J. Stark (rstark@brownrudnick.com)
                Sigmund S. Wissner-Gross (swissnergross@brownrudnick.com)

- and -

Brown Rudnick LLP
One Financial Center
Boston, Massachusetts  02111
Telephone:      (617) 856-8200
Facsimile:      (617) 856-8201
Attention:      Steven B. Levine (slevine@brownrudnick.com)

**Counsel to MLH**

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Attention:      Paul M. Basta, P.C. (paul.basta@kirkland.com)
                Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**Counsel to TA**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:        (212) 813-8800
Facsimile:        (212) 409-8404
Attention:        Michael H. Goldstein (mgoldstein@goodwinprocter.com)
                  William P. Weintraub (wweintraub@goodwinprocter.com)

United States Trustee

Office of the United States Trustee for the District of Delaware
844 King Street
Suite 2207
Wilmington, Delaware 19801
Facsimile:  (302) 573-6491

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    BACKGROUND TO THE OUT-OF-COURT TRANSACTION AND CHAPTER 11 CASES

### A.    The Company's Business

#### 1.    Laboratory and Analytics Services

The Company is a leading provider in the growing specialty market of laboratory-based diagnostic testing focused on drugs of abuse and clinical medication monitoring.  Through its various service offerings, comprised of urine drug testing ("UDT"), pharmacogenetic testing ("PGT"), and predictive analytics, the Company provides its customers with personalized solutions to monitor and manage their patients' utilization of both prescription and non-prescription drugs.  Substantially all of the Company's revenue derives from its analytics and laboratory testing services, received in large part through Medicare and Medicaid reimbursements, as well as payments from commercial payors.

The Company was founded in December 2007 by James Slattery, who currently serves as the Chairman of the Board of Managers of Millennium Lab Holdings II, LLC.  The Company's UDT services employ proprietary methods to deliver fast turn-around times for requested testing, and also offer "a la carte" testing to pinpoint the presence or absence of specific substances.  In 2012, the Company launched its PGT services, which utilize a genetic analysis of a patient's metabolism to allow clinicians to more accurately anticipate the most effective drug therapy for each individual patient.  PGT assists providers in identifying situations in which patients may experience reduced efficacy or potential adverse reactions to proposed medications.  The goal of PGT is to give healthcare providers the information they need in order to maximize the safety and efficacy of proposed treatment regimens for their patients.  Finally, the Company acquired RxAnte, Inc.[6] in December 2013 for cash consideration of $50,020,000 (plus additional contingent consideration with an estimated fair value of $3.367 million).  RxAnte employs an analytic model that uses risk-stratification and predictive targeting to help clinicians improve medication adherence programs, driving additional effectiveness and cost savings for clinicians and payors.

---

[6]        As described below, RxAnte is the successor to RxAnte, Inc.

15

Today, the Company is based in San Diego, California.  The Company also operates additional facilities in Ann Arbor, Michigan; McLean, Virginia; and Portland, Maine.  Of the Company's 1,243 employees, approximately 516 form a dedicated sales and service team, and approximately 383 are scientists, PhDs, PharmDs, and laboratory personnel who work in laboratories, laboratory support, and research and development.  The Company provides support to approximately 8,325 clinicians, medical centers, and other healthcare providers across the United States.  In 2014, the Company generated total revenue of $687 million, and tested approximately 2.7 million specimens.

The Company's non-Debtor subsidiaries, namely Pain In The Air, LLC ("PITA"), Raven Aeronautical Holdings, LLC ("Raven"), and Jet Air Systems, LLC ("JAS"), engage in separate endeavors largely unrelated to the Company's core business.  See the section of this Disclosure Statement entitled "Certain Relationships and Related Transactions—Transactions with Non-Debtor Subsidiaries and Affiliates."

### 2.    Government Regulation and Compliance

The Company, like other clinical laboratory companies, is subject to regulation and oversight by various federal, state, and local government agencies.  These agencies regulate and oversee a wide variety of subjects, such as licensure and operation of clinical laboratories, payment for laboratory services, health care fraud and abuse, and various safety issues, including quality, environmental, and occupational safety.

In addition to governmental oversight, private parties may also bring "whistleblower" suits under certain state and federal statutes (including, among others, the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-33) against clinical laboratory companies on behalf of government payors, private payors, and/or patients, alleging inappropriate billing practices, or violations of state and federal law, including the Anti-Kickback statute (42 U.S.C. § 1320a-7b) (the "Anti-Kickback Statute") and the federal Ethics in Patient Referral Act (42 U.S.C. § 1395nn) (the "Stark Law").  While the federal False Claims Act is aimed at preventing contractors from submitting false claims to the federal government for payment, the Anti-Kickback Statute and the Stark Law are intended to thwart the exchange of financial or other remuneration to health care providers in exchange for referrals.  These state and federal statutes apply to companies doing business throughout the health care services sector.

Furthermore, the Company participates in the Medicare and Medicaid programs.  Continued compliance with the prevailing regulations is a significant financial and operational cost to the Company, as these regulations are subject to ongoing government review and interpretation, which can result in shifts in review protocol, government interpretation, and government implementation.  All of these factors can have material impacts on the business of the Company.

### B.    The Company's Corporate Structure

Holdings is the parent of Millennium, which in turn is the parent of RxAnte. Millennium is also the parent of its wholly-owned, non-Debtor subsidiaries PITA and Raven and Raven's subsidiary, JAS. A corporate organization chart depicting the Company's ownership structure is attached hereto as Exhibit G. The anticipated Debtors in the Chapter 11 Cases are (i) Holdings, (ii) Millennium, and (iii) RxAnte.

### C.    The Company's Capital Structure

#### 1.    Existing Credit Agreement

As of the date hereof, the obligations under the Existing Credit Agreement constitute the Debtors' only material funded debt obligation outstanding.  Millennium borrowed $1.825 billion under a senior

16

secured credit facility by entering into the Existing Credit Agreement on April 16, 2014.  The Existing Credit Agreement initially provided for (a) a $1.775 billion Term Loan, which amortized in consecutive quarterly installments equal to $4,437,500 beginning on September 30, 2014, with the remaining outstanding amount payable on the maturity date on April 16, 2021, and (b) a revolving loan in a principal amount not to exceed $50 million, which was to terminate on April 16, 2019.  The Company terminated the revolving loan commitments in full, which were not utilized, as of June 30, 2015.  The loans and other obligations under the Existing Credit Agreement, and certain swap obligations and cash management obligations, are guaranteed by Holdings and RxAnte, and secured by substantially all of the assets of Millennium, Holdings and RxAnte, subject to customary exceptions.  As of the date hereof, the Existing Credit Agreement had an outstanding principal balance of approximately $1,752,812,500.

### 2.  Equity Interests

As of the date of this Disclosure Statement, there were three members of Holdings, each holding a different class of membership interests, with differing consent, distribution, and voting rights, as set forth in Holdings' Second Amended and Restated Limited Liability Company Agreement.  TA holds all 450 outstanding Class A Units.  MLH holds all 550 outstanding Class B Units.  Finally, MLHCU, LLC, a Delaware limited liability company, holds all 58.4194 outstanding Class C Units.

### D.  Events Leading to the Out-of-Court Transaction and the Chapter 11 Cases

### 1.  Reorganization and Dividend Recapitalization

On March 29, 2012, the Company entered into a Credit Agreement (as amended, supplemented, or otherwise modified, the "2012 Credit Agreement"), by and among MLH and Millennium as borrowers, JPMorgan Chase Bank, N.A. as prior administrative agent, and the lenders party thereto, which provided for a $310 million Term Loan facility and a $20 million revolving credit facility. The 2012 Credit Agreement was subsequently amended and restated in December 2013 to provide for an additional Term Loan of approximately $52 million and an increase of the revolving credit facility to $30 million (the Term Loan and revolver facilities collectively, as so amended and restated, the "2013 Credit Facility"). The proceeds from the 2013 Credit Facility were used to consummate the Company's purchase of 100% of the outstanding stock of RxAnte.  The 2013 Credit Facility was scheduled to mature on March 29, 2017.

In April 2014, the Company undertook a reorganization of its corporate structure in conjunction with a dividend recapitalization transaction (collectively, the "April 2014 Transaction").  These transactions, as described in further detail herein, ultimately resulted in the present corporate and capital structure of the Debtors.

On April 16, 2014, the Company entered into the Existing Credit Agreement, as detailed above.  The proceeds from the Existing Credit Agreement were primarily utilized to satisfy all of the Company's outstanding obligations under the 2013 Credit Facility and to pay a special dividend to stockholders.  Millennium Laboratories, Inc. (predecessor-in-interest to Millennium), RxAnte, Inc., and Pain In the Air, Inc. each converted to a limited liability company. Holdings was formed, and MLH (the parent company to Millennium Laboratories, Inc.) exchanged its equity interests in Millennium Laboratories, Inc. for 100% of the membership interests in Holdings.  Next, MLH remitted 45% of its membership interests in Holdings to TA in satisfaction of certain debt securities previously issued by MLH and all obligations outstanding under such debt securities, including accrued but unpaid interest and the redemption of stock purchase warrants in Millennium Lab Holdings, Inc.

2.      USA Investigation, CMS Revocation and Suspension, and Settlement

USA Investigation and Lawsuit

Beginning in early 2012, the Company's business became subject to an investigation by the United States Attorney for the District of Massachusetts, operating as an arm of the DOJ.  The DOJ's investigation continued through 2014.  In response to the investigation, the Company produced nearly 11 million pages of documents and met with the DOJ on numerous occasions to discuss, among other things, document productions and the allegations under investigation.  In late December 2014, the DOJ informed the Company that the DOJ would be pursuing certain claims against the Company.  On March 19, 2015, the DOJ, on behalf of the USA, filed a complaint against the Company.

CMS Notices of Revocation

By letter dated February 9, 2015, Noridian Healthcare Solutions, LLC ("Noridian"), a CMS MAC, notified the Company that, effective as of March 11, 2015, the Company's Medicare billing privileges would be revoked, on account of alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries.  By a letter dated May 4, 2015, Noridian notified the Company that, in addition to the reasons outlined in the earlier revocation notice, the Company's Medicare billing privileges would also be revoked on account of Millennium allegedly submitting claims for services without a valid order from a physician.

CMS extended the revocation date on numerous occasions during the pendency of the Company's negotiations with the USA Settlement Parties.

CMS's Overpayment Determination

On March 6, 2015, CMS's MAC issued an overpayment determination.  That overpayment determination was rescinded and then later reissued on October 15, 2015.  On April 27, 2015, the CMS MAC issued an appeal decision finding that Millennium had been underpaid for certain claims that were part of a claims review separate from the review that resulted in the overpayment determination.  The USA Settlement Agreements include a resolution of these overpayment and underpayment determinations, and specifically reserve certain claims and liabilities.

Terms Sheet Negotiated with the USA

Since March 2015, the Company and DOJ, on behalf of the USA, have been engaged in negotiations and settlement discussions surrounding the USA's claims.  These settlement discussions ultimately led to the execution of a Terms Sheet (the "USA Terms Sheet"), as described below and subject to the Company's request that the CMS administrative matters, including revocation, and the False Claims Act matters be resolved in a global fashion.

In conjunction with a potential settlement with the USA, on April 30, 2015, the Company sent a letter to OIG to begin discussions regarding a CIA.  The Company then met with OIG on May 5, 2015 to begin the process of negotiating the CIA's terms.  The Company and OIG continued negotiating the terms of the CIA while the Company continued its settlement discussions with the other USA Settlement Parties.

On May 20, 2015, Millennium entered into the USA Terms Sheet with the USA and the Plaintiff States,  which contemplated, among other things, the resolution of the pending investigative and administrative matters.  The USA Terms Sheet provided, in relevant part, that the Company would pay $256 million to the USA Settlement Parties to settle the USA's and Plaintiff States' allegations.  The

18

settlement payment was conditioned upon, among other things, the resolution of certain CMS revocation proceedings and OIG's agreement not to exercise its permissive exclusion authority against the Company. The USA Terms Sheet also outlined certain releases and dismissals to be granted by the USA Settlement Parties.

<u>Restructuring Negotiations with Prepetition Lenders</u>

Immediately following the Company's May 20, 2015 execution of the USA Terms Sheet, the Company disclosed certain terms of the proposed USA Settlement to the Prepetition Lenders. The Ad Hoc Group organized in June 2015 and retained advisors. At the same time, the Company and its advisors prepared an updated five-year forecast which reflected the expected impact on the Company's business of, among other things, (a) changes in reimbursement trends, (b) the proposed USA Settlement, (c) projected post-settlement operational adjustments required under a CIA and (d) additional regulatory pressures. The Company concluded that its capacity to service its debt had diminished. Accordingly, the Company, the Ad Hoc Group, and the Members engaged in discussions to develop and implement a transaction to satisfy the Company's monetary obligations under the proposed USA Settlement and restructure the financial obligations of the Company.

In the course of negotiations, the Ad Hoc Group of Prepetition Lenders articulated claims and causes of action against the Members in connection with the April 2014 Transaction. The Members deny any liability. Accordingly, the scope of the negotiations expanded to encompass a resolution of these issues as well.

<u>Negotiations Leading to the RSA and USA Settlement Agreements</u>

Following the execution of the USA Terms Sheet, the Company continued to negotiate with the DOJ on behalf of the USA, the Plaintiff States and other parties in interest. On July 22, 2015, the Company informed the DOJ that (1) it would not be able to pay the lump sum settlement amount originally negotiated due to the financial state of the Company and its debt burden; and (2) a restructuring of the Company would be necessary to facilitate the settlement payment. On July 22, 2015, DOJ set a mid-September 2015 deadline for the Company to present a payment plan that could be approved by the USA's financial analysts at DOJ, whose approval is necessary for any settlement agreements paid over time. By mid-August 2015, the respective counsel to MLH, TA and the Ad Hoc Group were involved in negotiations with the DOJ. On September 21, 2015, the parties informed the DOJ that they had the framework for a proposal that would allow the Company to satisfy its monetary obligations under the Terms Sheet. Subsequently, the DOJ, on behalf of the USA, set October 2, 2015 as the deadline (the "<u>USA Deadline</u>") by which the Company was required to finalize its proposal for funding the Company's monetary obligations under the USA settlement, which would be supported by the Prepetition Lenders, MLH and TA.

During a September 30, 2015 meeting between the DOJ, on behalf of the USA, the Company and its counsel, counsel to the Ad Hoc Group, counsel to MLH and counsel to TA, the USA agreed to extend its USA Deadline to October 16, 2015 (and CMS agreed to extend the revocation effective date to the same date) in exchange for, among other things, the promise to pay an initial $50 million deposit toward the USA Settlement obligations. Specifically, by October 16, 2015, the Company was required to (i) execute definitive settlement agreements with the USA Settlement Parties, including CMS, (ii) fund the $50 million deposit, and (iii) establish irrevocable support of a restructuring of the Company's financial obligations evidenced by a restructuring support agreement between the Company, Prepetition Lenders holding at least a majority in number and 66 2/3% in amount of the Existing Credit Agreement Claims, and TA and MLH. In connection with this arrangement, CMS informed the Company that it would suspend Medicare payments until definitive settlement documentation was executed. Medicare payments

were suspended beginning October 1, 2015, and were released from suspension on October 16, 2015, when the USA Settlement Agreements were executed and effective.

After nearly four months of intense settlement discussions and negotiations among the various parties in interest, the parties were ultimately successful in reaching a negotiated resolution embodied in the USA Settlement Agreements and the RSA. The RSA was signed on October 15, 2015 and the USA Settlement Agreements were executed on October 16, 2015. As mentioned above, any payments subject to the CMS suspension were released promptly to the Company.

The USA Settlement Agreements

The USA Settlement Agreements (including the CIA) resolved certain issues as set forth in the USA Settlement Agreements[7] between the USA Settlement Parties, on the one hand, and the Debtors and their respective Related Parties, on the other. Upon the execution of the USA Settlement Agreements, Millennium paid the USA the Initial USA Settlement Deposit, which was credited toward Millennium's total settlement obligations. On October 16, 2015, CMS lifted its suspension of Medicare payments. As part of the USA Settlement Agreements and pursuant to the RSA, TA and MLH severally guaranteed the $50 million Initial USA Settlement Deposit to the USA pursuant to a Guarantee Agreement entered into on October 16, 2015 (the "Guarantee Agreement"). However, in the event that TA and MLH are required to make payment to the USA of such $50 million pursuant to such Guarantee Agreement, TA and MLH will have a subrogation claim (the "Subrogation Claim") against Millennium for the full amount so paid, which Millennium and the Consenting Lenders agree will be an allowed claim in the Chapter 11 Cases. The terms of the Subrogation Claim, including the sources of recovery therefor, are further set forth in the RSA. It is a condition to the confirmation of the Plan that the Debtors have filed a motion with the Bankruptcy Court seeking (i) authority to assume the USA Settlement Agreements, (ii) a waiver of any claims to avoid the Initial USA Settlement Deposit, and (iii) approval of the Subrogation Claim and related sources of recovery therefor.

### 3.    Restructuring Support Agreement

As set forth above, on October 15, 2015, the Company entered into the RSA with the Participating Lenders, MLH and TA. Pursuant to the RSA, the Participating Lenders have agreed to (i) enter into the Master Restructuring Agreement that is attached hereto as Exhibit B to implement and consummate the Out-of-Court Transaction, (ii) vote in favor of the Plan attached hereto as Exhibit C and (iii) consent to the Existing Credit Agreement Amendments attached hereto as Exhibit D.

The transactions contemplated by the RSA represent a global resolution of numerous issues relating to the Debtors, including the satisfaction of the Debtors' obligations under the USA Settlement Agreements and all claims against MLH and TA and their Related Parties, to be implemented either through the Out-of-Court Transaction or the Plan. Specifically, pursuant to the RSA, and the Out-of-Court Transaction, or the Plan, as applicable, MLH and TA will provide the Settlement Contribution, which is comprised of (i) the USA Settlement Funding Contribution to be paid to or for the benefit of Millennium, which will be distributed to the USA in full and final satisfaction of Millennium's monetary obligations under the USA Settlement Agreements subject to the terms set forth therein and (ii) the Millennium Funding Contribution to be paid to Millennium to reimburse Millennium for the Initial USA Settlement Deposit, for working capital purposes, and as otherwise set forth in the RSA. MLH has agreed to pay $178.75 million of the Settlement Contribution (the "MLH Contribution") and TA has agreed to pay $146.25 million of the Settlement Contribution (the "TA Contribution"). The USA Settlement

---

[7]    The USA Settlement Agreements, and the Plan, preserve certain claims of governmental units. These preserved claims shall survive discharge.

Funding Contribution will be paid to the USA. If the USA Settlement Funding Contribution is not paid to the USA, then the USA will receive cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

Further, in exchange for the Settlement Contribution and pursuant to the RSA, MLH and TA and certain related parties will receive full releases as further described in the Master Restructuring Agreement and the Plan. In the case of the Plan, the parties will also be subject to a bar order, an injunction and related protective provisions as further described in the Plan. In addition, the transactions contemplated by the RSA and the Out-of-Court Transaction or the Plan, as applicable, will restructure the Debtors' balance sheet to reduce its funded debt obligations to a manageable load. As a result of the transactions contemplated by the RSA and the Out-of-Court Transaction or the Plan, as applicable, 100% of the equity interests in Millennium will be beneficially owned by the Consenting Lenders (in the case of the Out-of-Court Transaction) or the Prepetition Lenders (in the case of the Plan) in consideration for the cancellation of such Prepetition Lenders' Existing Credit Agreement Claims. In addition, the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust will be established and vested with the right to prosecute and settle Retained Claims against Excluded Parties as set forth in Article V.F. of the Plan and Sections III.E. and V.D(6)-(7) below. The Out-of-Court Transaction will be consummated in the event that the Out-of-Court Requisite Lenders consent to the Out-of-Court Transaction. If the Out-of-Court Requisite Lenders do not consent to the Out-of-Court Transaction by the Consenting and Voting Deadline but the Requisite Consenting Lenders vote in favor of the Plan by the Consenting and Voting Deadline, the transactions contemplated by the RSA will be effectuated through the confirmation of the Plan.

Articles III and V of this Disclosure Statement describe the terms of the Out-of-Court Transaction and the Plan in detail. Copies of the RSA, the Master Restructuring Agreement and the Plan are attached to this Disclosure Statement as Exhibits A, B and C, respectively.

## III.     MASTER RESTRUCTURING AGREEMENT

If the Out-of-Court Requisite Lenders consent to the Out-of-Court Transaction by executing the Master Restructuring Agreement prior to the Consenting and Voting Deadline, the Company will effectuate the Out-of-Court Transaction. Pursuant to the Out-of-Court Transaction, control of Millennium will be transferred to the Consenting Lenders, and the debt owed to the Prepetition Lenders will be restructured.

