**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  15-12284 (LSS)<br><br>(Jointly Administered)<br><br>Hearing Date: December 10, 2015 at 11:00 AM ET<br>Objection Deadline:  December 7, 2015 at 4:00 PM ET |

**MEMORANDUM OF LAW OF THE OPT-OUT LENDERS IN OPPOSITION TO**
**(I) APPROVAL OF THE DISCLOSURE STATEMENT,**
**(II) APPROVAL OF THE CLASS 2 BALLOT, AND**
**(III) CONFIRMATION OF THE PREPACKAGED JOINT PLAN OF**
**REORGANIZATION OF MILLENNIUM LAB HOLDINGS II,** *ET AL.*

**LOWENSTEIN SANDLER LLP**
Sharon L. Levine, Esq.
Sheila Sadighi, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: 973-597-2500  Fax: 973-597-2400
slevine@lowenstein.com
ssadighi@lowenstein.com
abehlmann@lowenstein.com
*Counsel to the Opt-Out Lenders*

**WHITEFORD, TAYLOR & PRESTON LLC**
Christopher M. Samis, Esq. (Del. Bar No. 4909)
L. Katherine Good, Esq. (Del. Bar No. 5101)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel: 302-353-4144  Fax: 302-661-7950
csamis@wtplaw.com
kgood@wtplaw.com

*Delaware Counsel to the Opt-Out Lenders*

December 4, 2015

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219) ("RxAnte").  The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 2

BACKGROUND ............................................................................................ 3

    A.    The Opt-Out Lenders .............................................................. 3

    B.    The Dividend Recapitalization Transaction............................ 4

    C.    The DOJ Investigation and Its Aftermath ............................... 4

    D.    The USA Settlement ............................................................... 8

    E.    The Plan ................................................................................ 10

    F.    The Proposed Nonconsensual Third-Party Release .............. 10

    G.    The Bar Order and Plan Injunction ...................................... 15

    H.    Judgment Reduction .............................................................. 16

ARGUMENT ................................................................................................ 17

I.    THE COURT DOES NOT HAVE JURISDICTION TO APPROVE THE THIRD-PARTY RELEASE OR RELATED PROVISIONS OF THE PLAN. ................................................................................. 17

    A.    The Debtors have no indemnification obligation that could give rise to subject-matter jurisdiction ...................................... 18

    B.    The Court does not have "related to" subject-matter jurisdiction based on any contributions to the Debtors' reorganization by the Released Parties or their Related Parties ....................... 22

    C.    The Court does not have jurisdiction to approve the Judgment Reduction Provision ............................................................. 24

II.     THE PLAN IS UNCONFIRMABLE BECAUSE THE THIRD-PARTY RELEASE, BAR ORDER, PLAN INJUNCTION, AND JUDGMENT REDUCTION PROVISION CONTRAVENE APPLICABLE LAW. .......................................................................26

     A.     The Third-Party Release is impermissible because the Court cannot use Section 105 of the Bankruptcy Code to create new substantive remedies that contravene other provisions of the Bankruptcy Code. ...............................................................................26

     B.     The Plan must permit creditors to opt out of the Third-Party Release. ...............................................................................29

     C.     Even if the Plan provided an opt-out mechanism, there is no basis to approve the Third-Party Release..............................................31

III.     THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT...............................................................................33

     A.     The Disclosure Statement should not be approved because it describes an unconfirmable Plan. ........................................................33

     B.     Even if the Plan were confirmable, the Disclosure Statement lacks adequate information regarding the impact of the Third-Party Release.......................................................................34

IV.     THE COURT SHOULD NOT APPROVE THE CLASS 2 BALLOT............38

RESERVATION OF RIGHTS ........................................................................39

CONCLUSION............................................................................................40

# TABLE OF AUTHORITIES

**PAGES**

C**ASES**

In re 266 Wash. Assocs.,
    141 B.R. 275 (Bankr. E.D.N.Y. 1992), aff'd, 147 B.R. 827 (E.D.N.Y. 1992)............33

In re A.H. Robins Co.,
    880 F.2d 694 (4th Cir. 1989) ......................................................................................32

Alten v. Ellin & Tucker, Chartered,
    854 F.Supp. 283 (D. Del. 1994)...................................................................................20

In re Arrowmill Dev. Corp.,
    211 B.R. 497 (Bankr. D.N.J. 1997) .............................................................................27

Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),
    372 F.3d 154 (3d Cir. 2004).................................................................................17, 23

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004)..............................................18, 19, 20, 21, 22, 23, 26, 27

In re Copy Crafters Quickprint, Inc.,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) .........................................................................35

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................27, 29

County of Hudson v. Janiszewski,
    351 Fed. Appx. 662 (3d Cir. 2009)..............................................................................20

In re Drexel Burnham Lambert Group, Inc.,
    960 F.2d 285 (2d Cir. 1992).........................................................................................32

Eichenholtz v. Brennan,
    52 F.3d 478 (3d Cir. 1995)...........................................................................................25

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ..............................................................................29

In re Federal-Mogul Global, Inc.,
    300 F.3d 368 (3d Cir. 2002).................................................................................18, 19

In re Ferretti,
    128 B.R. 16 (Bankr. D.N.H. 1991) ..............................................................................35

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001) ....................................................................31, 32

Gillman v. Continental Airlines (In re Continental Airlines),
    203 F.3d 203 (3d Cir. 2000)......................................................................18, 21, 31, 32

In re Indianapolis Downs, LLC,
    486 B.R. 286 (Bankr. D. Del. 2013) ............................................................................29

Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,
    456 U.S. 694 (1982)....................................................................................................23

John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assocs.,
    987 F.2d 154 (3d Cir. 1993).......................................................................................33

In re Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988).......................................................................................32

Law v. Siegel,
    134 S.Ct. 1188 (2014) ..........................................................................................26, 27

In re Lower Bucks Hosp.,
    471 B.R. 419 (Bankr. E.D. Pa. 2012) .........................................................................36

In re Main Street AC, Inc.,
    234 B.R. .......................................................................................................................34

In re Market Square Inn, Inc.,
    163 B.R. 64 (Bankr. W.D. Pa. 1994) ..........................................................................33

In re Metromedia Fiber Network, Inc.,
    416 F.3d 136 (2d Cir. 2005).......................................................................................27

Norwest Bank Worthington v. Ahlers,
    485 U.S. 197 (1988)....................................................................................................26

In re Oneida Motor Freight, Inc.,
    848 F.2d 414 (3d Cir. 1988).......................................................................................34

Pacor, Inc. v. Higgins,
    743 F.2d 984 (3d Cir. 1984).................................................................................18, 19

In re Pecht,
    57 B.R. 137 (Bankr. E.D. Va. 1986) ...........................................................................34

In re Phoenix Petroleum Co.,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .........................................................................33

In re Spansion, Inc.,
    426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................29, 30

Stern v. Marshall,
    131 S.Ct. 2594 (2011) ........................................................................................17, 25

In re Wash. Mut., Inc.,
    442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................29, 30

Wellness Int'l Network, Ltd. v. Sharif,
    135 S. Ct. 1932 (2015).............................................................................................17

In re Western Real Est. Fund, Inc.,
    922 F.2d 592 (10th Cir. 1990) ................................................................................28

In re Zale Corp.,
    62 F.3d 746 (5th Cir. 1995) ...............................................................................27, 28

**STATUTES**

11 U.S.C. § 105...........................................................................................2, 26, 27, 28

11 U.S.C. § 524..................................................................................................27, 28

11 U.S.C. § 524(e) ............................................................................................27, 28

11 U.S.C. § 524(g) ......................................................................................23, 24, 27

11 U.S.C. § 1125.................................................................................................1, 34

28 U.S.C. § 157(a) .................................................................................................17

28 U.S.C. § 1334(a)-(b) .........................................................................................17

**RULES**

Fed. R. Bankr. P. 3016(c) .......................................................................................36

**OTHER AUTHORITIES**

2 COLLIER ON BANKRUPTCY ¶ 105.01[2] (16th ed. 2013) .................................................26

Laura J. Keller, *The Disastrous Loan Deal That Shows Wall Street Still Has a
    Wild West*, BLOOMBERG, July 16, 2015[2].....................................................................8

---

[2]    *Available at*  http://www.bloomberg.com/news/articles/2015-07-16/jpmorgan-s-little-secret-on-a-loan-deal-that-went-very-wrong

Patrick Fitzgerald, *Millennium Health's Bankruptcy Shows Dangers of Leveraged Loans*, WALL ST. J., Nov. 17, 2015[3] .............................................................................4

---

[3]    *Available at* http://www.wsj.com/articles/millennium-healths-bankruptcy-shows-dangers-of-leveraged-loans-1447802994

The funds and accounts identified on Exhibit A annexed hereto, in their capacity as lenders (the "Opt-Out Lenders") to certain of the above-captioned debtors-in-possession (the "Debtors") under a $1.825 billion senior secured credit facility (the "Existing Credit Facility") pursuant to that certain Credit Agreement dated as of April 16, 2014 (the "Existing Credit Agreement")[4] among Millennium Lab Holdings II, LLC ("Holdings"), Millennium Health, LLC, f/k/a Millennium Laboratories, LLC ("Millennium"), the several lenders from time to time party thereto (the "Lenders"), and Wilmington Savings Fund Society, FSB as Administrative Agent (the "Successor Agent"),[5] by and through their undersigned counsel,[6] hereby submit this memorandum of law in opposition to:

(a)    approval of the *Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization* (the "Disclosure Statement") [D.I. 15] as adequate pursuant to section 1125 of the Bankruptcy Code,

(b)    approval of the Class 2 Ballot for Voting on the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. (the "Class 2 Ballot") [D.I. 16 Ex. A], and

(c)    confirmation of the *Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.* (the "Plan") [D.I. 14].

The Opt-Out Lenders object to confirmation of the Plan and approval of the Disclosure Statement and Class 2 Ballot (the "Objection") and respectfully state as follows in support of the Objection:

---

[4]    The Debtors filed a marked copy of the Existing Credit Agreement, reflecting modifications proposed in connection with their prepetition solicitation of an out-of-court workout, as an exhibit to the Disclosure Statement. See Disclosure Statement, Ex. D-2, Annex I.

[5]    The Successor Agent replaced JPMorgan Chase Bank, N.A. (the "Prior Agent") as administrative agent for the Existing Credit Facility in September 2015.

[6]    Axis Specialty Limited is represented in this matter solely by Whiteford, Taylor & Preston LLC.

## PRELIMINARY STATEMENT

As discussed more fully below, the Opt-Out Lenders, which hold approximately $106.8 million in the aggregate of term loan principal under the Existing Credit Facility, hold and intend to assert direct claims for RICO violations, fraudulent inducement, aiding and abetting fraud, and civil conspiracy against certain non-Debtor affiliates of the Debtors and others arising out of, among other things, material misrepresentations made to the Opt-Out Lenders in connection with the issuance of the Existing Credit Facility.

The Opt-Out Lenders object to confirmation of the Plan because:

- the Court lacks subject-matter jurisdiction to approve the sweeping third-party releases and injunctions contained in the Plan, which would improperly preclude the Opt-Out Lenders' direct claims against other non-Debtors, including claims for fraud and other intentional torts, even though the Opt-Out Lenders voted to reject the Plan (and thus have not consented to the releases and injunctions or this Court's jurisdiction on those issues);

- the Court lacks subject-matter jurisdiction to approve the judgment reduction provision in the Plan, which improperly asks this Court to dictate and constrain the amount of a damage award the District Court, an Article III court, may award in separate, non-bankruptcy litigation between non-Debtor parties by preordaining non-Debtor defendants' entitlement to judgment reduction and the amount thereof, based on an arbitrary formula and contrary to applicable law;

- the Debtors cannot create subject matter jurisdiction over improper third-party releases by agreeing to indemnify non-Debtor parties through the Plan and then relying on that indemnification obligation – which is in the same unconfirmed Plan as the improper releases – as the basis for "related to" jurisdiction to approve the releases;

- the Court cannot use section 105 of the Bankruptcy Code to grant the Debtors' non-Debtor affiliates and myriad others a de facto discharge; and

- even if nonconsensual third-party releases were permissible in the Third Circuit (which they are not), no extraordinary circumstances exist in this case that would warrant approval of such releases.

The Opt-Out Lenders also object to approval of the Disclosure Statement because (a) it describes an unconfirmable Plan and (b) fails to provide *any*, let alone adequate, disclosure of who the myriad non-Debtor releasees are, why those parties are entitled to a release of non-Debtors' direct claims against them, what claims against them would be released, and the value of those claims. Similarly, the Opt-Out Lenders object to approval of the Class 2 Ballot because it does not afford creditors an opportunity to opt out of the proposed third-party releases and injunctions, as is required in this jurisdiction.

All of the Opt-Out Lenders' concerns can be resolved by simply permitting the Opt-Out Lenders to opt out of the third-party releases, injunctions, and related provisions contained in the Plan, including the automatic judgment reduction provision. Exhibit B annexed hereto provides proposed Plan revisions to resolve the Objection.

## BACKGROUND[7]

### A.    The Opt-Out Lenders

1.    The Opt-Out Lenders are Lenders of approximately $106.8 million of aggregate principal amount of senior secured debt issued in April 2014 pursuant to the Existing Credit Agreement. The Opt-Out Lenders are funds and accounts managed by Voya Investment Management Co. LLC and Voya Alternative Asset Management LLC (collectively, "Voya"), and include publicly traded mutual funds and other funds and accounts whose investors include state and municipal pension funds, research and charitable foundations and endowments, and other institutional and individual investors.

---

[7]    Unless otherwise noted, the background information in this section is derived from the Disclosure Statement and/or the complaint in intervention filed in the *qui tam* action styled as United States of America *ex rel.* McGuire v. Millennium Laboratories, Inc., Case No. 12-cv-10132-NMG, 12-cv-10631-NMG, 13-cv-10825-NMG (D. Mass.) (the "Qui Tam Complaint"), a copy of which is annexed hereto (without exhibits) as **Exhibit C**. In the interest of brevity, not every assertion in this section includes a separate citation.

Through the Plan, the Opt-Out Lenders' loans to Millennium will be cancelled and exchanged for an "Estimated Recovery: > 34%." See Disclosure Statement at 7.

### B.    The Dividend Recapitalization Transaction

2.    The Existing Credit Facility was issued in April 2014 as part of a dividend recapitalization transaction. Id. at 17.  Of the original $1.775 billion of term loan proceeds, nearly $1.3 billion was paid out as a "special dividend" to the non-Debtor stockholders of Millennium's parent company, Holdings.[8]  Approximately 55% of the stock of Holdings is owned by non-Debtor Millennium Lab Holdings, Inc. ("MLH"), and approximately 45% of the stock of Holdings is owned by non-Debtor TA Millennium, Inc. ("TA" and collectively with MLH, the "Non-Debtor Equity Holders").  TA is an affiliate of private equity firm TA Associates Management, L.P.  The stock of non-Debtor MLH is owned by fourteen trusts, seven of which were established by Millennium founder, Chairman and former-CEO James Slattery ("Slattery") for the benefit of himself and/or various members of his family (the "Slattery Trusts"), and the Slattery Trusts in turn own approximately 79.896% of the stock of non-Debtor MLH.  Thus, at all relevant times, Slattery (including through MLH) and TA owned and controlled Millennium through Holdings.

### C.    The DOJ Investigation and Its Aftermath

3.    As a laboratory-based diagnostic testing company, Millennium is subject to substantial regulation and oversight by various federal and state government agencies.  These agencies regulate and oversee, among other things, licensure and operation of Millennium's clinical laboratories and monitor and investigate health care fraud including

---

[8]    See Patrick Fitzgerald, *Millennium Health's Bankruptcy Shows Dangers of Leveraged Loans*, WALL ST. J., Nov. 17, 2015, *available at* http://www.wsj.com/articles/millennium-healths-bankruptcy-shows-dangers-of-leveraged-loans-1447802994.

based on Millennium's participation in federal Medicare and Medicaid programs.  In addition to government oversight, private parties – including employees – may bring "whistleblower" suits alleging inappropriate billing practices and/or violations of certain federal and state statutes such as the federal False Claims Act, the federal "Anti-Kickback Statute," and the federal Ethics in Patient Referral Act (the "<u>Stark Law</u>"), which could result, *inter alia*, in criminal charges, civil monetary penalties with tripled fines, and Medicare/Medicaid program exclusion.

4.      It should not be surprising to think that it would be important to any decision to participate in the Existing Credit Agreement that Millennium's reported revenues and profitability were based on legal operations, were not inflated through illegal practices, and reasonably could be expected to recur at least at then-current levels essential to support the debt service on the Existing Credit Facility.  Nor should it be surprising that it would be important and material to a decision to extend credit that Millennium was in material compliance with the multitude of regulations to which it was subject, and that Millennium had not run afoul of the various government and regulatory agencies that could effectively shut down its business.

5.      As has become apparent over the last six months, however, Millennium for years operated in blatant disregard of federal and state laws, under the control of the Non-Debtor Equity Holders.  As alleged by the United States of America following a three-year federal investigation: "Since its founding, Millennium has knowingly submitted many millions of dollars' worth of false claims to the Medicare program . . . in violation of the [Stark Law], and the Anti-Kickback Statute . . . ."  Qui Tam Complaint, ¶ 2.  Moreover, "Millennium was warned by consultants, customers,

competitors, insurers and regulators that its marketing schemes were illegal. Millennium nonetheless pressured its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure." Qui Tam Complaint, ¶ 7. The United States alleged that this illegal culture "came from the top of the Company," <u>see</u> Qui Tam Complaint, ¶ 180, referencing, for example, then-CEO Slattery presiding over Millennium's 2012 National Sales Meeting, at which, among other things, Millennium's General Counsel[9] gave a presentation to employees – who could have brought whistleblower actions relating to Millennium's practices – that sent a clear message:

> Don't be a weasel. . . . I don't want to be on the other side of litigation from any of you. I hope you don't want to be on the other side of litigation with Millennium. There is no amount of time or resources we won't spend to hold our employees accountable. . . . [W]e will protect this company . . . .

Qui Tam Complaint, ¶ 182. The General Counsel's message was accompanied by an animated slide of a former employee with whom Millennium had been in litigation, depicted as a target with multiple gunshots to his head and body:



<u>See</u> Qui Tam Complaint, ¶ 181.

---

9    The Debtors presented the same General Counsel as one of the faces of the Debtors' bankruptcy case at the first-day hearing. <u>See</u> Transcript of Hearing Held November 12, 2015, at 4:22-23 (introducing Martin Price, the Debtors' General Counsel).

6.      In order to induce the Lenders to fund the Existing Credit Facility, in early 2014, the controlling Non-Debtor Equity Holders caused Millennium and Holdings to make false and misleading representations and warranties upon which *inter alia* the closing of the Existing Credit Facility was conditioned.  For example:

> To induce the . . . Lenders to enter into this [Existing Credit] Agreement and to make the Loans . . . Holdings and the Borrower hereby jointly and severally represent and warrant to . . . each Lender that: . . .
>
> . . . [Millennium] is in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.
>
> No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or to the actual knowledge of Holdings or the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues … that would reasonably be expected to have a Material Adverse Effect.
>
> No written statement or information contained in this [Existing Credit] Agreement . . . or any other document, certificate or information furnished by or on behalf of any Loan Party to . . . the Lenders . . . for use in connection with the transactions contemplated by this Agreement . . . taken as a whole, contained as of the date of such statement, . . . any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein . . . not materially misleading in light of the circumstances under which such statements are made . . . .  There is no fact known to any Loan Party that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein.

<u>See</u> Existing Credit Agreement, §§ 4, 4.3(d), 4.6, 4.19.

7.      As has since been revealed, in stark contrast to those representations:

- Since early 2012, the United States Department of Justice (the "<u>DOJ</u>") had been conducting joint criminal and civil investigations of Millennium (the "<u>DOJ Investigation</u>");

- Throughout the DOJ Investigation, Millennium met with the DOJ "on numerous occasions" to discuss the allegations under investigation and produced to the DOJ approximately 11 million pages of documents;

- In December 2014, the DOJ confirmed to Millennium that the DOJ would pursue claims against Millennium;

- By February 2015, the Centers for Medicare & Medicaid Services ("CMS") notified Millennium that it was revoking Millennium's Medicare billing privileges based on billings submitted for 59 deceased patients; and

- On May 4, 2015, Millennium received a notification that its Medicare billing privileges also would be revoked on account of its alleged submission of fraudulent claims for services without valid physician orders.

See Disclosure Statement at 18.  Crucially, neither the fact nor the scope of the DOJ Investigation was disclosed to the Opt-Out Lenders at the inception of the Existing Credit Facility.[10]  Having already cashed out and extracted nearly $1.3 billion from the Debtors, the Non-Debtor Equity Holders effectively left the Lenders holding the bag.

### D.    The USA Settlement

8.    On May 20, 2015, Millennium entered into a term sheet with the United States government (through the DOJ) and various states to settle and resolve the federal and state claims against Millennium for payments totaling $256 million (the "USA Settlement Payment").  On October 16, 2015, consistent with the May 20 term sheet, the Debtors entered into a series of settlement agreements (the "USA Settlement Agreements") with various federal agencies and *qui tam* relators (the "USA Settlement Parties") to resolve the various claims related to the USA Investigation.  See Disclosure Statement, Ex. E.

9.    Thus, the Lenders now know that (a) without the DOJ settlement, Millennium was headed for "bet the company" litigation with the federal government, if it even could survive that long following revocation of its Medicare billing privileges, and (b) most of the money they lent to Millennium under pretense, including the pretense

---

[10]    See Laura J. Keller, *The Disastrous Loan Deal That Shows Wall Street Still Has a Wild West*, BLOOMBERG, July 16, 2015, http://www.bloomberg.com/news/articles/2015-07-16/jpmorgan-s-little-secret-on-a-loan-deal-that-went-very-wrong.

that there were no actual or threatened investigations that reasonably could have a Material Adverse Effect, had been distributed in large part to TA and to family trusts affiliated with Slattery.  The problem with the DOJ settlement was that Millennium itself couldn't afford to pay (of course, that would not be the case if the Non-Debtor Equity Holders had not shifted nearly $1.3 billion of loan proceeds into their own pockets barely one year prior, while Millennium was already two years deep into the criminal and civil DOJ Investigation).

10.    Apparently, the Non-Debtor Equity Holders saw the DOJ settlement and the threat of Medicare billing privilege revocation as levers to safeguard the nearly $1.3 billion payout they engineered in the midst of the DOJ Investigation.  In exchange for an aggregate $325 million partial refund to Millennium's estate – $256 million of which would fund the USA Settlement Payment, $50 million of which would be paid to certain Lenders for their early commitment to support Millennium's restructuring (and none of which would flow to the Opt-Out Lenders for the direct, i.e. non-derivative, claims they hold against the Non-Debtor Equity Holders, separate and apart from the Existing Credit Facility claims against the Debtors), the Debtors would fully and finally release all claims against the Non-Debtor Equity Holders, including but not limited to fraudulent conveyance or other claims through which Millennium (or its Lenders derivatively) could have sought to recover the Non-Debtor Equity Holders' nearly $1.3 billion special dividend.[11]

---

[11]    The Opt-Out Lenders are not objecting to the adequacy of the Non-Debtor Equity Holders' $325 million contribution as consideration for the releases of estate claims being given <u>by the Debtors</u>. However, even if the Court had jurisdiction to approve the proposed Third-Party Release, the Non-Debtor Equity Holders are providing no separate consideration for such releases.

**E.      The Plan**

11.      The economic crux of the Plan is the exchange of $1.752 billion of term loan principal indebtedness under the Existing Credit Facility for a new $600 million credit facility and the speculative equity value of the reorganized Debtors.  The Plan also calls for a $325 million partial refund by MLH and TA, which, as discussed above, will be used primarily to fund the USA Settlement Payment and an early commitment fee for Lenders that supported the Plan.

**F.      The Proposed Nonconsensual Third-Party Release**[12]

12.      Beyond insulating themselves from claims brought by or derivatively on behalf of Millennium, the Non-Debtor Equity Holders also seek to use their $325 million partial refund to the estate to hold the USA Settlement Agreements (and thus the Debtors' continued viability) hostage unless they also are guaranteed a free pass on other non-Debtors' direct claims against them for the Non-Debtor Equity Holders' (and others') own actionable conduct in connection with the Existing Credit Facility.  However, this cash (re)injection, which would not be necessary had the insiders not paid themselves nearly $1.3 billion, is now essential to fund a settlement by Millennium with the federal government *of the same material liabilities* that arose under the control of the Non-Debtor Equity Holders and were affirmatively denied in connection with the issuance of the Existing Credit Agreement.  Moreover, the Plan does not provide for, and the Non-Debtor Equity Holders are not providing, any separate consideration to the Opt-Out

---

[12]      The Plan Injunction and the Bar Order (as defined below) each purport to enjoin third parties from pursuing the claims that would be released by the Third-Party Release.  For brevity, the term "Third-Party Release" as used throughout this Objection refers to (a) the third-party release set forth in Article X.H of the Plan and (b) the Bar Order and Plan Injunction set forth in Article X.J and X.K of the Plan, respectively, to the extent they would enjoin or otherwise preclude non-Debtor third parties from pursuing claims proposed to be released by the third-party release set forth in Article X.H of the Plan.

Lenders for the proposed Third-Party Release of the Opt-Out Lenders' direct claims against other non-Debtors.

13.    The Plan contains (a) the Third-Party Release, which would release certain non-Debtor parties' claims against certain other non-Debtors, (b) a requirement that the Confirmation Order permanently enjoin the commencement or prosecution by any entity of any claims released pursuant to the Plan (the "<u>Bar Order</u>"), and (c) an injunction precluding all entities from commencing or continuing (among other claims) any claims released pursuant to the Plan (the "<u>Plan Injunction</u>").    Plan, Art. X.H, X.J, X.K. Ascertaining the full scope of the broad universe of claims and parties impacted by the Third-Party Release is nearly impossible and requires dissecting a veritable labyrinth of defined terms and scattered Plan provisions.    The Disclosure Statement provides little help in that regard because it contains no explanation of the claims and parties the Third-Party Release would release and enjoin.

14.    The Third-Party Release provides as follows (key defined terms in bold):

EFFECTIVE AS OF THE EFFECTIVE DATE, THE **THIRD PARTY RELEASING PARTIES** AND THEIR RESPECTIVE **RELATED PARTIES** SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE **RELEASED PARTIES**, AND THEIR RESPECTIVE **RELATED PARTIES** FROM ANY AND ALL **RELEASED CLAIMS** THAT ANY OF THE **THIRD PARTY RELEASING PARTIES** WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES . . . .

Plan, Art. H.

15.     The "Third Party Releasing Parties" are the non-Debtor third parties whose claims, in addition to the claims of their respective "Related Parties," would be released by the Third-Party Release, defined as follows:

> "Third Party Releasing Parties" means, collectively, the Holders of Claims against or with respect to or Equity Interests in the Debtors, including Non-Consenting Lenders.

Plan, Art. 1.169.

16.     The "Released Claims" affected by the Third-Party Release are defined as follows:

> "Released Claims" means (a) solely with respect to the Released Parties, any and all Core Released Claims[13] and (b) with respect to the Related Parties of the Released Parties, all Core Released Claims, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, the Restructuring Transactions and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement.  For the avoidance of doubt, Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agents as provided in Article V.O and Article VI.F of this Plan.

Plan, Art. 1.142

---

[13]    "Core Released Claims" include

collectively, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or Causes of Action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Effective Date arising out of, or in any way related to in any manner, the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, and the Restructuring Transactions and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto.  For the avoidance of doubt, Core Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agent as provided in Article V.O and Article VI.F of this Plan, any Retained Claims or claims against Excluded Parties.

Plan, Art. 1.34.

17.     The Plan defines the "Released Parties" benefiting from the Third-Party
Release as follows:

> "Released Parties" means, collectively, in each case solely in
> their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the
> Participating Lenders and Consenting Lenders; (e) Wilmington Savings
> Fund Society, FSB, in its capacity as the Administrative Agent; (f) Jeanne
> Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard Appel; (j)
> David Cohen; (k) Greg Stein, (l) Sunshine Alexis Stein; (m) Dr. Marvin
> Retsky; (n) Murray Rosenthal; (o) those persons serving as officers or
> managers of the Company as of the Closing Date or Effective Date, as
> applicable, (p) the Early Commitment Facility Agent, and (q) Brown
> Rudnick, LLP and FTI; provided, however, that in the event that an
> Excluded Party is also a Prepetition Lender under the Existing Credit
> Agreement, its status as a Participating Lender or a Consenting Lender
> shall not make it a Released Party for any purpose.

Plan, Art. 1.143.  The Disclosure Statement provides no explanation of who the Released

Parties are or why the Debtors believe the Released Parties are entitled to the benefits of

the Third-Party Release.

18.     The Third-Party Release purports to release claims (a) not only of the

Third Party Releasing Parties, but also of their "Related Parties," and (b) not only against

the Released Parties, but also against their Related Parties, defined as follows:

> "Related Parties" means, with respect to an Entity, collectively,
> current and former affiliates of such Entity, and such Entity's and
> such affiliates' predecessors, successors and assigns, subsidiaries,
> managed accounts or funds, current and former directors, principals,
> managers, officers, and equity holders (regardless of whether such
> interests are held directly or indirectly), equity holders' spouses, trusts,
> assigns, heirs, beneficiaries, members, partners, employees, advisory and
> observer board members, financial advisors, Kirkland & Ellis LLP, as
> attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA
> and its Related Parties (but for the avoidance of doubt, not as attorneys for
> Millennium), accountants, investment bankers, consultants,
> representatives, management companies, fund advisors and other
> professionals.  For the avoidance of doubt, none of the Excluded Parties[14]
> shall be a Related Party to any of the Released Parties.

---

[14]    "Excluded Parties" means any party not expressly identified as one of the Released Parties, or as a

Plan, Art. 1.141.

19.    The definition of "Related Parties" encompasses *eighty-six* different categories of persons and entities.[15]  Multiplying the laundry list of Released Parties by the myriad categories of Related Parties yields potentially thousands of parties entitled to the benefits of the Third-Party Release.  In addition, the Third Party Release would bind Related Parties of the Third Party Releasing Parties, even though such Related Parties are strangers to the Chapter 11 Cases, have no claims against the Debtors, and likely are not receiving any distributions under the Plan.  However, the Disclosure Statement provides no information to (a) identify the Related Parties of any of the Released Parties or the Third Party Releasing Parties, (b) explain why any Related Parties of Released Parties are entitled to the benefits of the Third-Party Release, or (c) explain why the Third Party Releasing Parties and their Related Parties should be deemed to have released claims against their will.

20.    The Debtors propose that the releases and injunctions in favor of the Non-Debtor Equity Holders will – contrary to applicable law, as discussed below – automatically bind each and every creditor of the Debtors, without any opportunity for creditors to opt out and regardless of whether they voted to reject the Plan.

---

Related Party of such Released Party, including but not limited to (a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan Chase Bank, N.A., in its individual corporate capacity and in its capacity as Prior Administrative Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) Suntrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i). Plan, Art. 1.54.

[15]    For a given entity, "Related Parties" includes (a) thirty categories of Related Parties, plus (b) twenty-eight categories of Related Parties of the entity's current affiliates, plus (c) twenty-eight categories of Related Parties of the entity's former affiliates.

G.    **The Bar Order and Plan Injunction**

21.    The Plan contains two additional provisions that would severely prejudice parties who have not consented to the Third-Party Release.  First, the Plan requires that the Confirmation Order permanently enjoin the commencement or prosecution of claims released pursuant to the Plan (the "Bar Order"), as follows:

> The Confirmation Order *shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders*, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, *of any claims or Causes of Action released pursuant to this Plan*, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H.  For the avoidance of doubt, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity  or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Lenders arising out of or in connection with any Retained Claims. . . .

Plan, Art. X.J (emphasis added).

22.    Second, the Plan contains an injunction permanently enjoining all entities from pursuing, among other claims, any claims or causes of action released pursuant to the Plan, as follows:

> EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT,

> CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED
> OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED,
> OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE
> PLAN OR THE CONFIRMATION ORDER. . . . BY ACCEPTING
> DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF
> AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE
> DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS
> INJUNCTION. . . .

Plan, Art. X.K (emphasis added).

**H.      Judgment Reduction**

23.      In addition, the Plan (apparently in contemplation of the reality that the Third-Party Release cannot actually be approved with respect to parties who have not consented to it) provides that if

> any [Opt-Out] Lender obtains a judgment pursuant to which MLH and/or
> TA become liable to a[n Opt-Out] Lender, MLH and/or TA shall be
> entitled to a dollar for dollar offset and credit against any such judgment in
> an amount equal to the product of: (x) the Pro Rata amount of that
> indebtedness under the Existing Credit Agreement that such [Opt-Out]
> Lender held and upon which its claim against MLH and/or TA is based[,]
> multiplied by (y) the Settlement Contribution.

Plan, Art. X.J (the "Judgment Reduction Provision").  As discussed below, the Judgment Reduction Provision exceeds the Court's jurisdiction and contravenes the acceptable judgment reduction mechanism in the Third Circuit.  In addition, the arbitrary formula proposed in the Plan, simply apportions to a given Lender a pro rata share of the Non-Debtor Equity Holders' $325 million partial refund of the special dividend, as though the funds went directly to the Lenders.  This methodology is inappropriate because none of the partial refund to the Debtors by the Non-Debtor Equity Holders will flow to the Opt-Out Lenders on account of their direct claims against the Non-Debtor Equity Holders.

-16-

## ARGUMENT

**I.    THE COURT DOES NOT HAVE JURISDICTION TO APPROVE THE THIRD-PARTY RELEASE OR RELATED PROVISIONS OF THE PLAN.**

24.    The jurisdiction of the Bankruptcy Courts is statutorily defined, and is confined to the boundaries of that statutory definition. Stern v. Marshall, 131 S.Ct. 2594, 2603 (2011) (noting that Bankruptcy Courts may only "hear and enter final judgments in all core proceedings arising under title 11, or arising in a case under title 11"); see also Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1945 (2015) (observing that "bankruptcy courts possess no free-floating authority to decide claims traditionally heard by Article III courts"); 28 U.S.C. § 157(a).  Rather, Bankruptcy Courts may only enter final judgments on non-core matters with the consent of the affected parties. Wellness, 135 S.Ct. at 1949.  Because the Third-Party Release would impact direct, non-bankruptcy claims held by non-Debtors against other non-Debtors and which would not trigger the Court's jurisdiction, the Court does not have jurisdiction to approve the Third-Party Release without the consent of the Third Party Releasing Parties.  The Opt-Out Lenders have not given such consent.

25.    Bankruptcy Courts have core jurisdiction over four specific types of matters: "(1) cases under [the Bankruptcy Code], (2) proceeding[s] arising under [the Bankruptcy Code], (3) proceedings arising in a case under [the Bankruptcy Code], and (4) proceedings related to a case under [the Bankruptcy Code]." Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004) (citation and internal quotation marks omitted); see also 28 U.S.C. § 1334(a)-(b).

26.    A proceeding solely between non-debtor parties based on non-bankruptcy law can never fall within a Bankruptcy Court's "arising under" jurisdiction.  Rather, such

proceedings can *only* lie within a Bankruptcy Court's "related to" jurisdiction, and then only "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate[.]" <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984) (citations omitted); <u>see also</u> <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190, 226 (3d Cir. 2004). The Third Circuit has reaffirmed the <u>Pacor</u> test, subject to the limitations discussed below. <u>See, e.g.</u>, <u>id.</u>; <u>In re Federal-Mogul Global, Inc.</u>, 300 F.3d 368 (3d Cir. 2002).

27.    The Court "cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party . . . actions against non-debtors." <u>Gillman v. Continental Airlines (In re Continental Airlines)</u>, 203 F.3d 203, 214, n. 12 (3d Cir. 2000). Thus, as a threshold issue to confirmation of the Plan, the Court must evaluate whether it has jurisdiction to release and enjoin claims of non-consenting non-Debtors against other non-Debtors. The Opt-Out Lenders respectfully submit that the Court does not have such jurisdiction and thus should not confirm the Plan as proposed.

### A.    The Debtors have no indemnification obligation that could give rise to subject-matter jurisdiction.

28.    Notwithstanding the phrasing of the <u>Pacor</u> test, more than just a tenuous connection to a debtor's estate is necessary for an action between third parties to fall within the Court's "related to" jurisdiction. <u>See</u> <u>Combustion Eng'g</u>, 391 F.3d at 226. Rather, for "related to" jurisdiction to exist under the <u>Pacor</u> test, an action between third parties must *automatically* impact the estate without the need for a separate action (such as a lawsuit for indemnification or contribution) to impose liability on the debtor. <u>See</u> <u>id.</u> (noting that "the potentially expansive language in <u>Pacor</u> was subject to the limiting

principles announced in that case" and thus the Pacor test "inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of another lawsuit"). Where potential indemnification and contribution claims against a debtor have not yet accrued and "would require another lawsuit before they could affect . . . the bankruptcy estate," the Bankruptcy Court lacks "related to" subject-matter jurisdiction over the underlying dispute between non-debtor third parties.  Id.

29.     For instance, in Pacor, the putative action between non-debtors could have given rise to a claim for indemnification against the debtor.  Pacor, 743 F.2d at 995. However, the debtor's indemnification obligation would not have arisen automatically. Id.  Rather, a separate suit seeking indemnity would have been necessary for the debtor to become obligated.  Id.  The Third Circuit held that because the debtor *could not become bound automatically* by the action between third parties, the Bankruptcy Court lacked "related to" jurisdiction.  Id.; see also Combustion Eng'g, 391 F.3d at 227 ("Because the potential indemnification and contributions claims against [the debtors in Federal-Mogul] *had not yet accrued and would require another lawsuit before they could affect* [the] bankruptcy estate, we concluded the district court correctly held it lacked subject matter jurisdiction over the third-party . . . claims.") (emphasis added).

30.     Similarly, in Combustion Engineering, the Third Circuit held that a mere affiliate relationship between a debtor and a non-debtor was, by itself, insufficient to create "related to" jurisdiction over claims of third parties against the non-debtor affiliate. Combustion Eng'g, 391 F.3d at 228 ("A corporate affiliation between lateral, peer companies in a holding company structure, without more, cannot provide a sufficient basis for exercising federal subject matter jurisdiction.").

-19-

31.    The Opt-Out Lenders intend to file a complaint (the "Fraud Complaint")[16] asserting direct claims against the Non-Debtor Equity Holders and other defendants for, among other things, (a) the Non-Debtor Equity Holders' pattern of racketeering conduct by their use of Millennium as an enterprise to illegally take money through false pretenses, including Medicare and insurance fraud, as well as fraudulent inducement of the Lenders; (b) fraudulent inducement; (c) conspiracy to commit fraud; and (d) aiding and abetting fraud.    The Non-Debtor Equity Holders are not entitled to automatic indemnification for these claims.  See, e.g., County of Hudson v. Janiszewski, 351 Fed. Appx. 662, 665 (3d Cir. 2009) (affirming District Court decision holding there is no right to indemnification under RICO); Alten v. Ellin & Tucker, Chartered, 854 F.Supp. 283, 290 (D. Del. 1994) (holding that willful misconduct "cannot be indemnified").

32.    Moreover, the Debtors' purported attempt to provide a limited indemnity to the Non-Debtor Equity Holders and their Related Parties for the Opt-Out Lenders' direct claims against those non-Debtors (including claims for intentional torts) through the Plan, see Plan, Art. M, does not create "related to" jurisdiction over the improper Third-Party Release.  See Combustion Eng'g, 391 F.3d at 225 ("'Related to' jurisdiction must . . . exist *independently of any plan provision purporting to involve or enjoin claims against non-debtors*.") (emphasis added and citation omitted).   Indeed, the purported indemnification is no more than a pretextual attempt to create subject-matter jurisdiction where none exists.  This bootstrap argument is precluded under governing Third Circuit law and relies on the flawed circular reasoning that this newly created indemnification obligation – which is in the same unconfirmed Plan as the improper Third-Party Release

---

[16]    The Opt-Out Lenders will file a copy of the Fraud Complaint as a supplemental exhibit to this memorandum of law once the Fraud Complaint has been filed.

and thus does not yet obligate the Debtors to do anything – creates jurisdiction over the Third-Party Release.

33.    If that were the case, any chapter 11 debtor, together with controlling insider non-debtors, could simply contrive a scheme to create "related to" jurisdiction over non-debtors' claims against other non-debtors by proposing through a plan to indemnify the non-debtor defendants if they get sued and use that new, inchoate indemnification obligation to create "related to" jurisdiction to approve third-party releases.  As with the <u>Combustion Engineering</u> debtors' attempt to create subject-matter jurisdiction over non-debtors' claims against other non-debtors through a partial refund of the special dividend, couched as a plan contribution, <u>see</u> ¶¶ 35-40 below, "'[w]here a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.'"  <u>See</u> 391 F.3d at 228 (citations omitted). Permitting parties to create the "exceptional circumstances" several other circuits (but not the Third Circuit) have found to justify third-party releases and injunctions in rare cases, <u>see</u> <u>Continental</u>, 203 F.3d at 212-13, would permit the exception to swallow the rule.

34.    The Debtors have not demonstrated that any – much less all – of the vast group of proposed third-party Released Parties and their respective Related Parties[17] would be entitled to automatic indemnification by the Debtors in the event the Opt-Out Lenders obtain a judgment against them.  To the contrary, under non-bankruptcy law, the Debtors would not have an indemnification obligation for any of the types of intentional, fraud-based claims to be asserted by the Opt-Out Lenders in the Fraud Complaint. Moreover, the Debtors' attempt to bootstrap subject-matter jurisdiction over one Plan

---

[17]    To be clear, the Debtors have not even explained who all of the proposed non-Debtor releasees *are*, much less demonstrated why those parties are entitled to a sweeping release of claims against them by other non-Debtors.

provision by crafting another Plan provision is circular and must fail.  Accordingly, the

Court does not have "related to" subject-matter jurisdiction to release or enjoin the Opt-

Out Lenders' claims against non-Debtor defendants.  See Combustion Eng'g, 391 F.3d at

226.

> **B.**     **The Court does not have "related to" subject-matter jurisdiction based on any contributions to the Debtors' reorganization by the Released Parties or their Related Parties.**

        35.     Presumably, the Debtors intend to assert in support of confirmation that

the Non-Debtor Equity Holders' partial refund of the special dividend is so integral to the

Plan as to create "related to" subject-matter jurisdiction over the Third Party Releasing

Parties, their Related Parties, and their Released Claims against Released Parties and their

Related Parties.  This argument fails because (a) the Debtors, TA, and MLH cannot,

through their own agreement and without the consent of the affected third parties, confer

subject-matter jurisdiction on the Court where none exists and (b) none of the other

proposed Released Parties or their Related Parties are contributing anything to the

Debtors' reorganization.

        36.     The Third Circuit held in Combustion Engineering that a non-debtor's

monetary contribution to fund a debtor's reorganization, even if conditioned upon a third-

party release, is not sufficient to create "related to" jurisdiction where none otherwise

exists:

> Although [non-debtor] ABB Limited's contributions to the Asbestos PI
> Trust may depend on freeing [non-debtor affiliates] Lummus and Basic of
> asbestos liability, and [non-debtor ABB's] contributions may inure to the
> benefit of certain Combustion Engineering asbestos claimants, *these
> factors alone do not provide a sufficient basis for exercising subject
> matter jurisdiction.*  If that were true, a debtor could create subject matter
> jurisdiction over [claims against] *any* non-debtor third-party by structuring
> a plan in such a way that it depended upon third-party contributions.  As

we have made clear, "[s]ubject matter jurisdiction cannot be conferred by consent of the parties.  Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."

Combustion Eng'g, 391 F.3d at 228 (quoting Resorts Int'l, 372 F.3d at 161; citing Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court.")).  Thus, it is clear that in the Third Circuit, parties cannot simply create subject-matter jurisdiction over claims between non-debtors from whole cloth.

37.    In Combustion Engineering, the debtor proposed a plan of reorganization pursuant to which non-debtor ABB Limited would contribute $82 million worth of common stock, $250 million in cash, and another $100 million in cash if its future financial performance met certain benchmarks.  391 F.3d at 207.  The plan called for ABB's contribution to fund a trust for the benefit of asbestos claimants, to which the claimants' claims would be channeled pursuant to section 524(g) of the Bankruptcy Code.  Id. at 206.  The plan also called for a non-debtor affiliate of ABB to contribute approximately $10 million in cash and $105 million in indemnification, plus another approximately $38 million to pay asbestos claims attributable solely to two other non-debtors, Basic, Inc. ("Basic") and ABB Lummus Global, Inc. ("Lummus").

38.    The plan provided for third-party releases of claims held by those creditors against non-debtors Basic and Lummus and channeled those claims as well to an asbestos claimants' trust that the debtor Combustion Engineering proposed to establish pursuant to section 524(g) of the Bankruptcy Code.  Yet, the Third Circuit held that the non-debtor affiliates' contributions to the estate did not give the Bankruptcy Court subject-matter jurisdiction to approve the release of other non-debtors' claims against them, even when

certain of those non-debtors also held claims against the debtor and stood to benefit from Basic's and Lummus's contributions to the debtor to satisfy those non-debtor claims.

39.      Similarly here (although without the benefits of section 524(g) of the Bankruptcy Code), the Debtors have proposed a plan pursuant to which the Non-Debtor Equity Holders would refund a portion of the special dividend in order to fund (among other uses) the Debtors' payment of $256 million to resolve claims asserted by the federal government in connection with the DOJ Investigation.  See Disclosure Statement at 1.

40.      $227 million of the USA Settlement Payment constitutes consideration for the resolution of a number of *qui tam* actions against Millennium.  The *qui tam* settlement provides for the United States government and the relators in the *qui tam* actions to release not only Millennium, but also a number of its affiliates and insiders – including TA, MLH, and Slattery, among others.  See Disclosure Statement, Ex. E-2, at ¶ 3.  Thus, the Non-Debtor Equity Holders are funding the USA Settlement Payment not out of some benevolent devotion to sustaining the Debtors' business, but to secure a release from massive federal claims implicating them.  Funneling the USA Settlement Payment through the Debtors as "consideration" to fund the Plan is simply an artifice to attempt to justify the Third-Party Release and another attempt to bootstrap "related to" subject-matter jurisdiction where no jurisdiction exists.

**C.      The Court does not have jurisdiction to approve the Judgment Reduction Provision.**

41.      As currently drafted, the Judgment Reduction Provision would automatically provide the Non-Debtor Equity Holders with a pre-determined credit against any judgment the Opt-Out Lenders ultimately obtain against them.  See Plan, Art. X.J; ¶ 23 above.  The credit would be calculated as (a) the proportion of the principal

amount of the Existing Credit Facility held by the Opt-Out Lenders (approximately 6.07%) multiplied by (b) the Non-Debtor Equity Holders' $325 million partial refund of the special dividend.  Id.  Thus, TA and MLH would *automatically* receive approximately a $19.7 million judgment reduction credit,[18] without regard to any other party's proportional fault (i.e., even if TA and MLH are found to be 100% at fault), and even if applicable non-bankruptcy law provides for a lesser amount or prohibits judgment reduction entirely.[19]  In practice, the Judgment Reduction Provision is simply a "back door" through which the Non-Debtor Equity Holders seek to obtain a de facto partial release, contrary to applicable law and without the consent of the Opt-Out Lenders.

42.     This Court, as an Article I court, does not have jurisdiction to dictate the quantum of damage an Article III judge may award in separate, non-bankruptcy litigation between non-Debtor parties.  See Stern, 131 S.Ct. at 2603.  By preordaining both the entitlement of TA and MLH to a judgment reduction credit and the amount thereof, the Judgment Reduction Provision inappropriately attempts to strip the Article III court in which the Opt-Out Lenders intend to file the Fraud Complaint of the ability to render an appropriate judgment against TA and MLH.  The Court does not have jurisdiction to do so.  At most, the Plan should preserve whatever rights TA and MLH have, if any, to seek

---

[18]  The Opt-Out Lenders hold approximately $106.3 million, or 6.07%, of the principal indebtedness outstanding under the Existing Credit Facility.  Thus, the Judgment Reduction Provision would provide TA and MLH with a judgment reduction credit of 6.07% of $325 million, or approximately $19.7 million.  It is unclear from the language of the Judgment Reduction Provision whether this amount would be double-counted or allocated pro rata between TA and MLH.  In either instance, this arbitrary calculation methodology contravenes applicable law.

[19]  The Third Circuit generally recognizes proportional fault as the appropriate method of judgment reduction.  See, e.g., Eichenholtz v. Brennan, 52 F.3d 478, 487 (3d Cir. 1995).  Under that method, "*the jury*, in the non-settling defendants' trial[,] will assess the relative culpability of both settling and non-settling defendants, and the non-settling defendants will pay a commensurate percentage of the judgment."  Id. (emphasis added).  Thus, the determination of the amount of any judgment reduction credit to which TA or MLH may eventually be entitled is an issue for the trial court in which the Opt-Out Lenders file the Fraud Complaint to decide at the time of judgment, not for this Court to preordain based on an arbitrary formula invented by the Debtors and the Non-Debtor Equity Holders.

a judgment reduction credit pursuant to non-bankruptcy law, subject to the Opt-Out

Lenders' right to oppose any such request.

II.    **THE PLAN IS UNCONFIRMABLE BECAUSE THE THIRD-PARTY RELEASE, BAR ORDER, PLAN INJUNCTION, AND JUDGMENT REDUCTION PROVISION CONTRAVENE APPLICABLE LAW.**

43.    Even if the Court determines it has subject matter jurisdiction to approve

the Third-Party Release, the Plan is nevertheless unconfirmable because (a) the Court

cannot use Section 105 of the Bankruptcy Code to approve the Third-Party Release, a

substantive remedy that contravenes other provisions of the Bankruptcy Code; (b) the

Plan does not permit creditors to opt out of the Third-Party Release; and (c) there is no

basis to approve the Third-Party Release nonconsensually.

A.    **The Third-Party Release is impermissible because the Court cannot use Section 105 of the Bankruptcy Code to create new substantive remedies that contravene other provisions of the Bankruptcy Code.**

44.    Section 105(a) of the Bankruptcy Code permits Bankruptcy Courts to

"issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code.]"    In doing so, however, the Court cannot use

section 105(a) to craft new remedies that contravene existing statutory provisions.  Law

v. Siegel, 134 S.Ct. 1188, 1194 (2014).  Rather, "[i]t is hornbook law that § 105(a) 'does

not allow the bankruptcy court to override explicit mandates of other sections of the

Bankruptcy Code.'"    Id. (quoting 2 COLLIER ON BANKRUPTCY ¶ 105.01[2] (16th ed.

2013)); see also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206-07 (1988)

("[W]hatever equitable powers remain in the bankruptcy courts must and can only be

exercised within the confines of the Bankruptcy Code."); Combustion Eng'g, 391 F.3d at

236 ("[T]he equitable powers authorized by § 105(a) are not without limitation, and

courts have cautioned that this section 'does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law . . . .''") (citation omitted).  Although section 105(a) permits Bankruptcy Courts to enter orders necessary "to carry out" the provisions of the Bankruptcy Code, "it is quite impossible to do that by taking action that the Code prohibits."  <u>Law</u>, 134 S.Ct. at 1194.

45.    The Bankruptcy Code expressly grants Bankruptcy Courts the ability to enjoin non-debtors' claims against other non-debtors only under very specific circumstances and solely with respect to asbestos-related liability.  11 U.S.C. § 524(g); <u>In re Metromedia Fiber Network, Inc.</u>, 416 F.3d 136, 141-42 (2d Cir. 2005); <u>Combustion Eng'g</u>, 391 F.3d at 236 n.48.  In all other circumstances, the Bankruptcy Code expressly provides that the discharge of a debtor's indebtedness "does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).

46.    The Court cannot use section 105(a) to circumvent the restriction imposed by section 524(e).  <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 335 (Bankr. D. Del. 2004) ("Keeping in mind the Third Circuit's analysis that section 524(e) specifically limits the scope of the discharge, and that the Bankruptcy Code does not contemplate a discharge of nondebtors, this court holds that plans of reorganization may not contain provisions which discharge nondebtors.") (quoting <u>In re Arrowmill Dev. Corp.</u>, 211 B.R. 497, 506 (Bankr. D.N.J. 1997)); <u>Arrowmill</u>, 211 B.R. at 506 ("While . . . there may be very good policy reasons for providing a discharge to a nondebtor, the court is constrained by the plain language of 11 U.S.C. § 524 . . . ."); <u>see also</u> <u>Combustion Eng'g</u>, 391 F.3d at 236 n.48 ("Outside the context of § 524(g), § 524(e) provides statutory authority for limiting the extension of bankruptcy relief to non-debtors."); <u>In re Zale</u>

Corp., 62 F.3d 746, 760-61 (5th Cir. 1995) ("Section 524 prohibits the discharge of debts of nondebtors.  Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor.").

47.    The Zale court noted that a *temporary* injunction of third parties' claims against other third parties may be permissible under certain circumstances; however, a temporary injunction does not "effectively discharge[] a nondebtor" and thus does not run afoul of section 524(e) of the Bankruptcy Code.  See Zale, 62 F.3d at 760 (quoting In re Western Real Est. Fund, Inc., 922 F.2d 592, 601-02 (10th Cir. 1990)).  The Western Real Estate court distinguished temporary stays *during* chapter 11 cases from permanent injunctions barring non-debtors from *ever* pursuing claims against other non-debtors:

> [W]hile a temporary stay prohibiting a creditor's suit against a nondebtor . . . during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) . . ., *the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor.*  Not only does such a permanent injunction improperly insulate nondebtors *in violation of section 524(e)*, it does so without any countervailing justification of debtor protection . . . .

Western Real Est., 922 F.2d at 601-02 (emphasis added).

48.    As discussed above, the Third-Party Release would release, and thus the Plan Injunction and Bar Order would enjoin, non-consenting non-Debtors' claims against other non-Debtors in a manner functionally identical to granting a bankruptcy discharge to the myriad Released Parties, who are not debtors in bankruptcy, in direct contravention of the dictates of section 524(e) of the Bankruptcy Code.  Accordingly, the Court should not confirm the Plan unless the Third-Party Release is excised or the Opt-Out Lenders are afforded the opportunity to opt out of the Third-Party Release.

B.      **The Plan must permit creditors to opt out of the Third-Party Release.**

49.     As proposed, the Third-Party Release would bind *all* creditors, with no opportunity to opt out of granting the release.  See Plan, Art. 1.169, Restructuring Support Agreement at 3 (definition of "Third Party Releasing Parties" under the Plan includes, among others, "Non-Consenting Lenders" that do not approve the Plan and the Third-Party Release); Art. X.A (Plan binds all holders of claims against the Debtors "notwithstanding whether or not such holder . . . affirmatively voted to reject the Plan"). This mandatory mechanism is impermissible and precludes confirmation of the Plan.

50.     Releases of a non-debtor's claims against another non-debtor are impermissible absent the consent of the party whose claims are being released.  See, e.g., In re Wash. Mut., Inc., 442 B.R. 314, 352 (Bankr. D. Del. 2011); Coram, 315 B.R. at 335-36 ("[T]o the extent the . . . Plan seeks approval of a release by third parties of claims . . . they may have against [other non-debtors] (other than derivative claims which the Trustee has waived), it cannot be approved."); see also In re Exide Techs., 303 B.R. 48, 73-74 (Bankr. D. Del. 2003) (declining to approve third-party release and injunction that bound creditors who rejected the plan).  Rather, such releases "must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)." Wash. Mut., 442 B.R. at 352; see also In re Indianapolis Downs, LLC, 486 B.R. 286, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor *upon consent of the party affected.*") (emphasis added); In re Spansion, Inc., 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("Courts have determined that a third party release may be included in a plan

if the release is consensual and *binds only those creditors voting in favor of the plan*.")
(emphasis added).

51.     Some courts in this District have found that failure to vote to reject a plan
containing third-party releases constitutes tacit consent to be bound by such releases in
the event the plan is confirmed.  See, e.g., Spansion, 426 B.R. at 144.[20]  However, the
inverse is also true:  Forced consent is no consent at all.  A party that has expressly
voiced its objection to a plan containing a third-party release cannot be bound by that
release because it has not consented to grant the release.  Wash. Mut., 442 B.R. at 354-55
(finding that a third-party release is effective only with affirmative consent by "voting in
favor of the Plan *and* not opting out of third party releases.") (emphasis added); cf.
Spansion, 426 B.R. at 144 (noting that "the silence of the unimpaired [and thus
nonvoting] classes . . . is persuasive").

52.     Faced with a plan containing third-party releases that, like the Third-Party
Release, purported to bind even creditors that expressly indicated they did not want to
grant the release, the Washington Mutual court noted that

> This Court has previously held that it does not have the power to grant a
> third party release of a non-debtor. . . . Rather, any such release *must be
> based on the consent of the releasing party (by contract or the mechanism
> of voting in favor of the plan)*. . . . Therefore, the original language in the
> Plan that would mandate third party releases even in the place of an
> indication on the ballot that the party did not wish to grant the release
> would not pass muster.

442 B.R. at 352 (emphasis added).

---

[20]     But see Wash. Mut., 442 B.R. at 355 ("Failing to return a ballot is not a sufficient manifestation of
consent to a third party release.").  The likely explanation for this distinction is that the nonvoting
creditors in Spansion were being paid in full and never objected to the third-party release.  See
Spansion, 426 B.R. at 144.  Here, the Opt-Out Lenders are not being paid in full and have expressly
objected to the Third-Party release.  Thus, even a failure to vote likely could not be construed as tacit
consent to the Third-Party Release.

53.    This rule is simply the logical endpoint of the lack of subject-matter jurisdiction discussed in Point I above.  If the Court lacks subject-matter jurisdiction to forcibly release non-Debtors' claims against other non-Debtors, the only way the Court can approve such a release through the Plan is by consent – essentially making the releases a contractual provision that creditors have the option to carve themselves out of.

54.    As in <u>Washington Mutual</u>, the Plan purports to bind non-Debtor entities to the Third-Party Release not only if they fail to vote to accept or reject the Plan, but even if they affirmatively vote, as the Opt-Out Lenders did, to reject the Plan.  There is no legal basis for such a release.  Accordingly, the Court should not confirm the Plan unless the Opt-Out Lenders are provided an opportunity to opt out of the Third-Party Release.

**C.    Even if the Plan provided an opt-out mechanism, there is no basis to approve the Third-Party Release.**

55.    In <u>Continental</u>, the Third Circuit surveyed case law from jurisdictions that permit and prohibit third-party releases.  <u>See</u> <u>Continental</u>, 203 F.3d at 212-14.  However, the <u>Continental</u> court neither ruled on the permissibility of third-party releases nor suggested how it might rule, finding instead that the releases at hand "[we]re so clearly invalid under any standard, we need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  <u>Id.</u> at 214 n.11.

56.    Some courts have interpreted the Third Circuit's dicta in <u>Continental</u> as a suggestion that the Third Circuit *might* approve a non-consensual third-party release if the "hallmarks" other courts have considered in approving such releases were present. <u>See, e.g.</u>, <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 603 (Bankr. D. Del. 2001). However, "[that] reservation was made in the context of a comment about the releases

and permanent injunctions issued in mass litigation cases such as <u>Robins</u>, <u>Manville</u> and <u>Drexel</u>." <u>Id.</u>; <u>see</u> <u>Continental</u>, 203 F.3d at 212-214, 214 n.11.  As the <u>Continental</u> court noted, even if permissible, any release or injunction limiting the liability of a non-debtor to another non-debtor "is a 'rare thing' that should not be considered absent 'a showing of exceptional circumstances'[.]"  <u>Continental</u>, 203 F.3d at 213 n. 9.  No such circumstances existed in <u>Continental</u>, and no such circumstances exist here.

57.    The cases in which courts found "exceptional circumstances" warranting approval of non-consensual third-party releases involved "widespread claims against co-liable parties" and "[a] central focus of these . . . reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties."  <u>Id.</u> at 212-13 (citing <u>In re Drexel Burnham Lambert Group, Inc.</u>, 960 F.2d 285, 293 (2d Cir. 1992); <u>In re Johns-Manville Corp.</u>, 843 F.2d 636, 640, 649 (2d Cir. 1988); <u>In re A.H. Robins Co.</u>, 880 F.2d 694, 702 (4th Cir. 1989)).

58.    By contrast, the Debtors here are not seeking to globally resolve mass tort liability involving co-liable parties.  Rather, the Debtors are seeking approval of releases and injunctions that would exonerate certain of their insiders for their own *independent liability* for fraud in connection with the Debtors' entry into the Existing Credit Facility by eviscerating the Opt-Out Lenders' direct, independent claims against other non-Debtors.  The Debtors have made no showing of any circumstances (other than their principals' and affiliates' desire to be absolved of direct liability for fraud) warranting approval of the non-consensual Third-Party Release, much less the "exceptional circumstances" the <u>Continental</u> court observed in decisions from other circuits, because no such circumstances exist here.

### III.    THE    COURT    SHOULD    NOT    APPROVE    THE    DISCLOSURE STATEMENT.

59.    The Disclosure Statement should not be approved for two reasons.  First, the Disclosure Statement does not contain adequate information for a creditor to make an informed judgment about the Plan.  Second, even if it contained a fulsome disclosure of the myriad releasees, releasors, and released claims, the Disclosure Statement nevertheless should not be approved because the Third-Party Release renders the Plan described in the Disclosure Statement patently unconfirmable.

### A.    The Disclosure Statement should not be approved because it describes an unconfirmable Plan.

60.    Courts generally will not approve a disclosure statement describing a plan that cannot be confirmed, regardless of the extent of disclosure.  See John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 157 (3d Cir. 1993); see also In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); In re Market Square Inn, Inc., 163 B.R. 64 (Bankr. W.D. Pa. 1994) (concluding that where a plan was unconfirmable, it is "appropriate to refuse approval of the disclosure statement"); In re 266 Wash. Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."), aff'd, 147 B.R. 827 (E.D.N.Y. 1992).

61.    The purpose behind this rule is simply common sense: Courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that — even if

unanimously accepted by creditors — could never be confirmed.  See, e.g., In re Main Street AC, Inc., 234 B.R. at 775; In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

62.     As discussed in Part I above, the Plan is unconfirmable because it provides no opportunity for creditors to opt out of the Third-Party Release and because there is no basis to approve the Third-Party Release.  See ¶¶ 24-58 above.  Accordingly, the Court should not approve the Disclosure Statement.

**B.     Even if the Plan were confirmable, the Disclosure Statement lacks adequate information regarding the impact of the Third-Party Release.**

63.     A chapter 11 debtor may only solicit votes to accept or reject a chapter 11 plan of reorganization once the Court has approved the debtor's written disclosure statement for that plan as containing "adequate information."   11 U.S.C. § 1125(b). Section 1125(a) of the Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a).

64.     The Third Circuit has emphasized the importance of adequate disclosure, stating that, given the reliance creditors and bankruptcy courts place on disclosure statements, "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information."  In re Oneida Motor Freight, Inc., 848 F.2d 414, 417 (3d Cir. 1988).

65.     Although courts assess adequacy on a case-by-case basis, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).  In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

66.     Here, the Disclosure Statement devotes only three paragraphs to the Dividend Recapitalization, including only a cursory reference to the fact that the Debtors paid a special dividend in connection with that series of transactions.  See Disclosure Statement at 17 ("The Proceeds from the Existing Credit Agreement were primarily utilized to satisfy all of the Company's outstanding obligations under the 2013 Credit Facility and to pay a special dividend to stockholders.").  The Disclosure Statement completely fails to discuss:

- the amount of the nearly $1.3 billion special dividend paid in connection with the Dividend Recapitalization,

- the recipients of the special dividend,

- the fact that the Debtors failed to disclose to the lenders in the Dividend Recapitalization the material fact that the federal government was investigating the Debtors' business, which threatened the Debtors' very existence, at the same time the Debtors borrowed $1.8 billion to pay a $1.3 billion dividend, and falsely represented that no such investigation or litigation was pending or threatened;

- the fact that, through the Third-Party Release, the Debtors are proposing to release any and all claims related to the $1.3 billion special dividend – beyond claims by the Debtors or derivative claims – in exchange for a payment of $325 million, or

- the nature and value of the myriad other claims the Debtors seek to unilaterally foreclose through the Third-Party Release.

In light of the fact the Third-Party Release is allegedly a fundamental component of the Plan, it is telling that this information is available in the press but not in the Disclosure Statement, particularly since fulsome disclosure on each of these topics is absolutely essential for voting creditors to make an informed judgment about the Plan.

67.    In addition, the Disclosure Statement does not comply with Bankruptcy Rule 3016(c), which provides that

> [i]f a plan provides for an injunction against conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction.

Fed. R. Bankr. P. 3016(c); see also In re Lower Bucks Hosp., 471 B.R. 419, 460 (Bankr. E.D. Pa. 2012).[21]

68.    The sections of the Disclosure Statement that describe the Third-Party Release and the Plan Injunction are in capital letters, but are not in "bold, italic, or underlined text" as expressly mandated by Bankruptcy Rule 3016(c).  In addition, the description of the Plan Injunction in the Disclosure Statement does not "describe in specific and conspicuous language . . . all acts to be enjoined" pursuant to the Plan Injunction and the Bar Order.  The Disclosure Statement does not describe with specificity *any* acts to be enjoined by the Plan Injunction and Bar Order.

---

[21]    The Lower Bucks court noted that although Bankruptcy Rule 3016(c) purports to address only injunctions, "[i]ts purpose is to alert parties in interest that the plan purports to restrict their rights in ways that ordinarily would not result from confirmation of a plan."   471 B.R. at 460.  As here, "[w]hether 'enjoined' or merely 'released,' in this case, the Plan was designed to deprive [third parties] of their right to prosecute a claim against a non-debtor."  Id.  Here, the Plan purports to both release non-Debtors' claims against non-Debtors and enjoin the future prosecution of such claims.  See ¶ 13 above.  Thus, Bankruptcy Rule 3016(c) applies to the presentation of both the Third-Party Releases and the Plan Injunction in the Plan and Disclosure Statement.

69.     Rather, to ascertain the types of claims the Third-Party Release would release, and thus that the Plan Injunction and the Bar Order would bar after the effective date of the Plan, a hypothetical creditor must first ascertain whether a particular claim or remedy is one "released or to be released, exculpated or to be exculpated, or discharged or to be discharged pursuant to the Plan or the Confirmation Order."  See Disclosure Statement at 82.  If the answer to each of these laborious inquiries is "Yes," then the Plan Injunction and Bar Order would enjoin the creditor from asserting the claim.

70.     In practice, the analysis is far more complicated.  To ascertain whether a claim is a Released Claim against a Released Party or a Related Party of a Released Party, a hypothetical creditor must determine (a) whether the creditor itself is a "Third Party Releasing Party" (or whether any other party it may be concerned about is a "Related Party" of the creditor itself), (b) whether the claim it seeks to assert is a "Released Claim," and (c) whether the party against which they seek to assert the claim is a "Released Party" or a "Related Party" of a Released Party.  See id. at 80-81.

71.     Answering these questions requires creditors to turn to the Plan and locate the meanings of numerous defined terms.  See Plan, Art. 1.169 ("Third Party Releasing Parties"), 1.142 ("Released Claims"), 1.143 ("Released Parties"), and 1.141 ("Related Parties").  Each of these defined terms uses other defined terms, leading creditors down a byzantine path of cross references among various documents.  See ¶¶ 13-23 above.

72.     It is impossible for a creditor to ascertain the full universe of releasing parties, released parties, and released claims from the Disclosure Statement.  It is impossible to do so even after an exhaustive analysis of the Plan.  Thus, even after navigating the Debtors' linguistic maze, a hypothetical creditor may well have no idea

whether its claim is a Released Claim against a Released Party or a Related Party of a Released Party, particularly where the definition of "Released Parties" includes numerous individuals identified only by name and the definition of "Related Parties" includes an incredibly broad group of persons and entities who might have had *some* tangential contact with one another.  See ¶¶ 18-19 above.

73.    The end result of this analysis is clear:  If a hypothetical creditor seeking to bring a claim after the Plan has gone effective could not reasonably ascertain, even after navigating numerous provisions of multiple documents, whether the Plan has released a particular claim against a particular defendant, there is no way a hypothetical creditor attempting to evaluate the impact of the Plan could cast an informed vote. Absent (a) substantial modifications to the Disclosure Statement to rectify the Debtors' failure to disclose the scope and impact of the Third-Party Release with even a modicum of clarity and (b) modification of the Plan to permit the Opt-Out Lenders to opt out of the Third-Party Release, the Court should not approve the Disclosure Statement.

## IV.    THE COURT SHOULD NOT APPROVE THE CLASS 2 BALLOT.

74.    The Class 2 Ballot failed to provide holders of claims under the Existing Credit Facility with the ability to opt out of the Third-Party Release.  For the reasons set forth above, such failure renders the Plan unconfirmable.  See ¶¶ 49-54 above.  Because the Plan is unconfirmable, the Class 2 Ballot is a nullity.  Accordingly, the Court should not approve the form of Class 2 Ballot unless the Plan is modified to provide that creditors in Class 2 that voted to reject the Plan are not subject to the Third-Party Release.

## RESERVATION OF RIGHTS

75.    By submitting this Memorandum of Law, the Opt-Out Lenders do not consent to the entry of a final judgment or order on any issue, including but not limited to confirming the Plan, if it is determined that this Court, absent the consent of the parties, lacks jurisdiction to enter a final order or judgment consistent with Article III of the United States Constitution.  **FOR THE AVOIDANCE OF DOUBT, THE OPT-OUT LENDERS DO NOT CONSENT, AND HEREBY OBJECT, TO THE THIRD-PARTY RELEASE, BAR ORDER, AND PLAN INJUNCTION (TO THE EXTENT THE BAR ORDER AND/OR PLAN INJUNCTION WOULD IMPAIR THE OPT-OUT LENDERS' DIRECT CLAIMS AGAINST NON-DEBTOR ENTITIES).**

76.    As the Debtors have not yet filed their brief in support of confirmation of the Plan (the "Confirmation Brief"), the Opt-Out Lenders reserve the right to file a supplemental memorandum of law responding to the Confirmation Brief in advance of the hearing on confirmation of the Plan.

*[ **remainder of page intentionally left blank** ]*

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Opt-Out Lenders respectfully request that the Court (a) decline to confirm the Plan and (b) decline to approve the Disclosure Statement and Class 2 Ballot unless, at a minimum, the Debtors amend the Plan to permit the Opt-Out Lenders to opt out of the Third Party Release. Proposed modifications to the Plan to resolve the Objection are set forth on Exhibit B.

Dated: December 4, 2015                    Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**
Sharon L. Levine, Esq.
Sheila Sadighi, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: 973-597-2500 Fax: 973-597-2400
slevine@lowenstein.com
ssadighi@lowenstein.com
abehlmann@lowenstein.com
*Counsel to the Opt-Out Lenders*[22]

**WHITEFORD, TAYLOR & PRESTON LLC**
  */s/ Christopher M. Samis*
Christopher M. Samis, Esq. (Del. Bar No. 4909)
L. Katherine Good, Esq. (Del. Bar No. 5101)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel: 302-353-4144 Fax: 302-661-7950
csamis@wtplaw.com
kgood@wtplaw.com
*Delaware Counsel to the Opt-Out Lenders*

---

[22]    As to all of the Opt-Out Lenders other than Axis Specialty Limited, which is represented in this matter solely by Whiteford, Taylor & Preston LLC.