**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MILLENNIUM LAB HOLDINGS II, LLC, et al. | : | Case No. 15-12284 (LSS) |
| | : | |
| Debtor. | : | (Jointly Administered) |

**TA MILLENNIUM, INC. JOINDER AND BRIEF IN SUPPORT OF PLAN CONFIRMATION AND IN OPPOSION TO VOYA'S PLAN OBJECTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ........................................................................................................................ 6

I. This Court Has Subject Matter Jurisdiction to Grant the Releases and Injunctions ........... 6

II. The Extraordinary Circumstances of this Case Warrant Non-Consensual Third Party Releases ........................................................................................................................ 9

A. There is an Identity of Interest Between TA and the Debtors' Estates ................. 12

B. TA Is Making Substantial Contributions to the Debtors' Reorganization ............ 13

C. The Releases and Injunctions in Favor of TA Are Essential to the Debtors' Reorganization ........................................................................................ 15

D. An Overwhelming Majority of Creditors Support the Plan and the Releases ....... 18

E. The Plan Fairly Treats the Third Party Releasing Parties .................................... 18

1. Voya's Assertions About Its Claims are Misleading and Incorrect .......... 20

2. The Non-Consensual Releases and Injunctions are Fair and Equitable With Respect to Voya .................................................................... 26

CONCLUSION ...................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airadigm Comm's, Inc. v. FCC (In re Airadigm Comm's, Inc.)*,
616 F.3d 642 (7th Cir. 2008) ....................11

*Bank of N.Y., Mellon Trust Co. v. Becker (In re Lower Bucks Hosp.)*,
488 B.R. 303, *aff'd* 2014 U.S. App. LEXIS 12633 (3d Cir. July 3, 2014)....................7

*In re Catholic Diocese of Wilmington*,
484 B.R. 629 (D. Del. 2012)....................10

*In re CD Liquidation Co.*,
2012 Bankr. LEXIS 5924 (Bankr. D. Del. Dec. 28, 2012)....................25

*Celotex Corp. v. Edwards*,
514 U.S. 300 (U.S. 1995) ....................6

*In re Combustion Eng'g*,
391 F.3d 190 (3d Cir. 2004) ....................6, 8, 9

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ....................12

*Crescent Res. Litig. Trust v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013)....................23

*Feldman v. Cutaia*,
951 A.2d 727 (Del. 2008)....................25

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ....................11

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
203 F.3d 203 (3d Cir. 2000) ....................*passim*

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ....................12

*Martin v. Martin (In re Martin)*,
91 F.3d 389 ....................4

*Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*,
No. 02-02-22582, 2006 WL 2516386 (Bankr. W.D.N.Y. Aug. 28, 2006)....................23

*Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*,
692 F.3d 283 (3d Cir. 2012) ....................26

*Pacor, Inc. v. Higgins*,
743 F.2d 984 (3d Cir. 1984) ....................6, 8

*In re Resorts Int'l*,
372 F.3d 154 (3d Cir. 2004) ....................6

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ....................10

*Things Remembered v. Petrarca*,
516 U.S. 124 (U.S. 1995) ....................6

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ....................10, 11, 12

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012)....................26

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
591 F.3d 164 (3d Cir. 2009) ....................7

*Walton v. Houlihan, Lokey, Howard & Zukin (In re UA Theatre Co.)*,
315 F.3d 217 (3d Cir. 2003) ....................10

*In re Zenith Elec. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ....................10, 13

**Statutes**

11 U.S.C. § 105(a) ....................12

11 U.S.C. § 1123(a)(5)....................12

11 U.S.C. § 524(e) ....................11

28 U.S.C. § 157 ....................6

28 U.S.C. § 1334(b) ....................6

**Other Authorities**

Duff Wilson, *U.S. drug testing firm probed for alleged fraud, intimidation*,
REUTERS, Nov. 16, 2012, available at www.reuters.com/article/us-millenium-investigation-idUSBRE8AF0XQ20121116# SjDGQjzdi6iy6Qp5.99 (last visited Dec. 7, 2015)....................3, 23

TA Millennium, Inc. ("TA"), by and through its undersigned counsel, hereby responds to the Memorandum of Law filed by those certain funds and accounts managed by Voya Investment Management Co. LLC and Voya Alternative Asset Management LLC (collectively "Voya") on December 4, 2015 [ECF No. 122] (the "Voya Objection") and writes in support of confirmation of the Prepackaged Joint Plan of Reorganization (the "Plan") of Millennium Lab Holdings II, LLC its debtor affiliates (collectively, the "Debtors").[1] TA hereby joins in and adopts by reference the arguments made in the Debtors' Response to Voya Objection to Confirmation of Proposed Chapter 11 Plan (the "Debtor's Response") and other filings in support of Plan confirmation. In further support of confirmation of the Plan and approval of the third party releases, bar orders, and contribution claim protections contained in Article X of the Plan (the "Releases and Injunctions"), TA respectfully states as follows:

**PRELIMINARY STATEMENT**

TA has committed to contribute over $145 million[2] and to relinquish its equity interests in the Debtors in order to restructure the Debtors' businesses, right-size the Debtors' balance sheet, resolve threatened litigation, and maintain the Debtors' rights to participate in and seek reimbursement from the Medicare and Medicaid programs. These substantial contributions are absolutely essential to achieve a successful and prompt restructuring in these chapter 11 cases. Without TA's and MLH's contributions, the Debtors could not settle the litigation claims asserted by the USA and certain states before those parties' imposed December 30, 2015

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] TA and Millennium Lab Holdings, Inc. ("MLH"), the owners of all of the Class A and B Units of Holdings, are contributing to the $325 million Settlement Contribution according to their respective equity positions. Accordingly, TA's 45% and MLH's 55% approximate ownership stakes in Holdings result in funding commitments of $146.25 million and $178.75 million, respectively.

deadline. Thus, the Debtors could not prevent the revocation of the Debtors' Medicare and Medicaid billing privileges ("Medicare Billing Privileges"), which would cause rapid destruction of the value of the Debtors' businesses. Without TA's and MLH's contributions, the Debtors also could not settle the claims asserted by the Prepetition Lenders. Thus, the Debtors would not be in a position to deleverage their balance sheet and consensually transfer ownership and control of Millennium to the Prepetition Lenders, allowing the Reorganized Millennium to continue to operate, service customers, preserve jobs, and satisfy its creditors.

TA is willing to make its substantial contributions to fund and support the Plan only because doing so resolves litigation that has been threatened against TA and preserves value for the remaining stakeholders that would otherwise be destroyed. Put bluntly, the Releases and Injunctions contained in the Plan are the *quid pro quo* for TA making such a large contribution to these Debtors' estates, funding the settlements on which the Plan is based, and supporting the Plan. To give effect to this multi-party bargain, the Plan has been structured such that this Court's approval of the Releases and Injunctions in favor of TA and the other Released Parties is a precondition to TA's and MLH's obligations to fund and the Plan's effectiveness. The Releases and Injunctions are integral to the global settlements set forth in the RSA and embodied in the Plan, and were reached after extensive good faith negotiations and due diligence by and among the Debtors, the USA, the Ad Hoc Group of Prepetition Lenders, TA, and MLH.

The wisdom of the grand compromise struck among these sophisticated and well-represented parties is validated by the near universal support for the Plan. Holders of over 93% of Existing Credit Agreement Claims have voted in favor of the Plan and support the Releases and Injunctions. Voya, the lone objector, while supporting confirmation of the Plan and the benefits it will receive thereunder, opposes the Plan's third party releases and seeks to retain the

ability to sue TA and the other Released Parties following the conclusion of these chapter 11 cases. Voya wants to have its cake (the substantial benefits it is to receive under the Plan) and eat it too (by preserving claims against TA and MLH, the very parties that have made the Plan possible).

TA firmly believes that none of the creditors, including Voya, have viable claims against it arising from the dividend recapitalization and related transactions that closed in April 2014 (the "April 2014 Transactions"). Indeed, throughout its objection Voya uses the misleading term "Non-Debtor Equity Holders" – which is defined to include TA – to make irresponsible and incorrect accusations about TA. As an example, the Voya Objection states that the "Non-Debtor Equity Holders caused Millennium to make false and misleading representations" regarding DOJ investigation that was pending at the time of the closing of the April 2014 Transactions. First, TA was not a shareholder of any of the Debtors until after the April 2014 Transactions closed and did not sit on the Debtors' boards of directors or otherwise control the Debtors' actions.[3] Accordingly, TA had no control over the due diligence and disclosures that the Debtors provided to potential participants in the Existing Credit Agreement. Second, the existence of the DOJ's investigation was in no way withheld from Voya or other potential lenders. To the contrary, the pending DOJ investigation and the unproven and disputed allegations regarding the Debtors' business practices were public knowledge at the time of the April 2014 Transactions and had been prominently reported in the press. *See, e.g.*, Duff Wilson, *U.S. drug testing firm probed for alleged fraud, intimidation*, REUTERS, Nov. 16, 2012, available at www.reuters.com/article/us-millenium- investigation-idUSBRE8AF0XQ20121116# SjDGQjzdi6iy6Qp5.99 (last visited Dec.

---

[3] Upon the closing of the April 2014 Transactions, TA first became a minority owner of Holdings and obtained the right to one seat on the Holdings board of directors. In other words, both before and after the April 2014 Transactions, TA never had a majority or controlling interest in any of the Debtors.

7, 2015). Thus, there is no basis for Voya's allegation that "neither the fact nor the scope of the DOJ Investigation was disclosed to [Voya] at the inception of the Existing Credit Facility." Voya Objection at ¶ 7. Third, the DOJ's investigation and threatened litigation have not cost Voya a single penny because the USA Settlement Parties' claims will be fully and finally released as a result of the payments TA and MLH are making under the Plan – unless, of course, Voya is successful in destroying the Plan.

Notwithstanding Voya's baseless threats, if TA is forced to incur the cost, time, energy, and risk of litigation with Voya or any other creditor over the April 2014 Transactions or other matters relating to these Debtors, the benefit of making a $146.25 million contribution to fund a settlement of those very litigation claims would be completely undermined. If forced to endure the threat of litigation from Voya and other potential litigants, TA – which owes no fiduciary duties to the Debtors' stakeholders – will determine that it is a better use of its capital to forego the Plan and defend itself in court.

Simply put, Voya is attempting to gain advantage over the overwhelming majority of its co-lenders and in doing so is imperiling the Plan. This game of Russian Roulette has the potential to destroy hundreds of millions of dollars of value for these estates and result in years of costly and uncertain litigation rather than the swift and value-maximizing balance sheet restructuring provided for under the Plan. The facts and circumstances present here and the bankruptcy policy of encouraging consensual settlements does not support such a result. *See Martin v. Martin (In re Martin)*, 91 F.3d 389, 393 ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'") (internal citation omitted).

There can be no dispute that the non-consensual third party releases and other post-Effective Date litigation shields sought in these chapter 11 cases can be approved under governing Third Circuit precedent where the facts demonstrate that such releases are fair and necessary to the reorganization. *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) ("*Continental*"). The record before the Court establishes that the releases are fundamentally fair and necessary to this reorganization. That record includes the following facts:

(i) TA and MLH are making a massive contribution by co-funding the settlement of complex and high-stakes litigation, including the USA Settlement Agreements that allow for the preservation of the Debtors' Medicare Billing Privileges;

(ii) TA and MLH are facilitating a consensual transfer of control and a balance sheet restructuring;

(iii) All creditors other than the Existing Credit Agreement Claims and the MLH Tax Note Claim will be unimpaired;

(iv) The holders of Existing Credit Agreement Claims are being treated fairly, as evidenced by the Plan consideration to which that class is entitled and the fact that that class has voted nearly unanimously in favor of the Plan (other than Voya); and

(v) TA and MLH would not enable items (i) through (iv) in the absence of the releases, injunctions, bar order, and judgment credit protections provided for under the Plan.

The negotiations that preceded the development of the Plan were protracted, intense, and involved the Debtors, the Prepetition Lenders (by and through the Ad Hoc Group and its counsel), and the USA. Unlike in other large cases, all affected parties were at the negotiating table and one of the guiding principles to these integrated discussions was "global peace." Because of the high stakes involved for the very survival of these Debtors, these cases present the very "extraordinary" circumstances that warrant non-consensual third party releases under *Continental*. *Id*. at 212-13.

## ARGUMENT

### I. This Court Has Subject Matter Jurisdiction to Grant the Releases and Injunctions

By operation of reference from the district court, this Court has subject matter jurisdiction over proceedings "arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. §§ 157(a), 157(b), 1334(b). Here, the Court may exercise "related to" jurisdiction to grant the Releases and Injunctions and enjoin Voya and other third parties from bringing claims against TA and the other Released Parties in non-bankruptcy forums.

An action is "related to" a bankruptcy case where "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*," meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original).[4] *See also In re Combustion Eng'g*, 391 F.3d 190, 226 (3d Cir. 2004). As the Supreme Court has stated, "'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate, and that the 'related to' language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving the property of the debtor or the estate.'" *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (U.S. 1995) (quoting *Pacor*, 743 F.2d at 994).

---

[4] Although certain aspects of the *Pacor* decision were overruled by the U.S. Supreme Court in *Things Remembered v. Petrarca*, 516 U.S. 124 (U.S. 1995), the analysis of "related to" jurisdiction in *Pacor* remains good law that continues to be cited favorably by the Third Circuit and other courts around the country. *See In re Resorts Int'l*, 372 F.3d 154, 164 n.6 (3d Cir. 2004). Indeed, the Supreme Court agreed with the *Pacor* court's analysis of the scope of "related to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300 (U.S. 1995).

The Voya Objection completely ignores the fact that TA and MLH have contractual indemnity rights against the Debtors pursuant to each of the Debtors' operating agreements.[5] Those contractual provisions would require each of the Debtors to indemnify, defend, and hold TA[6] harmless from liability, damages, costs, and expenses (including attorneys' fees and other costs and expenses of defense) in the litigation Voya threatens to bring against TA and MLH. Accordingly, any claims asserted against TA or MLH by Voya or any other third party arising from the April 2014 Transactions would result directly in these indemnification claims being asserted against these estates to compensate TA for the costs of defending such litigation and to indemnify them against any losses.[7] *See Bank of N.Y., Mellon Trust Co. v. Becker (In re Lower*

---

[5] *See* Debtors' Response at Annex 1; the Supplemental Declaration of William Brock Hardaway filed contemporaneously with the Debtors' Response (the "Hardaway Decl.").

[6] This indemnity includes TA's direct and indirect partners, members, stockholders, directors, officers, employees, agents, and any individual or entity who controls any of them. *See, e.g.*, Amended and Restated Limited Liability Company Agreement of Holdings at ¶ 11.2, which is attached as an exhibit to the Hardaway Decl. Thus, Voya's complaint about the breadth of the Releases and Injunctions with respect to TA's "Related Parties" are without merit. *See* Voya Objection at ¶ 34.

[7] Although the Third Circuit has held that an inchoate common law right to indemnity does not in and of itself give rise to "related to" jurisdiction, the facts of those cases are easily distinguishable from the facts here. *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 172-73 (3d Cir. 2009) (collecting cases) ("an inchoate claim of common law indemnity is not, in and of itself, enough to establish the bankruptcy court's subject matter jurisdiction."; "there is no related-to jurisdiction over a third-party claim if there would need to be another lawsuit before the third-party claim could have any impact on the bankruptcy proceedings."). *W.R. Grace* and the cases upon which it relied involved situations in which the third party seeking protection from the bankruptcy court had no contractual indemnification rights and would need first to be held liable in the non-bankruptcy forum and second successfully bring an indemnification or contribution claim in the bankruptcy court under common law. *Id.* Here, TA and MLH's rights to indemnity are contractual and automatically give rise to claims against the estate for costs of defense without the need for the indemnified party to be found liable in the litigation or succeed on a separate lawsuit against the Debtors seeking such indemnification payments. *See id.* ("MCC had a clear contractual right to indemnity, which may have presented a more direct threat to Grace's reorganization. In the present case, by contrast, Montana has only a 'potential common law indemnification claim against Debtors pending the outcome of the state action, which falls far short of direct or

*Bucks Hosp.)*, 488 B.R. 303, 312, *aff'd* 2014 U.S. App. LEXIS 12633 (3d Cir. July 3, 2014) ("We conclude that the Bankruptcy Court had 'related to' jurisdiction over the third party release provision as part of LBH's plan of reorganization. This is because the filing of the class action against BNYM had an immediate effect on LBH's bankruptcy estate when it triggered BNYM's claim for defense costs against LBH."). Because TA's and MLH's contractual indemnity claims would automatically create liabilities for these Debtors' estates in favor of TA and MLH, this Court has "related to" jurisdiction to enjoin Voya and other third parties from commencing litigation that would give rise to such indemnity claims and impact the administration of these chapter 11 cases. In essence, a lawsuit against TA or MLH would be equivalent to a lawsuit against the Debtors.

Accordingly, Voya is incorrect in arguing that the parties are attempting to manufacture jurisdiction through the Plan's indemnity provisions; the necessary "related to" jurisdiction already exists by virtue of the indemnity requirements under the Debtors' operating agreements. *See* Voya Objection at ¶¶ 32-33. Voya's reliance on the *Combustion Engineering* case for the proposition that a non-debtor's contribution to a plan of reorganization conditioned on a release cannot alone create "related to" jurisdiction is similarly misplaced. In that case, the Third Circuit found "related to" jurisdiction lacking where the contributing parties seeking a release of potential asbestos liability were non-debtor sister corporations that did not have any contractual indemnification rights vis-à-vis the debtors. *Combustion Eng'g*, 391 F.3d at 229.[8] The basis for

---

automatic liability….'"); *Pacor*, 743 F.2d 984, 995 ("In this case, however, there would be no automatic creation of liability against Manville on account of a judgment against Pacor. Pacor is not a contractual guarantor of Manville, nor has Manville agreed to indemnify Pacor, and thus a judgment in the Higgins-Pacor action could not give rise to any automatic liability on the part of the estate.").

[8] The Third Circuit in *Combustion Engineering* also rejected the claim that shared insurance between the debtors and the prospective releasees was sufficient to create "related to"

this Court's jurisdiction to grant the Releases and Injunctions is the aforementioned contractual indemnity requirements, not solely the substantial contributions TA and MLH are making under the Plan.[9]

Finally, Voya is incorrect that the Court lacks jurisdiction to impose a judgment reduction provision contained in Article X.J of the Plan. The Plan embodies a global and comprehensive settlement of a variety of litigation claims by multiple parties. As described herein, the Court has the jurisdiction to enjoin and bar third parties from commencing litigation against TA and MLH to facilitate those settlements and the Debtors' reorganization under the Plan. If the Court has jurisdiction to bar such non-bankruptcy litigation (which it does), it similarly possesses the jurisdiction to restrict the amount such third parties may recover from TA and MLH in such litigation in the event that it is brought. The judgment reduction provision of the Plan merely reinforce the Releases and Injunctions to ensure that TA and MLH receive the benefit of their bargain.

## II. The Extraordinary Circumstances of this Case Warrant Non-Consensual Third Party Releases

Under *Continental*, courts within the Third Circuit may approve non-consensual third party releases where specific findings support the following "hallmarks": (i) fairness, (ii) necessity to the reorganization, and (iii) fair consideration given in exchange for the release. *Id.* at 214. *See also Walton v. Houlihan, Lokey, Howard & Zukin (In re UA Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) (quoting *Continental*, 203 F.3d at 214-15).

---

jurisdiction because the parties had not presented sufficient evidence or obtained findings about the terms of those insurance policies to establish that claims against the prospective releasees would impact the debtors' estates. *Id.* at 232-33.

[9] TA joins in and does not repeat the Debtors' other arguments about jurisdiction, including with respect to *Stern v. Marshall* and this Court's "arising in" jurisdiction to approve third party releases appurtenant to confirmation of a plan of reorganization.

In analyzing whether the *Continental* hallmarks are satisfied, courts within the Third Circuit have considered the following factors:

1. an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

2. substantial contribution by the non-debtor of assets to the reorganization;

3. the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

4. an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

5. provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[10]

*In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)) (the "Master Mortgage Factors").[11] *See also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001).[12] "These

[10] Judge Carey of the United States Bankruptcy Court for the District of Delaware has interpreted this fifth factor as follows: "Whether the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable compensation in exchange for the release." *See Tribune*, 464 B.R. at 178 (Bankr. D. Del. 2011); *In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010).

[11] Other factors courts look to when deciding whether to enjoin third parties from litigating against non-debtors are "danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize," "reasonable likelihood of reorganization," a balance of "the relative harm as between the debtor and the creditor who would be restrained," and the "public interest." *In re Catholic Diocese of Wilmington*, 484 B.R. 629, 638 (D. Del. 2012). These factors also heavily weigh in favor of granting the Releases and Injunctions because, without the feasible and favorable reorganization under the Plan (which is dependent on the Releases and Injunctions) there is no ability for these Debtors to reorganize and these estates will be imminently and irreparably harmed. Public policy is also served by confirming a chapter 11 plan that preserves enterprise value and jobs, approves settlements that resolve complex and high-stakes litigation claims, and gives effect to the stated desire of all impacted stakeholders (except Voya).

[12] The Third Circuit in *Continental* referenced the *Master Mortgage* Factors as relevant to the determination of whether a non-debtor's claims against another non-debtor could be enjoined

factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011).

Voya attempts to relegate the teachings of *Continental* to dicta and seeks instead to rely on non-binding Fifth and Tenth Circuit precedent for the proposition that third party releases are impermissible because they run afoul of section 524(e) of the Bankruptcy Code. *See* Voya Objection at ¶¶ 46-48 (citing *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) and *In re Western Real Est. Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990)). Voya's misreading of section 524(e) of the Bankruptcy Code and reliance on out-of-circuit precedent should be rejected. In addition to not being binding on this Court and being contrary to Third Circuit precedent, decisions that interpret section 524(e) to prohibit third party releases are incorrect. Section 524(e) does not bar a bankruptcy court from using its equitable powers to grant a third party release. To the contrary, section 524(e) merely provides that the discharge of a debtor under bankruptcy does not automatically discharge a non-debtor that is liable on the <u>same</u> debt. *See Airadigm Comm's, Inc. v. FCC (In re Airadigm Comm's, Inc.)*, 616 F.3d 642, 656 (7th Cir. 2008) ("§ 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claim"). This is precisely why TA and MLH are requesting third party releases: the Released Parties will not be released from liability to third parties for separate, non-derivative claims as a result of the Debtors receiving a discharge. Contrary to those courts that misinterpret section 524(e) to forbid third party releases, the Bankruptcy Code explicitly gives this Court the equitable authority to grant a third party release in an order "when necessary or appropriate to carry out the provisions of [the Bankruptcy Code" and to provide "adequate means for the plan's implementation." 11 U.S.C. §§ 105(a) and 1123(a)(5).

---

under a chapter 11 plan on a non-consensual basis. *See Continental*, 203 F.3d at 217, n.17 (citing *Master Mortgage*, 168 B.R. at 935).

Thus, the Court has the jurisdiction and authority to grant the Releases and Injunctions if the record sufficiently demonstrates that such protections are fair, necessary to the reorganization, and being given for fair consideration. As set forth below, the evidence before the Court overwhelmingly forms the basis for granting the requested third party releases, bar orders, and injunctions in favor of TA and the other Released Parties.

**A. *There is an Identity of Interest Between TA and the Debtors' Estates***

TA, MLH, and the Debtors have an identity of interest with respect to the releases contained in the Plan because, as explained above, both TA and MLH have indemnification rights against the Debtors arising under each of the Debtors' operating agreements. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release."). Accordingly, any litigation claims that Voya or any other third party asserts against TA are tantamount to claims against the Debtors and will result in TA asserting a claim for indemnity against these estates, depleting resources and creditor recoveries.

TA and the Debtors also share a unified interest in that they – along with MLH, the Participating Lenders, the Federal Settlement Parties, and the Plaintiff States – seek to confirm the Plan in lieu of pursuing litigation that would be costly, risky, uncertain, and highly destructive to the value of these estates. By jointly formulating the Plan, TA, the Debtors, and the other stakeholders share an identity of interest in their common goal of implementing a mutually beneficial restructuring. *See Tribune*, 464 B.R. at 187 (debtors and releasees "sharing common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* Factors); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) ("identity of interest" factor supported where releasees and debtor "share a common goal of achieving a reorganization of the

Debtors”); *Zenith*, 241 B.R. at 111 (“identity of interest” found where releasees “instrumental in formulating the plan” shared with the debtor the goal of “seeing that the Plan succeed and the company reorganize”).

Implicit in the common goal of implementing the Plan is (i) preserving the Debtors’ Medicare Billing Privileges and, thus, the Debtors’ ability to operate, (ii) avoiding complex, disputed and costly litigation, (iii) right-sizing the Reorganized Debtors’ balance sheet, and (iv) providing for the consensual transfer of control over the Debtors to the Prepetition Lenders. Indeed, each of the stakeholders in these cases want to maximize value for the benefit of the community of interest that rely upon these Debtors.

Because the Debtors, TA, and MLH share identity of interest with respect to the Plan and the Releases and Injunctions, this first *Master Mortgage* Factor weighs in favor of granting a third party release to TA and MLH (and their Related Parties).

**B. *TA Is Making Substantial Contributions to the Debtors’ Reorganization***

TA and MLH are each making substantial contributions to the Debtors’ reorganization. That fact is unquestionable. Upon consummation of the Plan, TA and MLH will provide $146.25 million and $178.75 million, respectively, to fund the $325 million Settlement Contribution. *See* Plan at Art. V.A(i). In addition to these cash contributions, TA and MLH are consenting to relinquish the entirety of their equity stakes in Millennium and allow the Prepetition Lenders to become the owners of Reorganized Millennium and its subsidiaries. *See* Plan at Arts. III.C., V.C, V.D(iii), and V.E. Total control of the Reorganized Millennium and any upside that goes along with the rehabilitation of the Debtors’ balance sheet and resolution of litigation claims under the Plan will exclusively go to Voya and the other Prepetition Lenders.

Further, to facilitate the USA Settlement Agreements and provide the USA Settlement Parties with comfort that they will be paid upon a closing of the transactions contemplated under

the Plan, TA and MLH have gone to the extraordinary lengths of posting collateral to support their funding commitments (in TA's case in the form of a letter of credit in favor of the DOJ). *See, e.g.*, Federal UDT Settlement Agreement at ¶ 1.c.iii.[13] In compliance with the USA Settlement Agreements, TA posted a $95,450,297 letter of credit in favor of the USA on November 6, 2015. TA and MLH have also executed a Guaranty Agreement in connection with the USA Settlement Agreements to severally guaranty the $50 million Initial USA Settlement Deposit paid by the Debtors pre-bankruptcy and protect the USA Settlement Parties from such payment being recovered in an avoidance action under chapter 5 of the Bankruptcy Code or analogous state law. *See* USA Settlement Agreements at Exh. B (Guaranty Agreement).[14]

Under Article X.F of the Plan, TA and MLH are also consenting to release potentially valuable claims they may have against each other, the Debtors, and each of their respective Related Parties.

TA and MLH are the source of hundreds of millions of dollars of consideration that would enure under the Plan to the benefit of Prepetition Lenders (including Voya), the USA Settlement Parties, and all other stakeholders. There can be no doubt that the second of the *Master Mortgage* Factors weighs in favor of granting a third party release because TA and MLH are making a substantial contribution to the Plan.

[13] Each of the USA Settlement Agreements to which TA is a party contain language requiring the posting of irrevocable standby letters of credit in favor of the USA for the payments due from the Debtors under that particular agreement. The USA Settlement Agreements to which TA is a party are attached as Exhibit E-2 through E-6 to the Disclosure Statement [ECF No. 15].

[14] An executed Guaranty Agreement is attached as Exhibit B to each of the USA Settlement Agreements to which TA is a party, which are attached as Exhibit E-2 through E-6 to the Disclosure Statement [ECF No. 15].

### C. ***The Releases and Injunctions in Favor of TA Are Essential to the Debtors' Reorganization***

The substantial contributions TA is making to co-fund and support the Plan are absolutely necessary to enable the Debtors to reorganize. These funds are critical to maintain Reorganized Millennium and its subsidiaries as going concerns. The clock is ticking because the USA (not TA or MLH) has imposed a December 30, 2015 deadline to complete this restructuring in order to maintain the Debtors' Medicare Billing Privileges. Without these funds, no plan would be feasible let alone confirmable before (or after) this deadline. These contributions and support enable the Debtors to (i) settle the claims that the USA Settlement Parties and the Prepetition Lenders have asserted, (ii) maintain their Medicare Billing Privileges, and (iii) emerge from bankruptcy with a healthy balance sheet and enhanced ability to satisfy their debts (as restructured) in the challenging business environment in which the Debtors operate.

The Plan is clear, however, that TA's funding of its share of the $325 million Settlement Contribution is dependent on the Plan becoming effective. *See* Plan at Art. V.A.(i) (Settlement Contribution funded by TA and MLH not to occur until "after the Effective Date"). In turn, the Plan will not go effective until after the conditions precedent enumerated in Article VIII.B are satisfied (or waived), which conditions precedent include entry of the Confirmation Order which approves the Releases and Injunctions and the Confirmation Order becoming a Final Order. Plan at Art. VIII.B(ii) and (iii). Accordingly, unless the Releases and Injunctions are approved in a Confirmation Order that has become a Final Order, TA has no obligation to fund the TA Contribution.[15]

[15] The requirement that the Confirmation Order become a Final Order may be waived only with the written consent of TA and MLH, which consent they have no obligation to give. *See* Plan at Art. VIII.D.

The reason TA is willing to make its substantial contributions, support the Plan (including the consensual change of control), and fund the recoveries creditors (including Voya) are to receive, is that the Plan contains the Releases and Injunctions that provide TA finality and protection from continued litigation over its investments in the Debtors and the April 2014 Transactions. Without the repose provided by the Releases and Injunctions, TA will need to expend significant resources defending and resolving such litigation claims. TA and MLH do not want to pay $325 million to settle and resolve claims threatened by the Debtors, the Prepetition Lenders, and the USA, surrender their equity, and promote a feasible plan that leaves unsecured creditors unimpaired, only to have some subset of the foregoing turn around and sue TA and MLH on claims arising from the same set of operative facts. Settling and paying $325 million but leaving an indirect path open for more litigation would be worse than imprudent. Without a full release – including a release from non-consenting third parties such as Voya – TA is not willing to fund $146.25 million to enable the restructuring contemplated under the Plan to occur. Instead, TA could hold onto its money and use a portion of it to defend the threatened litigaton.

Voya is happy to accept TA's and MLH's contributions to the Plan, but argues that those payments are only consideration to resolve estate causes of action and those of the USA Settlement Parties but <u>not</u> Voya's unproven, unfounded, and unsupportable fraud claims against TA. *See* Voya Objection at ¶ 10 n.11; 40. That is a self-interested and wrong way to view this situation. TA's contributions to the Plan resulted from simultaneous multi-party negotiations that were all part of an integrated and interdependent set of compromises. The parties took a holistic approach to resolving their problems and the Settlement Contribution cannot be apportioned to the various claims that are proposed to be released. TA's contributions are being

provided for the explicit purpose of resolving all claims. TA will not fund the Plan unless it receives the full and final release of any and all claims that could be asserted against it and its Related Parties by the Prepetition Lenders (including Voya's so-called "direct claims"), the Debtors, the USA Settlement Parties, and any other party. Granting Voya a "free pass" is not an option.

If TA does not receive the benefits of the Releases and Injunctions and, in turn does not fund the TA Contribution, the Plan cannot be confirmed. The alternatives facing the Debtors in that scenario are bleak and uncertain. The Debtors have no alternative source for the $325 million TA and MLH are contributing to the Plan – $146.25 million of which is being funded by TA. Without these funds, the Debtors could not satisfy the $256 million payment obligation due under the USA Settlement Agreements[16] and could not prevent the Debtors' Medicare Billing Privileges from being promptly revoked, which would cause a swift and severe destruction of the value of these estates. It is not speculative to predict that failure of this Plan would result in the Debtor's liquidation and send all parties directly into full-scale litigation over the April 2014 Transactions. As demonstrated by the USA's entry into the USA Settlement Agreements and the Prepetition Lenders' negotiation of and overwhelming support for the Plan and the settlements embodied therein, it is clear that those parties prefer the certainty of the substantial recoveries provided for under the Plan's restructuring scenario to the speculative and unknowable recoveries available following a multi-front litigation war.

[16] As noted in the Disclosure Statement, prior to the Petition Date, Millennium paid $50 million of the $256 million due under the USA Settlement Agreements as an "Initial USA Settlement Deposit." Disclosure Statement at 20. Under the Plan, of the aggregate $325 million TA and MLH are contributing, $206 million (plus interest, costs, and fees) will be paid to the USA satisfy the remaining amounts due under the USA Settlement Agreements and the remainder would reimburse Millennium for the Initial USA Settlement Deposit, for working capital purposes, and as otherwise set forth in the RSA. *Id.*

The TA Contribution is necessary to achieve a successful reorganization and will not be provided without the Releases and Injunctions. Thus, the *Continental* hallmark and *Master Mortgage* Factor that the Releases and Injunctions be necessary to the reorganization has been met.

**D. *An Overwhelming Majority of Creditors Support the Plan and the Releases***

The Plan provides for unimpairment of all claims except those of the Prepetition Lenders and MLH's claims arising from the MLH Tax Note.[17] *See* Plan at Art. III.B. Class 2 – Existing Credit Agreement Claims – is the only class of creditors impaired and entitled to vote on the Plan. As set forth in the Debtors' brief in support of Plan confirmation, over 93% in both number of claimants and percentage of amount have voted in favor of the Plan and consent to the Releases and Injunctions. The Prepetition Lenders' near unanimous support for the Plan demonstrates that the *Continental* "hallmarks" of fairness and fair consideration for the Releases and Injunctions are present.

**E. *The Plan Fairly Treats the Third Party Releasing Parties***

As set forth above, TA and MLH are making massive financial contributions to the Plan in exchange for the requested Releases and Injunctions. These contributions are necessary to fund the USA Settlement Agreements, avoid revocation of the Debtors' Medicare Billing Privileges, facilitate the significant recoveries that creditors (including the Prepetition Lenders) are receiving under the Plan, and to enable the consensual change of control to occur. Specifically, under the Plan, in exchange for their existing $1.75 billion of secured claims, the Prepetition Lenders are to receive substantial consideration comprised of, on a *pro rata* basis:

[17] Although Class 7 (MLH Tax Note Claims) is receiving no distribution and is presumed to reject the Plan, MLH is the holder of that claim and is a party to the RSA and an obvious supporter of the Plan.

(i) 100% of the equity of Reorganized Millennium along with all of the upside such ownership entails, (ii) a $600 million senior secured New Term Loan, (iii) payment of their advisors' fees and expenses, (iv) a beneficial interest in the Millennium Corporate Trust that has the right to prosecute and settle certain causes of action retained by the Reorganized Debtors, which is being funded by the Debtors with liquidity created by TA's and MLH's contributions, and (v) to the extent they are a Consenting Lender, a beneficial interest in the Millennium Lender Claim Trust that has the right to prosecute and settle causes of action contributed to that trust by the Consenting Lenders, which is also being funded by the Debtors with liquidity created by TA's and MLH's contributions. Plan at Art. III.C(ii)(2). None of this could occur without the survival of the Debtors, which TA and MLH assure by funding the payments required under the USA Settlement Agreements.

Voya in its objection incorrectly (and purposefully) misstates that the estimated recovery for Existing Credit Agreement Claims is >34%. Voya Objection at ¶ 1. As the Disclosure Statement clearly indicates, the 34% figure only accounts for the $600 million New Term Loan but not the equity in Reorganized Millennium and the interests in the Millennium Corporate Trust. Disclosure Statement at 7, n.5. As set forth in the Debtors' Response and the declaration of Michael Wiggins of Lazard Fréres & Co. LLC ("Lazard") filed in connection therewith, Lazard estimates that the total enterprise value of Reorganized Millennium will be in excess of $900 million on a going concern, pro forma reorganized basis.

Significantly, the entity that Voya and the other Prepetition Lenders will own post-Effective Date – Reorganized Millennium – will have in place: (i) a healthy, deleveraged balance sheet with ample working capital, (ii) fully-funded and final settlements with the USA Settlement Parties, (iii) intact Medicare Billing Privileges, (iv) cured and assumed commercial

payor and other executory contracts, and (v) a management team and Board of Directors selected by the Prepetition Lenders. As projected by the Debtors, Reorganized Millennium is anticipated to (i) generate positive EBITDA of $141 million in fiscal year 2016, growing to $169 million in fiscal year 2019, and (ii) build cash from $167 million at the end of fiscal year 2016 to $315 million at the end of fiscal year 2019. Disclosure Statement at Exhibit H, 5 (Financial Projections). Moreover, Consenting Lenders who voted in support of the Plan by the Early Commitment Deadline are receiving a pro rata share of the $50 million senior secured Early Commitment Facility. *See* Disclosure Statement at 22; Plan at Art. III.C(i).

This is treatment that over 93% of the Prepetition Lenders have found to be fair compensation for the Releases and Injunctions being given to TA, MLH, and the other Released Parties. The Plan's treatment of Existing Credit Agreement Claims is similarly fair with respect to Voya. Indeed, Voya in its objection is not looking to undo the Plan; it merely seeks to accept the favorable treatment being provided to all Prepetition Lenders under the Plan and <u>also</u> pursue litigation claims against TA and other Released Parties. Voya should not be permitted to gamble its co-lenders' and all other stakeholders' recoveries in this manner.

Lastly, in addition to the significant recovery by the Prepetition Lenders, all other classes (other than the MLH Tax Note Claim and Existing Equity Interests in Millennium) are <u>unimpaired</u> and will be paid <u>in full</u>. This means that substantially all Third Party Releasing Parties will be paid in full and the equity in the Reorganized Debtors that is being transferred to the Prepetition Lenders (including Voya) provides those lenders with upside value that could result in full payment, or more.

**1. <u>Voya's Assertions About Its Claims are Misleading and Incorrect</u>**

In its objection Voya threatens to bring direct claims against TA for RICO violations, fraudulent inducement, aiding and abetting fraud, and civil conspiracy based on frivolous and

unsupported allegations that TA somehow misled Voya into participating in the April 2014 Transactions. *See* Voya Objection at 2. These claims are completely without merit, lack any evidentiary support, and are based solely on the unproven and disputed allegations contained in the Qui Tam Complaint (as defined in the Voya Objection). Indeed, the Qui Tam Complaint makes no mention of TA (or MLH).

First, prior to and at the time of the April 2014 Transactions, TA was only the holder of debt securities and certain stock purchase warrants issued by the Debtors. *See* Disclosure Statement at 17 (as part of the April 2014 Transactions, "MLH remitted 45% of its membership interests in Holdings to TA in satisfaction of certain debt securities previously issued by MLH and all obligations outstanding under such debt securities, including accrued but unpaid interest and redemption of stock purchase warrants in Millennium Lab Holdings, Inc."). Accordingly, because TA was not even a shareholder of the Debtors – let alone a controlling shareholder – and because TA was not represented on any of the Debtors' boards of directors at the time the April 2014 Transactions were approved, it had no control over the acts that Voya alleges gave rise to its damages (*i.e.*, the approval and closing of the April 2014 Transactions).

Because TA was not even a shareholder of the Debtors at the time of the April 2014 Transactions, it is incorrect and irresponsible for Voya to create a misleading defined term that includes TA within it – "Non-Debtor Equity Holders" – in order to slyly insinuate without any support whatsoever that TA somehow had control over any of the Debtors' acts with respect to the due diligence provided in connection with the April 2014 Transactions and any unproven allegations regarding Millennium's business practices. Neither in the Qui Tam Complaint upon which Voya rests its unsupported allegations nor anywhere else (as Voya has submitted no

evidence in support of its allegations) is there a factual basis or evidentiary support for Voya's false allegations about TA that:

- "Millennium for years operated in blatant disregard of federal and state laws, under the control of the Non-Debtor Equity Holders [including TA]";

- "in order to induce the Lenders to fund the Existing Credit Facility, in 2014, the controlling Non-Debtor Equity Holders [including TA] caused Millennium and Holdings to make false and misleading representations and warranties upon which *inter alia* the closing of the Existing Credit Facility was conditioned.";

- that the Settlement Contributions are "now essential to fund a settlement by Millennium with the federal government *of the same material liabilities* that arose under the control of the Non-Debtor Equity Holders [including TA] and were affirmatively denied in connection with the issuance of the Existing Credit Agreement."; and

- that there exists "the Non-Debtor Equity Holders' [including TA's] pattern of racketeering conduct by their use of Millennium as an enterprise to illegally take money through false pretenses, including Medicare and insurance fraud….".

Voya Objection at ¶¶ 5, 6, 12, and 31. Voya knows better, yet it recklessly made blatantly incorrect statements about TA. TA reserves its rights regarding these false accusations, including to pursue appropriate sanctions against Voya and its counsel under Rule 11.

Second, it is disingenuous for Voya to pretend outrage that a significant portion of the proceeds of the Existing Credit Agreement were delivered to TA and MLH. *See* Voya Objection at ¶ 7, 12. The April 2014 Transactions were structured as a dividend recapitalization transaction under which TA and MLH were to receive proceeds of the loans provided under the Existing Credit Agreement and the Existing Credit Agreement specifically provided for such dividends to be paid. Voya and all of the other Prepetition Lenders were fully aware of this fact when they willingly participated in the April 2014 Transactions and provided their loans. In addition, at the

time of the April 2014 Transactions it was public knowledge that the Debtors operated in a volatile industry subject to pricing pressures imposed by the federal government and commercial payors. Moreover, as stated above, the existence of the DOJ's investigation and the unproven allegations regarding Millennium's business practices were not concealed from Voya at the time of the April 2014 Transactions; they were public knowledge. Indeed, as noted above, Reuters published an article in November 2012 discussing the DOJ's investigation and describing the allegations against Millennium. Voya, a sophisticated lender charged with conducting its own due diligence when making loans, knew or should have known all of this.

Because Voya participated in the April 2014 Transactions with full knowledge of who it was lending to, the characteristics of the industry in which the Debtors operate, and how the loan proceeds would be distributed, Voya has waived and should be estopped from arguing that it was somehow defrauded because proceeds of the loan did not stay at the Company but instead flowed to TA and MLH. *See Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 479-82 (W.D. Tex. 2013) (rejecting state court fraudulent transfer claims against equity holders in a ~$1.2 billion transaction involving a dividend recapitalization where lenders had full knowledge that the funds would flow directly to equity rather than remaining at the company; "whether the defense is consent, ratification, or estoppel, the undisputed evidence shows the original lending banks participated in the 2006 Duke Transaction with full knowledge of the transaction they helped design."); *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-02-22582, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006) ("[O]n equitable grounds, this Court would not make a finding of avoidance and recovery on the proposed Section 548 and [state law] causes of action when the only entity that would benefit from that avoidance and recovery would

be [a creditor] which specifically approved the [subject] transaction in writing and significantly benefitted from the transaction.”).

Third, Voya’s reliance on the DOJ’s investigation into the Debtors’ business conduct and the unproven allegations in the Qui Tam Complaint are irrelevant. The litigation threatened by the USA Settlement Parties as a result of that investigation are being fully and finally resolved under the USA Settlement Agreements, which settlement is being funded entirely by TA and MLH. Voya and the other Prepetition Lenders have not been deprived of a single penny as a result of the DOJ’s investigation and Voya’s reliance on the unproven allegations in the Qui Tam Complaint in its objection is nothing more than an incendiary red herring. Indeed, the Voya Objection is based on an erroneous presumption: that Millennium is the subject of a restructuring because of the DOJ investigation and the claims alleged in the Qui Tam Complaint. The impact of industry sector pressures is what has negatively impacted Millennium’s operations. Even so, Millennium is not in payment default to the Prepetition Lenders because notwithstanding those pressures, Millennium continues to operate and generate positive EBITDA and cash flow.

Fourth, even if Voya had viable direct claims against TA, such claims are duplicative of the derivative claims being settled as there can only be one recovery for the same damages. Voya’s only conceivable damages are the shortfall between what it lent to the Debtors and what it is receiving under the Plan. Because Voya is recovering its *pro rata* share of a $600 million New Term Note, the equity in Reorganized Millennium, and distributions from the Millennium Corporate Trust, it is far from clear that Voya has suffered any loss by participating in the April 2014 Transactions in light of the reorganization that TA and MLH have facilitated through their contributions to the Plan. Indeed, as demonstrated by: (i) the substantial value of the equity of

Reorganized Millennium set forth in the Debtors' Response and the Lazard declaration, (ii) Voya's share of such equity plus its share of the $600 million New Term Note, and (iii) recoveries by the trust being established to pursue retained estate causes of action, the total value received by the Prepetition Lenders could eclipse any purported losses and result in Voya and the other Prepetition Lenders ultimately recovering more than what they would have had the Existing Credit Agreement been serviced and repaid under its original terms. There is no doubt that MLH and TA's contributions are driving such a recovery and that this recovery is substantial and fair consideration warranting the approval of the Releases and Injunctions.

Finally, Voya's purported claims are not direct claims against TA and MLH, but are instead derivative claims no different than the claims that all other Prepetition Lenders could assert and which are being settled under the Plan. Voya makes unsupported arguments that the Debtors inflated their revenues through corrupt business practices that "tricked" the government into reimbursing Millennium for medically unnecessary testing and the Prepetition Lenders into participating in the April 2014 Transactions. Even if those fraud allegations, unsupported by any evidence, could be proven, they are merely claims against TA and MLH that are derivative of the claims against the Debtors. TA and MLH were not performing urine tests or filing reimbursement claims with the government, the Debtors were. TA and MLH did not provide due diligence to prospective lenders or borrow the money, the Debtors did. Thus, in order to hold TA and MLH liable for fraud, Voya must prove fraud claims against the Debtors. This is a quintessential derivative claim that can and should be released pursuant to the Plan. *In re CD Liquidation Co.*, 2012 Bankr. LEXIS 5924, *12 (Bankr. D. Del. Dec. 28, 2012) ("In order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large") (quoting *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008)). *See*

*also Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 297-99 (3d Cir. 2012) ( "related to" jurisdiction existed over fraud claim by creditor against the debtors' accountant for actions arising out of a lending transaction through which the creditor sought to recover for the same harm through the bankruptcy claims process).

### 2. The Non-Consensual Releases and Injunctions are Fair and Equitable With Respect to Voya

The Plan embodies a good faith, comprehensive, and multi-faceted settlement of many hotly contested claims that was heavily negotiated by sophisticated parties. *See* Plan at Art. V.A. These settlements are fair and equitable, widely-supported, and well within the range of reasonableness. *See In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (D. Del. 2012) (in analyzing a settlement for purposes of Bankruptcy Rule 9019, courts should not conduct a "mini-trial" on the merits but rather "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness") (internal citations omitted). As set forth above, in the Debtors' Response, and in the evidentiary record, the Plan and its embedded settlements are fair with respect to Voya because (i) Voya is receiving ample consideration for the release of any claims it may have against TA and the other Released Parties, and (ii) Voya cannot establish (and has not submitted a scintilla of admissible supporting evidence) that it has viable claims or that it suffered any damages as a result of the April 2014 Transactions.

From TA's vantage, irrespective of the merits of Voya's threatened claims, the preservation of going concern value that is accomplished as a result of TA's contributions under the Plan (*i.e.*, resolution of the USA's threatened litigation and avoidance of the catastrophic consequences of a loss of the Debtors' Medicare Billing Privileges) and the Plan consideration Voya is receiving, mitigates whatever damages Voya believes it has suffered. Accordingly, no claim can be made that the Plan treats Voya unfairly.

**CONCLUSION**

All of the "hallmarks" of a permissible non-consensual third party release and injunction from *Continental* are present in these cases – fairness, necessity to the reorganization, and fair consideration to the releasing party. In light of the extraordinary circumstances before the Court, the Voya Objection should be overruled, the Plan and the Releases and Injunctions should be approved, and the Debtors should be permitted to reorganize and exit chapter 11 on the terms negotiated and supported by an overwhelming percentage of the Debtors' stakeholders.

Dated: December 7, 2015
Wilmington, Delaware

MORRIS NICHOLS ARSHT & TUNNELL LLP

*/s/ Andrew R. Remming*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@mnat.com
aremming@mnat.com

-and-

GOODWIN PROCTER LLP
Michael H. Goldstein
William P. Weintraub
Gregory W. Fox
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333
Email: mgoldstein@goodwinprocter.com
wweintraub@goodwinprocter.com
gfox@goodwinprocter.com

*Counsel for TA Millennium, Inc.*