# EXHIBIT A

**Notice of Confirmation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :

In re:                        :     Chapter 11
              :

MILLENNIUM LAB HOLDINGS II, LLC, et al.,  :     Case No. 15-12284 (LSS)
              :

           Debtors.[1]       :     Jointly Administered
              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION OF MILLENNIUM LAB HOLDINGS II, LLC, ET AL., AND (II) OCCURRENCE OF EFFECTIVE DATE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

     1.    **Plan Confirmation.** On December [___], 2015, this Court entered an order (the "Confirmation Order") (Docket No. [___]) confirming the Debtors' amended prepackaged joint plan of reorganization (the "Plan") (Docket No. [___]).[2]

     2.    **Copies of Plan and Confirmation Order.** The Confirmation Order, the Plan, and the other documents filed in these cases are available free at https://cases.primeclerk.com/millenniuminfo/Home-DocketInfo or for a nominal fee at https://ecf.deb.uscourts.gov/ (with use of a PACER account).

     3.    **Effective Date.** On December [___], 2015, the Effective Date of the Plan occurred. All conditions precedent to the Effective Date set forth in section VIII.B of the Plan have been satisfied or waived.

     4.    **Professional Fee Claims.** All final requests for payment of Professional Fee Claims (the "Final Fee Applications") must be filed no later than forty-five (45) days after the Effective Date. Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Reorganized Debtors and on the requesting Professional by the later of (a) 60 days after the Effective Date or (b) 30 days after the filing of the applicable Final Fee Application. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Court. From and after the Effective Date, any requirements

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

[2]    Capitalized terms used but not defined herein have the meanings assigned to them in the Confirmation Order or, if not used therein, in the Plan.

that professionals comply with sections 327 through 331 of the Bankruptcy Code or any order previously entered by the Court in seeking retention or compensation for services rendered or expenses incurred after such date shall terminate.

Dated: Wilmington, Delaware
      December [___], 2015

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    */s/ [DRAFT]*
                    Anthony W. Clark (I.D. No. 2051)
                    Jason M. Liberi (I.D. No. 4425)
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Fax: (302) 651-3001

                    - and -

                    Kenneth S. Ziman
                    Raquelle L. Kaye
                    Four Times Square
                    New York, New York 10036-6522
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000

                    - and -

                    Felicia Gerber Perlman
                    Matthew N. Kriegel
                    155 N. Wacker Drive
                    Chicago, Illinois 60606-1720
                    Telephone: (312) 407-0700
                    Fax: (312) 407-0411

                    Counsel for Debtors and Debtors in Possession

# <u>EXHIBIT 1</u>

## Amended Plan

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                          :    Chapter 11
                                                :
MILLENNIUM LAB HOLDINGS II, LLC, et al.,        :    Case No. 15-12284 (LSS)
                                                :
Debtors.[1]                                     :    Jointly Administered
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION
OF MILLENNIUM LAB HOLDINGS II, LLC, et al.**

Dated:  December 9, 2015        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                Anthony W. Clark (I.D. No. 2051)
                                Jason M. Liberi (I.D. No. 4425)
                                One Rodney Square
                                P.O. Box 636
                                Wilmington, Delaware 19899-0636
                                T: (302) 651-3000
                                F: (302) 651-3001

                                – and –

                                Kenneth S. Ziman
                                Raquelle L. Kaye
                                Four Times Square
                                New York, New York 10036-6522
                                T: (212) 735-3000
                                F: (212) 735-2000

                                – and –

                                Felicia Gerber Perlman
                                Matthew Kriegel
                                155 N. Wacker Drive
                                Chicago, Illinois 60606-1720
                                Telephone: (312) 407-0700
                                Fax: (312) 407-0411

                                *Proposed Counsel to Debtors and Debtors in Possession*

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219).  The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

ARTICLE I RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS..............................................1
    A.      Rules of Interpretation, Computation of Time and Governing Law .................1
    B.      Definitions ........................................................................................................2

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ...................................... 19
    A.      Administrative Claims................................................................................. 19
    B.      Priority Tax Claims .....................................................................................20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED
        CLAIMS AND EQUITY INTERESTS .......................................................21
    A.      Introduction..................................................................................................21
    B.      Summary of Classification and Treatment of Classified Claims and
          Equity Interests ............................................................................................21
    C.      Classification and Treatment of Claims and Equity Interests ........................21
    D.      Special Provision Governing Unimpaired Claims .........................................27
    E.      Discharge of Claims ....................................................................................27
    F.      Alternative Treatment..................................................................................27

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ..........................28
    A.      Presumed Acceptance of Plan......................................................................28
    B.      Deemed Rejection of Plan ...........................................................................28
    C.      Voting Classes ............................................................................................28
    D.      Acceptance by Impaired Classes of Claims..................................................28
    E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .............28

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN .........................28
    A.      General Settlement of Claims ......................................................................28
    B.      Corporate Existence ....................................................................................30
    C.      Vesting of Assets in the Reorganized Debtors .............................................30
    D.      New Term Loan; Sources of Consideration for Plan Distributions ...............30
    E.      New Holdco Common Stock Issued Under the Plan .....................................31
    F.      Millennium Corporate Claim Trust..............................................................31
    G.      Millennium Lender Claim Trust ..................................................................33
    H.      Issuance of New Securities and Related Documentation ...............................34
    I.      Release of Liens, Claims and Equity Interests .............................................35
    J.      Reservation of Certain Claims of Governmental Units..................................35
    K.      New Holdco and Reorganized Debtors Organizational Documents...............36
    L.      Directors and Officers of Reorganized Debtors............................................36
    M.      Restructuring Transactions ..........................................................................37
    N.      Corporate Action.........................................................................................37

O.      Cancellation of Notes, Certificates and Instruments......................................38
P.      Preservation and Maintenance of Debtor Causes of Action...........................39
Q.      Exemption from Certain Transfer Taxes .......................................................40
R.      Certain Tax Matters........................................................................................40
S.      Further Transactions.......................................................................................42

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
          UNEXPIRED LEASES...............................................................................43
A.      Assumed Contracts and Leases......................................................................43
B.      Assignment of Executory Contracts or Unexpired Leases............................43
C.      Rejection of Executory Contracts or Unexpired Leases ...............................44
D.      Cure of Defaults for Assumed Executory Contracts and Unexpired
          Leases .......................................................................................................44
E.      Assumption of Officer Insurance Policies.....................................................45
F.      Indemnification Provisions ............................................................................45
G.      Compensation and Benefit Programs .............................................................46
H.      Workers' Compensation Benefits...................................................................46
I.      Third Party Payer Contracts...........................................................................47
J.      Medicare and Medicaid Agreements..............................................................47

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ...............................48
A.      Distribution Record Date................................................................................48
B.      Dates of Distributions.....................................................................................48
C.      Distribution Agent...........................................................................................48
D.      Cash Distributions...........................................................................................49
E.      Rounding of Payments ....................................................................................49
F.      Distributions on Account of Allowed Claims................................................49
G.      General Distribution Procedures ....................................................................50
H.      Address for Delivery of Distributions ...........................................................50
I.      Undeliverable Distributions and Unclaimed Distributions ...........................50
J.      Withholding Taxes ..........................................................................................50
K.      Setoffs.............................................................................................................51
L.      Surrender of Cancelled Instruments or Securities.........................................51
M.      Lost, Stolen, Mutilated or Destroyed Securities ...........................................51

ARTICLE VIII CONDITIONS PRECEDENT TO THE PLAN'S
          CONFIRMATION AND EFFECTIVE DATE ...........................................52
A.      Conditions to Confirmation............................................................................52
B.      Conditions to Effective Date...........................................................................52
C.      Conditions to the Equity Transfer Date..........................................................53
D.      Waiver of Conditions .....................................................................................54
E.      Effect of Non Occurrence of Conditions to the Effective Date.....................54

ARTICLE IX RETENTION OF JURISDICTION...........................................................54
A.      Retention of Jurisdiction.................................................................................54
B.      Lack of Bankruptcy Court Jurisdiction .........................................................56
C.      Failure of Bankruptcy Court to Exercise Jurisdiction...................................56

ARTICLE X EFFECTS OF CONFIRMATION ........................................................................56
    A.    Binding Effect ................................................................................56
    B.    Subordination Rights ......................................................................57
    C.    Discharge of the Debtors ................................................................57
    D.    Exculpation and Limitation of Liability ..........................................57
    E.    Releases by Debtor ........................................................................58
    F.    Releases by TA and MLH ..............................................................59
    G.    Releases by Lender Releasing Parties ..............................................60
    H.    Releases by Third Party Releasing Parties ........................................61
    I.    Waiver of Limitations on Releases of Unknown Claims ....................62
    J.    Bar Order ....................................................................................63
    K.    Injunction ....................................................................................64
    L.    Retained Claims ............................................................................64
    M.    Other Obligations With Respect To Released Parties ..........................66

ARTICLE XI MISCELLANEOUS PROVISIONS ..................................................................68
    A.    Dissolution of the Committee ..........................................................68
    B.    Payment of Statutory Fees ..............................................................68
    C.    Modification of Plan ......................................................................68
    D.    Revocation of Plan ........................................................................68
    E.    Severability of Plan Provisions ........................................................69
    F.    Successors and Assigns ..................................................................69
    G.    Reservation of Rights ....................................................................69
    H.    Further Assurances ........................................................................70
    I.    Notices to Debtors ........................................................................70
    J.    Governing Law ............................................................................73
    K.    Exhibits ......................................................................................73
    L.    No Strict Construction ....................................................................73
    M.    Conflicts ......................................................................................73

## PLAN EXHIBITS

Exhibit A    Millennium Corporate Claim Trust Agreement
Exhibit B    Millennium Lender Claim Trust Agreement
Exhibit C    New Holdco Charter
Exhibit D    New Holdco Bylaws
Exhibit E    New Term Loan Agreement

## PLAN APPENDICES

Appendix 1    RSA

JOINT PLAN OF REORGANIZATION OF
MILLENNIUM LAB HOLDINGS II, LLC, et al.

## INTRODUCTION

Millennium Lab Holdings II, LLC, a Delaware limited liability company, together with the above-captioned debtors (each a "Debtor" and collectively, the "Debtors") hereby proposes this prepackaged joint plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, events leading up to Solicitation of the Plan, projections, and for a summary and analysis of this Plan and the treatment provided for herein. The Debtors urge all Holders of Impaired Claims (as defined below) to review the Disclosure Statement and Plan in full. There also are other agreements and documents that will be filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits. All such Exhibits are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions set forth in the RSA (as defined herein), this Plan, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date.

If the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the RSA, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

## ARTICLE I

## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

**A.      Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or

supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.      Definitions

1.1      "Ad Hoc Group" means the members of the ad hoc group of Prepetition Lenders represented by Brown Rudnick LLP and listed on Exhibit A to the RSA term sheet, as amended from time to time as provided for in the RSA.

1.2      "Ad Hoc Group Majority" has the meaning set forth in the RSA.

1.3      "Administrative Agent" means Wilmington Savings Fund Society, FSB as successor administrative agent under the Existing Credit Agreement.

1.4      "Administrative Agent Fees" means the fees, expenses, and indemnities payable to the Administrative Agent, in its capacity as administrative agent, under the terms of the Existing Loan Documents.

1.5      "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

1.6      "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.7      "Allowed" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that the Debtors have assented to the validity of or that has been (a) allowed by an order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Plan, (c) allowed by agreement between the Holder of such Claim or Equity Interest and the Debtors or Reorganized Debtors, or (d) allowed or held to be valid or enforceable by an

order or judgment of a court or other tribunal in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" or an Equity Interest as an "Allowed Equity Interest," the Debtors do not waive their rights to contest the amount and validity of such Claim or Equity Interest to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim or Allowed Equity Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

  1.8 "Approved Plan" has the meaning set forth in the RSA.

  1.9 "Assumed Agreement" means an Executory Contract or Unexpired Lease which has been assumed by the Debtors.

  1.10 "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

  1.11 "Backstop MLH Shareholder" means any Contributing MLH Shareholder that funds a Non-Contributing MLH Shareholder's Pro Rata portion of the MLH Contribution.

  1.12 "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan and consent to the releases, exculpations and related provisions provided for in this Plan, including the ballots cast on or before the Solicitation Termination Date.

  1.13 "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

  1.14 "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

  1.15 "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, the Local Rules, and the Federal Rules of Civil Procedure, in each case as amended from time to time and as applicable to the Chapter 11 Cases or proceedings therein.

  1.16 "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

  1.17 "Cash" means legal tender of the United States of America.

1.18    "Cause of Action" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.    Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtors, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) any state law fraudulent transfer claim.

1.19    "Chapter 11 Cases" means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

1.20    "CIA" means that certain Corporate Integrity Agreement between Millennium and OIG dated October 15, 2015.

1.21    "Claim" means a "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

1.22    "Class" means one of the classes of Claims or Equity Interests listed in Article III of the Plan.

1.23    "CMS" means the Centers for Medicare and Medicaid Services.

1.24    "Company" means the Debtors, collectively.

1.25    "Comparative Fault Reduction" has the meaning set forth in Article X.L(i).

1.26    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order subject to all conditions specified in Article VIII.A having been satisfied, or waived as provided for in Article VIII.

1.27    "Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order on its docket, within the meanings of Bankruptcy Rules 5003 and 9021.

1.28    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.29    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan entered pursuant to section 1129 of the Bankruptcy Code and in the form and with the provisions as required herein.

1.30    "Consenting Lender Indemnity-Related Rights" has the meaning set forth in Article V.O of this Plan.

1.31    "Consenting Lenders" has the meaning set forth in the RSA.

1.32    "Consistent With The Restructuring Term Sheet" has the meaning set forth in the RSA.

1.33    "Consummation Deadline" has the meaning set forth in Article V.S of this Plan.

1.34    "Contributing MLH Shareholder" means an MLH Shareholder that has contributed to funding the MLH Contribution.

1.35    "Core Released Claims" means, collectively, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or Causes of Action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Effective Date arising out of, or in any way related to in any manner, the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, and the Restructuring Transactions and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto.  For the avoidance of doubt, Core Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agent as provided in Article V.O and Article VI.F of this Plan, any Retained Claims or claims against Excluded Parties.

1.36    "Cure" means the payment of Cash by the Debtors, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors may assume under section 365(a) of the Bankruptcy Code.  For the avoidance of doubt, the cure of all Medicare and Medicaid Agreements is set forth in Article VI.J of this Plan.

1.37    "Debtor Releasing Parties" means the Debtors and the Reorganized Debtors, each in their individual capacities and as debtors in possession.

1.38    "Debtors" means Holdings, Millennium, and RxAnte, LLC, as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.39    "Disclosure Statement" means that certain Disclosure Statement for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. under Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.40    "Distribution Agent" means New Holdco or any party designated by New Holdco to serve as distribution agent under this Plan.  Except for distributions of New Holdco Common Stock, which shall be effected by book entry by New Holdco, for purposes of distributions under this Plan to Holders of Allowed Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent.  For purposes of distributions under this Plan to Holders of Early Commitment Facility Claims, the Early Commitment Facility Agent shall act as the Distribution Agent.

1.41    "D&O Liability Insurance Policies" means all insurance policies for officers' liability maintained by the Debtors as of the Petition Date.

1.42    "DHA" means the Defense Health Agency of the United States Department of Defense.

1.43    "Distribution Record Date" means the date of entry of the Confirmation Order.

1.44    "Early Commitment Deadline" means 12:00 p.m. (prevailing Eastern Time) on November 5, 2015.

1.45    "Early Commitment Facility" means that senior secured term loan, which is senior in lien priority to the Existing Credit Agreement Claims, dated as of November 5, 2015 among Millennium, as borrower, the Early Commitment Facility Agent, as administrative agent, and the Consenting Lenders that voted to approve a Qualified Out-of-Court Transaction and this Plan and the releases thereunder or hereunder by the Early Commitment Deadline, and which was distributed Pro Rata to the Consenting Lenders.  Each Consenting Lender that participates in the Early Commitment Facility shall receive its Pro Rata share (based on all Existing Credit Agreement Claims held by Prepetition Lenders) of $50.0 million.

1.46    "Early Commitment Facility Agent" means Wilmington Savings Fund Society, FSB as administrative agent under the Early Commitment Facility and related loan documents.

1.47    "Early Commitment Facility Agent Fees" means the fees, expenses, and indemnities payable to the Early Commitment Facility Agent, in its capacity as administrative agent, under the terms of the Early Commitment Facility and loan documents related thereto.

1.48    "Early Commitment Facility Claim" means a Claim or obligation arising under or relating to the Early Commitment Facility other than the Early Commitment Facility Agent Fees.  The aggregate of all Early Commitment Facility Claims shall be Allowed in an aggregate principal amount not to exceed $50.0 million, plus any and all accrued interest, fees, and other amounts due and payable under the Early Commitment Facility.

1.49    "Effective Date" means the date on which the Plan shall take effect, which date shall be a Business Day on which (a) all conditions in Article VIII.B of the Plan have been satisfied or waived as provided for in Article VIII and (b) consummation of the Restructuring Transactions has commenced.

1.50    "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.51    "Equity Defendants" has the meaning set forth in Article X.F(iii) hereof.

1.52    "Equity Interest" means all outstanding ownership interests in any of the Debtors, including any interest evidenced by common or preferred stock, membership interest, option, or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

1.53    "Equity Transfer Date" means the date on which the Equity Interests in Reorganized Millennium are (i) transferred from the Holders of the Existing Equity Interests of Millennium to the Holders of Allowed Existing Credit Agreement Claims and (ii) immediately thereafter, transferred from the Holders of Allowed Existing Credit Agreement Claims to New Holdco, which date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA, and in any event shall be no later than December 31, 2015.

1.54    "Estates" means the estates of the Debtors in the Chapter 11 Cases, as created under section 541 of the Bankruptcy Code.

1.55    "Excluded Parties" means any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to (a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan Chase Bank, N.A., in its individual corporate capacity and in its capacity as a Prior Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) Suntrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i).

1.56    "Exculpated Parties" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Settling Members, (d) the Ad Hoc Group, (e) the Participating Lenders, (f) the Administrative Agent, (g) the Early Commitment Facility Agent, and (h) each such party's Related Parties; provided, however, that, for the avoidance of doubt, no Excluded Party shall be an Exculpated Party.

1.57    "Exculpation" means the exculpation provided in Article X.C hereof.

1.58    "Executory Contract" means a contract to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.59    "Exhibit" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified, or otherwise supplemented from time to time).

1.60    "Existing Credit Agreement" means that certain Credit Agreement, dated as of April 16, 2014, as amended by the Existing Credit Agreement Solicitation Amendment (as

amended, supplemented, or otherwise modified from time to time), among Millennium, Holdings, the Administrative Agent, and the lenders from time to time party thereto.

1.61    "Existing Credit Agreement Claim" means a Claim or obligation arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement, other than the Prior Agent Indemnity Claims.  The aggregate of all Existing Credit Agreement Claims shall be Allowed in the aggregate amount of $1,752,812,500 in outstanding principal, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents other than the Prior Agent Indemnity Claims.

1.62    "Existing Credit Agreement Solicitation Amendment" means that certain amendment to the Existing Credit Agreement that, among other things, allows the issuance of the Early Commitment Facility consistent with the terms of the RSA.

1.63    "Existing Equity Interest" means an Equity Interest in any Debtor that is authorized, issued, and outstanding prior to the Effective Date.

1.64    "Existing Loan Documents" means the Existing Credit Agreement together with all related loan documentation.

1.65    "Federal Administrative Settlement Agreement" means that certain Millennium Health, LLC Settlement Agreement to Resolve Administrative Denial and Overpayment Claims, as amended, supplemented, or modified from time to time, between and among HHS, acting through CMS and its officers and agents, including its contractors, and Millennium dated October 15, 2015.

1.66    "Federal PGT Settlement Agreement" means that certain Settlement Agreement – Pharmacogenetic Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.67    "Federal Settlement Parties" means the United States Parties, and the USA on behalf of HHS and CMS.

1.68    "Federal UDT Settlement Agreement" means that certain Settlement Agreement – Urine Drug Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.69    "Final Order" means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction as to which no stay has been entered and either the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired;

provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

1.70    "General Unsecured Claim" means any Claim against any Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Early Commitment Facility Claim, Existing Credit Agreement Claim, Prior Agent Indemnity Claim, Other Secured Claim, Government Claim, MLH Tax Note Claim, or Intercompany Claim.

1.71    "Government Claim" means a Claim by any of the USA Settlement Parties against any of the Debtors, as described in, and restricted by, the respective USA Settlement Agreements.    The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision. The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

1.72    "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.73    "Gross Damages" has the meaning set forth in has the meaning set forth in Article X.L(i).

1.74    "HHS" means the United States Department of Health and Human Services.

1.75    "Holder" means an Entity holding a Claim against, or Equity Interest in, any Debtor as of the applicable date of determination.

1.76    "Holdings" means Millennium Lab Holdings II, LLC, a Delaware limited liability company.

1.77    "Holdings LLC Agreement" means that certain Second Amended and Restated Limited Liability Agreement of Millennium Lab Holdings II, LLC.

1.78    "Impaired" refers to being impaired within the meaning of section 1124 of the Bankruptcy Code.

1.79    "Indemnification Agreement" means that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and W. Brock Hardaway, that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and Martin A. Price, and any other indemnification agreement between any of the Debtors and a Senior Executive not applicable to other executive officers.

1.80    "Initial USA Settlement Deposit" means the irrevocable $50 million ($50,000,000.00) initial deposit paid to the USA Settlement Parties upon execution of the USA

Settlement Agreements in partial satisfaction of Millennium's settlement obligations under the USA Settlement Agreements.

      1.81    "Intercompany Claim" means any Claim by a Debtor against another Debtor.

      1.82    "Interim Cash Collateral Order" means the Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363,502,503,507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Credit Parties; (III) Allowing Subrogation Claim; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (Docket No. 94).

      1.83    "JS Real Estate Leases" means the four (4) leases by and among Millennium, as lessee, and Pain In San Diego, LLC, a California limited liability company, as lessor, relating to Millennium's facilities at 16980 Via Tazon Building 1, San Diego, California 92127, 16981 Via Tazon Building 2, San Diego, California, 16980 Via Tazon, San Diego, California, and 15330 Avenue of Science, San Diego, California, in each case, as amended, supplemented, or otherwise modified from time to time.

      1.84    "Lender Releasing Parties" means, collectively, the Consenting Lenders, the Administrative Agent, and the Early Commitment Facility Agent.

      1.85    "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

      1.86    "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

      1.87    "Medicare and Medicaid Agreements" means any and all agreements or documentation necessary and required to enable the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, to participate in, and seek reimbursement from, the Medicare programs and Medicaid programs pursuant to 42 U.S.C. §§ 1395 et seq. and 42 U.S.C. §§ 1396 et seq., including, but not limited to, the Debtors' and Reorganized Debtors' (as applicable) enrollment agreements required under 42 C.F.R. §§ 424.500 et seq., and evidenced by their execution of the appropriate CMS 855 forms.

      1.88    "Millennium" means Millennium Health, LLC, a California limited liability company.

      1.89    "Millennium Claim Trusts" means the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust.

      1.90    "Millennium Corporate Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Corporate Claim Trust Agreement.

1.91    "Millennium Corporate Claim Trust Advisory Board" means that certain three-member board of the Millennium Corporate Claim Trust appointed by an Ad Hoc Group Majority.

1.92    "Millennium Corporate Claim Trust Agreement" means that certain trust agreement by and among the Millennium and Millennium Corporate Claim Trust Trustee, in substantially in the form attached as Exhibit A hereto.

1.93    "Millennium Funding Contribution" means the cash payment to be made by MLH and TA collectively to Millennium in an amount equal to $325 million less the amount comprising the USA Settlement Funding Contribution to Millennium.

1.94    "Millennium Lender Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Lender Claim Trust Agreement.

1.95    "Millennium Lender Claim Trust Advisory Board" means that certain three-member board of the Millennium Lender Claim Trust appointed by an Ad Hoc Group Majority.

1.96    "Millennium Lender Claim Trust Agreement" means that certain trust agreement by and among the Company and Millennium Lender Claim Trust Trustee, in substantially in the form attached as Exhibit B hereto.

1.97    "MLH" means Millennium Lab Holdings, Inc., a Delaware Corporation.

1.98    "MLH and/or TA Liability" has the meaning set forth in Article X.L(ii) of this Plan.

1.99    "MLH Contribution" means fifty five percent (55%) of the Settlement Contribution, or $178.75 million, to be funded by MLH.

1.100    "MLH Shareholders" means the holders of equity interests in MLH.

1.101    "MLH Tax Note" means that certain Promissory Note dated as of May 1, 2014, issued by Millennium to MLH in the original principal sum of $19,755,547.00, as amended, supplemented or modified from time to time.

1.102    "MLH Tax Note Claims" means any Claims or obligations arising under or pursuant to the MLH Tax Note.

1.103    "New Board" means the initial board of directors of New Holdco as designated pursuant to Article V.L of this Plan.

1.104    "New Holdco" means a Delaware corporation to be formed by the Prepetition Lenders on or prior to the Equity Transfer Date which shall be the parent holding company of Reorganized Millennium pursuant to the transactions contemplated herein.

1.105  "New Holdco Common Stock" means the shares of common stock of New Holdco with a par value of $0.01 and that shall be fully paid and non-assessable upon issuance.

1.106  "New Holdco Organizational Documents" means the charter of incorporation of New Holdco in substantially the form contained in Exhibit C of this Plan, the bylaws of New Holdco in substantially the form contained in Exhibit D of this Plan, or any other applicable organizational documents of New Holdco.

1.107  "New Securities and Debt Documents" means collectively, the New Holdco Common Stock, the New Term Loan Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

1.108  "New Term Loan" means that certain secured term loan in the aggregate principal amount of $600 million to be made under the terms of the New Term Loan Agreement.

1.109  "New Term Loan Agreement" means that certain agreement providing for the New Term Loan in the form attached as Exhibit E of this Plan to be included in the Plan Supplement.

1.110  "Non-Consenting Lender" means a Prepetition Lender that is not a Consenting Lender.

1.111  "Non-Contributing MLH Shareholder" means an MLH Shareholder that has not funded, in any part, the MLH Contribution.

1.112  "Non-Contributing MLH Shareholder Claim" means any known and unknown claims and causes of action against Non-Contributing MLH Shareholders.

1.113  "Non-Contribution Action" has the meaning set forth in Article X.L(ii) of this Plan.

1.114  "OIG" means the Office of the Inspector General of HHS.

1.115  "Operating Agreements" has the meaning set forth in Article VI.F of this Plan.

1.116  "OPM" means the United States Office of Personnel Management.

1.117  "Ordinary Course Professionals Order" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

1.118  "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.119  "Other Secured Claims" means all Secured Claims against the Debtors other than the Prior Agent Indemnity Claims or the Existing Credit Agreement Claims.

1.120  "Participating Lenders" has the meaning set forth in the RSA.

1.121  "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

1.122  "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.123  "Plaintiff States" means the plaintiff states that are party to the States UDT Settlement and the States PGT Settlement Agreement and any such states that may become a party thereto from time to time.

1.124  "Plan" has the meaning set forth in the Introduction and includes the Exhibits and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

1.125  "Plan Supplement" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.

1.126  "Post-Closing Tax Period" means any tax period beginning after the Equity Transfer Date and, with respect to any tax period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period beginning after the Equity Transfer Date.

1.127  "Pre-Closing Tax Period" means any taxable period ending on or before the Equity Transfer Date and, with respect to any taxable period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period ending on and including the Equity Transfer Date.

1.128  "Prepetition Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Existing Credit Agreement from time to time.

1.129  "Preserved Estate Claims" means all known and unknown claims and Causes of Action (including derivative claims) of Millennium against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.130  "Preserved Indemnified Parties" has the meaning set forth in Article VI.F of this Plan.

1.131  "Preserved Lender Claims" means all known and unknown direct and derivative claims and Causes of Action of the Lenders against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.132 "Prior Agents" means, collectively: (a) JPMorgan Chase Bank, N.A., in its capacity as the prior administrative agent under the Existing Loan Documents, (b) Citibank Global Markets Inc., it its capacity as the syndication agent under the Existing Loan Documents, (c) BMO Capital Markets Corp. and Suntrust Bank, in their capacities as Co-Managers and Co-Documentation Agents under the Existing Loan Documents, (d) J.P. Morgan Securities LLC and Citibank Global Markets Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners under the Existing Loan Documents and (e) to the extent indemnified under the Existing Loan Documents, any affiliates, officers, directors, employees, agents, advisors, partners and controlling persons of the foregoing parties listed in clauses (a) through (d) hereof.

1.133 "Prior Agent Indemnity Claims" means all indemnification Claims of the Prior Agents against any of the Debtors arising under and to the extent provided in the Existing Loan Documents.

1.134 "Prior Agent Lender Indemnity Obligations" means all indemnification obligations of the Prepetition Lenders to the Prior Agents arising under and to the extent provided in the Existing Loan Documents.

1.135 "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.136 "Pro Rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.137 "Professional" means any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise.

1.138 "Professional Claims Bar Date" means the date that is forty-five (45) days after the Effective Date.

1.139 "Professional Fee Claim" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

1.140 "Professional Fee Escrow Account" means an account to be funded by the Debtors pursuant to Article II.A(i)(3) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.141 "Professional Fee Reserve Amount" means the aggregate amount of unpaid Professional Fee Claims through the Effective Date, as estimated pursuant to Article II.A(i)(2) of the Plan.

1.142 "Proof of Claim" means a proof of Claim or Equity Interest filed against any Debtor in the Chapter 11 Cases.

1.143 "Qualified Out-of-Court Transaction" has the meaning set forth in the RSA.

1.144 "Reinstated" or "Reinstatement" means, with respect to any Claim: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

1.145 "Related Parties" means, with respect to an Entity, collectively, current and former affiliates of such Entity, and such Entity's and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holders' spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals. For the avoidance of doubt, none of the Excluded Parties shall be a Related Party to any of the Released Parties.

1.146 "Released Claims" means (a) solely with respect to the Released Parties, any and all Core Released Claims and (b) with respect to the Related Parties of the Released Parties, all Core Released Claims, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, the Restructuring Transactions and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement. For the avoidance of doubt, Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agents as provided in Article V.O and Article VI.F of this Plan.

1.147 "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders and Consenting Lenders; (e) Wilmington Savings Fund Society, FSB, in its capacity as the Administrative Agent; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard

Appel; (j) David Cohen; (k) Greg Stein, (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) Murray Rosenthal; (o) those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable, (p) the Early Commitment Facility Agent, and (q) Brown Rudnick, LLP and FTI; provided, however, that in the event that an Excluded Party is also a Prepetition Lender under the Existing Credit Agreement, its status as a Participating Lender or a Consenting Lender shall not make it a Released Party for any purpose.

1.148   "Reorganized" means, in reference to a Debtor, such Debtor from and after the Effective Date.

1.149   "Restructuring Transactions" means the restructuring transactions described in the RSA and herein, whether implemented pursuant to a Qualified Out-of-Court Transaction or an Approved Plan, in each case, which shall be implemented Consistent With The Restructuring Term Sheet and the tax provisions described therein.

1.150   "Retained Claim Judgment" has the meaning set forth in Article X.L of this Plan.

1.151   "Retained Claim Plaintiff" has the meaning set forth in Article X.L of this Plan.

1.152   "Retained Claims" means collectively, the Preserved Estate Claims and the Preserved Lender Claims.

1.153   "Retained Corporate Causes of Action" means any and all claims and Causes of Action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium and the Administrative Agent (in its capacity as agent under the Existing Loan Documents), including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action expressly released under this Plan, including, without limitation the claims subject to the bar order pursuant to Article X.J of this Plan and the injunction pursuant to Article X.K of this Plan.

1.154   "Retained Lender Causes of Action" means the individual claims and Causes of Action of each of the Consenting Lenders against any Person or Entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action that are released under this Plan and/or subject to the bar order and injunction provisions of this Plan.

1.155   "RSA" means that certain Restructuring Support Agreement dated October 15, 2015 by and among the Debtors, the Settling Members, and each of the Participating Lenders signatories thereto, attached hereto as Appendix 1, as may be amended, supplemented, or modified from time to time, as provided for therein.

1.156   "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.157 "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

1.158 "Senior Executive" shall have the meaning set forth in the RSA.

1.159 "Settlement Contribution" means a cash payment of $325 million comprised of the USA Settlement Funding Contribution and the Millennium Funding Contribution, to be paid to, or for the benefit of, Millennium pursuant to the terms of the USA Settlement Agreements, the RSA, and this Plan.

1.160 "Settlement Letters of Credit" means (i) the irrevocable letters of credit in the amount, including interest, as required by the USA Settlement Agreements, posted by MLH and TA on or before November 9, 2015 for the benefit of the USA Settlement Parties pursuant to the terms of the USA Settlement Agreements; or (ii) the funds in the amount, including interest, as required by the USA Settlement Agreements to be placed into escrow by MLH and/or TA on or before November 9, 2015, pursuant to the terms of the USA Settlement Agreements and the terms of escrow agreements mutually acceptable to the USA Settlement Parties and MLH and/or TA.

1.161 "Settlement Letters of Credit Funds" means the cash proceeds from a draw on the Settlement Letters of Credit by the USA, including a draw on the funds in escrow.

1.162 "Settling Members" means, collectively, MLH and TA.

1.163 "Solicitation" means the Debtors' formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

1.164 "Solicitation Termination Date" means November 8, 2015 at 5:00 p.m. (prevailing Eastern Time).

1.165 "States PGT Settlement Agreement" means those certain Millennium Genetic Testing State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.166 "States UDT Settlement Agreement" means those certain Millennium UDT State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.167 "Subrogation Claim" has the meaning set forth in the RSA, and includes the Liens and assignments described in the RSA to secure payment of such claim subject to the terms of any Final Order authorizing the Debtors' use of its cash collateral and granting related relief, or, if no Final Order is entered, the Interim Cash Collateral Order.

1.168 "TA" means TA Millennium, Inc., a Delaware corporation.

1.169   "TA Shareholders" means the holders of equity interests in TA.

1.170   "Tax Code" means the Internal Revenue Code of 1986, as amended.

1.171   "Third Party Payers" means, collectively, the Entities that pay or reimburse the Debtors for services rendered to a third party.

1.172   "Third Party Payer Contracts" means contracts between the Debtors and Third Party Payers.

1.173   "Third Party Releasing Parties" means, collectively, the Holders of Claims against or with respect to or Equity Interests in the Debtors, including Non-Consenting Lenders.

1.174   "Trust Delayed Draw Facility" means that $7,000,000 facility between Reorganized Millennium, the Millennium Corporate Claim Trust, and the Millennium Lender Claim Trust, pursuant to which Reorganized Millennium shall advance up to $7,000,000 in the aggregate to the Millennium Corporate Claim Trust and/or the Millennium Lender Claim Trust in respect of fees and costs thereof.

1.175   "Unexpired Lease" means a lease to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including, without limitation, the JS Real Estate Leases.

1.176   "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.177   "Unimpaired" means any Claim or Equity Interest that is not designated as Impaired.

1.178   "United States Parties" means collectively, the USA on behalf of the OIG, the DHA, and the OPM.

1.179   "USA" means the United States of America.

1.180   "USA Settlement Parties" means collectively, the Federal Settlement Parties and the Plaintiff States.

1.181   "USA Settlement Agreements" means, collectively, the Federal UDT Settlement Agreement, the States UDT Settlement Agreement, the Federal PGT Settlement Agreement, the States PGT Settlement Agreement, the Federal Administrative Settlement Agreement, and the CIA, and all respective exhibits thereto.

1.182   "USA Settlement Assumption Order" means the Final Order approving the assumption of the USA Settlement Agreements, which order may be the Confirmation Order.

– 18 –

1.183 "USA Settlement Funding Contribution" means the payment to be made by MLH and TA severally to or for the benefit of Millennium in the amount of $206 million plus accrued interest to be distributed to the USA as provided in the USA Settlement Agreements on account of the Government Claims.

1.184 "Voting Agent" means Prime Clerk LLC, and any successor.

1.185 "Voting Class" means the Class of Existing Credit Agreement Claims.

1.186 "Voting Record Date" means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is October 29, 2015 for all Holders of Claims.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

### A.    Administrative Claims

Subject to subparagraph (i) below, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Administrative Claim will (i) be Reinstated, (ii) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder, or (iii) will otherwise be left Unimpaired; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due. Any taxes that arose postpetition shall be paid in the ordinary course of business and the taxing authorities that hold Claims on account of such postpetition taxes shall not be required to file a proof of claim for an Administrative Claim in the Chapter 11 Cases.

### (i)    Professional Fee Claims

1.    Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; provided that the upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of

business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtors of such hearing.

2.   Professional Fee Reserve Amount.   Prior to the Effective Date, the Professionals shall estimate their Professional Fee Claims through the Effective Date and shall deliver such estimate to the Debtors for the purposes of determining the amount held in the Professional Fee Escrow Account. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account.

3.   Professional Fee Escrow Account.   On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

4.   RSA Fees.   The foregoing shall not apply to (x) the Debtors' obligations to pay the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group as professional advisors to the Ad Hoc Group pursuant to the RSA and this Plan or (y) the Administrative Agent's Fees under this Plan.

**B.   Priority Tax Claims**

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Priority Tax Claim will (i) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Priority Tax Claim or (b) such other less favorable treatment as agreed to in

writing by the Debtors or Reorganized Debtors, as applicable, and such Holder or (ii) otherwise be left Unimpaired; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date.

**ARTICLE III**

**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.    Introduction**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**B.    Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Early Commitment Facility Claims | Unimpaired | Presumed to Accept |
| 2 | Existing Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Prior Agent Indemnity Claims | Unimpaired | Presumed to Accept |
| 4 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Government Claims | Unimpaired | Presumed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | MLH Tax Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Existing Equity Interests in Holdings | Unimpaired | Presumed to Accept |
| 10 | Existing Equity Interests in Millennium | Impaired | Deemed to Reject |
| 11 | Existing Equity Interests in RxAnte, LLC | Unimpaired | Presumed to Accept |

**C.    Classification and Treatment of Claims and Equity Interests**

(i)    Class 1 – Early Commitment Facility Claims.

1.    Classification:  Class 1 consists of all Early Commitment Facility Claims.

2.    Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Early Commitment Facility Claim shall be paid in full

– 21 –

in Cash. In addition, on or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility Agent shall receive payment in full in Cash of the Early Commitment Facility Agent Fees, and the Reorganized Debtors are authorized to pay such Early Commitment Facility Agent Fees without the need for further Bankruptcy Court approval.

3.        Impairment and Voting: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(ii)    Class 2 – Existing Credit Agreement Claims.

1.        Classification: Class 2 consists of all Existing Credit Agreement Claims. The Existing Credit Agreement Claims are Allowed Claims in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims.

2.        Treatment: On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, canceled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:

(A)    on the Equity Transfer Date, such Holder's Pro Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V. D(iii) of this Plan;

(B)    on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;

(C)    on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of this Plan, such Holder's Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust; and

(D)    to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to the reimbursement rights of the Backstop

MLH Shareholders as provided in Article V.G of this Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.

In addition, on or as reasonably practicable after the Equity Transfer Date, the Administrative Agent shall receive payment in full in Cash of the Administrative Agent Fees, and Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group shall receive payment in full of any fees and expenses owed to them under the RSA as advisors to the Ad Hoc Group.  New Holdco, Reorganized Millennium, and its subsidiaries are authorized to pay such fees without the need for further Bankruptcy Court approval or the filing of fee applications.  The payment of such fees shall be subject to paragraph 14(d) of the Interim Cash Collateral Order.

Collectively, the distributions of payments to the Holders of Existing Credit Agreement Claims and the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan, and the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group pursuant to the RSA shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Existing Credit Agreement, except as provided with respect to the Administrative Agent in Article V.O hereof.

      3.    <u>Impairment and Voting</u>:  Class 2 is Impaired by the Plan.  Each Holder of an Allowed Existing Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(iii)    <u>Class 3 – Prior Agent Indemnity Claims</u>.

      1.    <u>Classification</u>:  Class 3 consists of all Prior Agent Indemnity Claims.

      2.    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; <u>provided</u>, <u>however</u> for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under this Plan, Reorganized Holdings shall be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty shall be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of the principal and interest outstanding under the Early Commitment Facility.

      3.    <u>Impairment and Voting</u>:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively presumed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(iv)    <u>Class 4 – Other Secured Claims</u>.

    1.    <u>Classification</u>: Class 4 consists of all Other Secured Claims.

    2.    <u>Treatment</u>: With respect to each Other Secured Claim that becomes due or payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim (A) shall be paid in full in Cash, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be; (B) shall have its Allowed Other Secured Claim Reinstated, and paid in full, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later to occur of the Effective Date or when such Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) shall have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 4 Claim will have agreed upon in writing; <u>provided</u> that Class 4 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

    3.    <u>Impairment and Voting</u>: Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

(v)    <u>Class 5 – Government Claims</u>.

    1.    <u>Classification</u>:    Class 5 consists of all Government Claims.    The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision. The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

    2.    <u>Treatment</u>:    On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement

Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements or (2) Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.

        3.      <u>Impairment and Voting</u>: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(vi)     <u>Class 6 – General Unsecured Claims</u>.

        1.      <u>Classification</u>: Class 6 consists of all General Unsecured Claims.

        2.      <u>Treatment</u>: On or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall (A) be paid in full in Cash; (B) have its Allowed General Unsecured Claim Reinstated, and paid in full, including postpetition interest (which shall not accrue at a default rate), if any, on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' or Reorganized Debtors' business operations or when such Claim becomes due or Allowed by order or judgment of a court or other tribunal of competent jurisdiction; (C) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 6 Claim will have agreed upon in writing.

        3.      <u>Impairment and Voting</u>: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

(vii)    <u>Class 7 – MLH Tax Note Claims</u>.

        1.      <u>Classification</u>: Class 7 consists of all MLH Tax Note Claims.

        2.      <u>Treatment</u>: On the Effective Date, all of the Debtors' outstanding obligations under the MLH Tax Note shall be extinguished, canceled, and discharged, and each Holder of an MLH Tax Note Claim shall receive no distribution on account of such Claim.

3.    Impairment and Voting: Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(viii)    Class 8 – Intercompany Claims.

1.    Classification: Class 8 consists of all Intercompany Claims.

2.    Treatment: On the Effective Date, all Allowed Intercompany Claims, at the sole option of the Debtors or Reorganized Debtors, shall be (A) Reinstated and treated  or paid in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (B) canceled, extinguished, and discharged.

3.    Impairment and Voting: Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(ix)    Class 9 – Existing Equity Interests in Holdings.

1.    Classification: Class 9 consists of all Existing Equity Interests in Holdings.

2.    Treatment: On the Effective Date, all Allowed Existing Equity Interests in Holdings shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.    Impairment and Voting: Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Equity Interests will not be entitled to vote to accept or reject the Plan.

(x)    Class 10 – Existing Equity Interests in Millennium.

1.    Classification: Class 10 consists of all Existing Equity Interests in Millennium.

2.    Treatment: On the Equity Transfer Date, all Existing Equity Interests in Millennium shall be presumed automatically cancelled, released, and extinguished without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors or the Reorganized Debtors thereunder shall be discharged.

3.    Impairment and Voting: Class 10 is an Impaired Class, and the Holders of Class and the Holders of Class 10 Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests will not be entitled to vote to accept or reject the Plan.

– 26 –

(xi)    Class 11 – Existing Equity Interests in RxAnte LLC.

1.    Classification: Class 11 consists of all Existing Equity Interests in RxAnte LLC.

2.    Treatment: On the Effective Date, all Allowed Existing Equity Interests in RxAnte LLC shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.    Impairment and Voting: Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 11 Equity Interests will not be entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

**E.    Discharge of Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, and effective as of the Effective Date or Equity Transfer Date, as applicable: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**F.    Alternative Treatment**

Notwithstanding any provision herein to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other less favorable distribution or treatment to which it and the Debtors or Reorganized Debtors may agree in writing.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance of Plan**

Classes 1, 3, 4, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.      Deemed Rejection of Plan**

Classes 7 and 10 are Impaired and Holders of Class 7 Claims and Class 10 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.      Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Class (Class 2) will be entitled to vote to accept or reject the Plan.

**D.      Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Such modification shall not substantially alter the treatment of the Government Claims pursuant to the USA Settlement Agreements.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims**

As set forth herein, this Plan embodies an overall negotiated settlement of numerous disputed Claims and issues pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates,

creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

      (i)     Settlements and Releases

      In consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement between the Debtors, the Settling Members, and the Consenting Lenders regarding, inter alia, the Released Claims held by (or that could be asserted by or on behalf of) the Consenting Lenders, the Existing Credit Agreement Claims (including, without limitation, the treatment of the Holders of Existing Credit Agreement Claims under the Plan and the releases provided for herein), and the treatment of the Settling Members under the Plan (including the releases and related provisions provided herein), and in partial consideration therefor, the Settlement Contribution.

      In accordance with and subject to the terms of the RSA and the USA Settlement Agreements, and in exchange for the treatment of the Settling Members provided for in the RSA and this Plan (including the releases provided for herein), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Settling Members shall collectively make a Cash payment to, or for the benefit of, Millennium in the form of the Settlement Contribution. The Settlement Contribution shall be funded 55% by MLH, and 45% by TA as follows: (x) $178.75 million to be funded by MLH and (y) $146.25 million to be funded by TA. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

      (ii)    USA Settlement

      The provisions of the USA Settlement Agreements constitute a good faith compromise and settlement between the Debtors and the USA Settlement Parties of the Government Claims as specifically described in, and restricted by, the USA Settlement Agreements. The Debtors shall continue to perform their obligations under the USA Settlement Agreements and the USA Settlement Assumption Order. To the extent the USA Settlement Assumption Order has not been entered on or before the Effective Date, the USA Settlement Agreements shall be assumed and the Subrogation Claim shall be approved under this Plan. Pursuant to Article III.C(v)(2), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors shall pay (or cause to be paid) the Government Claims in full from the proceeds of the USA Settlement Funding Contribution plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements. The USA Settlement Funding Contribution shall be paid to the USA. If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements. The Cash payment of the Initial USA Settlement Deposit shall be final and irrevocable and shall not be subject to any Avoidance Action or any other avoidance or recovery on any basis in law or equity. Any and all

– 29 –

claims against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit shall be waived by the Debtors and their Estates and no Entity shall bring any claim against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit, and all such claims by any Entity are permanently and indefinitely prohibited, barred, and enjoined.

## B.    Corporate Existence

On or prior to the Effective Date, New Holdco will be formed, and pursuant to the transactions contemplated under this Plan, will become the parent entity of Reorganized Millennium. The charter of incorporation and by-laws of New Holdco will be substantially in the form of the New Holdco Organizational Documents. The Reorganized Debtors shall continue to exist as separate legal entities, pursuant to the applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Vesting of Assets in the Reorganized Debtors

Except as provided in Article V.F of the Plan with respect to the property and assets to be transferred to the Millennium Corporate Claim Trust, elsewhere in the Plan, in the USA Settlement Agreements, or in the Confirmation Order, on or after the Equity Transfer Date, all property and assets of the Estates (including, without limitation, Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of this Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

## D.    New Term Loan; Sources of Consideration for Plan Distributions

(i)    New Term Loan

On the Equity Transfer Date, the applicable Reorganized Debtors will be authorized to execute and deliver the New Term Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in

each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the New Term Loan Agreement).

      (ii)     Settlement Contribution

On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors will receive the benefit of the Settlement Contribution by reason of the funding of the USA Settlement Funding Contribution and receipt of the Millennium Funding Contribution thereafter, and the USA Settlement Funding Contribution shall be paid to the USA. As set forth herein, the Settlement Contribution will be utilized (1) to make (or cause to be made) the required distributions to the Holders of Allowed Government Claims under the Plan; (2) to reimburse Millennium for the Initial USA Settlement Deposit; (3) for working capital needs in the Reorganized Debtors' operations; and (4) to pay the Early Commitment Facility Claims. If the USA Settlement Funding Contribution is not paid to the USA as contemplated in this Plan, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

      (iii)     Equity Interests in Reorganized Millennium

On the Equity Transfer Date, 100% of the Equity Interests of Reorganized Millennium shall be transferred and shall be deemed transferred, on behalf of Holders of Existing Credit Agreement Claims, to New Holdco in exchange for 100% of the New Holdco Common Stock.

      (iv)     Cash Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' or Reorganized Debtors' Cash balances, including Cash from operations and the Millennium Funding Contribution. Other than the USA Settlement Funding Contribution, Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**E.    New Holdco Common Stock Issued Under the Plan**

On the Equity Transfer Date, immediately following the transfer of 100% of the Equity Interests in Reorganized Millennium to New Holdco, in exchange therefor, New Holdco will distribute the New Holdco Common Stock Pro Rata to the Holders of Existing Credit Agreement Claims pursuant to the terms set forth in the Plan and the RSA. The New Holdco Common Stock shall be subject to potential dilution from any equity incentive plan adopted in the future.

**F.    Millennium Corporate Claim Trust**

      (i)     Formation of Millennium Corporate Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Corporate Claim Trust shall be created by

Millennium and shall be funded by Reorganized Millennium in the amount of $1,000,000 in Cash (as provided below) plus such additional tangible or intangible assets of Millennium as Reorganized Millennium shall determine. The Millennium Corporate Claim Trust shall be governed and administered in accordance with the Millennium Corporate Claim Trust Agreement substantially in the form attached as Exhibit A. The Millennium Corporate Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Corporate Claim Trust, and if necessary, a replacement trustee therefor.

  (ii) Millennium Corporate Claim Trust Assets

   Substantially simultaneously with the formation of the Millennium Corporate Claim Trust, the Retained Corporate Causes of Action shall be automatically deemed to have been contributed to the Millennium Corporate Claim Trust. The Millennium Corporate Claim Trust shall be funded by an initial Cash contribution by Reorganized Millennium of in the amount of $1,000,000. Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Corporate Claim Trust at the request of the Millennium Corporate Claim Trust Advisory Board. Amounts advanced by Reorganized Millennium to the Millennium Corporate Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Corporate Claim Trust (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Corporate Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium). The initial $1,000,000 cash contribution and subsequent payment of up to $10,000,000 of invoices shall not be required to be reimbursed.

  (iii) Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

   The beneficiaries of the Millennium Corporate Claim Trust are the Holders of Existing Credit Agreement Claims. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution. Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.F(iii), the Holders of Existing Credit Agreement Claims shall receive their Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust, as provided in Article III.C(ii)(2) of this Plan.

(iv)    Federal Income Tax Treatment of Millennium Corporate Claim Trust

The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust. For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party acting reasonably and in good faith to cooperate with one another to jointly determine such values.

## G.    Millennium Lender Claim Trust

(i)    Formation of Millennium Lender Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Lender Claim Trust shall be created and shall be funded by Reorganized Millennium in the amount of $2,000,000 Cash (as provided below), plus such additional tangible or intangible assets as the Reorganized Millennium shall determine. The Millennium Lender Claim Trust shall be governed and administered in accordance with the Millennium Lender Claim Trust Agreement substantially in the form attached as Exhibit B. The Millennium Lender Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Lender Claim Trust, and if necessary, a replacement trustee therefor.

(ii)    Millennium Lender Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Lender Claim Trust, the Consenting Lenders shall each be automatically deemed to have contributed the Retained Lender Causes of Action to the Millennium Lender Claim Trust. The Millennium Lender Claim Trust shall be funded by an initial contribution by Reorganized Millennium of in the amount of $2,000,000. Thereafter, Reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Lender Claim Trust at the request of the

– 33 –

Millennium Lender Claim Trust Advisory Board.    Amounts advanced by Reorganized Millennium to the Millennium Lender Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Lender Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Lender Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium).    The initial $2,000,000 cash contribution and subsequent payment of up to $10,000,000 in payment of invoices shall not be required to be reimbursed.

      (iii)     Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution.  Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.G(iii), the Consenting Lenders shall receive their Pro Rata share, based on the aggregate principal amount of only those Existing Credit Agreement Claims held by all Consenting Lenders, of beneficial interests in the Millennium Lender Claim Trust, as provided in Article III.C(ii)2 of this Plan.

      (iv)     Federal Income Tax Treatment of Millennium Lender Claim Trust

The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.

**H.**    **Issuance of New Securities and Related Documentation**

On the Equity Transfer Date, but after the transactions described in clause (i) of the definition of Equity Transfer Date, the Reorganized Debtors and New Holdco will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance and distribution of the New Holdco Common Stock will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Equity Transfer Date contemplated by or in furtherance of the Plan, including, without limitation, the New Term Loan Agreement, the New Holdco Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon

the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Equity Transfer Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of New Holdco will be that number of shares of New Holdco Common Stock as may be designated in the New Holdco Organizational Documents.

**I.      Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Equity Transfer Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens, Claims, or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

**J.      Reservation of Certain Claims of Governmental Units**

Notwithstanding any other provision of the Plan, the Bankruptcy Code, or the Confirmation Order, the Debtors  shall not be released from, property and assets shall not vest in the Reorganized Debtors free and clear of, and the USA Settlement Parties specifically reserve, the following claims:

(i)      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

(ii)      Any criminal liability;

(iii)      Except as explicitly stated in the USA Settlement Agreements, any administrative liability/action, including, without limitation, mandatory exclusion from federal health care programs;

(iv)      Any liability to the USA (or its agencies) for any conduct other than the (i) Covered Conduct in the Federal UDT Settlement Agreement, (ii) Covered Conduct in the States UDT Settlement Agreement, (iii) Covered Conduct in the Federal PGT Settlement Agreement, and (iv) Covered Conduct in the States PGT Settlement Agreement (in each case, as "Covered Conduct" is defined in each respective USA Settlement Agreement);

(v)      Any liability based upon obligations created by the USA Settlement Agreements;

(vi)    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(vii)    Any liability for failure to deliver goods or services due;

(viii)    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct (as defined in each respective USA Settlement Agreement); and

(ix)    Any liability of individuals as specifically reserved for in each respective USA Settlement Agreement related to the Covered Conduct (as defined in each respective USA Settlement Agreement);

(x)    Any right of HHS or CMS to reopen and deny claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for fraud or similar fault under 42 C.F.R. § 405.980; or

(xi)    Any liability for the claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for which payment is reduced pursuant to any Medicare coverage or payment law, regulation, or guidance, other than for submission of claims that were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

**K.    New Holdco and Reorganized Debtors Organizational Documents**

The certificates of incorporation and bylaws or other organizational documents of the Reorganized Debtors shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code Consistent With The Restructuring Term Sheet. The New Holdco Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall authorize the issuance of New Holdco Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan. In each case, the applicable organizational documents of the Reorganized Debtors or New Holdco will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, and (iii) with respect to New Holdco, Millennium and its subsidiaries, include other provisions concerning corporate governance and shareholder rights as may be agreed upon by the Ad Hoc Group Majority. After the Effective Date, New Holdco and the Reorganized Debtors may amend and restate their certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

**L.    Directors and Officers of Reorganized Debtors**

On the Effective Date, the New Board shall be as selected by the Ad Hoc Group Majority and disclosed in the Plan Supplement. To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such

Person is an insider, the nature of any compensation for such Person. Each such director and each officer of Millennium and RxAnte will serve from and after the Effective Date pursuant to applicable law and the terms of the New Holdco Organizational Documents and their other constituent and organizational documents and any employment agreements entered into with such Person.

## M.    Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors and/or the Reorganized Debtors shall enter into the Restructuring Transactions and any documents contemplated hereunder. The Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization structure of the Reorganized Debtors Consistent With The Restructuring Term Sheet. The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate. The actions taken by the Debtors and/or the Reorganized Debtors to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan and any documents contemplated hereunder, and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and any documents contemplated hereunder, and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the Debtors and/or the Reorganized Debtors determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

## N.    Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the Restructuring Transactions, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, members, officers, or directors of any Debtor (as of prior to the Effective Date) will be deemed to have been so

approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the equity holders, members, officers, or directors, of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the equity holders, members, officers, or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, any appropriate officer of the Debtors or the Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, file, record, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or referenced in the Plan in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable, including but not limited to those items referenced specifically in Article V.M and this Article V.N, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**O.    Cancellation of Notes, Certificates and Instruments**

On the Equity Transfer Date, and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by New Holdco and the Reorganized Debtors, as applicable and delivered to the party or parties entitled thereto, except as provided below, all notes, stock, instruments, certificates, agreements and other documents evidencing the Existing Credit Agreement Claims and the Existing Equity Interests in Millennium will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. On the day following the date that the final distribution is made by Administrative Agent, the Administrative Agent will be released and discharged from any further responsibility under the Existing Loan Documents; provided, however, that any and all rights of indemnification applicable to the Administrative Agent (including, without limitation, any rights related to reimbursement of Administrative Agent Fees) or the Prior Agents, respectively, under the Existing Loan Documents and related documents shall survive and remain in full force and effect; provided further, however, until the Administrative Agent Fees have been paid in full, the Administrative Agent will retain its charging liens under the Existing Loan Documents with respect to any cash distributions to be made under the Plan by the Administrative Agent.  For the avoidance of doubt, by virtue of such Reinstatement or assumption, as applicable, any Prior Agent Indemnity Claims and Prior Agent Lender Indemnity Obligations shall continue to be governed by Sections 9.7 and 10.5, as applicable, of the Existing Credit Agreement and any other applicable provisions

of the Existing Loan Documents, and the Consenting Lenders shall have and retain all indemnity-related rights conferred on them pursuant to Section 9.7 of the Existing Credit Agreement and any other applicable provisions of the Existing Loan Documents and applicable law (collectively, the "Consenting Lender Indemnity-Related Rights") and in the event either the Prepetition Lenders or the Debtors (or the Reorganized Debtors, except for Holdings) make any payment in respect of a Prior Agent Indemnity Claim or Prior Agent Lender Indemnity Obligation, as applicable, nothing contained in this Plan shall be deemed to constitute a release of any Consenting Lender Indemnity-Related Rights or other indemnity, contribution or other claims or rights the Prepetition Lenders, the Debtors or such Reorganized Debtors may have as against each other under the Existing Loan Documents or otherwise applicable law.

**P.      Preservation and Maintenance of Debtor Causes of Action**

(i)      Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action that are not Released Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not Released Claims without notice to or approval from the Bankruptcy Court. The Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) may pursue such retained claims, rights or Causes of Action, suits, or proceedings as appropriate, but for the avoidance of doubt, not any Released Claims, in accordance with the best interests of the Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) who hold such rights.

(ii)      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article X.J of this Plan, Article X.K of this Plan, and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, other than with respect to Released Claims, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Corporate Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes

of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). Any Retained Corporate Causes of Action shall be transferred to the Millennium Corporate Claim Trust in accordance with Article V.F of this Plan for later adjudication by the Millennium Corporate Claim Trust. In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**Q.    Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by a Debtors to a Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**R.    Certain Tax Matters**

(i)    Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to this Agreement shall be allocated in accordance with the Holdings LLC Agreement; (B) the acquisition by the Holders of Existing Credit Agreement Claims of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Holders of Existing Credit Agreement Claims and the acquisition of the assets of Millennium by the Holders of Existing Credit Agreement Claims; and (C) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

Subject to the preceding paragraph, for U.S. federal tax purposes (and for all other applicable tax purposes), the creation of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of assets to the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of beneficial interests in the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, and the transfer of 100% of the Equity Interests In Reorganized Millennium to the Holders of Existing Credit Agreement Claims shall be characterized as an integrated transaction. Such integrated transaction shall be treated as the receipt by each Holder of Existing Credit Agreement Claims, in full and final satisfaction of the Existing Credit Agreement Claims, of its Pro Rata share of and interest in (A) 100% of the

Equity Interests in Reorganized Millennium and (B) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the characterization provided in this Article V.R, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

(ii)    USA Settlement Deduction

Any tax deduction with respect to amounts payable from the Settlement Contribution, whether under the USA Settlement Agreements or otherwise shall be deductions of Holdings attributable to a Pre-Closing Tax Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH Shareholders.

(iii)    Section 754 Election

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

(iv)    Cooperation; Amended Returns

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, and the historic TA Shareholders and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any of the identified parties to any valuation of Millennium (except with respect to transfers to the Millennium Corporate Claim Trust, as identified in Article V.F(iv) hereof). Neither New Holdco nor any Prepetition Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

(v)    Holdings Tax Returns

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH. Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns. Holdings will be liquidated for tax purposes no later than February 28, 2016. MLH, TA and Holdings will make no claims against the Holders of Existing Credit Agreement Claims, Millennium or New Holdco for any taxes of Holdings. The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be liable for any income or tax liabilities attributable to the

Company's assets for a Pre-Closing Tax Period. Holdings shall have no liability with respect to the debt owed to the Holders of Existing Credit Agreement Claims or the Prior Agent Indemnity Claims. Holdings intends to treat any of the debt owed to the Holders of Existing Credit Agreement Claims and Prior Agent Indemnity Claims in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

(vi)    Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date. No party (other than New Holdco or the Holders of Existing Credit Agreement Claims with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

(vii)    TA and MLH Taxes and Refunds

The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Prepetition Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Prepetition Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

(viii)    Post-Closing Taxes

New Holdco shall be responsible for all taxes of Reorganized Millennium and its subsidiaries attributable to Post-Closing Tax Periods, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to Post-Closing Tax Periods.

**S.    Further Transactions**

If the conditions to occurrence of the Effective Date set forth in Article VIII.B are not satisfied on or before December 30, 2015 (the "Consummation Deadline"), the Debtors shall not be authorized to proceed to consummate the Plan. Subject to the consent of the Federal Settlement Parties, MLH, TA, and an Ad Hoc Group Majority, as determined in each such party's sole and absolute discretion, the Debtors may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**A.      Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer.  Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be unenforceable.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**B.      Assignment of Executory Contracts or Unexpired Leases**

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and

– 43 –

assignment, which will: (a) list the applicable Cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed Cure amounts. Any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related Cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or Cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

## C.      Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law. Rejection damages claims are Class 6 Claims.

## D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged Cure amount, which may be asserted at any time. In the event of a dispute regarding (1) the amount of any payments to Cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**E.      Assumption of Officer Insurance Policies**

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

**F.      Indemnification Provisions**

The indemnification provisions currently in place under the Limited Liability Company Operating Agreement for Millennium dated as of April 11, 2014 (without regard to any amendments which may have been made thereto or any board resolutions which may have been adopted in respect of indemnification) (the "Operating Agreement") and the Existing Loan Documents solely for the following: (i) the Prior Agents; (ii) the Administrative Agent; (iii) the Early Commitment Facility Agent; (iv) the officers of Millennium who served in such capacity as of the Petition Date or any time thereafter through the Effective Date and (v) the Prepetition Lenders (but solely to the extent of, and without prejudice to, any of the Consenting Lender Indemnity-Related Rights or any other indemnity, contribution or other Claims they may have against the Debtors (or the Reorganized Debtors, except for Holdings) under the Existing Loan Documents on account of their making a payment in respect of a Prior Agent Lender Indemnity Claim) (collectively, the "Preserved Indemnified Parties") with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be) solely in respect to the Preserved Indemnified Parties, and will survive effectiveness of the

Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying Operating Agreement and Existing Loan Documents. Notwithstanding anything in this Article VI.F to the contrary, no other claimed Indemnification Agreement regarding any Senior Executive shall be assumed or Reinstated unless mutually agreed upon by the Ad Hoc Group Majority and the respective Senior Executive with respect to any such indemnity terms (and such other Indemnification Agreements may be amended by the mutual agreement of the Ad Hoc Group Majority and the respective Senior Executive). If the Ad Hoc Group Majority and Senior Executive do not reach an agreement regarding the assumption or Reinstatement of such Senior Executive's other claimed Indemnification Agreements, all parties reserve their rights regarding such other claimed Indemnification Agreements. For the avoidance of doubt, nothing in this Article VI.F shall (i) expand the indemnification obligations owed by any of the Releasing Parties to the Released Parties beyond the limits set forth in Article X.M hereof; (ii) constitute a Reinstatement or assumption of any indemnification obligations which may be owed by Millennium or any other Debtor to Holdings or any other Person or Entity other than the Preserved Indemnified Parties solely with respect to the indemnification provisions set forth above,  or (iii) constitute a Reinstatement or assumption of any indemnification obligations of either Millennium to Holdings, or Holdings or any Debtor to any of the Preserved Indemnified Parties or any other Person or Entity except for Millennium.

### G.    Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to its employees, retirees, and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.   To the extent that such plans or agreements providing for bonuses or severance to insiders may fall within this Article VI.G of the Plan, such plans and agreements will not be assumed; provided, however, that such insiders may assert any claims arising under such plans or agreements against the applicable Debtors as Class 6 Claims.

### H.    Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance. All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements,

policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

## I.      Third Party Payer Contracts

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all Third Party Payer Contracts are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any provision in the Third Party Payer Contracts that purports to declare a breach or default or to accelerate any payment obligations based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable. Nothing under the Plan shall affect the Debtors' or the applicable counterparty's rights, claims and defenses in respect of any Third Party Payer Contract, or the right of either party thereto to future adjudication of any disputes in respect thereto in accordance with the applicable provisions of such Third Party Payer Contract.

## J.      Medicare and Medicaid Agreements

The Medicare and Medicaid Agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; provided that, for the avoidance of doubt, Holdings is not assuming any Medicare and Medicaid Agreements. Nothing under the Plan will affect the USA's, HHS's, or CMS's rights, claims, and defenses in respect of any Medicare and Medicaid Agreements for future adjudication in accordance with the applicable provisions of such Medicare and Medicaid Agreements. The "cure" and adequate assurance of future performance under section 365 of the Bankruptcy Code for the assumption of the Medicare and Medicaid Agreements shall be: (a) the performance by the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, of their obligations under the USA Settlement Agreements; and (b) the continued participation of the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, in the Medicare and Medicaid programs in the ordinary course of business to be governed by and subject to, the terms and conditions of the Medicare and Medicaid Agreements and the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments other than the Determined Overpayments (as defined in the Federal Administrative Settlement Agreement) in the ordinary course of business. In the event that any of the Medicare and Medicaid Agreements are subsequently terminated and the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries re-enroll in the Medicare and Medicaid programs, such parties agree that they shall assume successor liability as to any liability arising under the Medicare Agreements and that such successor liability shall be governed by and subject to, the terms and conditions of the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments in the ordinary course of business.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.     Distribution Record Date**

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Claims after the Distribution Record Date shall not be recognized for purposes of this Plan. On the Distribution Record Date, the Administrative Agent shall provide a true and correct copy of the registry for the Existing Credit Agreement Claims to the Debtors. The Distribution Agent, or any party responsible for making distributions pursuant to this Article VII.A shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

**B.     Dates of Distributions**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan or Confirmation Order and in the USA Settlement Agreements, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Equity Transfer Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

**C.     Distribution Agent**

Except as provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, New Holdco, or the Administrative Agent, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Debtors or New Holdco as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court. For purposes of distributions under this Plan to the Holders of Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent and in acting in such

– 48 –

capacity shall be entitled to all of the rights, protections, and indemnities afforded to the Administrative Agent under the Existing Credit Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof. If the Distribution Agent is an entity other than a Reorganized Debtor or New Holdco, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

### D.    Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### E.    Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar. To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as an Unclaimed Distribution under the Plan.

No fractional shares shall be issued or distributed under the Plan. Each Person entitled to receive Equity Interests or New Holdco Common Stock shall receive the total number of whole shares of Equity Interests or New Holdco Common Stock, as applicable to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of Equity Interests or New Holdco Common Stock, the actual distribution of shares of such Equity Interests shall be rounded to the next lower whole number.

### F.    Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim). Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

## G.    General Distribution Procedures

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.    All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

## H.    Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, or (4) in accordance with the Existing Credit Agreement.

## I.    Undeliverable Distributions and Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Unclaimed Distribution within one year from the date upon which a distribution is first made to such entity shall be deemed to forfeit all rights to such Unclaimed Distribution under the Plan.    Such Unclaimed Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtor free of any restrictions thereon.    Entities which fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

## J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.    From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.    For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of this Plan, to the Millennium Corporate Claim Trust, or the Millennium Lender Claim Trust.

**K.      Setoffs**

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.  The Reorganized Debtors shall provide prompt notice of any setoff to the Holder of the subject Allowed Claim, and all Holders of Allowed Claims shall have the right to challenge such setoff in any forum with jurisdiction over the parties.

**L.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

**M.      Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent:  (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE PLAN'S
## CONFIRMATION AND EFFECTIVE DATE

**A.**     **Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(i)     The Plan and Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Federal Settlement Parties, the Ad Hoc Group, and the Settling Members and shall be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(ii)     The RSA shall not have been terminated by any of the parties thereto.

(iii)     The Debtors shall have filed a motion seeking assumption of the USA Settlement Agreements and approval of the Subrogation Claim.

**B.**     **Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)     The Effective Date shall not occur prior to December 15, 2015.

(ii)     The Bankruptcy Court shall have entered an order confirming the Plan. This condition precedent is not subject to waiver by any party.

(iii)     The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order (1) shall (A) approve the releases (including the third party release) and exculpations provided for in Article X.E, Article X.F, Article X.G, and Article X.H of this Plan, but not approve the release of, and specifically reserve for the benefit of the USA and Plaintiff States, the claims and liabilities provided for in Article V.J of this Plan; (B) contain the contribution claim and Non-Contribution Claim protections provided for in Article X.L of this Plan and such other protections for the Released Parties and their respective Related Parties set forth in the RSA; and (C) contain the bar order provisions set forth in Article X.J of this Plan, in each case, in form, scope, and substance consistent in all material respects with the RSA; and (2) shall otherwise be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(iv)     The Confirmation Order shall be a Final Order; provided, however, that only the Settling Members may agree in writing, in their sole and absolute discretion, to waive the condition that the Confirmation Order be a final, non-appealable order.

(v)     The RSA shall have been assumed pursuant to the Confirmation Order and shall not have been terminated by any of the parties thereto.

(vi)     The USA Settlement Agreements shall have been assumed pursuant to the USA Settlement Assumption Order or Confirmation Order and shall not have been terminated by any of the parties thereto. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(vii)     Good faith efforts have been made for the organizational documents of the Reorganized Debtors to have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization.

(viii)     New Holdco shall have been formed and the New Holdco Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws.

(ix)     The Debtors shall have received any and all required regulatory approvals to consummate the transactions contemplated by the Plan, the Disclosure Statement, and any documents contemplated thereunder.

(x)     The transactions contemplated by this Plan, the Disclosure Statement, and any other documents contemplated hereunder or thereunder shall have been approved to the extent required and shall not be subject to avoidance.

(xi)     All other documents and agreements necessary to implement the Plan on the Effective Date to the extent required herein or in the RSA, including the without limitation the New Term Loan Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(xii)     All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

(xiii)     The New Securities and Debt Documents shall be in form and substance reasonably satisfactory to the Debtors and an Ad Hoc Group Majority, and shall have been executed and delivered by all parties thereto to the extent required hereunder.

## C.     Conditions to the Equity Transfer Date

The occurrence of the Equity Transfer Date is subject to each of the following conditions precedent:

(i)     All conditions to the Effective Date of the Plan as provided in Article VIII.B above shall have been satisfied or waived.

(ii)     The Equity Transfer Date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA.

(iii)     The JS Real Estate Leases shall have been amended on the terms specified in the RSA and assumed by Millennium.

(iv)     The Debtors shall have paid or caused to be paid the USA Settlement Funding Contribution to the USA.

**D.     Waiver of Conditions**

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article VIII may be waived only if waived in writing by each of the Debtors, the Ad Hoc Group Majority, and the Settling Members (except as otherwise stated in this Article VIII or the RSA) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the RSA.  The failure to satisfy or waive a condition to the Effective Date may be asserted by any of the Debtors, the Ad Hoc Group Majority, and the Settling Members regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors, the Ad Hoc Group Majority, or the Settling Members to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

**E.     Effect of Non Occurrence of Conditions to the Effective Date**

If the Effective Date of the Plan does not occur on or before December 30, 2015, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect; provided, however, that such date may be extended by agreement of all of the Debtors, the Ad Hoc Group Majority, MLH, TA, and the Federal Settlement Parties, each acting in their respective sole and absolute discretion.

**ARTICLE IX**

**RETENTION OF JURISDICTION**

**A.     Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

– 54 –

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; provided, however, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

(iv)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(ix)    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(x)    enforce the terms and condition of this Plan and the Confirmation Order;

(xi)    resolve any cases, controversies, suits or disputes with respect to the release, the Exculpation, the indemnification provisions and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xii)    to enforce the releases, bar order(s), and injunction(s) provided in Article X hereof;

(xiii)    resolve any cases, controversies, suits, or disputes with respect to the release of all claims against USA Settlement Parties on account of the payment of the Initial USA Settlement Deposit and the USA Settlement Funding Contribution;

(xiv)    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xv)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

(xvi)    enter an order concluding or closing the Chapter 11 Cases; and

(xvii)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

## B.    Lack of Bankruptcy Court Jurisdiction

Notwithstanding any other provision of this Plan or the Confirmation Order, the Bankruptcy Court shall not have jurisdiction with respect to: (i) any actions or proceedings to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements; (ii) any claims, actions or proceedings for any of the liabilities provided for in Article V.J of this Plan; and (iii) any claims, actions or proceedings regarding regulation and administration of the participation in the Medicare and Medicaid programs by the Debtors, New Holdco, Reorganized Millennium, and all subsidiaries of Reorganized Millennium, as applicable.

## C.    Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Article IX.A of the Plan, the provisions of this Article IX shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X

## EFFECTS OF CONFIRMATION

## A.    Binding Effect

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN

THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

**B.      Subordination Rights**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

**C.      Discharge of the Debtors**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the occurrence of the Effective Date. However, the foregoing provisions will have no effect on the Debtors' liabilities as reserved by the USA Settlement Agreements and as provided for in Article V.J of this Plan, whether such liabilities arose prior to or after the Confirmation Date.

**D.      Exculpation and Limitation of Liability**

The Exculpated Parties and the USA Settlement Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection

with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the RSA, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement including the Retained Claims.

## E.    Releases by Debtor

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN OR THE CONFIRMATION ORDER, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES (AND EACH SUCH RELEASED PARTY AND THEIR RESPECTIVE RELATED PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER, OR ON BEHALF OF ANOTHER PARTY AGAINST THE RELEASED PARTIES OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT, INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (IV) ANY CLAIMS OR DEFENSES AGAINST THIRD PARTY PAYERS UNDER ASSUMED CONTRACTS; PROVIDED, FURTHER, HOWEVER THAT FOR PURPOSE OF THIS Article X.E (I) NEITHER RXANTE, LLC NOR MILLENNIUM SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS

– 58 –

AND (II) NO EMPLOYEE OR PROFESSIONAL OF HOLDINGS SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS.

FURTHERMORE, EFFECTIVE AS OF THE EFFECTIVE DATE OF THE USA SETTLEMENT AGREEMENTS AND CONTINUING TO BE EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE USA SETTLEMENT PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER, AND RELEASE TO THE USA SETTLEMENT PARTIES AND THE USA SETTLEMENT PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED, AND DISCHARGED BY THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS RELEASED PURSUANT TO THE USA SETTLEMENT AGREEMENTS.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.  FOR PURPOSES OF THIS RELEASE, AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE DEBTORS ARE SPECIFICALLY ASSUMING CONTROL OF AND RELEASING ALL AVOIDANCE ACTIONS AGAINST THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND CAUSES OF ACTION THAT ARE COVERED OR THAT ARISE UNDER BANKRUPTCY CODE SECTION 544.

## F.    Releases by TA and MLH

(i)    SUBJECT TO (iii) BELOW, TA, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS, MLH, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT TA OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY, AND INCLUDING, FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS ARISING FROM MLH'S FAILURE TO MAINTAIN ITS STATUS AS AN S CORP), AGAINST HOLDINGS OR MLH OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT)

WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(ii)    SUBJECT TO (iii) BELOW,  MLH, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS AND TA, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT MLH OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY), AGAINST HOLDINGS OR TA OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(iii)    FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING SUBPARAGRAPHS (I) AND (II) ABOVE, IN ANY LAWSUIT OR OTHER LEGAL ACTION BY AN EXCLUDED PARTY AGAINST TA, MLH OR THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "EQUITY DEFENDANTS"), EACH EQUITY DEFENDANT PRESERVES AND DOES NOT WAIVE THE RIGHT TO DEFEND OR OTHERWISE RESPOND TO SUCH ACTION BY ASSERTING THAT ANOTHER EQUITY DEFENDANT IS RESPONSIBLE FOR ANY OR ALL CAUSES OF ACTION ASSERTED BY, OR DAMAGES CLAIMED BY, AN EXCLUDED PARTY; AND PROVIDED, FURTHER, HOWEVER, NOTHING IN THIS PARAGRAPH RELEASES ANY PERSON FROM ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN, INCLUDING THE PROVISIONS OF Article V.R OF THIS PLAN.

## G.    Releases by Lender Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE LENDER RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE LENDER RELEASING PARTIES OR THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY AND ITS RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH LENDER RELEASING PARTY TO

ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; AND/OR (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## H.    Releases by Third Party Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE THIRD PARTY RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES, AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT ANY OF THE THIRD PARTY RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND/OR PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING (A) RETAINED CLAIMS, (B) ANY CLAIMS AGAINST EXCLUDED PARTIES , (C) ANY PRIOR AGENT INDEMNITY CLAIMS OR PRIOR AGENT LENDER INDEMNITY OBLIGATIONS UNDER THE EXISTING LOAN DOCUMENTS WITH RESPECT TO MILLENNIUM AND THE CONSENTING LENDERS, AS APPLICABLE, AND TO THE EXTENT A CONSENTING LENDER PAYS A PRIOR AGENT LENDER INDEMNITY OBLIGATION, ANY CONSENTING LENDER INDEMNITY-RELATED RIGHTS OR OTHER CONTRIBUTION, INDEMNITY  OR OTHER CLAIM OF SUCH CONSENTING LENDER  AGAINST THE DEBTORS (OR REORGANIZED DEBTORS, EXCEPT FOR HOLDINGS), UNDER THE EXISTING LOAN DOCUMENTS OR OTHERWISE APPLICABLE LAW (WITHOUT PREJUDICE TO ANY SUCH CONSENTING LENDER INDEMNITY-RELATED RIGHTS), (II) THE RIGHTS OF SUCH THIRD PARTY RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR REINSTATED OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER

OF THE BANKRUPTCY COURT; (III) ANY LIABILITY EXPRESSLY RESERVED BY CERTAIN GOVERNMENTAL UNITS AS PROVIDED IN Article V.J OF THIS PLAN; (IV) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (V) THE RIGHT OF AN EXCLUDED PARTY, IF SUED IN ANY LAWSUIT OR OTHER LEGAL PROCEEDING BY A MILLENNIUM CLAIM TRUST, MILLENNIUM, A CONSENTING LENDER AND/OR ANY OTHER RELEASED PARTY OR ANY OF ITS RELATED PARTIES (ANY SUCH PARTY INSTITUTING SUCH LAWSUIT OR OTHER LEGAL PROCEEDING, IN ITS CAPACITY AS SUCH, THE "ASSERTING PARTY"), TO ASSERT ANY DEFENSE, CROSS-CLAIM AND/OR COUNTERCLAIM, IF ANY, AGAINST SUCH ASSERTING PARTY IN SUCH LAWSUIT OR OTHER LEGAL PROCEEDING WHERE SUCH EXCLUDED PARTY IS SUED; PROVIDED, HOWEVER, THAT IN THE EVENT A CROSS-CLAIM OR COUNTERCLAIM, IF ANY, IS ASSERTED, (X) IN NO EVENT SHALL ANY RECOVERY BY THE EXCLUDED PARTY ON SUCH CROSS-CLAIM OR COUNTERCLAIM AGAINST SUCH ASSERTING PARTY (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) EXCEED THE AMOUNT OF ANY RECOVERY OBTAINED (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) AGAINST THAT EXCLUDED PARTY BY SUCH ASSERTING PARTY AND (Y) THE PROVISIONS OF Article X.L OF THIS PLAN SHALL OTHERWISE BE APPLICABLE TO SUCH CROSS-CLAIM OR COUNTERCLAIM.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## I.     Waiver of Limitations on Releases of Unknown Claims

Each of the Debtors, Lender Releasing Parties, and Third Party Releasing Parties agree and acknowledge that the releases contained in Article X.E, Article X.F, Article X.G, and Article X.H shall extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties shall be deemed to waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

The parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542. The Parties also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

However, nothing in this section shall affect the claims and liabilities specifically reserved for Governmental Units in the USA Settlement Agreements as provided for in Article V.J of this Plan.

**J.    Bar Order**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, of any claims or Causes of Action released pursuant to this Plan, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H. For the avoidance of doubt and subject to the following sentence, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Consenting Lenders arising out of or in connection with any Retained Claims. The foregoing provision shall not operate to enjoin (i) the commencement or prosecution by the USA Settlement Parties of any action or proceeding to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements, (ii) the commencement or prosecution by a Prior Agent of any action or proceeding to enforce any Prior Agent Lender Indemnity Claims or Prior Agent Lender Indemnity Obligations under the Existing Loan Documents with respect to Millennium and the Consenting Lenders, as applicable, or (iii) the right of an Excluded Party, if sued in any lawsuit or other legal proceeding by an Asserting Party to assert any defense, cross-claim and/or counterclaim, if any, against such

– 63 –

Asserting Party in such lawsuit or other legal proceeding where such Excluded Party is sued; provided, however, that in the event a cross-claim or counterclaim, if any, is asserted, (x) in no event shall any recovery by the Excluded Party on such cross-claim or counterclaim against such Asserting Party (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) exceed the amount of any recovery obtained (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) against that Excluded Party by such Asserting Party and (y) the provisions of Article X.L of this Plan shall otherwise be applicable to such cross-claim or counterclaim.

The Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Prepetition Lenders with respect to any Retained Claims that are, immediately prior to the Effective Date, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties other than any liability of Millennium or any Prepetition Lender (including, without limitation, a Consenting Lender) to a Prior Agent for any Prior Agent Indemnity Claims or Prior Agent Lender Indemnity Obligations, as applicable, and all such claims shall be barred, enjoined and released.

## K.    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY AVOIDANCE ACTION (AS DEFINED IN THIS PLAN) OR ANY OTHER ACTION TO AVOID OR RECOVER THE INITIAL USA SETTLEMENT DEPOSIT.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## L.    Retained Claims

The Preserved Estate Claims are hereby expressly preserved and the Preserved Lender Claims are hereby expressly preserved.  The releases provided for herein do not preclude the Prepetition Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Preserved Lender Claim or Preserved Estate Claim is assigned (the Prepetition Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Retained Claim Plaintiff") from prosecuting, and the Prepetition Lenders and Millennium retain the right, respectively, to bring,

the Retained Claims against the Excluded Parties. In the event that the Retained Claim Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Retained Claim Judgment"), the parties' rights shall be as follows:

(i)     where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then the Prepetition Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Retained Claim Plaintiff by the equitable share of Gross Damages attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Retained Claim Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and the Retained Claim Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Retained Claim Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Retained Claim Plaintiff equal to such excess so that the Retained Claim Plaintiff shall not recover in excess of its Gross Damages; and

(ii)     where the Retained Claim Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Retained Claim Plaintiff affirmatively consents to any such petition for intervention by MLH and/or TA (or any of their Related Parties)), and where the Retained Claim Plaintiff successfully obtains a Retained Claim Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Retained Claim Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Retained Claim Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and the Retained Claim Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).

In the event that, after one or more trustees are appointed to pursue Retained Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with

any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties in the forum selected by the Retained Claim Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties. In any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Retained Claim Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA. Moreover, in any litigation by the Retained Claim Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Retained Claim Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Retained Claim Plaintiff, the Prepetition Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required. The Retained Claim Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted. Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties). In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Retained Claim Plaintiff, which shall be exercised in the sole discretion of the Retained Claim Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of the Retained Claim Plaintiff. To the extent that any settlement of any Retained Claim between a Retained Claim Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon. For the avoidance of doubt, the Prepetition Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

## M.    Other Obligations With Respect To Released Parties

MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Retained Claim Plaintiff, the Prepetition Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as

parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Prepetition Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Retained Claim Plaintiff, Millennium or Prepetition Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

To the extent that the Released Parties do not obtain a full and complete release from the Third Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, or the Restructuring Transactions that any of the Third Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event, MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in the preceding paragraph, shall not exceed an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third Party Releasing Parties or the Excluded Parties. For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in Article X.J above shall be deemed to fall within the litigation-related costs that are covered in Article X.L and this Article X.M.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### A.    Dissolution of the Committee

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

### B.    Payment of Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### C.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and in the RSA: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; provided that any such modification must be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under this Plan.

### D.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties'

rights under the RSA and under the USA Settlement Agreements. If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## E.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, at their option may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Notwithstanding anything to the contrary in this Article XI.E, no alteration or interpretation can modify the conditions to the Effective Date set forth in Article VIII.B or compel the funding of Settlement Contribution if the conditions to such funding set forth in the RSA have not been satisfied.

## F.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

## G.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred.. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

## H.    Further Assurances

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## I.    Notices to Debtors

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, (e) facsimile transmission or (f) email transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

### If to the Debtors:

Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Facsimile:    (858) 217-1910
Attention:    Martin Price, Esq., President and General Counsel
(martin.price@millenniumhealth.com)

### with a copy to (which shall not constitute notice):

Counsel to the Debtors

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Facsimile:    (302) 651-3001
Attention:    Anthony W. Clark (anthony.clark@skadden.com)
Jason M. Liberi (jason.liberi@skadden.com)

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
Facsimile:      (212) 735-2000
Attention:      Kenneth S. Ziman (ken.ziman@skadden.com)
                Raquelle L. Kaye (raquelle.kaye@skadden.com)

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Facsimile:      (312) 407-0411
Attention:      Felicia Gerber Perlman (felicia.perlman@skadden.com)
                Matthew Kriegel (matthew.kriegel@skadden.com)

**If to the Participating Lenders:**

To each Participating Lender at the address identified in
such Participating Lender's signature page

**with a copy to (which shall not constitute notice):**

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone:      (212) 209-4862
Facsimile:      (212) 209-4801
Attention:      Robert J. Stark (rstark@brownrudnick.com)
                Sigmund S. Wissner-Gross
                (swissnergross@brownrudnick.com)

- and -

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Telephone:      (617) 856-8200
Facsimile:      (617) 856-8201
Attention:      Steven B. Levine (slevine@brownrudnick.com)

**If to MLH:**

> Millennium Lab Holdings, Inc.
> James Slattery
> 16981 Via Tazon, Suite F
> San Diego, CA 92127
> Telephone:     (858) 451-3535
> Facsimile:     (858) 217-1910
> Attention:     Martin Price, Esq.

**with a copy to (which shall not constitute notice):**

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Telephone:     (212) 446-4750
> Facsimile:     (212) 446-4900
> Attention:     Paul M Basta, P.C. (paul.basta@kirkland.com)
>                Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

> TA Millennium, Inc.
> c/o TA Associates
> John Hancock Tower
> 200 Clarendon Street
> 56th Floor
> Boston, MA 02116
> Telephone:     (617) 574-6725
> Facsimile:     (617) 574-6728
> Attention:     Jeffrey C. Hadden

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:    (212) 813-8800
Facsimile:    (212) 409-8404
Attention:    Michael H. Goldstein (mgoldstein@goodwinprocter.com)
              William P. Weintraub (wweintraub@goodwinprocter.com)

## J.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

## K.    Exhibits

All exhibits and schedules to this Plan, including the Exhibits, are incorporated and are a part of this Plan as if set forth in full herein.

## L.    No Strict Construction

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Ad Hoc Group, the Participating Lenders, the Settling Members, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits, and the agreements and documents contemplated therein or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits, and the documents contemplated thereunder and related thereto.

## M.    Conflicts

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

[Remainder of page intentionally left blank]

Dated: Wilmington, Delaware
       December 9, 2015

 

MILLENNIUM LAB HOLDINGS II, LLC, on behalf of itself and its affiliates listed below

/s/ W. Brock Hardaway
Name:      W. Brock Hardaway
Title:       Chief Executive Officer

MILLENNIUM HEALTH LLC
RXANTE LLC

# **APPENDIX 1**

## **RSA**

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "Agreement"), dated as of October 14, 2015, is entered into by and among (a) Millennium Lab Holdings II, LLC ("Holdings"), Millennium Health, LLC ("Millennium"), and all of Millennium's direct and indirect subsidiaries (collectively, the "Company"), (b) the undersigned lenders (solely in such capacity, the "Participating Lenders") party to that certain Credit Agreement, dated April 16, 2014 (as amended, modified, supplemented, and extended from time to time, the "Existing Credit Agreement", and together with all related loan documentation the "Existing Loan Documents"), among Millennium as the borrower, Holdings and RxAnte LLC ("RxAnte") as guarantors, the lenders from time to time party thereto (the "Lenders"), (c) Millennium Lab Holdings, Inc. ("MLH") and (d) TA Millennium, Inc. ("TA"). The Company, each Participating Lender, MLH and TA and each other person that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "Parties" and individually as a "Party." Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

## RECITALS

WHEREAS, the Company has determined that a restructuring (the "Restructuring") of its obligations under the Existing Credit Agreement and existing equity interests in the Company is necessary and would be in the best interest of the Company and its stakeholders;

WHEREAS, the Parties desire to effectuate the DOJ Settlement Agreement;

WHEREAS, as of the date of this Agreement, the Company is obligated to, among other parties, the Lenders under the Existing Credit Agreement in the aggregate principal amount of $1,752,812,500 plus accrued interest (the "Lender Claims" together with all other claims and obligations arising under or related to the Existing Credit Agreement, "Existing Credit Agreement Claims");

WHEREAS, the Parties desire to consummate the Restructuring in accordance with the terms of this Agreement and the terms of the Restructuring Term Sheet;

WHEREAS, the Restructuring will be effected either (a) through a consensual out-of-court transaction (an "Out-of-Court Transaction") or (b) pursuant to a joint "pre-packaged" chapter 11 plan of reorganization (a "Plan"), in each case subject to being Consistent With The Restructuring Term Sheet, and with the support of (i) each of the Participating Lenders, (ii) MLH, and (iii) TA;

WHEREAS, the Parties desire to work together to complete the negotiation of the terms of the documents necessary to effect the Restructuring; and

WHEREAS, this Agreement is not intended to be and shall not be deemed to be a solicitation for votes on a plan of reorganization;

NOW, THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

1.    <u>Definitions and Interpretation</u>.

(a)    The following terms used in this Agreement shall have the following definitions:

"<u>Ad Hoc Group</u>" means the members of the ad hoc group of Lenders represented by Brown Rudnick LLP and listed on <u>Exhibit A</u> to the Term Sheet, as amended from time to time as provided for in the Term Sheet.

"<u>Ad Hoc Group Majority</u>" shall have the meaning set forth in the Term Sheet.

"<u>Ad Hoc Group Super-Majority</u>" shall have the meaning set forth in the Term Sheet.

"<u>Administrative Agent</u>" means Wilmington Federal Savings Bank, FSB in its capacity as Administrative Agent under the Existing Credit Agreement.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Alternative Proposal</u>" has the meaning set forth in <u>Section 5(a)(v)</u> hereof.

"<u>Approved Out-of-Court Transaction Documents</u>" has the meaning set forth in <u>Section 3(a)</u> hereof.

"<u>Approved Plan</u>" means a plan of reorganization for the Company that is consistent in all material respects with this Agreement and is Consistent With The Restructuring Term Sheet.

"<u>Approved Plan Documents</u>" has the meaning set forth in <u>Section 3(b)</u> hereof.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"<u>Bankruptcy Court</u>" has the meaning set forth in <u>Section 3(b)</u> hereof.

"<u>Business Day</u>" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Chapter 11 Cases</u>" means proceedings under chapter 11 of the Bankruptcy Code for the Company.

"Closing Date" shall have the meaning set forth in the Term Sheet.

"CMS" means the Center for Medicare and Medicaid Services, an agency of HHS.

"Commencement Date" means the date on which the Company shall have commenced the Chapter 11 Cases.

"Company" has the meaning set forth in the preamble hereof.

"Consenting Lenders" means those Lenders who approve (i) the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date and (ii) the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

"Consistent With The Restructuring Term Sheet" means, (i) in the case of a Restructuring consummated pursuant to an Out-of-Court Transaction, that the Out-of-Court Transaction and the Out-Of-Court Transaction Documents contain the terms and conditions of the Restructuring Term Sheet, are consistent in all material respects with this Agreement and the Restructuring Term Sheet, and do not in any manner, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement or the Restructuring Term Sheet in any manner that is adverse to, or prejudicial to, the Company, MLH, TA or the Participating Lenders; and (ii) in the case of a Restructuring consummated pursuant to an Approved Plan, the Approved Plan and the Approved Plan Documents contain the terms and conditions of the Restructuring Term Sheet, are consistent in all material respects with the this Agreement and the Restructuring Term Sheet, and do not in any manner, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement or the Restructuring Term Sheet in any manner that is adverse to, or prejudicial to, the Company, MLH, TA or the Participating Lenders.

"Disclosure Statement" means a disclosure statement with respect to the Plan consistent with the requirements of section 1125 of the Bankruptcy Code.

"DOJ" has the meaning set forth in the preamble hereof.

"DOJ Funding Contribution" has the meaning set forth in the Term Sheet.

"DOJ Parties" means, collectively, the DOJ, CMS, OIG, and the Plaintiff States.

"DOJ Settlement" has the meaning set forth in the Term Sheet.

"DOJ Settlement Agreement" has the meaning set forth in the Term Sheet.

"DOJ Term Sheet" means that certain Terms Sheet dated May 20, 2015 among Millennium, the DOJ, and the Plaintiff States, as amended, modified or supplemented by a settlement agreement(s) among Millennium and the DOJ and Plaintiff States, as agreed to in writing by MLH, TA and the Ad Hoc Group.

"Early Commitment Facility" shall have the meaning set forth in the Term Sheet.

"Effective Date" shall have the meaning set forth in the Term Sheet.

"Existing Credit Agreement" has the meaning set forth in the preamble hereof.

"Existing Credit Agreement Claims" has the meaning set forth in the recitals hereof.

"Existing Loan Documents" has the meaning set forth in the preamble hereof.

"General Termination Event" has the meaning set forth in Section 8 hereof.

"Guarantee Agreement" means that certain Guarantee Agreement among the DOJ Parties, MLH, TA and the Consenting Lenders.

"HHS" means the United States Department of Health and Human Services.

"Holdings" has the meaning set forth in the preamble hereof.

"Initial DOJ Deposit" has the meaning set forth in the Term Sheet.

"Lender Claims" has the meaning set forth in the recitals hereof.

"Lenders" has the meaning set forth in the preamble hereof.

"Master Restructuring Agreement" has the meaning set forth in the Term Sheet.

"Material Adverse Event" means, the occurrence of one of the events or conditions set forth on Exhibit 3 hereto, the occurrence of which shall be determined as of the dates and times specified in Exhibit 3.

"Millennium" has the meaning set forth in the preamble hereof.

"MLH" has the meaning set forth in the preamble hereof.

"MLH Contribution" has the meaning set forth in the Term Sheet.

"MLH DOJ Funding Contribution" means fifty-five percent (55%), or $113,300,000, of the DOJ Funding Contribution.

"MLH/TA Termination Event" has the meaning set forth in Section 8 hereof.

"Non-Consenting Lenders" means those Lenders who do not approve (i) the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (ii) the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

"OIG" means the HHS Office of Inspector General.

4

"Out-of-Court Releases" has the meaning set forth in the Term Sheet.

"Out-of-Court Requisite Lenders" means, as of Solicitation Termination Date, Lenders holding all but $50 million of the outstanding principal indebtedness under the Existing Credit Agreement; provided, however, MLH, TA, the Ad Hoc Group Super-Majority and the Company may agree in writing that the amount of outstanding principal indebtedness under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million for the purposes of determining the Out-of-Court Requisite Lenders, in each of their sole and respective absolute discretion.

"Out-of-Court Transaction Documents" shall have the meaning set forth in Section 3(a) hereof.

"Participating Lenders" has the meaning set forth in the preamble hereof.

"Participating Lender Termination Event" has the meaning set forth in Section 8 hereof.

"Parties" has the meaning set forth in the preamble hereof.

"Plaintiff States" mean the plaintiff states that are party to the DOJ Terms Sheet.

"Plan" has the meaning set forth in the preamble hereof.

"Plan Related Documents" has the meaning set forth in Section 3(b) hereof.

"Prior Agent" means JPMorgan Chase Bank, N.A. as the prior administrative agent under the Existing Credit Agreement.

"Qualified Marketmaker" means an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (B) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Qualified Out-of-Court Transaction" has the meaning set forth in Section 3(a) hereof.

"Requisite Consenting Lenders" means, as of the date of determination, both  (i) Lenders holding a majority in number of the Existing Credit Agreement Claims and (ii) Lenders holding in the aggregate no less than eighty-five percent (85%) in aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement (the "Debt Threshold Amount"); provided, however that the Debt Threshold Amount may be reduced by agreement of MLH and TA to no less than sixty-six and two-thirds percent (66 2/3%) in the aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement.

"Requisite Participating Lenders" means, as of the date of determination, Participating Lenders holding at least a majority and in number and more than sixty-six and two-thirds (66 2/3rds) in principal amount of the aggregate amount of Lender Claims held by all Lenders.

"Restructuring" means the transactions contemplated by this Agreement.

"Restructuring Term Sheet" means, collectively, the Term Sheet and the DOJ Terms Sheet.

"RxAnte" has the meaning set forth in the preamble hereof.

"Solicitation" means the Company's formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

"Solicitation Commencement Date" has the meaning set forth in Section 8(a)(ii) hereof.

"Solicitation Termination Date" means the date on which solicitation of the Out-of-Court Transaction and Approved Plan terminates, which date shall be determined by the Company and the Ad Hoc Group, MLH, and TA, but shall be (i) at least five (5) days after the Solicitation Commencement Date, and (ii) in no event later than November 8, 2015.

"Subrogation Claim" has the meaning set forth in the Term Sheet.

"TA" has the meaning set forth in the preamble hereof.

"TA Contribution" has the meaning set forth in the Term Sheet.

"TA DOJ Funding Contribution" means forty-five percent (45%), or $92,700,000, of the DOJ Funding Contribution.

"Term Sheet" means the Term Sheet annexed hereto as Exhibit 1, as the same may be amended, modified, supplemented in a writing executed by the Company, an Ad Hoc Group Majority, MLH and TA.

"Third-Party Escrow" means an escrow account (or letter(s) of credit) established pursuant to third-party escrow agreements (or letter(s) of credit documents) among, MLH and TA, on the one hand, and the United States, on the other hand, on terms and conditions acceptable to them in their sole and absolute discretion, which escrow agreements (or letter(s) of credit documents) shall provide that if the conditions precedent in the escrow agreements (or letter(s) of credit documents) are satisfied the escrow funds (or letter(s) of credit) can be released to the DOJ Parties, which conditions precedent shall include, among other things, that if the Restructuring does not close on or before December 30, 2015, for whatever reason whatsoever, the escrow funds (or letter(s) of credit) shall be released and returned to MLH and TA, respectively.

(b)      Other Interpretive Provisions. The word "include" and its various forms shall be read as if followed by the phrase "without limitation". "Will" and "shall" have the same meaning. Where appropriate in context, terms used in this Agreement shall include both the singular and the plural. Headings are for convenience only and shall not affect the interpretation of this Agreement.

2.      Proposed Restructuring; Incorporation of the Restructuring Term Sheet.

The Restructuring will be accomplished pursuant to a Qualified Out-of-Court Transaction or, in the event that an Out-of-Court Transaction is not approved by the Out-of-Court Requisite Lenders, pursuant to an Approved Plan, in each case which Approved Plan is Consistent With The Restructuring Term Sheet. The Restructuring Term Sheet is incorporated herein by reference and is made part of this Agreement.

3.      Implementation of the Restructuring.

(a)      The Company intends to implement the Restructuring on a consensual basis in an Out-of-Court Transaction, which will be Consistent With The Restructuring Term Sheet and provide for, among other things, the payment of the monetary obligations of the DOJ Settlement Agreement and the modification or satisfaction of Existing Credit Agreement Claims. Such consensual modifications and satisfactions will be implemented pursuant to various agreements and related documentation (collectively, the "Out-of-Court Transaction Documents"). Each of the Out-of-Court Transaction Documents shall be Consistent With The Restructuring Term Sheet and shall be in form and substance reasonably acceptable to the Company and the Ad Hoc Group, MLH and TA, provided, however, that any provision thereof which affects the rights, benefits, obligations or exposure of any of the Company, the Participating Lenders, MLH or TA shall be acceptable to such person in its sole and absolute discretion (the Out-of-Court Transaction Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "Approved Out-of-Court Transaction Documents" and the Restructuring contemplated by the Approved Out-of-Court Transaction Documents is referred to herein as the "Qualified Out-of-Court Transaction").

(b)      If on or before the Solicitation Termination Date, the Out-of-Court Transaction and the Out-of-Court Releases, in each case Consistent With The Restructuring Term Sheet, are not approved by the Out-of-Court Requisite Lenders, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation, and the same is confirmed in writing by MLH and TA, then, and only then, shall the Company effectuate the Restructuring by commencing the Chapter 11 Cases under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on or before the Commencement Date. As part of the Chapter 11 Cases, the Company intends to file the plan-related documents (the "Plan Related Documents"), which shall include, but not be limited to, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the Approved Plan, (d) any other documents or agreements required in connection with the Plan and Disclosure Statement, including, but not limited to, (1) a proposed confirmation order, (2) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, and (3) any motion and proposed order relating to the use of cash collateral and any other motions or applications filed by the

Company in the Chapter 11 Cases. Each of the Plan Related Documents (including any amendments, modifications, supplements, exhibits and schedules) shall be Consistent With The Restructuring Term Sheet, and shall be in form and substance reasonably acceptable to the Ad Hoc Group, MLH, and TA; provided, however, that any provision of any of the Plan Related Documents which affects the rights, benefits, obligations or exposure of any of the Company, the Participating Lenders, MLH or TA shall be acceptable to such person in its sole and absolute discretion (such Plan Related Documents with the foregoing required approvals are collectively referred to herein as the "Approved Plan Documents"). In addition, concurrent with the commencement of the Chapter 11 Cases, the Company shall file a motion to assume the DOJ Settlement, approve and confirm the transactions thereunder, including without limitation, approving the Initial DOJ Deposit and ordering that the payment of the Initial DOJ Deposit shall not be subject to avoidance or recovery for any reason whatsoever.

4.    Representations of the Parties

(a)    Representations of the Company. The Company hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of the Company's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)    The execution, delivery and performance by the Company of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)    To the extent this Agreement becomes effective pursuant to Section 16 hereof, this Agreement is the legally valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(iv)    The execution, delivery and performance by the Company of this Agreement does not and shall not require any material registration or material filing with, material consent or material

8

approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for approval by the Bankruptcy Court of the Company's authority to implement this Agreement and, if applicable, notice to the DOJ of our intent to execute the Restructuring pursuant to an Approved Plan.

(v)     To its actual knowledge, no event or circumstance which does, or would be reasonably likely to, constitute a Material Adverse Event exists as of the date of this Agreement.

(vi)     From and after June 1, 2015, it has neither paid nor reimbursed TA or MLH for any professional fees they have incurred in connection with the Company or and DOJ-related matters, except for payments to Kirkland & Ellis LLP for legal services in the amount of approximately $1.35 million and payments to CEA LLP for tax and accounting services in the amount of approximately $177,500.

(b)     <u>Representations of the Participating Lenders</u>.  Each Participating Lender hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)     It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)     The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)     To the extent this Agreement becomes effective pursuant to <u>Section 16</u> hereof, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(iv)    Such Participating Lender (i) either (A) is the sole legal and beneficial owner of the Existing Credit Agreement Claims set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Existing Credit Agreement Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Existing Credit Agreement Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Existing Credit Agreement Claims in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Existing Credit Agreement Claims.  Furthermore, such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, hypothecation, security interest or lien grant, voting proxy, transfer or power of attorney, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Existing Credit Agreement Claims that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(v)    Such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

(c)    Representations of MLH and TA.  MLH and TA hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)    The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any

10

provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)    To the extent this Agreement becomes effective pursuant to Section 16 hereof, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

5.    Agreements of the Participating Lenders

(a)    Subject to the terms and conditions hereof and for so long as no General Termination Event or Participating Lender Termination Event, as defined in Section 8 below, shall have occurred, and except as the Company, MLH, and TA may expressly release the Participating Lenders in writing from any of the following obligations, each Participating Lender shall:

(i)    agree to and support the Master Restructuring Agreement, including consent to (A) the terms of the Out-of-Court Restructuring, (B) the new secured term loan on the terms substantially set forth in Annex A to the Term Sheet, and (C) the amendments to the Existing Loan Documents;

(ii)    (A) agree to any Qualified Out-of-Court Transaction and deliver and not withdraw the requisite consents and vote (when solicited to do so and by the applicable deadline for doing so) such Existing Credit Agreement Claims in favor of the Approved Plan proposed by the Company, (B) deliver its duly executed and completed ballot voting in favor of such Approved Plan on a timely basis following commencement of the Solicitation for such Qualified Out-of-Court Transaction and Approved Plan, (C) deliver its consent to the releases, including the third party releases, provided for in the Approved Plan, and (D) not change or withdraw such agreement or vote or consent (or cause or direct such agreement or vote or consent to be changed or withdrawn), provided that such agreement and vote and consent may be revoked or withdrawn immediately upon occurrence of a General Termination Event or Participating Lender Termination Event (as defined in Section 8 below);

(iii)    not object to, or vote any of such Existing Credit Agreement Claims to reject or impede, a Qualified Out-of-Court

Transaction or Approved Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Out-of-Court Transaction or Approved Plan or, to the extent applicable, any of the Approved Plan Documents filed by the Company in connection with the Chapter 11 Cases and confirmation of the Approved Plan, or any other documents prepared by the Company in connection with consummation of a Qualified Out-of-Court Transaction;

(iv)     agree to use commercially reasonable and good faith best efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, including, without limitation, supporting the releases and third party releases provided for in the Approved Plan, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable;

(v)     not directly or indirectly seek, solicit, support, encourage, vote such Existing Credit Agreement Claims for, or consent to (A) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company (each, an "Alternative Proposal") other than a Qualified Out-of-Court Transaction or Approved Plan; (B) any other action that is inconsistent with, or that would delay or obstruct, a Qualified Out-of-Court Transaction or Approved Plan; or (C) solicit or direct any person or entity to undertake any of the foregoing; provided, however, that the Participating Lenders may agree to modifications to the Plan and the Approved Plan Documents, as provided herein;

(vi)     authorizes the Ad Hoc Group to take all actions contemplated by this Agreement and the Restructuring Term Sheet;

(vii)     and hereby does acknowledge and agree to the provisions in the Term Sheet with respect to the Subrogation Claim, the assignment of cash distributions to pay the Subrogation Claim, the granting of a lien to secure the Subrogation Claim, and the obligations in connection therewith as more particularly described in the Term Sheet;

(viii)    refrain from taking any action, directly or indirectly, that may result in the commencement of cases under (A) chapter 7 or chapter 11 of the United States Bankruptcy Code or (B) any other applicable bankruptcy, insolvency or similar law, in any case, by or against the Company, for ninety-one (91) days after the Closing Date of a Qualified Out-of-Court Transaction; and

(ix)    during the period for which this Agreement remains in effect, hereby forbear from exercising any rights and remedies under the Existing Credit Agreement, or applicable law, available to them or the Administrative Agent in respect of or arising out of any Default or Event of Default under the Existing Credit Agreement (each as defined therein) existing as of the effective date of this Agreement, including without limitation any Default or Event of Default arising from or related to the execution, delivery or performance of the DOJ Settlement Agreement.

The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support, other than as set forth on the Restructuring Term Sheet.

(b)    Each Participating Lender agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, hypothecate, assign or otherwise dispose of any Existing Credit Agreement Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Existing Credit Agreement Claims (including, without limitation, any participation therein), unless (i) the transferee, participant or other party (A) is a Participating Lender or (B) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended) and agrees in writing to assume and be bound by all of the terms of this Agreement with respect to all Existing Credit Agreement Claims such transferee, participant or other party currently holds or shall acquire in the future by executing the Joinder attached hereto as Exhibit 2 (such transferee, participant or other party, if any, to also be a "Participating Lender" hereunder), (ii) the transferor complies with any applicable transfer restrictions and/or conditions to transfer set forth herein; and (iii) the transfer is permitted under, and otherwise complies with, the Existing Credit Agreement and applicable law.  If a transferee of any of the Existing Credit Agreement Claims is not a Participating Lender or does not execute a Joinder in substantially the form attached hereto as Exhibit 2 prior to the completion of such transfer, participation or other grant or otherwise agree to be bound by all of the terms of this Agreement, then such sale, transfer, assignment or other disposition of the Existing Credit Agreement Claims or related option, right or interest shall be deemed void *ab initio*.  This Agreement shall in no way be construed to preclude any Participating Lender from acquiring additional Existing Credit Agreement Claims subject to compliance with the Existing Credit Agreement and applicable law; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Participating Lender agrees that such additional Existing Credit Agreement Claims shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Existing Credit Agreement Claims entitled to vote on the Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this Section 5.

Subject to the terms and conditions of any order of the Bankruptcy Court, each Participating Lender agrees to provide to counsel for the Company (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Existing Credit Agreement Claims, in each case within three (3) business days of the consummation of the transaction disposing of, or acquiring, Existing Credit Agreement Claims.

(c)     Notwithstanding anything herein to the contrary, (A) any Participating Lender may Transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such Existing Credit Agreement Claims against the Debtors to an entity that is acting in its capacity in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Participating Lender; provided that (i) the Qualified Marketmaker subsequently transfers (by purchase, sale, assignment, participation or otherwise) the right, title or interest in such Existing Credit Agreement Claims against the Debtors to a transferee that is or becomes a Participating Lender by executing a Joinder and (ii) prior to such transfer and the execution of a Joinder,  the Participating Lender which is the transferor of such Existing Credit Agreement Claim retains the right and obligation to vote such claim in favor of a Qualified  Out-of-Court Transaction or an Approved Plan in accordance with Section 5(a) hereof and (B) to the extent that a Participating Lender is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title  or interest in such Existing Credit Agreement Claims against the Debtors that the Qualified Marketmaker acquires from a holder of the Existing Credit Agreement Claims that is not a Participating Lender, without the requirement that the transferee be or become a Participating Lender.

(d)     In the event that MLH and/or TA is required to perform under the Guarantee Agreement and make a payment thereunder to the DOJ Parties, MLH and TA, to the extent of such respective payment, shall be entitled to an offset against any judgment that may obtained against MLH or TA by, or on behalf of, the Consenting Lenders based upon the Released Claims as defined in the Restructuring Term Sheet.

6.     Agreements of MLH and TA

(a)     As long as a General Termination Event or MLH/TA Termination Event has not occurred, and except as the Participating Lenders and the Company may expressly release MLH and TA jointly (and not severally), as applicable, in writing from any of the following obligations,

(i)     MLH agrees to fund the MLH Contribution in accordance with the Restructuring Term Sheet upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet.

(ii)     Pursuant to a Third Party-Escrow, MLH agrees to deposit the MLH DOJ Funding Contribution in the Third-Party Escrow, or provide other alternative assurance of performance acceptable to the DOJ, no later than three (3) business days following (A) approval by

the Out-of-Court Requisite Lenders of the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (B) approval of the Requisite Consenting Lenders of the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

(iii)    MLH agrees to enter into the Guarantee Agreement  as contemplated by the Restructuring Term Sheet..

(iv)    TA agrees to fund the TA Contribution accordance with the Restructuring Term Sheet upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet.

(v)    Pursuant to a Third Party-Escrow, TA agrees to deposit the TA DOJ Funding Contribution in the Third-Party Escrow, or provide other alternative assurance of performance acceptable to the DOJ, no later than three (3) business days following (A) approval by the Out-of-Court Requisite Lenders of the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (B) approval of the Requisite Consenting Lenders of the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

(vi)    TA agrees to enter into the Guarantee Agreement.

(vii)    MLH and TA each agree to use commercially reasonable and good faith best efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(viii)    MLH and TA shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than a Qualified Out-of-Court Transaction or Approved Plan (as it may be amended, supplemented or otherwise modified as

15

provided herein), nor shall MLH or TA solicit or direct any person or entity to undertake any of the foregoing; provided, however, that MLH and TA may agree to modifications to the Plan and the Approved Plan Documents, as provided herein.

7.    Agreements of the Company

(a)    As long as a General Termination Event has not occurred, and except as the Participating Lenders, MLH, and TA may expressly release the Company, as applicable, in writing from any of the following obligations,

(i)    The Company hereby agrees to prepare or cause the preparation of the Out-of-Court Transaction Documents, and the Approved Plan Documents.

(ii)    The Company agrees to use commercially reasonable efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(iii)    The Company shall cause each of its subsidiaries and affiliates to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Plan and the Approved Plan Documents, as applicable, (C) not take any action described in Sections 8(b)(i), (ii), (iii), or (iv) that would cause a Participating Lender Termination Event and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents, or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(iv)    The Company shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than a Qualified Out-of-Court Transaction or an Approved

Plan (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; provided, however, that the Company may agree to modifications to the Plan and the Approved Plan Documents, as provided herein.

(b)    The Company shall promptly notify the Participating Lenders if it becomes aware that a Material Adverse Effect exists.

(c)    The Company shall (i) in connection with an Out-of-Court Restructuring pay when due and payable, and in any case, on or before the Closing Date, or (ii) in connection with the Chapter 11 cases, shall seek the authority to pay when due and payable, and in any case on or before the Effective Date, the respective reasonable and documented fees and expenses incurred in connection with the Restructuring by (i) the professional advisors for the Company and (ii) Brown Rudnick, LLP and FTI as professional advisors to the Ad Hoc Group. All such reasonable and documented fees, expenses and disbursements of such firms incurred up to the Petition Date shall be paid in full and all retainers replenished.

8.    Termination of Obligations.

(a)    General Termination Events. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon the occurrence of any of the following unless such General Termination Event is waived or extended by the Company, MLH, TA and an Ad Hoc Group Majority in writing (each, a "General Termination Event"):

(i)    at any time by the mutual written consent of the Company, an Ad Hoc Group Majority, MLH, and TA;

(ii)    at 5:00 P.M. prevailing Eastern Time on October 29, 2015 unless the Company has begun Solicitation for the Out-of-Court Transaction and the Approved Plan (the "Solicitation Commencement Date");

(iii)    if the Out-of-Court Transaction and Out-of-Court Releases are not approved by the Out-of-Court Requisite Lenders by the Solicitation Termination Date, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation by the Solicitation Termination Date, and the same is confirmed in writing by MLH and TA, and the Company commences the Chapter 11 Cases, at 5:00 p.m. prevailing Eastern Time on December 15, 2015 unless the Bankruptcy Court shall have approved the Disclosure Statement and confirmed the Approved Plan by such date;

(iv)    at 5:00 p.m. prevailing Eastern Time on December 30, 2015 if there has not occurred (A) the Closing Date of a

17

Qualified Out-of-Court Transaction or (B) the Effective Date of an Approved Plan on or before such date;

(v)    upon the entry of an order by the Bankruptcy Court (1) dismissing any of the Chapter 11 Cases, (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(vi)    the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Approved Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) or is not Consistent With The Restructuring Term Sheet;

(vii)    upon the DOJ Parties taking any Enforcement Action (as defined in the Term Sheet);

(viii)    the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order permanently enjoining the consummation of a material portion of the Restructuring;

(ix)    the entry of an order by the any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Existing Credit Agreement Claims or liens securing them;

(x)    upon the material breach by any of the Participating Lenders of any of the undertakings, representations, warranties or covenants of such Participating Lender(s) set forth in this Agreement, including the Participating Lenders' obligations under Section 5, which breach remains uncured for a period of three (3) business days after the receipt by the Participating Lender(s) of notice of such breach from the Company, MLH, or TA; provided however that the foregoing shall constitute a General Termination Event in favor of the Company, MLH and TA only, and shall not constitute a General Termination Event in favor of any of the Participating Lenders (including the breaching Participating Lender); provided further however that in the event the Company, MLH or TA terminates this Agreement with respect to the foregoing General Termination Event, such termination shall be effective only with respect to the breaching Participating Lender(s) and this Agreement shall remain in full force and effect with respect to all other Participating Lenders, the Company, MLH and TA; provided further however that nothing herein shall limit the right to obtain specific performance against such breaching Participating Lender;

(xi)    upon the material breach by MLH or TA of any of the undertakings, representations, warranties or covenants of the MLH and TA set forth in this Agreement, including the their respective obligations under Section 6, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Company, or an Ad Hoc Group Majority.

(xii)    upon occurrence of a Material Adverse Event, which continues to exist for a period of five (5) days after the receipt of written notice of such Material Adverse Event by the Company from an Ad Hoc Group Majority, MLH, or TA.

(b)    Participating Lender Termination Events. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon written notice from an Ad Hoc Group Majority to the Company, MLH, and TA, terminating this Agreement after the occurrence of any of the following events (each, a "Participating Lender Termination Event"):

(i)    upon the filing by the Company of any motion or other request for relief seeking to (1) dismiss any of the Chapter 11 Cases, (2) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, unless such motion or other request for relief is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court and (y) entry of an order by the Bankruptcy Court approving the requested relief;

(ii)    upon the withdrawal, amendment or modification by the Company or any other Party of the Approved Plan or any of the Approved Plan Documents or the filing of a pleading seeking to amend or modify the Approved Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing is not Consistent With The Restructuring Term Sheet (with such amendments and modifications as have been effected in accordance with the terms hereof), or if the Company, files any motion or pleading with the Bankruptcy Court that is not Consistent With The Restructuring Term Sheet and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice from the Ad Hoc Group that such motion or pleading is inconsistent with this Agreement or the Approved Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

(iii)    the Company files, proposes or otherwise supports any plan of reorganization other than the Approved Plan; or

(iv)    upon the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Section 7, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from an Ad Hoc Group Majority, MLH, or TA.

(c)    Additional MLH/TA Termination Events. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon written notice from MLH or TA, to the Company and an Ad Hoc Group Majority, terminating this Agreement after the occurrence of any of the following events (each, a "MLH/TA Termination Event"):

(i)    the occurrence of any Participating Lender Termination Event;

(ii)    the Requisite Consenting Lenders have failed to execute this Agreement or Joinder on or before the business day proceeding the Commencement Date, if any; or

(iii)    on or before December 30, 2015, if the Bankruptcy Court does not enter an order, which is final and non-appealable, that confirms the Approved Plan.

(d)    Effect of Termination Events.

For the avoidance of doubt, in the event of commencement of the Chapter 11 Cases, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving of any such notice).

Upon occurrence of a General Termination Event, Participating Lender Termination Event, or MLH/TA Termination Event, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, and there shall be no liability or obligation on the part of any Party hereto; provided, however, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, (ii) obligations under this Agreement which by their terms expressly survive any such termination, and (iii) any remedy provided in Section 10 hereof on account of such breach or non-performance; and provided, further that, notwithstanding anything to the contrary herein, any General Termination Event may be waived in accordance with the procedures established by Section 12 hereof, in which case the General Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver. Upon

20

termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.  Upon termination of this Agreement, except as provided in Section 20 hereof, or the proviso to the first sentence of this paragraph, no Party shall have any continuing liability or obligation to any Party hereunder that arises after such termination; provided however that the Participating Lenders obligations with respect to the Subrogation Claim and the obligations in connection therewith described in the Term Sheet shall survive any such termination.  Upon the occurrence of the General Termination Event under this Agreement, the fees and expense reimbursements required by Section 7(b) hereof shall be payable for work through the termination date.

9.    Good Faith Cooperation; Further Assurances; Transaction Documents

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring, including taking such reasonable actions to document and implement the transactions contemplated by this Agreement.  Furthermore, each of the Parties shall take such actions (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.

10.    Remedies

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party; provided, however, that if there is a breach of the Agreement by a Participating Lender, money damages shall be an insufficient remedy to the other Participating Lenders and any Participating Lender can seek specific performance as against another Participating Lender; provided further that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

11.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Company and the Participating Lenders (and their respective advisors) with respect to the subject matter hereof.

12.    Amendments

Except as otherwise provided in this Agreement, this Agreement (including the Restructuring Term Sheet) may not be modified, amended, or supplemented and no General Termination Event may be waived without the prior written consent of the Company, an Ad Hoc

Group Majority, MLH, and TA, in each of their sole and absolute discretion; *provided* that any waiver, modification, amendment or supplement to this Section 12 shall require the written consent of all of the Parties.

13. Independent Analysis

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

14. Representation by Counsel

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

15. Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

16. Effective Date

This Agreement shall become effective, and each Party shall be bound to the terms of this Agreement, as of the date the Company, the Requisite Participating Lenders, MLH, and TA have executed and delivered a signature page to this Agreement. This Agreement shall not be binding upon or enforceable against any Party, and no Party shall have any rights or

obligations under this Agreement, until this Agreement has become effective in accordance with this Section 16.

    17.    <u>Notices</u>

       All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the following addresses, emails and facsimile numbers:

       **If to the Company:**

       Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone:    (858) 451-3535
Facsimile:    (858) 217-1910
Attention:    Martin Price, Esq., President and General Counsel
(martin.price@millenniumhealth.com)

       **with a copy to (which shall not constitute notice):**

       Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Telephone:    (212) 735-3310
Facsimile:    (917) 777-3310
Attention:    Kenneth S. Ziman (ken.ziman@skadden.com)

       **If to the Participating Lenders:**

       To each Participating Lender at the address identified in such Participating Lender's signature page

       **with a copy to (which shall not constitute notice):**

       Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone:    (212) 209-4862
Facsimile:    (212) 209-4801
Attention:    Robert J. Stark (rstark@brownrudnick.com)

**If to MLH:**

Millennium Lab Holdings, Inc.
James Slattery
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone:    (858) 451-3535
Facsimile:    (858) 217-1910
Attention:    Martin Price, Esq.

**with a copy to (which shall not constitute notice):**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4750
Facsimile:    (212) 446-4900
Attention:    Paul M Basta, P.C. (paul.basta@kirkland.com)
              Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

TA Millennium, Inc.
c/o TA Associates
John Hancock Tower
200 Clarendon Street
56th Floor
Boston, MA 02116
Telephone:    (617) 574-6725
Facsimile:    (617) 574-6728
Attention:    Jeffrey C. Hadden

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:    (212) 813-8800
Facsimile:    (212) 409-8404
Attention:    Michael H. Goldstein
              William P. Weintraub

18.    <u>Reservation of Rights</u>

Except as expressly provided in this Agreement, nothing herein is intended to, or
does, in any manner waive, limit, impair or restrict the ability of each Party to protect and

24

preserve its rights, remedies and interests, including the Existing Credit Agreement Claims and any other claims against the Company or other parties, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, after a General Termination Event, Participating Lender Termination Event, or MLH/TA Termination Event the Parties hereto each fully reserve any and all of their respective rights, remedies and interests, in the case of any claim for breach of this Agreement. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as any appearance by a Party and the positions advocated by such Party in connection therewith are Consistent With The Restructuring Term Sheet and are not for the purpose of, and would not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring. Notwithstanding any contained in this Agreement, this Agreement and all other exhibits, schedules and appendices thereto are subject to Rule 408 of the Federal Rules of Evidence and shall not be admissible into evidence other than in a proceeding seeking to enforce their terms.

19.    Rule of Interpretation

Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a plan of reorganization under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

20.    Survival

Notwithstanding (i) any sale of the Existing Credit Agreement Claims in accordance with Section 5(a)(i) or (ii) the termination of this Agreement in accordance with its terms, (x) the agreements and obligations of the Company in Sections 5(a)(vii), 7(c) (solely to the extent of fees and expenses accrued before termination), (y) the Parties' obligations which survive termination pursuant to the second paragraph of Section 8(d) hereof and (z) the Parties' obligations under Sections 18 and 28 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

21.    Successors and Assigns; Severability; Several Obligations

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Participating Lenders under this Agreement are, in all respects, several and not joint.

22.    Third-Party Beneficiary

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

23. <u>Counterparts</u>

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

24. <u>Entire Agreement</u>

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Out-of-Court Transaction Documents, Approved Plan and, to the extent applicable, the Approved Plan Documents; <u>provided</u>, <u>however</u>, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Participating Lender shall continue in full force and effect.

25. <u>Headings</u>

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

26. <u>No Solicitation</u>

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of each of the Lenders will not be solicited until the Lenders have received the Disclosure Statement and related ballot.

27. <u>Settlement Discussions</u>

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

28. <u>Publicity</u>

The Company shall submit drafts to the advisors to the Participating Lenders, MLH, and TA of any press releases and/or public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement prior to making any such disclosure, and shall afford them a reasonable opportunity to comment on such documents and disclosures. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Participating Lender, no Party or its advisors shall (a) use the name of any Participating Lender in any public manner or (b) disclose to any person (including, for the avoidance of doubt, any other Participating Lender), other than the

Company, advisors to the Company, and advisors to the Participating Lenders, the principal amount or percentage of any Existing Credit Agreement Claims held by any Participating Lender, in each case, without such Participating Lender's prior written consent; provided, however, that (i) if such disclosure is required by law or regulation, the disclosing party shall use reasonable best efforts to afford the relevant Participating Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the Existing Credit Agreement Claims.

29.    Conflicts Between the Restructuring Transaction Documents and this Agreement.

In the event of any conflict among the terms and provisions in the Approved Out-of-Court Documents or the Approved Plan and the Approved Plan Documents, as applicable, on the one hand, and this Agreement, on the other hand, the terms and provisions of the Approved Out-of-Court Documents or the Approved Plan and Approved Plan Documents, as applicable, shall control.  Nothing contained in this Section 29 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Approved Out-of-Court Documents and Approved Plan set forth in Section 12 hereof.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**MILLENNIUM LAB HOLDINGS II, LLC**
**(on behalf of itself and all of its direct and indirect affiliates)**

By: _____
Name: W. Brock Hardaway
Its: CEO

*Signature Page to Restructuring Support Agreement*

## Summary of Participating Lender Signatures

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| Invesco Ltd. | A Voce CLO, Ltd. | | |
| Invesco Ltd. | American General Life Insurance Company | | |
| Invesco Ltd. | The United States Life Insurance Company in the City of New York | | |
| Invesco Ltd. | The Variable Annuity Life Insurance Company | | |
| Invesco Ltd. | American Home Assurance Company | | |
| Invesco Ltd. | Commerce and Industry Insurance Company | | |
| Invesco Ltd. | Lexington Insurance Company | | |
| Invesco Ltd. | National Union Fire Insurance Company of Pittsburgh, Pa. | | |
| Invesco Ltd. | Avalon IV Capital, Ltd. | | |
| Invesco Ltd. | Betony CLO, Ltd. | | |
| Invesco Ltd. | Blue Hill CLO, Ltd. | | |
| Invesco Ltd. | BOC Pension Investment Fund | | |
| Invesco Ltd. | Diversified Credit Portfolio Ltd. | | |
| Invesco Ltd. | Invesco Dynamic Credit Opportunities Fund | | |
| Invesco Ltd. | Invesco Floating Rate Fund | | |
| Invesco Ltd. | Kaiser Foundation Health | | |
| Invesco Ltd. | Kaiser Permanente Group Trust | | |
| Invesco Ltd. | Limerock CLO II, Ltd. | | |
| Invesco Ltd. | Limerock CLO III, Ltd. | | |
| Invesco Ltd. | Linde Pension Plan Trust | | |
| Invesco Ltd. | Marea CLO, Ltd. | | |
| Invesco Ltd. | Medical Liability Mutual Insurance Company | | |
| Invesco Ltd. | Invesco BL Fund, Ltd. | | |
| Invesco Ltd. | Nomad CLO, Ltd. | | |
| Invesco Ltd. | North End CLO, Ltd. | | |
| Invesco Ltd. | The City of New York Group Trust | | |
| Invesco Ltd. | Invesco Polaris US Bank Loan Fund | | |
| Invesco Ltd. | Invesco Senior Income Trust | | |
| Invesco Ltd. | Invesco Senior Loan Fund | | |
| Invesco Ltd. | Sentry Insurance a Mutual Company | | |
| Invesco Ltd. | Invesco SSL Fund LLC | | |
| Invesco Ltd. | Wasatch CLO Ltd | | |
| Invesco Ltd. | Invesco Zodiac Funds - Invesco US Senior Loan Fund | | |
| Invesco Ltd. | Invesco Zodiac Funds - Invesco Global Senior Loan Fund | | |
| **Invesco Ltd. Subtotal** | | | |
| Eaton Vance Management | AGF Floating Rate Income Fund | | |
| Eaton Vance Management | Eaton Vance CLO 2013-1 LTD | | |
| Eaton Vance Management | Eaton Vance CLO 2014-1 Ltd. | | |
| Eaton Vance Management | Eaton Vance CLO 2015-1 Ltd. | | |
| Eaton Vance Management | DaVinci Reinsurance Ltd. | | |
| Eaton Vance Management | Eaton Vance Loan Holding Limited | | |
| Eaton Vance Management | Eaton Vance Floating-Rate Income Plus Fund | | |
| Eaton Vance Management | Eaton Vance Senior Floating-Rate Trust | | |
| Eaton Vance Management | Eaton Vance Floating-Rate Income Trust | | |
| Eaton Vance Management | Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio | | |
| Eaton Vance Management | Eaton Vance Short Duration Diversified Income Fund | | |
| Eaton Vance Management | Eaton Vance Institutional Senior Loan Fund | | |
| Eaton Vance Management | Eaton Vance Limited Duration Income Fund | | |
| Eaton Vance Management | Eaton Vance Floating Rate Portfolio | | |
| Eaton Vance Management | Google Inc. | | |
| Eaton Vance Management | KP Fixed Income Fund | | |
| Eaton Vance Management | MET Investors Series Trust-Met/Eaton Vance Floating Rate Portfolio | | |
| Eaton Vance Management | Pacific Select Fund-Floating Rate Loan Portfolio | | |
| Eaton Vance Management | Pacific Funds Series Trust - PF Floating Rate Loan Fund | | |
| Eaton Vance Management | Renaissance Reinsurance Ltd. | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| **Lender Group / Manager / Advisor** | **Participating Lender** | **Amount** | **Percent** |
| Eaton Vance Management | Columbia Funds Variable Series Trust II - Variable Portfolio-Eaton Vance Floating Rate Income Fund | | |
| Eaton Vance Management | Senior Debt Portfolio | | |
| Eaton Vance Management | Eaton Vance VT Floating-Rate Income Fund | | |
| Eaton Vance Management | Eaton Vance Senior Income Trust | | |
| **Eaton Vance Management Subtotal** | - | | |
| Symphony Asset Management LLC | Symphony Senior Loan Master Fund, LTD. | | |
| Symphony Asset Management LLC | Symphony Long-Short Credit Master Fund, LTD. | | |
| Symphony Asset Management LLC | Symphony Event Driven Opportunities Master Fund, L.P. | | |
| Symphony Asset Management LLC | Symphony CLO XV, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XIV, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XII, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XI, Limited Partnership | | |
| Symphony Asset Management LLC | Symphony CLO X, LTD | | |
| Symphony Asset Management LLC | Symphony CLO VIII, Limited Partnership | | |
| Symphony Asset Management LLC | Symphony CLO V, LTD. | | |
| Symphony Asset Management LLC | Symphony CLO IX, Limited Partnership | | |
| Symphony Asset Management LLC | SSF Trust | | |
| Symphony Asset Management LLC | SCOF-2 LTD. | | |
| Symphony Asset Management LLC | Principal Funds Inc. - Diversified Real Asset Fund | | |
| Symphony Asset Management LLC | Nuveen Symphony Floating Rate Income Fund | | |
| Symphony Asset Management LLC | Nuveen Short Duration Credit Opportunities Fund | | |
| Symphony Asset Management LLC | Nuveen Senior Income Fund | | |
| Symphony Asset Management LLC | Nuveen Floating Rate Income Opportunity Fund | | |
| Symphony Asset Management LLC | Nuveen Floating Rate Income Fund | | |
| Symphony Asset Management LLC | Nuveen Diversified Dividend & Income Fund | | |
| Symphony Asset Management LLC | Nuveen Credit Strategies Income Fund | | |
| Symphony Asset Management LLC | Nomura Multi Managers Fund - Global Bond GBD SYM Account | | |
| Symphony Asset Management LLC | Municipal Employees' Annuity and Benefit Fund of Chicago (Symphony) | | |
| Symphony Asset Management LLC | Menard, Inc. | | |
| Symphony Asset Management LLC | Diversified Real Asset CIT | | |
| Symphony Asset Management LLC | Nuveen Tax Advantaged Total Return Strategy Fund | | |
| **Symphony Asset Management LLC Subtotal** | - | | |
| OppenheimerFunds, Inc. | HarbourView CLO VII, Ltd. | | |
| OppenheimerFunds, Inc. | Oppenheimer Fundamental Alternatives Fund | | |
| OppenheimerFunds, Inc. | Catlin RE Switzerland Ltd. | | |
| OppenheimerFunds, Inc. | Catlin Underwriting Agencies Limited | | |
| OppenheimerFunds, Inc. | Oppenheimer Master Loan Fund LLC | | |
| OppenheimerFunds, Inc. | Oppenheimer Senior Floating Rate Plus Fund | | |
| OppenheimerFunds, Inc. | Oppenheimer Senior Floating Rate Fund | | |
| **OppenheimerFunds, Inc. Subtotal** | | | |
| Ares Management LLC | Ares XXIII CLO Ltd. | | |
| Ares Management LLC | Ares XXIV CLO Ltd. | | |
| Ares Management LLC | Ares XXV CLO Ltd. | | |
| Ares Management LLC | Ares XXVI CLO Ltd. | | |
| Ares Management LLC | Ares XXVII CLO Ltd. | | |
| Ares Management LLC | Ares XXVIII CLO Ltd. | | |
| Ares Management LLC | Ares XXIX CLO Ltd. | | |
| Ares Management LLC | Ares XXX CLO Ltd. | | |
| Ares Management LLC | Ares XXXI CLO Ltd. | | |
| Ares Management LLC | Ares XXXII CLO Ltd. | | |
| Ares Management LLC | Ares XXXIII CLO Ltd. | | |
| Ares Management LLC | Ares Senior Loan Trust | | |
| Ares Management LLC | Ares Enhanced Loan Investment Strategy IR, Ltd. | | |
| Ares Management LLC | Wellpoint, Inc. | | |
| Ares Management LLC | Ontario Public Service Employees Union Pension Plan Trust Fund | | |
| Ares Management LLC | Renaissance Floating Rate Income Fund | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| **Lender Group / Manager / Advisor** | **Participating Lender** | **Amount** | **Percent** |
| Ares Management LLC | Enhanced Loan Investment Strategy | | |
| Ares Management LLC | Superannuation Funds Management Corporation of Southern Australia | | |
| Ares Management LLC | Russell Institutional Funds, LLC | | |
| Ares Management LLC | Community Insurance Company | | |
| Ares Management LLC | Aviva Staff Pension Scheme | | |
| Ares Management LLC | Goldman Sachs Trust II - Goldman Sachs Multi-Manager Alternatives Fund | | |
| Ares Management LLC | Kaiser Foundation Hospitals | | |
| Ares Management LLC | Kaiser Permanente Group Trust | | |
| Ares Management LLC | Lloyds Bank Pension Trust (No. 1) Limited | | |
| Ares Management LLC | Lloyds Bank Pension Trust (No. 2) Limited | | |
| Ares Management LLC | Goldman Sachs Trust II - Goldman Sachs Multi-Manager Non-Core Fixed Income Fund | | |
| Ares Management LLC | Ares Institutional Loan Fund B.V. | | |
| Ares Management LLC | SEI Global Master Fund PLC - The SEI High Yield Fixed Income Fund | | |
| Ares Management LLC | SEI Institutional Investments Trust - High Yield Bond Fund | | |
| Ares Management LLC | SEI Institutional Investments Trust - Opportunistic Income Fund | | |
| Ares Management LLC | SEI Institutional Managed Trust - High Yield Bond Fund | | |
| Ares Management LLC | SEI Institutional Managed Trust Enhanced Income Fund | | |
| **Ares Management LLC Subtotal** | - | | |
| Marathon Asset Management LP | Marathon Asset Management LP | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Marathon Liquid Credit Long Short Fund | | |
| Marathon Asset Management LP | Penteli Master Fund, Ltd. | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| Marathon Asset Management LP | Baldr Mason Fund Inc. | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Penteli Master Fund, Ltd. | | |
| Marathon Asset Management LP | Master SIF SICAV-SIF | | |
| Marathon Asset Management LP | MV Credit Opportunity Fund, L.P. | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| Marathon Asset Management LP | Marathon Court Square, LP | | |
| Marathon Asset Management LP | Baldr Mason Fund Inc. | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Marathon Liquid Credit Long Short Fund | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| **Marathon Asset Management LP Subtotal** | - | | |
| Brigade Capital Management, LP | Future Directions Credit Opportunities Fund | | |
| Brigade Capital Management, LP | Brigade Credit Fund II Ltd. | | |
| Brigade Capital Management, LP | Big River Group Fund SPC Limited - Bond Segregated Portfolio | | |
| Brigade Capital Management, LP | Citigroup Pension Plan | | |
| Brigade Capital Management, LP | Battalion CLO III Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO IV Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO V Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO VI Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO VII Ltd. | | |
| Brigade Capital Management, LP | Delta Master Trust | | |
| Brigade Capital Management, LP | Brigade Distressed Value Master Fund Ltd. | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| **Lender Group / Manager / Advisor** | **Participating Lender** | **Amount** | **Percent** |
| Brigade Capital Management, LP | FedEx Corporation Employees' Pension Trust | | |
| Brigade Capital Management, LP | FirstEnergy System Master Retirement Trust | | |
| Brigade Capital Management, LP | JPMorgan Chase Retirement Plan Brigade Bank Loan | | |
| Brigade Capital Management, LP | Brigade Opportunistic Credit LBG Fund Ltd. | | |
| Brigade Capital Management, LP | Los Angeles County Employees Retirement Association | | |
| Brigade Capital Management, LP | Brigade Leveraged Capital Structures Fund Ltd. | | |
| Brigade Capital Management, LP | Goldman Sachs Trust II - Goldman Sachs Multi Manager Alternatives Fund | | |
| Brigade Capital Management, LP | OCA Brigade Credit Fund II LLC | | |
| Brigade Capital Management, LP | Russell Investment Company Russell Multi-Strategy Alternative Fund | | |
| Brigade Capital Management, LP | SC Credit Opportunities Mandate LLC | | |
| Brigade Capital Management, LP | The Coca-Cola Company Master Retirement Trust | | |
| Brigade Capital Management, LP | Tasman Fund LP | | |
| Brigade Capital Management, LP | Brigade Opportunistic Credit Fund 16 LLC | | |
| Brigade Capital Management, LP | Texas Absolute Credit Opportunities Strategy LP | | |
| Brigade Capital Management, LP | Virtus Alternative Income Solution Fund | | |
| Brigade Capital Management, LP | Virtus Alternative Inflation Solution Fund | | |
| Brigade Capital Management, LP | Virtus Alternative Total Solution Fund | | |
| **Brigade Capital Management, LP Subtotal** | - | | |
| THL Credit | THL Credit Senior Loan Strategies, LLC | | |
| THL Credit | THL Credit Advisors, LLC | | |
| **THL Credit Subtotal** | - | | |
| Crescent Capital Group LP | Crescent Senior Secured Floating Rate Loan Fund, LLC | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund VIII, Ltd. | | |
| Crescent Capital Group LP | West Bend Mutual Insurance Company | | |
| Crescent Capital Group LP | Illinois State Board of Investment | | |
| Crescent Capital Group LP | Aucara Heights Inc. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund III, Ltd. | | |
| Crescent Capital Group LP | Trustmark Insurance Company | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund IV, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund V, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund VI, Ltd. | | |
| Crescent Capital Group LP | National Electrical Benefit Fund | | |
| Crescent Capital Group LP | Allied World Assurance Company Ltd | | |
| Crescent Capital Group LP | Crescent Capital High Income Fund B, L.P. | | |
| Crescent Capital Group LP | Crescent Capital High Income Fund L.P. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund II, Ltd. | | |
| Crescent Capital Group LP | American Beacon Crescent Short Duration High Income Fund | | |
| Crescent Capital Group LP | TCW Senior Secured Loan Fund, LP | | |
| **Crescent Capital Group LP Subtotal** | - | | |
| Guardian Life Insurance | The Guardian Life Insurance Company of America | | |
| Guardian Life Insurance | The RS Floating Rate Fund | | |
| **Guardian Life Insurance Subtotal** | - | | |
| Franklin Advisers, Inc. | Franklin Advisers, Inc. | | |
| Franklin Advisers, Inc. | Commonwealth Fixed Interest Fund 17 | | |
| **Franklin Advisers, Inc. Subtotal** | - | | |
| Glendon Capital Management, LP | Glendon Opportunities Fund, LP | | |
| Glendon Capital Management, LP | Altair Global Credit Opportunities Fund (A), LLC | | |
| Glendon Capital Management, LP | Cornell University | | |
| **Glendon Capital Management, LP Subtotal** | - | | |
| GSO Capital | GSO Cactus Credit Opportunities Fund LP | | |
| GSO Capital | GSO Churchill Partners LP | | |
| GSO Capital | GSO Coastline Credit Partners LP | | |
| GSO Capital | GSO Credit Alpha Trading (Cayman) LP | | |
| GSO Capital | GSO Credit-A Partners LP | | |
| GSO Capital | GSO Palmetto Opportunistic Investment Partners LP | | |

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| **Summary of Participating Lender Signatures** | | | |
| GSO Capital | GSO Special Situations Master Fund LP | | |
| GSO Capital | Steamboat Credit Opportunities Master Fund LP | | |
| **GSO Capital Subtotal** | - | | |
| BlackRock Financial Management Inc. | JPMBI re BlackRock BankLoan Fund | | |
| BlackRock Financial Management Inc. | BlackRock Floating Rate Income Trust | | |
| BlackRock Financial Management Inc. | BlackRock Defined Opportunity Credit Trust | | |
| BlackRock Financial Management Inc. | BlackRock Limited Duration Income Trust | | |
| BlackRock Financial Management Inc. | BlackRock Funds II, BlackRock Floating Rate Income Portfolio | | |
| BlackRock Advisors, LLC | BlackRock Funds II, BlackRock Multi-Asset Income Portfolio | | |
| BlackRock Financial Management Inc. | BlackRock Secured Credit Portfolio of BlackRock Funds II | | |
| BlackRock Institutional Trust Company, N.A. | BlackRock Short Duration High Income Fund | | |
| BlackRock Financial Management Inc. | BlackRock Debt Strategies Fund, Inc. | | |
| BlackRock Financial Management Inc. | BlackRock Floating Rate Income Strategies Fund, Inc. | | |
| BlackRock Financial Management Inc. | BlackRock Global Investment Series: Income Strategies Portfolio | | |
| BlackRock Financial Management Inc. | Ironshore Inc. | | |
| BlackRock Financial Management Inc. | Magnetite VI, Limited | | |
| BlackRock Financial Management Inc. | Magnetite VII, Limited | | |
| BlackRock Financial Management Inc. | Magnetite VIII, Limited | | |
| BlackRock Financial Management Inc. | Magnetite IX, Limited | | |
| BlackRock Financial Management Inc. | The PNC Financial Services Group, Inc. Pension Plan | | |
| BlackRock Financial Management Inc. | BlackRock Senior Floating Rate Portfolio | | |
| BlackRock Financial Management Inc. | New York State Common Retirement Fund | | |
| BlackRock Financial Management Inc. | Magnetite XII, Ltd. | | |
| BlackRock Financial Management Inc. | Magnetite XI, Limited | | |
| BlackRock Financial Management Inc. | Magnetite XIV, Limited | | |
| **BlackRock Financial Management Inc. Subtotal** | - | | |
| Sound Point Capital Management | Sound Point Capital Management | | |
| **Sound Point Capital Management Subtotal** | - | | |
| Trimaran Advisors, L.L.C. | KCAP Financial, Inc. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2012-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2013-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2014-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2014-2 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2015-1 Ltd. | | |
| **Trimaran Advisors, L.L.C. Subtotal** | - | | |
| Metropolitan Life Insurance Company | Metropolitan Life Insurance Company | | |
| **Metropolitan Life Insurance Company Subtotal** | - | | |
| MJX Asset Management LLC | Venture X CLO, Limited | | |
| MJX Asset Management LLC | Venture XI CLO, Limited | | |
| MJX Asset Management LLC | Venture XII CLO, Limited | | |
| MJX Asset Management LLC | Venture XIII CLO, Limited | | |
| MJX Asset Management LLC | Venture XIV CLO, Limited | | |
| MJX Asset Management LLC | Venture XIX CLO, Limited | | |
| MJX Asset Management LLC | Venture XX CLO, Limited | | |
| MJX Asset Management LLC | Venture XV CLO, Limited | | |
| MJX Asset Management LLC | Venture XVI CLO, Limited | | |
| MJX Asset Management LLC | Venture XVIII CLO, Limited | | |
| MJX Asset Management LLC | Venture XVII CLO, Limited | | |
| **MJX Asset Management LLC Subtotal** | - | | |
| Healthcare Financial Solutions LLC | Healthcare Financial Solutions LLC | | |
| **Healthcare Financial Solutions LLC Subtotal** | - | | |
| New York Life | New York Life Insurance Company | | |
| New York Life | New York Life Insurance and Annuity Corporation | | |
| New York Life | Flatiron CLO 2011-1 Ltd. | | |
| New York Life | Flatiron CLO 2012-1 Ltd. | | |
| New York Life | Flatiron CLO 2013-1 Ltd. | | |
| New York Life | Flatiron CLO 2014-1 Ltd. | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| New York Life | Flatiron CLO 2015-1 Ltd. | | |
| New York Life | Flatiron CLO 2007-1 Ltd. | | |
| New York Life | MainStay Floating Rate Fund | | |
| New York Life | MainStay VP Floating Rate Portfolio | | |
| **New York Life Subtotal** | - | | |
| BNP Paribas | BNP Paribas Global Senior Corporate Loans | | |
| BNP Paribas | BNPP IP CLO 2014-II, LLC | | |
| BNP Paribas | BNPP IP CLO 2014-I, Ltd. | | |
| **BNP Paribas Subtotal** | - | | |
| WhiteHorse | WhiteHorse VI, Ltd. | | |
| WhiteHorse | WhiteHorse VII, Ltd. | | |
| WhiteHorse | WhiteHorse VIII, Ltd. | | |
| WhiteHorse | WhiteHorse IX, Ltd. | | |
| WhiteHorse | WhiteHorse X, Ltd. | | |
| **WhiteHorse Subtotal** | - | | |
| American Capital CLO Management, LLC | ACAS CLO 2012-1, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2013-2, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2014-1, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2014-2, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2015-1, Ltd | | |
| American Capital ACSF Management, LLC | ACSF Funding I, LLC | | |
| American Capital ACSF Management, LLC | ACAS Funding I, LLC | | |
| American Capital ACSF Management, LLC | ACAS Funding II, LLC | | |
| **American Capital Subtotal** | - | | |
| Allstate Life Insurance Company | Allstate Life Insurance Company | | |
| Allstate Life Insurance Company | Allstate Life Insurance Company | | |
| Allstate Life Insurance Company | AIMCO CLO, Series 2014-A | | |
| **Allstate Life Insurance Company Subtotal** | - | | |
| Credit Value Partners, LP | Credit Value Partners, LP | | |
| **Credit Value Partners, LP Subtotal** | - | | |
| KVK | KVK CLO 2014-1 LTD. | | |
| KVK | KVK CLO 2015-1 LTD. | | |
| KVK | KVK CLO 2014-3 LTD. | | |
| KVK | KVK CLO 2014-2 LTD. | | |
| **KVK Subtotal** | - | | |
| CVC Credit Partners, LLC | Apidos CLO IX | | |
| CVC Credit Partners, LLC | Apidos CLO X | | |
| CVC Credit Partners, LLC | Apidos CLO XI | | |
| CVC Credit Partners, LLC | Apidos CLO XII | | |
| CVC Credit Partners, LLC | Apidos CLO XIV | | |
| CVC Credit Partners, LLC | Apidos CLO XIX | | |
| CVC Credit Partners, LLC | Apidos CLO XV | | |
| CVC Credit Partners, LLC | Apidos CLO XVI | | |
| CVC Credit Partners, LLC | Apidos CLO XVII | | |
| CVC Credit Partners, LLC | Apidos CLO XVIII | | |
| CVC Credit Partners, LLC | Apidos CLO XX | | |
| **CVC Credit Partners, LLC Subtotal** | - | | |
| MidOcean Credit | MidOcean Credit CLO I | | |
| MidOcean Credit | MidOcean Credit CLO II | | |
| MidOcean Credit | MidOcean Credit CLO III | | |
| MidOcean Credit | MidOcean Credit Focus Fund I LP | | |
| MidOcean Credit | MidOcean Credit Opportunity Master Fund, L.P. | | |
| **MidOcean Credit Subtotal** | - | | |
| Deutsche Bank | Deutsche Bank AG Cayman Islands Branch | | |
| **Deutsche Bank Subtotal** | - | | |
| Trinitas | Trinitas CLO I, Ltd. | | |
| Trinitas | Trinitas CLO II, Ltd. | | |
| Trinitas | Trinitas CLO III, Ltd. | | |
| **Trinitas Subtotal** | - | | |
| Marblegate | Marblegate Special Opportunities Master Fund LP | | |
| Marblegate | P Marblegate Ltd | | |
| **Marblegate Subtotal** | - | | |
| 3i Debt Management U.S. LLC | 3i US Senior Loan Fund, L.P. | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| 3i Debt Management U.S. LLC | COA Summit CLO Ltd. | | |
| 3i Debt Management U.S. LLC | Fraser Sullivan CLO VII Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO I Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO II Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO III Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO IV Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO V Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO VI Ltd. | | |
| **3i Debt Management U.S. LLC Subtotal** | - | | |
| Tall Tree Investment Management, LLC | Nelder Grove CLO, Ltd. | | |
| Tall Tree Investment Management, LLC | Tuolumne Grove CLO, Ltd. | | |
| Tall Tree Investment Management, LLC | Lockwood Grove CLO, Ltd. | | |
| **Tall Tree Investment Management, LLC Subtotal** | - | | |
| Credit Suisse Loan Funding LLC | Credit Suisse Loan Funding LLC | | |
| **Credit Suisse Loan Funding LLC Subtotal** | - | | |
| Metropolitan West Asset Management, LLC | Metropolitan West Floating Rate Income Fund | | |
| TCW Asset Management Company | Figueroa CLO 2013-2, Ltd. | | |
| TCW Asset Management Company | Figueroa CLO 2014-1, Ltd. | | |
| TCW Asset Management Company | Figueroa CLO 2013-1, Ltd. | | |
| **TCW Asset Management Company Subtotal** | - | | |
| ZAIS Group | ZAIS CLO 1, Limited | | |
| ZAIS Group | ZAIS CLO 2, Limited | | |
| ZAIS Group | ZAIS CLO 3, Limited | | |
| **ZAIS Group Subtotal** | - | | |
| Insight Investment | Cutwater 2014-I, Ltd. | | |
| Insight Investment | Cutwater 2014-II, Ltd. | | |
| **Insight Investment Subtotal** | - | | |
| Cedar Funding Ltd. | Cedar Funding Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding IV CLO, Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding II CLO, Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding III CLO, Ltd. | | |
| **Cedar Funding Ltd. Subtotal** | - | | |
| FOC Partners | Stanford Street CLO, LTD | | |
| FOC Partners | Longfellow Place CLO, LTD | | |
| FOC Partners | Hull Street CLO, LTD | | |
| **FOC Partners Subtotal** | - | | |
| Steele Creek | Steele Creek CLO 2014-1, LTD | | |
| Steele Creek | Steele Creek CLO 2015-1, LTD | | |
| **Steele Creek Subtotal** | - | | |
| Sound Harbor | Sound Harbor Loan Funds 2014-1 | | |
| **Sound Harbor Subtotal** | - | | |
| Och-Ziff Loan Management | OZLM Funding II, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding III, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding IV, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding V, Ltd. | | |
| Och-Ziff Loan Management | OZLM VI, Ltd. | | |
| Och-Ziff Loan Management | OZLM VII, Ltd. | | |
| Och-Ziff Loan Management | OZLM VIII, Ltd. | | |
| Och-Ziff Loan Management | OZLM IX, Ltd. | | |
| Och-Ziff Loan Management | OZLM X, Ltd. | | |
| Och-Ziff Loan Management | OZLM XI, Ltd. | | |
| **Och-Ziff Loan Management Subtotal** | - | | |
| HRS Investment Holdings LLC | HRS Investment Holdings LLC | | |
| **HRS Investment Holdings LLC Subtotal** | | | |
| First Trust | First Trust Senior Loan ETF | | |
| First Trust | First Trust Senior Floating Rate Income Fund II | | |
| First Trust | First Trust Short Duration High Income Fund | | |
| First Trust | First Trust Senior Loan Fund | | |
| **First Trust Subtotal** | - | | |
| Loomis, Sayles & Company | Loomis Sayles CLO II, Ltd. | | |
| **Loomis, Sayles & Company Subtotal** | - | | |
| Saratoga Investment Corp. | Saratoga Investment Corp. CLO 2013-1 | | |
| **Saratoga Investment Corp. Subtotal** | - | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| P. Shoenfeld Asset Management LP | Thracia, LLC | | |
| **P. Shoenfeld Asset Management LP Subtotal** | - | | |
| Centerbridge | CCP Credit Acquisition Holdings, LLC | | |
| **Centerbridge Subtotal** | - | | |
| KKR | Spruce Investors II Limited Partnership | | |
| KKR | Maryland State Retirement and Pension System | | |
| KKR | Spruce Investors Limited | | |
| KKR | Presidio Investors Limited | | |
| KKR | Oregon Public Employees Retirement Fund | | |
| **KKR Subtotal** | - | | |
| MatlinPatterson Global Advisers LLC | MatlinPatterson Global Opportunities Master Fund, L.P. | | |
| **MatlinPatterson Global Advisers LLC Subtotal** | - | | |
| Lake Loan Funding LLC | Lake Loan Funding LLC | | |
| **Lake Loan Funding LLC Subtotal** | - | | |
| Aegon USA Investment Management | Transamerica Floating Rate | | |
| **Aegon USA Investment Management Subtotal** | - | | |
| **Total Participating** | - | 1,500,961,623.15 | 85.63% |
| **Total Principal Balance** | - | 1,752,812,500.00 | 100.00% |

**MILLENNIUM LAB HOLDINGS, INC.**
**(on behalf of itself and each of its direct and indirect affiliates)**

By: _____

Name: _____James Slattery_____

Its: _____Chairman of the Board_____

**TA MILLENNIUM, INC.**
**(on behalf of itself and each of its direct and indirect affiliates)**

By: _____

Name: JEFFREY C. HADDEN

Its: _____

EXHIBIT 1

RESTRUCTURING TERM SHEET

EXECUTION VERSION

Millennium Health, LLC, et al.

Restructuring Term Sheet

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND THE RESTRUCTURING SUPPORT AGREEMENT AND OTHERWISE ACCEPTABLE TO THE AD HOC GROUP,[1] MLH, TA, AND THE COMPANY. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF MILLENNIUM HEALTH, LLC.**

This term sheet and the exhibits attached hereto (the "Term Sheet") set forth the principal terms of a proposed financial restructuring for the existing debt of the Company under the Existing Credit Agreement and certain other obligations of, and existing equity interests in, the Company on a consensual basis through an Out-of-Court Transaction, or in the event that an Out-of-Court Transaction is not consummated in accordance with the terms hereof, through an Approved Plan as to which votes are solicited prior to, and that is confirmed in connection with a case commenced under chapter 11 of the Bankruptcy Code.

---

[1] Terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement dated as of October 14, 2015 (the "Agreement").

| Overview | |
|---|---|
| Parties | Holdings, Millennium, MLH, TA, and the Participating Lenders |
| Transaction Summary | The purpose of the Restructuring is to (i) implement a settlement among the Company, the Lenders, MLH, and TA as described more fully herein, (ii) effectuate the DOJ Settlement, (iii) effect a recapitalization of the Company's balance sheet on a consensual basis through an Out-of-Court Transaction, (iv) cause the existing equity of Millennium to be cancelled, and (v) cause the issuance of 100% of the equity of reorganized Millennium to Lenders, who shall form a new holding company that is classified as a corporation for tax purposes ("New Holdco"), to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco.  In the event that the Out-of-Court Transaction  and Out-of-Court Releases are not approved by the end of the Solicitation (as determined by the Company and confirmed by the Ad Hoc Group Majority, MLH, and TA) by Out-of-Court Requisite Lenders, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation (as determined by the Company and confirmed by the Ad Hoc Group Majority, MLH, and TA), then, and only then, shall the Company effectuate the Restructuring through a pre-packaged chapter 11 Approved Plan Consistent With The Restructuring Term Sheet.  The Restructuring will be effectuated pursuant to the "Milestones" set forth on Annex A. |
| Outside Date | The closing date of the Out-of-Court Transaction (the "Closing Date") or the effective date of the Plan (the "Effective Date") shall have occurred by December 30, 2015 (but as provided below not sooner than December 15, 2015), unless otherwise agreed to by, and in each's sole and absolute discretion, Millennium, MLH, TA, and by more than 66.67% in principal amount of the ad hoc group of Lenders listed on Exhibit A, (the "Ad Hoc Group") as such list may be amended in writing with notice to the parties hereto from time to time by the Ad Hoc Group provided that the Ad Hoc Group at all times holds no less than fifty and one one-hundredths percent (50.1%) of the principal amount outstanding under the Existing Credit Agreement.  As used in this Term Sheet and the Restructuring Support Agreement, "Ad Hoc Group Majority" means holders of more than 50.1% in principal amount of the total principal amount of Loans under the Existing Credit Agreement then collectively held by members of the Ad Hoc Group and " Ad Hoc Group Super-Majority " means holders of more than 66.67% of the total principal amount of Loans under the Existing Credit Agreement then collectively held by the then members of the Ad Hoc Group. |
| Shareholder Contributions | |
| Settlement Contribution | MLH and TA shall collectively make a cash payment of $325 million to, or for the benefit of, Millennium upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet, and which shall be comprised of:<br><br>(a) $206 million to be distributed to the DOJ on account of the Government Claims, plus any accrued interest thereon to the extent required by the DOJ |

| | |
|---|---|
| | Settlement Agreement (the "<u>DOJ Funding Contribution</u>"), and in full and final satisfaction of Millennium's monetary obligations under the DOJ Terms Sheet and/or the DOJ Settlement Agreement in accordance with the terms set forth herein and therein; and |
| | (b)  an amount equal to $325 million less the DOJ Funding Contribution (the "<u>Millennium Funding Contribution</u>, and together with the DOJ Funding Contribution the "<u>Settlement Contribution</u>") to be paid to Millennium to reimburse Millennium for the Initial DOJ Deposit, for working capital purposes, and as otherwise set forth herein. |
| | The Settlement Contribution shall be funded fifty-five percent (55%) by MLH and forty-five percent (45%) by TA as follows: (x) $178.75 million to be funded by MLH (the "<u>MLH Contribution</u>") and (y) $146.25 million to be funded by TA (the "<u>TA Contribution</u>"). |
| No Further Distributions or Payments | Until the Closing Date or the Effective Date, other than ordinary course business expenses, or as permitted on <u>Annex E</u> (which shall   include scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement), no distributions or payments, including tax distributions, other payments for taxes, or accounting /tax advisory expense benefits or any other Restricted Payments (as defined in the Existing Credit Agreement), shall be made from Holdings, Millennium, or its subsidiaries to TA, or the shareholders of TA (the "<u>TA Shareholders</u>") or to MLH, or the shareholders of MLH (the "<u>MLH Shareholders</u>," and together with the TA Shareholders, the "<u>Shareholders</u>"), or between any of the foregoing parties, under any existing agreement between such parties. |
| MLH Tax Note | There shall be no further payments made under that certain Promissory Note, dated as of May 1, 2014, issued by Millennium to MLH in the principal sum of $19,755,547.00 (as amended, the "<u>MLH Tax Note</u>"). |
| JS Real Estate | The four (4) leases related to Millennium's headquarters facilities in San Diego shall be amended to provide the tenant with two optional five year extensions on the same terms (with annual CPI rate adjustments) and freely transferable by the tenant or landlord. |
| **DOJ Settlement** | |
| Definitive Documentation | Prior to the commencement of the Solicitation, Millennium will enter into definitive documentation with the DOJ Parties, including a definitive settlement agreements (the "<u>DOJ Settlement Agreement</u>") and a corporate integrity agreement (a "<u>CIA</u>"), the DOJ Settlement Agreement being in form and substance satisfactory to Millennium, the DOJ Parties, MLH, TA, and  an  Ad Hoc Group Majority, in each of their sole and respective absolute discretion, resolving all outstanding issues between the DOJ, CMS, and OIG, and the Plaintiff States (any such claims held by the DOJ Parties, the "<u>Government Claims</u>") on the one hand, and any of the Company, MLH, TA, and their respective Related Parties on the other (such documentation, the "<u>DOJ Settlement </u>"). |
| | Upon execution of the DOJ Settlement Agreement Millennium shall pay the |

3

| | |
|---|---|
| | DOJ a $50 million initial settlement deposit (the "Initial DOJ Deposit"), which shall be credited toward Millennium's total settlement obligations. |
| | As part of the DOJ Settlement Agreement, TA and MLH shall collectively guarantee the $50 million Initial DOJ Deposit to the DOJ pursuant to a Guarantee Agreement in form and substance acceptable to TA and MLH and the DOJ, in each of their sole and absolute discretion. In the event that TA and MLH are required to make payment to the DOJ of such $50 million pursuant to such Guaranty Agreement, TA and MLH shall have a subrogation claim (the "Subrogation Claim") (which shall be a 45%/55% interest, respectively, in such Subrogation Claim) against Millennium for the full amount so paid, which Millennium and the Consenting Lenders agree shall be an allowed claim in the Chapter 11 Cases. The Consenting Lenders, severally and not jointly will, and hereby do, assign to TA and MLH on account of and to secure their Subrogation Claim, such Consenting Lender's pro-rata share (based on the portion which the principal amount of loans it owns bears to the aggregate principal amount of all loans owned by Consenting Lenders) of any cash distributions it receives from Millennium's bankruptcy estate in an aggregate amount not to exceed the lesser of (x) $25.0 million for all Consenting Lenders in the aggregate, or (y) 50% of the amount of the Initial DOJ Deposit which is avoided pursuant to a final order in such case or proceeding and required to be disgorged. The obligation of each Consenting Lender shall be limited to the assignment of cash distributions received from the Millennium bankruptcy estate, except for such cash distributions, shall be non-recourse to the Consenting Lenders' own funds or assets and shall be several and not joint. |
| | Millennium and the Consenting Lenders agree that the Subrogation Claim shall have a super-priority lien on the proceeds of avoidance actions recoveries by the Millennium bankruptcy estate against the DOJ in an amount not to exceed the lesser of (i) $25 million or (ii) 50% of such Subrogation Claim and that concurrent with commencing the Chapter 11 Cases, Millennium shall file a motion to allow the Subrogation Claim and to grant MLH and TA a super-priority lien on such avoidance actions proceeds to secure the Subrogation Claim, and the Consenting Lenders will support the motion and such relief. |
| | Execution of the DOJ Settlement Agreement is a condition precedent to commencing Solicitation. |
| **Restructuring Transaction Summary** | |
| Out-of-Court Transaction Summary | In connection with the Out-of-Court Transaction, contingent upon approval and effectiveness of the Out-of-Court Releases by the Out-of-Court Requisite Lenders (both as defined below), control of Millennium shall be transferred to the Lenders, and the debt owed to the Lenders will be restructured, as follows: |
| | (a)    at least one business day prior to the Closing Date, the Settlement Contribution shall be paid by MLH and TA collectively to or for the benefit of Millennium and the DOJ Funding Contribution shall be paid over to the DOJ; |
| | (b)    all of Millennium's outstanding obligations under the Existing Loan Documents will be extinguished as of the Closing Date except to the extent applicable to any Non-Consenting Lender and all of Millennium's existing equity shall be cancelled; |

|  | (c)      each Consenting Lender shall receive on the Closing Date, in full and final satisfaction of the obligations under the Existing Loan Documents, its *pro rata* share of and interest in: |
| --- | --- |
|  | (i)      100% of the equity in reorganized Millennium, which will be subsequently transferred by the Consenting Lenders to New Holdco. |
|  | (ii)      a new secured term loan issued by New Holdco in the aggregate principal amount of $600 million on the terms substantially set forth in <u>Annex B</u> to this Term Sheet (the "<u>New Credit Agreement</u>"). |
|  | (iii)      the Millennium Corporate Claim Trust substantially on the terms set forth in <u>Annex C</u> to this Term Sheet. |
|  | (iv)      to the extent a Lender held a directly owned claim prior to a record date to be established by an Ad Hoc Group Majority, the opportunity to contribute such directly owned claims, and receive a pro rata beneficial interest in the Millennium Lender Claim Trust to be formed pursuant to <u>Annex C</u>. |
|  | (d)      after the transfer of 100% of the equity in reorganized Millennium to the Consenting Lenders, the Consenting Lenders shall cause 100% of the equity of reorganized Millennium to be transferred to New Holdco in exchange for 100% of the common stock of New Holdco, subject to dilution for awards issued pursuant to the Employee Incentive Plans described herein (such transactions described in paragraphs (a) through (c) of this section, the "<u>Transfer of Control</u>"). |
| **Out-of-Court Early Commitment Fee** | Upon approval of the Out-of-Court Transaction and Out-of-Court Releases by the Requisite Consenting Lenders, each Lender that consents to the Out-of-Court Transaction and the Out-of-Court Releases by 12:00 p.m. (prevailing Eastern Standard Time) on November 5, 2015 (the "<u>Early Commitment Deadline</u>"), shall receive its *pro rata* share of a new senior secured term loan, which shall be senior in lien and payment priority to the Existing Credit Agreement Claims. The Existing Loan Documents will be amended to permit the incurrence of such loans and the related liens and any necessary intercreditor and subordination agreements will be entered into between Millennium and the Participating Lenders), in the aggregate principal amount of $50.0 million (the "<u>Early Commitment Facility</u>"). |
|  | The Early Commitment Facility shall otherwise be on substantially the same terms, including maturity, interest, prepayment rights, and covenants as the Existing Credit Agreement. (prior to the amendments thereto contemplated by <u>Annex D</u> hereto). |
|  | The Early Commitment Facility is fully earned, non-refundable, and non-avoidable at the time of issuance. The Early Commitment Facility will be paid in full in cash upon the Closing Date of the Out-of-Court Transaction or the effective date of an Approved Plan. In the event that the Out-of-Court Transaction does not close and an Approved Plan is not consummated, the Early Commitment Facility shall continue in full force and effect in accordance with its terms. |
| **Out-of-Court Forbearance** | In connection with the Out-of-Court Transaction, effective upon the Closing Date, each Consenting Lender shall approve: |
|  | (i)      an amendment to the Existing Credit Agreement on the terms substantially set forth in <u>Annex D</u> to this Term Sheet providing for, among other things, a permanent waiver of any defaults and/or events of |

| | |
|---|---|
| | default and an agreement not to declare any defaults, acceleration or otherwise exercise remedies for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction.[2] |
| | (ii)    a non-amendable provision in the New Credit Agreement which provides for an agreement not to declare any defaults, acceleration or otherwise exercise remedies for a period of ninety-one (91) days following either the closing of the Out-of-Court Transaction or after the Effective Date of the Approved Plan.[3] |
| | (iii) The other modifications to the terms of the Existing Credit Agreement set forth on <u>Annex D</u> hereto. |
| Corporate Governance | Until the Closing Date of the Out-of-Court Transaction, MLH shall maintain full control and governance of Holdings and MLH shall maintain full control and governance of Millennium, each in accordance with the operating agreements of Holdings and Millennium; <u>provided</u>, <u>however</u>, that MLH shall not cause Millennium to do, and Millennium shall not do, any action which Millennium is not permitted to take without the consent of the Ad Hoc Group Majority under the section captioned "Ordinary Course Operations" and <u>Annex E</u> hereto without first obtaining such consent as provided on <u>Annex E</u>. |
| | Without limitation of the generality of the foregoing, notwithstanding anything in <u>Annex E</u> or any provision of this Term Sheet to the contrary, no further distributions or payments (other than scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement), except as specifically set forth herein, will be made to any TA Shareholder or MLH Shareholder or any Related Party (as defined below) to TA or MLH, or to any professional acting on their behalf. In addition, simultaneously with their delivery to members of the Millennium board, a copy of all board packages, resolutions and other written materials prepared for the board shall be provided to Brown Rudnick LLP, as counsel to the Ad Hoc Group, on a "attorney's eyes only" basis; provided however that such materials shall be redacted to prevent the disclosure of privileged information. |
| | Following the Closing Date of the Out-of-Court Transaction, the bylaws and other governance documents of reorganized Millennium and New Holdco shall prohibit the board of directors of reorganized Millennium and New Holdco, as well as the shareholders of reorganized Millennium and New Holdco, from, directly or indirectly, commencing or filing a petition seeking any voluntary, or consenting to or acquiescing in any involuntary, in each case, Insolvency Proceeding against, or with respect to, reorganized Millennium or New Holdco, for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction or the Effective Date. For purposes hereof, "Insolvency Proceeding" shall mean a bankruptcy, insolvency, assignment for the benefit of creditors, receivership, custodian, |

---

[2]     The only remaining debt outstanding under the Existing Credit Agreement following closing of the Out-of-Court Transaction will be held by the Non-Consenting Lenders.

[3]     Because the Consenting Lenders will control 100% of the equity in the reorganized Millennium following closing of the Out-of-Court Transaction, they will also control reorganized Millennium's compliance with the New Credit Agreement.

| | |
|---|---|
| | or similar proceeding, under, in each case, any applicable federal or state law relating to bankruptcy, insolvency, reorganization, winding up liquidation of a person or its assets. |
| Master Restructuring Agreement | In connection with the Out-of-Court Transaction, each Consenting Lender shall execute a master restructuring agreement (the "Master Restructuring Agreement") pursuant to which each Consenting Lender shall: (x) consent to and approve (i) the terms of the Out-of-Court Restructuring (including, without limitation, the Out-of-Court Releases), (ii) the new secured term loan on the terms substantially set forth in Annex B to this Term Sheet, and (iii) the amendments to the Existing Credit Agreement on the terms substantially set forth in Annex D to this Term Sheet; and (x) vote in favor of the Approved Plan and consent to and agree to provide the releases provided for therein by executing the ballot and releases made a part of the Master Restructuring Agreement.  The Company, MLH, TA and the Consenting Lenders shall all be parties to the Master Restructuring Agreement. |
| Bankruptcy Toggle | If the Company does not receive consents to the Out-of-Court Transaction and the Out-of-Court Releases from Lenders holding all but $50 million of the outstanding principal indebtedness under the Existing Credit Agreement (the "Out-of-Court Requisite Lenders") by the Solicitation Termination Date, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation by the Solicitation Termination Date, and the same is confirmed in writing by MLH and TA, then, and only then, shall the Company commence the Chapter 11 Cases in the Bankruptcy Court and the parties will work together to implement the transactions pursuant to an Approved Plan Consistent With The Restructuring Term Sheet. <br><br> MLH, TA, the Ad Hoc Group Super Majority and the Company may agree in writing that the amount of outstanding principal indebtedness under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million for the purposes of determining the Out-of-Court Requisite Lenders. <br><br> The proposed Debtors in the Chapter 11 Cases will be: Holdings, Millennium, and RxAnte. |
| Restructuring Transactions | The Restructuring transactions (the "Restructuring Transactions") described herein, whether implemented pursuant to a Qualified Out-of-Court Restructuring or an Approved Plan, in each case shall be implemented Consistent With The Restructuring Term Sheet and consistent with the tax provisions described in Annex F.  For the avoidance of doubt, the Restructuring Transactions may include the creation of new or successor entities, or the alternation of or elimination of existing entities. |
| Transfer of MLH Claims | Any claims, known and unknown, and causes of action against non-contributing MLH Shareholders shall be assigned to the Millennium Corporate Claim Trust or the Millennium Lender Trust, as applicable, and the proceeds of such claims shall be distributed consistent with the provisions described in Annex C. |
| Releases/Exculpations | (a)      Out-of-Court Releases. |

|  | (i)    The Settlement Contribution and Transfer of Control are contingent on:<br><br>(A)    a full and complete release of the Released Parties[4] and their respective Related Parties[5] by the Company of the Released Claims[6] that the Company or its Related Parties would have been legally entitled to assert in their own right, on behalf of one another or on behalf of another party against the Released Parties or their respective Related Parties; and<br><br>(B)    a full and complete release of the Company, the Released Parties and their respective Related Parties, by the RSA Releasing Parties,[7] and each of the foregoing parties Related Parties, from the Released Claims that the RSA Releasing Parties or their Related Parties, would have been legally entitled to assert in their own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against the Released Parties; provided, however, that there shall be no release of any of the Released Claims by the Participating Lenders or the Company of any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to (1) Skadden, Arps, Slate, Meagher & Flom (including its partners and other attorneys), (2) JPMorgan Chase Bank, N.A., (3) J.P. Morgan Securities LLC, (4) Citibank Global Markets Inc.; (5) BMO Capital Markets, (5) Suntrust Bank, (6) KPMG LLP, (7) Citibank, N.A., (8) Bank of Montreal and any affiliates or Related Parties of the foregoing parties listed in (1) to (8) (the "Excluded Parties"), and the Retained Claims (as defined |
|--|--|

---

[4]    "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders; (e) Wilmington Federal Savings Bank, FSB, in its capacity as the successor Administrative Agent.; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard Appel; (j) David Cohen; (k) Greg Stein; (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) and those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable; and (o) Brown Rudnick, LLP and FTI.

[5]    "Related Parties" means, collectively, current and former affiliates and such entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holder's spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals. For the avoidance of doubt,. none of the Excluded Parties shall be a Related Party to any of the Released Parties.

[6]    "Released Claims" means (a) solely with respect to the Released Parties, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or causes of action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Closing Date of an Out-of-Court Transaction or the Effective Date of an Approved Plan, as applicable, arising out of, or in any way related to in any manner, the Company, the Government Claims, the DOJ Settlement, the Existing Credit Agreement, and the Restructuring and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto (collectively, the "Core Released Claims"); and (b) with respect to the Related Parties of the Released Parties, all Core Released Clams, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the DOJ Settlement, the Existing Credit Agreement, the Restructuring and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement.

[7]    "RSA Releasing Parties" means, collectively, the Participating Lenders.

below) shall be expressly excluded from this subparagraph (B), and all such Retained Claims may be pursued against the Excluded Parties and shall be subject to paragraph (c) below.

(ii) Any claims against the non-contributing MLH Shareholders shall be expressly excluded from the Out-of-Court Releases in order to preserve the claims being transferred to the Millennium Corporate Claim Trust or the Millennium Lender Trust, as applicable (the releases described in this paragraph (a), the "Out-of-Court Releases").

(b) In-Court Releases/Exculpations.

(i) The Settlement Contribution and the treatment to be provided to the Existing Credit Agreement Claims (described below) are contingent on the following releases to be provided for in an Approved Plan that is confirmed by the Bankruptcy Court:

(A) a full and complete release of the Released Parties and their respective Related Parties by the Company from Released Claims;

(B) a full and complete release of the Company, the Released Parties and their respective Related Parties by the RSA Releasing Parties from Released Claims that the RSA Releasing Parties, or each of the foregoing party's Related Parties, would have been legally entitled to assert in their own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against a Released Party; provided, however, that the release by the Participating Lenders shall not include the Retained Claims and such Retained Claims shall be subject to paragraph (c) below; and

(C) a full and complete release of the Company, the Released Parties and their respective Related Parties by the Third-Party Releasing Parties[8] from Released Claims that any of the Third-Party Releasing Parties would have been legally entitled to assert in its own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against a Released Party.

(D) a bar order directed to and prohibiting any person from commencing or asserting any Released Claims against the Released Parties and their respective Related Parties, including, without limitation, all Third-Party Releasing Parties, any Non-Consenting Lender and, for the avoidance of doubt, any Consenting Lender.

(ii) The Plan releases shall expressly exclude any claims against the non-contributing MLH Shareholders in order to preserve the claims being transferred to the Millennium Corporate Claim Trust or Millennium Lender Trust, as applicable (the releases described in this paragraph (b), the "In-Court Releases").

(iii) The Plan shall include customary exculpation provisions, including exculpation for the Released Parties.

(c) Whether the Restructuring Transactions contemplated herein are effected

---

[8] "Third-Party Releasing Parties" means any holder of a Claim (as defined in the Bankruptcy Code) or Interest against the Company.

through an Out-of-Court Transaction or an Approved Plan, all known and unknown claims[9] (including derivative claims) of Millennium against the Excluded Parties are preserved (such preserved claims are the "Estate Claims"), and all known and unknown direct and derivative claims of the Lenders against the Excluded Parties are preserved (such preserved claims are the "Lender Claims"). The releases provided for herein do not preclude the Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Lender Claim or Estate Claim is assigned (the Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Plaintiff") from prosecuting, and the Lenders and Millennium retain the right, respectively, to bring, the Lender Claims and Estate Claims (collectively, the "Retained Claims") against the Excluded Parties. In the event that the Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Plaintiff Judgment"), the parties' rights shall be as follows (and shall be incorporated in the Approved Plan): (i) where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Plaintiff by the equitable share of Gross Damages (as hereinafter defined) attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Plaintiff equal to such excess so that the Plaintiff shall not recover in excess of its Gross Damages; and (ii) where Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Plaintiff affirmatively consents to any such

---

[9] All references to "unknown claims" in this Term Sheet shall be deemed to include a release of such claims that would not otherwise be released pursuant to the operation of California Civil Code Section 1542 and any other similar statutory provisions. The parties also agree that they waive solely with respect to Released Claims, to the fullest extent possible, any and all protections or preservations for fraudulent inducement (or similar) claims that might be premised on unknown or subsequently discovered facts. The final settlement agreement shall include a specific waiver of such claims.

petition for intervention   by MLH and/or TA (or any of their Related Parties)), and where the Plaintiff successfully obtains a Plaintiff Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Plaintiff Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).  In the event that, after one or more Trustees are appointed to pursue Estate Claims and/or Lender Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties in the forum selected by Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by Plaintiff against an Excluded Party or Excluded Parties.  In any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (c)(i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA.  Moreover, in any litigation by the Plaintiff of a Retained Claim (regardless of whether MLH, TA , or their respective  Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Plaintiff, the Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required.  The Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted.  Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties).  In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Plaintiff, which shall be exercised in the sole discretion of Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of Plaintiff.  To the extent that any settlement of any Retained Claim between Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of

11

competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon.  For the avoidance of doubt, the Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

(d)   Lenders, Millennium and New Holdco (and its subsidiaries) further agree that, MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Plaintiff, the Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. Lenders further agree that, if the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Plaintiff, Millennium or Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.[10]

(e) In the event the Restructuring Transactions contemplated herein are effected through an Approved Plan,  the Approved Plan shall provide for an order (the "Bar Order") (i) barring, enjoining and restraining all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA,

---

[10]   This Agreement shall operate as a demand that each of Millennium, the Consenting Lenders, MLH and TA institute a litigation hold and each such party shall, promptly following the effective date of the Agreement, issue a litigation hold notice to their respective Related Parties that could reasonably be expected to have in their possession, custody or control any documents, including electronic documents, relating to the Retained Claims or Released Claims. In addition, Millennium and MLH shall issue a litigation hold notice to any Released Parties affiliated with each of them, respectively. Litigation hold notices shall specify that such litigation hold shall continue until further notice from Millennium and the trustee of any litigation trusts established under an Approved Plan that all litigation against Excluded Parties has been settled, abandoned or otherwise concluded.

No further professional fees may be paid for or on account of TA and MLH's professionals after October 9, 2015, except as expressly set forth herein.

MLH, or their respective Related Parties based on any Released Claims; (ii) barring, enjoining and restraining, to the maximum extent possible under applicable law, each Excluded Party and each Third-Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Lenders arising out of or in connection with any Retained Claims; (iii) providing that to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the pro-rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based; multiplied by (y) the Settlement Contribution; and (iv) providing that the Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Lenders with respect to any Retained Claims, or Lender Claims or Estate Claims that are, immediately prior to the Closing Date or the Effective Date, as applicable, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties, and that all such claims shall be barred, enjoined and released.

(f)   In the event the Restructuring Transactions contemplated herein are effected through an Approved Plan, to the extent that the Released Parties do not obtain a full and complete release from the Third-Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the DOJ Settlement, the Existing Credit Agreement, or the transactions contemplated by the Restructuring that any of the Third-Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. Lenders further agree that, if the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities),  in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third-Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery , including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in "d" above, shall not exceed an aggregate maximum of $3 million,  50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

|  | For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third-Party Releasing Parties or the Excluded Parties. For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in (e) above shall be deemed to fall within the litigation-related costs that are covered in (c), (d) and (f) above. |
|---|---|
| **Treatment of Claims and Interests Under Approved Plan** ||
| Administrative, Priority Tax and Other Priority Claims | On or as soon as practicable after the Effective Date, each holder of an administrative, priority tax, or other priority claim shall receive cash equal to the full amount of its claim or otherwise be left unimpaired. *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Early Commitment Facility | The Early Commitment Facility shall be paid in full in cash. *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Existing Credit Agreement Claims | All of the Company's outstanding obligations under the Existing Loan Documents will be extinguished, canceled, and discharged as of the Effective Date, and in exchange therefor, and in full and final satisfaction of such claims, each holder of an Existing Credit Agreement Claim (as defined below) shall receive on the Effective Date its *pro rata* share of and interest in: (a)  100% of the equity in reorganized Millennium (but which shall be transferred no earlier than one business day after the payment of the Settlement Contribution) which will subsequently be transferred by the Lenders to New Holdco; and (b)  a new secured term loan issued by New Holdco in the aggregate principal amount of $600 million on the terms substantially as set forth in Annex B to this Term Sheet. (c)  the Millennium Corporate Claim Trust on the terms substantially set forth in Annex C to this Term Sheet. (d)  to the extent a Lender held a directly owned claim prior to a record date to be established by an Ad Hoc Group Majority, the opportunity to contribute such directly owned claims, and receive a pro rata beneficial interest in the Millennium Lender Claim Trust to be formed pursuant to Annex C. "Existing Credit Agreement Claims" means all claims and obligations arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement, in a total outstanding principal amount of approximately $1.752 billion, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents, other than the Prior Agent Indemnity Claims. *Impaired; entitled to vote.* |

| Prior Agent Indemnity Claims | On the Effective Date, the Prior Agent Indemnity Claims shall be assumed. |
| | The "Prior Agent Indemnity Claims" means all indemnification claims of JPMorgan Chase Bank, N.A. arising under the Existing Loan Documents. |
| | *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Other Secured Claims | On the Effective Date or as soon as practicable thereafter, all secured claims other than Existing Credit Agreement Claims shall be assumed or reinstated and paid in full in cash in the ordinary course as such claims become due or shall receive such other treatment as satisfies the requirements of section 1124 of the Bankruptcy Code. |
| | *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Government Claims | On the Effective Date or as soon thereafter as practicable, but at least one business day prior to the cancellation of the equity interests in Millennium, in satisfaction of the Government Claims, the DOJ shall receive a distribution in cash of $206 million plus accrued interest, which shall be funded pursuant to the DOJ Funding Contribution and from Millennium in accordance with the terms of the DOJ Settlement. The Plan will provide that the Initial DOJ Deposit payment will be irrevocable and not subject to avoidance and that all preference and other claims against the DOJ shall be waived. |
| | *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| General Unsecured Claims | All general unsecured claims (other than the Government Claims and the MLH Tax Note Claims) shall be reinstated or paid in full in cash in the allowed amount of the claim or in the ordinary course as such claims become due, as applicable. |
| | *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| MLH Tax Note Claims | On the Effective Date, the MLH Tax Note shall be deemed canceled. All claims arising out of or pursuant to the MLH Tax Note (the "MLH Tax Note Claims") shall be canceled and discharged and holders of MLH Tax Note Claims shall receive no distribution on account of such claims. |
| | *Impaired; not entitled to vote; conclusively deemed to reject.* |
| Intercompany Claims | All intercompany claims shall be (i) reinstated, in full or in part, and treated in the ordinary course of business or (ii) cancelled and discharged. |
| Existing Equity Interests in Holdings | On the Effective Date for Holdings, or as soon as practicable thereafter, all the existing equity interests shall be unimpaired. |
| | *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Existing Equity in Millennium | On the Effective Date for Millennium, or as soon as practicable thereafter, all the existing equity interests in Millennium shall be canceled, extinguished and discharged. |
| | *Impaired; not entitled to vote; conclusively deemed to reject.* |
| Existing Equity in Millennium | On the Effective Date, or as soon as practicable thereafter, all allowed |

| Subsidiaries | equity interests in Millennium's subsidiaries that are Debtors shall be reinstated and otherwise unaffected by the Plan.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
|---|---|
| **Plan Implementation Provisions** | |
| Use of Cash Collateral | In connection with the  Chapter 11 Cases, the Participating Lenders shall consent to the use of cash collateral (as such term is defined in the Bankruptcy Code) , subject to reasonable terms regarding, among other customary provisions, adequate protection to be negotiated by the Company and the Ad Hoc Group. |
| Treatment of Executory Contracts and Unexpired Leases | Each executory contract or unexpired lease to which the Company is party shall be deemed assumed as of the Effective Date, except those executory contracts or unexpired leases identified on the schedule of "Rejected Executory Contracts and Unexpired Leases" to be included in the Plan supplement as an exhibit to the Plan (which schedule shall be subject to the approval of the Ad Hoc Group), or except as otherwise rejected pursuant to the Plan or by separate order of the Bankruptcy Court.  The executory contracts and unexpired leases identified on the schedule of "Rejected Executory Contracts and Unexpired Leases" shall be deemed rejected as of the Effective Date.  The Restructuring Support Agreement shall be deemed assumed upon confirmation of the Plan. The four (4) leases related to Millennium's headquarter facilities in San Diego shall be assumed in accordance with the terms set forth herein. |
| Transfer of Newly Issued Equity to New Holdco/Establishment of Lender Litigation Trust | On the Effective Date, or as soon as practicable thereafter, but not before one business day after the payment of the Settlement Contribution and the payment of the Government Claims, 100% of the existing equity of Millennium shall be cancelled and 100% of the equity of reorganized Millennium shall be issued to Lenders, who shall form New Holdco, to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco, subject to dilution for awards issued pursuant to the Employee Incentive Plans described herein.<br><br>The Millennium Lender Claim Trust shall be established in accordance with Annex C hereof and each of the Consenting Lenders shall contribute or be deemed to have contributed any and all of their individual claims and causes of action against any person or entity related to the Debtors (other than Released Claims against Released Parties) to such Trust. |
| **Corporate Governance and Employee Incentive Plans** | |
| Board of Directors | Composition of the Board of Directors will be determined by an Ad Hoc Group Majority prior to the Solicitation Commencement Date. |
| Corporate Governance Documents | In connection with the consummation of the Plan or Out-of-Court Restructuring, New Holdco shall adopt an amended and restated certificate of incorporation, bylaws, and shareholders' agreement that will include the provisions described herein in the section "Corporate Governance" with respect to Millennium and New Holdco, and on terms that shall be reasonably acceptable to the Ad Hoc Group, subject to consultation with Millennium. |

16

<table>
<tr><td></td><td>

The amended and restated certificate of incorporation, bylaws and any other corporate documentation for New Holdco shall include customary provisions concerning, among other things, some or all of the following, in each case, with the specific terms thereof to be in the discretion of the Ad Hoc Group and satisfactory thereto:

(a)    selection of the Board of Directors;

(b)    rights of stockholders to act by written consent and of stockholders holding a minimum percentage of stock to call a special meeting;

(c)    rights to receive financial and other information to be provided to stockholders, subject to restrictions regarding confidentiality and access by competitors;

(d)    restrictions on trading shares to non-accredited investors and competitors and as necessary to preserve status as a private company, but otherwise freely tradeable to the extent permitted by applicable law;

(e)    preemptive rights and drag-along and tag-along rights; and

(f)    opting out of section 203 of the Delaware General Corporation Law.

</td></tr>
<tr><td>

Senior Executive Officers

</td><td>

The below-listed individuals shall continue to serve as senior executive officers of New Holdco (collectively, the "Senior Executives"), and shall enter into employment agreements with Millennium as of the Closing Date or the Effective Date, as applicable, on terms  agreeable to such Senior Executives and an Ad Hoc Group Majority:

(a)    Brock Hardaway

(b)    Martin Price

For the avoidance of doubt, no Senior Executive or other employee is a third-party beneficiary hereof and no Senior Executive's or other employee's continued employment shall be a condition precedent to any party's obligations to consummate the Restructuring Transactions. It is anticipated that certain other high-level employees of Millennium may receive employment agreements on terms to be determined.  The key terms of such executive employment agreements shall be as agreed by the executives and the Ad Hoc Group.

</td></tr>
<tr><td>

Employee Incentive Plans

</td><td>

In addition to base compensation, the Ad Hoc Group and the Senior Executives may agree upon additional forms of incentive compensation.

</td></tr>
<tr><td colspan="2">

**Miscellaneous Provisions**

</td></tr>
<tr><td>

Ordinary Course Operations

</td><td>

Millennium shall operate in the ordinary course of business consistent with current practices; provided, however, Millennium acting in accordance with, or in anticipation of any, either a CIA with OIG, or any changes in federal, state or private reimbursement practices, shall be operating in the ordinary course of business; and provided, further, that any actions that Millennium is prohibited from taking, or is required to take, in connection with the Chapter 11 Cases or the Plan shall be deemed to be ordinary course of business transactions.

Without limitation of the generality of the foregoing, Millennium shall not take or agree in writing or otherwise to take any of the actions prohibited

</td></tr>
</table>

| | |
|---|---|
| | under Annex E hereof without prior notice to and the consent of the Ad Hoc Group without first obtaining such consent as provided on Annex E. |
| Conditions to Effectiveness | If implemented through an Approved Plan, the Restructuring shall be subject to such conditions to effectiveness as are customary in restructurings of this type, including without limitation: (i) the RSA shall not be terminated; (ii) on or before December 30, 2015, the Bankruptcy Court must enter an order, which is final and non-appealable, that confirms the Approved Plan, that approves the releases (including third party releases) and exculpations, that contains the contribution claim and Non-Contribution Claim protections and other protections for the Released Parties and their respective Related Parties, and that contains the bar order language, in each case, in form, scope, and substance consistent in all material respects with the "Releases/Exculpations" provisions of the Term Sheet; (iii) all of the transactions contemplated by the Approved Plan shall be approved and not subject to avoidance; and (iv) the confirmation order shall be Consistent With The Restructuring Term Sheet.<br><br>The condition that the confirmation order is a final non-appealable order may be waived only if agreed to in writing by MLH, and TA, each in their sole and absolute discretion.<br><br>The Out-of-Court Transaction shall be subject to and conditioned on the receipt of any required material regulatory authorizations and consents and other customary conditions and that the RSA shall not have been terminated.<br><br>Neither the Out-of-Court Transaction nor the Restructuring under the Approved Plan shall close prior to December 15, 2015. |
| Press; Qui Tam and a Relator Disclosure | (a)    Millennium, MLH, TA, and the Participating Lenders will keep the specific terms of the transactions contemplated in this Term Sheet confidential and will not disclose them to any person (with customary exceptions for affiliates, persons who need to know).<br><br>(b)    Millennium, MLH, TA, and the Ad Hoc Group will agree on the language of a press release disclosing that an agreement among the Parties and with the DOJ Parties has been reached.<br><br>(c)    Millennium, MLH, TA, and the Participating Lenders shall not make any disparaging comments about the other, including with respect to any of the facts and circumstances giving rise to the transactions contemplated by the Restructuring Term Sheet.<br><br>(d)    Millennium will use its reasonable best efforts to ensure that DOJ and Relator Actions are unsealed substantially simultaneously with Millennium's announcement of Lender Solicitation results. |

## ANNEX A

## MILESTONES

| Milestones | |
|---|---|
| Targeted Solicitation Date | October 29, 2015 |
| Targeted Filing Date (if necessary) | November 10, 2015 |
| Earliest Closing Date for In-Court or Out-of-Court Transaction | December 15, 2015 |

**ANNEX B**

**TERMS OF NEW DEBT**

Capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Restructuring Term Sheet ("Restructuring Term Sheet") to which this term sheet is attached.

| Terms of New Debt | |
| --- | --- |
| Borrowers | Millennium Health, LLC and New Holdco (the "Borrowers") |
| Guarantors | RxAnte and each other direct and indirect domestic subsidiary of the Borrowers, subject to exceptions substantially similar to those set forth in the Existing Credit Agreement (such subsidiaries other than Millennium Health, LLC, collectively, the "Subsidiary Guarantors"; together with the Borrowers, the "Obligors"). |
| Lenders | Lenders party to the Existing Credit Agreement. |
| Required Lenders | Those Lenders holding greater than fifty percent (50%) of the outstanding principal amount of the Term Loans of all Lenders. |
| Administrative Agent | [TBD] (the "Agent"). |
| Type and Amount | New term loan in the aggregate principal amount of $600 million ("Term Loan"; the credit facility to which the terms of this term sheet apply, the "Term Loan Facility"). The Term Loan shall be deemed made in a single drawing on the Closing Date (subject to the prior satisfaction of the Conditions Precedent (hereinafter defined)) in exchange for, together with equity to be distributed in connection with the Restructuring Transactions, the cancellation of the outstanding loans under the Existing Credit Agreement. |
| Security | The Term Loan shall be secured by a perfected first priority security interest in substantially all property and assets of the Borrowers and the Subsidiary Guarantors (real and personal, tangible and intangible, whether now owned or hereafter acquired, developed and/or existing and wherever located and, including, without limitation, a perfected first priority security interest in all of the equity interests held by the Borrowers and all Subsidiary Guarantors), in each case, subject to the exceptions and limitations substantially similar to those set forth in the Existing Credit Agreement and the Loan Documents (as defined in the Existing Credit Agreement), provided that (x) the Obligors' cash and deposit accounts shall be subject to control agreements, under which the Agent shall be granted a perfected first priority security interest in the cash and deposit accounts (subject to customary exceptions), but the Borrowers shall be permitted to use such cash in the ordinary course of business unless and until an Event of Default occurs and is continuing, (y) Obligors' letter of credit rights valued at greater than a mutually agreed upon threshold shall constitute Collateral under the Term Loan Facility and (z) the types of property and assets described in clauses (d) and (r) of the definition of "Excluded Collateral" (as defined in the Existing Credit Agreement) shall |

20

| | |
|---|---|
| | not constitute Collateral under the Term Loan Facility so long as "but only to the extent that the granting of security interests therein would be prohibited by the terms thereof" shall be added to the end of such exceptions when they are excluded from Collateral under the Term Loan Facility (collectively, the "<u>Collateral</u>"). |
| Maturity | The Term Loan will mature on the date that is five years after the Effective Date (the "<u>Term Maturity Date</u>"). |
| Interest Rate | The Borrowers may elect that the Term Loan bear interest at a rate per annum equal to (a) the Base Rate plus the 5.50% per annum or (b) the LIBOR Rate plus 6.50% per annum.<br><br>The terms "Base Rate" and "LIBOR Rate" shall have the meanings customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest based on the LIBOR Rate shall be customary and appropriate for financings of this type and substantially similar to the Existing Credit Agreement; provided, that at no time will the (i) LIBOR Rate be deemed to be less than 1.00% per annum and (ii) Base Rate be deemed to be less than 2.00% per annum. |
| Interest Payment Dates | In the case of that portion of the Term Loan bearing interest at the Base Rate ("<u>Base Rate Loans</u>"), interest shall be payable quarterly in arrears.<br><br>In the case of that portion of the Term Loan bearing interest at the LIBOR Rate ("<u>LIBOR Rate Loans</u>"), interest shall be payable on the last day of each relevant interest period; provided, that if any interest period is longer than three months, interest shall be payable on each successive date three months after the first day of such interest period. |
| Default Rate | Upon the occurrence and during the continuation of an Event of Default (hereinafter defined), the interest rate on the Term Loan will be increased by two percent (2.00%) per annum at the direction of Administrative Agent (which shall be at the direction of the Required Lenders), which may be charged back to the initial date on which such Event of Default occurred. |
| Amortization; Prepayments | (a)  Amortization: 1.00% of the original principal amount per annum of the Term Loan, payable in equal quarterly installments.  The balance of the Term Loan will be repayable on the Term Maturity Date.<br><br>(b)  Voluntary prepayments: Permitted, in whole or in part, at any time, without premium or penalty.<br><br>(c) Mandatory prepayments: The Term Loan shall  include mandatory prepayment requirements (including, without limitation, an excess cash flow payment requirement on terms TBD)  provided that the percentage(s) of "excess cash flow", financial metrics and financial covenant definitions, in |

21

|  | each case, related to the excess cash flow payment requirement shall be mutually agreed upon and based upon such percentage(s), financial metrics and definitions as are customary for a financing of this type to a similarly situated borrower). |
|---|---|
| Conditions Precedent To Closing Date | Conditions precedent customary for this type of financing, including, without limitation (collectively, the "Conditions Precedent"; the date on which each of the Conditions Precedent are satisfied or waived and the closing occurs, the "Closing Date"): |

1) Solely in the case of a prepackaged bankruptcy, (i) entry of a final non-appealable order of the Bankruptcy Court (which is not subject to any appeal or contest unless waived in accordance with the terms of the Restructuring Term Sheet, including by MLH and TA, each in their sole and absolute discretion) approving a plan of reorganization which plan has been approved by the Requisite Consenting Lenders and other requisite creditors necessary to approve such plan (the "Plan of Reorganization");

2) Solely in the case of a prepackaged bankruptcy, debtor in possession lenders' administrative agent shall have received a cash payment in the amount necessary to repay all of the debtor in possession loans (if any) and the other obligations outstanding under the debtor in possession facility (if any), for the ratable benefit of the debtor in possession lenders;

3) Payment of all (x) accrued and unpaid fees, costs and expenses that are payable by the Obligors on the Closing Date, including without limitation, any applicable administrative agent fee due and payable under the Term Loan Facility and (y) reasonable fees, costs and expenses incurred by Agent and the Lenders, including reasonable attorneys' fees of the Agent and one counsel for the Lenders, in connection with the preparation, negotiation, execution, and delivery of the Loan Documents, through the Closing Date;

4) Execution and delivery of definitive documentation evidencing the Term Loan Facility including, without limitation, the loan agreement, security agreement, subordination agreement (if any),  and other agreements as reasonably required by Agent and Lenders in their reasonable discretion, each in form and substance reasonably satisfactory to the Agent and Lenders and consistent with the Documentation Principles (hereinafter defined) (collectively, the "Loan Documents");

5) There shall have occurred no Material Adverse Event (as defined in the Restructuring Support Agreement) since the date of the execution of this Agreement;

6) The DOJ Settlement shall be in full force and effect and the CIA shall be in form and substance satisfactory to Lenders; and

7) Satisfaction of the conditions to effectiveness in the Restructuring Term Sheet and such other conditions precedent as are customary for

| | |
|---|---|
| | financings of this type to a similarly situated borrower. |
| Representations and Warranties | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those representations and warranties set forth in the Existing Credit Agreement. |
| Affirmative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those affirmative covenants set forth in the Existing Credit Agreement. |
| Negative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those negative covenants set forth in the Existing Credit Agreement. |
| Financial Covenant | Leverage ratio, interest coverage ratio and/or minimum liquidity/cash covenant (to be mutually agreed), in each case, with levels, measurement periods and financial covenant related definitions to be mutually agreed (it being understood that the financial covenant related definitions shall be customary for a financing of this type to a similarly situated borrower). |
| Events of Default | Usual and customary for financings of this type and similar to those Events of Default set forth in the Existing Credit Agreement (but, for the avoidance of doubt, including Events of Default arising as a result of the commencement of a government investigation or proceeding involving an Obligor that could reasonably be expected to cause a Material Adverse Effect (as defined in the Existing Credit Agreement). |
| Default, Acceleration, other Remedies | The Agent and Lenders shall be prohibited from and shall forbear from (x) declaring any defaults under the Term Loan Facility and (y) accelerating any debt under the Term Loan Facility or otherwise exercising rights or remedies under the Term Loan Facility, in each case, for a period of ninety-one (91) days either following the closing of the Out-of-Court Transaction or the Effective Date. This provision shall be non-amendable. |
| Documentation Principles | The definitive documentation for the Term Loan Facility shall reflect the provisions set forth in this term sheet and shall otherwise be substantially consistent with the Existing Credit Agreement and Loan Documents (as defined in the Existing Credit Agreement), adjusted to reflect (i) the elimination of the revolving credit facility, swing line facility and letter of credit facility; (ii) the Obligors' existing financial condition, the Out-of-Court Transaction or prepackaged bankruptcy plan, as applicable, and other revisions to account for changes to the Obligors' corporate structure and business related to the foregoing, (iii) a cap (to be mutually agreed) on the aggregate amount of assets of and revenues that can be derived from Unrestricted Subsidiaries (as defined in the Existing Credit Agreement) and (iv) other items to be reasonably agreed (collectively, the "Documentation Principles"). Each reference in this term sheet to the phrase "substantially consistent with Existing Credit Agreement", "substantially similar to . . . the Existing Credit Agreement", "similar to those Events of Default set forth in |

| | |
|---|---|
| | the Existing Credit Agreement" or any similar phrase shall be subject to the Documentation Principles.  With respect to terms and conditions not addressed herein or in any final Restructuring documentation based upon this term sheet, those terms and conditions shall be reasonably agreed in good faith negotiations between the Lenders and Borrowers, and shall be usual and customary for similarly situated facilities of this type. |
| Assignments | The Lenders will be permitted to make assignments in respect of the Term Loan Facility in a manner substantially consistent with the assignment provisions set forth in the Existing Credit Agreement; provided, that the Borrowers' consent shall only be required to consummate such assignments to the extent that no Events of Default are then continuing. |
| Expenses and Indemnification; Yield Protection and Taxes | Usual and customary for financings of this type and substantially similar to similar provisions set forth in the Existing Credit Agreement provided that there shall be no cap thereunder in regards to reimbursable fees, costs and expenses, including without limitation, legal fees. |
| Governing Law and Forum | New York |

24

## ANNEX C

## CREATION OF CORPORATE CLAIM AND LENDER LITIGATION TRUSTS

| | |
|---|---|
| Creditor and Individual Lender Claim Litigation Trusts | Immediately following the transfer of 100% of the equity in reorganized Millennium to the Lenders (the, "Transfer Date") whether pursuant to an Out-of-Court Transaction or an Approved Plan, two litigation trusts shall be created—the "Millennium Corporate Claim Trust" and the "Millennium Lender Claim Trust" (together, the "Trusts"), which trusts shall constitute "grantor trusts" under the Internal Revenue Code, and each of which shall be funded by the reorganized Millennium in such amount and/or receive such other tangible or intangible assets as the reorganized Millennium shall determine. The materials distributed in connection with the Solicitation shall contain a description of the material terms and conditions concerning the formation, organization, operation, funding and powers of such Trusts as contemplated by the Ad Hoc Consortium of Lenders. |
| Grant of Claims to the Trusts | On the Transfer Date, any and all claims and causes of action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to the Company or the Agent under the Existing Credit Agreement other than Released Claims against Released Parties) (collectively, the "Retained Corporate Causes of Action") shall be contributed to the Millennium Corporate Claim Trust for prosecution, settlement, or other liquidation, in the discretion of the Trustee (defined below). On the Transfer Date, each of the Participating Lenders shall contribute or be deemed to have contributed any and all of their individual claims and causes of action against any person or entity related to the Debtors (other than Released Claims against Released Parties) to the Millennium Lender Claim Trust for prosecution, settlement or other liquidation, in the discretion of the Trustee (the "Lender Causes of Action"; and together with the Retained Corporate Causes of Action, the "Causes of Action"). |
| Contribution by the Debtors | The Steering Committee for the Ad Hoc Consortium of Lenders contemplate that the Millennium Corporate Claim Trust shall be funded by an initial contribution made by the reorganized Millennium on the Transfer Date of $1,000,000 and the Millennium Lender Claim Trust shall be funded by an initial contribution to be made by the reorganized Millennium on the Transfer Date in the amount of $2,000,000.00. In addition, on the Transfer Date, the Trusts and the reorganized Millennium shall enter into a $7 million Delayed Draw Facility with the Trusts pursuant to which the reorganized Millennium shall advance up to $7,000,000 in additional funds in respect of fees and costs of the Trusts at the request of their respective Trust Advisory Boards. Notwithstanding the existence of the $7,000,000 facility, the reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Trusts and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor. Amounts contributed, advanced or paid by reorganized Millennium to the Trusts (including, but not limited, draws on the Delayed Draw Term Loan) shall be reimbursed to it, without interest, from net proceeds recovered by the Trusts (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Trusts and in connection with prosecution, settlement or liquidation of the Causes of Action which have |

| | not previously been reimbursed or paid by the reorganized Millennium). |
|---|---|
| Beneficiaries | All Lenders shall be the beneficiaries of the Millennium Corporate Claim Trust. Participating Lenders shall be the sole beneficiaries of the Millennium Lender Claim Trust. In each case, the Lenders who are beneficiaries of each Trust shall hold beneficial interests therein in the same proportion as the principal amount of the Loans they hold under the Existing Credit Agreement as of the record date used for purposes of the Solicitation bears to the total amount of Loans held by Lenders who are beneficiaries of that Trust. |
| Non-Contributing MLH Shareholder Claims and Causes of Action | With respect to any proceeds recovered by the Millennium Corporate Claim Trust or Millennium Lender Trust from any claims or causes of action against non-contributing MLH Shareholders, such proceeds shall be distributed first to the contributing MLH Shareholders, up to the amount of the non-contributing MLH Shareholders pro-rata share of the MLH Contribution, and second to the Lenders or Participating Lenders, as applicable. |
| Governance | Each of the Trusts shall be governed by a three-member board appointed by an Ad Hoc Group Majority (the "Trust Advisory Board"). Among its other duties, the Trust Advisory Board shall select a trustee or trustees for the Trusts and if necessary, a replacement Trustee therefor. |
| Tax Reporting | Subject to Annex F, all parties agree to characterize and report the creation of the Trusts, the transfer of claims to the Trusts, the transfer of Trust beneficial interests to the Lenders, and the transfer of 100% of the equity in Reorganized Millennium to the Lenders as an integrated transaction for tax purposes. Such integrated transaction shall be characterized and reported as each Lender's receipt, in full and final satisfaction of the obligations under the Existing Loan Documents, of its pro rata share of and interest in (i) 100% of the equity in reorganized Millennium and (ii) 100% of the beneficial interests in the Millennium Corporate Claim Trust. The grantor trusts and the contributions to the grantor trusts shall be structured in a tax-efficient manner as determined by the Lenders, and all parties hereto agree to report for all tax purposes in a manner consistent therewith. |
| Forms of Trust Agreements | Forms of Trust Agreements for each Trust shall be included in the Solicitation Materials. |

## ANNEX D

## EXISTING CREDIT AGREEMENT AMENDMENTS

In connection with the Solicitation of consent to the Restructuring Transaction, the Consenting Lenders shall consent to the following amendments to the Existing Credit Agreement effective as of the consummation of the Restructuring Transactions whether through the Out-of-Court Transaction or an Approved Plan:

| | |
|---|---|
| Waiver of Defaults | Any defaults and/or events of default under the Existing Credit Agreement as of the date the Restructuring Transactions are consummated through an Out-of-Court Transaction shall be permanently waived. |
| Forbearance | The Lenders remaining under the Existing Credit Agreement as of the date the Restructuring Transactions are consummated and the Agent shall be prohibited (and shall forebear) from declaring any defaults under the Existing Credit Agreement and the other Loan Document (as defined in the Existing Credit Agreement), accelerating any of the loans or other obligations under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) or otherwise exercising any of their rights or remedies under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction and Effective Date. |
| Deleted Provisions | The following provisions of the Existing Credit Agreement shall be deleted: <br><br> (a)  Section 2.11(a) (Mandatory Prepayment/Proceeds of Indebtedness); <br><br> (b)  Section 2.11(b) (Mandatory Prepayment/Proceeds from Asset Sale and Recovery Event); <br><br> (c)  Article IV (Representations and Warranties); <br><br> (d)  Article VI (Affirmative Covenants) with the exception of Section 6.13 <br><br> (e)  Article 7 (Negative Covenants); and <br><br> (f)  Sections 8.1(b), (c), (d), (e), (g), (h), (i), (j), (k) and (l) (Events of Default). |
| Pro Rata Treatment of Payments | Section 2.17 (Pro Rata Treatment of Payments) shall be revised to (x) expressly permit the contemplated exchange of loans under the Existing Credit Agreement ("Term Loans") for loans under the exit facility, the terms of which are set forth in Annex B (such exit facility, the "Exit Facility") (y) provide for the subordination of the liens securing the obligations under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) to the liens securing the obligations under the Exit Facility and Early Commitment Facility and (z) the incurrence by Millennium of the Early Commitment Facility. |
| Prohibition of Assignment | Section 10.6 shall be amended to provide that any assignment of Term Loans and/or other Obligations (as defined in the Existing Credit Agreement) and the granting of participations in any Term Loans and other Obligations (as defined in the Existing Credit Agreement), in each case, by any Lender |

| | under Existing Credit Agreement, is prohibited. |
|---|---|
| Intercreditor and Subordination | The Consenting Lenders shall authorize the Administrative Agent to enter into an intercreditor and subordination agreement on customary and reasonable terms according priority to the liens securing the Exit Facility and Early Commitment Facility over the liens securing the Existing Credit Agreement. |
| Excess Cash Flow | Section 2.11(c) shall be amended to provide that no Excess Cash (7) Flow (as defined in the Existing Credit Agreement) payment shall be payable if an excess cash flow payment is payable under the Exit Facility. |

**ANNEX E**

**PROHIBITED ACTIONS DEEMED OUTSIDE OF THE ORDINARY COURSE OF BUSINESS**

During the pendency of the Restructuring Support Agreement, Millennium shall not undertake any of the following actions without the consent of the Ad Hoc Group, which consent shall not be reasonably withheld.[1]  Upon receiving notice and request for consent to any of the actions prohibited under  Annex E, the Ad Hoc Group shall not be deemed to have consented to such actions unless the Ad Hoc Group advises Millennium within five (5) business days after receiving such notice that it consents to such action. For the avoidance of doubt, the following actions shall only apply to actions taken after the signing of the Restructuring Support Agreement through the Closing Date or the Effective Date.

| | |
|---|---|
| Indebtedness | Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except as permitted under Sections 7.2(c), (e) (provided that the dollar amount of such Indebtedness under this clause (e) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (j) (provided that the dollar amount of such Indebtedness under this clause (j) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (l), (m), (n) or (r) of the Existing Credit Agreement. |
| Liens | Create, incur, assume or suffer to exist any Lien upon any of its property, except liens securing the obligations under the Existing Credit Agreement and as permitted under Sections 7.3(a), (b), (c), (d), (m), (o), (p) and (s) of the Existing Credit Agreement. |
| Disposition of Property | Dispose of any of its property, issue or sell any shares of such Restricted Subsidiaries Capital Stock to any Person except as permitted under Sections 7.5(a), (b), (d), (e), (g) or (h) of the Existing Credit Agreement. |
| Restricted Payments | Make any Restricted Payment except as permitted under Sections 7.6 (a), (c) or (i) (provided that any payments under clause (i) shall only be permitted to the extent expressly permitted under this Annex E) of the Existing Credit Agreement.<br><br>For the avoidance of doubt, notwithstanding anything in this Annex E or any provision of this Term Sheet to the contrary, no further distributions or payments (other than scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement) will be made to any TA Shareholder or MLH Shareholder  or any Related Party (as defined below) to |

---

[1]    Capitalized terms used herein and not defined herein or in the Restructuring Support Agreement or the Restructuring Term Sheet shall have the same meaning as in the Existing Credit Agreement.  All section references herein are to the Existing Credit Agreement.

| | |
|---|---|
| | TA or MLH. |
| Investments/Subsidiaries/Joint Ventures | Make any Investment other than as permitted under Sections 7.8 (a), (b), (c), (d) (provided that the dollar amount of such Investments under this clause (d) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (e), (f), (i) and (k) of the Existing Credit Agreement. Create any Subsidiaries, or enter into any joint venture, or similar agreement. |
| Issuance of Stock | Issue, deliver, sell, or authorize (i) any additional shares of capital stock or other form of equity, (ii) securities convertible into capital stock or any other form of equity, or (iii) subscriptions, rights, warrants or options to acquire capital stock or other form of equity. |
| Amendments to Charter Documents | Amend or propose to amend its charter or other organizational documents except as contemplated by the Restructuring Term Sheet. |
| Modification of Compensation/Benefits | Modify compensation/benefit arrangements with senior-management level employees or independent contractors by more than $100,000 (provided that in the aggregate such amounts do not exceed $1,000,000 and absolutely no increases in the compensation of the Senior Executives may be made without consent of an Ad Hoc Group Majority); enter into new arrangements with senior-management level employees or independent contractors; grant severance or termination pay to senior management-level employees in amounts greater than $100,000 (provided that in the aggregate such severance and termination payments do not exceed $1,000,000 and absolutely no increases in the compensation of the Senior Executives may be made without consent of an Ad Hoc Group Majority); enter into collective bargaining agreements; establish, adopt, enter into or amend any bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination or severance or other plan, trust, fund, policy or arrangement applicable to any senior-management level employee. |
| Litigation | Initiate, compromise, release or settle any material litigation, investigation or arbitration proceeding except for the DOJ Settlement, in a manner that would require payment by the company in excess of $1,000,000. All claims against any of the Excluded Parties shall be considered material and shall not be released or settled. |
| Material Contracts | Modify, amend or terminate any material contract pursuant to which Millennium makes or receives payments in excess of $10,000,000 on an annual basis or waive, release or assign any material rights or claims including, but not limited to, compromise of any material accounts receivable in excess of $1,000,000. |
| Tax | Make or rescind tax elections, settle or compromise any tax liability or amend any tax return.<br><br>The prohibition on making or rescinding tax elections shall also be subject to |

|  | Annex F. Therefore, no party (other than the Lenders with respect to post-closing tax periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities. The Ad Hoc Group shall not be deemed to have consented to any such election identified in Annex F. |
|---|---|
| Capital Expenditures | Make any capital expenditure in excess of $1,000,000. |
| Accounting Methods | Change its methods of accounting (except as required by law or GAAP). |
| Employee Indebtedness | Forgive Indebtedness owed by any employee (of Holdings, the Borrower or any of their respective Subsidiaries) to Holdings, the Borrower or any of their respective Subsidiaries. |

**ANNEX F**

**RESTRUCTURING TRANSACTIONS TAX MATTERS**

| Restructuring Transactions Tax Matters | |
|---|---|
| Tax Treatment of the Restructuring | All income and gain resulting from the cancellation or modification of debt or claims shall be allocated to MLH and TA in accordance with the Holdings LLC agreement. |
| | 100% of the existing equity of Millennium, a disregarded entity, shall be cancelled and 100% of the equity of reorganized Millennium shall be issued to Lenders, in a transaction which shall constitute the acquisition of the assets of Millennium by Lenders; the Lenders shall form New Holdco, to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco in a transaction constituting a Section 351 exchange. |
| Section 754 Election | Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes) shall make elections under Section 754 of the Internal Revenue Code of 1986, as amended (the "Tax Code") for the taxable year of the partnership in which the restructuring occurs, if one is not already in place. |
| Tax Matters and Reporting | Millennium, Holdings, MLH, TA, the Lenders, New Holdco, and the Shareholders shall file all tax returns consistent with the characterization provided herein and in the Plan of Reorganization, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code. |
| | The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Lenders, New Holdco the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. |
| | The present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively. |
| | MLH, TA and Holdings will make no claims against the Lenders, Millennium or New Holdco for any taxes of Holdings. Lenders will not be allocated any income or tax liabilities from Holdings for any tax periods nor will Lenders be allocated any income or tax liabilities attributable to Millennium's assets for the pre-closing period. |
| | Any deductions for the $256m DOJ payment shall be a pre-closing deduction of Holdings and shall be allocated 55/45 to MLH and TA, respectively. Any deductions for the Settlement Contribution shall be a pre-closing deduction of Holdings to the extent permitted by law and shall be allocated 55/45 to MLH and TA, respectively. It is understood that any other such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH shareholders. It is understood that for tax |

purposes the transfer of the interests in Millennium shall be treated as the transfer of assets owned by Millennium by Holdings to the Lenders. It is further understood that after the transfer of the interests in Millennium to the Lenders, Holdings shall have no liability with respect to the debt owed to the Lenders. It is also understood that Holdings intends to treat any of the debt owed to the Lenders in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

New Holdco to be responsible for all post-closing taxes of Millennium, and to receive all post-closing tax refunds and benefits of Millennium attributable to the post-closing period.

Millennium, Holdings, MLH, TA, the Lenders, New Holdco, and the historic owners of both TA and MLH to work cooperatively and collectively with respect to tax reporting and to take consistent tax positions. Neither New Holdco nor any Lender shall (i) file or amend any tax return of Millennium or its subsidiaries for any pre-closing tax period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a pre-closing tax period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld or delayed.

All income tax returns and similar tax returns of Holdings will be prepared jointly by TA and MLH. Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns. Holdings will be liquidated for tax purposes no later than February 28, 2016. Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as disregarded entities for all tax purposes until the transfer of the interests in reorganized Millennium to the Lenders. No party (other than the Lenders with respect to post-closing tax periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

**EXHIBIT A**

**AD HOC GROUP OF LENDERS**

1. Ares Management LLC
2. Brigade Capital Management, LP
3. Eaton Vance Management
4. Invesco Ltd.
5. Marathon Asset Management LP
6. Oppenheimerfunds Inc.
7. Symphony Asset Management LLC
8. THL Credit Advisors, LLC
9. THL Credit Senior Loan Strategies, LLC

EXHIBIT 2

JOINDER

JOINDER

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of October [___], 2015 (the "Agreement"), by and among Millennium Lab Holdings II, LLC ("Holdings"), Millennium Health, LLC ("Millennium"), and all of Millennium's direct and indirect subsidiaries (collectively, the "Company"), **[Transferor's Name]** ("Transferor"), and certain other parties signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "Participating Lender" under the terms of the Agreement.

Date Executed: _____, 201_

**TRANSFEREE**

Name of Institution: _____

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

**Existing Credit Agreement Claims**

$ _____

EXHIBIT 3

MATERIAL ADVERSE EVENTS

(a)     For the cumulative period between October 1, 2015 and three business days prior to the Effective Date of a Plan of Reorganization (ED Test Date),[1] Total Revenue and EBITDA are less than 80% of the forecast for such period excluding, in each case, any prior period negative adjustments that were not already identified in the forecast for periods prior to October 1, 2015.  For any partial month in which the ED Test Date falls, the total volume of UDT specimens for the 30-day period (or 31-day period, as applicable and, in each case, excluding legal holidays) preceding the ED Test Date are less than 80% of the forecasted total volume for such month.

(b)     Between October 1, 2015 and the ED Test Date actual terminations of commercial payor contracts, which payor contracts account for more than 15% of total revenues in the aggregate as reflected in 2016 forecast (as adjusted pro forma for commercial payor contracts entered into following October 1, 2015).

(c)     Prior to the ED Test Date, other than the proposed CMS pricing announced on September 25, 2015, any changes to government or individual commercial payor policies covering UDT implemented after September 30, 2015 and prior to the ED Test Date, that collectively, on a pro forma basis for all of 2015 as if the change occurred effective January 1, 2015, would have had a negative impact on 2015 forecasted EBITDA of more than 15% (net of the offset that the Company would be reasonably expected to have realized as a result of implementing commercially reasonable mitigation strategies, which mitigation strategies shall in no event be more than 10% of 2015 forecasted EBITDA, in response to any such changes).

(d)     Prior to the ED Test Date, the Company becomes aware that it is the target of any new action, litigation, investigation or proceeding by CMS, the DOJ or another governmental entity that would reasonably be expected to have a material adverse impact on the Company's operations.  The Company will notify the professionals to the Ad Hoc Lenders of any new action, litigation, investigation or proceeding by CMS, the DOJ or another governmental entity within 2 business days of the Company becoming aware of any such action, litigation, investigation or proceeding and provide details of such item to the Ad Hoc Lenders' professionals.

(e)     Management fails to attest in writing as of the ED Test Date that they still reasonably believe that 2016 forecasted EBITDA will not be less than $112.5 million.

(f)     Management fails to attest in writing as of the ED Test Date that they reasonably believe that as of the Effective Date, restructuring and other debt like obligations (other than reinstated lender debt obligations) would not exceed by more than 20% the amounts reflected in the most recent forecast provided to the Ad Hoc Lenders (e.g., $145mm threshold).

(g)     A material breach of the Corporate Integrity Agreement or Settlement Agreement with the DOJ as set forth in a written notice by the DOJ.

---

[1]     The Target Restructuring Effective Date is December 15, 2015, and the outside date is December 30, 2015.

(h)     Revocation of Medicare billing privileges, or a suspension of Medicare reimbursements by CMS that is not reasonably expected to be lifted contemporaneously with the occurrence of the Effective Date and the payment of unpaid amounts under the Settlement Agreement.

(i)      Loss of lab license.

For the purposes of, and in connection with, the foregoing Material Adverse Events:

(a)     A schedule shall be attached hereto reflecting monthly UDT volume, EBITDA and Total Revenue, which is the same as the forecast provided to FTI on July 29, 2015.

(b)     The Company shall provide financial reporting on a monthly basis to the professionals for the Ad Hoc Group as previously agreed plus a certificate with sufficient detail to verify compliance.

(c)     Revenue is as booked in accordance with GAAP and EBITDA is used herein as defined in the Existing Credit Agreement for 2015 figures and for 2016 calculated consistent with the forecast provided to the Lenders on July 29, 2015.

## UDT Volume, EBITDA and Total Revenue Schedule

|  | Oct-15 | Nov-15 | Dec-15 |
|---|---|---|---|
| UDT Volume | 218,747 | 218,747 | 218,747 |
| Total Revenue (in '000's) | $45,389 | $45,419 | $45,182 |
| Total EBITDA (in '000's) | $19,327 | $19,340 | $18,718 |