### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, et al. | Case No. 15-12284 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 202, 203, 205, 234, 243** |

## MEMORANDUM OPINION

Before the Court is the Opt-Out Lenders' motion pursuant to 28 U.S.C. § 158(d)(2)(A)[1] to certify this Court's order[2] confirming the Debtors' *Prepackaged Joint Chapter 11 Plan of Reorganization of Millennium Lab Holdings II, LLC* [D.I. 182] (as amended, the "Plan") directly to the United States Court of Appeals for the Third Circuit. While the Opt-Out Lenders assert multiple grounds for direct certification, the crux of their argument is that my approval of nonconsensual third party releases is contrary to at least one other decision in this district and involves a matter of "public importance," which warrants bypassing the normal appeals process. While I do not believe that any of the other criteria for direct certification are met, or any one of the other five issues raised by the Opt-Out Lenders meet the statutory criteria, I agree that the Confirmation Order involves one question of law requiring resolution of conflicting decisions. Accordingly, I must follow the mandate of the statute and certify the issue for direct appeal to the Third Circuit.

---

[1] *Opt-Out Lenders' Emergency Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(d)(2)* [D.I. 203] (the "Certification Mot.").

[2] *Findings of Fact, Conclusions of Law and Order (I) Approving the (A) Prepetition Solicitation Procedures, (B) Forms of Ballots, (C) Adequacy of Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, and (D) Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, and (II) Confirming the Prepackaged Joint Chapter 11 Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.* [D.I. 195] (the "Confirmation Order").

**Background[3]**

The Debtors[4] are in the business of laboratory-based diagnostic testing.  The Debtors
offer various services, including urine drug testing for the presence or absence of specified
substances and pharmacogenetic testing, which provides a genetic analysis of a patient's
metabolism and allows clinicians to more accurately predict effective drug therapies.  Medicare
reimbursement is the Debtors' single, largest source of revenue.

Prepetition, the Debtors' business became subject to an investigation by the United States
Attorney for the District of Massachusetts, operating as an arm of the Department of Justice (the
"DOJ").  In late December 2014, the DOJ informed the Debtors that it would be pursuing claims
against the company for violations of the Stark law and the Anti-Kickback Statute, and for
violations of the False Claims Act.  In March 2015, the DOJ filed a complaint against the
company.  At about the same time, the Debtors received various letters from a Medicare
administrative contractor for the Centers for Medicare and Medicaid (the "CMS") threatening to
revoke the Debtors' billing privileges because of certain alleged fraudulent billing practices.  As
a result of the DOJ's complaint and the threatened termination of billing privileges, the Debtors
sought a global resolution with the government and regulatory agencies.  Ultimately, the
Debtors' negotiations included the DOJ, the CMS, and the United States Department of Health
and Human Services Office of the Inspector General.  These negotiations resulted in the
execution of a Terms Sheet on May 20, 2015, with the United States as well as certain individual
states (collectively, the "USA Settling Parties") to resolve the investigative and administrative
matters.  The Terms Sheet required an aggregate payment to the governmental entities of $256
million.  The Debtors also entered into a corporate integrity agreement.

After entry into the Terms Sheet, the Debtors disclosed the terms of the proposed
settlement to an ad hoc group of prepetition lenders (the "Ad Hoc Group") holding debt under
the 2014 Existing Credit Agreement.[5]  Pursuant to the 2014 Existing Credit Agreement, the
Debtors borrowed $1.825 billion in April 2014, the proceeds of which were primarily used to

---

[3] I set forth the background to frame the issues.  Further background is found in my bench ruling of
December 11, 2015 [D.I. 206].
[4] The Debtors are:  Millennium Lab Holdings II, LLC; Millennium Health, LLC; and RxAnte, LLC.
[5] Credit Agreement Among Millennium Lab Holdings II, LLC, as Holdings, Millennium Laboratories,
LLC as Borrower, the Several Lenders from Time to Time Parties Hereto and JPMorgan Chase Bank,
N.A. as Administrative Agent Dated as of April 16, 2014.

2

pay off certain existing debt and provide a special dividend to equity holders as well as to provide for working capital. At the same time that the Debtors informed the Ad Hoc Group of the settlement, they updated their financial forecasts, accounting for, among other things, the effect of the settlement with the USA Settling Parties, reimbursement trends for services, and the corporate integrity agreement. As a result of that process, the Debtors determined that their capacity to service their debt had diminished. Negotiations with the Ad Hoc Group led to the Restructuring Support Agreement,[6] which resolved the issues between the Debtors, certain consenting lenders under the 2014 Existing Credit Agreement, the Debtors' equity holders, and their respective related parties.

The settlements reached in the Terms Sheet and the Restructuring Support Agreement provide the basis for the continuation of the Debtors' business. In broad terms, and as relevant to the appeal, the settlements provide for: (i) an infusion into the Debtors of $325 million from their equity holders—$178.75 million from Millennium Lab Holdings, Inc. ("MLH") and $146.25 million from TA Millennium, Inc. ("TA"); (ii) conversion of the 2014 Existing Credit Agreement into a $600 million new term loan; (iii) distribution of 100% of the beneficial ownership of the reorganized Debtors to holders of claims under the 2014 Existing Credit Agreement; (iv) the creation of two trusts—one holding the Debtors' retained claims (with recoveries inuring to the benefit of the reorganized Debtors) and one holding claims contributed by the consenting prepetition lenders (with recoveries inuring to their benefit); (v) payment of the remaining settlement amount ($206 million) to the USA Settling Parties by December 30, 2015; (vi) a 100% recovery for all creditors other than the holders of claims under the 2014 Existing Credit Agreement; and (vii) third party releases of MLH, TA, the prepetition lenders, and their Related Parties (as defined in the Plan).[7]

The Restructuring Support Agreement and the settlement agreement with the USA Settling Parties provided for an out-of-court restructuring[8] if an affirmative vote threshold for holders of claims under the 2014 Existing Credit Agreement was met. It was not. Accordingly,

---

[6] Restructuring Support Agreement Among Millennium Lab Holdings II, LLC, Millennium Health, LLC and All of Millennium's Direct and Indirect Subsidiaries, Certain Participating Lenders Under the 2014 Existing Credit Agreement, TA Millennium, Inc. and Millennium Lab Holdings, Inc. Dated October 14, 2015.

[7] Certain Excluded Parties (as defined in the Plan) do not receive releases under the Plan.

[8] In an out-of-court restructuring, only the debt of the consenting prepetition lenders would be converted into new debt and only consenting lenders would receive beneficial ownership of the restructured Debtors. Non-consenting lenders would continue to hold debt under the 2014 Existing Credit Agreement.

on November 10, 2015, the Debtors filed their voluntary petitions together with their *Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization* [D.I. 15] ("Disclosure Statement") and Plan. While the Debtors did not receive the requisite votes in the 2014 Existing Credit Agreement class to permit an out-of-court restructuring, this class did accept its treatment under the Plan by 93.02% in number and 93.74% in amount.

On December 10, 2014, I held a hearing with respect to the sufficiency of the Disclosure Statement as well as confirmation of the Plan. The Opt-Out Lenders (sometimes referred to as "Voya") did not object to the settlements contained in the Plan, but did object to the third party releases. They asserted (and continue to assert) that they have meritorious claims against the Debtors' former equity holders and two corporate executives that are the beneficiaries of third party releases, namely: MLH, TA, TA Associates Management, L.P., James Slattery, and Howard Appel.[9] These claims are set forth in a complaint filed on December 9, 2015, in the United States District Court for the District of Delaware, styled *ISL Loan Trust v. TA Associates Management, L.P.*, No.15-01138 (GMS) (D. Del. Dec. 9, 2015) (the "Complaint").[10]

For the reasons set forth in my bench ruling of December 11, 2015, I confirmed the Plan and overruled the Opt-Out Lenders' objection to the third party releases. On the same day, the Opt-Out Lenders filed their: (i) *Notice of Appeal* [D.I. 202]; (ii) *Motion of the Opt-Out Lenders for Stay Pending Appeal of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.* [D.I. 204] (the "Stay Motion"); and (iii) the Certification Motion. I, *sua sponte*, stayed the effect of the Confirmation Order [D.I. 209] pending the conclusion of the hearing on the Stay Motion. For the reasons set forth in my December 18, 2015, bench ruling [D.I. 232], I denied the Stay Motion and, after the Opt-Out Lenders stated no opposition to the Debtors' proposed form of order, signed an order vacating

---

[9] Since the confirmation hearing, the Opt-Out Lenders have twice confirmed that their objection with respect to the releases is limited to MLH, TA, TA Associates Management, L.P., Mr. Slattery, and Mr. Appel. Stay Hr'g Tr. 16:14–25, 17:1–7, Dec. 17, 2015; Cert'n Appeal Hr'g Tr. 9:25, 10:1–6, Dec. 30, 2015.

[10] In the Complaint, Voya asserts that: (x) TA Associates Management, L.P. controls TA. (Complaint ¶ 50); (y) Mr. Slattery is the founder, Chairman of the Board of Millennium and, until May 2013, was its Chief Executive Officer; and (z) Mr. Appel served as the Company's Chief Financial Officer from 2007 through January 2010, and thereafter served as Millennium's President until "recently" in 2015 (Complaint ¶ 53). Mr. Slattery and Mr. Appel are also two of the individual shareholders of MLH. *See, e.g., Debtors' Response to Voya Objection to Confirmation of Proposed Chapter 11 Plan* [D.I. 131].

the temporary stay [D.I. 227]. The Debtors filed a notice of the occurrence of the effective date of the Plan later that day [D.I. 229]. The Opt-Out Lenders did not appeal the order denying the Stay Motion.

On December 28, 2015, the Opt-Out Lenders filed their *Designation of Record and Statement of Issues on Appeal Pursuant to Fed. R. Bankr. P. 8009(a)* [D.I. 246] (the "Designation"). In their Designation, the Opt-Out Lenders state the following issues on appeal (the "Issues")[11]:

> 1. Can Bankruptcy Courts exercise "related to" jurisdiction over a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct on the basis of contractual indemnification agreements by the debtor of the other non-debtors that expressly and/or as a matter of law preclude indemnification for acts of fraud, wilfull [sic] misconduct, and violations of the Racketeer Influenced and Corrupt Organization (RICO) Act?

> 2. Do Bankruptcy Courts have the authority to release a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct without the consent of the releasing non-debtor?

> 3. Assuming *arguendo* that Bankruptcy Courts do have authority to release a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct without the consent of the releasing non-debtor, what standard of law governs the approval of such releases where no consideration is paid for the release?

> 4. Can services performed by a debtor's directors, officers, and employees in connection with the debtor's reorganization constitute a financial contribution to the debtor's estate?

> 5. Can a financial contribution made by a non-debtor to a debtor's estate be a financial contribution also made "on behalf of" other, and otherwise non-contributing, non-debtors?

> 6. Assuming *arguendo* that the Bankruptcy Court (a) properly determined that it had subject-matter jurisdiction and legal authority to release the non-debtor Opt-Out Lenders' direct claims against other non-debtors for fraud and other willful misconduct without the Opt-Out Lenders' consent and (b) applied the correct legal standard to its review of such releases, did the Bankruptcy Court err in concluding that the facts of this case warranted such a release?

**Discussion**

Section 158(d)(2)(A), enacted as part of the BAPCPA amendments, permits the direct appeal of a bankruptcy court order to the Circuit Court of Appeals if one or more of the specified

---

[11] Designation at 6–7.

statutory criteria are satisfied. *Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude L.P.)*, 407 B.R. 82, 111 (Bankr. D. Del. 2009); *In re Gen. Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009). Once certified, the Court of Appeals, in the exercise of its discretion, will determine whether to accept the appeal. *SemCrude*, 407 B.R. at 111.

Section 158(d)(2)(A) provides:

> (2)(A) The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

> and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § 158(d)(2)(A). While the section contains three subparts, there are actually four disjunctive criteria as subpart (i) sets forth two separate benchmarks for certification. As here, when a party asserts that several issues satisfy the requisites for certification, courts undertake an analysis of each criterion against each issue. *Stanziale v. Car-Ber Testing, Inc. (In re Conex Holdings, LLC)*, 534 B.R. 606 (D. Del. 2015); *In re Tribune Co.*, 477 B.R. 465 (Bankr. D. Del. 2012) ("*Tribune*").

In their submissions and at oral argument, the Debtors took the position that none of the Issues met any of the four criteria enumerated in section 158(d)(2)(A). On the other hand, the Opt-Out Lenders took the position that each of their six Issues met each of the four statutory criteria for certification. At argument, however, the Opt-Out Lenders agreed that Issue 2 was the most likely candidate for certification. Therefore, I will first briefly address the reasons why Issues 1 and 3–6 do not meet the criteria for certification before turning to Issue 2.

### A. Issues on Appeal That Do Not Meet the Criteria for Certification

(i)     Issue 1: Can Bankruptcy Courts exercise "related to" jurisdiction over a non-debtor's direct claims against other non-debtors for fraud and other

6

> willful misconduct on the basis of contractual indemnification agreements
> by the debtor of the other non-debtors that expressly and/or as a matter of
> law preclude indemnification for acts of fraud, wilfull [sic] misconduct,
> and violations of the Racketeer Influenced and Corrupt Organization
> (RICO) Act?

At the confirmation hearing, the Opt-Out Lenders argued that a bankruptcy court lacks jurisdiction to enter third party releases. The Debtors and other parties-in-interest argued that under section 1334(b) this Court had "arising in" jurisdiction to consider and confirm a plan as a "core" matter, as well as "related to" jurisdiction to enter the third party releases. The Debtors' "related to" jurisdiction argument was based on the indemnification provisions of the Debtors' operating agreements and individual prepetition indemnification agreements with certain individuals, including, as relevant here, Mr. Slattery and Mr. Appel. After a review of all relevant agreements submitted into evidence, I found that I had at least "related to" jurisdiction on the basis of both the indemnification and advancement obligations contained in those documents.[12]

The controlling Third Circuit Court of Appeals decision on which this ruling was made is *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984). Application of long-standing, settled law to the facts of a particular case is not a basis for direct appeal to the Third Circuit. *See Am. Home Mortg. Inv. Corp. v. Lehman Bros. (In re Am. Home Mortg. Inv. Corp.)*, 408 B.R. 42, 44 (D. Del. 2009) (denying certification on mixed question of law and fact); *Tribune*, 477 B.R. at 472 (when issue is not a pure legal issue, it is not appropriate for direct appeal).

Further, Issue 1 is not a question of law requiring resolution of conflicting decisions. As just stated, the Court's "related to" jurisdiction is not a pure matter of law. Rather, it is an application of facts to well-settled law. In addition, the Opt-Out Lenders did not cite any conflicting law in their opposition to confirmation, the Stay Motion, or in support of the current motion; rather, the Opt-Out Lenders contend that I applied the law incorrectly.

Finally, this jurisdictional issue neither involves a matter of public importance nor would its resolution materially advance the progress of the case. In order for an issue on appeal to be a matter of public importance, it must "transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *Am. Home Mortg.*, 408 B.R. at 44 (citing 1 *Collier on Bankruptcy* 5.05[A] (15th ed.

---

[12] Issue 1 does not reflect my reliance on the advancement clauses in the relevant agreements.

rev.)).[13]  Issue 1 is not a purely legal question nor does it transcend the litigants as the decision
was based on the facts of this case.  *Tribune*, 477 B.R. at 472 (not a matter of public importance
when decision is in line with controlling law in the Third Circuit and remainder of issue involves
factual matters specific to the case).  And, a decision on this issue by the Third Circuit will not
materially advance the case as the Plan has been confirmed and gone effective.[14]  *Am. Home
Mortg.*, 408 B.R. at 44 (resolution of issue will not materially advance the case when the
underlying bankruptcy case is proceeding regardless of the appeal).  Thus, I find that Issue 1
does not meet the statutory requisites for certification.

> (ii)  Issue 3:  Assuming *arguendo* that Bankruptcy Courts do have authority to
> release a non-debtor's direct claims against other non-debtors for fraud
> and other willful misconduct without the consent of the releasing non-
> debtor, what standard of law governs the approval of such releases **where
> no consideration is paid for the release**? (Emphasis supplied).
>
> Issue 4:  Can services performed by a debtor's directors, officers, and
> employees in connection with the debtor's reorganization **constitute a
> financial contribution** to the debtor's estate? (Emphasis supplied).
>
> Issue 5: Can a **financial contribution** made by a non-debtor to a debtor's
> estate be a **financial contribution** also made "on behalf of" other, and
> **otherwise non-contributing**, non-debtors?  (Emphasis supplied).

I group these three issues together because they all admit of the same flaw with respect to
the certification criteria and because each of them, to a greater or lesser extent, states a question
that does not fully encompass my ruling at confirmation.  First, while the Opt-Out Lenders assert
that each of these Issues purport to be a question of law, each Issue specifically assumes certain
facts as evidenced by the bolded language (*i.e.*, no consideration is paid for the release; an
otherwise non-contributing non-debtor; the performance of services).  The inclusion of assumed
facts in the Issues illustrates that such questions are not questions of law.

Further, the statement of each of these Issues assumes one prong of a standard
(consideration, financial contribution) which the Opt-Out Lenders argue has not been articulated
by the Third Circuit.  In reviewing these Issues, it appears to me that they are simply subsets of

---

[13]  Now found at 1 *Collier on Bankruptcy* ¶ 5.06[4][b] (Alan N. Resnick & Henry J. Sommer eds., 16th
ed. 2015).
[14]  Counsel for the Opt-Out Lenders noted that " . . . frankly, we're not sure why the debtors are opposing
us.  They've gone effective—they're moving forward with their reorganized debtor plan."  Cert'n Appeal
Hr'g Tr. 6:7–10.

Issue 2 (whether the bankruptcy court has the authority to grant nonconsensual third party releases over objection).[15] Further, to treat these Issues as questions of law suggests that there are separate legal standards for any given factual scenario rather than one legal standard applied to the facts of a particular case. The Opt-Out Lenders have cited no authority for such a proposition.

Finally, assumption of facts that do not completely reflect a court's findings cannot form the basis for certification to the Third Circuit. *See, e.g.*, *22 Saulsbury, LLC v. TD Bank, N.A., (In re 22 Saulsbury, LLC)*, 2015 WL 661396, at *3 (D. Del. Feb. 13, 2015) (direct certification not appropriate when appellant bases assertion on incorrect assessment of bankruptcy court decision); *Am. Home Mortg.*, 408 B.R. at 43 (noting that numerous issues raised on appeal were not "directly linked" to the bankruptcy court's decision, but rather appeared to refer to broad legal principles, thus not satisfying the requirement of Fed. R. Bankr. P. 8001(f)(3)(c)).[16] Here, I specifically found that (x) there was consideration for the releases and (y) the Debtors' officers and directors not only contributed services to the Debtors, but that management's continued services to the reorganized Debtors was critical to unlocking total enterprise value.[17] For all these reasons, Issues 3–5 are not appropriate for certification.

> (iii)    Issue 6: Assuming *arguendo* that the Bankruptcy Court (a) properly determined that it had subject-matter jurisdiction and legal authority to release the non-debtor Opt-Out Lenders' direct claims against other non-debtors for fraud and other willful misconduct without the Opt-Out Lenders' consent and (b) applied the correct legal standard to its review of such releases, did the Bankruptcy Court err in concluding that the facts of this case warranted such a release?

Issue 6 is a straightforward challenge to my application of the facts to the appropriate standard for granting nonconsensual third party releases. As such, and as admitted by the Opt-Out Lenders at argument,[18] this question is not appropriate for certification to the Third Circuit Court of Appeals.

**B.  Issue on Appeal That Satisfies the Criteria for Certification**

---

[15] *See* Cert'n Appeal Hr'g Tr. 8:13–20 ("We [the Opt-Out Lenders] believe that Issue 2, as Your Honor correctly points out, is the cleanest statement of what we've just been talking about today. We believe that all of the other questions, though, flow from Issue 2.").

[16] Federal Rule of Bankruptcy Procedure 8001(f)(c)(3) is now Federal Rule of Bankruptcy Procedure 8006(f)(2).

[17] Confirmation Hr'g Tr. 20:9–25, 21:1–11, 24:3–9, Dec. 11, 2015.

[18] Cert'n Appeal Hr'g Tr. 13:4–14.

Having disposed of Issues 1 and 3–6, I am left with Issue 2:  Do Bankruptcy Courts have the authority to release a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct without the consent of the releasing non-debtor?  The Opt-Out Lenders argue that this Issue meets each of the four criteria for certification while the Debtors argue it meets none of the criteria.  I will address the statutory factors in order.

> (i)    Whether the Confirmation Order involves a question of law as to which there is no controlling decision of the Third Circuit or the Supreme Court of the United States.

The Opt-Out Lenders argue, and I concur, that Issue 2 states an issue of law, particularly if one ignores the reference to "fraud and willful misconduct."  The question asked is whether a bankruptcy court has the authority to grant nonconsensual third party releases over objection.  I held, relying on *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) ("*Continental*") and courts interpreting that authority, that I could approve nonconsensual third party releases and that those releases were both fair and necessary to Millennium's reorganization.  In making that determination, I considered the factors articulated in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo.1994),[19] but ultimately returned to the *Continental* hallmarks.[20]

The Opt-Out Lenders argue that there is no controlling Third Circuit precedent because the statement in *Continental* setting forth the hallmarks of nonconsensual third party releases is mere *dicta*.  The Opt-Out Lenders also correctly note that the United States Supreme Court has not ruled on this issue.

The Debtors assert that *Continental* is controlling law and, to the extent that the statements in that case could have been labeled *dicta* in 2000, the Third Circuit's subsequent decisions in *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) and most recently in *In re Global Industrial Technologies, Inc.*, 645 F.3d 201 (3d Cir. 2011) ("*Global Industrial*") adopted the *Continental* hallmarks for nonconsensual releases, thereby curing any *dicta* concern.  The Debtors argue that these two Third Circuit cases, together with the jurisprudence that has evolved in this district surrounding releases, establishes the controlling law.

---

[19]  Confirmation Hr'g Tr. 17:9–25, 18:1–25, 19:1–25, 20:1-25, 21:1–25, 22:1–25, 23:1–25, 24:1–18.
[20]  Confirmation Hr'g Tr. 24:19–25, 25:1–25, 26:1–8.

Controlling law for the purposes of section 158(d)(2)(A)(i) is that which "admits of no ambiguity in resolving the issue." *Conex*, 534 B.R. at 611 (citing *Hybrid Tech Holdings, LLC v. Official Comm. of Unsecured Creditors (In re Fisker Auto. Holdings, Inc.)*, 2014 WL 576370, at *3 (D. Del. Feb. 12, 2014) and *Reorganized Debtors v. Blue Dog Props. Trust (In re Goody's Family Clothing, Inc.)*, 2009 WL 2355705, at *2 (D. Del. July 30, 2009)). Further, controlling law may be supplied by combining holdings from multiple cases. In *Tribune*, the issue before the court was the meaning of the word "notwithstanding" in section 510(a) of the Bankruptcy Code. While there was no Third Circuit case directly on point, the court found controlling law by referencing a Third Circuit decision interpreting the meaning of the word "notwithstanding" in another section of the Bankruptcy Code together with a United States Supreme Court decision holding that identical words in a statute are presumptively intended to have the same meaning. *Tribune*, 477 B.R. at 471. In so finding, the Court rejected the argument that the presumption was rebutted by the legislative history, relying on yet other Third Circuit and Supreme Court decisions. *Id.*; *see also Goody's Family Clothing*, 2009 WL 2355705, at * 2 ("Taken together, *NLRB v. Bildisco*, 465 U.S. 513, 530, 104 S. Ct. 1188, 79 L.Ed.2d 482 (1984), and *Zagata Fabricators, Inc. v. Superior Air Products*, 893 F.2d 624, 627 (3d Cir. 1990), as well as the longstanding and consistent practice of recovering post-petition rent as an administrative expense, clearly establish that stub rent is recoverable on a priority basis.").

Here, I am persuaded that there is controlling law in this jurisdiction when considering *Continental* with *Global Industrial*. In *Continental*, the Court canvased case law on nonconsensual third party releases, including cases holding that such releases were *per se* impermissible. The Court then stated that "[t]he hallmarks of permissible nonconsensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions—are all absent here." *Continental*, 203 F.3d at 214. As the Opt-Out Lenders point out, notwithstanding this language, the *Continental* Court also stated that "[b]ecause the release and permanent injunction of Plaintiffs' claims are so clearly invalid under any standard, we need not speculate on whether there are circumstances under which we might validate a nonconsensual release that is both necessary and given in exchange for fair consideration." *Id.* at 214 n.11.

The *Continental* hallmarks have been referenced in numerous cases since 2000.[21]  In *Global Industrial*, the Third Circuit specifically relied on the *Continental* hallmarks in its ruling. In *Global Industrial*, the Third Circuit reviewed a bankruptcy court decision holding that certain insurers did not have standing to raise objections to confirmation.  The plan of reorganization included a so called "silica trust" to which silica-related claims would be channeled and which would be funded by the assignment of certain insurance policies.  *Global Indus.*, 645 F.3d at 205. In its background discussion, the Third Circuit stated that:

> For the Plan to be approved as designed (*i.e.*, with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent, requires showing with specificity that the Silica Injunction is both necessary to the reorganization and fair.  *See Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203, 214 (3d Cir.2000) (holding that a third-party injunction would only be proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair).  In practical terms, this meant showing that the silica-related liability was sufficiently onerous to jeopardize the debtors' reorganization if not resolved via the Silica Injunction and APG Silica Trust.  *See id.* at 215 (noting that the debtors had failed to show the necessity of the injunction where they had not demonstrated that the success of the reorganization hinged in any way on the issuance of the injunction).

*Global Indus.*, 645 F.3d at 206.  The matter was remanded to the bankruptcy court so that the insurers could be heard on the propriety of the silica trust.  In remanding, the Third Circuit stated: "[o]n remand, the Bankruptcy Court should make sufficient findings" so that if there is a subsequent appeal "a determination can be made on whether there is a legitimate basis for concluding that the APG Silica Trust and Silica Injunction are necessary to the reorganization and fair." *Id.* at 215.[22]

---

[21]  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (in discussing *Continental*, "[w]e [the Third Circuit] did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties."); *United Artists Theatre Co.*, 315 F.3d at 227 ("The 'hallmarks of permissible non-consensual releases' are 'fairness, necessity to the reorganization, and specific factual findings to support these conclusions.'  Added to these requirements is that the releases 'were given in exchange for fair consideration'") (internal citations omitted); *see also* discussion in subsection (ii) below.

[22]  The dissent disagreed with the majority on the holding related to standing, but noted that the Bankruptcy Court "conducted an admirable, exhaustive review" into all claims asserted by the insurers, and "for that reason . . . a section 105 injunction would be warranted even if [the insurance companies] had standing." *Global Indus.*, 645 F.3d at 216 n.2.

Based on these cases, as well as the acknowledgement of the lower courts within this jurisdiction that the *Continental* hallmarks are the law of this Circuit (*see* discussion in subsection (ii) below), I conclude that the Third Circuit has controlling precedent regarding the efficacy of nonconsensual third party releases.

      (ii)     Whether the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions.

The Opt-Out Lenders also argue that resolution of this Issue requires the resolution of conflicting decisions in this circuit and across circuits. To show this split, the Opt-Out Lenders point not only to my decision in the matter *sub judice* but also to two decisions out of the District of New Jersey[23] and "a handful of Courts in this district" in unpublished decisions.[24] The Opt-Out Lenders contend that these decisions, which grant nonconsensual releases over objection, stand in sharp contrast to other decisions in this district that do not permit nonconsensual third party releases. For the latter proposition, the Opt-Out Lenders rely on *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (and certain cases cited therein), *U.S. Bank National Association v. Wilmington Trust Company (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010), and *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013). The Opt-Out Lenders also point to decisions from other circuits which are in conflict with my decision.[25] The Debtors argue that each of the cases relied upon by the Opt-Out Lenders is just an application of law to the facts (*i.e.*, *Continental*) and that inter-circuit splits cannot satisfy this criteria.

As an initial matter, inter-circuit splits do not satisfy section 158(d)(2). Rather, section 158(d)(2) references conflicting decisions within the same circuit. *WestLB AG v. Kelley*, 514 B.R. 287, 294 (D. Minn. 2014); *Gen. Motors Corp.*, 409 B.R. at 29 ("[D]ecisions from *outside* the Circuit are not a basis for § 158(d)(2) review."). Further, I find that the Opt-Out Lenders' characterization of the *Spansion* and *Indianapolis Downs* decisions is incorrect. A review of the quotations taken from these cases, as cited in the Opt-Out Lenders' briefs,[26] are simply a

---

[23]  *In re 710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) and *In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000).

[24]  Certification Mot. ¶ 21.

[25]  *Compare Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995) (holding that non-debtor releases are impermissible as a matter of law), *and Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592 (10th Cir. 1990) (same), *with Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640 (7th Cir. 2008) (holding that nonconsensual non-debtor releases are permissible).

[26]  Certification Mot. at 10–11.

recognition that courts within this jurisdiction have consistently recognized that consensual releases are permitted (a proposition in which I concur), not a conclusion that nonconsensual third party releases are impermissible. Indeed, while the *Spansion* court did state that "Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan," the *Spansion* court later applied the *Continental* hallmarks to the facts before it and held that "the proposed nonconsensual Third Party Release does not pass muster under *Continental*." *Spansion*, 426 B.R. at 144–45. Similarly, while the *Indianapolis Downs* court stated that "Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected[,]" the *Indianapolis Downs* court also stated that "[t]he United States Trustee contends that the Third Party Release is unenforceable without affirmative consent. Nevertheless, case law teaches that no such hard and fast rule applies." *Indianapolis Downs*, 486 B.R. at 305.[27] Accordingly, I find that neither *Spansion* nor *Indianapolis Downs* creates an intra-circuit split.

I do, however, find that my decision is in conflict with the *Washington Mutual* decision. In *Washington Mutual*, certain plan objectors made the same argument advanced by the Opt-Out Lenders here—that third party releases can only be accomplished with the affirmative agreement of the affected party. In its analysis, the *Washington Mutual* court first stated, citing *Continental*, that "[w]hile the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule." *Wash Mut.*, 442 B.R. at 351. But, after noting cases from other circuits that both support and reject nonconsensual third party releases over objection, the *Washington Mutual* court stated:

> This Court has previously held that it does not have the power to grant a third party release of a non-debtor. *See, e.g., Coram*, 315 B.R. at 335 (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties."). Rather, any such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan). *Id.*; *Zenith*, 241 B.R. at 111. Therefore, the original language in the Plan that would mandate third party releases even in the place of an indication on the ballot that the party did not wish to grant the release would not pass muster. *See, e.g., In re Nickels Midway Pier, LLC*, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (finding third party releases were impermissible where no consideration was going to the releasing parties who had objected and they were

---

[27] The *Indianapolis Downs* court ultimately found the third party releases could be characterized as consensual under the circumstances of that case.

not necessary to the debtor's reorganization because it was liquidating); *In re Spansion, Inc.,* 426 B.R. 114, 145 (Bankr. D. Del. 2010) (finding improper releases of third parties by objecting shareholders who were receiving nothing under the plan); *Exide,* 303 B.R. at 74 (approving releases which were only binding on those creditors and equity holders who accepted the terms of the plan); *Zenith,* 241 B.R. at 111 (finding that a release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

*Id.* at 352.[28] My decision is to the contrary.

In response to questions at oral argument, the Debtors contend that I cannot find both that Issue 2 is one for which there is controlling precedent and one which requires a resolution of conflicting law. This argument has appeal. But, I find these circumstances similar to those in *In re MPF Holding U.S. LLC*, 444 B.R. 719 (Bankr. S.D. Tex. 2011) ("MPF") where the bankruptcy court did just that. In *MPF*, the question before the bankruptcy court was whether the language in the confirmed plan adequately reserved causes of action for post-confirmation prosecution. The court held that the plan did not "'specifically and unequivocally' preserve[] post-confirmation causes of action as required by the Fifth Circuit in *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008)." *MPF*, 444 B.R. at 724. The litigation trustee/plaintiff appealed the ruling and moved for direct certification to the Fifth Circuit Court of Appeals. In certifying the order to the Fifth Circuit, the bankruptcy court first held that there was controlling Fifth Circuit case law (*United Operating*), and that simply disputing the application of the precedent did not satisfy section 158(d)(2)(A)(i). But, it then found conflicting decisions warranting certification under section 158(d)(2)(A)(ii) "because this Court's interpretation of what the Fifth Circuit means by the phrase 'specific and unequivocal' conflicts with the interpretation of this phrase applied by other bankruptcy courts, including two bankruptcy judges who sit in the Northern District of Texas." *Id.* at 726–27. Here, all of the cases within the Third Circuit cited by the parties recognize *Continental*, even *Washington Mutual.* But, my interpretation of what is meant by *Continental's* hallmarks— fairness and necessity to the reorganization—differs from that of the *Washington Mutual* court. Accordingly, I find that Issue 2 meets the criteria of section 158(d)(2)(A)(ii).

---

[28] Ultimately, over objection, the court found that a "release for distribution" provision did not violate the best interest of creditors test and was purely voluntary. *In re Wash. Mut.*, 461 B.R. 200 (Bankr. D. Del. 2011).

To finish my analysis of this issue, I find that Issue 2 does not rise to the level of public importance nor would a decision on appeal materially advance the case. As previously stated, in order for an issue on appeal to be a matter of public importance, it must "transcend[] the litigants and involve[] a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *Am. Home Mortg.*, 408 B.R. at 44 (citing 1 *Collier on Bankruptcy* 5.05[A] (15th ed. rev.)).[29]  In their papers, the Opt-Out Lenders argue that "[r]esolution by the Third Circuit of the legal standards underpinning the Court's decision is essential to provide both debtors and their lenders with certainty as to how direct claims against non-debtor parties will be treated in future cases.[30]  At argument, the Opt-Out Lenders argued that this matter is one of public importance because (x) "this is the type of open issue that impacts valid economic actors;" (y) it is the type of public policy issue that should be certified; and (z) it is a "practical approach" to dealing quickly with an important issue because the appeal is going to wind up in the Third Circuit.[31]

While the issue of third-party releases is in no way inconsequential and is unqualifiedly important to the parties in this matter, a review of the case law reveals that the proffered reasons do not justify circumventing the normal appeal process. For example, in *In re Lehman Brothers, Inc.*, 2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013), certain banks appealed from an order of the bankruptcy court denying them customer status under the Securities Investor Protection Act of 1970 with respect to a series of repurchase transactions. The banks argued that certification to the Second Circuit Court of Appeals was warranted based on all of the criteria. In particular, the banks argued that the appeal involved a matter of public importance because "any decision affecting the enforcement remedies available to parties to repurchase agreements will have an impact on the 'repo and larger securities market' in the United States" and that the bankruptcy court decision "threatens the stability that [repo] participants feel." *Lehman Bros.*, 2013 WL 5272937, at *5. The District Court for the Southern District of New York denied certification. As relevant here, the District Court held that "[a]side from their broad assertion that the repurchase market is a 'critical' component of the United States and global capital markets, a proposition with which the SIPC does not disagree, [the banks] do not explain how the resolution of these issues through direct appeal would advance the development of the law to an unusual

---

[29] Now found at 1 *Collier on Bankruptcy*, *supra* note 13, ¶ 5.06[4][b].
[30] Certification Mot. ¶ 18
[31] Cert'n Appeal Hr'g Tr. 5–6, 14.

degree, or impact the public at large." *Id.* (citing 1 *Collier on Bankruptcy* ¶ 5.06[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)).[32]

Further, case law is clear that even the near certainty that this appeal will ultimately end up before the Third Circuit is not a basis on which to certify the order. *Fisker Auto.*, 2014 WL 576370, at *4 n.3 (denying certification; future appeals, even if "presumably inevitable" do not satisfy section 158(d)(2)(A)); *O'Cheskey v. Templeton (In re Am. Hous. Found.)*, 2013 WL 3808096 (Bankr. N.D. Tex. July 22, 2013) ("threat of a certain appeal" to the circuit court can be made in any case and does not warrant certification).

Finally, as before, resolution of Issue 2 will not materially advance the case as the Plan has been confirmed and gone effective. *Am. Home Mortg.*, 408 B.R. at 44 (resolution of the issue will not materially advance the case when the underlying bankruptcy case is proceeding regardless of the appeal).

---

[32] *See also WestLB*, 514 B.R. at 295 (denied certification of decision approving substantive consolidation; argument that issue on appeal is critical to lenders and investors does not rise to the level of public importance, also noting that there were rulings in other circuits for the edification of lenders and investors); *Mark IV Indus. v. N.M. Env't Dep't*, 452 B.R. 385 (S.D.N.Y. 2011) (denied certification of order involving debtor's ability to discharge environmental cleanup obligations through bankruptcy proceedings; other than pointing to two other bankruptcy cases allegedly involving same issues, movant did not explain how resolution of issue on appeal would advance the development of case law to an unusual degree); *Gen. Motors Corp.*, 409 B.R. at 28–29 (denying certification; successor liability under section 363 is "ultimately a matter of statutory interpretation and common law analysis—as contrasted, for example, to constitutional issues[;]" also, issue had already been decided by circuit).

**Conclusion**

Because I find that my Confirmation Order involves a question of law requiring resolution of conflicting decisions, I am required to enter an order certifying the appeal to the United States Court of Appeals for the Third Circuit. Whether the Third Circuit should exercise its discretion to hear the appeal is not for me to comment on. While I am cognizant of the burden placed on the Third Circuit by my certification of this appeal, the statute gives the appellate court, not the lower court, the gatekeeping burden when the order on appeal meets the statutory requisite. *Weber v. U.S. Trustee*, 484 F.3d 154, 161 (2d Cir. 2007) ("While it was not improper for the bankruptcy court to permit the parties to request leave to file a direct appeal and to certify the appeal, we decline to exercise our discretion to hear this appeal."). An appropriate order follows.

Dated: Jan 12 , 2016

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE