## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC,<br>*et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 15-12284 (LSS)<br><br>Jointly Administered<br><br>**Hearing Date:**<br>**May 4, 2016 at 11:00 a.m. (prevailing ET)**<br><br>**Objection Deadline:**<br>**April 22, 2016 at 4:00 p.m. (prevailing ET)** |

### MOTION OF THE PLAN TRUSTEE FOR AUTHORITY TO TAKE TARGETED DISCOVERY, PURSUANT TO THE DEBTORS' CONFIRMED PLAN OF REORGANIZATION, CONFIRMATION ORDER, BANKRUPTCY CODE SECTION 105(a) AND BANKRUPTCY RULE 2004

Marc S. Kirschner, in his capacity as Trustee of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust (together, the "Plan Trusts") established under the *Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.,* dated December 9, 2015 [Docket No. 182] (the "Plan"),[1] respectfully submits this motion for entry of an Order pursuant to the Plan, the Confirmation Order,[2] Bankruptcy Code Section 105(a), and Bankruptcy Rule 2004 authorizing the Trustee to take reasonable and targeted discovery, as described herein. In support of this Motion, the Trustee respectfully states as follows:

---

[1]    In support of this Motion, the Trustee submits the *Declaration of Jacob T. Beiswenger in Support of the Plan Trustee's Motion to Take Targeted Discovery Pursuant to Bankruptcy Rule 2004,* filed contemporaneously herewith (the "Beiswenger Declaration"). All references to "Ex." herein refer to the applicable exhibit attached to the Beiswenger Declaration. A true and accurate copy of the confirmed Plan is attached as Ex. 1 to the Beiswenger Declaration. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2]    See *Findings of Fact, Conclusions of Law and Order (I) Approving the (A) Prepetition Solicitation Procedures, (B) Forms of Ballots, (C) Adequacy of Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, and (D) Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, and (II) Confirming the Prepackaged Joint Chapter 11 Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.,* dated December 14, 2015 [Docket No. 195] (the "Confirmation Order") (attached to the Beiswenger Declaration at Ex. 2).

## PRELIMINARY STATEMENT

1.     The Trustee requests an Order authorizing discovery <u>by document production</u>

<u>only</u>[3] of certain targeted parties that had close prepetition involvement with the Debtors,

concerning matters bearing on the Debtors' financial collapse, Chapter 11 filings and, in turn,

creditors' realized losses totaling many hundreds of millions of dollars.  The Trustee seeks

document productions from: (1) certain banking institutions that helped arrange the Debtors'

prepetition capital structure and/or served in a bank agency role (the "<u>Arranging/Agent Banks</u>");

(2) the law firm assisting the Arranging/Agent Banks ("<u>Simpson Thacher</u>"); and (3) the Debtors'

historical accounting firm ("<u>KPMG</u>" and, together with the Arranging/Agent Banks and Simpson

Thacher, the "<u>Targets</u>").  The relief requested should be granted for five reasons.

2.     First, these Chapter 11 cases involve facts giving rise to a strong suspicion of

wrongdoing that caused the Debtors and, in turn, their creditors substantial harm.  The Debtors

are a relatively new business operation (existing for only about eight years) but, during that time,

they reported astronomical year-over-year growth. About two years ago (April 16, 2014), the

Arranging/Agent Banks assisted the Debtors' placement of $1.8 billion in new secured

indebtedness, predicated on representations and warranties that, among other things:  (i) the

Debtors were in full compliance with applicable laws and government regulations; (ii) no

governmental investigation was pending or threatened that would have a material adverse effect

on the company; and (iii) no statement used in connection with soliciting the loan participation

contained any untrue statement of material fact.  Borrowed funds were mostly delivered to

stockholders via special dividend of approximately $1.3 billion.  Eight months later (December

---

[3]     The Trustee reserves his right to file additional motions requesting broadened discovery, as circumstances
warrant, including seeking depositions of the Targets of this Motion and document production and depositions
of other third parties whom the Trustee believes may have information pertinent to enable the Trustee to
conduct a prudent and appropriate investigation.

19, 2014), the U.S. Department of Justice (the "DOJ") informed the Debtors that they would be pursuing claims against the Debtors and shortly thereafter (March 19, 2015) initiated a "qui tam" lawsuit (filed under seal) alleging that the Debtors had engaged in widespread billing misconduct involving false claims for urine testing payments.  Just prior to the filing of the "qui tam" complaint (February 9, 2015), the Debtors received notice that their Medicare billing license soon would be revoked because of material violations of Medicare laws and regulations. Revocation of the Debtors' Medicare billing license would have essentially ended the Debtors' business.  The Debtors delayed reporting these developments to their secured lenders (the "Lenders").  About one year after the debt placement (May 20, 2015), the Debtors agreed to a settlement involving the payment to federal and state government entities of $256 million (the "Government Settlement"), but the Debtors did not have sufficient liquidity to satisfy this payment.  Only at this point did the Debtors fully disclose these developments to their Lenders, thus prompting restructuring talks.

3.     Second, the Lenders were not given a fair opportunity to investigate all these matters before or during the Chapter 11 cases.  Promptly after learning of the Government Settlement, the Lenders organized and, by early June 2015, retained professionals.  But, diligence was materially hampered by several factors, including the following: (i) the Government Settlement required a fully executed agreement in less than three months (initially, October 2, 2015; eventually extended to December 30, 2015) and payment by the end of 2015 as there was constant pressure from CMS regarding the revocation of the Debtors' Medicare billing license, thus requiring the Lenders to prioritize restructuring work, focusing predominantly on the role and responsibility of, and contributions from, the insiders; (ii) the Lenders were not authorized to view the government's sealed qui tam complaint until August 4, 2015; and (iii)

with limited exception,[4] requests for voluntary discovery from the Targets were flatly rejected. After the Plan agreement-in-principal was reached (September 30, 2015), the stakeholders engaged in months of virtually non-stop efforts to memorialize the agreement, solicit Lender support, prepare for the "pre-packaged" bankruptcy, respond to a zealous confirmation objection, and consummate the restructuring – all before the federal government's "drop-dead" payment deadline of December 30, 2015 (and revocation of the Debtors' Medicare billing license). There simply was insufficient time and opportunity to conduct an appropriate investigation of all parties potentially liable for losses suffered by the Debtors and Lenders.

4.    Third, given case circumstances, the Plan was specifically designed to facilitate an appropriate "facts and circumstances" investigation post-consummation. The Plan specifically excluded from the Plan releases the Arranging/Agent Banks, their counsel, the Debtors' law firm (Skadden, Arps, Slate, Meagher & Flom LLP) and other potentially culpable parties. The Plan provided for the creation of the Plan Trusts, vesting them with initial funding to conduct an investigation, as well as the right to request additional funding (up to a total of $20 million) from the reorganized Debtors. The Plan Trusts also were vested with all estate and consenting Lender claims and causes of action against any non-released parties, including the specifically identified "Excluded Parties,"[5] should the Trustee's investigation reveal that there are claims warranting

---

[4]    The Lenders' counsel was permitted to conduct certain interviews (not under oath) separately with the Debtors, the insiders, JPMorgan Bank, N.A. and J.P. Morgan Securities LLC (together, the "JPM Entities"), and Simpson Thacher, attorneys for the JPM Entities. Simpson Thacher attorneys were in close communication with Lenders' counsel and afforded Lenders' counsel an informal interview with the partner in charge of the initial engagement, but did not produce any documents. The Trustee includes Simpson Thacher in the list of Targets to ensure that the firm produces all documents relevant to his investigation, including handwritten notes of meetings/conversations with Debtor representatives that were not turned over. Less than 9,000 documents totaling approximately 70,000 pages were produced by the Debtors and insiders, most on an "attorneys'-eyes-only" basis. Due to the truncated time period, there was simply no time to investigate the Debtors' auditor, KMPG. The JPM Entities and Simpson Thacher refused to produce any documents.

[5]    Under the Plan, "Excluded Parties" means "any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to (a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets, Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan

prosecution.  The Plan and Confirmation Order also intentionally provided for the broadest possible retention of this Court's jurisdiction, ensuring the fullest opportunity under law for post-consummation relief under Bankruptcy Rule 2004.

5.      Fourth, document discovery from the Targets is necessary.  The Plan obligates the reorganized Debtors to cooperate with the Trustee's investigation, but disclosure solely from the reorganized Debtors is insufficient.  The matters at issue are very large, remarkably complex, and involve suspicions of serious misconduct that is likely to hinder voluntary and full disclosure by knowledgeable persons and entities.  Further, certain key individuals mentioned in the qui tam complaint are no longer employed by the reorganized Debtors, are not easily found, and otherwise cannot be compelled by the Plan to cooperate.  Moreover, given the nature of the matters at issue, it is critical to basic fact-finding that there be discovery of non-Debtor third-parties, including the specifically identified Excluded Parties.  Indeed, if the federal government's "drop-dead" deadline did not compel such a speedy case resolution, an examiner likely would have been appointed pursuant to Bankruptcy Code Section 1104 or an official creditors' committee would have likely been appointed and have sought investigating authority, and such examiner or committee would certainly have requested the document production sought here.[6]

6.      Finally, the relief requested herein is truly in the nature of an initial investigation. No decision has been made to initiate litigation against any party.  At this point, the Trustee is simply gathering facts and seeking to understand what caused the Debtors' financial collapse.

---

Chase Bank, N.A., in its individual corporate capacity and in its capacity as a Prior Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) SunTrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i).

[6]  For one or more of the Targets, the production requested herein likely is not a laborious undertaking.  On information and belief, one or more of the Targets provided documents to the DOJ in connection with the government's investigation that ultimately lead to its filing of the qui tam complaint.

The Trustee, Marc S. Kirschner, is an experienced bankruptcy lawyer and trustee in several large and complex bankruptcy cases and complex investigations and litigations, such as the claims assigned to the Plan Trusts. Mr. Kirschner is currently Senior Managing Director of Goldin Associates LLC, a restructuring firm specializing in financial advisory, interim management, litigation support, strategic valuation, governance, independent monitoring and fiduciary services. Prior to his current position, Mr. Kirschner spent most of his 40-year career as an attorney in private practice, specializing in bankruptcy and reorganization, with a heavy emphasis on complex bankruptcy litigation. From 1987 through January 25, 2001, he was the head of the Bankruptcy Restructuring Practice, and from January 1, 1997, the Business Practice Group, in the New York office of the global law firm Jones Day. In addition to serving as Trustee of the Plan Trusts, Mr. Kirschner also was the liquidation trustee for the SNTL litigation trust (formerly, Superior National Insurance Group), in Los Angeles, and the LeNature's liquidation trust in the United States Bankruptcy Court for the Western District of Pennsylvania, and currently is the litigation trustee for matters arising from the Refco Inc. bankruptcy in New York, and the litigation trustee for the Tribune litigation trust formed under the Tribune plan in this district.[7]

7.    In filing this motion, the Trustee is treading thoughtfully and carefully. As a responsible and experienced fiduciary, it behooves the Trustee to first obtain a full factual understanding, especially considering the magnitude of the losses suffered and the seriousness of the suspected misconduct. The Trustee believes that proceeding under Bankruptcy Rule 2004 is a responsible, expeditious and cost-effective tool to enable the Plan Trusts to decide on an appropriate, prudent course of action. Moreover, the Trustee is particularly mindful of the fact

---

[7]    For a more comprehensive discussion of the Trustee's credentials and *curriculum vitae*, the Trustee submits, contemporaneously herewith, the *Declaration of Marc S. Kirschner in Support of the Plan Trustee's Motion to Take Targeted Discovery Pursuant to Bankruptcy Rule 2004.*

that the Lenders are not only Plan Trust beneficiaries, they also own the reorganized Debtors and, as mentioned above, the reorganized Debtors (and, in turn, the Lenders) will be the ones funding any litigation that might be advanced by the Plan Trusts.

8.    For these reasons, as more fully discussed herein, the Trustee respectfully requests that the Court enter an Order awarding the relief requested below.

## RELIEF REQUESTED

9.    The Trustee requests document production, as set forth on Exhibit A hereto, from the following parties: (1) JPMorgan Chase Bank, N.A; (2) J.P. Morgan Securities LLC; (3) Citibank Global Markets Inc.; (4) BMO Capital Markets Corp.; (5) Bank of Montreal; (6) SunTrust Bank; (7) Simpson Thacher & Bartlett LLP; and (8) KPMG LLP.

## BACKGROUND

**A.    The Debtors' Business; Astounding Growth Trajectory; Profit Reliance On Government Billing; The Government Begins An Investigation.**

10.    The Debtors' business was founded in December 2007, and focused on laboratory-based diagnostic testing pertaining to drugs of abuse and clinical medication monitoring. (Ex. 3, at 15). Almost from inception, the Debtors reported astounding growth: The Debtors reported average EBITDA growth of approximately 60% for each year, from 2009 to 2014. (Ex. 4, at 18). The Debtors reported total 2014 revenue of $687 million. (Ex. 3, at 16). Approximately 40% of the Debtors' revenue derived from Medicare.

11.    In 2012, the DOJ initiated a criminal and civil investigation of the Debtors' Medicare billing practices. (Ex. 3, at 18). The purpose and extent of the DOJ investigation (in which the Debtors produced over 11,000,000 pages of documents to the DOJ, see Ex. 5 ¶ 16) and

related investigations by state attorneys' general were not made known outside the company and

its advisors until years later.

**B.     The $1.8 Billion Capital Raise; The Purpose**
**And Use Of Borrowed Funds; Representations**
**Made To Lenders In Connection With The Capital Raise.**

12.     On April 16, 2014, the Debtors borrowed $1.775 billion from the Lenders under a

senior secured term loan agreement (the "2014 Term Loan"). (Ex. 3, at 16-17).  The 2014 Term

Loan had two primary purposes: (1) to refinance the Debtors' then-existing $300 million term

loan; and (2) to fund a $1.3 billion cash dividend to the Debtors' small handful of stockholders

(*i.e.*, the proceeds from the 2014 Term Loan were not invested in the company; rather, they left

the company). (Ex. 3, at 17).

13.     To incentivize participation in the 2014 Term Loan, the Debtors made various

representations to potential funding sources, including that: (i) the Debtors' sales force was

dedicated to strict regulatory compliance (Ex. 4, at 33, 55-57); (ii) the Debtors' profit margins

were sustainable in the long-term due to compliance monitoring (Ex. 4, at 38); and (iii) the

Debtors' testing processes were of "medical necessity" and, thus, their billing practices were not

subject to material risk of regulatory scrutiny (Ex. 4, at 52).

14.     Additionally, the 2014 Credit Agreement contained various representations and

warrantees, including the following: (1) the Debtors have not experienced any events that would

cause a "Material Adverse Effect" on the Debtors' business (Ex. 6 §§ 4.2, 4.19); (2) the Debtors

were in compliance with all applicable laws (Ex. 6 § 4.3(d)); (3) the Debtors were not subject to

any government investigation that would have a "Material Adverse Effect" on the Debtors'

business (Ex. 6 § 4.6); (4) the Debtors were not in default under any of their contractual

obligations, including their contracts with private commercial payors (Ex. 6 § 4.7); and (5) the

2014 Credit Agreement and other loan documents did not contain any untrue statements of material fact or omit to state material facts that would make such statements materially misleading (Ex. 6 § 4.19).

**C.  Adverse Legal Action; The Debtors Delay Reporting To Lenders.**

15.  Less than one month after the 2014 Credit Agreement was executed (May 6, 2014), a major competitor (Ameritox, Ltd.) won summary judgment against the Debtors for sales practices in violation of federal law.  (Ex. 7).  One month later (June 16, 2014), the plaintiff/competitor was awarded $11,260,000 in damages. (Ex. 8-9).[8]

16.  Eight months after the 2014 Credit Agreement was executed (December 19, 2014), the DOJ informed the Debtors that the government intended to pursue claims against the Debtors and shortly thereafter (March 19, 2015) filed under seal its qui tam complaint against the Debtors. (Ex. 11).  The qui tam complaint spanned more than 200 pages, including extensive charts and email communications as exhibits, and alleged widespread abuse of the Debtors' Medicare billing privileges during a lengthy period prior to the closing under the 2014 Credit Agreement.  (Ex. 11).  The qui tam complaint was based on alleged violations of the False Claims Act,[9] the Stark Law[10] and the Anti-Kickback Statute.[11]

17.  Shortly before the filing of the DOJ's qui tam complaint (February 9, 2015), the Centers for Medicare & Medicaid Services ("CMS") notified the Debtors that, effective as of

---

[8]  The award was later vacated on jurisdictional grounds by the 11th Circuit.  (Ex. 10).

[9]  See 31 U.S.C. §§ 3729-3733.  The False Claims Act is a federal statute that imposes civil liability on persons and companies who defraud governmental programs, including Medicare and Medicaid.

[10]  See 42 U.S.C. § 1395nn.  The Stark Law is a federal statute that imposes civil penalties for physician referrals of health services for Medicare and Medicaid patients if the physician has a financial relationship with the referral entity.

[11]  See 42 U.S.C. § 1320a-7b(b).  The Anti-Kickback Statute is a federal criminal statute that prohibits the exchange or offer to exchange of anything of value for the purpose of inducing the referral of Medicare and Medicaid business or the business of other governmental health care programs.

March 11, 2015, the Debtors' Medicare billing license would be revoked on the basis that the Debtors billing practices were in contravention of federal laws and regulations. (Ex. 3, at 18).

18.     The Debtors did not report either the qui tam action or the CMS revocation letter to Lenders until several months later, as described below.

**D.    Announcement Of The Government Settlement;
The Lenders Organize; Obstacles To Lender Diligence; The Federal
Government Compels A Settlement Between The Lenders And Stockholders.**

19.     About thirteen months after execution of the 2014 Credit Agreement (May 20, 2015), the Debtors agreed to the Government Settlement, which provided for the payment of $256 million to federal and state government entities. (Ex. 3, at 18). Shortly thereafter, the Debtors disclosed to the Lenders (for the first time) this and other of the above-described developments. (Ex. 12 ¶ 6). Almost immediately thereafter, Lenders holding the vast majority of the 2014 Term Loan indebtedness formed an "ad hoc" committee (the "Ad Hoc Committee"), retained professionals, and began addressing the situation. (Ex. 12 ¶¶ 3, 7).

20.     As stated above, the Ad Hoc Committee was materially hampered in its ability to conduct basic due diligence. At all relevant times, the Debtors and the DOJ made clear to the Ad Hoc Committee that CMS was very serious about revoking the Debtor's Medicare billing privileges, that CMS would move forward quickly with revocation absent consummation of the Government Settlement, and that such revocation would result in the Debtors ceasing to operate as a going concern. (Ex. 12 ¶ 8). The deadline to achieve a fully executed global settlement was initially set at October 2, 2015. (Ex. 12 ¶ 10).

21.     As also mentioned above, the qui tam complaint and all matters relevant to that action were sealed by court order. The Ad Hoc Committee was not permitted to know about any facet of the litigation until the district court issued an order allowing certain Ad Hoc

Committee's professionals to review the sealed documents.  Only from August 4, 2015 onward could those professionals begin speaking with the Debtors about the matters discussed in that action.  But, by this point, the Lenders were compelled to focus almost exclusively on trying to restructure (and, thus, save) the business enterprise before the government's "drop-dead" deadline (October 2, 2015).

22.    Two days before that deadline (September 30, 2015), the DOJ convened a meeting at its offices in Washington, D.C.  In attendance were key representatives of the DOJ, the Debtors, the Ad Hoc Committee, and stockholders.  At that meeting, the DOJ made clear to all parties in attendance that the October 2 deadline was firm. (Ex. 12 ¶ 11).  As represented to the Court at the confirmation hearing, representatives from the Ad Hoc Committee "saw the whites of the eyes of the government and they knew that if they didn't have a deal, this company was dead." (Ex. 13, 149:3-7). That day, a settlement-in-principal was achieved among the Debtors, the Ad Hoc Committee and stockholders, pursuant to which the stockholders (in exchange for "global" releases) would contribute $325 million, a sum sufficient to fund the Government Settlement and bankruptcy exit, and turn over all their equity.[12]  With this agreement in place, CMS agreed to extend the "drop-dead" deadline to December 30, 2015.

### E.    Non-Stop And Focused Effort Towards Memorializing And Effectuating The Government Settlement Before The Government's "Drop-Dead" Deadline.

23.    From October through December 2015, the Debtors, the Ad Hoc Committee and the lead stockholders focused non-stop on documenting the settlement-in-principle, initially through an exceptionally long (more than 70 pages) and detailed "Restructuring Support

---

[12]    The focus of the restructuring was to obtain a contribution from insiders who received the $1.3 billion dividend in order to pay the Government Settlement and to turn over all the equity of the Debtors to the Lenders, in exchange for releases of potential claims.  Any claims against other potentially culpable third parties were expressly preserved and assigned to the Plan Trusts for investigation and litigation, if appropriate.

Agreement" (the "RSA") (Ex. 3 at Exhibit A) and, thereafter, the Plan and attendant closing documents.

24.    On November 10, 2015 (the "Petition Date"), the Debtors commenced these Chapter 11 cases by filing with this Court voluntary Chapter 11 petitions.  On the Petition Date, the Debtors filed the Plan and the Disclosure Statement, which embodied the terms of the global settlement set forth in the RSA.

25.    After a hotly contested confirmation hearing held on December 10, 2015, the Court acknowledged the necessity of a truncated timeline for these Chapter 11 cases, noting that it was "ruling from the bench because a prompt ruling is needed in this case, given the looming December 30 deadline under the settlement agreement with . . . the U.S. settling parties". (Ex. 14, at 4:18-21).  The Court further acknowledged that the Plan had to be confirmed in short order because "an important term of the agreement is that the U.S.A. receive payment by December 30th" (Ex. 14, at 11:6-7) and that "CMS will revoke the debtors' license, and there will be no ongoing business if payment is not made by the U.S.A. settlement parties by December 30th." (Ex. 14, at 25:6-8).[13]

26.    On December 14, 2015, the Court entered the Confirmation Order.  The Plan became effective on December 18, 2015 (the "Effective Date"). (Ex. 15).

27.    That same day, the sole opposing party to the Plan filed a motion seeking a stay pending appeal of the Confirmation Order.  See Docket No. 204 (the "Stay Motion").  At the hearing on the Stay Motion, the DOJ stated in unequivocal terms that "to the extent there is any

---

[13]    The Court reiterated the findings in the Confirmation Order in its decision of December 18, 2015, stating that "[t]he record reflects that the company and the ad hoc lender committee made a deal with the United States just days before a firm, drop-dead deadline imposed by the United States." (Ex. 17, at 12:7-9).  In addition, the Court noted that "[i]n the event that the settlement is not consummated by December 30, and the debtors' Medicare billing privileges are revoked, whether immediately or in the future, the debtors' business will be lost." (Ex. 17, at 15:5-9).

confusion . . . the December 30th deadline is a hard deadline." (Ex. 16, at 61:4-6). Accordingly, the Court denied the Stay Motion, recognizing the dire emergency necessitating immediate consummation of the Plan and stating in its decision that "there was no testimony at confirmation . . . that there is any flexibility in these deadlines, including the payment deadline, or that these deadlines were imposed by any party other than the Department of Justice . . . [and] the Department of Justice and the United States will consider the stay of confirmation no different than if the plan had not been confirmed . . . including revocation of the debtors billing privileges." (Ex. 17, at 12:19-13:3).

28.     The time span between the Petition Date and the Effective Date was only 39 days. As described above, the speed of these Chapter 11 cases was necessitated by the December 30, 2015 "drop-dead" payment deadline under the Government Settlement and the CMS license revocation.

**F.      The Opportunity To Conduct An Appropriate Investigation of the Background Facts and Potentially Other Culpable Parties Is Reserved For Post-Consummation; The Court's Jurisdiction Is Intentionally Reserved "To The Fullest Extent Possible" To Enable, *Inter Alia*, Appropriate Court Orders In Aid Of Such Investigation.**

29.     On December 21, 2015, the Plan Trusts were established and vested with certain assets,[14] including all of the Debtors' causes of action for prepetition conduct (Ex. 1, Art. V(F)(ii), V(G)(ii); Ex. 2 ¶ 14; Ex. 18-19 § 2.2(a)), and the Trustee was appointed and vested with certain stipulated rights, powers and duties (Ex. 1, Art. V(F)-(G); Ex. 2 ¶¶ 19, 21-22, 24). Those

---

[14]     Under the Trust Agreements, the Trust Assets are defined to include the "Retained Corporate Causes of Action" (Ex. 18, Appendix A) and the "Retained Lender Causes of Action" (Ex. 19, Appendix A), both of which include all "Retained Claims" under the Plan. Under the Plan, "Retained Claims" are defined collectively as "the Preserved Estate Claims and the Preserved Lender Claims." (Ex. 1, Art. I(B)(1.152)). The "Preserved Estate Claims" include "all known and unknown claims and Causes of Action (including derivative claims) of Millennium against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties." (Ex. 1, Art. I(B)(1.129)). The "Preserved Lender Claims" include "all known and unknown direct and derivative claims and Causes of Action of the Lenders against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties." (Ex. 1, Art. I(B)(1.131)).

duties include conducting an appropriate investigation and, if the Plan Trusts are in possession of viable causes of action, prosecuting same before a court of competent jurisdiction. (Ex. 18-19 §§ 2.5(a), 4.2; Ex. 1, Arts. V(F)(ii), V(G)(ii)).

30.    Section 2.7 of the Trust Agreements provides that "the principal purpose of [each Trust Agreement] is to aid in the implementation of the Plan and Confirmation Order . . . ." (Ex. 18-19 § 2.7).  In order to facilitate such implementation, the Trust Agreements further provide that:

> To that end, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan that directly affect the interests of the [Plan Trusts], and **to seek any orders from the Bankruptcy Court solely in furtherance of [the Trust Agreements]**.

(Ex. 18-19 § 2.7 (emphasis added)).

31.    Similarly, Section 4.2 of the Trust Agreements expressly preserves all rights the Plan Trusts may choose to assert under any provision of the Bankruptcy Code or applicable non-Bankruptcy law.  Specifically, Section 4.2 of the Trust Agreements provides, in relevant part, that:

> nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Retained Corporate Causes of Action [or Retained Lender Causes of Action] that the Debtors or their Estates [or the Consenting Lenders] may have or which the [Plan Trusts] may choose to assert (subject to [the Trust Agreements], under any provision of the Bankruptcy Code or any applicable non-Bankruptcy law . . . .

(Ex. 18-19 § 4.2).

32.    To facilitate, among other things, the Trustee's post-consummation investigation and his right to assert and pursue the Retained Claims of the Debtors and Lenders, the Plan and Confirmation Order intentionally include the broadest possible retention of this Court's

jurisdiction. Indeed, the Confirmation Order specifically states that the Court retains jurisdiction "to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article IX.A of the Plan." (Ex. 2 ¶ 62).

33.    Article IX(A) of the Plan specifies, in relevant part, that the Court has retained jurisdiction, without limitation, to:

> (i) allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured **status of any Claim** or Equity Interest, including, without limitation, . . . the resolution of any and all objections to the allowance or priority of any Claim or Equity Interests;

> (iv) **resolve any issues** related to any matters adjudicated in the Chapter 11 Cases;

> (v) ensure that **distributions to the Holders of Allowed Claims are accomplished** pursuant to the provisions of this Plan;

> (vi) decide or resolve any motions, adversary proceedings, contested or litigated matters and **any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future**, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

> (vii) enter such orders as may be **necessary or appropriate to implement or consummate the provisions of this Plan** and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

> (viii) resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or **enforcement of this Plan** or any Entity's obligations incurred in connection with this Plan;

> (ix) issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or **enforcement of this Plan**, except as otherwise provided in this Plan;

> (x) **enforce the terms and conditions of this Plan and Confirmation Order;**
>
> (xv) **resolve any other matters** that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; . . . .

(Ex. 1 Art. IX(A) (emphasis added)).

34.    Accordingly, the Plan, Confirmation Order and Trust Agreements retain this Court's jurisdiction to enter Orders in aid of the Trustee's "facts and circumstances" investigation.

## ARGUMENT

**I.    The Relief Requested Herein Is Well-Rooted In
The Law And Appropriate Under The Circumstances.**

35.    Bankruptcy Rule 2004 provides that, on the motion of any party-in-interest,[15] the Court may order an examination of, and the production of documentary evidence by, any entity concerning any matter relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtor's estate . . . ." Fed. R. Bankr. P. 2004(b).  The examination "may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any matter relevant to the case or to the formulation of a plan." Id.

36.    Accordingly, Bankruptcy Rule 2004 permits any party with an interest in the bankruptcy estate to conduct an examination of any matter relating to the debtor's acts, conduct, property or liabilities or affecting the implementation of a plan. See Fed. R. Bankr. P. 2004(b); In

---

[15]    Here, the Trustee is a party-in-interest as the successor to and representative of: (i) the Debtors with respect to the transferred Preserved Estate Claims (Ex. 18 § 2.2(a)); and (ii) the Lenders with respect to the Preserved Lender Claims (Ex. 19 § 2.2(a)). See also Ex. 18-19 § 4.2.

re Teleglobe Commc'ns Corp., 493 F.3d 345, 354, n.6 (3d Cir. 2007) ("Federal Rule of Bankruptcy Procedure 2004 allows parties with an interest in the bankruptcy estate to conduct discovery into matters affecting the estate.").

37.    Bankruptcy courts have broad discretion in determining whether to order an examination pursuant to Bankruptcy Rule 2004. See In re Wash. Mutual, Inc., 408 B.R. 45, 49 (Bankr. D. Del. 2009) ("The scope of a Rule 2004 examination is 'unfettered and broad'") (quoting In re Bennett Funding Grp., Inc., 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)). Bankruptcy Rule 2004 affords parties-in-interest an extremely broad right of discovery and "is even broader than that of discovery permitted under [the Federal Rules of Civil Procedure], which themselves contemplate broad, easy access to discovery." In re Valley Forge Plaza Assocs., 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990) (citations omitted).

38.    This broad scope extends to discovery of any third-parties who "possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate" or who have a relationship with the debtor. In re East West Resort Dev. V, L.P., Case No. 10-10452 (BLS), 2014 WL 4537500 at *7 (Bankr. D. Del. Sept. 12, 2014); see also Ionosphere Clubs, Inc. v. Am. Nat Bank and Trust Co. of Chicago (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 432 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) ("Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."); see also In re Mittco, Inc., 44 B.R. 35, 36 (Bankr. D. Wis. 1984) ("Where there is a showing that the purpose of the examination is to enable a party to probe into matters which may lead to the discovery of assets by examining not only the debtor, but also other witnesses, such inquiry is allowed.").

39.      As set forth above, the circumstances of this case give rise to a strong suspicion of wrongdoing that caused the Debtors and, in turn, their creditors substantial harm.  Because of the truncated time period, the pre-Effective Date investigation only focused on the insiders, and in an artificially narrowed way; there was simply no time to investigate the scope of potential culpability of any third-parties.  The Plan preserved all rights to do so in the Plan Trusts.  An appropriate investigation is warranted but case circumstances necessitated that this investigation be conducted post-consummation, and the Plan and Confirmation Order reserve broad jurisdiction of this Court to authorize investigations under Bankruptcy Rule 2004 of the Preserved Estate Claims and Preserved Lender Claims.  The Motion should be granted.

II.      **The Relief Requested Can**
         **(And Should) Be Authorized Post-Consummation.**

40.      Plan consummation does not prohibit access to Bankruptcy Rule 2004.  To the contrary, a Bankruptcy Rule 2004 examination is still permitted post-consummation when, as here, the examination pertains to issues over which the Court has retained jurisdiction.  See, e.g., In re Express One Int'l, Inc., 217 B.R. 215, 216-217 (Bankr. E.D. Tex. 1998); In re Cinderella Clothing Indus., Inc., 93 B.R. 373, 377 (E.D. Pa. 1988).

41.      For example, courts have authorized Bankruptcy Rule 2004 examinations for post-consummation liquidating trusts investigating potential claims and causes of action.  See, e.g., Ernst & Young, LLP v. Pritchard (In re Daisytek, Inc.), 323 B.R. 180, 185-186 (Bankr. N.D. Tex. 2005) (stating that it is permissible for a post-confirmation trustee to conduct Bankruptcy Rule 2004 examinations because "the [p]lan contemplates the prosecution of the claims . . . and the prosecution of the claims will thus impact compliance with, or completion of, the [p]lan"); *Decision and Order Granting Motion of Trustee of The Antioch Company Litigation Trust for Order Pursuant to Federal Bankruptcy Rule 2004 Authorizing the Examination of Certain*

*Entities and Persons*, In re The Antioch Co., Case No. 08-35741 (Bankr. S.D. Ohio, Aug. 6, 2009) [Docket No. 423] at 8 (same) (hereinafter, "Antioch") (attached to the Beiswenger Declaration at Ex. 20).

42.     The Antioch case is particularly instructive.  In Antioch, the trustee of a post-consummation litigation trust sought post-confirmation discovery pursuant to Bankruptcy Rule 2004 on the basis that the bankruptcy court retained jurisdiction over the debtors' claims and causes of action vested in the trust by the plan of reorganization. See Antioch at 10.  In that case, the trustee had received limited information regarding the debtors' claims prior to confirmation while previously acting as counsel for the official committee of unsecured creditors. See id. at 7. During the committee's pre-confirmation investigation, the committee received "at least one million pages of documents"[16] from the debtors and other third-parties and conducted interviews of certain of the debtors' prepetition officers and directors. Id. Despite already having received a substantial amount of documents pre-confirmation, the bankruptcy court held that the circumstances warranted Bankruptcy Rule 2004 examinations as a pre-litigation investigation tool for potential actions against possible litigation targets. See id. at 9.  The bankruptcy court found that it had sufficient jurisdiction to authorize post-petition examinations pursuant to Bankruptcy Rule 2004 because the court retained jurisdiction over the plan and the litigation trust received, by direct transfer through the plan, assets of the debtors' bankruptcy estates (*i.e.*, claims and causes of action belonging to the debtors) with "the intent . . . to benefit impaired creditors and equity holders of the [d]ebtors' estates and provide a further avenue for potential recovery." Id. at 10.  Additionally, the bankruptcy court noted that it should have "jurisdiction

---

[16]     As noted above, the investigation by the Ad Hoc Committee was much more limited; less than 9,000 documents totaling approximately 70,000 pages were produced and the JPM Entities and Simpson Thacher refused to produce any documents.  Additionally, there was simply no time to seek documents and investigate potential claims against the Debtors' auditors, KPMG.

over causes of action that arose prepetition and that have been assigned by a debtor to a post-confirmation trust through a plan that specifically reserves jurisdiction for the bankruptcy court and was intended to benefit the creditors and former equity holders of the [d]ebtors' estates." Id. at 11.[17]

43.    Here, the Plan, Confirmation Order, and attendant closing documents intentionally reserve this Court's post-consummation jurisdiction "to the fullest extent possible" under the law.  This is a more generous grant than that which was found satisfactory in, for example, Antioch.

44.    A post-consummation investigation fits within the broad retention of this Court's jurisdiction because it: (1) ensures proper case administration, given that an investigation is clearly warranted, but was disabled by the rushed need to consummate the Government Settlement; (2) facilitates process integrity, given that the Lenders were deprived of the opportunity to discover what happened and, for pragmatic reasons, entrusted all their rights to investigate and commence appropriate claims to the Plan Trusts; (3) concerns the acts or conduct of the Debtors and their incurrence of liabilities under the 2014 Credit Agreement given that it

---

[17]    The Third Circuit has noted that the standard for determining whether "related to" jurisdiction should be upheld post-confirmation turns upon "whether the outcome could significantly affect consummation of the plan as confirmed" and "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy jurisdiction over the matter." See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 166-167 (3d Cir. 2004) (internal citations and quotations omitted).  Generally, the Third Circuit has found that "litigation trusts by their nature maintain a connection to the bankruptcy even after the plan has been confirmed" and "[m]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." See id. at 167.  In Resorts, the Third Circuit held that the bankruptcy court lacked jurisdiction over an adversary proceeding against an accounting firm filed by a Chapter 11 post-confirmation litigation trustee because the claims against the professionals arose post-confirmation.  See id at 169.  The result in Resorts is easily distinguishable from these Chapter 11 cases because, unlike in Resorts, here all of the events creating potential claims for which the Trustee seeks discovery occurred prepetition, accrued to the Debtors' estates, and were specifically transferred to the Plan Trusts for appropriate investigation and prosecution.

will aid in the evaluation of any claims that might be filed by Targets;[18] (4) <u>concerns the administration of estate assets</u>, including estate causes of action vested in the Millennium Corporate Trust; and (5) <u>aids in Plan implementation</u>, given that the reorganized Debtors are obligated to fund up to $20 million in Plan Trust expenses and, so, a thoughtful and cautious approach is in keeping with the purposes and provisions of the Plan. As noted above, the Trustee is an experienced bankruptcy lawyer and fiduciary handling many similar complex litigation matters and desires to fulfill his fiduciary obligations in a responsible, cost-effective and efficient manner. The Motion should be granted.

### III.    The Scope Of Discovery Requested Herein Is Reasonable, Tailored, And Appropriate <u>Given The Particular Circumstances Of These Cases.</u>

45.    Bankruptcy Rule 2004 requires the Court to "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." <u>In re Drexel Burnham Lambert Grp.</u>, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991). In making this determination, courts consider the purpose of the request as well as the degree of intrusiveness. <u>See id.</u> at 711-12; <u>In re Hawley Coal Mining Corp.</u>, 47 B.R. 392, 394 (S.D. W. Va. 1984). In the post-confirmation context, a court may also consider:  (i) the truncated time period prior to confirmation; (ii) whether the documents provided and information produced by other parties prior to confirmation is the same information sought from the parties subject to the Bankruptcy Rule 2004 examination; and (iii) whether the parties subject to the Bankruptcy Rule 2004

---

[18]    The Arranging/Agent Banks may have indemnification claims against the Debtors which are subject to objection as to validity and amount. As noted above, the Plan expressly reserves this Court's jurisdiction to "allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, . . . the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest." (Ex. 1, Art. IX(A)(i)). Under Section 4.2 of the Trust Agreements, the Trustee, as representative of the Debtors, has express authority to litigate claims seeking affirmative relief against the Debtors. (Ex. 18-19 § 4.2).

examination have provided any documents or other information to the litigation trustee.  See
Antioch at 8.

46.     Here, the balance of competing interests militates strongly in favor of the Trustee
being permitted to obtain and examine documents from the Targets.  As indicated above, the
Trustee (and the Lenders before him) requested voluntary production of documents but (with
limited exception, as noted above) the Targets flatly refused cooperation.  The requests are
pertinent to the cases and for a fair understanding of the reasons behind the Debtors' financial
collapse. Again, no depositions or other forms of discovery are requested at this time.  Moreover,
one or more Targets have, on information and belief, already assembled Debtor-related
documents and produced them to the DOJ; so, production to the Trustee might not be
burdensome.  The Motion should be granted.

## CERTIFICATION OF
## COMPLIANCE WITH LOCAL RULE 2004-1

47.     Attached hereto as Exhibit B is a certification of James S. Green Jr., as Delaware
co-counsel to the Trustee, in accordance with Local Rule 2004-1 with respect to all Targets
except JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC.

48.     Attached hereto as Exhibit C is a certification of Jared T. Green, as Delaware co-
counsel to the Trustee, in accordance with Local Rule 2004-1 solely with respect to JPMorgan
Chase Bank, N.A. and J.P. Morgan Securities LLC.

## NOTICE

49.     Notice of this Motion has been given to: (a) the Office of the United States
Trustee; (b) each of the Targets; and (c) the Debtors.  The Trustee respectfully submits that such
notice is sufficient and no other or further notice is necessary under the circumstances.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Trustee respectfully requests that this Court enter an Order substantially in the form attached hereto as <u>Exhibit A</u>: (i) authorizing the discovery requested herein as set forth in Annexes A through F of the Order; (ii) reserving all of the Trustee's rights to take further discovery (including depositions) of any individuals related to the Targets or any other party; and (iii) granting such other and further relief.

Dated:    April 6, 2016
          Wilmington, Delaware

**LANDIS RATH & COBB LLP**

   */s/ James S. Green Jr.*
Richard S. Cobb, Esq. (No. 3157)
James S. Green Jr., Esq. (No. 4406)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
Email:  cobb@lrclaw.com
Email:  green@lrclaw.com

*Co-Counsel to the Trustee for the Plan Trusts, with respect to all Targets except the JPM Entities and Simpson Thacher*

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Sigmund S. Wissner-Gross, Esq.
Jacob T. Beiswenger, Esq.
7 Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801
Email:  rstark@brownrudnick.com
Email:  swissnergross@brownrudnick.com
Email:  jbeiswenger@brownrudnick.com

*Co-Counsel to the Trustee for the Plan Trusts*

**SEITZ, VAN OGTROP, & GREEN, P.A.**

   */s/ Jared T. Green*
Jared T. Green, Esq. (No. 5179 )
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 888-0600
Facsimile:  (302) 888-0606
Email:  jtgreen@svglaw.com

*Co-Counsel to the Trustee for the Plan Trusts, solely with respect to the JPM Entities and Simpson Thacher*

**WOLLMUTH MAHER & DEUTSCH LLP**
David H. Wollmuth, Esq.
Jeffrey Coviello, Esq.
500 Fifth Avenue
New York, NY 10110
Telephone:  (212) 382-3300
Facsimile:  (212) 382-0050
Email:  dwollmuth@wmd-law.com
Email:  jcoviello@wmd-law.com

*Co-Counsel to the Trustee for the Plan Trusts, except with respect to Simpson Thacher*