Specifically, in accordance with the Master Restructuring Agreement attached hereto as Exhibit B, all of the Company's outstanding obligations under the Existing Loan Documents will be extinguished (except to the extent such obligations of Millennium and its subsidiaries are applicable to any Non-Consenting Lender) and the Second Existing Credit Agreement Amendment will become effective. In addition, each Consenting Lender will receive on the Closing Date, in full and final satisfaction of such Consenting Lender's Existing Credit Agreement Claims, its pro rata share of and interest in: (i) 100% of the Millennium Equity Interests, all of which will be subsequently transferred by the Consenting Lenders to New Holdco in exchange for 100% of the New Holdco Common Stock, subject to potential dilution for equity securities issued pursuant to any equity incentive plan adopted in the future and any other subsequent issuances of equity securities by New Holdco; (ii) the New Term Loan; (iii) the Millennium Corporate Claim Trust; and (iv) to the extent a Consenting Lender held a directly owned Retained Lender Cause of Action prior to the Consenting and Voting Record Date, a pro rata beneficial interest in the Millennium Lender Claim Trust.

In addition, each Consenting Lender that consents to the Out-of-Court Transaction (including the Out-of-Court Releases), executes and delivers the Existing Credit Agreement Amendments and votes in

favor of the Plan (including the releases, exculpations, bar order and injunction included therein) by the Early Commitment Deadline will receive a pro rata share of the Early Commitment Facility.

The following is a description of each of the material components to the Out-of-Court Transaction as contemplated by the Master Restructuring Agreement.  Capitalized terms used but not defined in this Article III have the meanings ascribed to them in the Master Restructuring Agreement.

### A.    Summary of Early Commitment Facility

The Master Restructuring Agreement contemplates that the Existing Credit Agreement will be amended to, among other things, (i) permit the incurrence of the Early Commitment Facility as of the Early Commitment Deadline and (ii) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the Early Commitment Facility.

Each Holder of Existing Credit Agreement Claims that consents to the Out-of-Court Transaction (including the Out-of-Court Releases), the Plan (including the releases, exculpations, bar order and injunction and related provisions thereof) and the Existing Credit Agreement Amendments by the Early Commitment Deadline will receive its pro rata share of the $50.0 million Early Commitment Facility. The Early Commitment Facility will be senior in lien to the liens securing the Existing Credit Agreement Claims.  The terms of the Early Commitment Facility will otherwise be similar to the terms of the Existing Credit Agreement, including with respect to interest, prepayment rights, and covenants (prior to the amendments set forth in the Existing Credit Agreement Amendments), except, in each case, to the extent changes are necessary due to the nature of the obligations under the Early Commitment Facility.

The First Existing Credit Agreement Amendment and the Early Commitment Facility will become operative as of the Consenting and Voting Deadline.  Pursuant to the Master Restructuring Agreement, contemporaneously with the payment of the Equityholder Contributions and the USA Settlement Funding Contribution, Millennium will be required to pay in full in cash the outstanding obligations under the Early Commitment Facility.[8]  A copy of the Early Commitment Facility is attached to this Disclosure Statement as <u>Exhibit F</u>.

### B.    Summary of Second Existing Credit Agreement Amendment

Pursuant to the Master Restructuring Agreement, the Company and the Consenting Lenders will enter into the Second Existing Credit Agreement Amendment which will, among other things, (i) permit the execution of a subordination agreement in order to effectuate the subordination of the liens under the Existing Credit Agreement to the liens under the New Term Loan, (ii) eliminate substantially all of the representations, covenants and prepayment obligations contained in the Existing Credit Agreement, (iii) permanently waive any existing defaults under the Existing Loan Documents, (iv) prevent any party to the Existing Credit Agreement from exercising any rights or remedies under the Existing Loan Documents for a period of ninety-one (91) days after the Closing Date and (v) release and terminate Holdings' guarantee of the Existing Credit Agreement (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)).  In addition, pursuant to the Second Existing Credit Agreement Amendment, certain provisions of the Existing Credit Agreement will be deleted, including certain provisions related to mandatory prepayments,

---

[8]    In the case of the Plan, the Early Commitment Facility will be paid in full in cash on or as soon as practicable after the Effective Date.  In the event that the Out-of-Court Transaction does not close and the Plan is not consummated, the Early Commitment Facility will continue in full force and effect in accordance with its terms.

representations and warranties, affirmative covenants, negative covenants and events of default and the Second Existing Credit Agreement Amendment will contain a release of Holdings as a guarantor of the Existing Credit Agreement (including a release of the liens granted by Holdings pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)), subject to the occurrence of the Effective Date (as defined in the  Second Existing Credit Agreement Amendment).  In addition, the Master Restructuring Agreement contemplates that the Existing Guarantee and Collateral Agreement Amendment will eliminate substantially all of the representations, covenants and related obligations contained in the Existing Guarantee and Collateral Agreement.  As a result of the Existing Credit Agreement Amendments and the Existing Guarantee and Collateral Agreement Amendment, the rights and protections available to Non-Consenting Lenders under the Existing Loan Documents will be significantly reduced.

Specifically, the Second Existing Credit Agreement Amendment will contain the following terms:

| Material Terms of Second Existing Credit Agreement Amendment | |
|---|---|
| Waiver of Defaults | Any defaults and/or events of default under the Existing Credit Agreement as of the Closing Date shall be permanently waived. |
| Forbearance | The Prepetition Lenders remaining under the Existing Credit Agreement as of the Closing Date and the Administrative Agent shall be prohibited (and shall forebear) from declaring any defaults under the Existing Credit Agreement and the other Existing Loan Document, accelerating any of the loans or other obligations under the Existing Credit Agreement and the other Existing Loan Documents or otherwise exercising any of their rights or remedies under the Existing Credit Agreement and the other Existing Loan Documents for a period of ninety-one (91) days following the Closing Date. |
| Deleted Provisions | The following provisions of the Existing Credit Agreement shall be deleted:<br><br>(a)    Section 2.11(a) (Mandatory Prepayment/Proceeds of Indebtedness);<br><br>(b)    Section 2.11(b) (Mandatory Prepayment/Proceeds from Asset Sale and Recovery Event);<br><br>(c)    Article IV (Representations and Warranties);<br><br>(d)    Article VI (Affirmative Covenants) with the exception of Section 6.13;<br><br>(e)    Article 7 (Negative Covenants); and<br><br>(f)    Sections 8.1(b), (c), (d), (e), (g), (h), (i), (j), (k) and (l) (Events of Default).<br><br>In addition, (x) Holdings will be removed as a party to the Existing Credit Agreement, (y) Holdings will be released as a guarantor under the Existing Credit Agreement, and (z) the liens and security interests granted by Holdings in connection with the Existing Credit |

23

| | Agreement will be released. |
|---|---|
| Pro Rata Treatment of Payments | Section 2.17 (Pro Rata Treatment of Payments) shall be revised to (x) expressly permit the exchange of Existing Credit Agreement Claims for the New Term Loan and (y) provide for the subordination of the liens securing the obligations under the Existing Credit Agreement and the other Existing Loan Documents to the liens securing the obligations under the New Term Loan. |
| Prohibition of Assignment | Section 10.6 shall be amended to provide that any assignment of Existing Credit Agreement Claims and/or other Obligations (as defined in the Existing Credit Agreement) and the granting of participations in any Existing Credit Agreement Claims and other Obligations (as defined in the Existing Credit Agreement), in each case, by any Prepetition Lender under the Existing Credit Agreement, is prohibited. |
| Subordination | The Consenting Lenders shall authorize the Administrative Agent to enter into a subordination agreement on customary and reasonable terms according priority to the liens securing the New Term Loan over the liens securing the Existing Credit Agreement. |
| Excess Cash Flow | Section 2.11(c) shall be amended to provide that no Excess Cash (7) Flow (as defined in the Existing Credit Agreement) payment shall be payable for any period in which any excess cash flow payment is payable under the New Term Loan. |

The Existing Credit Agreement Amendments are attached to this Disclosure Statement as Exhibit D. The Second Existing Credit Agreement Amendment will become operative on the Closing Date. As a condition to the Closing Date, Consenting Lenders will be required to execute and deliver a copy of the Second Existing Credit Agreement Amendment pursuant to the terms of the Master Restructuring Agreement. Obligations under the Existing Loan Documents to Non-Consenting Lenders will remain outstanding following the Closing Date and will continue to be subject to the provisions of the Existing Loan Documents, as amended by Existing Credit Agreement Amendments.

C.      **Summary of New Term Loan**

As partial consideration for the cancellation of the Existing Credit Agreement Claims, under either the Out-of-Court Transaction or the Plan, each Holder of Existing Credit Agreement Claims that is a Consenting Lender will receive its pro rata share of the New Term Loan. The New Term Loan will consist of a five-year, $600 million term facility and will be secured by a first priority security interest in substantially all of the Company's assets. Subject to certain exceptions, the interest rate on the New Term Loan will be equal to (a) the Base Rate plus the 5.50% per annum or (b) the LIBOR Rate plus 6.50% per annum, at the election of the Company. The New Term Loan will contain the following terms:[9]

---

[9]      The New Term Loan will also be implemented in the case of the Plan subject to the terms set forth therein. In the event that the Out-of-Court Requisite Lenders do not consent to the Out-of-Court Transaction but the

*(cont'd)*

| Material Terms of New Term Loan[10] | |
|---|---|
| Borrowers | Millennium and New Holdco (the "<u>Borrowers</u>"). |
| Guarantors | RxAnte and each other direct and indirect domestic subsidiary of the Borrowers, subject to exceptions substantially similar to those set forth in the Existing Credit Agreement (such subsidiaries other than Millennium, collectively, the "<u>Subsidiary Guarantors</u>"; together with the Borrowers, the "<u>Obligors</u>"). |
| Lenders | Consenting Lenders. |
| Required Lenders | Those Consenting Lenders holding greater than fifty percent (50%) of the outstanding principal amount of the New Term Loan. |
| Administrative Agent | To be determined by the Ad Hoc Group Majority (the "<u>New Term Loan Agent</u>"). |
| Type and Amount | Aggregate principal amount of $600 million.  The New Term Loan shall be deemed made in a single drawing on the Closing Date (subject to the prior satisfaction of the Conditions Precedent (hereinafter defined)). |
| Security | The New Term Loan shall be secured by a perfected first priority security interest in substantially all property and assets of the Borrowers and the Subsidiary Guarantors (real and personal, tangible and intangible, whether now owned or hereafter acquired, developed and/or existing and wherever located and, including, without limitation, a perfected first priority security interest in all of the equity interests held by the Borrowers and all Subsidiary Guarantors), in each case, subject to the exceptions and limitations substantially similar to those set forth in the Existing Credit Agreement and the Existing Loan Documents, provided that (x) the Obligors' cash and deposit accounts shall be subject to control agreements, under which the New Term Loan Agent shall be granted a perfected first priority security interest in the cash and deposit accounts (subject to customary exceptions), but the Borrowers shall be permitted to use such cash in the ordinary course of business unless and until an event of default occurs and is continuing, (y) Obligors' letter of credit rights valued at greater than a mutually agreed upon threshold shall constitute Collateral under the New Term Loan and (z) the types of |

_(cont'd from previous page)_

Requisite Consenting Lenders vote in favor of the Plan, the New Term Loan Agreement will be provided with a supplement to the Plan (the "<u>Plan Supplement</u>").

[10]    Each reference to Existing Credit Agreement under the "Material Terms of New Term Loan" shall mean the Existing Credit Agreement prior to giving effect to the Existing Credit Agreement Amendments.

| | |
|---|---|
| | property and assets described in clauses (d) and (r) of the definition of "Excluded Collateral" (as defined in the Existing Credit Agreement) shall not constitute Collateral under the New Term Loan so long as "but only to the extent that the granting of security interests therein would be prohibited by the terms thereof" shall be added to the end of such exceptions when they are excluded from Collateral under the New Term Loan (collectively, the "<u>Collateral</u>"). |
| Maturity | The New Term Loan will mature on the date that is five years after the Closing Date (the "<u>Term Maturity Date</u>"). |
| Interest Rate | The Borrowers may elect that the New Term Loan bear interest at a rate per annum equal to (a) the Base Rate plus the 5.50% per annum or (b) the LIBOR Rate plus 6.50% per annum.<br><br>The terms "Base Rate" and "LIBOR Rate" shall have the meanings customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest based on the LIBOR Rate shall be customary and appropriate for financings of this type and substantially similar to the Existing Credit Agreement; provided, that at no time will the (i) LIBOR Rate be deemed to be less than 1.00% per annum and (ii) Base Rate be deemed to be less than 2.00% per annum. |
| Interest Payment Dates | In the case of that portion of the New Term Loan bearing interest at the Base Rate ("<u>Base Rate Loans</u>"), interest shall be payable quarterly in arrears.<br><br>In the case of that portion of the New Term Loan bearing interest at the LIBOR Rate ("<u>LIBOR Rate Loans</u>"), interest shall be payable on the last day of each relevant interest period; provided, that if any interest period is longer than three months, interest shall be payable on each successive date three months after the first day of such interest period. |
| Default Rate | Upon the occurrence and during the continuation of an event of default, the interest rate on the New Term Loan will be increased by two percent (2.00%) per annum at the direction of the New Term Loan Agent (which shall be at the direction of the Required Lenders), which may be charged back to the initial date on which such event of default occurred. |
| Amortization; Prepayments | (a)  Amortization: 1.00% of the original principal amount per annum of the New Term Loan, payable in equal quarterly installments.  The balance of the New Term Loan will be repayable on the Term Maturity Date.<br><br>(b)  Voluntary prepayments: Permitted, in whole or in part, at any time, without premium or penalty.<br><br>(c) Mandatory prepayments: The New Term Loan shall include mandatory prepayment requirements (including, without limitation, |

| | |
|---|---|
| | an annual excess cash flow payment that is expected to be between 50% to 75% of excess cash flow, provided that after giving effect to such payment Borrowers are left with at least $110 million to $125 million of liquidity) provided that the percentage(s) of "excess cash flow", financial metrics and financial covenant definitions, in each case, related to the excess cash flow payment requirement shall be mutually agreed upon and based upon such percentage(s), financial metrics and definitions as are customary for a financing of this type to a similarly situated borrower.  It is expected that the first excess cash flow payment will be required to be made in March or April 2017. |
| Conditions Precedent To Closing Date | Conditions precedent customary for this type of financing, including, without limitation (collectively, the "<u>Conditions Precedent</u>"): <br><br> 1) Solely in the case of a prepackaged bankruptcy, (i) entry of a final non-appealable order of the Bankruptcy Court (which is not subject to any appeal or contest unless waived in accordance with the terms of the Restructuring Term Sheet, including by MLH and TA, each in their sole and absolute discretion) approving a plan of reorganization which plan has been approved by the Requisite Consenting Lenders and other requisite creditors necessary to approve such plan; <br><br> 2) Solely in the case of a prepackaged bankruptcy, debtor in possession lenders' administrative agent shall have received a cash payment in the amount necessary to repay all of the debtor in possession loans (if any) and the other obligations outstanding under the debtor in possession facility (if any), for the ratable benefit of the debtor in possession lenders; <br><br> 3) Payment of all (x) accrued and unpaid fees, costs and expenses that are payable by the Obligors on the Closing Date, including without limitation, any applicable administrative agent fee due and payable under the New Term Loan and (y) reasonable fees, costs and expenses incurred by New Term Loan Agent and the Lenders, including reasonable attorneys' fees of the New Term Loan Agent and one counsel for the Consenting Lenders, in connection with the preparation, negotiation, execution, and delivery of the New Term Loan Documents, through the Closing Date; <br><br> 4) Execution and delivery of definitive documentation evidencing the New Term Loan, including, without limitation, the loan agreement, security agreement, subordination agreement (if any), and other agreements as reasonably required by the New Term Loan Agent and Consenting Lenders in their reasonable discretion, each in form and substance reasonably satisfactory to the New Term Loan Agent and Consenting Lenders and consistent with the Documentation Principles (hereinafter defined) (collectively, the "<u>New Term Loan Documents</u>"); <br><br> 5) There shall have occurred no Material Adverse Event (as defined |

|  | in the RSA) since the date of the RSA; |
|  | 6)   Each of the USA Settlement and the CIA shall be in full force and effect; and |
|  | 7)   Satisfaction of such other conditions precedent as are customary for financings of this type to a similarly situated borrower. |
| Representations and Warranties | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those representations and warranties set forth in the Existing Credit Agreement. |
| Affirmative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those affirmative covenants set forth in the Existing Credit Agreement. |
| Negative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those negative covenants set forth in the Existing Credit Agreement. |
| Financial Covenants | Financial covenants with levels, measurement periods and financial covenant related definitions to be mutually agreed (it being understood that the financial covenant related definitions shall be customary for a financing of this type to a similarly situated borrower). |
| Events of Default | Usual and customary for financings of this type and similar to those events of default set forth in the Existing Credit Agreement (but, for the avoidance of doubt, including events of default arising as a result of the commencement of a government investigation or proceeding involving an Obligor that could reasonably be expected to cause a Material Adverse Effect (as defined in the Existing Credit Agreement)). |
| Default, Acceleration, other Remedies | The New Term Loan Agent and Consenting Lenders shall be prohibited from and shall forbear from (x) declaring any defaults under the New Term Loan and (y) accelerating any debt under the New Term Loan or otherwise exercising rights or remedies under the New Term Loan, in each case, for a period of ninety-one (91) days following the Closing Date.  This provision shall be non-amendable. |
| Documentation Principles | The definitive documentation for the New Term Loan shall reflect the provisions set forth in this term sheet and shall otherwise be substantially consistent with the Existing Credit Agreement and Existing Loan Documents, adjusted to reflect (i) the elimination of the revolving credit facility, swing line facility and letter of credit facility; (ii) the Obligors' existing financial condition, the Out-of-Court Transaction or prepackaged bankruptcy plan, as applicable, and other revisions to account for changes to  the Obligors' corporate structure and business related to the foregoing, (iii) a cap (to be |

| | |
|---|---|
| | mutually agreed) on the aggregate amount of assets of and revenues that can be derived from Unrestricted Subsidiaries (as defined in the Existing Credit Agreement) and (iv) other items to be reasonably agreed (collectively, the "<u>Documentation Principles</u>").  Each reference in this term sheet to the phrase "substantially consistent with Existing Credit Agreement", "substantially similar to . . . the Existing Credit Agreement", "similar to those Events of Default set forth in the Existing Credit Agreement" or any similar phrase shall be subject to the Documentation Principles.  With respect to terms and conditions not addressed herein or in any final Out-of-Court Transaction documentation based upon this Disclosure Statement, those terms and conditions shall be reasonably agreed in good faith negotiations between the Consenting Lenders and Borrowers, and shall be usual and customary for similarly situated facilities of this type. |
| Assignments | The Consenting Lenders will be permitted to make assignments in respect of the New Term Loan in a manner substantially consistent with the assignment provisions set forth in the Existing Credit Agreement; provided, that the Borrowers' consent shall only be required to consummate such assignments to the extent that no events of default are then continuing. |
| Expenses and Indemnification; Yield Protection and Taxes | Usual and customary for financings of this type and substantially similar to similar provisions set forth in the Existing Credit Agreement; provided that there shall be no cap thereunder in regards to reimbursable fees, costs and expenses, including without limitation, legal fees. |
| Governing Law and Forum | New York. |

### D.    Summary of Equity Capitalization of New Holdco

Promptly following the transfer by Holdings of 100% of the Millennium Equity Interests to the Consenting Lenders or the Prepetition Lenders, as applicable, the Consenting Lenders or Prepetition Lenders will be required to transfer all of the Millennium Equity Interests to New Holdco in exchange for 100% of the New Holdco Common Stock, subject to potential dilution for equity securities issued pursuant to any equity incentive plan adopted in the future and any other subsequent issuances of equity securities by New Holdco.  The New Holdco Charter and New Holdco Bylaws will provide, among other things: [11]

| Material Terms of New Holdco Corporate Governance | |
|---|---|
| Board of Directors | • 5 member initial Board, including the CEO.  The remaining |

---

[11]    In the event that the Out-of-Court Requisite Lenders do not consent to the Out-of-Court Transaction but the Requisite Consenting Lenders vote in favor of the Plan, the New Holdco Charter and New Holdco Bylaws will be provided with the Plan Supplement.

| | |
|---|---|
| (size, structure, composition, etc.) | designees on the initial Board will be determined by an Ad Hoc Group Majority<br><br>• Governance documents to require that a majority of the directors are independent (using Sarbanes Oxley independence standard); no waiver of corporate opportunity doctrine given independent director status; initial Chairman to be an independent director<br><br>• In the event an Ad Hoc Group Majority is unable to find satisfactory directors prior to Closing, the Ad Hoc Group Majority will have contractual nomination rights to fill enumerated vacancies (subject only to the fiduciary duties of the then-acting Board to accept such nominations and appoint the directors)<br><br>• Other board-related governance details to be determined by the new Board (e.g. committees; governance of subsidiaries; whether to continue to split CEO/Chairman)<br><br>• Default provisions of the General Corporation Law of the State of Delaware ("DGCL") to cover voting and approval requirements (e.g. related party transactions, hire/fire authority) |
| Stockholders (rights, voting and approval requirements, etc.) | • The following items will require approval of a majority of the stockholders (in addition to Board approval, and in addition to those matters that require stockholder approval under the DGCL):<br><br>    o Equity Incentive Plans, to the extent not approved by an Ad Hoc Group Majority prior to Closing<br><br>    o Issuance of 20% or more of capital stock in an acquisition transaction<br><br>    o Any Bylaw amendment/revision impacting stockholder rights<br><br>• Otherwise default DGCL to cover voting and approval requirements<br><br>• Governance documents to include the following stockholder rights:<br><br>    o Right of stockholders to act by written consent<br><br>    o Right of stockholders holding a minimum of 10% to call a special meeting<br><br>    o An annual stockholder meeting, with stockholders holding a minimum of 5% of the outstanding common stock having the |

|  | right to include a board nominee in any solicitation<br><br> o No prior notice requirements to nominate a director prior to a meeting called for that purpose |
| --- | --- |
| Capital Structure | • Charter to authorize a number of shares of common stock equal to at least 2X the number of shares outstanding immediately after the Closing (note: majority stockholder approval still required for 20% issuance in acquisition transactions even if sufficient shares are authorized)<br><br>• No blank check preferred, no preemptive rights |
| Transfer Restrictions | • Governance documents to prohibit any transfers that would create a public company in violation of the numerosity requirements (2,000 total or 500 non-accredited investors, excluding in either case employee compensation shares per JOBS Act rules)<br><br>• No tag or drag rights, no right of first offer/refusal, no buy-sell provisions<br><br>• No other restrictions other than securities laws.  Company to explore whether it can make shares DTC eligible for 144A transfers. |
| Dissolution | • Default DGCL to cover any dissolution-related matters. |
| Information Rights | • *Trading Information*: Company to provide sufficient information on a confidential basis to prospective purchasers including to permit immediate 144A transfers to QIBs<br><br>• *Investor Information*: Company to provide (1) annual and quarterly financial statements; (2) an annual forecast/budget (to sync with Loan Agreement); (3) quarterly updates on any "material" revisions to the budget/forecast (where "material" revisions is to be objectively defined in reference to previously disclosed budgets/forecasts, e.g. changes to significant metrics such as revenues, operating expenses, capital expenses, EBITDA or Net Income by more than a threshold percentage) and (4) quarterly conference calls.<br><br>• *Restriction on Competitors*: access to the above-mentioned information to be restricted from direct competitors |
| Registration Rights | • Eligible Holders (defined as stockholders holding at least 2% of the outstanding common stock at Closing) to have the ability to demand an IPO after a runway of 2 years post-Closing (note: funds under common management to be aggregated for Eligible |

| | |
|---|---|
| | Holder calculation purposes).  Demand for this purpose will require (a) support of a minimum threshold number of registrable securities and (b) satisfaction of a minimum aggregate proceeds threshold.<br><br>• Additional customary demand and piggyback registration rights for Eligible Holders |
| Other | • Charter will opt out of Section 203 of the Delaware General Corporation Law |

### E.    Summary of Millennium Claim Trusts

As partial consideration for the cancellation of the Existing Credit Agreement Claims, on the date that the transfer of 100% of the Millennium Equity Interests to the Consenting Lenders occurs (the "Transfer Date"), each Holder of Existing Credit Agreement Claims will receive its pro rata share of the beneficial interests in the Millennium Corporate Claim Trust.  In addition, any Prepetition Lender who held a directly owned Retained Lender Cause of Action prior to the Consenting and Voting Record Date and is a Consenting Lender will be automatically deemed to have contributed such Retained Lender Cause of Action to the Millennium Lender Claim Trust and will receive its pro rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by the Consenting Lenders) share of the beneficial interests in the Millennium Lender Claim Trust.  Non-Consenting Lenders will not be permitted to participate in the Millennium Lender Claim Trust.  The material terms of the Millennium Claim Trusts include the following:[12]

| Material Terms of Millennium Claim Trusts | |
|---|---|
| Grant of Claims to the Trusts | On the Transfer Date, any and all claims and causes of action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium or the Administrative Agent (in its capacity as agent under the Existing Loan Documents, but not its individual claims to indemnity or reimbursement) under the Existing Credit Agreement other than Released Claims against Released Parties (collectively, the "Retained Corporate Causes of Action") shall be deemed to have been contributed to the Millennium Corporate Claim Trust for prosecution, settlement, or other liquidation, in the discretion of the Trustee (defined below). On the Transfer Date, each of the Consenting Lenders will be automatically deemed to have contributed any and all of their individual claims and causes of action against any person or entity related to the Company (other than Released Claims against Released Parties) to |

---

[12]    The Millennium Claim Trusts will also be implemented in the case of the Plan subject to the terms set forth therein.  In the event that the Out-of-Court Requisite Lenders do not consent to the Out-of-Court Transaction but the Requisite Consenting Lenders vote in favor of the Plan, the Millennium Corporate Claim Trust Agreement and the Millennium Lender Claim Trust Agreement will be provided with the Plan Supplement.

| | |
|---|---|
| | the Millennium Lender Claim Trust for prosecution, settlement or other liquidation, in the discretion of the Trustee (the "<u>Lender Causes of Action</u>"; and together with the Retained Corporate Causes of Action, the "<u>Causes of Action</u>"). |
| Contribution by the Debtors | The Millennium Corporate Claim Trust shall be funded by an initial contribution made by Millennium on the Transfer Date in the amount of $1,000,000, and the Millennium Lender Claim Trust shall be funded by an initial contribution to be made by Millennium on the Transfer Date in the amount of $2,000,000.00. Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Claim Trusts and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust).  Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from a $7,000,000 delayed draw facility (the "<u>Trust Delayed Draw Facility</u>") to be entered into on the Transfer Date among the Millennium Claim Trusts and Millennium pursuant to which Millennium shall advance up to $7,000,000 (in the aggregate of all such funds advanced to both of the Millennium Claim Trusts) in respect of fees and costs of the Millennium Claim Trusts at the request of their respective Trustees and/or Trust Advisory Boards (defined below). Notwithstanding the existence of the Trust Delayed Draw Facility, amounts advanced by Millennium to the Millennium Claim Trusts by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Claim Trusts (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Claim Trusts and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by Millennium).  The initial $1,000,000 cash contribution (in the case of the Millennium Corporate Claim Trust), the initial $2,000,000 cash contribution (in the case of the Millennium Lender Claim Trust) and the subsequent payment of up to $10,000,000 of invoices will not be required to be reimbursed. |
| Beneficiaries and Reimbursement Rights of Backstop MLH Shareholders | The beneficiaries of the Millennium Corporate Claim Trust are (A) the Consenting Lenders and (B) solely to the extent of any net proceeds recovered in respect to claims belonging to and contributed by the Administrative Agent, the Consenting Lenders and the Non-Consenting Lenders, provided, however, that in the event net proceeds are recovered by the Millennium Corporate Claim Trust in respect of a claim contributed by the Administrative Agent, the portion of such net proceeds allocable to Non-Consenting Lenders (the "<u>Non-Consenting Lenders' Share</u>") shall be retained by the Trustee of the Millennium Corporate Claim Trust in an escrow |

account and not paid to any of the Non-Consenting Lenders unless the Trustee has been notified in writing that such Non-Consenting Lenders have not received payment in full of all amounts due to them under the Existing Credit Agreement as of the earlier to occur of (a "Sharing Event") (i) the Tranche B Maturity Date (as defined in the Existing Credit Agreement) or (ii) the occurrence and continuance of an Event of Default under the Existing Credit Agreement, upon which Sharing Event the Non-Consenting Lenders' Share shall be released to the Administrative Agent for ratable distribution to the Non-Consenting Lenders. Upon the date on which the Trustee is notified in writing that the Non-Consenting Lenders have received payment in full of all amounts due to them under the Existing Credit Agreement, the Non-Consenting Lenders' Share shall be distributed by such Trustee to the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' pro rata share of MLH Contribution. Subject to the other provisions hereof, with respect to any net proceeds recovered by the Millennium Corporate Claim Trust in respect to claims contributed by the Administrative Agent, such net proceeds shall be distributed pro rata to the Consenting Lenders and the Non-Consenting Lenders. Subject to the reimbursement rights of the Backstop MLH Shareholders and the proceeds distributed to the Non-Consenting Lenders in accordance with the Master Restructuring Agreement, the holders of Existing Credit Agreement Claims shall receive their pro rata share of beneficial interest in the Millennium Corporate Claim Trust.

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' pro rata share of MLH Contribution.

In each case, subject to the reimbursement rights of the Backstop MLH Shareholders, the Prepetition Lenders who are beneficiaries of each Millennium Claim Trust shall hold beneficial interests therein in the same proportion as the principal amount of the Existing Credit

| | |
|---|---|
| | Agreement Claims they hold as of the Consenting and Voting Record Date bears to the total amount of Existing Credit Agreement Claims held by Prepetition Lenders who are beneficiaries of the applicable Millennium Claim Trust. |
| Governance | Each of the Millennium Claim Trusts shall be governed by a three-member board to be appointed by an Ad Hoc Group Majority (the "Trust Advisory Board") prior to the Closing Date. Among its other duties, the Trust Advisory Board shall select a trustee or trustees for the Millennium Claim Trusts and, if necessary, a replacement Trustee therefor. |
| Federal Income Tax Treatment of Millennium Corporate Claim Trust | The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.  The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust. For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party reasonably and in good faith to cooperate with one another to jointly determine such values. |
| Federal Income Tax Treatment of Millennium Lender Claim Trust | The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. |

F.    **Summary of Out-of-Court Releases**

By consenting to the Out-of-Court Transaction and executing and delivering a copy of the Master Restructuring Agreement by the Consenting and Voting Deadline, each Consenting Lender will agree to the Out-of-Court Releases as described herein and as set forth in the Master Restructuring Agreement. The Out-of-Court Releases will become effective on the Closing Date in partial consideration for consummating the transactions contemplated by the Master Restructuring Agreement.

Release by the Company and New Holdco

The Company and New Holdco, on behalf of themselves and their Related Parties, will fully and completely release and forever discharge the Released Parties and their respective Related Parties from any and all Released Claims that the Company or New Holdco, or any of their Related Parties, would have been legally entitled to assert in their own right, on behalf of one another or on behalf of another party, or through derivative standing or otherwise (including, for the avoidance of doubt, on behalf of or derivatively for the Company), against the Released Parties or their respective Related Parties.

Releases by TA and MLH

(a)    Subject to (c) below, TA, on behalf of itself and its Related Parties, will (a) fully and completely release and forever discharge Holdings, MLH, and their respective Related Parties, and the Related Parties of such Related Parties, from any and all Core Released Claims that TA or any of its Related Parties would have been legally entitled to assert in their own right, on behalf of one another or on behalf of another party, or through derivative standing or otherwise (including, for the avoidance of doubt, on behalf of or derivatively for the Company, and including, for the avoidance of doubt, any claims arising from MLH's failure to maintain its status as an S Corp), against Holdings or MLH or their respective Related Parties and (b) acknowledge and waive any claim with respect to the non-compliance, if any, with the Umbrella Agreement (as defined in Section 12.12 of the Second Amended and Restated Limited Liability Agreement of Holdings (the "Holdings LLC Agreement")) with respect to any obligations under the Umbrella Agreement with respect to Section 8.5(b) of the Holdings LLC Agreement.

(b)    Subject to (c) below, MLH, on behalf of itself and its Related Parties, will (a) fully and completely release and forever discharge Holdings and TA, and their respective Related Parties, and the Related Parties of such Related Parties, from any and all Core Released Claims that MLH or any of its Related Parties would have been legally entitled to assert in their own right, on behalf of one another or on behalf of another party, or through derivative standing or otherwise (including, for the avoidance of doubt, on behalf of or derivatively for the Company), against Holdings or TA or their respective Related Parties and (b) acknowledge and waive any claim with respect to the non-compliance, if any, with the Umbrella Agreement (as defined in Section 12.12 of the Holdings LLC Agreement) with respect to any obligations under the Umbrella Agreement with respect to Section 8.5(b) of the Holdings LLC Agreement.

(c)    For the avoidance of doubt and notwithstanding subparagraphs (a) and (b) above, in any lawsuit or other legal action by an Excluded Party against TA, MLH or their respective Related Parties (collectively, "Equity Defendants"), each Equity Defendant preserves and does not waive the right to defend or otherwise respond to such action by asserting that another Equity Defendant is responsible for any or all causes of action asserted by, or damages claimed by, an Excluded Party; and provided, further, however, nothing in this paragraph releases any person from any claim or obligation arising under the Master Restructuring Agreement, including the provisions of Section 6.12 thereof.

Release by the RSA Releasing Parties

Pursuant to the Master Restructuring Agreement, the RSA Releasing Parties, on behalf of themselves and their respective Related Parties, will fully and completely release and forever discharge Millennium, New Holdco, the Released Parties and each of their respective Related Parties from and against any and all Released Claims that the RSA Releasing Parties or their Related Parties, would have been legally entitled to assert in their own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against the Released Parties; provided, however, that there will be no release of any of the Released Claims by the Consenting Lenders or the Company of any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to the Excluded Parties, and the Retained Claims will be expressly excluded from this paragraph, and all such Retained Claims may be pursued against the Excluded Parties and will be subject to the section entitled "Retained Claims" below and as further described in the Master Restructuring Agreement.

Waiver of Limitations on Releases of Unknown Claims

Each of the Company, New Holdco, the RSA Releasing Parties, TA, and MLH agree and acknowledge that the releases contained herein will extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties will be deemed to waive, and will waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties will be deemed to waive, and will waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The parties also will be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542.  The parties will also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts.  The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

Exclusion of Claims Against Non-Contributing MLH Shareholder

Any claims against any MLH Shareholder that has not funded, in any part, the MLH Contribution are hereby expressly excluded from the releases provided hereunder in order to preserve the claims being transferred to the Millennium Corporate Claim Trust or the Millennium Lender Claim Trust, as applicable.

Retained Claims

For the avoidance of any doubt, all known and unknown claims (including derivative claims) of Millennium against the Excluded Parties, or any other person or entity that is not a Released Party or a Related Party in respect to a Released Party, are preserved (such preserved claims are the "Company Claims"), and all known and unknown direct and derivative claims of the Lenders against the Excluded Parties are preserved (such preserved claims are the "Lender Claims").  The releases provided for in the Master Restructuring Agreement will not preclude the Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Lender Claim or Company Claim is assigned (the Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Plaintiff") from prosecuting, and the Lenders and Millennium retain the right, respectively, to bring, the Lender Claims and Company Claims (collectively, the "Retained Claims") against the Excluded Parties.  In the event that the Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Plaintiff Judgment"), the parties' rights will be as follows:  (i) where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then Lenders and Millennium agree that the Excluded Party or Excluded Parties will be entitled to reduce the amount of its liability to the Plaintiff by the equitable share of Gross Damages (as hereinafter defined) attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution Amount or any other source of recovery of the Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the Settlement Contribution Amount, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Plaintiff equal to such excess so that the Plaintiff shall not recover in excess of its Gross Damages; and (ii) where Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Plaintiff affirmatively consents to any such petition for intervention by MLH and/or TA (or any of their Related Parties)), and where the Plaintiff successfully obtains a Plaintiff Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Plaintiff Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).  In the event that, after one or more Trustees are appointed to pursue Company Claims and/or Lender Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties in the forum selected by Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced

by Plaintiff against an Excluded Party or Excluded Parties.  In any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (i) delineated in this paragraph, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA.  Moreover, in any litigation by the Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Plaintiff, the Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required.  The Plaintiff shall have the right, but not the obligation, to (w) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (x) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted. Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties). In any such action, neither MLH nor TA (nor any of their Related Parties) shall (y) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Plaintiff, which shall be exercised in the sole discretion of Plaintiff or (z) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of Plaintiff.  For the avoidance of doubt, the Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

<u>Other Obligations with Respect to Released Parties</u>

Lenders, Millennium and New Holdco (and its subsidiaries) further agree that, MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Plaintiff, the Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. Lenders further agree that, if the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Plaintiff, Millennium or Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which

shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

### G.      Employee Arrangements

The Company is working towards entering into employment agreements with Brock Hardaway and Martin Price (the "Senior Executives") as of the Closing Date on terms mutually acceptable to such Senior Executives and the Ad Hoc Group Majority, respectively.  The key terms of employment agreements with any other high-level employees will be on terms to be determined and agreed upon by such employees and the Ad Hoc Group Majority.  The Ad Hoc Group Majority and the Senior Executives may agree upon additional forms of incentive compensation.[13]  For the avoidance of doubt, no Senior Executives or other employee's continued employment shall be a condition precedent to the parties obligations to consummate the Restructuring Transactions.

### H.      JS Real Estate

Pursuant to the Master Restructuring Agreement, Millennium and the applicable landlord shall enter into, at or before the closing of the Out-of-Court Transaction, amendments to the JS Real Estate Leases (as defined in the Master Restructuring Agreement) to provide the tenant with two (2) optional five-year extensions on the same terms (with annual CPI rate adjustments) and transferable by the tenant or landlord on the conditions contained in such amendments.[14]

### I.      Conversion of Millennium

Millennium will convert into a Delaware limited liability company on the Closing Date at the time and in the manner further set forth in the Master Restructuring Agreement.

### J.      Certain Tax Matters

The parties to the RSA have agreed to take certain actions with respect to tax matters as further described below and in the Master Restructuring Agreement.

#### 1.      Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to the Master Restructuring Agreement shall be allocated to MLH and TA in accordance with the Holdings LLC Agreement; (ii) the acquisition by the Consenting Lenders of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Consenting Lenders and the acquisition of the assets of Millennium by the Consenting Lenders; and (iii) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

---

[13]      The employee arrangements will also be implemented in the case of the Plan subject to the terms set forth therein.

[14]      The lease amendments will also be implemented in the case of the Plan subject to the terms set forth therein.

Subject to the preceding paragraph, for U.S. federal income tax purposes (and for all other applicable tax purposes), the creation of the Millennium Claim Trusts, the transfer of assets to the Millennium Claim Trusts, the transfer of the beneficial interests in the Millennium Claim Trusts to the Consenting Lenders, and the transfer of 100% of the Millennium Equity to the Consenting Lenders will be characterized as an integrated transaction. Such integrated transaction will be treated as each Consenting Lender's receipt, in full and final satisfaction of the Existing Credit Agreement Claims, of its pro rata share of and interest in (i) 100% of the Millennium Equity and (ii) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the characterization provided in this Section III.J, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

2.        **USA Settlement Deduction**

Any tax deduction with respect to amounts payable from the Equityholder Contributions, whether under the USA Settlement Agreements or otherwise (including the Initial USA Settlement Deposit) shall be deductions of Holdings attributable to a Pre-Closing Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH shareholders.

3.        **Section 754 Election**

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

4.        **Cooperation; Amended Returns**

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the historic TA Shareholders, and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any party to any valuation of Millennium (except with respect to transfers as set forth in Section 2.7(a)(iv) of the Master Restructuring Agreement).  Neither New Holdco nor any Consenting Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

5.        **Holdings Tax Returns**

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH.  Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns.  Holdings will be liquidated for tax purposes no later than February 28, 2016. MLH, TA and Holdings will make no claims against the Lenders, the Company or New Holdco for any taxes of Holdings.  The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be allocated any income or tax liabilities attributable to the Company's assets for a Pre-Closing Tax Period.  Holdings shall have no liability with respect to the debt owed under the Existing Credit Agreement.  Holdings intends to treat any of the debt owed to the Lenders in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

### 6.       Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date.  No party (other than New Holdco or the Consenting Lenders with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

### 7.       TA and MLH Taxes and Refunds

The present owners of TA and/or MLH will receive all tax refunds and tax benefits of TA.  TA and the present owners of TA will be responsible for and will make no claims against the Consenting Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Consenting Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

### 8.       Post-Closing Taxes

New Holdco shall be responsible for all post-closing taxes of the Company, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to a Post-Closing Tax Period.

### 9.       Distributions to any Consenting Lender

Distributions to any Consenting Lender in respect of an Existing Credit Agreement Claim shall be allocated first to the principal amount of any such Existing Credit Agreement Claims, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Existing Credit Agreement Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Existing Credit Agreement Claim).

### 10.      Withholding

Millennium and its subsidiaries shall be entitled to deduct any federal, state or local withholding taxes from any amounts payable hereunder.  From and as of the Closing Date, Millennium and its subsidiaries shall comply with all reporting obligations imposed on it by any governmental unit in accordance with applicable law with respect to such withholding taxes.  As a condition to receiving any distribution under the Master Restructuring Agreement, Millennium and its subsidiaries may require that the holder of an Existing Credit Agreement Claim entitled to receive a distribution pursuant to the Master

Restructuring Agreement provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for Millennium and its subsidiaries to comply with applicable tax reporting and withholding laws.  For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of the Master Restructuring Agreement, to the Millennium Corporate Claim Trust or the Millennium Lender Claim Trust.

## IV.    ANTICIPATED CHAPTER 11 CASES

### A.    Motions to be Filed on the Petition Date

In the event that the Debtors do not receive consents to the Out-of-Court Transaction from the Out-of-Court Requisite Lenders but do receive votes in favor of the Plan from the Requisite Consenting Lenders, the Debtors will commence the Chapter 11 Cases.  The Debtors expect to file the following motions that would be addressed at the "first day" hearing to be held at the Bankruptcy Court.

#### 1.    Motion to Use Cash Collateral

The Debtors expect to seek authority to use the Prepetition Lenders' cash collateral in order to continue their business operations.  Specifically, the Debtors have achieved a consensual arrangement with the Participating Lenders that would allow the Debtors to use such amounts of their cash collateral as are necessary or appropriate to continue to operate the Debtors' businesses in the ordinary course and to avoid any immediate and irreparable harm to their businesses.

The motion will also seek approval to grant MLH and TA a super-priority lien on avoidance actions proceeds, and recoveries by the Prepetition Lenders, to secure the Subrogation Claim.  The Consenting Lenders party to the RSA have agreed to support the Debtor's motion and such relief.

#### 2.    Motion to Pay Unimpaired Claims in the Ordinary Course of Business

The Plan contemplates that Holders of General Unsecured Claims will be unimpaired and paid in full in the ordinary course of business.  In order to avoid disruption to the Debtors' business and the businesses of Holders of General Unsecured Claims, the Debtors intend to seek authority from the Bankruptcy Court to pay in the ordinary course of business (including prior to the Effective Date) all General Unsecured Claims.

#### 3.    Motion to Approve (i) Combined Disclosure Statement and Confirmation Hearing and (ii) Assumption of the USA Settlement Agreements and the RSA

The Debtors intend to seek confirmation of the Plan as expeditiously and efficiently as possible. To that end, the Debtors will file a motion seeking procedural and substantive relief necessary to timely confirm and consummate their Plan. First, the Debtors will seek to approve the procedures by which they solicited votes on the Plan prior to the Petition Date; schedule a combined hearing on or about December 10 to consider confirmation of the Plan and the adequacy of the Disclosure Statement; and establish procedures for the combined hearing, including noticing procedures and objection deadlines. Second, the Debtors will request that the Court enter an order following the combined hearing confirming of the Plan and approving the adequacy of the disclosure statement. Prior to the confirmation hearing, the Debtors will file a confirmation brief in further support of the Plan and Disclosure Statement and responding to any objections thereto. Finally, pursuant to the same motion, the Debtors will seek authorization to assume the RSA and the USA Settlement Agreements. As discussed herein, the USA Settlement Agreements and the RSA are integral to the restructuring negotiated among the Debtors and their

stakeholders, and, accordingly, prompt assumption of these agreements is consistent with the Debtors' objective to quickly consummate a consensual restructuring.

### 4.    Motion to Continue Using Existing Cash Management Systems

Because the Debtors expect the Chapter 11 Cases to be pending for approximately 45 days, and because of the administrative hardship that any operating changes would impose, the Debtors expect to seek authority to continue using their existing cash management system, bank accounts, and business forms.  Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow would be impeded to the detriment of the Debtors' estates and their creditors.

The Debtors will also seek to waive the investment and deposit requirements imposed by Bankruptcy Code section 345, to the extent that their investment and deposit practices do not conform to such requirements, so as to allow the applicable banking institutions to accept and hold the Debtors' funds consistent with prepetition practices.  This relief will enable the Debtors to maintain their centralized cash management system which is inextricably intertwined with their prepetition investment and deposit practices.

### 5.    Motion for Authority to Pay Prepetition Employee Compensation and Associated Benefits

The Debtors have a valuable asset in their work force and believe that any delay in paying prepetition compensation or benefits to their employees could impair their relationships with such employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical.  The Holders of Claims for prepetition obligations relating to the Debtors' employees and contractors will be unimpaired under the Plan.  Accordingly, the Debtors expect to seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date.

### 6.    Motion to Pay Taxes/Regulatory Expenses

Holders of Claims with respect to taxes and regulatory expenses will be unimpaired under the Plan.  The Debtors therefore expect to seek authority to pay prepetition sales taxes, use taxes, and property taxes regardless of when incurred, to the appropriate taxing, licensing and other governmental authorities.

### 7.    Motion to Maintain Insurance Policies

In connection with the operation of their business, the Debtors maintain various insurance policies.  Maintenance of insurance is essential to the continued operation of the Debtors' business.  In addition, Holders of Claims with respect to insurance policies will be unimpaired under the Plan.  Accordingly, the Debtors will request authority to continue to honor obligations under and related to their insurance policies, and to renew, revise, extend, supplement, change or obtain new insurance coverage, as needed in their business judgment.

### 8.    Adequate Assurance of Utilities

In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water, telephone and other similar services from many different utility companies.  Historically, the Debtors have paid these utility companies timely.  In addition, Holders of Claims with respect to utilities will be unimpaired under the Plan.  The Debtors therefore expect to move the Bankruptcy Court on the

Petition Date to enter an order approving, as adequate assurance of payment for the utility companies, a cash deposit of approximately $125,000 in the aggregate into a newly created, interest-bearing, segregated account.  The amount of the deposit equals the estimated aggregate cost for two weeks of utility services, calculated based on the historical average over the past 12 months.  Further, the motion will request an order prohibiting the utility companies from altering, refusing, or discontinuing services.  The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization.

### 9.        Other "First Day" and "Second Day" Motions and Applications

Upon the commencement of the Chapter 11 Cases, the Debtors also intend to seek court approval to provide for, among other things:

- joint administration of the Debtors' Chapter 11 Cases;

- the extension of the deadlines to file schedules and statements, and ultimate waiver if the Plan is effectuated;

- the retention of the Debtors' professionals;

- authorization to continue to utilize and pay non-bankruptcy professionals in the ordinary course of business; and

- the appointment of a claims and noticing agent.

### B.        Anticipated Timing of the Chapter 11 Cases

If the Debtors do not receive consents to the Out-of-Court Transaction (including the Out-of-Court Releases) from the Out-of-Court Requisite Lenders by the Consenting and Voting Deadline, but the Plan and the releases provided for therein are approved by the Requisite Consenting Lenders, then the Debtors intend to commence their Chapter 11 Cases as promptly as practicable.  The Debtors believe it is critical that the length of their stay in Chapter 11 be as short as practicable, as the USA Settlement sets December 30, 2015 as the outside date for payment of the Debtors' obligations thereunder pursuant to the Plan and the RSA sets the same date as the outside date for the Effective Date and the closing of the transactions contemplated by the Plan.  It therefore is critical that the Restructuring and recapitalization contemplated by the Plan be effectuated as expeditiously as possible.

The Debtors do not expect the Chapter 11 Cases to be protracted.  **In fact, the Debtors will request that the Bankruptcy Court confirm the Plan as soon as the Bankruptcy Court will allow and is practicable.**  Specifically, the Debtors will request that the hearing to consider the adequacy of this Disclosure Statement and confirmation of the Plan occur as soon as practicable at such time that the Bankruptcy Court may allow.  The Plan provides that the Effective Date will be the first Business Day (i) on which all conditions to the Plan's confirmation in Article VIII of the Plan have been satisfied and (ii) that is the date on which consummation of the Plan commences.  Pursuant to the RSA, the Effective Date shall not occur prior to December 15, 2015.  See "The Plan—Conditions Precedent to the Plan's Confirmation and Effective Date."

## V.      THE PLAN

THIS ARTICLE V IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE V AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

### A.      TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

#### 1.      Administrative Claims

Subject to subparagraph (a) below, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Administrative Claim will (i) be Reinstated, (ii) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder, or (iii) will otherwise be left Unimpaired; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

(a)      Professional Fee Claims

Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Confirmation Date must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; provided that upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business for any work performed after the Confirmation Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtors of such hearing to the Reorganized Debtors.

46

Payment of Interim Amounts.  Subject to the Professional Fee Reserve Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtor. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.

Professional Fee Escrow Account.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

RSA Fees.  The foregoing shall not apply to (x) the Debtors' obligations to pay the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group as professional advisors to the Ad Hoc Group pursuant to the RSA and this Plan or (y) the Administrative Agent's Fees under this Plan.

## 2.    Priority Tax Claims

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Priority Tax Claim will (i) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Priority Tax Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder or (ii) otherwise be left Unimpaired; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases provided, however, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

## B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

## 1.    Introduction

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and

47

1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### 2.    Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Early Commitment Facility Claims | Unimpaired | Presumed to Accept |
| 2 | Existing Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Prior Agent Indemnity Claims | Unimpaired | Presumed to Accept |
| 4 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Government Claims | Unimpaired | Presumed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | MLH Tax Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Existing Equity Interests in Holdings | Unimpaired | Presumed to Accept |
| 10 | Existing Equity Interests in Millennium | Impaired | Deemed to Reject |
| 11 | Existing Equity Interests in RxAnte, LLC | Unimpaired | Presumed to Accept |

### 3.    Classification and Treatment of Claims and Equity Interests

(a)    Class 1 – Early Commitment Facility Claims.

- Classification:  Class 1 consists of all Early Commitment Facility Claims.

- Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Early Commitment Facility Claim shall be paid in full in Cash.  In addition, on or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility Agent shall receive payment in full in Cash of the Early Commitment Facility Agent Fees, and the Reorganized Debtors are authorized to pay such Early Commitment Facility Agent Fees without the need for further Bankruptcy Court approval.

- Impairment and Voting:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(b)    Class 2 – Existing Credit Agreement Claims.

- Classification:  Class 2 consists of all Existing Credit Agreement Claims.  The Existing Credit Agreement Claims are Allowed Claims in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims.

48

- <u>Treatment</u>:  On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, canceled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:

    (A)    on the Equity Transfer Date, such Holder's Pro Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V. D(iii) of the Plan;

    (B)    on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;

    (C)    on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of the Plan, such Holder's Pro Rata share (based on the aggregate amount of all Existing Credit Agreement Claims) of beneficial interests in the Millennium Corporate Claim Trust; and

    (D)    to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.G of the Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.

    In addition, on or as reasonably practicable after the Equity Transfer Date, the Administrative Agent shall receive payment in full in Cash of the Administrative Agent Fees, and Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group shall receive payment in full of any fees and expenses owed to them under the RSA as advisors to the Ad Hoc Group.  New Holdco, Reorganized Millennium, and its subsidiaries are authorized to pay such fees without the need for further Bankruptcy Court approval or the filing of fee applications.

Collectively, the distributions of payments to the Holders of Existing Credit Agreement Claims and the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan, and the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group pursuant to the RSA shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Existing Credit Agreement, except as provided with respect to the Administrative Agent in Article V.O of the Plan.

- <u>Impairment and Voting</u>:  Class 2 is Impaired by the Plan.  Each Holder of an Allowed Existing Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(c)    <u>Class 3 – Prior Agent Indemnity Claims</u>.

- <u>Classification</u>:  Class 3 consists of all Prior Agent Indemnity Claims.

- <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; provided, however, for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under the Plan, Reorganized Holdings shall be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty shall be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of the principal and interest outstanding under the Early Commitment Facility.

- <u>Impairment and Voting</u>:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(d)    <u>Class 4 – Other Secured Claims</u>.

- <u>Classification</u>:  Class 4 consists of all Other Secured Claims.

- <u>Treatment</u>: With respect to each Other Secured Claim that becomes due or payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim (A) shall be paid in full in Cash, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be; (B) shall have its

50

Allowed Other Secured Claim Reinstated, and paid in full, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later to occur of the Effective Date or when such Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) shall have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 4 Claim will have agreed upon in writing; provided that Class 4 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

- Impairment and Voting:  Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

(e)    Class 5 – Government Claims.

- Classification:  Class 5 consists of all Government Claims. The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision.  The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

- Treatment:  On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements or (2)

Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.

- <u>Impairment and Voting</u>:  Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(f)  <u>Class 6 – General Unsecured Claims</u>.

- <u>Classification</u>:  Class 6 consists of all General Unsecured Claims.

- <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall (A) be paid in full in Cash; (B) have its Allowed General Unsecured Claim Reinstated, and paid in full, including postpetition interest (which shall not accrue at a default rate), if any, on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 6 Claim will have agreed upon in writing.

- <u>Impairment and Voting</u>:  Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

(g)  <u>Class 7 – MLH Tax Note Claims</u>.

- <u>Classification</u>:  Class 7 consists of all MLH Tax Note Claims.

- <u>Treatment</u>:  On the Effective Date, all of the Debtors' outstanding obligations under the MLH Tax Note shall be extinguished, canceled, and discharged, and each Holder of an MLH Tax Note Claim shall receive no distribution on account of such Claim.

- <u>Impairment and Voting</u>:  Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(h)  <u>Class 8 – Intercompany Claims</u>.

- <u>Classification</u>: Class 8 consists of all Intercompany Claims.

- <u>Treatment</u>: On the Effective Date, all Allowed Intercompany Claims, at the sole option of the Debtors or Reorganized Debtors, shall be (A) Reinstated and treated  or paid in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (B) canceled, extinguished, and discharged.

- <u>Impairment and Voting</u>:  Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(i)     <u>Class 9 – Existing Equity Interests in Holdings</u>.

- <u>Classification</u>: Class 9 consists of all Existing Equity Interests in Holdings.

- <u>Treatment</u>: On the Effective Date, all Allowed Existing Equity Interests in Holdings shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

- <u>Impairment and Voting</u>:  Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Equity Interests will not be entitled to vote to accept or reject the Plan.

(j)     <u>Class 10 – Existing Equity Interests in Millennium</u>.

- <u>Classification</u>: Class 10 consists of all Existing Equity Interests in Millennium.

- <u>Treatment</u>: On the Equity Transfer Date, all Existing Equity Interests in Millennium shall be presumed automatically cancelled, released, and extinguished without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors or the Reorganized Debtors thereunder shall be discharged.

- <u>Impairment and Voting</u>:  Class 10 is an Impaired Class, and the Holders of Class and the Holders of Class 10 Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests will not be entitled to vote to accept or reject the Plan.

(k)     <u>Class 11 – Existing Equity Interests in RxAnte LLC</u>.

- <u>Classification</u>: Class 11 consists of all Existing Equity Interests in RxAnte LLC.

- <u>Treatment</u>: On the Effective Date, all Allowed Existing Equity Interests in RxAnte LLC shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

53

- Impairment and Voting:  Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 11 Equity Interests will not be entitled to vote to accept or reject the Plan.

4.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

5.      **Discharge of Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, and effective as of the Effective Date or Equity Transfer Date, as applicable: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

6.      **Alternative Treatment**

Notwithstanding any provision in the Plan to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other less favorable distribution or treatment to which it and the Debtors or Reorganized Debtors may agree in writing.

C.      **ACCEPTANCE OR REJECTION OF THE PLAN**

1.      **Presumed Acceptance of Plan**

Classes 1, 3, 4, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.        **Deemed Rejection of Plan**

Classes 7 and 10 are Impaired and Holders of Class 7 Claims and Class 10 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

3.        **Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Class (Class 2) will be entitled to vote to accept or reject the Plan.

4.        **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.        **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Such modification shall not substantially alter the treatment of the Government Claims pursuant to the USA Settlement Agreements.

D.        **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.        **General Settlement of Claims**

As set forth in the Plan, the Plan embodies an overall negotiated settlement of numerous disputed Claims and issues pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

(a)        Settlements and Releases

In consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement between the Debtors, the Settling Members, and the Consenting Lenders regarding, inter alia, the Released Claims held by (or that could be asserted by or on behalf of) the Consenting Lenders, the Existing Credit Agreement Claims (including, without limitation, the treatment of the Holders of Existing Credit Agreement Claims under the Plan and the releases provided for in the Plan), and the treatment of the Settling Members under the Plan (including the releases and related provisions provided for in the Plan), and in partial consideration therefor, the Settlement Contribution.

In accordance with and subject to the terms of the RSA and the USA Settlement Agreements, and in exchange for the treatment of the Settling Members provided for in the RSA and the Plan (including the releases provided for in the Plan), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no

event later than December 30, 2015, the Settling Members shall collectively make a Cash payment to, or for the benefit of, Millennium in the form of the Settlement Contribution. The Settlement Contribution shall be funded 55% by MLH, and 45% by TA as follows: (x) $178.75 million to be funded by MLH and (y) $146.25 million to be funded by TA. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements..

(b)    USA Settlement

The provisions of the USA Settlement Agreements constitute a good faith compromise and settlement between the Debtors and the USA Settlement Parties of the Government Claims as specifically described in, and restricted by, the USA Settlement Agreements. The Debtors will continue to perform their obligations under the USA Settlement Agreements and the USA Settlement Assumption Order. To the extent the USA Settlement Assumption Order has not been entered on or before the Effective Date, the USA Settlement Agreements shall be assumed and the Subrogation Claim shall be approved under the Plan. Pursuant to Article III.C(v)(2) of the Plan, on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors shall pay (or cause to be paid) the Government Claims in full from the proceeds of the USA Settlement Funding Contribution plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements. The Cash payment of the Initial USA Settlement Deposit shall be final and irrevocable and shall not be subject to any Avoidance Action or any other avoidance or recovery on any basis in law or equity. Any and all claims against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit shall be waived by the Debtors and their Estates and no Entity shall bring any claim against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit, and all such claims by any Entity are permanently and indefinitely prohibited, barred, and enjoined.

2.    **Corporate Existence**

On or prior to the Effective Date, New Holdco will be formed, and pursuant to the transactions contemplated under the Plan, will become the parent entity of Reorganized Millennium. The charter of incorporation and by-laws of New Holdco will be substantially in the form of the New Holdco Organizational Documents. The Reorganized Debtors shall continue to exist as separate legal entities, pursuant to the applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    **Vesting of Assets in the Reorganized Debtors**

Except as provided in Article V.F of the Plan with respect to the property and assets to be transferred to the Millennium Corporate Claim Trust, elsewhere in the Plan, in the USA Settlement Agreements, or in the Confirmation Order, on or after the Equity Transfer Date, all property and assets of the Estates (including, without limitation, Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all

Liens or Claims.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Confirmation Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

### 4.      New Term Loan; Sources of Consideration for Plan Distributions

(a)      New Term Loan

On the Equity Transfer Date, the applicable Reorganized Debtors will be authorized to execute and deliver the New Term Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the New Term Loan Agreement).

(b)      Settlement Contribution

On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors will receive the benefit of the Settlement Contribution by reason of the funding of the USA Settlement Funding Contribution and receipt of the Millennium Funding Contribution thereafter, and the USA Settlement Funding Contribution shall be paid to the USA.  As set forth herein, the Settlement Contribution will be utilized (1) to make (or cause to be made) the required distributions to the Holders of Allowed Government Claims under the Plan; (2) to reimburse Millennium for the Initial USA Settlement Deposit; (3) for working capital needs in the Reorganized Debtors' operations; and (4) to pay the Early Commitment Facility Claims.  If the USA Settlement Funding Contribution is not paid to the USA as contemplated in this Plan, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

(c)      Equity Interests in Reorganized Millennium

On the Equity Transfer Date, 100% of the Equity Interests of Reorganized Millennium shall be transferred and shall be deemed transferred, on behalf of Holders of Existing Credit Agreement Claims, to New Holdco in exchange for 100% of the New Holdco Common Stock.

(d)      Cash Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' or Reorganized Debtors' Cash balances, including Cash from operations and the Millennium Funding Contribution.  Other than the USA Settlement Funding Contribution, Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

5.        **New Holdco Common Stock Issued Under the Plan**

On the Equity Transfer Date, immediately following the transfer of 100% of the Equity Interests in Reorganized Millennium to New Holdco, in exchange therefor, New Holdco will distribute the New Holdco Common Stock Pro Rata to the Holders of Existing Credit Agreement Claims pursuant to the terms set forth in the Plan and the RSA.  The New Holdco Common Stock shall be subject to potential dilution from any equity incentive plan adopted in the future.

6.        **Millennium Corporate Claim Trust**

(a)        Formation of Millennium Corporate Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Corporate Claim Trust shall be created by Millennium and shall be funded by Reorganized Millennium in the amount of $1,000,000 in Cash (as provided below) plus such additional tangible or intangible assets of Millennium as Reorganized Millennium shall determine.  The Millennium Corporate Claim Trust shall be governed and administered in accordance with the Millennium Corporate Claim Trust Agreement substantially in the form attached as Exhibit A to the Plan to be provided in the Plan Supplement.  The Millennium Corporate Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Corporate Claim Trust, and if necessary, a replacement trustee therefor.

(b)        Millennium Corporate Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Corporate Claim Trust, the Retained Corporate Causes of Action shall be automatically deemed to have been contributed to the Millennium Corporate Claim Trust.  The Millennium Corporate Claim Trust shall be funded by an initial Cash contribution by Reorganized Millennium in the amount of $1,000,000.  Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust).  Once this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Corporate Claim Trust at the request of the Millennium Corporate Claim Trust Advisory Board.  Amounts advanced by Reorganized Millennium to the Millennium Corporate Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Corporate Claim Trust (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Corporate Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium).  The initial $1,000,000 cash contribution and subsequent payment of up to $10,000,000 of invoices shall not be required to be reimbursed.

(c)        Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Corporate Claim Trust are the Holders of Existing Credit Agreement Claims.  Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop

MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution. Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with Article V.F(iii) of the Plan, the Holders of Existing Credit Agreement Claims shall receive their Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust, as provided in Article III.C(ii)(2) of the Plan.

(d)      Federal Income Tax Treatment of Millennium Corporate Claim Trust

The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust. For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party acting reasonably and in good faith to cooperate with one another to jointly determine such values.

### 7.      Millennium Lender Claim Trust

(a)      Formation of Millennium Lender Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Lender Claim Trust shall be created and shall be funded by Reorganized Millennium in the amount of $2,000,000 Cash (as provided below), plus such additional tangible or intangible assets as the Reorganized Millennium shall determine. The Millennium Lender Claim Trust shall be governed and administered in accordance with the Millennium Lender Claim Trust Agreement substantially in the form attached as Exhibit B to the Plan to be provided with the Plan Supplement. The Millennium Lender Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Lender Claim Trust, and if necessary, a replacement trustee therefor.

(b)      Millennium Lender Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Lender Claim Trust, the Consenting Lenders shall each be automatically deemed to have contributed the Retained Lender Causes of Action to the Millennium Lender Claim Trust. The Millennium Lender Claim Trust shall be funded by an initial contribution by Reorganized Millennium of in the amount of $2,000,000. Thereafter, Reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Lender Claim Trust at the request of the Millennium

Lender Claim Trust Advisory Board.  Amounts advanced by Reorganized Millennium to the Millennium Lender Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Lender Claim Trust (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Lender Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium). The initial $2,000,000 cash contribution and subsequent payment of up to $10,000,000 in payment of invoices shall not be required to be reimbursed.

(c)        Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution.  Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with Article V.G(iii) of the Plan, the Consenting Lenders shall receive their Pro Rata share, based on the aggregate principal amount of only those Existing Credit Agreement Claims held by all Consenting Lenders, of beneficial interests in the Millennium Lender Claim Trust, as provided in Article III.C(ii)2 of the Plan.

(d)        Federal Income Tax Treatment of Millennium Lender Claim Trust

The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.

**8.        Issuance of New Securities and Related Documentation**

On the Equity Transfer Date, but after the transactions described in clause (i) of the definition of Equity Transfer Date, the Reorganized Debtors and New Holdco will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance and distribution of the New Holdco Common Stock will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Equity Transfer Date contemplated by or in furtherance of the Plan, including, without limitation, the New Term Loan Agreement, the New Holdco Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Equity Transfer Date, after giving effect to the transactions contemplated by the Plan, the authorized capital stock or other equity securities of New Holdco will be that number of shares of New Holdco Common Stock as may be designated in the New Holdco Organizational Documents.

9.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Equity Transfer Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

10.     **Reservation of Certain Claims of Governmental Units**

Notwithstanding any other provision of the Plan, the Bankruptcy Code, or the Confirmation Order, the Debtors shall not be released from, property and assets shall not vest in the Reorganized Debtors free and clear of, and the USA Settlement Parties specifically reserve, the following claims:

(i)      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

(ii)     Any criminal liability;

(iii)    Except as explicitly stated in the USA Settlement Agreements, any administrative liability/action, including, without limitation, mandatory exclusion from federal health care programs;

(iv)     Any liability to the USA (or its agencies) for any conduct other than the (i) Covered Conduct in the Federal UDT Settlement Agreement, (ii) Covered Conduct in the States UDT Settlement Agreement, (iii) Covered Conduct in the Federal PGT Settlement Agreement, and (iv) Covered Conduct in the States PGT Settlement Agreement (in each case, as "Covered Conduct" is defined in each respective USA Settlement Agreement);

(v)      Any liability based upon obligations created by the USA Settlement Agreements;

(vi)     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(vii)    Any liability for failure to deliver goods or services due;

(viii)   Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct (as defined in each respective USA Settlement Agreement); and

(ix)     Any liability of individuals as specifically reserved for in each respective USA Settlement Agreement related to the Covered Conduct (as defined in each respective USA Settlement Agreement);

(x)      Any right of HHS or CMS to reopen and deny claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for fraud or similar fault under 42 C.F.R. § 405.980; or

(xi)    Any liability for the claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for which payment is reduced pursuant to any Medicare coverage or payment law, regulation, or guidance, other than for submission of claims that were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

## 11.    New Holdco and Reorganized Debtors Organizational Documents

The certificates of incorporation and bylaws or other organizational documents of the Reorganized Debtors shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code Consistent With The Restructuring Term Sheet.  The New Holdco Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall authorize the issuance of New Holdco Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan.  In each case, the applicable organizational documents of the Reorganized Debtors or New Holdco will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, and (iii) with respect to New Holdco, Millennium and its subsidiaries, include other provisions concerning corporate governance and shareholder rights as may be agreed upon by the Ad Hoc Group Majority.  After the Effective Date, New Holdco and the Reorganized Debtors may amend and restate their certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

## 12.    Directors and Officers of Reorganized Debtors

On the Effective Date, the New Board shall be as selected by the Ad Hoc Group Majority and disclosed in the Plan Supplement.   To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer of Millennium and RxAnte will serve from and after the Effective Date pursuant to applicable law and the terms of the New Holdco Organizational Documents and their other constituent and organizational documents and any employment agreements entered into with such Person.

## 13.    Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors and/or the Reorganized Debtors shall enter into the Restructuring Transactions and any documents contemplated under the Plan.  The Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization structure of the Reorganized Debtors Consistent With The Restructuring Term Sheet.  The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate.  The actions taken by the Debtors and/or the Reorganized Debtors to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan and any documents contemplated under the Plan, and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and any documents contemplated under the

Plan, and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the Debtors and/or the Reorganized Debtors determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated by the Plan, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

### 14.    Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the Restructuring Transactions, including, without limitation, the distribution of the securities to be issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, members, officers, or directors of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the equity holders, members, officers, or directors, of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the equity holders, members, officers, or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, any appropriate officer of the Debtors or the Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, file, record, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or referenced in the Plan in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable, including but not limited to those items referenced specifically in Articles V.M and V.N of the Plan, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

### 15.    Cancellation of Notes, Certificates and Instruments

On the Equity Transfer Date, and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by New Holdco and the Reorganized Debtors, as applicable and delivered to the party or parties entitled thereto, except as provided below, all notes, stock, instruments, certificates, agreements and other documents evidencing the Existing Credit Agreement Claims and the Existing Equity Interests in Millennium will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and

discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  On the day following the date that the final distribution is made by the Administrative Agent, the Administrative Agent will be released and discharged from any further responsibility under the Existing Loan Documents; provided, however, that any and all rights of indemnification applicable to the Administrative Agent (including, without limitation, any rights related to reimbursement of Administrative Agent Fees) or the Prior Administrative Agent, respectively, under the Existing Loan Documents and related documents shall survive and remain in full force and effect; provided further, however, until the Administrative Agent Fees have been paid in full, the Administrative Agent will retain its charging liens under the Existing Loan Documents with respect to any cash distributions to be made under the Plan by the Administrative Agent.

**16.    Preservation and Maintenance of Debtor Causes of Action**

(a)    Maintenance of Causes of Action

Except as otherwise provided in Article X of the Plan or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors or the Millennium Corporate Claim Trust (in accordance with Article V.F of the Plan), as applicable, shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action that are not Released Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, or the Millennium Corporate Claim Trust (in accordance with Article V.F of the Plan), as applicable, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not Released Claims without notice to or approval from the Bankruptcy Court.  The Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) may pursue such retained claims, rights or Causes of Action, suits, or proceedings as appropriate, but for the avoidance of doubt, not any Released Claims, in accordance with the best interests of the Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) who hold such rights.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article X.J of the Plan, Article X.K of the Plan, and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, other than with respect to Released Claims, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Corporate Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  Any Retained Corporate Causes of Action shall be transferred to the Millennium Corporate Claim Trust in accordance with Article V.F of the Plan for later adjudication by the Millennium Corporate Claim Trust. In addition,

64

the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

## 17.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by a Debtors to a Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 18.    Certain Tax Matters

(i)    Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to this Agreement shall be allocated in accordance with the Holdings LLC Agreement; (ii) the acquisition by the Holders of Existing Credit Agreement Claims of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Holders of Existing Credit Agreement Claims and the acquisition of the assets of Millennium by the Holders of Existing Credit Agreement Claims; and (iii) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

Subject to the preceding paragraph, for U.S. federal tax purposes (and for all other applicable tax purposes), the creation of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of assets to the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of beneficial interests in the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, and the transfer of 100% of the Equity Interests In Reorganized Millennium to the Holders of Existing Credit Agreement Claims shall be characterized as an integrated transaction.  Such integrated transaction shall be treated as the receipt by each Holder of Existing Credit Agreement Claims, in full and final satisfaction of the Existing Credit Agreement Claims, of its Pro Rata share of and interest in (A) 100% of the Equity Interests in Reorganized Millennium and (B) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the characterization provided by Article V.R of the Plan, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

(ii)    USA Settlement Deduction

Any tax deduction with respect to amounts payable from the Settlement Contribution, whether under the USA Settlement Agreements or otherwise shall be deductions of Holdings attributable to a Pre-Closing Tax Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to

MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH Shareholders.

(iii)    Section 754 Election

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

(iv)    Cooperation; Amended Returns

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, and the historic TA Shareholders, and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any of the identified parties to any valuation of Millennium (except with respect to transfers to the Millennium Corporate Claim Trust, as identified in Article V.F(iv) of the Plan).  Neither New Holdco nor any Prepetition Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

(v)    Holdings Tax Returns

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH.  Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns.  Holdings will be liquidated for tax purposes no later than February 28, 2016. MLH, TA and Holdings will make no claims against the Holders of Existing Credit Agreement Claims, Millennium or New Holdco for any taxes of Holdings.  The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be liable for any income or tax liabilities attributable to the Company's assets for a Pre-Closing Tax Period. Holdings shall have no liability with respect to the debt owed to the Holders of Existing Credit Agreement Claims or the Prior Agent Indemnity Claims.  Holdings intends to treat any of the debt owed to the Holders of Existing Credit Agreement Claims and Prior Agent Indemnity Claims in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

(vi)    Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date.  No party (other than New Holdco or the Holders of Existing Credit Agreement Claims with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

(vii)    TA and MLH Taxes and Refunds

The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA.  TA and the present owners of TA will be responsible for and will make no claims against the Prepetition Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Prepetition Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

(viii)    Post-Closing Taxes

New Holdco shall be responsible for all taxes of Reorganized Millennium and its subsidiaries attributable to Post-Closing Tax Periods, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to Post-Closing Tax Periods.

**19.    Further Transactions**

If the conditions to occurrence of the Effective Date set forth in Article VIII.B of the Plan are not satisfied on or before December 30, 2015 (the "Consummation Deadline"), the Debtors shall not be authorized to proceed to consummate the Plan.  Subject to the consent of the Federal Settlement Parties, MLH, TA, and an Ad Hoc Group Majority, as determined in each such party's sole and absolute discretion, the Debtors may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

**E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**1.    Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer.  Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases is deemed unenforceable pursuant to the Plan.  Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be unenforceable.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed

67

modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to Article VI of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 2.    Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable Cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed Cure amounts.  Any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related Cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or Cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### 3.    Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.  Rejection damages claims are Class 6 Claims.

4.        **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged Cure amount, which may be asserted at any time.  In the event of a dispute regarding (1) the amount of any payments to Cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

5.        **Assumption of Officer Insurance Policies**

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

6.        **Indemnification Provisions**

The indemnification provisions currently in place under the Limited Liability Company Operating Agreement for Millennium dated as of April 11, 2014 (without regard to any amendments which may have been made thereto or any board resolutions which may have been adopted in respect of indemnification) (the "Operating Agreement") and the Existing Loan Documents solely for the following: (i) Prior Administrative Agent; (ii) the Administrative Agent; (iii) the Early Commitment Facility Agent; and (iv) the officers of Millennium  who served in such capacity as of the Petition Date or any time thereafter through the Effective Date (collectively, the "Preserved Indemnified Parties") with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be) solely in respect to the Preserved Indemnified Parties, and will survive effectiveness of the Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying Operating Agreement and Existing Loan Documents. Notwithstanding anything in Article VI.F of the Plan to the contrary, no other claimed Indemnification Agreement regarding any Senior Executive shall be assumed or Reinstated unless mutually agreed upon by the Ad Hoc Group Majority and the respective Senior Executive with respect to

any such indemnity terms (and such other Indemnification Agreements may be amended by the mutual agreement of the Ad Hoc Group Majority and the respective Senior Executive). If the Ad Hoc Group Majority and Senior Executive do not reach an agreement regarding the assumption or Reinstatement of such Senior Executive's other claimed Indemnification Agreements, all parties reserve their rights regarding such other claimed Indemnification Agreements.  For the avoidance of doubt, nothing in Article VI.F of the Plan shall (i) expand the indemnification obligations owed by any of the Releasing Parties to the Released Parties beyond the limits set forth in Article X.M of the Plan; (ii) constitute a Reinstatement or assumption of any indemnification obligations which may be owed by Millennium or any other Debtor to Holdings or any other Person or Entity other than the Preserved Indemnified Parties solely with respect to the indemnification provisions set forth above, or (iii) constitute a Reinstatement or assumption of any indemnification obligations of either Millennium to Holdings, or Holdings or any Debtor to any of the Preserved Indemnified Parties or any other Person or Entity except for Millennium.

### 7.    Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to its employees, retirees, and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### 8.    Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### 9.    Third Party Payer Contracts

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all Third Party Payer Contracts are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any provision in the Third Party Payer Contracts that purports to declare a breach or default or to accelerate any payment obligations based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Nothing under the Plan shall affect the Debtors' or the applicable counterparty's rights, claims and defenses in respect of any Third Party Payer Contract, or the right of either party thereto to future adjudication of any disputes in respect thereto in accordance with the applicable provisions of such Third Party Payer Contract.

10.        **Medicare and Medicaid Agreements**

The Medicare and Medicaid Agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; provided that, for the avoidance of doubt, Holdings is not assuming any Medicare and Medicaid Agreements. Nothing under the Plan will affect the USA's, HHS's, or CMS's rights, claims, and defenses in respect of any Medicare and Medicaid Agreements for future adjudication in accordance with the applicable provisions of such Medicare and Medicaid Agreements. The "cure" and adequate assurance of future performance under section 365 of the Bankruptcy Code for the assumption of the Medicare and Medicaid Agreements shall be: (a) the performance by the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, of their obligations under the USA Settlement Agreements; and (b) the continued participation of the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, in the Medicare and Medicaid programs in the ordinary course of business to be governed by and subject to, the terms and conditions of the Medicare and Medicaid Agreements and the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments other than the Determined Overpayments (as defined in the Federal Administrative Settlement Agreement) in the ordinary course of business. In the event that any of the Medicare and Medicaid Agreements are subsequently terminated and the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries re-enroll in the Medicare and Medicaid programs, such parties agree that they shall assume successor liability as to any liability arising under the Medicare Agreements and that such successor liability shall be governed by and subject to, the terms and conditions of the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments in the ordinary course of business.

F.        **PROVISIONS GOVERNING DISTRIBUTIONS**

1.        **Distribution Record Date**

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Claims after the Distribution Record Date shall not be recognized for purposes of this Plan. On the Distribution Record Date, the Administrative Agent shall provide a true and correct copy of the registry for the Existing Credit Agreement Claims to the Debtors. The Distribution Agent, or any party responsible for making distributions pursuant to Article VII.A of the Plan shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

2.        **Dates of Distributions**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided in the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan and in the USA Settlement Agreements, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Equity Transfer Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any

Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

### 3. Distribution Agent

Except as provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, New Holdco, or the Administrative Agent, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Debtors or New Holdco as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court. For purposes of distributions under the Plan to the Holders of Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent and in acting in such capacity shall be entitled to all of the rights, protections and indemnities afforded to the Administrative Agent under the Existing Credit Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated by the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan. If the Distribution Agent is an entity other than a Reorganized Debtor or New Holdco, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

### 4. Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 5. Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar. To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as an Unclaimed Distribution under the Plan.

No fractional shares shall be issued or distributed under the Plan. Each Person entitled to receive Equity Interests or New Holdco Common Stock shall receive the total number of whole shares of Equity Interests or New Holdco Common Stock, as applicable to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of Equity Interests or New Holdco Common Stock, the actual distribution of shares of such Equity Interests shall be rounded to the next lower whole number.

### 6. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any

such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

### 7.        General Distribution Procedures

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

### 8.        Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, or (4) in accordance with the Existing Credit Agreement.

### 9.        Undeliverable Distributions and Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Unclaimed Distribution within one year from the date upon which a distribution is first made to such entity shall be deemed to forfeit all rights to such Unclaimed Distribution under the Plan.  Such Unclaimed Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtor free of any restrictions thereon.  Entities which fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

### 10.        Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes.  As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.  For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of the Plan, to the Millennium Corporate Claim Trust or the Millennium Lender Claim Trust.

11.     **Setoffs**

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.

12.     **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

13.     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent:  (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

G.     **CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION AND EFFECTIVE DATE**

1.     **Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

- The Plan and Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Federal Settlement Parties, the Ad Hoc Group, and the Settling Members and shall be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements.  This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

- The RSA shall not have been terminated by any of the parties thereto.

- The Debtors shall have filed a motion seeking assumption of the USA Settlement Agreements and approval of the Subrogation Claim.

## 2.    Conditions to Effective Date

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

- The Effective Date shall not occur prior to December 15, 2015.

- The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order (1) shall (A) approve the releases (including the third party release) and exculpations provided for in Article X.E, Article X.F, Article X.G, and Article X.H of the Plan, but not approve the release of, and specifically reserve for the benefit of the USA and the Plaintiff States, the claims and liabilities provided for in Article V.J of the Plan; (B) contain the contribution claim and Non-Contribution Claim protections provided for in Article X.L of the Plan and such other protections for the Released Parties and their respective Related Parties set forth in the RSA; and (C) contain the bar order provisions set forth in Article X.J of the Plan, in each case, in form, scope, and substance consistent in all material respects with the RSA; and (2) shall otherwise be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

- The Confirmation Order shall be a Final Order; provided, however, that only the Settling Members may agree in writing, in their sole and absolute discretion, to waive the condition that the Confirmation Order be a final, non-appealable order.

- The RSA shall have been assumed pursuant to the Confirmation Order and shall not have been terminated by any of the parties thereto.

- The USA Settlement Agreements shall have been assumed pursuant to the USA Settlement Assumption Order or Confirmation Order and shall not have been terminated by any of the parties thereto. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

- Good faith efforts have been made for the organizational documents of the Reorganized Debtors to have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization.

- New Holdco shall have been formed and the New Holdco Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws.

- The Debtors shall have received any and all required regulatory approvals to consummate the transactions contemplated by the Plan, the Disclosure Statement, and any documents contemplated hereunder or under the Plan.

- The transactions contemplated by the Plan, this Disclosure Statement, and any other documents contemplated hereunder or thereunder shall have been approved to the extent required and shall not be subject to avoidance.

- All other documents and agreements necessary to implement the Plan on the Effective Date to the extent required in the Plan or in the RSA, including the without limitation the New Term Loan Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

- All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

- The New Securities and Debt Documents shall be in form and substance reasonably satisfactory to the Debtors and an Ad Hoc Group Majority, and shall have been executed and delivered by all parties thereto to the extent required hereunder.

### 3.    Conditions to the Equity Transfer Date

The occurrence of the Equity Transfer Date is subject to each of the following conditions precedent:

- All conditions to the Effective Date of the Plan as provided in Article VIII.B of the Plan shall have been satisfied or waived.

- The Equity Transfer Date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA.

- The JS Real Estate Leases shall have been amended on the terms specified in the RSA and assumed by Millennium.

- The Debtors shall have paid or caused to be paid the USA Settlement Funding Contribution to the USA.

### 4.    Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article VIII of the Plan may be waived only if waived in writing by each of the Debtors, the Ad Hoc Group Majority, and the Settling Members (except as otherwise stated in Article VIII of the Plan or the RSA) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the RSA. The failure to satisfy or waive a condition to the Effective Date may be asserted by any of the Debtors, the Ad Hoc Group Majority, and the Settling Members regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors, the Ad Hoc Group Majority, or the Settling Members to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 5.    Effect of Non Occurrence of Conditions to the Effective Date

If the Effective Date of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

H.       EFFECTS OF CONFIRMATION

1.       Binding Effect

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

2.       Subordination Rights

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

3.       Discharge of the Debtors

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the occurrence of the Effective Date. However, the foregoing provisions will have no effect on the Debtors' liabilities as reserved by the USA Settlement Agreements and as provided for in Article V.J of the Plan, whether such liabilities arose prior to or after the Confirmation Date.

4.      **Exculpation and Limitation of Liability**

The Exculpated Parties and the USA Settlement Parties will neither have nor incur any liability to any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the RSA, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement including the Retained Claims.

5.      **Releases by Debtor**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE CONFIRMATION ORDER, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES (AND EACH SUCH RELEASED PARTY AND THEIR RESPECTIVE RELATED PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY AGAINST THE RELEASED PARTIES OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT, INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (IV) ANY CLAIMS OR DEFENSES AGAINST THIRD PARTY PAYERS UNDER ASSUMED CONTRACTS.

FURTHERMORE, EFFECTIVE AS OF THE EFFECTIVE DATE OF THE USA SETTLEMENT AGREEMENTS AND CONTINUING TO BE EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH

OF THE USA SETTLEMENT PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER, AND RELEASE TO THE USA SETTLEMENT PARTIES AND THE USA SETTLEMENT PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED, AND DISCHARGED BY THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS RELEASED PURSUANT TO THE USA SETTLEMENT AGREEMENTS.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE. FOR PURPOSES OF THIS RELEASE, AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE DEBTORS ARE SPECIFICALLY ASSUMING CONTROL OF AND RELEASING ALL AVOIDANCE ACTIONS AGAINST THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND CAUSES OF ACTION THAT ARE COVERED OR THAT ARISE UNDER BANKRUPTCY CODE SECTION 544.

6.    **Releases by TA and MLH**

(i)    SUBJECT TO (iii) BELOW, TA, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, WILL (A) FULLY AND COMPLETELY RELEASE AND FOREVER DISCHARGE HOLDINGS, MLH, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT TA OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY, AND INCLUDING, FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS ARISING FROM MLH'S FAILURE TO MAINTAIN ITS STATUS AS AN S CORP), AGAINST HOLDINGS OR MLH OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGE AND WAIVE ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(ii)    SUBJECT TO (iii) BELOW, MLH, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, WILL (A) FULLY AND COMPLETELY RELEASE AND FOREVER DISCHARGE HOLDINGS AND TA, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT MLH OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY), AGAINST HOLDINGS OR TA OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGE AND WAIVE ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE,

IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(iii)    FOR    THE    AVOIDANCE    OF    DOUBT    AND    NOTWITHSTANDING SUBPARAGRAPHS (I) AND (II) ABOVE, IN ANY LAWSUIT OR OTHER LEGAL ACTION BY AN EXCLUDED PARTY AGAINST TA, MLH OR THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "EQUITY DEFENDANTS"), EACH EQUITY DEFENDANT PRESERVES AND DOES NOT WAIVE THE RIGHT TO DEFEND OR OTHERWISE RESPOND TO SUCH ACTION BY ASSERTING THAT ANOTHER EQUITY DEFENDANT IS RESPONSIBLE FOR ANY OR ALL CAUSES OF ACTION ASSERTED BY, OR DAMAGES CLAIMED BY, AN EXCLUDED PARTY; AND PROVIDED, FURTHER, HOWEVER, NOTHING IN THIS PARAGRAPH RELEASES ANY PERSON FROM ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN, INCLUDING THE PROVISIONS OF ARTICLE V.R OF THE PLAN.

### 7.    Releases by Lender Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE LENDER RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE LENDER RELEASING PARTIES OR THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY AND ITS RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH LENDER RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; AND/OR (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

### 8.    Releases by Third Party Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE THIRD PARTY RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE

RELEASED THE COMPANY, THE RELEASED PARTIES, AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT ANY OF THE THIRD PARTY RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH THIRD PARTY RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY LIABILITY EXPRESSLY RESERVED BY CERTAIN GOVERNMENTAL UNITS AS PROVIDED IN ARTICLE V.J OF THE PLAN; AND/OR (IV) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

### 9.      Waiver of Limitations on Releases of Unknown Claims

Each of the Debtors, Lender Releasing Parties, and Third Party Releasing Parties agree and acknowledge that the releases contained in Article X.E, Article X.F, Article X.G, and Article X.H of the Plan shall extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties shall be deemed to waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542. The Parties also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true

with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

However, nothing in this section shall affect the claims and liabilities specifically reserved for Governmental Units in the USA Settlement Agreements as provided for in Article V.J of the Plan.

**10.    Bar Order**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, of any claims or Causes of Action released pursuant to the Plan, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H of the Plan. For the avoidance of doubt, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Lenders arising out of or in connection with any Retained Claims. The foregoing provision shall not operate to enjoin the commencement or prosecution by the USA Settlement Parties of any action or proceeding to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements.

In addition to the foregoing, to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the Pro Rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based multiplied by (y) the Settlement Contribution.

The Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Lenders with respect to any Retained Claims that are, immediately prior to the Effective Date, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties, and all such claims shall be barred, enjoined and released.

**11.    Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. FROM AND AFTER THE EFFECTIVE DATE, ALL

ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY AVOIDANCE ACTION (AS DEFINED IN THE PLAN) OR ANY OTHER ACTION TO AVOID OR RECOVER THE INITIAL USA SETTLEMENT DEPOSIT.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

### 12.    Retained Claims

The Preserved Estate Claims are expressly preserved under the Plan and the Preserved Lender Claims are expressly preserved under the Plan.  The releases provided for in the Plan do not preclude the Prepetition Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Preserved Lender Claim or Preserved Estate Claim is assigned (the Prepetition Lenders, Millennium and any of their successors and assigns, including such  litigation trust or trusts, hereinafter, collectively, the "Retained Claim Plaintiff") from prosecuting, and the Prepetition Lenders and Millennium retain the right, respectively, to bring, the Retained Claims against the Excluded Parties. In the event that the Retained Claim Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Retained Claim Judgment"), the parties' rights shall be as follows:

(a)    where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then the Prepetition Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Retained Claim Plaintiff by the equitable share of Gross Damages attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Retained Claim Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and the Retained Claim Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Retained Claim Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Retained Claim Plaintiff equal to such excess so that the Retained Claim Plaintiff shall not recover in excess of its Gross Damages; and

(b)    where the Retained Claim Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions under the Plan for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Retained Claim Plaintiff affirmatively consents to any such petition for intervention  by MLH and/or TA (or any of their Related Parties)), and where the Retained Claim Plaintiff successfully obtains a Retained Claim Judgment against

one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Retained Claim Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Retained Claim Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and the Retained Claim Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).

In the event that, after one or more trustees are appointed to pursue Retained Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties in the forum selected by the Retained Claim Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties.  In any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties as contemplated in the Plan, the Retained Claim Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (a) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA.  Moreover, in any litigation by the Retained Claim Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Retained Claim Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Retained Claim Plaintiff, the Prepetition Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required.  The Retained Claim Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth in the Plan, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted.  Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties).  In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Retained Claim Plaintiff, which shall be exercised in the sole discretion of the Retained Claim Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of the Retained Claim Plaintiff.  To the extent that any settlement of any Retained Claim between a Retained Claim Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon.  For the avoidance of doubt, the Prepetition Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

### 13.       Other Obligations With Respect To Released Parties

MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Retained Claim Plaintiff, the Prepetition Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium  insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Prepetition Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Retained Claim Plaintiff, Millennium or Prepetition Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld, solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided in the Plan and 50% of which shall be available to TA for reimbursement as provided in the Plan.

To the extent that the Released Parties do not obtain a full and complete release from the Third Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, or the Restructuring Transactions that any of the Third Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event, MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in the preceding paragraph, shall not exceed an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided in the Plan and 50% of which shall be available to TA for reimbursement as provided in the Plan.

For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them

in connection with litigation relating to the Third Party Releasing Parties or the Excluded Parties.  For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in Article X.J of the Plan shall be deemed to fall within the litigation-related costs that are covered in Articles X.L and X.M of the Plan.

## VI.    RISK FACTORS

PRIOR TO CONSENTING TO THE OUT-OF-COURT TRANSACTION OR VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE COMPANY'S BUSINESS OR THE OUT-OF-COURT TRANSACTION OR THE PLAN AND THEIR IMPLEMENTATION.

### A.    Risk Factors Relating to the Bankruptcy Process

#### 1.    *Potential adverse effects of Chapter 11.*

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement of the Chapter 11 Cases could materially adversely affect the relationship among the Debtors and their customers, employees and vendors.

#### 2.    *The Debtors may fail to satisfy the vote requirement.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or other in or out of court restructuring.  There can be no assurance that the terms of any such alternative restructuring would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan, or the Debtors may be forced to liquidate.

#### 3.    *The Debtors may not be able to secure Confirmation of the Plan.*

Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may determine that this Disclosure Statement and/or the Balloting procedures did not satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are

"fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article VIII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Section 1127 of the Bankruptcy Code permits the Debtors to modify the Plan at any time before Confirmation, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after Confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and this Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by this Court, such Holder changes their previous acceptance or rejection.

### 4. *The Effective Date may not occur.*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 5. *The Restructuring Support Agreement may terminate.*

The RSA may terminate if, among, other things, the deadlines set forth therein are not met or if the conditions precedent to the respective parties' obligation to support the Plan or to confirm the Plan, including, without limitation, that no Material Adverse Event (as defined in the RSA) has occurred, are not satisfied in accordance with the terms of the RSA. If the RSA terminates, the Debtors may not be able to obtain the support of the Holders of Existing Credit Agreement Claims required to confirm the Plan.

### 6. *Restructuring under chapter 11 of the Bankruptcy Code may adversely affect the Debtors' business.*

Although the Debtors intend to continue operating their business and servicing their customers in the ordinary course of business during their restructuring under chapter 11 of the Bankruptcy Code, there is no guarantee that their customers will continue to conduct business with them or that qualified professionals will be available to the Debtors in adequate numbers to staff their operating segments in light of the uncertainties inherent in the chapter 11 process. The loss of any major customer accounts or the Debtors' failure to retain employees could significantly impair the Debtors' performance. In addition, the Debtors will file certain "first-day" motions seeking relief they deem necessary to operate their business in bankruptcy with as little disruption as possible, including, for example, motions to pay employees in the ordinary course and to provide adequate assurance of performance to utility providers. There can be no assurance that such relief will be granted, in which case the Debtors' business may be disrupted. Further, the chapter 11 process may harm the Debtors' image and reputation, which in turn could materially and adversely affect the Debtors' business and operating results. This is particularly the case if the chapter 11 process requires significantly more time to complete than the Debtors anticipate, which may depend on factors beyond the Debtors' control.

**B.      Risk Factors Relating to the New Holdco Common Stock Issued Under the Out-of-Court Transaction or the Plan**

The following risks specifically apply only to Holders of the New Holdco Common Stock issued pursuant to the Out-of-Court Transaction or the Plan and should be considered along with other risk factors.  There are additional risk factors attendant to being an investor in the New Holdco's securities. These risks are described elsewhere in this Article VII.

**1.      *Holders of Shares of New Holdco Common Stock will be subject to certain transfer restrictions.***

The transfer of shares of New Holdco Common Stock will generally not be restricted under New Holdco's Charter except that the Charter will prohibit transfers of shares of New Holdco Common Stock (i) to any actual or potential competitor of New Holdco or its affiliates or any other person or entity whose activities or interests are otherwise adverse to the interests of New Holdco, (ii) if such transfer would result in New Holdco's being required to become a public filer under applicable securities laws.

**2.      *It is unlikely that the shares of New Holdco Common Stock will be registered pursuant to the Securities Act of 1933 or listed on any securities exchange.***

It is unlikely that shares of New Holdco Common Stock will be registered pursuant to the Securities Act of 1933 or listed on any securities exchange.  Because New Holdco is not a "listed issuer" as defined under Section 10A-3 of the Securities Exchange Act of 1934, as amended, and it will not be one until its equity securities are listed on a national security exchange, among other actions, it is not required to maintain a board consisting of a majority of independent directors by such regulations.  New Holdco is also not required to maintain an audit committee, nominating committee, or compensation committee consisting solely of independent directors because it is not a "listed issuer."  New Holdco does not have a standing audit committee, nominating committee, or compensation committee.  Therefore, holders of shares of New Holdco Common Stock will not have the protection afforded to equity holders of listed issuers as a result of the appointment of such committees and certain other corporate governance mechanisms required of "listed issuers."

**3.      *The ability to transfer shares of New Holdco Common Stock may be limited by the absence of an active trading market.***

There is no established trading market for shares of New Holdco Common Stock and an active trading market for shares of New Holdco Common Stock may not be developed or maintained in the future.  Future trading prices of shares of New Holdco Common Stock will depend on many factors, including, among other things, prevailing interest rates, Reorganized Millennium's operating results and the market for similar securities.  If an active trading market for shares of New Holdco Common Stock does develop, the trading market may not be liquid.  The liquidity of any market for shares of New Holdco Common Stock will depend on various factors, including the number of holders of the securities and the interest of security dealers in making a market for shares of New Holdco Common Stock.  If an active trading market is not developed and maintained or such trading market is not liquid, holders of shares of New Holdco Common Stock may be unable to sell their shares of New Holdco Common Stock at their fair market value or at all.  Consequently, holders of the New Holdco Common Stock may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New Holdco Common Stock will lose some or all of its value.

Reorganized Millennium cannot give any assurance as to:

- the liquidity of any trading market that may develop;

- the ability of holders to sell their New Holdco Common Stock; or

- the price at which holders would be able to sell their New Holdco Common Stock.

In addition, no transfer of any shares of New Holdco Common Stock shall be made if it would result in New Holdco being required to become a public filer under applicable securities laws. See "—Holders of Shares of New Holdco Common Stock will be subject to transfer restrictions."

**4.      *New Holdco is under no obligation to declare or pay any dividends or other distributions on account of the New Holdco Common Stock.***

New Holdco is under no obligation to declare or pay any dividends or other distributions on account of the New Holdco Common Stock.  The payment of dividends or other distributions will be made by its Board of Directors and will depend on a number of business and other factors deemed relevant by the Board of Directors.  Covenants in the documents governing the Company's indebtedness may also restrict New Holdco's ability to make distributions and certain other payments.  Consequently, the holder's only ability to recognize a return on the New Holdco Common Stock may be through the sale of its New Holdco Common Stock.

**5.      *Reorganized Millennium's operations might not be profitable after the Effective Date, which could have an adverse impact on the value of the New Holdco Common Stock.***

Reorganized Millennium's operating performance may be affected by, among other things, Reorganized Millennium's success attracting new customers, Reorganized Millennium's ability to bring new technologies to market, government regulation, demand for Reorganized Millennium's services, and strategic market positioning.  Any one of these factors, and the risks and other factors described under the heading entitled "Risk Factors—Risk Factors Relating to Reorganized Millennium's Business," could have a material adverse impact on Reorganized Millennium's business, financial condition, cash flows and results of operations, which could have an adverse impact on the value of New Holdco Common Stock.  Many of the above-referenced factors and risks may be affected by circumstances outside Reorganized Millennium's control.

**6.      *In the event of future issuances of New Holdco Common Stock, substantial dilution may occur.***

Shares of New Holdco Common Stock may be subject to dilution as a result of the issuance of new equity securities after the consummation of the Out-of-Court Transaction or the Plan.  In addition, as part of or subsequent to the Out-of-Court Transaction or the Plan, the Ad Hoc Group and the Senior Executives may agree upon an employee incentive plan that may result in the issuance by New Holdco shares of New Holdco Common Stock or rights with respect thereto.  Such grants or issuances may result in substantial dilution in ownership of New Holdco Common Stock.

**7.      *The amount of shares of New Holdco Common Stock to be provided to Holders of Existing Credit Agreement Claims does not reflect any independent valuation of the shares of New Holdco Common Stock or the Existing Credit Agreement Claims.***

The Company has not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the relative values of shares of New Holdco Common Stock or the Existing Credit Agreement Claims.  If the Out-of-Court Transaction or the Plan is consummated, a Holder of Existing

Credit Agreement Claims may or may not receive more or as much value than if the Out-of-Court Transaction or the Plan was not consummated.

> **8.      New Holdco will be a holding company, and its obligations are, or will be, structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.**

New Holdco's principal assets will consist of the shares of capital stock or other equity instruments of its subsidiaries and, accordingly, its cash flows and ability to meet its obligations will be largely dependent upon the earnings of its subsidiaries and the payment of such earnings to New Holdco in the form of dividends, distributions, loans, or otherwise, and repayment of loans or advances from New Holdco. These subsidiaries will be separate and distinct legal entities and will have no obligation (other than any existing contractual obligations, which may be suspended or altered in the Chapter 11 Cases) to provide New Holdco with funds for its payment obligations or the payment of dividends or other distributions to holders of equity securities of New Holdco. Any decision by a subsidiary to provide New Holdco with funds for its payment obligations will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions (including covenants in its existing and future debt agreements), applicable law, and other factors. Because New Holdco will be a holding company, its obligations to its creditors and its security holders will be structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, with respect to subsidiaries which do not guarantee New Holdco's obligations, New Holdco's rights and the rights of its creditors and its equity security holders to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized will be subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent New Holdco may be a creditor with recognized claims against any of its subsidiaries, New Holdco's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by New Holdco. Further, the rights of holders of the equity securities of New Holdco, including holders of shares of New Holdco Common Stock, are structurally subordinated to the rights of New Holdco's creditors.

> **9.      Holders of shares of New Holdco Common Stock may not be able to recover in future cases of bankruptcy, liquidation, insolvency, or reorganization.**

Upon implementation of the Out-of-Court Transaction or the Plan, each holder of shares of New Holdco Common Stock will become subordinated to all liabilities of New Holdco's subsidiaries and any creditors of New Holdco. Therefore, the assets of New Holdco and its subsidiaries would not be available for distribution to any holder of shares of New Holdco Common Stock in any bankruptcy, liquidation, insolvency, or reorganization of New Holdco unless and until all indebtedness of New Holdco and its subsidiaries has been paid. The remaining assets of New Holdco and its subsidiaries may not be sufficient to satisfy the outstanding claims of its equity holders, including the holders of shares of New Holdco Common Stock.

### C.      Risk Factors Relating to the Indebtedness to be Issued Under the New Term Loan

> **1.      Reorganized Millennium may incur more debt, which could exacerbate the risks associated with Reorganized Millennium's substantial leverage.**

Reorganized Millennium may incur significantly more debt in the future. Although the New Term Loan Agreement will restrict Reorganized Millennium and its restricted subsidiaries from incurring additional debt, these restrictions will be subject to important exceptions and qualifications. If Reorganized Millennium incurs additional debt, the risks that Reorganized Millennium faces as a result of its high leverage, including its possible inability to service its debt, could increase.

2.       *Substantially all of Reorganized Millennium's operations are conducted at the subsidiary level, which may materially adversely affect New Holdco's ability to service its debt.*

The principal assets of New Holdco will be the equity interests that it holds directly and indirectly, in its subsidiaries.  New Holdco's subsidiaries are legally distinct from New Holdco and have no obligation to pay amounts due on New Holdco's debt or to make funds available to New Holdco for such payment, other than through guarantees of its debt, which may be released under certain circumstances.  Because New Holdco's operations will be conducted through its subsidiaries, its ability to service its debt depends upon the earnings of its subsidiaries and the distribution of those earnings, or upon loans or other payments of funds, by the subsidiaries to New Holdco.  Although the New Term Loan will limit the ability of New Holdco's subsidiaries to enter into covenant restrictions on their ability to pay dividends and make other payments to New Holdco, these limitations will be subject to a number of significant qualifications.  If New Holdco's subsidiaries do not have sufficient earnings or cannot distribute their earnings or other funds to New Holdco, New Holdco's ability to service its debt may be materially adversely affected.

3.       *The New Term Loan Agreement will include financial and other covenants that will impose restrictions on Reorganized Millennium's financial and business operations.*

The New Term Loan Agreement will contain negative covenants customary for such financings, such as limiting New Holdco's and its restricted subsidiaries' ability to pay dividends, redeem stock or make other distributions or restricted payments, make certain investments, incur or guarantee additional debt, create liens, agree to dividend and other payment restrictions affecting restricted subsidiaries, consummate mergers, consolidations or other business combinations, designate subsidiaries as unrestricted, transfer, sell or acquire assets, change its or their line of business, or enter into certain transactions with affiliates.  The New Term Loan Agreement will have various financial and other covenants that will require Reorganized Millennium to maintain minimum coverage ratios.  Reorganized Millennium may also incur future debt obligations, which might subject Reorganized Millennium to additional restrictive covenants that could affect its financial and operational flexibility.

These covenants could adversely affect Reorganized Millennium's ability to finance its future operations or capital needs, pursue available business opportunities or make payment upon the New Term Loan Agreement.  Reorganized Millennium's ability to comply with these covenants may be subject to events outside its control.  Moreover, if Reorganized Millennium fails to comply with these covenants and is unable to obtain a waiver or amendment, an event of default would result.  If an event of default were to occur, the lenders under the New Term Loan Agreement could, among other things, declare outstanding amounts immediately due and payable.  Reorganized Millennium cannot provide assurance that it would have sufficient liquidity to repay or refinance the borrowings under the New Term Loan Agreement if such amounts were accelerated upon an event of default.  In addition, an event of default or declaration of acceleration under the New Term Loan Agreement could also result in an event of default under other financing agreements.

4.       *Any future pledge of collateral might be voidable in bankruptcy.*

Any future pledge of collateral under the New Term Loan Agreement, including pursuant to security documents delivered after the date of the New Term Loan Agreement, might be voidable by the pledgor (as debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the lenders under the New Term Loan Agreement to receive a greater recovery than if the pledge had not

been given and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

     **5.**     ***The rights of lenders under the New Term Loan to the collateral securing such debt may be adversely affected by the failure to perfect security interests in the collateral and other issues generally associated with the realization of security interests in collateral.***

Certain security interests in the collateral that will secure the New Term Loan may not be in place or perfected by the Closing Date or the Effective Date. To the extent any such security interest is not perfected by such date, Reorganized Millennium will be required to use its commercially reasonable efforts to have all such security interests perfected, to the extent required by the collateral documents, promptly after the closing date of this offering. Reorganized Millennium can give no assurance that it will be able to perfect any such security interests, which would reduce the amount of collateral that will secure the New Term Loan. To the extent a security interest in certain collateral is perfected following the Closing Date or the Effective Date, that security interest would remain at risk of having been granted within 90 days of a bankruptcy filing (in which case it might be voided as a preferential transfer by a trustee in bankruptcy) even after the security interests perfected on the Closing Date or Effective Date were no longer subject to such risk.

In addition, the rights of the secured parties under the New Term Loan in the collateral may be adversely affected by the failure to perfect security interests in certain collateral in the future. Applicable law requires that a security interest in certain tangible and intangible assets can only be properly perfected, and its priority retained, through certain actions undertaken by the secured party, and that certain property and rights acquired after the grant of a general security interest, such as equipment subject to a certificate and certain proceeds, can be perfected only at the time at which such property and rights are acquired and identified. The agent for the New Term Loan Agreement may not monitor, or Reorganized Millennium may not inform the agent of, the future acquisition of property and rights that constitute collateral, and necessary action may not be taken to properly perfect the security interest in such after acquired collateral. The agent for the New Term Loan Agreement has no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interest in favor of the New Term Loan Agreement against third parties. A failure to do so may result in the loss of the security interest therein or the priority of the security interest in favor of the New Term Loan Agreement against third parties.

Further, the security interest of the agent for the New Term Loan Agreement will be subject to practical challenges generally associated with the realization of security interests in collateral. For example, the agent may need to obtain the consent of third parties and make additional filings. If Reorganized Millennium is unable to obtain these consents or make these filings, the security interests may be invalid and the holders of the New Term Loan Agreement will not be entitled to the collateral or any recovery with respect to the collateral. The agent may not be able to obtain any such consent. Further, the consents of any third parties may not be given when required to facilitate a foreclosure on such collateral. Accordingly, the collateral agent may not have the ability to foreclose upon those assets, and the value of the collateral may significantly decrease.

     **6.**     ***The collateral is subject to casualty risks.***

Reorganized Millennium intends to maintain insurance or otherwise insure against hazards in a manner appropriate and customary for its business. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate Reorganized Millennium fully for its losses. If there is a complete or partial loss of any of the collateral,

the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the New Term Loan and the guarantees thereunder.

### 7.    *Certain assets will be excluded from the collateral.*

As set forth in the New Term Loan, certain assets will be excluded from the collateral securing the New Term Loan.  If an event of default occurs and the New Term Loan is accelerated, the New Term Loan will rank equally with the holders of all of Reorganized Millennium's other unsubordinated and unsecured indebtedness and other liabilities with respect to such excluded assets.  As a result, if the value of the collateral that secures the New Term Loan and the guarantees thereunder is less than the amount of the claims of the lenders under the New Term Loan, no assurance can be provided that the lenders under the New Term Loan would receive any substantial recovery from such excluded assets.

### 8.    *Under certain circumstances, a court could cancel the New Term Loan or void the related guarantees under fraudulent transfer laws.*

If Reorganized Millennium becomes a debtor in a future bankruptcy proceeding or encounters other financial difficulty, a court might avoid (that is, cancel) the obligations under the New Term Loan under federal or state fraudulent transfer laws.  The court might do so if it finds that, when Reorganized Millennium borrowed under the New Term Loan and the related guarantees, (i) New Holdco or any guarantor of the New Term Loan borrowed under the New Term Loan or incurred the guarantee, as applicable, with actual intent of hindering, delaying or defrauding creditors, or (ii) New Holdco or any guarantor received less than reasonably equivalent value or fair consideration in return for either borrowing under the New Term Loan or incurring the guarantee, as applicable, and, in the case of (ii) only, one of the following is also true at the time thereof:

- New Holdco or any guarantor was insolvent or rendered insolvent by reason of the borrowings under the New Term Loan or the incurrence of the guarantee, as applicable;

- the borrowings under the New Term Loan or the incurrence of the guarantee left New Holdco or any guarantor, as applicable, with an unreasonably small amount of capital to carry on its business; or

- New Holdco or any guarantor intended to, or believed that New Holdco or such guarantor would, incur debts beyond New Holdco's or such guarantor's ability to pay such debts as they mature.

For this analysis, "debts" include contingent and unliquidated debts.  If a court avoided New Holdco's obligations under the New Term Loan and the obligations of all of the guarantors under their guarantees, lenders under the New Term Loan would cease to be creditors of New Holdco and the guarantors and likely have no source from which to recover amounts due under the New Term Loan.  In addition, a court could avoid any payment by New Holdco or any guarantor pursuant to the New Term Loan or a related guarantee, as the case may be, and require any payment to be returned to New Holdco or the guarantor, as the case may be, or to be paid to a fund for the benefit of New Holdco's or the guarantor's creditors.  Further, the avoidance of the New Term Loan could result in an event of default with respect to Reorganized Millennium's other debt that could result in the acceleration of such debt.

9. ***New Holdco's unrestricted subsidiaries under the New Term Loan will not be subject to any of the covenants in the New Term Loan and will not guarantee the New Term Loan, and New Holdco may not be able to rely on the cash flow or assets of those unrestricted subsidiaries to pay any of its debt, including the New Term Loan.***

New Holdco's unrestricted subsidiaries will not be subject to the covenants under the New Term Loan and will not guarantee the New Term Loan. However, subject to compliance with the covenants contained in the New Term Loan Agreement, New Holdco will be permitted to designate its subsidiaries as unrestricted subsidiaries. If New Holdco designates a guarantor as an unrestricted subsidiary in accordance with the New Term Loan, the guarantee of the New Term Loan by such guarantor will be released under the New Term Loan. The creditors of the unrestricted subsidiary and its subsidiaries will generally be entitled to payment of their claim from the assets of such unrestricted subsidiary and its subsidiaries before those assets would be available for distribution to New Holdco. In addition, New Holdco's unrestricted subsidiaries may enter into financing arrangements that limit their ability to make loans or other payments to fund payments in respect of the New Term Loan. Accordingly, Reorganized Millennium can give no assurance that the cash flow or assets of its unrestricted subsidiaries will be available to pay any of its debt, including the New Term Loan.

10. ***Reorganized Millennium may have difficulty servicing its debt.***

Although New Holdco will have less indebtedness than the Company did prior to the Closing Date or the Effective Date, New Holdco will still have significant interest expense and principal repayment obligations. The ability to make payments on and to refinance its debt, including the obligations under the New Term Loan and other obligations, will depend on Reorganized Millennium's future financial and operating performance and its ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond Reorganized Millennium's control.

Although the Company believes that the Plan is feasible, there can be no assurance that Reorganized Millennium will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off New Holdco's debt obligations, including, among other obligations, those under the New Term Loan. New Holdco may need to refinance all or a portion of the debt on or before maturity; however, there can be no assurance that New Holdco will be able to refinance any of their debt on commercially reasonable terms or at all.

D.    **Additional Risk Factors Relating to the Out-of-Court Transaction**

1. ***If the Out-of-Court Transaction is consummated but not all Holders of Existing Credit Agreement Claims participate in the Out-of-Court Transaction, Reorganized Millennium will incur certain ongoing obligations related to the Existing Credit Agreement.***

In connection with the Out-of-Court Transaction, up to $50 million of Existing Credit Agreement Claims, or such greater amount as the Ad Hoc Group and Reorganized Millennium may agree, may remain outstanding under the Existing Credit Agreement from and after the consummation of the Out-of-Court Transaction. As a result, Millennium may continue to have obligations under the Existing Credit Agreement, as amended by the Existing Credit Agreement Amendments, in addition to the obligations that will be incurred under the New Term Loan as part of the Out-of-Court Transaction. Any such Existing Credit Agreement Claims that survive the consummation of the Out-of-Court Transaction could have a material adverse effect on the value of the New Term Loan, the New Holdco Common Stock, or Reorganized Millennium's financial condition or results of operations.

2.      *Any future acquisition by Reorganized Millennium of any Existing Credit Agreement Claims that remain outstanding following the consummation of the Out-of-Court Transaction may be on terms more or less favorable to Prepetition Lenders than the terms of the Out-of-Court Transaction.*

Subject to applicable law and the terms of Reorganized Millennium's then outstanding indebtedness (including borrowings under the New Term Loan), Reorganized Millennium may acquire Existing Credit Agreement Claims that remain outstanding following the consummation of the Out-of-Court Transaction through such means, and on such terms and at such prices, as they deem appropriate, which may be more or less favorable to Holders of the Existing Credit Agreement Claims than the terms of the Out-of-Court Transaction, and could be for cash or other consideration.  Reorganized Millennium may also repay any Existing Credit Agreement Claims to Prepetition Lenders who do not participate in the Out-of-Court Transaction in accordance with their terms.  If Reorganized Millennium repurchases or repays the Existing Credit Agreement Claims that remain outstanding following the consummation of the Out-of-Court Transaction, those Holders who decided not to participate in the Out-of-Court Transaction could be better off than those who participated in the Out-of-Court Transaction.

3.      *The Out-of-Court Transaction will constitute a taxable transaction.*

An exchange of Existing Credit Agreement Claims for an interest in the New Term Loan, the Millennium Corporate Claim Trust and the Millennium Equity Interests will be treated as a taxable exchange for U.S. federal income tax purposes. Accordingly, a holder of Existing Credit Agreement Claims may recognize income or gain (and may incur a tax liability) even though no cash is received in the Out-of-Court Transaction. In addition, the U.S. federal income tax treatment of certain aspects of the Out-of-Court Transaction is uncertain. For a more complete discussion of the tax matters relevant to the Out-of-Court Transaction, see "Master Restructuring Agreement—Certain Tax Matters."

4.      *The Restructuring Support Agreement may terminate.*

The RSA may terminate if, among, other things, the deadlines set forth therein are not met or if the conditions precedent to the respective parties' obligation to consent to the Out-of-Court Transaction, including, without limitation, that no Material Adverse Event (as defined in the RSA) has occurred, are not satisfied in accordance with the terms of the RSA.  If the RSA terminates, the Company may not be able to obtain the support of the Holders of Existing Credit Agreement Claims required to consummate the Out-of-Court Transaction.

E.      **Risk Factors Relating to Reorganized Millennium's Business**

1.      *Reorganized Millennium will be highly regulated.*

As discussed in this Disclosure Statement, the Company is subject to extensive regulation and oversight by federal, state, and local government agencies, including by virtue of its participation in the Medicare and Medicaid programs and may, from time to time, be subject to "whistleblower" suits initiated by private parties on behalf of government payors under certain state and federal statutes.

Continued compliance with prevailing regulations imposes significant financial and operational costs on Reorganized Millennium, as these regulations are subject to ongoing government review and interpretation, which can result in shifts in review protocol, government interpretation, and government implementation. Additionally, governments and regulators may modify existing laws or regulations or impose new ones, which may increase Reorganized Millennium's cost of compliance significantly.  All of these factors can have material impacts on Reorganized Millennium's business.

2.      ***The Company's revenues are highly dependent on Medicare, Medicaid, and commercial payor payment rates.***

The Company generates a large portion of its revenue from Medicare and Medicaid payors. Payment rates for Medicare and Medicaid reimbursable services are set by law and regulation and are therefore beyond the Company's ability to control.  Prevailing reimbursement rates for such services could be significantly reduced in the future, materially impairing the Company's revenue.  Moreover, certain services provided by the Company could cease to be reimbursable by Medicare or Medicaid at all.

The Company also generates significant revenue from commercial payors, such as insurance companies.  Payment rates offered by commercial payors could change materially depending on a variety of factors, including regulatory changes and cost pressures affecting the commercial payors' own businesses.  In particular, commercial payors are highly cost sensitive as a result of the rising cost of health care and other macroeconomic factors and may pressure Reorganized Millennium to accept lower payment rates as a result.  All of the foregoing may materially impact Reorganized Millennium's performance in ways that may be difficult to predict or mitigate.

3.      ***Reorganized Millennium may be subject to current and future litigation.***

The Company currently is a defendant in various lawsuits and other litigation and may become subject to additional litigation in the future.  Such litigation may concern a variety of matters including contract disputes, labor matters, intellectual property disputes, and others.  The Plan provides for the reinstatement or payment in full in cash of general unsecured claims.  Thus, the Plan generally will not discharge pending or future litigation claims against Reorganized Millennium, other than the Government Claims resolved pursuant to the USA Settlement.

In addition, although the USA Settlement resolved the majority of the known qui tam lawsuits against the Company, certain qui tam lawsuits relating to the Company's pharmacogenetics business and urine drug testing business were not resolved or were not resolved in their entirety.  The USA Settlement released the Company for certain covered conduct as specified in the USA Settlement Agreements, and required qui tam relators named in the USA Settlement Agreements to dismiss their actions in their entirety, save for certain attorneys' fees, expenses and costs claims and alleged retaliation claims, with prejudice.  However, it is possible that the few known relators not named in the USA Settlement Agreements may continue to pursue their allegations against Reorganized Millennium and may argue that those allegations fall outside the scope of the covered conduct released under the USA Settlement Agreements.  Further, it is possible that additional qui tam lawsuits against the Company exist that the Company is not yet aware of, or that additional qui tam lawsuits could be filed in the future, as is common for companies providing health care services.  Such litigation could have a material adverse effect on Reorganized Millennium's business.

Furthermore, the USA Settlement Agreements also reserved, and specifically did not release, certain liabilities and claims that belong to governmental units.  Such claims include, without limitation, CMS's rights to determine overpayments and other administrative matters, and to recoup and offset against payments submitted by the Company in the ordinary course of business.

4.      ***Reorganized Millennium's intellectual property may be misappropriated or Reorganized Millennium may be subject to infringement claims.***

Reorganized Millennium relies on intellectual property rights, including licensing arrangements and third-party nondisclosure and assignment agreements, to conduct its business.  Reorganized Millennium's failure to adequately maintain and protect its intellectual property could materially affect its business.

Reorganized Millennium's intellectual property could be challenged, invalidated, or circumvented by others and may be insufficient in scope and strength to meaningfully protect Reorganized Millennium. While Reorganized Millennium attempts to protect its intellectual property rights, it cannot guarantee that it will be successful in defending such rights against third parties who may infringe upon them. Similarly, it is possible that third parties will make claims of infringement against Reorganized Millennium, and there is no guarantee that Reorganized Millennium will successfully defend or otherwise resolve such claims. Any such claims, even if meritless, could disrupt or impose significant costs on Reorganized Millennium's business.

> **5.      *Competition may adversely affect Reorganized Millennium's performance.***

The Company has numerous competitors, and additional competitors may enter the market. The Company competes on a variety of factors, including price (with respect to commercial payors), performance, customer service, and physician relationships. There can be no assurance that Reorganized Millennium's services will remain competitive with those of its competitors, particularly as its competitors may attempt to improve their services or lower their costs in order to generate business at the expense of Reorganized Millennium.

> **6.      *Reorganized Millennium may lose or fail to attract and retain employees or suffer labor disruptions.***

Reorganized Millennium's success depends in part on the skills, experience, and efforts of its employees. The loss of one or more members of Reorganized Millennium's senior management or of numerous employees with critical skills could negatively impact Reorganized Millennium's performance. If Reorganized Millennium is unable to attract qualified, committed individuals to fill vacant positions when needs arise, Reorganized Millennium's ability to implement its business objectives may be impaired. Further, while Reorganized Millennium has no union employees, there can be no assurance that Reorganized Millennium will not experience work stoppages or other labor disruptions in the future, all of which may materially impair its business.

> **7.      *The Company relies significantly on information technology, and any failure, inadequacy, interruption, or security lapse of that technology could harm its ability to effectively operate its business.***

The Company's business operations depend significantly on several key information technology systems. The failure of these systems to operate effectively, or a breach in security of any of these systems, could significantly impair Reorganized Millennium's ability to efficiently provide services and process claims and reimbursements and otherwise disrupt Reorganized Millennium's business. Further, significant capital investments may be necessary to remediate any such failure, problem or breach.

In addition, hackers and data thieves are increasingly sophisticated. Despite security measures that the Company and its third party vendors have in place, any breach of Reorganized Millennium's or its third party service providers' networks may result in the loss of valuable business data, Reorganized Millennium's or third parties' personal or proprietary information, or a disruption of Reorganized Millennium's business, which could give rise to unwanted media attention, damage Reorganized Millennium's customer relationships and reputation, and result in lost sales, fines, or lawsuits. In addition, Reorganized Millennium must comply with increasingly complex regulatory standards enacted to protect this business, personal and proprietary data. Any inability to maintain compliance with these regulatory standards could expose Reorganized Millennium to risks of litigation and liability and adversely impact its business.

8. ***Reorganized Millennium's success depends on its senior management team and other key personnel, as well as on highly skilled employees that may be difficult to attract and retain.***

Reorganized Millennium's performance will likely depend on the services of its senior management team and other key personnel because of their experience, industry relationships and knowledge of the business.  The loss or departure of any member of its senior management team or other key employees could have a material adverse effect on the business, financial condition and results of operations and Reorganized Millennium may not be able to attract and retain individuals with the same or similar levels of experience or expertise.

Reorganized Millennium's success also depends in large part on its ability to attract and retain qualified employees. The failure to attract and retain qualified personnel, for which Reorganized Millennium faces significant competition, may have a material adverse effect on the business, financial condition and results of operations.

Reorganized Millennium's future operating results depend in significant part upon the continued contributions of a small number of its key senior management and technical personnel.

9. ***Financial information and projections are based on the Company's books and records and, unless otherwise stated, no audit was performed.***

The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Company relied on financial data derived from its books and records that was available at the time of such preparation.  Although the Company has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Company believes that such financial information fairly reflects, in all material respects, the financial results of the Company, the Company is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

As discussed in the introduction above, the information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, Reorganized Millennium's future financial performance, or Reorganized Millennium's projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue," the negatives of these terms, or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those discussed in the section entitled "Risk Factors" and in other sections of this Disclosure Statement, including in any documents incorporated by reference herein.  Although the Company believes that the expectations reflected in the forward-looking statements are reasonable, the Company cannot guarantee future results, events, levels of activity, performance, or achievements.  The Company expressly disclaims a duty to update any forward-looking statements.

## VII.    CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Equity Interests, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtors have complied with applicable provisions of the Bankruptcy Code, (d) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been

accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all Holders of Claims and Equity Interests in each Impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of any retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only classes of claims and interests that are "impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the Plan modifies the legal, equitable, or contractual rights of Holders of Claims and Equity Interests in the Class (other than by curing defaults and reinstating debt). Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Equity Interests that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Equity Interests whose Holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims or Equity Interests shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims or Allowed Equity Interests actually voting in the Class have voted to accept the Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims or Allowed Equity Interests actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

Only the Holders of Claims in Class 2 as of the Consenting and Voting Record Date shall be allowed to vote on the Plan. Class 2 shall have accepted the Plan if the Holders of at least two-thirds in amount, and more than one-half in number, of the Existing Credit Agreement Claims that timely submit Ballots vote in favor of the Plan. Distributions to be made under the Plan shall be made only to the Holders of Allowed Claims and Allowed Equity Interests as of the Consenting and Voting Record Date.

### B.    Feasibility of the Plan

In connection with Confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This is the so-called "feasibility" test. To support their belief in the feasibility of the Plan, the Debtors prepared the financial projections (the "Financial Projections") set forth as Exhibit H to this Disclosure Statement. The Financial Projections show that the Reorganized Debtors should have sufficient cash to make payments required under the Plan. Accordingly, the Debtors believe the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. ACCORDINGLY, READERS OF THIS DISCLOSURE STATEMENT ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS, AND SHOULD CAREFULLY REVIEW ARTICLE VI — "RISK FACTORS" HEREIN. THE FINANCIAL PROJECTIONS SHOULD NOT BE RELIED UPON AS NECESSARILY INDICATIVE OF FUTURE, ACTUAL RECOVERIES.

Holders of Claims against and Equity Interests in the Debtors are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

In addition to the assumptions footnoted in the Financial Projections themselves, the Financial Projections also assume that (i) the Plan or the Out-of-Court Transaction will be confirmed and consummated in accordance with their terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors other than as noted in the Financial Projections. Although considered reasonable by the Debtors as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

C.      **Best Interests Test**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan is in the "best interests" of all Holders of Claims or Equity Interests that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such member would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of claims or interests if a debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any

distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. As described in more detail in the liquidation analysis (the "Liquidation Analysis"), attached hereto as Exhibit I, the holders of Claims and Equity Interests of each of (i) Unimpaired Classes 3, 4, 5, 6, 8, 9 and 11 will receive a greater distribution under the Plan than in a liquidation, (ii) Unimpaired Class 1 and Impaired Classes 7 and 10 will receive the same distribution under the Plan as in a liquidation and (iii) Impaired Class 2 will receive more under the Plan than in a liquidation: in the event of a liquidation of the Debtors, the proceeds available for holders of Class 2 Claims would range from approximately $19,312,000 to $79,347,000. In contrast, under the Plan, holders of Allowed Class 2 Claims will various forms of consideration, including the New Term Loan in a principal amount of $600 million. The New Term Loan alone is greatly in excess of the likely recoveries to holders of Allowed Class 2 Claims in a liquidation scenario. In addition, holders of Allowed Class 2 Claims will receive the Millennium Equity and interests in the Millennium Corporate Claim Trust. Therefore, holders of Impaired Claims and Equity Interests will receive recoveries that are substantially more (as to Class 2) or the same (as to Classes 7 and 10) under the Plan than in a liquidation.

### D.    Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, a bankruptcy court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

The Debtors have been advised that Class 2 (which comprises the Existing Credit Agreement Claims) intends to accept the Plan. Thus, the cramdown provisions of section 1129(b) do not apply to that Class. Each of the Claims in Class 1, Class 3, Class 4, Class 5, Class 6, Class 8, Class 9 and Class 11 are Unimpaired under the Plan. Thus, the cramdown provisions of section 1129(b) also do not apply to these classes.

Classes 7 and 10 will receive no recovery under the Plan and are deemed to have rejected the Plan. In view of the deemed rejection by such Classes, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions under section 1129(b)(2)(C)(ii) of the Bankruptcy Code with respect to Classes 7 and 10.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

While the Company and the Ad Hoc Group believe that the Out-of-Court Transaction is the preferred approach to resolving the Company's capital requirements and balance-sheet restructuring, the Company and the Ad Hoc Group believe that the Plan affords the next best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the Debtors may be unable to satisfy their financial obligations under the USA Settlement Agreements within the timeframes they require. As a result, the Debtors' ability to continue operating as a going concern would be severely jeopardized. The realistic alternatives likely will be either a liquidation of the Company's assets through a sale or sales under section 363 of the Bankruptcy Code if the Company continues in Chapter 11 or a liquidation under Chapter 7.

The Company believes that, in a liquidation under Chapter 7, before creditors would receive any distributions, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Company's estates. The assets available for distribution to creditors would be reduced by such additional expenses, as well as by certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the liquidation.

The Liquidation Analysis demonstrates that a Chapter 7 liquidation would be an unmitigated disaster. The Prepetition Lenders under the Existing Credit Agreement would receive pennies on the dollar on account of their senior secured Existing Credit Agreement Claims, while unsecured creditors would receive nothing on account of their Claims.

**THE COMPANY AND THE AD HOC GROUP THEREFORE BELIEVE THAT THE OUT-OF-COURT TRANSACTION AND, IN THE ALTERNATIVE, THE PLAN, AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.**

IX.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE OUT-OF-COURT TRANSACTION**

A summary description of certain United States federal income tax consequences of the Plan and the Out-of-Court Transaction is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan and the Out-of-Court Transaction as discussed herein. Only United States federal income tax consequences of the Plan to the Debtor and certain holders of Existing Credit Agreement Claims are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan or the Out-of-Court Transaction. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan or the Out-of-Court Transaction, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan or the Out-of-Court Transaction as to any holder of a claim or interest. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan or the Out-of-Court Transaction, nor does it purport to address the United States federal income tax consequences of the Plan or the Out-of-Court Transaction to Non-U.S. Holders (as defined below, except with respect to the discussion of participation in the Early Commitment Facility) and all aspects of United States federal income taxation applicable to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of claims or interests who are, or who hold their claims or interests through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, persons holding claims or interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction and persons who acquired their claims or interests pursuant to the exercise of employee stock options or otherwise as compensation). The following discussion does not address United States federal taxes other than income taxes.

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a claim or interest that is neither a partnership (or other entity or arrangement treated as a partnership for United States federal income tax purposes) nor (1) an individual who is a citizen or resident of the United States, (2) a corporation created or organized under the laws of the United States or any state or political subdivision thereof, (3) an estate, the income of which is subject to federal income taxation regardless of its source, or (4) a trust that (i) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (ii) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If a partnership (including any entity or arrangement treated as a partnership for United States federal income tax purposes) holds claims or interests, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan or the Out-of-Court Transaction should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan or the Out-of-Court Transaction.

**Each holder of an Existing Credit Agreement Claim or Equity Interest should consult its tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

A.      **Certain United States Federal Income Tax Consequences to the Debtors**

Holdings is a partnership for income tax purposes, and each of Millennium and RxAnte are "disregarded entities" for income tax purposes and therefore, the Debtors pay no income tax. Instead, the income, gain or loss of the Debtors is allocated to, and is reported entirely on, the tax returns of the existing holders of the Millennium Equity Interests.  As a result of this structure, the Debtors do not anticipate that they will incur any United States federal income tax consequences associated with implementing the Plan or the Out-of-Court Transaction.

For U.S. federal income tax purposes, the cancellation and reissuance of Equity Interests in Millennium in extinguishment of Millennium's outstanding obligations under the Existing Credit Agreement will be treated as a sale of the assets held by Millennium. Accordingly, income, gain or loss will be recognized by Holdings pursuant to the Plan or the Out-of-Court Transaction, and such income, gain or loss will be allocated to the members of Holdings in accordance with the Holdings operating agreement and the provisions of the RSA, the Out-of-Court Transaction and the Plan. To the extent the amount of Millennium's outstanding obligations under the Existing Credit Agreement that are extinguished exceeds the fair market value of the assets of Millennium, it is possible that Holdings will recognize cancelation of indebtedness income, with such income being similarly allocated to the existing members of Holdings. Any deduction available with respect to payments made under the USA Settlement will allocated 55% to MLH and 45% to TA. Pursuant to the Plan or the Master Restructuring Agreement, as applicable, MLH and TA will retain control over the filing of tax returns by Holdings, and as such should consult their tax advisors regarding any tax consequences to them of the transactions occurring pursuant to the Plan or the Out-of-Court Transaction.

B.      **Certain United States Federal Income Tax Consequences to Holders of Existing Credit Agreement Claims**

The following is a summary description of certain United States federal income tax consequences of the transactions contemplated by the Plan or the Out-of-Court Transaction to holders of Existing Credit Agreement Claims and holders who participate in the Early Commitment Facility; however, no assurance can be given as to the treatment of such transactions by the IRS or as to whether such treatment will be sustained by a court if challenged. Therefore, holders of claims or interests should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan or the Out-of-Court Transaction.

(a)      Consequences to Holders of Existing Credit Agreement Claims Who Participate in the Out-of-Court Transaction and Consequences to Holders of Existing Credit Agreement Claims under the Plan

Gain or loss.  A holder of an Existing Credit Agreement Claim will generally recognize ordinary income to the extent that the amount of property received (or to be received) under the Plan or the Out-of-Court Transaction (i.e., an interest in the Millennium Corporate Claim Trust and the Millennium Equity Interests) is attributable to interest that accrued on an Existing Credit Agreement Claim but was not previously paid by the Debtor or included in income by the holder of the Existing Credit Agreement Claim.  The extent to which property received by a holder of an Existing Credit Agreement Claim will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan of Reorganization and the Out-Of-Court Transaction, all distributions or transfers in respect of any claim will be allocated first to the

principal amount of such claim and thereafter to accrued but unpaid interest, if any. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes. A holder of an Existing Credit Agreement Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its Existing Credit Agreement Claim and the amount realized by the holder upon consummation of the Plan or the Out-of-Court Transaction that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of the fair market value of the consideration received. The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder of the Existing Credit Agreement Claim, the nature of the Existing Credit Agreement Claim in its hands, whether the Existing Credit Agreement Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Existing Credit Agreement Claim, and the creditor's holding period of the Existing Credit Agreement Claim. If the Existing Credit Agreement Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the holder of the Existing Credit Agreement Claim held such Existing Credit Agreement Claim for longer than one year or short-term capital gain or loss if the holder of the Existing Credit Agreement Claim held such Existing Credit Agreement Claim for less than one year. The deductibility of capital losses is subject to limitation under the Tax Code.

Because Millennium is treated as an entity that is disregarded as separate from Holdings for U.S. federal income tax purposes, and because the Millennium Corporate Claim Trust will be treated as a "grantor trust" under the Tax Code, the transfer of the Equity Interests of Millennium and the interests in the Millennium Corporate Claim Trust to Consenting Lenders should be treated for U.S. federal income tax purposes as a transfer of the assets held by each of Millennium and the Millennium Corporate Claim Trust. Each holder of an Existing Credit Agreement Claim will take a basis in the assets of the Millennium Corporate Claim Trust and of Millennium equal to respective fair market value of each such item, and such holder's holding period in such property will begin the day after the holder receives such property.

A holder of an Existing Credit Agreement Claim who receives, in respect of its Existing Credit Agreement Claim, property with a fair market value that is less than its tax basis in such Existing Credit Agreement Claim may be entitled to a bad debt deduction if either: (i) the holder is a corporation; or (ii) the Existing Credit Agreement Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the holder's trade or business. A holder that has previously recognized a loss or deduction in respect of its Existing Credit Agreement Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan or the Out-of-Court Transaction to the extent such amounts exceed the holder's adjusted basis in such Existing Credit Agreement Claim.

**Market discount**. The market discount provisions of the Tax Code may apply to holders of Existing Credit Agreement Claim. If a holder of an Existing Credit Agreement Claim purchased the Existing Credit Agreement Claim at a price less than such Existing Credit Agreement Claim's principal amount, the difference would constitute "market discount" for federal income tax purposes. In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less) that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Any gain recognized by such holder on the receipt of cash in respect of its Existing Credit Agreement Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

**Contribution to New Holdco**. On the subsequent contribution of 100% of the Millennium Equity Interests to New Holdco, a holder will not recognize further gain or loss. The holder's tax basis in the New Holdco Common Stock and New Term Loan received in the exchange will equal the basis of the Millennium assets deemed contributed to New Holdco prorated between the New Holdco Common Stock and the interest in the New Term Loan received on the basis of the relative fair market value of each., and the holding period for such stock will include the holding period for the Millennium assets deemed contributed in the exchange.

Although there is no authority directly on point and therefore the matter is not free from doubt, we intend to take the position that the transfer of the Equity Interests by the Consenting Lenders (or in the case of the Plan, the Lenders) to New Holdco is treated as a contribution of the assets of Millennium to New Holdco for U.S. federal income tax purposes. It is possible, however, that the IRS could successfully contend that, because of the ownership by the Consenting Lenders (or in the case of the Plan, the Lenders) of 100% of the Equity Interests of Millennium, that the Consenting Lenders (or in the case of the Plan, the Lenders) temporarily formed a tax partnership that held the assets, and conducted the business, of Millennium and then contributed the equity of that partnership to New Holdco. Lenders should consult their tax advisors regarding any tax consequences to them if the Lenders are treated as forming a partnership the conducts Millennium's business.

**Participation in the Early Commitment Facility**. The tax treatment of the receipt of an interest in the Early Commitment Facility by a holder of an Existing Credit Agreement Claim pursuant to the Exchange Offer is unclear because there are no authorities that directly address the treatment of such payment. Under the Tax Code, any amount received by a holder on retirement of a debt obligation is generally treated as being received in exchange for the debt instrument. It is possible, however, that an interest in the Early Commitment Facility may be treated as a separate fee paid in exchange for a Consenting Lender's consent to the Out-Of-Court Transaction and the Existing Credit Agreement Amendment that would be subject to tax as ordinary income rather than additional consideration for the Existing Credit Agreement Claims.  If the interest in the Early Commitment Facility is treated as additional consideration with respect to Existing Credit Agreement Claims, such a payment would be treated as part of the total consideration received in exchange for the tendered Existing Credit Agreement Claims and treated in the manner described above.  Because it is unclear under U.S. federal income tax law whether the receipt of an interest in the Early Commitment Facility constitutes additional consideration received with respect to an Existing Credit Agreement Claim, additional interest or a fee, Millennium intends to withhold U.S. federal income tax at a rate of 30% from any transfer of such an interest to a Non-U.S. Holder (which will be effected by reducing such Non-U.S. Holder's pro rata share of the principal amount of the Early Commitment Facility), unless an exemption from or reduction of withholding tax is applicable, either because such amounts are effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States or because of an applicable income tax treaty with the United States. In order to claim an exemption from or reduction of withholding tax, the Non-U.S. Holder must deliver a property executed IRS Form W-8ECI (with respect to amounts effectively connected with the conduct of a trade or business within the United States) or IRS Form W-8BEN or W-8BEN-E (with respect to treaty benefits) claiming such exemption or reduction, and certifying an exemption from withholding under Sections 1471-1474 of the Tax Code.  Holders are urged to consult their tax advisors as to the proper treatment of the receipt of an interest in the Early Commitment Facility.

**Information reporting and backup withholding**.  Certain payments, including the payments with respect to Existing Credit Agreement Claims pursuant to the Plan or the Out-of-Court Transaction, may be subject to information reporting to the IRS.  Moreover, under certain circumstances, holders of Existing Credit Agreement Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan or the Out-of-Court Transaction, unless such holder either (i) meets the

requirements of certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Each holder of an Existing Credit Agreement Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan or the Out-of-Court Transaction would be subject to these regulations and require disclosure on the holder of an Existing Credit Agreement Claim's tax returns.

> (b)     Consequences to Holders of Existing Credit Agreement Claims Who Do Not Participate in the Out-of-Court Transaction if the Plan is Not Implemented.

If the Plan is not implemented, the tax treatment of a holder of Existing Credit Agreement Claims that does not participate in the Out-of-Court Transaction will depend on whether the Out-of-Court Transaction in a "deemed exchange" of such Existing Credit Agreement Claims for U.S. federal income tax purposes. Generally, a modification of a debt instrument will be treated, for U.S. federal income tax purposes, as resulting in a "deemed exchange" of an old debt instrument for a new debt instrument if the modification is "significant," as determined for U.S. federal income tax purposes. The Treasury Regulations provide that a modification of a debt instrument generally is a "significant modification" for U.S. federal income tax purposes if, based on all the facts and circumstances and considering certain modifications of the debt instrument collectively, the degree to which the legal rights and obligations are altered is "economically significant."

If there is not a "significant modification" of the Existing Credit Agreement Claims, a holder of such claims should not recognize any gain or loss for U.S. federal income tax purposes and such holder should continue to have the same adjusted tax basis, holding period and tax attributes with respect to the Existing Credit Agreement Claims as it had before the Out-of-Court Transaction. If there is a "significant modification" of the Existing Credit Agreement Claims, a holder generally would recognize gain or loss equal to the difference, if any, between the amount realized by the holder on the deemed exchange and the holder's adjusted tax basis in the Existing Credit Agreement Claims (subject to possible deferral of any loss realized under the wash sale rules). The amount realized by a holder in a deemed exchange of "old" obligations for the "new" obligations for U.S. federal income tax purposes, the U.S. federal income tax consequences to holders would depend upon, among other factors, whether the "old" obligations or "new" obligations are "publicly traded" within the meaning of applicable Treasury regulations. This taxable transaction will result in a new holding period with respect to the "new notes" and, if gain or loss is recognized on the deemed exchange, could also result in the "new notes" having a different tax basis, a different schedule for the accrual of interest, or bond premium or original issue discount ("OID") (which OID, unless considered "de minimis," within the meaning of the Tax Code may be required to be accrued into gross income on a constant yield basis). Holders that do not participate in the Out-of-Court Transaction should consult their tax advisors regarding any tax consequences to them if the Out-of-Court Transaction and related transactions result in a deemed taxable exchange.

C.        **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

**X.      OTHER MATTERS**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material that you have received, or if you wish to obtain an additional copy of the Plan, the Master Restructuring Agreement, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Voting Agent.

**IN ORDER TO PROMPTLY TRANSMIT YOUR SIGNATURE PAGES AND/OR BALLOT, YOU MUST SEND THEM VIA EMAIL OR OVERNIGHT DELIVERY TO THE FOLLOWING:**

**Millennium Ballot Processing**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**
**Email:  millenniumballots@primeclerk.com**
**Telephone (toll free): (844) 276-3028**
**Telephone (international): (917) 962-8498**

## RECOMMENDATION AND CONCLUSION

THE COMPANY BELIEVES THAT THE CONSUMMATION OF THE OUT-OF-COURT TRANSACTION OR, IN THE ALTERNATIVE, THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE COMPANY, ITS ESTATES, AND ITS CREDITORS.  FOR THESE REASONS, THE COMPANY URGES ALL PREPETITION LENDERS TO CONSENT TO THE OUT-OF-COURT TRANSACTION, AND TO VOTE TO ACCEPT THE PLAN, AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING AN EXECUTED COPY OF THE MASTER RESTRUCTURING AGREEMENT, THEIR BALLOTS, AND THE EXISTING CREDIT AGREEMENT AMENDMENTS SO THAT THEY WILL ACTUALLY BE RECEIVED BY THE VOTING AGENT ON OR BEFORE 5:00 P.M. (EASTERN TIME) ON NOVEMBER 8, 2015.

---

**ONLY PREPETITION LENDERS THAT (1) CONSENT TO THE OUT-OF-COURT TRANSACTION AND OUT-OF-COURT RELEASES AND DELIVER THEIR SIGNATURE PAGES TO THE MASTER RESTRUCTURING AGREEMENT, (2) VOTE IN FAVOR OF THE PLAN AND DELIVER THEIR BALLOTS, AND (3) DELIVER THEIR SIGNATURE PAGES TO THE EXISTING CREDIT AGREEMENT AMENDMENTS NO LATER THAN 12:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 5, 2015 WILL RECEIVE THEIR PRO RATA SHARE OF THE EARLY COMMITMENT FACILITY.**

---

Dated:  San Diego, California
        October 29, 2015

                                        MILLENNIUM LAB HOLDINGS II, LLC
                                        (on behalf of itself and the other Debtors)

                                        By:  _____/s/ W. Brock Hardaway_____
                                        Name:    W. Brock Hardaway
                                        Title:    Chief Executive Officer

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Anthony W. Clark_____

Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

– and –

Kenneth S. Ziman (pro hac vice admission pending)
Raquelle L. Kay (pro hac vice admission pending)
Four Times Square
New York, New York 10036-6522

Telephone: (212) 735-3000
Fax: (212) 735-2000

- and –

Felicia Gerber Perlman (pro hac vice admission pending)
Matthew N. Kriegel (pro hac vice admission pending)
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession