IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Millennium Lab Holdings II, LLC, et. al., | Case No. 15-12284 (LSS) |
| Debtors. | (Jointly Administered) |

## OPINION

On December 14, 2015, I entered an order confirming a plan of reorganization for then-debtors Millennium Lab Holdings II, LLC and certain of its affiliates ("Millennium" or "Debtors").[1] The plan provided for third party releases in favor of various non-debtor entities, including, as relevant here, certain of the Debtors' equity holders who contributed $325 million to the estate as part of a settlement contained in the plan. At the confirmation hearing, I overruled the objection filed by Voya,[2] which did not assent to the third party releases and found that the Debtors had met their burden of proof to show that the releases were warranted under *Continental*.[3] Voya appealed. Now, on remand from the district court, I have been asked to "consider whether, or clarify [my] ruling that, [I, as a] Bankruptcy Court had constitutional adjudicatory authority to approve the nonconsensual

---

[1] The Debtors are Millennium Lab Holdings II, LLC, Millennium Health, LLC and RxAnte, LLC.

[2] Voya, also known as the Opt-Out Lenders, means ISL Loan Trust; ISL Loan Trust II; NN (L) Flex – Senior Loans; NN (L) Flex – Senior Loans Select; Voya CLO 2012-1, Ltd.; Voya CLO 2012-2, Ltd.; Voya CLO 2012-3, Ltd.; Voya CLO 2012-4, Ltd.; Voya CLO 2013-1, Ltd.; Voya CLO 2013-2, Ltd.; Voya CLO 2013-3, Ltd.; Voya CLO 2014-1, Ltd.; Voya CLO 2014-2, Ltd.; Voya CLO 2014-3, Ltd.; Voya CLO 2014-4, Ltd.; Voya CLO 2015-1, Ltd.; Voya High Income Floating Rate Fund; Voya Prime Rate Trust; Voya Senior Income Fund; Voya Floating Rate Fund; Axis Specialty Limited; California Public Employees' Retirement System; The City of New York Group Trust; Medtronic Holdings Switzerland GMbH; New Mexico State Investment Council; Voya Investment Trust Co. Plan for Employee Benefit Investment Funds-Voya Senior Loan Trust Fund; and Voya Investment Trust Co. Plan for Common Trust Funds-Voya Senior Loan Common Trust Fund.

[3] *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000).

release of Appellants' direct non-bankruptcy common law fraud and RICO claims against the Non-Debtor Equity Holders."[4] I conclude that I did.[5] In so concluding, I reject Voya's expansive reading of *Stern*,[6] which not only applies *Stern* outside of the narrow context in which it was made, but far beyond the holding of any court, and which would, if accepted, dramatically change the division of labor between the bankruptcy and district courts.

Because I find that I had constitutional adjudicatory authority to approve, in a final order, the nonconsensual third party releases, I need not strike the nonconsensual release of Voya's claims from the confirmation order, nor make and submit to the district court additional proposed findings of fact and conclusions of law regarding the final disposition of Voya's RICO claims. Even if I am wrong, however, I still would not do so. Not only did Voya forfeit and/or waive any argument that I did not have constitutional adjudicatory authority to enter the confirmation order by not raising it at the confirmation hearing or at any time prior to entry of the order confirming the plan, Voya also independently waived its right to any trial on the merits of its RICO claims in the context of confirmation. Thus, to the extent that it is ever appropriate to have a hearing on the merits of claims being released by third parties in connection with confirmation—as opposed to, or in addition to, a hearing on the merits of the releases themselves or any settlement in which they are contained—Voya made a calculated decision not to put the merits of its RICO claims at issue during the confirmation hearing. I will not consider the merits now.

---

[4] *See Opt-Out Lenders v. Millennium Lab Holdings II, LLC* (*In re Millennium Lab Holdings II, LLC*), No. 16-110-LPS, 2017 WL 1032992, at *14 (D. Del. Mar. 20, 2017) ("Remand Decision"). The "Non-Debtor Equity Holders" are TA Associates Management, L.P., T.A. Millennium, Inc., Millennium Lab Holdings, Inc., James Slattery and Howard J. Appel.

[5] To answer the district court's inquiry directly, I did not previously rule on my constitutional adjudicatory authority to enter a confirmation order approving nonconsensual releases.

[6] *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

## BACKGROUND[7]

### A. The Confirmation Hearing

On November 10, 2015, the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code[8] together with their prepackaged plan of reorganization ("Plan") and accompanying disclosure statement.[9] The filing was the culmination of a seven-month process in which Millennium entered into multiple settlements, including a terms sheet with the United States and certain individual states, and a restructuring support agreement with both an ad hoc group of bondholders and the Non-Debtor Equity Holders. After an attempted out-of-court restructuring effort failed to garner the required support, the Debtors filed their bankruptcy petitions.

The Plan provided for a global resolution of claims related to the Debtors' April 2014 $1.825 billion senior secured credit facility, the proceeds of which funded a $1.3 million dividend to Millennium's equity holders, paid off certain debt and provided for working capital. As part of the lender group, Voya funded $106.3 million of the loan. Under the Plan, in exchange for an Allowed Claim (that is, a claim allowed under § 502 of the Bankruptcy Code), each lender, including Voya, received its pro rata share of: (i) a new $600 million term loan; (ii) 100% of the beneficial ownership interests of the reorganized Debtors; and (iii) any recoveries from a trust created to pursue the Debtors' retained causes of action.

---

[7] The background of this case is discussed in my Bench Ruling (defined *infra*) and in *In re Millennium Lab Holdings II, LLC*, 543 B.R. 703 (Bankr. D. Del. 2016). I discuss here only background necessary to address the questions on remand.

[8] 11 U.S.C. §§ 101–1532 (2012) ("Bankruptcy Code").

[9] Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., Nov. 10, 2015, D.I. 14; Disclosure Statement for Prepackaged Plan of Reorganization ("Disclosure Statement"), Nov. 10, 2015, D.I. 15.

On December 10, 2015, I held a combined hearing on confirmation of the Plan and
the adequacy of the Disclosure Statement. Prior to that hearing, Voya filed two
objections.[10] Voya did not object to the overall compromise embodied in the Plan, which
allowed the claims of all bondholders, brought $325 million into the estate (permitting the
Debtors to reorganize and make the distributions required under the Plan) and included
releases of both debtor and third party claims against the Non-Debtor Equity Holders.
Instead, Voya only objected to the inclusion in the Plan of releases of claims that creditors,
including Voya, might assert against the Non-Debtor Equity Holders and an accompanying
bar order and injunction. As to the releases, Voya made the following arguments: (i) that I
did not have subject matter jurisdiction to grant nonconsensual third party releases; (ii) that
third party releases are impermissible; (iii) that the Plan must permit parties to opt-out of the
releases; and, in any event, (iv) that the releases did not meet the *Continental* standard. To
crystalize its claims against the Non-Debtor Equity Holders, the day before the confirmation
hearing, Voya filed a complaint asserting RICO and common law fraud claims against those
entities in the United States District Court for the District of Delaware (the "RICO
Lawsuit"), which remains pending before the Honorable Gregory M. Sleet.[11]

On December 11, 2015, I issued a bench ruling[12] confirming the Plan and addressing
all of the issues raised by the parties, save one. As part of that ruling, I held that, at the very

---

[10] Memorandum of Law of the Opt-Out Lenders in Opposition to (I) Approval of the Disclosure
Statement, (II) Approval of the Class 2 Ballot, and (III) Confirmation of the Prepackaged Joint Plan
of the Reorganization of the Millennium Lab Holdings II, Dec. 4, 2015, D.I. 122 ("Initial
Confirmation Objection"); Supplemental Memorandum of Law of the Opt-Out Lenders in
Opposition to (I) Approval of the Disclosure Statement, (II) Approval of the Class 2 Ballot, and (III)
Confirmation of the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, et al.
("Supplemental Confirmation Objection"), Dec. 9, 2015, D.I. 174.
[11] *ISL Loan Tr. v. TA Assocs. Mgmt., L.P.*, Case No. 15-1138 (D. Del.) (GMS).
[12] Bench Ruling, Dec. 11, 2015, D.I. 206 ("Bench Ruling").

least, I had "related to jurisdiction."[13] I made this ruling because Voya argued (relying on *Combustion Engineering*[14]) that I did not have subject matter jurisdiction over the RICO Lawsuit, which was fatal to my ability to grant the third party releases as to Voya. I also stated that *Stern* did not change my conclusion on Voya's jurisdictional argument. At no time before I ruled did Voya argue that I lacked constitutional adjudicatory authority to enter a confirmation order containing releases or to otherwise enter a final order approving the nonconsensual releases in the Plan.

As part of my Bench Ruling, I informed the parties that (i) I was not in a position to rule on the bar order provision, as it had not been the subject of argument and I had not, independently, had a chance to fully understand it; and (ii) I had not yet reviewed the proposed form of confirmation order. After some discussion, I agreed that the parties could submit further briefing on the bar order provision and continued the hearing. But, before the conclusion of the hearing, the staff attorney for the Office of the United States Trustee commented on the proposed form of order and asked me to pay particular attention to paragraph LL, which she said contained detailed proposed findings on the injunctions and releases. I then asked: "Does any other party have [a] question or clarification they need to make on the record?"[15] As reflected in the transcript, there was no response. The hearing was then recessed until December 15.

Prior to the continued hearing, the Debtors filed a letter on the docket informing me that, with the consent of Voya and all other necessary parties, the bar order provision was deleted from the Plan.[16] The letter also informed me that: (i) Voya had no further objections

---

[13] Bench Ruling Hr'g Tr. 13:1–2.
[14] *In re Combustion Eng'g*, 391 F.3d 190 (3rd Cir. 2004).
[15] Bench Ruling Hr'g Tr. 35:25–36:2.
[16] Letter Regarding Form of Proposed Confirmation Order, Dec. 14, 2015, D.I. 194.

to the Plan that had not been ruled upon; and (ii) the Office of the United States Trustee

believed that the findings in paragraph LL of the proposed order regarding releases should

be stricken in favor of a reference to the Bench Ruling, and the Debtors disagreed.  After

considering the letter, on December 14, 2015, I entered an order confirming the Plan.

### B.  The Appeal and the Request for Certification to the Third Circuit

That same day, Voya filed its Notice of Appeal[17] together with an emergency motion

requesting certification of a direct appeal to the Third Circuit[18] and a motion for stay

pending appeal.[19]  Voya argued that a direct appeal would "enable the Third Circuit to

clarify two crucial legal issues that remain undetermined in this Circuit:  whether

nonconsensual releases of non-debtors' direct claims against other non-debtors are

permissible and if so, under what circumstances."[20]

Thereafter, Voya filed its Statement of the Issues on Appeal[21] identifying the

following questions.

> 1. Can Bankruptcy Courts exercise "related to" jurisdiction over a non-
> debtor's direct claims against other non-debtors for fraud and other willful
> misconduct on the basis of contractual indemnification agreements by the
> debtor of the other non-debtors that expressly and/or as a matter of law

---

[17]  Notice of Appeal of Findings of Fact, Conclusions of Law and Order (I) Approving the (A) Prepetition Solicitation Procedures, (B) Forms of Ballots, (C) Adequacy of Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, and (D) Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, and (II) Confirming the Prepackaged Joint Chapter 11 Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., Dec. 14, 2015, D.I. 202 ("Notice of Appeal").
[18]  Opt-Out Lenders' Emergency Motion for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(D)(2), Dec. 14, 2015, D.I. 203 ("Certification Motion").
[19]  Motion of the Opt-Out Lenders for Stay Pending Appeal of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., Dec. 14, 2015, D.I. 204 ("Stay Motion").
[20]  Certification Motion ¶ 5.
[21]  Designation of Record and Statement of Issues on Appeal Pursuant to Fed. R. Bankr. P. 8009(A), Dec. 28, 2015, D.I. 246 ("Voya's Statement of Issues on Appeal").

preclude indemnification for acts of fraud, wilfull [sic] misconduct, and violations of the Racketeer Influenced and Corrupt Organization (RICO) Act?

2. Do Bankruptcy Courts have the authority to release a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct without the consent of the releasing non-debtor?

3. Assuming *arguendo* that Bankruptcy Courts do have authority to release a non-debtor's direct claims against other non-debtors for fraud and other willful misconduct without the consent of the releasing non-debtor, what standard of law governs the approval of such releases where no consideration is paid for the release?

4. Can services performed by a debtor's directors, officers, and employees in connection with the debtor's reorganization constitute a financial contribution to the debtor's estate?

5. Can a financial contribution made by a non-debtor to a debtor's estate be a financial contribution also made "on behalf of" other, and otherwise non-contributing, non-debtors?

6. Assuming *arguendo* that the Bankruptcy Court (a) properly determined that it had subject-matter jurisdiction and legal authority to release the non-debtor Opt–Out Lenders' direct claims against other non-debtors for fraud and other willful misconduct without the Opt–Out Lenders' consent and (b) applied the correct legal standard to its review of such releases, did the Bankruptcy Court err in concluding that the facts of this case warranted such a release?

At no time before me on the Stay Motion or the Certification Motion did Voya argue that the appeal involved a question of my constitutional authority to enter a final order confirming the Plan.

### C. *The Remand Decision*

On March 20, 2017, the district court issued its Memorandum Opinion remanding the case for further proceedings. As the district court explained in the Remand Decision:

It is unclear to what extent the Bankruptcy Court had the opportunity to consider what is now the main issue on appeal—the Bankruptcy Court's authority post-*Stern* to enter a final order discharging Appellants' non-bankruptcy claims against non-debtors without Appellants' consent—given the lack of time and attention the parties ascribed to this issue in their briefing

and arguments below. What is clear is that the Bankruptcy Court had no
occasion to explain its reasoning on this issue.[22]

Accordingly, the district court remanded the bankruptcy case for further proceedings

on the following:

1. To consider whether, or clarify [my] ruling that, [I, as a] Bankruptcy
   Court had constitutional adjudicatory authority to approve the
   nonconsensual release of Appellants' direct non-bankruptcy common law
   fraud and RICO claims against the Non-Debtor Equity Holders.

2. If not, to submit proposed findings of fact and conclusions of law
   regarding the final disposition of these claims through the Confirmation
   Order, or, alternatively, to strike the nonconsensual release of Appellants'
   claims from the Confirmation Order.[23]

The parties made their submissions on remand and, on July 27, 2017, I heard extensive

argument. The matter is now ripe for decision.

### D. The Parties' Positions

On remand, the parties each proffer their interpretation of *Stern*. Voya asserts its

application of *Stern* to this matter is "straightforward." But, at argument on remand, Voya's

counsel admitted that no party has ever articulated its position.[24]

Voya posits that in analyzing whether I have constitutional adjudicatory authority to

enter a final order confirming a plan containing nonconsensual third party releases, I

should:

- either ignore or consider irrelevant that I am presiding over confirmation of a
  plan;[25]

---

[22] Remand Decision at *10.
[23] Remand Decision at *14.
[24]     **Mr. Redburn:** I'm not sure anybody has really actually articulated this issue in the way it's
         being articulated to this Court before.
Oral Argument on Remand, Hr'g Tr. 101:24–102:1, July 27, 2017, D.I. 456 ("Oral Argument on
Remand"). *See generally* discussion at Oral Argument on Remand, Hr'g Tr. 100:21–102:1.
[25] Oral Argument on Remand, Hr'g Tr. 117:14–18.

- consider the operative proceeding before me for *Stern* purposes to be the RICO Lawsuit;[26]

- apply *Stern* to the RICO Lawsuit; and

- hold that *Stern* prevents the bankruptcy court from entering a final order on confirmation because the RICO Lawsuit does not stem from the bankruptcy itself, nor must it necessarily be resolved in the claims allowance process.

Voya further asserts that *Stern* stands for the proposition that because Voya chose to filed its RICO Lawsuit in the district court, Voya has an absolute right to have the merits of its claims determined in the context of that civil lawsuit. Voya asserts that granting the third party releases over its objection constitutes an "adjudication" of the RICO Lawsuit, which is prohibited so neither the bankruptcy court nor the district court can enter a confirmation order containing releases. Indeed, Voya argues that no court can enter any order which impacts its RICO Lawsuit.[27] Voya's true argument, therefore, is not a *Stern* argument as

---

[26]    **Mr. Redburn:** It goes back to what I said earlier in the argument which is that for *Stern* purposes the analysis takes place at the level of the claims to which judgment is being entered upon, not the proceeding in which judgment is entered.
*Id.* 117:9–13.

[27]    Permeating its written submission on remand and at argument is Voya's real position: even the district court cannot enter an order confirming a plan that contains third party releases. *See, e.g.,* Opt-Out Lenders' Opening Brief on Remand Issues at 31, May 19, 2017, D.I. 439 ("Article III, as consistently interpreted by the Supreme Court, grants a party the right to an adjudication on the merits by an Article III judge of claims within the core of Article III judicial power. It does not authorize either Article III or non-Article III tribunals to summarily extinguish a common law claim over the plaintiff's objection without any form of merits-based adjudication whatsoever."); Opt-Out Lenders' Reply Brief on Remand Issues at 13, June 12, 2017, D.I. 444 ("Voya's consistent position from the beginning of plan confirmation proceedings was that this Court lacks the power or authority to grant non-consensual releases of Voya's claims against other non-debtors through a final plan confirmation order, that the proper forum for adjudication of Voya's claims against the Non-Debtor Equity Holders was the District Court in which the Fraud Action was filed, and that the releases had to be stricken form the Plan in order to comply with Article III."); Oral Argument on Remand, Hr'g Tr. 128:23–129:3, (The Court: So notwithstanding *Continental* Judge Stark can't [enter a confirmation order with nonconsensual releases] even though that's Third Circuit Law? Mr. Redburn: Correct, because the Article III and due process required adjudication of those claims on the merits.")

*Stern* addresses which judge—an Article III judge or an Article I judge—must issue the confirmation order, not whether the order should issue at all.

The Debtors[28] respond to Voya's argument on Voya's terms, that is, they assume *Stern* is applicable. The Debtors contend *Stern* stands for the proposition that bankruptcy judges have constitutional authority to resolve matters that are "'integral to the structuring of the debtor-creditor relationship.'"[29] The Debtors argue that it is the relationship of the claim to the bankruptcy process that is important, not the nature of the claim itself. The Debtors further posit that if it is necessary for the bankruptcy judge to rule on a matter in the context of plan confirmation, then the judge has the constitutional power to enter a final judgment on that core bankruptcy proceeding, even if it impacts state law claims. Here, they contend, it was necessary for me to approve the releases because both the feasibility and the implementation of the Plan required the contribution from the Non-Debtor Equity Holders. The Debtors conclude, therefore, that the *Stern* standard is met because my determination that the *Continental* hallmarks were satisfied means that the releases were integral to the debtor-creditor relationship and necessarily resolved as part of confirming the Plan.

## DISCUSSION

### I. Bankruptcy Jurisdiction

Bankruptcy jurisdiction is conferred in 28 U.S.C. § 1334, titled "Bankruptcy cases and proceedings." With exceptions not applicable here, district courts have original and

---

[28] The Debtors, TA Millennium, Inc. and James Slattery filed combined briefs on remand. When used in reference to positions on remand, the term "Debtors" will refer collectively to these parties.
[29] Supplemental Brief of the Debtors, TA Millennium, Inc., and James Slattery Regarding the Court's Adjudicatory Authority and Related Issues on Remand from the District Court 10–16, May 19, 2017, D.I. 437.

exclusive jurisdiction in all bankruptcy cases, i.e., the main proceeding.[30]  District courts also have original but not exclusive jurisdiction of all "civil proceedings arising under title 11, or arising in or related to cases under title 11."[31]  Because this jurisdiction is granted to the district court, bankruptcy judges exercise bankruptcy jurisdiction only to the extent the district court refers the case or proceeding to the bankruptcy judge.[32]  In the District of Delaware, there is a standing order referring all bankruptcy cases and their attendant civil proceedings to bankruptcy judges.[33]

Bankruptcy cases and civil proceedings arising in and arising under title 11 are "core" proceedings, while civil proceedings related to cases under title 11 are denominated "non-core."  The distinction is significant because bankruptcy judges can both hear and determine core proceedings, meaning that bankruptcy judges can enter final orders in these proceedings subject to appeal to the district court.  On the other hand, bankruptcy judges can only hear, but not determine, non-core proceedings, meaning that the bankruptcy judge must enter proposed findings of fact and conclusions of law for review by the district court under Federal Rule of Bankruptcy Procedure 9033.

If the proceeding before the court is neither core nor non-core, then it does not fall within the subject matter jurisdiction granted to district courts in § 1334 and neither the district court nor the bankruptcy judge may enter an order in the matter.

"Confirmations of plans" is one of sixteen core proceedings listed in § 157(b)(2).[34] The foremost treatise on bankruptcy places these sixteen enumerated core proceedings into

---

[30] 28 U.S.C. § 1334(a).
[31] 28 U.S.C. § 1334(b).
[32] 28 U.S.C. § 157(a)–(b).
[33] United States District Court for the District of Delaware Amended Standing Order of Reference, In re Standing Order of Reference Re: Title 11, February 29, 2012.
[34] 28 U.S.C. § 157(b)(2)(L).

five categories: (i) matters of administration; (ii) avoidance actions; (iii) property of the

estate; (iv) omnibus categories; and (v) cases filed under chapter 15.[35]  Confirmations of

plans is in the first category together with matters concerning the administration of the

estate, allowance and disallowance of claims against the estate and exemptions, estimations

of claims for purposes of confirming a plan, orders with respect to obtaining financing,

motions to terminate the automatic stay, dischargability determinations and objections to

discharges.[36]  As Collier states with respect to matters of administration, such as

confirmations of plans:

> There has never been any doubt about the constitutional authority of a
> nontenured judge to enter final orders in such matters, which are unique to
> bankruptcy cases.  This has been true since the regime of the Bankruptcy Act
> and remains true today, even under *Marathon, Granfinanciera, S.A. v. Norberg*
> and *Stern v. Marshall.*  This category of core proceedings has produced almost
> no litigation regarding bankruptcy court authority.[37]

## II. A Bankruptcy Judge has Constitutional Adjudicatory Authority to Enter a Confirmation Order Containing Nonconsensual Third Party Releases

### A. Decisional law Applying *Marathon* and *Stern* Uniformly Hold that Bankruptcy Judges have such Authority

#### 1. The *Marathon* Decision

Before *Stern*, there was *Marathon*.[38]

In *Marathon*, the Supreme Court of the United States concluded that Congress's

broad grant of jurisdiction to bankruptcy judges in the Bankruptcy Act of 1978 ("Act") was

unconstitutional.  This ruling was made in the context of civil litigation asserting state law

causes of action.  In *Marathon*, the plaintiff/debtor Northern Pipeline sued defendant

---

[35]  *See* 1 COLLIER ON BANKRUPTCY ¶ 3.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).
[36]  *See id* at ¶ 3.02[3][a].
[37]  *Id.* (citations omitted).
[38]  *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion).

Marathon Pipe Line by filing a complaint in the bankruptcy court in which Northern

Pipeline's bankruptcy case was pending.  Northern Pipeline asserted state law claims

sounding in breaches of contract and warranty, misrepresentation, coercion and duress.

Marathon moved to dismiss the complaint asserting that the Act unconstitutionally

conferred judicial powers on non-Article III judges.  In a plurality opinion, the Supreme

Court agreed with Marathon.  Striking down the entire Act—as opposed to so much of the

Act as permitted the bankruptcy judge to render judgment on the state law action—upended

the bankruptcy community and created significant uncertainty regarding bankruptcy

jurisdiction.[39]  In the wake of congressional inaction after the *Marathon* decision, on

December 3, 1982, the Judicial Conference of the United States proposed emergency model

rules, which each judicial circuit approved for adoption by district courts as local rules.[40]

Congress subsequently adopted the Emergency Rules as part of the Bankruptcy

Amendments and Federal Judgeship Act of 1984, the current statute conferring bankruptcy

jurisdiction.[41]

In the heyday/melée of *Marathon*, the United States Court of Appeals had occasion

to address whether bankruptcy judges have constitutional authority to enter final orders

confirming plans of reorganization containing third party releases.  In *In re AOV Industries,*

*Inc.,*[42] a case having strong parallels to *Millennium*, the bankruptcy court approved such a

plan over objection.  AOV consisted of an integrated group of coal mining, processing,

exporting and trading companies.  Its exclusive European marketing agent, Steag Handel

---

[39] *See generally* Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Court Jurisdiction Under the Judicial Conference Emergency Rule,* 16 UCC L.J. 59 (1983).

[40] *See id.*

[41] Amendments since 1984 are not relevant to this analysis.

[42] 792 F.2d 1140 (D.C. Cir. 1986).

GmbH ("Steag"), was also a major creditor. Pre-bankruptcy, AOV needed working capital;

it raised that cash by negotiating a stock purchase agreement through which Sleigh, Ltd.

("Sleigh") acquired a 50% interest in AOV. Once Sleigh took control of AOV, AOV filed its

bankruptcy case. Two pieces of litigation figured prominently in *AOV Industries*: (i) a

postpetition lawsuit by AOV against Sleigh surrounding the stock acquisition; and (ii) a

prepetition lawsuit by Hawley Fuel Coalmart ("Hawley") against Steag asserting that Steag

guaranteed AOV's indebtedness to Hawley.

After negotiations, AOV, Sleigh and Steag entered into a plan contribution

agreement that formed the basis of AOV's plan of reorganization. Sleigh and Steag

collectively agreed to forego over $51 million in claims against AOV for, respectively, 100%

of the AOV stock and a $2.6 million security interest in AOV's assets. Further, as a "critical

component" of the plan, Sleigh and Steag agreed to contribute $3 million of a $4.5 million

fund for unsecured creditors. This fund, however, would not be available unless all but a

few creditors gave Sleigh and Steag releases.[43] One of those required to give a release if he

wanted a distribution was AOV's founder Hubert Bruce.

AOV's creditors voted overwhelmingly in favor of the plan. Bruce, however,

challenged the bankruptcy court's jurisdiction to render a binding judgment on the plan

based on the recent *Marathon* decision. Mindful of this challenge, the bankruptcy judge

certified the case to the district court pursuant to the bankruptcy Emergency Rules then in

---

[43] The $4.5 million fund was available to unsecured creditors "on the Consummation Date if releases are received from creditors except for Hawley Fuel Coal, Inc., Ambrose Branch Coal Co., their affiliates and any other creditor or creditors whose claims, when taken as a whole, do not exceed $300,000." *Id.* at 1143. In this respect, the releases appear to be consensual, if coerced. The opinion does not turn on the nature of the releases.

effect.[44] Bruce and Hawley also took a direct appeal of the bankruptcy court's ruling to the district court. In the consolidated certification/appeal proceeding, the district court rejected the constitutional challenge and held that the bankruptcy court could enter a final order on confirmation consistent with *Marathon.*

On further appeal, the D.C. Circuit described Bruce's argument as follows: (i) the confirmation of the debtor's plan could only be approved by the district court because the confirmation hearing was "outside the core of normal bankruptcy proceedings" as the plan involved the release of "non-bankruptcy claims—those held by one creditor against another creditor"; (ii) Bruce had separate, outstanding claims against both Sleigh and Steag, which the plan significantly affected; therefore, (iii) such releases are prohibited because it permits an Article I court to influence cases that can only be resolved by an Article III court.[45]

Keenly aware of the recent jurisdictional upheaval, the D.C. Circuit began its ruling with an analysis of bankruptcy jurisdiction following *Marathon.* The court acknowledged the Supreme Court's holding that Congress had overstepped its bounds in the Bankruptcy Reform Action of 1978 by impermissibly—and unconstitutionally—granting Article I judges judicial power reserved for Article III courts. The court also recognized the Emergency Rules subsequently adopted by Congress in the Bankruptcy Amendments and Federal Judgeship Act of 1984, which distinguished between related and core proceedings.

---

[44] Model Emergency Rule § (e)(2)(A)(ii) permitted the bankruptcy court to certify that "circumstances require that the order or judgment [entered by the bankruptcy judge] be approved by a district judge, whether or not the matter was controverted before the bankruptcy judge or any notice of appeal or application for leave to appeal was filed." *See generally* Weintraub & Resnick, 16 UCC L.J. 59 (1983).
[45] The court does state that Bruce "never specifies, however, how his claims are affected." *AOV Indus.*, 792 F.2d at 1145.

Acknowledging the state of play, the D.C. Circuit Court soundly rebuffed Bruce's expansive

reading of *Marathon*:

> We reject Bruce's argument and his reading of *Marathon*. The approval of a
> disclosure statement and the confirmation of a reorganization plan are clearly
> proceedings at the core of bankruptcy law; appellant cites no authority for the
> notion the court's actions were "related" proceedings within the meaning of
> the Emergency Rule or the 1984 Bankruptcy Amendments. See 28 U.S.C.
> § 157(b)(2)(L) (core proceedings include "confirmations of plans"):
> Emergency Rule § (d)(3)(A) ("related proceedings do not include … matters
> concerning the administration of the estate… [or] proceedings in respect to
> the confirmation of plans"). **Although the bankruptcy's court's decision
> may have an impact on claims outside the scope of the immediate
> proceedings, we do not read Marathon and its progeny to prohibit all
> bankruptcy court decisions that may have tangential effects. The expansive
> reading of Marathon urged on us by Bruce would limit the power of these
> article I courts to a far greater degree than we believe Congress or the
> Supreme Court intended.**[46]

The only other circuit court that appears to have addressed the issue is the Seventh

Circuit. In a single sentence, the Seventh Circuit adopted the *AOV Industries* position,

stating: "As a preliminary matter, we note that a bankruptcy court does have the power to

determine the legality of provisions, including releases, incorporated into a

reorganization plan."[47]

### 2. The *Stern* Decision

*Stern* followed *Marathon* by twenty-nine years. It did not change much.

In *Stern*, Vickie Lynn Marshall filed a chapter 11 bankruptcy case in the Central

District of California. Prior to filing her bankruptcy petition, Vickie,[48] who was the third

wife of the elderly and very wealthy J. Howard Marshall, filed suit in Texas state probate

---

[46] *Id.* at 1145–46 (emphasis added).

[47] *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1045 (7th Cir. 1993) (citing *AOV Indus.*, 792 F.2d at 1145, and 28 U.S.C. § 157(b)(2)(L), and noting that the appellants were really questioning the legitimacy of the releases).

[48] I will continue the Supreme Court's practice of referring to the parties by their first names.

court ("Texas Litigation") against Pierce Marshall, J. Howard's son, for tortious interference with an *inter vivos* gift. In the Texas Litigation, Vickie asserted that Pierce had fraudulently induced J. Howard to exclude Vickie from J. Howard's living trust (and, later, his will) even though, Vickie asserted, J. Howard meant to give her one-half of his estate.

Pierce initiated an adversary proceeding in Vickie's bankruptcy case seeking both damages for defamation and a declaration that the defamation claim was nondischargeable under 11 U.S.C. § 523(a). Pierce also filed a proof of claim for damages due to defamation. Vickie defended Pierce's defamation claim in the adversary proceeding and filed a counterclaim for tortious interference with the gift she believed J. Howard sought to give her. Vickie's counterclaim appeared to mirror, at least in part, the state law complaint she filed in the Texas Litigation.

The bankruptcy judge entered orders in the adversary proceeding all in Vickie's favor. As to Pierce's defamation claim, the judge granted summary judgment for Vickie, thus denying Pierce any recovery. After a bench trial on Vickie's counterclaim for tortious interference, the bankruptcy judge awarded Vickie over $400 million in compensatory damages and $25 million in punitive damages. In the meantime, the judge in the Texas Litigation presided over a jury trial and entered judgment in favor of Pierce on his defamation claim.

In post-trial proceedings, Pierce re-asserted an argument that Vickie's counterclaim was not a core proceeding and thus the bankruptcy judge was limited to submitting proposed findings of fact and conclusions of law to the district court for review *de novo* on that claim. The bankruptcy court rejected Pierce's argument finding that counterclaims are core based on § 157(b)(2)(C). On appeal the district court disagreed holding that while

Vickie's counterclaim fell within the literal language of § 157(b)(2)(C), the Supreme Court's decision in *Marathon* precluded the court from holding that "any and all" counterclaims are core. Eventually, the Ninth Circuit agreed with the district court's legal conclusion, holding that "a counterclaim under § 157(b)(2)(C) is properly a 'core' proceeding 'arising in a case under' the Code only if the counterclaim is so closely related to a [creditor's] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself."[49] The Supreme Court granted certiorari.

In its opinion, the Supreme Court first addressed the bankruptcy court's statutory authority to enter a final order on Vickie's counterclaim. The Court rejected Pierce's argument that Vickie's counterclaim was in a new category of proceedings—namely, core proceedings that do not arise in or arise under title 11. Instead, the Court recognized core proceedings are "at most, those that arise in title 11 cases or arise under title 11"[50] and that each of the sixteen types of proceedings enumerated in § 157 are core. Thus, the Court agreed with Vickie that "§ 157(b)(2)(C) permits the bankruptcy court to enter a final judgment on her tortious interference claim."[51]

Notwithstanding the finding that as a statutory matter the bankruptcy judge could enter a final order on Vickie's counterclaim, the Court ruled that Article III of the Constitution precluded it. The Court held that Vickie's state law counterclaim was not a public right under any of its admittedly inconsistent and various formulations of that doctrine articulated to date.[52] Vickie's counterclaim was not related to federal governmental

---

[49] *In re Marshall*, 600 F.3d 1037, 1058 (9th Cir. 2010) (quotation omitted).
[50] *Stern*, 131 S. Ct. at 2605 (quotation omitted).
[51] *Id.*
[52] *See id.* at 2611.

action;[53] it did not flow from a federal statutory scheme;[54] nor was it "completely dependent upon" adjudication of a claim created by federal law.[55]  The Court also held that the bankruptcy court does not qualify as an authority (such as a federal agency) limited to a "particularized area of the law."[56]

The Supreme Court also conducted a lengthy examination of Vickie's counterclaim in light of the preference actions brought by the trustees in *Katchen* and *Langenkamp*.  In each of those cases, a preference defendant filed a proof of claim against the estate.  The Court held that the defendants were not entitled to an Article III adjudicator because the trustee's claims could be determined as part of the claims allowance and disallowance process.[57]  The Supreme Court also noted that in both *Katchen* and *Langenkamp*, the trustee was asserting a right of recovery created by federal bankruptcy law.  By contrast, Vickie's counterclaim, "is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding."[58]  And, the Supreme Court noted the discussion in *Granfinanciera* distinguishing between suits to augment the estate (such as fraudulent conveyance claims and Vickie's counterclaim) and "creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res."[59]

---

[53] *See id.* at 2613.
[54] *See id.* at 2614.
[55] *See id.*
[56] *See id.* at 2615.
[57] *See Katchen v. Landy*, 382 U.S. 323 (1966) (holding that the plenary proceeding the creditor sought could be entertained in the bankruptcy court because the same issues arose as part of the claim allowance/disallowance process, and offering no opinion on whether the referee would have summary jurisdiction over a trustee's claim for affirmative relief that could not be disposed of in connection with ruling on objections to a proof of claim (cited in *Stern*, 131 S. Ct. at 2616)); *Langenkamp v. Culp*, 498 U.S. 42 (1990) (holding that when a creditor files a proof of claim, "the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction.") (cited in *Stern*, 131 S. Ct. at 2617).
[58] *Stern*, 131 S. Ct. at 2618.
[59] *Id.* at 2614 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)).

It was in the context of its discussion of *Katchen, Langenkamp* and *Granfinanciera* (all lawsuits brought by trustees seeking affirmative recoveries), that the *Stern* Court announced a disjunctive test (the "Disjunctive Test") for whether a bankruptcy judge can enter a final order on a trustee's counterclaim:

> Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself *or* would necessarily be resolved in the claims allowance process.[60]

Vickie's counterclaim failed the Disjunctive Test. Vickie's counterclaim did not "stem" from the bankruptcy itself as it did not derive from bankruptcy law and it existed without regard to the bankruptcy proceeding. And it was not necessarily resolved in the claims allowance process because there never existed a reason to believe that the process of ruling on Pierce's proof of claim would necessarily resolve Vickie's counterclaim. Thus, the Court ruled that the bankruptcy judge lacked the constitutional authority to "enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[61] In doing so, it emphasized its narrow ruling stating: "[w]e do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute."[62]

The actual outcome of *Stern*—that a bankruptcy judge cannot enter a final order on a trustee's state law counterclaim against a creditor that is not resolved in the process of ruling on the creditor's proof of claim—tread little new ground. As Chief Justice Roberts observed: if you substitute "tort" for "contract"— and, I would add, "counterclaim" for

---

[60] *Id.* at 2618 (emphasis added).
[61] *Id.* at 2620.
[62] *Id.*

"claim"—you have *Marathon*.[63]  What was novel about *Stern* is that Vickie's counterclaim

falls into one of the enumerated categories of core proceedings in § 157(b)(2).  For the first

time, the Supreme Court held that notwithstanding the statutory designation of a

proceeding as core, a bankruptcy judge could not enter a final judgment in that proceeding.

Unlike *Marathon*, however, the Supreme Court did not find the entirety of Congress's

referral of core proceedings to bankruptcy judges to be unconstitutional, mandating a

congressional fix.  Upon finding "one isolated" instance of constitutional infirmity, the *Stern*

Court dealt with that instance; it did not expand its holding to the entirety of § 157(b)(2).

      The parties directed me to only two post-*Stern* cases addressing the constitutionality

of bankruptcy judges entering final orders confirming plans containing third party releases.[64]

In the first case, *Charles Street African Methodist Episcopal Church of Boston*,[65] the bankruptcy

judge determined he had constitutional authority to enter a final confirmation order

containing releases even though he considered the proposed third party release

inappropriate on the facts before him and ultimately did not confirm the debtor's plan.  In

*Charles Street*, the debtor filed its bankruptcy petition because it was facing foreclosure by its

largest creditor, OneUnited.  OneUnited's loans were secured by the church property and

one of the loans was the subject of a disputed guarantee from the First Episcopal District of

the African Methodist Episcopal Church ("FEDAME").  A complex plan was proposed,

which, as relevant here, contained a release of FEDAME's guaranty obligations.

---

[63] *Id.* at 2615.

[64] As opposed to objecting to the merits of the releases themselves, which is a typical objection, an objection to the bankruptcy court's ability to enter a final order approving third party releases is rare. See *infra* Part I. Our independent research did not reveal reported cases post-*Stern* analyzing constitutional authority to enter final confirmation orders containing releases other than those cited by the parties.

[65] *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66 (Bankr. D. Mass. 2013).

OneUnited objected to the plan on nineteen different grounds, including that the releases were an impermissible means of implementation. Specifically, OneUnited contended that: (i) the bankruptcy court lacked subject matter jurisdiction to approve a plan containing releases; (ii) the bankruptcy court lacked constitutional authority to adjudicate a plan containing third party releases; (iii) § 524(e) prohibits the grant of third party releases; (iv) third party releases cannot be approved over objection; (v) equity barred the release because FEDAME fraudulently induced OneUnited to rely on the guarantee and false financial statements; and (vi) the release did not meet the *Master Mortgage* standards.

In analyzing OneUnited's objection, Judge Bailey first concluded that he had subject matter jurisdiction under § 1334(b) over confirmation of plans, which "is the matter before the Court" and is "the quintessential bankruptcy matter."[66] Next, he concluded that he had constitutional authority to enter a final order confirming a plan with releases. Judge Bailey determined the operative proceeding was the confirmation hearing, which stems from federal law. Indeed, he declared confirmation of a plan to be a public right. And he rejected the same argument now made by Voya on remand, concluding that approval of the release in the plan was not tantamount to adjudication of FEDAME's guaranty, and thus *Stern* did not preclude him from entering a final order confirming a plan containing third party releases. In ruling, Judge Bailey determined that confirmation of a plan is not an adjudication of all the disputes it may touch.

In the second case, *MPM Silicone*, Judge Drain came to the same conclusion. In a bench ruling confirming a plan of reorganization containing releases, Judge Drain stated: "I also should note, because this was raised in the objection, that I firmly believe that I have

---

[66] *Id.* at 99.

jurisdiction over [releases] for the reasons that I stated at the beginning of this ruling, and

that I can issue a final order on it within the confines of *Stern v. Marshall*, given that this is in

the context of the confirmation of the plan, and pertains ultimately to the debtors' rights

under the Bankruptcy Code."[67]

### B. Bankruptcy Judges have Constitutional Adjudicatory Authority to Enter Final Orders Confirming Plans Containing Nonconsensual Releases Under Any Interpretation of *Stern*

#### 1. The Various Interpretations of *Stern*

In the immediate aftermath of *Stern*, courts and commentators debated its

implications.  Some supported a narrow interpretation of *Stern*: *Stern* stands for the sole

proposition that a bankruptcy judge "lacked constitutional authority to enter a final

judgment on a **state law counterclaim** that is not resolved in the process of ruling on a

creditor's proof of claim" (the "Narrow Interpretation").  To support this view, courts and

commentators point to Chief Justice Roberts' repeated and express statements that the

practical consequences of the decision would not be significant, that the limitation imposed

by *Stern* would not "meaningfully change[] the division of labor in the current statute" and

that "the question presented [to the Court] was a 'narrow' one."  Others supported a broad

interpretation of *Stern*, not limited to counterclaims: that a bankruptcy judge cannot enter a

final judgment on **all state law claims, all common law causes of action or all causes of**

**action under state law** (the "Broad Interpretation").  Support for the Broad Interpretation

comes from the varying language used in *Stern*, which does not consistently limit the

---

[67] *MPM Silicones, LLC*, No. 14-22503-rdd, 2014 WL 4436335, at *34 (Bankr. S.D.N.Y. Sept. 9, 2014).  Earlier, Judge Drain stated: "I clearly have jurisdiction with regard to [] issues, which arise under sections 510(a), 502(b)(2), 506(b), 1129(a) and (b) of the Bankruptcy Code, pursuant to 28 U.S.C. sections 157(a)–(b) and 1334(b), as these issues arise under the Bankruptcy Code and in the chapter 11 case, let alone that they're clearly related to the chapter 11 case." *Id.* at *1.

discussion to a "Vickie-type" counterclaim.  Under both the Narrow Interpretation and the

Broad Interpretation, *Stern* is limited to a state law claim or counterclaim brought by the

debtor-in-possession or trustee.  In other words, *Stern* is limited to claims based on state law

that are commenced in the context of traditional civil litigation, or generically

"Debtor/Trustee v. Defendant." [68]

After considering these opposing viewpoints, it appears that my colleagues on the

Delaware bench who have specifically taken a position have consistently adopted the

Narrow Interpretation.  Our research of reported decisions reveals that in adopting the

Narrow Interpretation, Judge Sontchi concluded that *Stern* was "not applicable" to a

complaint asserting equitable subordination,[69] Judge Gross concluded that *Stern* did not

preclude him from entering final orders on fraudulent conveyance and preference actions

brought to augment the estate,[70] Judge Walsh concluded that he could enter final orders on

the core preference, postpetition transfer, fraudulent transfer, and unjust enrichment claims

---

[68] For a fulsome and thoughtful discussion of the Narrow Interpretation and the Broad Interpretation, *see In re USDigital, Inc.*, 461 B.R. 276 (Bankr. D. Del. 2011).

[69] *USDigital*, 461 B.R. at 292 (Sontchi, J.) ("Count 15, which asserts a claim for equitable subordination, is a non-enumerated core proceeding under section 157(b)(2).  Moreover, as it does not involve a state law counterclaim to a proof of claim filed by the trustee, the Supreme Court's holding in *Stern* is not applicable.  The inquiry in this case is limited to the statutory framework. Thus, Count 15 is a core proceeding under both the statute and the Constitution.") (citations omitted).

[70] *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 644 (Bankr. D. Del. 2012) (Gross, J.) ("The Supreme Court expressly took measures to limit the reach and breadth of its opinion and its interpretation by lower courts.  The Court adopts the Narrow Interpretation and holds that *Stern* only removed a non-Article III court's authority to finally adjudicate one type of core matter, a debtor's state law counterclaim asserted under § 157(b)(2)(C).  By extension, the Court concludes that *Stern* does not remove the bankruptcy courts' authority to enter final judgments on other core matters, including the authority to finally adjudicate preference and fraudulent conveyance actions like those at issue before this Court.").

before him,[71] and Judge Carey concluded that *Stern* was not a factor when ruling on a motion to enforce releases in a confirmation order.[72]

Judge Walrath, in her opinion in *WaMu*,[73] did not specifically take a position on the Narrow Interpretation or the Broad Interpretation. Rather, the approach she took might be labeled the "most broad" interpretation, meaning that bankruptcy judges should examine their ability to enter final orders in **all enumerated or unenumerated core proceedings** ("Broadest Interpretation").[74] In *WaMu*, the plan of reorganization's central component was a global settlement of claims and counterclaims among the debtors, the creditors' committee and multiple major parties in the case. Certain major groups of creditors contended that although Judge Walrath could conduct the confirmation hearing she could only present proposed findings of fact and conclusions of law to the district court because the settlement of the estate's claims could only be determined by an Article III court.[75]

---

[71] *Zazzali v. 1031 Exch. Grp. (In re DBSI)*, 467 B.R. 767, 772 (Bankr. D. Del. 2012) (Walsh, J.) ("I agree with my colleagues that *Stern's* holding should be read narrowly and thus restricted to the case of a "state-law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Stern*, 131 S. Ct. at 2620. I note also that numerous other recent decisions have agreed with the narrow interpretation. *See, e.g., Kirschner v. Agoglia (In re Refco, Inc.)*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011); *Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012). Thus, I find that *Stern* is not applicable to this action, as it does not involve a state-law counterclaim by the estate.").

[72] *In re WCI Cmtys., Inc.*, No. 09-52250, 2012 WL 1981713 n.14 (Bankr. D. Del. June 1, 2012) (Carey, J.) ("The parties offered supplemental submissions after the United States Supreme Court's decision in *Stern v. Marshall* 546 U.S. ___, 131 S.Ct. 2594 (2011). The Espinals argue that *Stern* requires that the "State Law" claims raised in the State Court Action be transferred to the Article III district court or to the State Court. The underlying merits of the claims made in the State Court Action are not before me; therefore, *Stern v. Marshall* does not pose a challenge to this Court's jurisdiction.").

[73] *In re Wash. Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 23, 2012).

[74] In *Charles Street*, Judge Bailey appears to have adopted the Broadest Interpretation by entertaining the possibility that the grant of authority in § 157(b)(2)(L)—confirmation of a plan—could be unconstitutional. 499 B.R. at 99–100.

[75] The objectors had argued in their written submissions that the court did not have authority to conduct the confirmation hearing at all, but they modified their position at the commencement of the confirmation hearing. *See Wash. Mut.*, 461 B.R. at 213.

Judge Walrath rejected the objectors' argument for three separate reasons. First, she recognized the historical practice of approval of settlements dating back to the Bankruptcy Act. She noted that compromises are integral to bankruptcy cases, that compromises are often included in plans of reorganization, and that confirmation of a plan is "within the bankruptcy court's core jurisdiction."[76] Second, Judge Walrath looked at the nature of settlement approval. She observed the "fundamental difference" between approving a settlement of a claim and adjudicating the merits of a claim. She ruled that a court does not need jurisdiction over the underlying claims in order to approve a compromise of them. She also examined the standard the court considers when approving a settlement and held that the standard, which is the "lowest point in the range of reasonableness" establishes that the court is not ruling on the merits of the claims being settled.[77] Finally, Judge Walrath found the approval of the global settlement "particularly within the core jurisdiction" of the bankruptcy court because it dealt with a determination of whether property is property of the estate.

At bottom, Judge Walrath concluded she had jurisdiction to both hear and determine confirmation of the *WaMu* plan, which incorporated the global settlement. In her Broadest Interpretation of *Stern*, Judge Walrath did not try to squeeze the proverbial "square peg" of confirmation into the proverbial "round hole" of trustee claims and counterclaims. In other words, Judge Walrath did not import the Disjunctive Test into her analysis; she tailored her constitutional argument to the proceeding in front of her.

---

[76] *Id.* at 215 (quoting *AOV Indus.*, 792 F.2d at 1145–46 ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law . . . . Accordingly, we find that the bankruptcy court had jurisdiction to approve [them].")).

[77] "The lowest point in the range of reasonableness is far from the standard required for an Article III court to enter a final determination on the merits of the claims." *Id.* at 216 (quotation omitted).

### 2. The Operative Proceeding is Confirmation of a Plan, Which is Governed by a Federal Standard

In this matter, the operative proceeding for purposes of a constitutional analysis is confirmation of a plan. Confirmation of a plan is not a "claim" or "counterclaim." It is not an "action" as the word is used in *Stern*.[78] The confirmation process is commenced by the filing of a disclosure statement, which, once approved, may be noticed out together with the plan and ballots soliciting acceptances and rejections.[79] In addition to classifying claims and specifying treatment for those claims, plans may seek approval of sales, assumption or rejection of contracts, substantive consolidation, equitable subordination and, as it did here, approval of settlements and releases. An objection transforms the confirmation hearing into a contested matter.[80]

"Confirmations of plans" is an enumerated core proceeding under 28 U.S.C. § 157(b).[81] As such, I have statutory authority to enter a final judgment on confirmation of a plan under *Stern*.[82] The question then becomes whether I have constitutional authority to do so. Adopting the Narrow Interpretation, *Stern* is inapplicable as confirmation of a plan is not "a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." Adopting the Broad Interpretation, the same is true: *Stern* is inapplicable as confirmation of a plan is not a state law claim of any type. Under both of these

---

[78] In context, the word "action" in *Stern* means a complaint or counterclaim: "*Granfinanciera's* distinction between **actions** that seek to 'augment the bankruptcy estate' and those that seek 'a pro rata share of the bankruptcy *res*,' *ibid.*, reaffirms that Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case: the question is whether the **action** at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499 (emphasis added).

[79] *See* FED. R. BANKR. P. 3017.

[80] *See* FED. R. BANKR. P. 3020(b)(1).

[81] 28 U.S.C. § 157(b)(2)(L).

[82] *See Stern*, 131 S. Ct. at 2605.

interpretations, then, my constitutional analysis stops. My inquiry is limited to the statutory framework, and I can enter a final order confirming Millennium's Plan as a constitutional matter.[83]

The outcome is the same if I adopt the Broadest Interpretation. First, confirmation of a plan is a "proceeding[] at the core of bankruptcy law,"[84] or, in other words, a quintessential "core" proceeding.[85] Confirmation of a plan is the goal of chapter 11 cases, and is "historically a core competency of the bankruptcy court."[86] "Confirmations of plans," which are "matters of administration" are "unique to bankruptcy cases."[87]

Second, in confirming a plan, even one with releases, the judge is applying a federal standard. To confirm a plan, it must satisfy each subsection of § 1129(a) and (b), as applicable. To the extent a *Stern* analysis requires a specific look at releases (and it is not clear that it does), those releases must comply with applicable provisions of the Bankruptcy Code. Courts that permit releases in appropriate circumstances often look to §§ 1129(a)(1),[88] 1123(b)(6)[89] and 105.[90] Courts that do not permit releases often cite § 524(e).[91] Regardless,

---

[83] *See USDigital*, 461 B.R. at 292.

[84] *AOV Indus.*, 792 F.2d at 1145.

[85] *Charles St.*, 499 B.R. at 99.

[86] *In re Manchester Oaks Homeowners Ass'n, Inc.*, No. 11–10179–BFK, 2014 WL 961167, at *7 (Bankr. E.D. Va. Mar. 12, 2014). *See also id.* at *8 ("This case does not involve the entry of a money judgment, and does not raise the kind of systemic concerns at issue in *Stern*.").

[87] *See* 1 COLLIER ON BANKRUPTCY ¶ 3.02[3][a].

[88] 11 U.S.C. § 1129(a)(1) (The court shall confirm a plan only if: "The plan complies with the applicable provisions of this title.").

[89] 11 U.S.C. § 1123(b)(6) (plans may "include any other appropriate provision not inconsistent with the applicable provisions of this title.").

[90] 11 U.S.C. § 105(a) ("The court may issue any order process, or judgment that is necessary to carry out the provisions of this title.").

[91] 11 U.S.C. § 524(e) ("Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

courts are interpreting federal law.  As the Seventh Circuit held, whether these releases are legally permissible is a matter the bankruptcy court has the power to determine.[92]

In the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if they meet the *Continental* standard of fairness and necessity to the reorganization.[93]  In my Bench Ruling, I held that the releases in the Millennium Plan met that standard after examining the *Continental* hallmarks and the *Master Mortgage* factors.[94] The *Master Mortgage* factors, like the *Dow* factors[95] (or any other standard in circuits that permit third party releases), are a federal, judicially-created yardstick against which a third party release is measured:

> The *Master Mortgage* Court cites five factors to consider in allowing a release of a third party as part of a plan of reorganization: (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[96]

The above five factors compel the bankruptcy judge to examine the terms of the plan of reorganization, the outcome of the solicitation of the plan and the necessity of the injunction to the success of the plan.  These factors do not ask the bankruptcy judge to examine or

---

[92] *Specialty Equip.*, 3 F.3d at 1045.  *See also* discussion *supra* concerning *AOV Indus.*, *Charles St.*, and *MPM Silicones*.
[93] Bench Ruling Hr'g Tr. 24:19–22.  *See also Continental*, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions . . . .").
[94] Bench Ruling Hr'g Tr. 16:12–26:14.
[95] *See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657–58 (6th Cir. 2002).
[96] *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund*, 168 B.R. 930, 937 (Bankr. W.D. Mo.)).

make rulings with respect to the many claims that may be released by virtue of the third party releases.[97] An order confirming a plan with releases, therefore, does not rule on the merits of the state law claims being released.[98]

Further, there is no state law equivalent to confirmation of a plan. And, third party releases do not exist without regard to the bankruptcy proceeding.[99] Rather, a ruling approving third party releases is a determination that the plan at issue meets the federally created requisites for confirmation and third party releases.[100] Thus, looking to historical context, the nature of confirmation and the standard the judge applies to determine whether

---

[97] *Cf. AOV*, 792 F.2d at 1153 (in determining whether it could grant effective relief to objector Hawley on its objection that the plan discriminated among creditors, the D.C. Circuit stated: "The [favorable state court] holding for Steag does not affect the propriety of the Plan's treatment of appellant, any more than the verdict favorable to Hawley would have. *The current case is not concerned with the merits of the underlying claims; the focus is on whether the Plan as devised treats some creditors unfairly.*") (emphasis added); *In re WCI Communities, Inc.*, No. 09–52250 (KJC), 2012 WL 1981713 n.14 (reorganized debtor filed an adversary proceeding against putative state court class action plaintiffs to enforce releases and injunction in confirmation order channeling certain claims to a trust. In finding jurisdiction, Judge Carey stated: "the underlying claims in the State Court Action are not before me; therefore *Stern v. Marshall* does not pose a challenge to this Court's jurisdiction.").

[98] *See, e.g., Charles St.*, 499 B.R. at 99 ("Confirmation of a plan is not an adjudication of the various disputes it touches upon—the Guaranty being here but one of many; it is a total reorganization of the debtor's affairs in a manner available only in bankruptcy.").

[99] *Cf. Stern*, 131 S. Ct. at 2618 ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").

[100] *Cf. In re Okwonna-Felix*, No. 10–31663–H4–13, 2011 WL 3421561 (Bankr. S.D. Tex. Aug. 3, 2011) ("In the dispute at bar, the Debtor is requesting this Court to approve a settlement under an express bankruptcy provision, i.e., Bankruptcy Rule 9019. This Rule gives bankruptcy courts discretion to approve a compromise. State law has no equivalent to Bankruptcy Rule 9019. Moreover, the factors which bankruptcy courts are required to review in making a determination of whether or not to approve a settlement have been developed entirely by the federal courts, including the Supreme Court of the United States. *See United States v. Key*, 397 U.S. 322 (1970); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Accordingly, because the resolution of the Motion is not based on state common law, but entirely on federal bankruptcy law (both the Rule and the case law instructing how to apply the Rule), the holding in *Stern* is inapplicable, and this Court has the constitutional authority to enter a final order in this contested matter pursuant to 28 U.S.C. §§ 157(a) and (b)(1).").

releases are appropriate, a bankruptcy judge has constitutional adjudicatory authority to enter a final confirmation order containing nonconsensual third party releases.[101]

### 3. Voya's Interpretation Finds no Basis in *Stern*

Voya does not agree with the Narrow, Broad, or Broadest Interpretation of *Stern*. Voya rejects both the Narrow Interpretation and the Broad Interpretation as it applies *Stern* outside the context of traditional civil litigation, i.e., § 157(b)(2)(C) (a counterclaim by a debtor à la Vickie's counterclaim), a complaint filed by the trustee to augment the estate (à la Northern Pipeline's breach of contract suit against Marathon) or an objection to a proof of claim (à la Pierce's proof of claim).  Voya also rejects the Broadest Interpretation as it recognizes but ignores the context of the proceeding before the court (confirmation of a plan).  Rather, Voya contends that because it filed the RICO Lawsuit, the *Stern* analysis I must do in the confirmation context focuses on that lawsuit.  Voya inserts its claims in the RICO Lawsuit into the *Stern* Disjunctive Test and contends that they neither stem from the bankruptcy itself nor are resolvable in the claims allowance process (the "Voya Interpretation").  Voya, therefore, concludes that I cannot enter a final order confirming a plan that releases those claims.

Assuming that it is ever appropriate to import the Disjunctive Test into a context other than a state law cause of action filed by a trustee/debtor (i.e., complaint or counterclaim),[102] Voya does not point to anything in *Stern*, or in any case interpreting *Stern*, suggesting that the "action at issue" should be a proceeding other than the operative proceeding before the bankruptcy judge.  The *Stern* Court looked at Vickie's counterclaim in

---

[101] *See Wash. Mut.*, 461 B.R. at 213–17.
[102] I would be remiss if I did not point out prior to the conclusion of my analysis that RICO claims, which are the predominant claims asserted in the RICO Lawsuit, are not claims based on state law.

-31-

the adversary proceeding before the bankruptcy court and in light of Pierce's proof of claim.
It did not, for example, look at the Texas Litigation Vickie commenced prepetition. Nor did
it rule on the basis that a court properly exercising bankruptcy jurisdiction could not affect
the Texas Litigation. And, there was no other "action at issue" before the bankruptcy judge
to look at; certainly confirmation of a plan was not before the bankruptcy judge. Focused as
it was on an actual *claim,* albeit a counter*claim* in an adversary proceeding (and comparing
Vickie's counterclaims to the claims asserted in *Katchen, Langenkamp, Granfinanciera* and
*Marathon*), the *Stern* Court defined what was constitutional in that context—a counterclaim
by the debtor/trustee against a third party. [103] The *Stern* Court examined Pierce's right to an
Article III adjudication on Vickie's counterclaim and found that Vickie's claim "is in no
way derived from or dependent upon bankruptcy law,"[104] neither was there "reason to
believe that the process of ruling on Pierce's proof of claim would necessarily result in the
resolution of Vickie's counterclaim."[105]

    Voya's inverse reasoning finds no justification in *Stern*. *Stern* did not address, either
expressly or by implication, any context other than counterclaims; the Supreme Court
certainly did not announce a broad holding addressing every facet of the bankruptcy
process. *Stern* did not hold, as Voya suggests, that regardless of which articulated (or
unarticulated) core proceeding is before the court, the bankruptcy judge cannot, consistent
with the Constitution, enter a final order in that core proceeding if that order affects a
party's entitlement to have a debtor's or trustee's state law claim heard by an Article III

---

[103] *Cf. Cottonwood P'ship, L.L.P. v. Kivisto (In re SemCrude L.P.),* No. 11-1174 (SLR), 2012 WL
5554819, at *3 (D. Del. Nov. 15, 2012) (affirming the bankruptcy court's decision to look at the
motion before it—a motion to enjoin—and not the subject matter of the underlying litigation
pending in a different court when conducting its jurisdictional analysis).
[104] *Stern*, 131 S. Ct. at 2618.
[105] *Stern*, 131 S. Ct. at 2617–18.

court. All the more, *Stern* does not endorse the Voya Interpretation—that "[u]nder *Stern*, Article III prevents a bankruptcy court from entering final judgment disposing of a non-bankruptcy claim against a non-debtor that is not resolved as part of the claim resolution process, regardless of the proceeding (adversary proceeding, contested matter, plan confirmation, etc.)."[106]

But, if I were going to import the *Stern* Disjunctive Test into Millennium's plan confirmation proceeding, it would be closer to the Debtors' analysis.[107] First, however, I would conclude that confirmation of the Plan, as the operative proceeding, satisfies the first standard articulated in the Disjunctive Test. For all of the reasons set forth above, I would find that the Plan (and/or the releases) "stem(s) from the bankruptcy case" and thus I can, consistent with the Constitution, enter a final order confirming Millennium's Plan. Second, I would also conclude that the confirmation of the Plan satisfies the second standard articulated in the Disjunctive Test. As I already found, the releases were integral to confirmation and thus integral to the restructuring of the debtor-creditor relationship. Thus, the releases would be "necessarily resolved in the confirmation process" or "necessarily resolved in the process of restructuring the debtor-creditor relationship."

Finally, even under the Voya Interpretation, on the facts of this case I would determine that the RICO Lawsuit was "necessarily [] resolved in the claims allowance process." As previously discussed, the Plan settlements were comprehensive in nature. The settlements provided for the contribution of $325 million in exchange for the releases by the

---

[106] Opt-Out Lenders' Opening Brief on Remand Issues at 19.
[107] The Debtors' position is most akin to the Broadest Interpretation in that they extend the Disjunctive Test beyond § 157(b)(2)(C). But, the Debtors do not argue that the court should look at "whether the action at issue"—i.e., the confirmation proceedings (or the releases)—"stems from the bankruptcy itself." Rather, the Debtors import the Disjunctive Test and contend that the court must look at whether the releases "would necessarily be resolved in the confirmation process."

Debtors and third parties (including Voya), the settlement with the USA Settling Parties, as well as the allowance and treatment of claims under the Existing Credit Agreement.[108]  The settlement was global in nature: the claims under the Existing Credit Agreement were "Allowed," but only in the context of the Plan funded by the Non-Debtor Equity Holders, which required the third party releases.  Voya held such a claim, and so its claim was "Allowed" by virtue of the Plan.  As third party releases were essential to the allowance of those claims, the RICO Lawsuit was necessarily resolved in the claims allowance process.[109]

### C. A Bankruptcy Judge's Final Order on a Core Issue That May Have a Preclusive Effect on a Third Party Lawsuit Does Not Violate *Stern*

Voya also contends that it is unconstitutional for a bankruptcy judge to enter a final order in any context if that final order might affect a lawsuit filed by a creditor against a third party.  Voya is incorrect.  While the Third Circuit has not directly ruled on the question before me on remand, it has ruled that *Stern* does not prevent a bankruptcy judge from entering final orders in statutorily core proceedings notwithstanding the orders' collateral impact on state law claims.

In *In re Lazy Days' RV Center Inc.*,[110] the bankruptcy court re-opened a confirmed bankruptcy case at the request of the reorganized debtor in order to rule on whether a purchase option in an assigned lease that was the subject of a prepetition settlement agreement incorporated into a plan of reorganization survived in light of § 365(f) of the

---

[108]  The Plan provided: "Class 2 consists of all Existing Credit Agreement Claims.  The Existing Credit Agreement Claims are *Allowed Claims* in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims."  Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. at 22, Nov. 10, 2015, D.I. 14.
[109]  *See Fisher Island Invs., Inc. v. Solby+Westbrae Partners (In re Fisher Island)*, 778 F.3d 1172, 1192 n.13 (11th Cir. 2015) (noting that even if ownership of a debtor is not generally a core issue, the facts of the case made it core as the issue was the central one in the case).
[110]  724 F.3d 418 (3d Cir. 2013).

Bankruptcy Code. Post-confirmation, the reorganized debtor attempted to exercise the

purchase option, but the landlord refused to honor it. The landlord and the reorganized

debtors each filed separate lawsuits in Florida state court to determine their respective rights

under the lease. The reorganized debtors also filed an emergency motion in the bankruptcy

court seeking a ruling that the lease's anti-assignment clause was unenforceable. The

bankruptcy judge ruled that the anti-assignment provision in the lease was unenforceable

and that the landlord's refusal to honor the purchase option violated the settlement

agreement. On appeal, the district court vacated the bankruptcy judge's order finding it to

be an advisory opinion. On further appeal, the Third Circuit reversed the district court's

ruling and remanded.

Among the issues on appeal, the Third Circuit addressed the landlord's argument

that the bankruptcy judge unconstitutionally "asserted subject matter jurisdiction over a

private rights dispute."[111] The court quickly dispatched this argument, ruling that unlike

*Stern*, *Granfinanciera* and *Marathon*, which "dealt with the difficult question of when a

bankruptcy court may constitutionally exercise jurisdiction over common law claims":

> By contrast, the Bankruptcy Court in this case did not decide a question of
> state common law, but rather determined whether, in light of 11 U.S.C.
> § 365(f)(3), an anti-assignment clause survived the Settlement Agreement it
> had confirmed as part of a Chapter 11 bankruptcy. **Here, the Reorganized
> Debtors' claim for relief was based on a federal bankruptcy law provision
> with no common law analogue, so the *Stern* line of cases is plainly
> inapposite.**[112]

In analyzing the *Stern* argument, the court looked at the proceeding before it—the motion to

reopen the bankruptcy case and the request for a declaration of rights under a section of the

---

[111] *Id.* at 423.
[112] *Id.* at 423 (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)) (emphasis added).

Bankruptcy Code. It did not look at the Florida state law claims. The Third Circuit was not

oblivious to the state law litigation, however, as the landlord also argued that the mandatory

abstention provision of 28 U.S.C. § 1334(c)(2) required the bankruptcy court to defer to

pending state law litigation.[113] The Third Circuit quickly dispatched of this argument

as well:

> As we noted already, **although this proceeding may have been provoked by
> state court actions and surely impacted them, the proceeding in the
> Bankruptcy Court was founded upon a quintessentially federal claim,** *viz.,*
> whether the anti-assignment clause was invalid under 11 U.S.C. § 365(f)(3).
> **Furthermore, this dispute "aris[es] in a case under the title 11"** as the
> Bankruptcy Court was asked to interpret and enforce a reorganization plan
> which was entered as part of Lazy Days's Chapter 11 bankruptcy.[114]

Applying *Lazy Days* here shows that the *Stern* line of cases is inapposite. The Third

Circuit in *Lazy Days* focused on the operative proceeding in front of the bankruptcy judge,

not the state law claims. Here, the operative proceeding is confirmation of a plan of

reorganization under § 1129 of the Bankruptcy Code, a proceeding "based on a federal

bankruptcy law provision with no common law analogue." And, even if the operative

proceeding is more narrow—namely, Millennium's request for confirmation of a plan that

---

[113] § 1334(c)(2) provides:
> Upon timely motion of a party in a proceeding based upon a State Law claim or
> State law cause of action, related to a case under title 11 but not arising under title 11
> or arising in a case under title 11, with respect to which an action could not have
> been commenced in a court of the United States absent jurisdiction under this
> section, the district court shall abstain from hearing such proceeding if an action is
> commenced, and can be timely adjudicated, in a State forum of appropriate
> jurisdiction.

[114] *Lazy Days*, 724 F.3d at 424 (emphasis added). The Third Circuit reversal of the district court's
opinion also demonstrates the Third Circuit was aware that the bankruptcy court's ruling would
impact the pending state court litigation. In the district court opinion, the judge stated that: "it is
crystal clear that the reorganized debtors went to the Bankruptcy Court to get an opinion that could
be submitted to the Florida courts" and found, therefore, that the bankruptcy court had issued an
advisory opinion on the survivability of the purchase option, which was the subject of the Florida
litigation.

includes third party releases—the *Stern* line of cases is still inapposite.  There is no state law

analogue; third party releases in chapter 11 plans are quintessentially federal in nature.

Whether this requested relief is permissible or not is based entirely on federal bankruptcy

law—the *Continental* hallmarks.

Even more recently (on March 20 of this year), the Third Circuit held in *Linear*

*Electric Company, Inc.*[115] that *Stern* did not prevent a bankruptcy judge from entering a final

order "discharging" construction liens filed by a non-debtor supplier against real property

owned by a non-debtor.  Pursuant to New Jersey state law, a supplier who sells materials on

credit to a contractor who then incorporates those materials into property owned by a third

party may file a lien against the third parties' real property if the supplier goes unpaid.

Linear, the contractor/debtor, filed its chapter 11 petition at a time when two of its suppliers

had not been paid in full.  The suppliers thereafter filed construction liens on the real

property into which Linear had incorporated their materials.  Linear immediately filed a

motion with the bankruptcy court to discharge the liens against the real property (owned by

a non-debtor) as violating the automatic stay asserting that the liens were, in actuality,

against the funds the non-debtor owed Linear (i.e., Linear's accounts receivable).  The

bankruptcy judge granted the motion and the non-debtor owner paid its outstanding

account payable to Linear.  The bankruptcy judge also held the suppliers' construction liens

to be void *ab initio* for violation of the automatic stay.[116]

On appeal, the suppliers argued that the bankruptcy judge could not enter a final

order invalidating their state law construction liens consistent with the constitutional

---

[115] *In re Linear Elec. Co., Inc.*, 852 F.3d 313 (3d Cir. 2017).
[116] The bankruptcy judge did rule that the date of the filing of the liens could be treated as a notice under 11 U.S.C. § 546(b), which generally provides relation back lien protection against the debtor's interests.  *See Linear*, 852 F.3d at 319.

proscriptions found in *Stern* because their filed state law liens against the non-debtor owner were private rights entrusted to Article III courts. The Third Circuit disagreed. While acknowledging that bankruptcy judges cannot enter final orders on certain state common law claims between private parties without their mutual assent, the Third Circuit found that Congress could assign cases involving "public rights" to non-Article III courts. The Third Circuit described public rights cases as those cases "in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority."[117] Looking at the operative proceeding—the motion alleging violation of the automatic stay—the court held:

> **Those claims arise under the federal bankruptcy laws. As such, any rights at issue are rights created by Congress, and such rights are public rights.** Article III does not prevent a non-Article III court from resolving cases regarding public rights; thus the Bankruptcy Court could constitutionally determine whether the liens violated the automatic stay.[118]

*Linear* is significant for multiple reasons. Post-*Stern* and *Wellness Int'l Network, Ltd. v. Sharif*,[119] the Third Circuit has spoken more definitively than the Supreme Court on bankruptcy and public rights. The Third Circuit has now declared that claims arising under the federal bankruptcy laws are public rights.[120] In *Linear* the "claim arising under the federal bankruptcy laws" was the debtor's motion for violation of the automatic stay arising under section 362 of the Bankruptcy Code; here, it is the Debtors' request for confirmation of a plan arising under section 1129 of the Bankruptcy Code (or, more narrowly, the third

---

[117] *Id.* at 320 & n.31 (quoting *Stern*, 131 S. Ct. at 2613).
[118] *Id.* at 320 (emphasis added).
[119] 135 S. Ct. 1932 (2015).
[120] *See Linear*, 852 F.3d at 319–20.

party releases under the *Continental* hallmarks.) As such, the Third Circuit has effectively

endorsed the view that confirmation of a plan is a public right.

Further, the posture of *Linear* and *Millennium* are similar, compelling similar results.

Although not stated in *Linear*, it seems clear that the direct claim of the suppliers to a

construction lien on the non-debtor owner's real property interests would be, at most,

"related to" the bankruptcy case, while the motion for violation of the automatic stay is

core. Notwithstanding the decision on the merits, the Third Circuit recognized that the

suppliers had two sources of recovery; they could have asserted liens against both the

debtor's accounts receivable and the non-debtors' real property.[121] Thus, the bankruptcy

court's ruling that the construction liens were void *ab initio* "surely impacted" any claims

that the non-debtor suppliers had against the non-debtor's real property interests.[122] There is

no question, then, that, if the proper standard is met, a bankruptcy judge may enter a final

order in a core matter that impacts or even precludes a state law action between two non-

debtors.[123]

---

[121] *See id.* at 323 ("Hence the text of the Construction Lien Law provides no reason to believe that
the liens are not *also* against Linear Electric's accounts receivable (*in addition to the development owners'
real property interests.*") (second emphasis added).
[122] It might be argued that the automatic stay will lift once a discharge is granted or the case is
dismissed so there is no harm to the supplier. But, because New Jersey lien law requires the
supplier's lien to be lodged of record within, at most, 120 days following the date the material was
supplied for which payment is claimed, N.J. STAT. ANN. § 2A:44A-6(a)(2), the Third Circuit's ruling
left the suppliers without a remedy against the non-debtor owner. "For better or for worse, the
automatic stay requires that [the suppliers] wait as Linear Electric's bankruptcy case proceeds and
receive whatever they will receive under bankruptcy law *without resort to other mechanisms to claim
greater payments." Id.* (emphasis added).
[123] A Westlaw search revealed seven Third Circuit cases that cite *Stern.* The other five are:
(1) *In re Prosser*, 574 F. App'x 82, 84 (3d Cir. 2014) (holding in context of turnover action and
without discussion, that *Stern* "does not alter this [subject matter jurisdiction] analysis, because this
case does not involve a counterclaim, nor is it solely based on state law."). This panel appears to
adopt the Narrow Interpretation.
(2) *Holber v. Suffolk Constr. Co. (In re Red Rock Servs., Co.)*, 642 F. App'x 110, 114–15 (3d Cir. 2016)
(non-debtor subcontractor filed proof of claim in contractor/debtor's bankruptcy case asserting
damages for breach of contract; debtor filed adversary proceeding against subcontractor asserting

The Third Circuit is not the only circuit drawing this conclusion. The Sixth Circuit

in *In re Hart*[124] also ruled *Stern* did not preclude the entry of a final order by a bankruptcy

judge even though that order would appear to indirectly preclude certain state law claims.

In *Hart*, the bankruptcy judge entered a judgment finding a bank's loans to debtor Hart

nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code. At the bank's request and

---

same; Third Circuit held that the bankruptcy court had constitutional authority to enter a final order
on all state law claims because they were "inextricably interlinked with the claims flowing from the
adversary proceeding and, consequently, from the federal bankruptcy statutory regime." The state
law claims had to be resolved to determine whether the debtor and the creditor had claims against
each other.) This panel appears to adopt the Broad Interpretation of *Stern*, and suggests that the
claims process is part of the federal bankruptcy statutory scheme.
(3) *Carr v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, **544 F. App'x 70,
73–74 (3d Cir. 2013)** (Creditor and debtor settled creditor's state law damages claim based on fraud
and violation of the Truth-in-Lending Act. Creditor subsequently asserted that debtor had
fraudulently induced her into settling claim and asserted that the bankruptcy court did not have
authority to enter a final order on her claims. The Third Circuit distinguished Vickie's counterclaim
and held that the creditor's fraudulent inducement was "irreversibly intertwined" with the previous
settlement of the creditor's claims.). This panel appears to adopt the Broad Interpretation.
(4) *One2One Commc'ns, LLC v. Quad/Graphics, Inc. (In re One2One Commc'ns, LLC)*, **805 F.3d 428,
433 (3d Cir. 2015)** (in the context of a concurring opinion discussing equitable mootness, Judge
Krause states: "Thus, the Court in *Stern* made clear that non-Article III bankruptcy judges do not
have the constitutional authority to adjudicate a claim that is exclusively based upon a legal right
grounded in state law despite appellate review of the bankruptcy judge's decision by an Article III
judge. However, Stern did not consider the authority of bankruptcy judges to make final
determinations regarding other kinds of claims and counterclaims brought by debtors and creditors,
nor did *Stern* consider whether Article III requires appellate review of a bankruptcy judge's decisions
by an Article III judge. Accordingly, we are obligated to apply this Court's equitable mootness
doctrine notwithstanding *Stern*."). Judge Krause's discussion suggests the Broad Interpretation. She
also suggests that a bankruptcy judge can enter a final order confirming a plan containing releases.
*See id.* at 445 ("Although Article III judges decide whether an appeal is equitably moot, bankruptcy
courts control nearly all of the variables in the equation, including whether a reorganization plan is
initially approved, whether a stay of plan implementation is granted, whether settlements or releases
crucial to a plan are approved and executed, whether property is transferred, whether new entities
(in which third parties may invest) are formed, and whether distributions (including to third parties)
under the plan begin—all before plan challengers reach an Article III court.").
(5) *Tribune Media Co. v. Aurelius Capital Mgmt. (In re Tribune Media Co.)*, **799 F.3d 272 (3d Cir.
2015)** (mentioning *Stern* in concurring opinion responding to Judge Krause's concurrence in
*One2One*; not relevant for current analysis).
In sum, the Third Circuit has either adopted the Narrow Interpretation (*Prosser*), the Broad
Interpretation (*RedRock, New Century, One2One* (concurrence)) or the Broadest Interpretation (*Lazy
Days, Linear*) in each of its reported decisions.
[124] *Hart v. S. Heritage Bank (In re Hart)*, 564 F. App'x 773 (6th Cir. 2014).

over Hart's *Stern* objection, the bankruptcy judge also entered judgment on the amount of

each non-dischargeable loan.  The Sixth Circuit distinguished *Stern* both factually and

legally.  Factually, unlike Vickie, Hart did not assert a counterclaim in the

nondischargeabilty proceeding; only the bank's claim was before the bankruptcy court.

Legally, unlike Vickie's counterclaim, the bank's claim against Hart arose in the bankruptcy

case and was an enumerated core matter under § 157(b)(2)(I)–(J).[125]  The court also

concluded that the bankruptcy court could enter a final order on the amount of a claim in

the dischargeability context under Sixth Circuit precedents.[126]

     *Hart* rejected the debtor's argument that the bankruptcy judge lacked constitutional

authority to enter a final judgment because of pending state court litigation even though it

precluded Hart from filing and pursuing counterclaims in that litigation.  As relevant here,

the Sixth Circuit recognized the distinction between entering a judgment that directly

extinguished counterclaims filed in state court (which *arguably* exceeded the bankruptcy

court's constitutional authority) and entering a monetary judgment on dischargeability (a

federal issue that indirectly precluded Hart from filing her counterclaim in state court).  As

the Sixth Circuit observed: "Hart should not be able to escape the collateral effects of the

bankruptcy court's decision made under proper authority."[127]

---

[125] Consisting of "determinations as to the dischargeability of particular debts," and "objections to discharges."  *See* 28 U.S.C. § 157(b)(2)(I)–(J).

[126] The panel deciding *Hart* may have felt constrained by its previous rulings, as the *Hart* court recognized that "bankruptcy courts' well-settled statutory and constitutional authority to make dischargeability determinations is *distinct* from the question of whether the bankruptcy courts may enter a final monetary judgment after determining the amount of the discharge." *Hart*, 564 F. App'x at 776 n.1.

[127] *Id.* at 777.

In *In re Fisher Island Investments, Inc.*,[128] the Eleventh Circuit held that a bankruptcy judge had both statutory and constitutional authority to enter a final order determining which of two non-debtor entities owned three alleged debtors in the context of involuntary bankruptcy filings. The involuntary bankruptcy proceedings were "but a small part of global litigation" over the ownership and control of a wealthy businessman's assets, a dispute "spawn[ing] litigation in the Republic of Georgia, the United Kingdom, Liechtenstein, the British territory of Gibraltar, and both state and federal courts in the United States."[129]

Prepetition, two factions (the Redmond Group and the Zeltser Group) were litigating the ownership issues in New York and California. When the petitioning creditors filed the involuntary petitions, they also moved for joint administration of the cases and to appoint a trustee to take control of the alleged debtors' assets. The Zeltser Group answered the involuntary petition on behalf of the alleged debtors consenting to all the relief sought. The Redmond Group claimed it was the authorized representative of the alleged debtors, moved to strike the Zeltser Group's answer and alleged that the involuntary petitions were improperly filed to stay the state court ownership litigation. Ultimately, the bankruptcy judge ruled in favor of the Redmond Group. Zeltser appealed.

At the circuit court level, the court ruled that the ownership dispute was "core" and that the bankruptcy judge had both statutory and constitutional authority to enter a final judgment. The court determined that resolution of the ownership issue was critical to the administration of the alleged debtors' estates and directly affected the debtor-creditor

---

[128] *Fisher Island*, 778 F.3d 1172.
[129] *Id.* at 1177.

relationship thus falling within the catch-all enumerated core proceedings of §§ 157(b)(2)(A) and (O).[130] It further concluded that the bankruptcy judge necessarily had to determine who owned the alleged debtors in order to adjudicate the involuntary petitions and the $32 million in alleged debt because one faction admitted the debt and the other did not.[131] Alternatively, the Eleventh Circuit found that the Zeltzer Group consented to the bankruptcy court's final adjudication of the ownership issue by its actions and representations and even invoked the aid of the bankruptcy court on the issue.

As for *Stern,* the Eleventh Circuit determined that its "narrow holding" was "wholly inapplicable."[132] It recognized that the ownership issue resembled Vickie's counterclaim as it was a state law claim that did not involve public rights, or stem from the federal regulatory scheme.  Further, the ownership issue did not involve a particularized area of the law nor was it determined by bankruptcy law.  And although the court concluded that the ownership issue was "necessarily resolved by the bankruptcy court through the process of adjudicating the creditors' claims," the claims process was not the proof of claim process referenced by the *Stern* court as the "relevant parties" did not file a proof of claim.  Rather, the "claims process" appears to be the involuntary petition itself.[133]  As the court repeatedly emphasized, determining the authorized representative of the debtor was a threshold issue in the case because it was necessary to determine whether the involuntary petition was

---

[130]  28 U.S.C. § 157(b)(2)(A) (core proceedings include "matters concerning the administration of the estate"); § 157(b)(2)(O) (core proceedings include "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.").
[131]  It is unclear from the opinion whether the Zeltzer Group actually contested the debt, contested the involuntary petition, or both.
[132]  *Fisher Island,* 778 F.3d at 1192.
[133]  There is no suggestion in the opinion that the three creditors who filed the involuntary petition were in any way involved in the ownership dispute.

contested or not.[134] Thus, the Eleventh Circuit ruled that the bankruptcy judge could enter

a final order on the ownership issue, notwithstanding its substantial impact on the pending

proceedings in other courts.[135]

Here, the entry of the order confirming Millennium's Plan did collaterally impact the

RICO Lawsuit—I undoubtedly provided the Non-Debtor Equity Holders with a defense

that they can use in any continuation of the RICO Lawsuit before Judge Sleet. Whether

that defense is the affirmative defense of *res judicata* (as Voya contends), release,[136] a Rule

12(b)(1) mootness defense,[137] issue preclusion, or a defense that the claim should be barred

by reason of § 1141 of the Bankruptcy Code,[138] the confirmation order has *surely impacted* the

RICO Lawsuit. But, as can be seen from *AOV Industries, Specialty Equipment, Lazy Days,*

*Linear, Hart, Fisher Island* and any number of other cases, a bankruptcy court order that

impacts a litigant's state law claims even when litigation is pending does not violate

---

[134] In an interesting footnote, the 11th Circuit stated that even if ownership of a debtor is not generally a core issue, the facts of the case made it core as the issue was the central one in the case. *See Fisher Island*, 778 F.3d at 1192 n.13.

[135] I recognize that in *Lazy Days, Hart* and *Fisher Island*, each objecting party received some sort of adjudication on at least a part of the actual merits of its claims whereas here there has been no hearing on the merits of the RICO Lawsuit. The hearings the objectors received, however, were not the Article III adjudications they requested.

[136] FED. R. CIV. P. 8(c) lists release as an affirmative defense. ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . release . . . ."). Release is a concept distinct from *res judicata*, another enumerated affirmative defense.

[137] Voya's claims may have been made moot due to the impossibility of recovery. *See In re AE Liquidation, Inc.*, 435 B.R. 894, 903 (Bankr. D. Del. 2010) (rejecting a *res judicata* theory with respect to two counts in adversary proceeding seeking to prevent a sale of aircraft that would convey clear title to a buyer because they were not the same cause of action as a § 363 sale motion, but holding that those counts were made moot by the entry of the sale order transferring the aircraft free and clear of claims, and thus bankruptcy judge no longer had jurisdiction over those two counts of the complaint).

[138] *See e.g. CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 n.4 (3d Cir. 1999) (suggesting that issue preclusion or § 1141(a) may be the more appropriate defense, but analyzing claim preclusion/*res judicata* because the district court and the parties primarily treated the case as one of claim preclusion).

*Marathon* or *Stern*.[139]  This conclusion holds true even if that impact effectively precludes adjudication of the merits of a state law claim.

Voya argues, primarily based on *Digital Impact*[140] and *CoreStates* (or perhaps a combination of the two), that the entry of a confirmation order containing releases constitutes an "adjudication" of its RICO Lawsuit, which *Stern* prohibits.  Voya's reliance on these cases is misplaced.  Taking the position that third party releases in a plan are equivalent to an impermissible adjudication of the litigation being released is, at best, a substantive argument against third party releases, not an argument that confirmation orders containing releases must be entered by a district court.  Indeed, neither of these cases examine a bankruptcy judge's constitutional power to enter an order.

---

[139] Other reported decisions in which courts have held that a bankruptcy judge has constitutional adjudicatory authority to issue an order in a core proceeding that impacts state law claims include: (i) *In re Safety Harbor Resort and Spa*, 456 B.R. 703 (Bankr. M.D. Fla. 2011) (finding that a bankruptcy judge has constitutional adjudicatory authority to impose creditor suggested "lock up" restrictions on the reorganized debtor's business operations and non-debtor guarantors' assets as condition to confirming plan containing third party releases; lock up restrictions were an integral part of the order confirming the plan and confirmation of a plan is core; also finding guarantor consent by virtue of controlling interest in debtor as proponent of the plan); (ii) *In re Catholic Bishop of N. Alaska*, 525 B.R. 723, 730 (D. Alaska 2015) (over *Stern* objection, holding that even if parties had not waived their right to challenge bankruptcy judge's constitutional adjudicatory authority by not raising it prior to appeal, bankruptcy judge had authority to determine state law adverse possession property rights in context of non-debtor/purchaser's motion to enforce § 363 sale order because it "was necessary for the proper administration of the bankruptcy estate"); *In re Owner Mgmt. Serv., LLC Trustee Corps.*, 530 B.R. 711 (Bankr. C.D. Cal 2015) (holding that post-*Stern*, bankruptcy judges can continue to enter final orders on substantive consolidation) (citing *In re LLS America*, 2011 WL 4005477 (Bankr. E.D. Wash. Sept. 8, 2011) *aff'd In re LLS Am., LLC*, 2012 WL 2042503 (9th Cir. BAP June 5, 2012) ("Substantive consolidation does not exist outside the context of a bankruptcy proceeding.  It is only available in a bankruptcy proceeding commenced under the federal bankruptcy scheme.  Although not expressly provided for in the Bankruptcy Code, it has been a tool utilized by bankruptcy courts since the Bankruptcy Act of 1898.  Clearly, substantive consolidation is a core matter as it "arises under" Title 11 or "arises in" a case under Title 11. . . . The narrow holding of *Stern v. Marshall* does not apply to the Motion for Substantive Consolidation.")); *In re Land Resource, LLC*, 505 B.R. 571, 581–82 (M.D. Fla. 2014) (holding that the bankruptcy court had constitutional adjudicatory authority to enter order approving settlement that contained permanent injunction and bar order permanently enjoining non-debtors from pursuing claims against other non-debtors, and that *Stern* is inapposite and should not be extended beyond its narrow holding).

[140] *In re Dig. Impact, Inc.*, 223 B.R. 1 (Bankr. N.D. Okla. 1998).

Moreover, Voya's position rests on backwards reasoning—it examines the legal consequence of the confirmation order to find fault with the entry of the order, rather than examining the propriety of issuing the confirmation order in the first instance. Citing *Digital Impact* and *CoreStates*, Voya starts from a general premise that a confirmation order containing third party releases is *res judicata* with respect to the claims it releases. Because *res judicata* requires that the impacted action (the RICO Lawsuit) be based on the same cause of action as the prior suit (the confirmation order),[141] Voya reasons that the confirmation order is an adjudication on the RICO Lawsuit. And, because the RICO Lawsuit is non-core, Voya concludes that I cannot enter the confirmation order approving third party releases because I could not enter a final order in the non-core RICO Lawsuit absent its consent, which it does not give.[142] This is not the law.

First, as admitted by Voya's counsel at argument, *Digital Impact* does not hold that confirmation of a plan of reorganization is an adjudication of the merits of the RICO Lawsuit.[143] Rather, *Digital Impact* states that the release before it was "equivalent to issuing

---

[141] "Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *CoreStates*, 176 F.3d at 194.

[142] See Opt-Out Lenders' Opening Brief on Remand Issues 17-18.

[143]     **The Court:** But isn't confirmation what was in front of me?
    **Mr. Redburn:** Let me be clear about what I'm saying. Yes, confirmation is what was in front of you.
        When you asked me what was in front of you I interpreted that as what was the claim as to which the Court entered judgment and there were two things; confirmation, but by through the release injunction and bar order that was contained in the confirmation plan that Your Honor confirmed – sorry, plan of reorganization that Your Honor confirmed that was a judgment that was entered on Voya's claim.
    **The Court:** And who says that other than *Digital Impact*? What case says that other than *Digital Impact*?
    **Mr. Redburn:** That's an excellent question. *The way I would respond to it is I don't have a specific case that says that explicitly; however–*
    **The Court:** Because the case of *Digital Impact* doesn't say that either.

-46-

a final judgment" in favor of the released party.[144]  Even so, it is no more "equivalent to a

final judgment" than any other order issued by a bankruptcy judge that may be used in

subsequent litigation to establish a defense, including the orders entered in *Lazy Days,*

*Linear, Hart* or *Fisher Island*.[145]

      Second, *Digital Impact* is a pure jurisdictional case.  In *Digital Impact,* the bankruptcy

judge held a confirmation hearing and *sua sponte* raised two issues: (i) whether the court

could confirm a plan that did not pay priority administrative claimants in full; and (ii)

whether the court had jurisdiction or power to enter an order releasing a third party

(Dickerson) from claims relating to his participation in the case.  After post trial briefing and

argument, the *Digital Impact* judge found that she did not have even "related to" jurisdiction

over any potential/theoretical third party litigation against Dickerson because the outcome

of that litigation would not have any effect on the administration of the estate.[146]  The *Digital*

*Impact* judge also questioned her jurisdiction under § 1334 to grant releases at all—not

whether she or the district court must enter the final order granting the releases.  It is in this

context that *Digital Impact* cites *Western Real Estate Fund* (which holds that section 524(e)

---

     **Mr. Redburn:** *I agree with that, however, it's a matter of simple logic.*  What the effect of the release injunction and bar order is the exercise of judicial power to extinguish a claim as a matter of law.  If that's not what a judgment is I don't know what is.
Oral Argument on Remand, July 27, 2017, Hr'g Tr. 80:21–81:19, D.I. 456 (emphasis added).
[144] *Dig. Impact,* 223 B.R. at 12.
[145] *See* n.136, 137, 138 *supra.*  Until a litigant attempts to use a bankruptcy order as a defense in subsequent litigation, and the presiding court performs its analysis, it is not certain which defensive theory, if any, might be the most appropriate.  The Non-Debtor Equity Holders may also have the ability to bring a motion to enforce the confirmation order.
[146] The plan required simultaneous funding and distributions to creditors on the effective date. *Dig. Impact,* 223 B.R. at 12.  Dickerson also waived any claims that he had against the estate. *Id.* at 5.

prohibits third party releases) for the proposition that a confirmation order containing releases is "equivalent" to a ruling on the merits of the litigation it touches.[147]

Third, an analysis of *CoreStates* does not assist Voya; rather, it is fatal to Voya's theory. *CoreStates* analyzed the claim preclusive effect of a specific confirmation order and held that where a subsequent claim arose from the same cause of action as a claim actually asserted in the bankruptcy case and resolved by the confirmation order, claim preclusion was applicable.[148] It did not, as Voya suggests, hold that every confirmation order is *res judicata* on every issue raised in a post-confirmation lawsuit.[149] More importantly, Voya ignores the first ruling of the *CoreStates* Court: that a confirmation order has claim preclusive effect on a "related to" proceeding if that proceeding otherwise meets the requisites for *res judicata*.

*CoreStates* involved an intercreditor dispute between two lenders (CoreStates and Huls) regarding which of them was entitled to funds from their mutual borrower/debtor United Chemical Technologies. Prepetition, CoreStates, Huls and United Chemical were parties to a subordination agreement under which Huls agreed to hold in trust for CoreStates any funds it might receive in a United Chemical bankruptcy, and to immediately deliver any such funds to CoreStates. When United Chemical subsequently filed its bankruptcy case, it sponsored a plan by which it proposed to pay CoreStates over time and

---

[147] *Id.* While the *Digital Impact* judge does not adopt the § 524(e) statutory argument against releases, she states that § 524(e) embodies an important policy. *See id.* at 10.

[148] *CoreStates*, 176 F.3d at 195–99. In its conclusion, the Third Circuit stresses that *CoreStates*' claims in subsequent litigation are precluded "because of the coincidence of several unusual circumstances." *CoreStates*, 176 F.3d at 206.

[149] Indeed, the following year, the Third Circuit held that a confirmation order did not bar a subsequent lawsuit because the later claim did not arise from the same cause of action as a claim actually asserted in the earlier bankruptcy case. *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 339 (3d Cir. 2000) (discussing *CoreStates*).

permit CoreStates to retain certain liens. Huls was to receive $600,000 in cash on its claim.

CoreStates objected to the plan on the basis that the payment to Huls unfairly discriminated

between creditors, but CoreStates did not specifically base its objection on the subordination

agreement. CoreStates' objection was overruled and the plan was confirmed. After

multiple appeals and payment of the $600,000 to Huls, an amended plan was confirmed; the

amended plan did not change Huls' plan treatment or purport to change CoreStates' rights

vis-à-vis Huls. After confirmation, CoreStates sued Huls in the district court on the

subordination agreement, and Huls raised a *res judicata* defense. Based on the specific facts

and posture of the case, the district court granted Huls's motion to dismiss.

On appeal, CoreStates challenged not only the district court's specific application of

the doctrine of *res judicata*, but whether the doctrine could be applied at all. CoreStates

argued that the preclusive effect of bankruptcy court orders should be limited. Specifically,

CoreStates argued that the claim preclusion doctrine should not "preclude claims that [fall]

within the non-core 'related'—as opposed to the core—bankruptcy jurisdiction."[150] In a

several page discussion, the Third Circuit recognized and discussed a split among the

circuits with respect to the question of whether a bankruptcy judge—which can only hear,

but not determine, a non-core matter (absent consent)—could enter a confirmation order

that could bar the prosecution of that non-core matter. Siding with the majority of circuits,

and examining the Restatement (Second) of Judgments, the Third Circuit concluded that it

could.[151] The Third Circuit was persuaded that a limitation on the judicial power of a judge

is not a limitation on jurisdiction, and thus not a limitation on the preclusive effect of the

---

[150] *CoreStates*, 176 F.3d at 195.
[151] *Id.*

judge's order. The Third Circuit, thus, ruled that a confirmation order has preclusive effect

with respect to a non-core, "related to" proceeding if the proceeding otherwise meets the

requisites of the *res judicata* doctrine.[152]

    *CoreStates* runs counter to Voya's argument. It comports with the conclusion reached

from an analysis of the Third Circuit's decisions in *Lazy Days* and *Linear*, that an order

entered by a bankruptcy judge may "surely impact" state law claims.

### D. Adopting the Voya Interpretation Would Dramatically Change the Division of Labor Between the Bankruptcy and District Courts

    Finally, I feel compelled to briefly address Voya's assertion on remand that under the

Voya Interpretation "the vast majority of activities in which a bankruptcy court engages on

a day-to-day basis, such as issuing DIP financing orders, approving asset sales, allowing or

disallowing claims against a debtor's estate, are entirely unaffected by *Stern*."[153] Voya makes

this proclamation in its opening brief on remand without any analysis. As acknowledged at

argument, however, Voya recognizes at least two times when district courts would be

compelled to enter the final order approving a debtor's requested relief: (i) any § 363 sale of

assets in which a purchaser seeks to be free of successor liability—which is every § 363 sale

of assets; and (ii) requests to compel annual meetings of stockholders.[154] In addition to the

contexts already examined in this Opinion,[155] I would add: (i) substantive consolidation of

debtors, and/or debtors and non-debtors (in which the rights of creditors and non-creditors

---

[152] Voya's *res judicata* argument is at odds with its position that the merits of the RICO Lawsuit were not in front of me at confirmation. *See* Part IV, *infra*.

[153] Opt-Out Lenders' Opening Brief on Remand Issues at 22.

[154] Oral Argument on Remand, Hr'g Tr. at 119:16–122:20.

[155] Those contexts are: (i) stay violation motions (in which state law lien rights against third parties are adjudicated); (ii) involuntary proceedings (in which ownership issues between two non-debtors are adjudicated); (iii) interpretation of previous orders (in which state law contractual rights are adjudicated) and (iv) non-dischargeability litigation (in which judgment is entered on state law claims).

against non-debtor entities are rearranged); (ii) recharacterization and/or subordination (in which state law debts are transformed); (iii) requests to establish notice procedures to preserve a debtor's net operating losses by prohibiting trading in stock without certain advance notice (in which trades in derogation of those procedures are declared void *ab initio*); and (iv) a sale of property subject to a co-debtor stay (in which the court compels the sale of a non-debtors' interest in property).[156] Voya suggests that consent may permit the bankruptcy court to enter a final order in these instances, but it seems at least arguable that consent would be withheld to leverage a party's position. As Judges Krause and Ambro noted in their respective discussions of equitable mootness in their separate concurring opinions in *One2One* and *Tribune*, there is ample room for gamesmanship by both debtors and creditors in the bankruptcy context.[157]

While recognizing that even a slight encroachment by Congress into the prerogative of the Judicial Branch cannot be tolerated, Chief Justice Roberts was convinced that his ruling in *Stern* did not "change all that much."[158] The main reason is that the bankruptcy system already contemplates that certain state law claims, such as Vickie-type

---

[156] These are not random thoughts. Since the Remand Decision, I have been asked to (i) approve a § 363 sale motion with successor liability provisions, (ii) establish procedures for preservation of net operating losses, (iii) approve a sale of co-debtor property, and (iv) interpret a previous order approving substantive consolidation.

[157] *See, e.g., One2One*, 805 F.3d at 453 (Krause, J., concurring) ("we should be even less solicitous of parties who act opportunistically or advocate unlawful plan provisions during confirmation"); *Tribune*, 799 F.3d at 288–89 (Ambro, J., concurring) ("Without equitable mootness, any dissenting creditor with a plausible (or even not-so-plausible) sounding argument against plan confirmation could effectively hold up emergence from bankruptcy for years (or until such time as other constituents decide to pay the dissenter sufficient settlement consideration to drop the appeal), a most costly proposition.") Indeed, the O'Hagan article cited by Voya appears to fall into this category. The author describes his article as a look at "an underutilized—yet potent—procedural weapon." Eamonn O'Hagan, *On a "Related" Point: Rethinking Whether Bankruptcy Courts Can "Order" the Involuntary Release of Non-Debtor, Third-Party Claims*, 23 AM. BANKR. INST. L.R. 531, 531 (2015).

[158] *Stern*, 131 S. Ct. at 2620.

counterclaims, are to be ultimately resolved by non-bankruptcy judges. As Chief Justice

Roberts observed, district court judges review *de novo* and enter final orders in lawsuits that

allege "related to" claims, and bankruptcy courts must or may abstain from ruling on state

law disputes that can be timely adjudicated.[159] But, there is no established alternative

framework for ruling on core proceedings interpreting federal law that touch upon state law

rights.

      For all of these reasons, I conclude that I had constitutional adjudicatory authority to

enter a final order confirming Millennium's Plan.[160]

---

[159] *See* 28 U.S.C. §§ 157(c), 1334 (c)(1)–(2).

[160] As many courts before me, I performed a "related to" analysis in the first instance because that is
the argument that Voya made. Finding that I had at least "related to" jurisdiction, and with this
being the only non-merits challenge, I determined I had subject matter jurisdiction and proceeded to
analyze the merits of the requested relief.

      Given the analysis I have just performed (and the significant time we have spent in chambers
to be in a position to respond to the district court's question on remand[A]), I question whether this
"related to" analysis is the proper analytical framework to begin with as it relates to confirmation of
a plan containing releases.[B] Some courts do not perform such an analysis. The circuit courts
deciding *AOV Industries* and *Specialty Equipment* held that the bankruptcy court can rule on the
legality of release provisions in a plan consistent with the Constitution, and they ruled without
performing a "related to" analysis. Further, courts do not conduct this analysis in other contexts in
which third party litigation is impacted.

      Our research did not reveal the genesis of this analytical framework, and an attempt to trace
it back to its origins did not supply a satisfying result. But at least one commentator has suggested it
was improperly imported from decisions addressing the court's ability to issue injunctions
temporarily staying third party litigation.[C] Having immersed ourselves in the *Stern* question
presented by the Remand Decision, I believe that to the extent a "related to" analysis is relevant to
third party releases in the confirmation context, it may act as a check on the outer boundaries of
permissible releases, as a substantive matter.[D] In that regard, I agree with Judge Frank that perhaps
many reported decisions conflate, as Voya did in many ways here, subject matter jurisdiction with
the substantive merits.[E] Where I may part ways with Judge Frank, however, is his suggestion that
this distinction may be wholly academic in most cases. If the "related to" analysis is appropriate in
the confirmation context, there would appear to be no principled reason not to perform a "related
to" analysis in the many other contexts in which bankruptcy judges rule on matters that may impact
private rights between non-debtors.

---

[A] There is no denying the complexity of the cases interpreting the Supreme Court's holdings in the
Article I/Article III arena. *Kirschner*, 461 B.R. at 191 (citing cases). And, although distinct from

### III.    Voya Both Forfeited and Waived any Constitutional Adjudicatory Authority Objection to my Ability to Enter a Final Order Confirming the Plan

Even assuming that I did not have constitutional adjudicatory authority to enter a

final order confirming Millennium's Plan, Voya forfeited the right to contest my authority

by not raising the argument. Voya also implicitly consented[161] to my authority, thereby

waiving the right to contest it.

---

jurisdictional questions, a byproduct of answering the question on remand is the re-thinking of the entire framework of confirmation of plans containing releases.

[B] I am not the first to do so. *See In re Lower Bucks Hosp., 471 B.R. 419, 448 n.45 (Bankr. E.D. Pa. 2012), aff'd sub nom. Bank of N.Y. v. Becker (In re Lower Bucks Hosp.), 488 B.R. 303 (E.D. Pa. 2013), aff'd sub nom. In re Lower Bucks Hosp., 571 F. App'x 139 (3d Cir. 2014); Charles St.*, 499 B.R. at 99 ("It may or may not be appropriate for a court exercising bankruptcy jurisdiction to confirm a plan containing a third-party release—and, if it is appropriate, the manner and degree of relation of the released claim to the case are certainly factors in the analysis—but the court undoubtedly has jurisdiction to adjudicate the plan, even without recourse to its related-to jurisdiction.").

[C] These injunctions are unmoored to confirmation of plans. *See generally* Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten Callaway v. Benton Case*, 72 AM. BANKR. L.J. 1 (1988). While I do not necessarily agree with Professor Brubaker's conclusions, I appreciate the thought put into analyzing the genesis of the framework.

[D] Judge Frank was not confronted with this direct question either, but he posited:

> Because there is no express provision of the Bankruptcy Code authorizing the confirmation of plans that include third party releases, the decisional law on the subject permitting confirmation of such plans appears to be a judicial gloss on the statute, albeit one grounded in 11 U.S.C. § 105. Viewed from that perspective, arguably, it may be more accurate to conceptualize a ruling, in a particular case, that the bankruptcy court lacks the authority to approve a particular third-party release or impose a particular injunction because the nexus between the released or enjoined matter and the bankruptcy case is too attenuated, as a decision of substantive bankruptcy law—i.e., establishing the boundary line of permissible plan provisions—rather than a decision based on *subject matter jurisdiction* under 28 U.S.C. § 1334(b). *But see Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (suggesting that the exercise of bankruptcy jurisdiction involves *in rem* proceedings "premised on the debtor and his estate").

*Lower Bucks*, 471 B.R. at 448 n.45.

[E] *Lower Bucks*, 471 B.R. at 448 n.45 ("There is a reasonable case to be made that [the objector] and perhaps the courts in some reported decisions, have conflated subject matter jurisdiction with the substantive merits.").

[161] As Mr. Weintraub pointed out at argument, the use of the word "consent" in the context of this case can be confusing as it is used in myriad contexts. *See* Oral Argument on Remand, Hr'g Tr. 146:6–148:5. I will use the word "consent" when referring to whether a party agrees that the bankruptcy court may enter a final order on a matter (or has impliedly consented, or

Waiver and forfeiture are commonly confused terms. "Although jurists often use the words interchangeably,"[162] waiver and forfeiture have different meanings. "[F]orfeiture is the failure to make the timely assertion of a right[;] waiver is the 'intentional relinquishment or abandonment of a known right.'"[163]

In 2015, the Supreme Court ruled in *Wellness* that litigants may consent to a bankruptcy court's constitutional adjudicatory authority to enter final orders.[164] If litigants consent, any objection to a bankruptcy court's authority is waived.[165] Consent may be express or implied,[166] but in either event must be knowing and voluntary.[167] After the Supreme Court's decision in *Wellness* confirmed that litigants can consent to a bankruptcy judge's constitutional adjudicatory authority, many courts have found implied consent when a party appears before a bankruptcy judge without raising a constitutional objection.[168]

---

waived/forfeited the argument). I will use the word "assent" when referring to whether a party has agreed to the grant of third party releases. Lest anyone is confused, I find that Voya did not assent to the granting of third party releases, but that it did consent (or waived/forfeited any objection) to the entry of a final order on confirmation.

[162] *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004). While I have attempted to adhere closely to these definitions in this Opinion, I believe certain intentional actions can constitute both a forfeiture and a waiver of a right.

[163] *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

[164] *Wellness*, 135 S. Ct. at 1948–49.

[165] *Id.*, *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) ("the entitlement to an Article III adjudicator is 'a personal right' and thus ordinarily 'subject to waiver.'").

[166] *See, e.g., Wellness*, 135 S. Ct. at 1948 ("[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express."); *Roell v. Withrow*, 538 U.S. 580, 590 (2003) ("the Article III right is substantially honored" by permitting waiver based on "actions rather than words.").

[167] *See Wellness*, 135 S. Ct. at 1948 (citing *Roell*, 538 U.S. at 588 n.5).

[168] *See Mandel v. Jones*, No. 4:12-cv-87, 2016 WL 4943366, at *5 (E.D. Tex. Sept. 16, 2016) (holding that parties may impliedly consent when a bankruptcy judge hears evidence and testimony without objection by the parties) (citing *In re McCollom Interests, LLC*, 551 B.R. 292, 300 (Bankr. S.D. Tex. 2016) ("[T]his Court held two hearings during which two of the Firm's attorneys appeared and gave testimony; and the Firm never objected to this Court's constitutional authority to enter a final order . . . . If these circumstances do not constitute implied consent, nothing does.")); *Campbell v. Carruthers (In re Campbell)*, 553 B.R. 448, 452 (Bankr. M.D. Ala. 2016) (misprint in published decision, but available in Westlaw version) (concluding that a defendant's failure to appear and defend against claims in an adversary proceeding, despite service of the summons, constituted

While *Wellness* primarily focused on consent, the Supreme Court also recognized that a party can forfeit a constitutional right.[169]  Both the concept of implied consent and forfeiture increase judicial efficiency and check gamesmanship.

On remand, I asked the parties to brief the issue of whether Voya had waived any argument that I lacked constitutional adjudicatory authority to enter a final order confirming Millennium's Plan.  I did so for a simple reason—I believed I had ruled on all objections fairly raised at the confirmation hearing.  I did not remember the words "constitutional adjudicatory authority," "proposed findings of fact and conclusions of law," "report and recommendation," or the like in any of Voya's confirmation submissions or in Voya's argument at confirmation.  But, recognizing that I could be incorrect, I asked the parties to identify the portions of the record in which Voya made its *Stern* argument.[170]

In its submissions on remand, Voya identified the following portions of the record: (i) its "Local Rule 9013-1(h) reservation of rights;" and (ii) Paragraph 24 of Voya's Initial Confirmation Objection.[171]  Voya also pointed to the Debtors' statements and written submissions regarding *Stern* as well as its own lack of assent to the releases.  I will address each of these items in order.

---

knowing and voluntary consent to a non-Article III adjudicator within the meaning of *Wellness*) (and cases cited therein); *In Matter of Smiley*, 559 B.R. 215, 217 (Bankr. N.D. Ind. 2016) (finding implied consent when litigants "actively participate in the proceeding, knowing their rights, but choose not to assert them").

[169]  *Wellness*, 135 S. Ct. at 1949 (The Supreme Court left it to the Seventh Circuit on remand to decide "whether Sharif's actions evinced the requisite knowing and voluntary consent," if so, consent waives the right to an Article III judge, "and also whether, as Wellness contends, Sharif forfeited his *Stern* argument below.").

[170]  In requesting this briefing, I trust I have not erred or hopelessly ventured beyond the scope of the questions presented to me by the Remand Decision.

[171]  Opt-Out Lenders' Reply Brief on Remand Issues at 11, June 12, 2017, D.I. 444.

Delaware Local Bankruptcy Rule 9013-1(h) (the "Local Rule") provides:

> All objections or other responses to a motion filed pursuant to this Rule
> [which pertains to any motion or application filed in a main bankruptcy case,
> *see* L.R. 9013-1(a)] shall contain a statement that the filing party does or does
> not consent to the entry of final orders or judgments by the Court if it is
> determined that the Court, absent consent of the parties, cannot enter final
> orders or judgments consistent with Article III of the United States
> Constitution. If no such statement is included, the filing party shall have
> waived the right to contest the authority of the Court to enter final orders or
> judgments.[172]

The Local Rule appears to serve two purposes. It draws one bright line for waiver
determinations: if a party does not include the proposed statement in its filing (and has not
actually made a constitutional argument), the party has waived its right to contest the
bankruptcy judge's entry of a final order on the proceeding before the court.[173] Conversely,
if a party includes the proposed statement in its filing, the Local Rule appears to provide a
"safe harbor" and the constitutional adjudicatory authority issue is not waived by way of
that initial filing.[174]

By pointing to the Local Rule, Voya equates not waiving the right with actually
making the argument. But, they are not the same, and the rule does not suggest as much.
Reciting the statement in the Local Rule is no substitute for timely making the argument

---

[172] Del. Bankr. L.R. 9013-1(h), http://www.deb.uscourts.gov/court-info/local-rules-and-orders/local-rules?items_per_page=All (emphasis added). The current version of Local Rule 9013-1(h) was added to Delaware Local Bankruptcy Rules in 2013. *Compare* L.R. 9013-1(h) (2012) *with* L.R. 9013-1(h) (2013), http://www.deb.uscourts.gov/local-rules-and-orders.

[173] Additionally, the Local Rule provides parties and counsel with notice of the need to object to entry of final orders by a bankruptcy judge. *Cf. In re Campbell*, 553 B.R. at 452 (implied consent exists when defendant ignores summons containing language stating that a failure to respond to the summons will be deemed consent to entry of a judgment by the bankruptcy court) (misprint in published decision, but available in Westlaw version). Voya does not argue that it was not aware of the ability or need to challenge my constitutional authority to enter a final order.

[174] Indeed, it is not uncommon for a party to put such a statement in its Notice of Appearance.

clearly and unequivocally in a subsequent filing.[175]  Failure to make the argument negates

any previous "reservation" of the right to do so.[176]

In any event, Voya did not insert the Local Rule verbatim into its submission.

Instead, Voya changed the language of the Local Rule in its filing to state:

> By submitting this Memorandum of Law, the Opt-Out Lenders do not
> consent to the entry of a final judgment or order on any issue, including but
> not limited to confirming the Plan, if it is determined that this Court, absent
> the consent of the parties, **lacks jurisdiction to enter** a final order or
> judgment consistent with Article III of the United States Constitution.[177]

The next sentence stated:

> **FOR THE AVOIDANCE OF DOUBT, THE OPT-OUT LENDERS DO
> NOT CONSENT, AND HEREBY OBJECT, TO THE THIRD-PARTY
> RELEASE, BAR ORDER, AND PLAN INJUNCTION (TO THE
> EXTENT THE BAR ORDER AND/OR PLAN INJUNCTION WOULD
> IMPAIR THE OPT-OUT LENDERS' DIRECT CLAIMS AGAINST
> NON-DEBTOR ENTITIES).[178]**

Although Voya's editing of the Local Rule only changed a few words—from "if it is

determined that the Court, absent consent of the parties, *cannot enter* final orders or

judgments" to "if it is determined that this Court, absent the consent of the parties, *lacks*

*jurisdiction to enter* a final order or judgment"—the changes are significant.  Voya changed

the words to reflect a jurisdictional argument (the subject matter jurisdiction argument it

raised) rather than a constitutional argument.  Ultimately, however, Voya's true focus was

---

[175] Of course, placing the statement in a submission in which a constitutional adjudicatory authority argument is actually made is entirely unnecessary as the argument has not been waived. Conversely, placing the statement in a submission ought to mean that the constitutional argument was not made in it.
[176] Voya places its modified Local Rule statement in a "reservation of rights" section, which is a common misnomer.
[177] *See* Initial Confirmation Objection ¶ 75 (emphasis added).
[178] *Id.*

the next sentence, which signaled in all caps and bolded text, that Voya did not assent to the third party releases.

The Local Rule is not a trump card for parties to hide behind, allowing them to wait and see how the judge rules before crying "*Stern.*" If a party has a constitutional objection to the bankruptcy judge's adjudicatory authority to enter final orders, it is incumbent upon the party to place that objection squarely before the judge. In expedited proceedings, such as Millennium's confirmation hearing, it is all the more critical that the specific argument be brought to the judge's attention at the hearing as well. The insertion in a party's submission of the statement in the Local Rule (modified or not)—with nothing more—is not sufficient to make a constitutional objection.[179]

Voya suggests that Paragraph 24 of its Initial Confirmation Objection provides the "something more." Paragraph 24 is the first of four paragraphs under the substantive heading "The Court Does Not Have Jurisdiction To Approve The Third-Party Release Or Related Provisions Of The Plan." It reads, in full:

> The jurisdiction of the Bankruptcy Courts is statutorily defined, and is confined to the boundaries of that statutory definition. *Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011) (noting that Bankruptcy Courts may only "hear and enter final judgments in all core proceedings arising under title 11, or arising in a case under title 11"); see also *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015) (observing that "bankruptcy courts possess no free-floating authority to decide claims traditionally heard by Article III courts"); 28 U.S.C. § 157(a). Rather, Bankruptcy Courts may only enter final judgments on non-core matters with the consent of the affected parties. *Wellness*, 135 S. Ct. at 1949. Because the Third-Party Release would impact direct, non-bankruptcy claims held by non-Debtors against other non-Debtors

---

[179] *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) ("[T]he crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the district court." (internal quotation and citation omitted)); *Shell Petroleum, Inc. v. U.S.*, 182 F.3d 212, 218 (3d Cir. 1999) ("a party still must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." (citation omitted)); *Keenan v. City of Phila.*, 983 F.2d 459, 471 (3d Cir. 1992) ("[T]he crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the [trial] court.").

and which would not trigger the Court's jurisdiction, the Court does not have jurisdiction to approve the Third-Party Release without the consent of the Third Party Releasing Parties. The Opt-Out Lenders have not given such consent.[180]

Nowhere in this paragraph does Voya challenge my constitutional authority to enter a final order confirming Millennium's Plan. Read in context, this paragraph appears to be the first paragraph of an introductory jurisdictional section, citing *Stern* and *Wellness* for general jurisdictional principles.[181] And, it is yet another statement that Voya does not assent to third party releases. In any event, the argument that Voya now makes is not contained in Paragraph 24.

---

[180] Initial Confirmation Objection ¶ 24.

[181] The entirety of the section reads as follows:

> 25. Bankruptcy Courts have core jurisdiction over four specific types of matters: "(1) cases under [the Bankruptcy Code], (2) proceeding[s] arising under [the Bankruptcy Code], (3) proceedings arising in a case under [the Bankruptcy Code], and (4) proceedings related to a case under [the Bankruptcy Code]." Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004) (citation and internal quotation marks omitted); see also 28 U.S.C. § 1334(a)–(b).
>
> 26. A proceeding solely between non-debtor parties based on non-bankruptcy law can never fall within a Bankruptcy Court's "arising under" jurisdiction. Rather, such proceedings can *only* lie within a Bankruptcy Court's "related to" jurisdiction, and then only "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate[.]" *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (citations omitted); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004). The Third Circuit has reaffirmed the *Pacor* test, subject to the limitations discussed below. *See, e.g., id.; In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002).
>
> 27. The Court "cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party . . . actions against non-debtors." *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214, n.12 (3d Cir. 2000). Thus, as a threshold issue to confirmation of the Plan, the Court must evaluate whether it has jurisdiction to release and enjoin claims of non-consenting non-Debtors against other non-Debtors. The Opt-Out Lenders respectfully submit that the Court does not have such jurisdiction and thus should not confirm the Plan as proposed.

*Id.* at ¶ 25–27.

At oral argument, Voya admitted that its position on remand is novel and that nobody has "really articulated this issue in the way it's being articulated to this Court before."[182] On that basis, it is all the more important that Voya articulate its position fully and with specificity, in both its written submissions and at oral argument. Any general discussion of or general reference to *Stern* did not make a constitutional adjudicatory authority argument.[183]

Moreover, the Debtors' references to *Stern* in their written submission or in argument do not assist Voya here. It its confirmation submission, the Debtors apparently treated the above paragraph 24 (with its citation to *Stern*) as a possible constitutional argument and responded to it accordingly.[184] Voya filed its Supplemental Confirmation Objection in response.[185] Although Voya's Supplemental Confirmation Objection replies to the Debtors'

---

[182] Oral Argument on Remand, Hr'g Tr. 100:21–102:1.

[183] *See, e.g., United States v. Perminter*, No. 10-204, 2012 WL 642530 (W.D. Pa. 2012) ("While the Government did cite to *Samson* in its opposing brief, 'simply citing a case in the District Court is not sufficient to raise all arguments that might flow from it.'" (citations omitted)); *In re Inv. Sales Diversified, Inc.*, 49 B.R. 837 (Bankr. D. Minn. 1985) (while both parties cited to and argued for and against the application of a previous decision, defendants did not plead or effectively raise collateral estoppel and so that defense was waived); *Walsh v. Mellas*, 837 F.2d 789, 799–800 (7th Cir. 1988) ("In *Walsh I*, the defendants 'raised' the defense in their answer to plaintiff's complaint, but failed to bring the argument to the court's attention, despite their having had numerous opportunities to do so. The cases holding that an omission of this character constitutes a waiver of the right to present that issue on appeal are legion. The mere fact that an obscure reference to defendants' 'good faith' is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal. [A] trial judge may properly depend upon counsel to apprise him of the issues for decision. He is not obligated to conduct a search for issues which may lurk in the pleadings." (citations and footnotes omitted)).

[184] *See* Debtors' Response to Voya's Objection to Confirmation of Proposed Chapter 11 Plan at 17–19, Dec. 7, 2015, D.I. 131; Oral Argument at Dec. 10 Hearing, Hr'g Tr. 33:2–34:2.

[185] The introductory paragraph to Voya's submission reads: "The Opt-Out Lenders, as defined in the *Memorandum of Law of the Opt-Out Lenders in Opposition to (I) Approval of the Disclosure Statement, (II) Approval of the Class 2 Ballot, and (III) Confirmation of the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, et al.*, by and through their undersigned counsel, hereby submit this supplemental memorandum of law in response to the briefs submitted by TA (the 'TA Br.'), D.I. 124, the Debtors (the 'Debtors' Br.'), D.I. 131, and James Slattery (the 'Slattery Br.' and collectively with the TA Br. and the Debtors' Br., the 'Confirmation Briefs'), D.I. 136. In response to the

"arising in" and "related to" jurisdictional arguments, it does not reply at all to the Debtors' constitutional argument. The words "*Stern*" or "constitution" do not appear in the Supplemental Confirmation Objection, nor does Voya object to the entry of a final order in connection with confirmation or request that proposed findings of fact and conclusions of law be submitted to the district court.[186]  Failure to respond to an argument simply cannot be construed as making an argument.[187]

Similarly, Voya failed to respond to the Debtors' preemptive *Stern* comments made at argument. At no time during the confirmation hearing did Voya utter the word *Stern*, make any constitutional adjudicatory authority argument, or contend that I was limited to submitting proposed findings of fact and conclusions of law to the district court. Nor did Voya speak up once I concluded my Bench Ruling or even after I asked whether any party had a question or clarification it needed to make on the record. While the United States Trustee offered comments on the proposed form of order immediately after my Bench Ruling and subsequently as reflected in the Debtors' December 14, 2015 letter, Voya stood silent.[188]

---

arguments set forth in the Confirmation Briefs, the Opt-Out Lenders respectfully state as follows . . ." Supplemental Confirmation Objection 1.

[186] Voya does, again, "reserve" whatever rights it previously "reserved" in paragraph 75 of its Initial Confirmation Objection. Supplemental Confirmation Objection ¶ 39.

[187] *See Diaz v. Bullock*, No. 13–5192 (JLL), 2014 WL 5100560, at *3 (D.N.J. Oct. 10, 2014) ("Plaintiff did not respond to Defendants' jurisdictional arguments at all, which constitutes a waiver of this issue."); *Walker v. E.I. du Pont de Nemours and Co.*, 199 F.Supp.3d 883, 896 (D. Del. 2016) (plaintiff abandons claim stated in complaint where he fails to mention it in his opposition to a motion for summary judgment).

[188] Typically, I would be skeptical of the Debtors' argument that Voya consented to the entry of a final order when it failed to specifically object to such in the context of the settlement of the order. The settlement of an order is not the time to re-hash objections. Standing alone, I would reject this argument. But, in context, I find it another indication that Voya waived and/or forfeited any *Stern* argument. Further, I reject Voya's argument that it believed I had ruled on the constitutional issue and, if not, that there was no "meeting of the minds." *See, e.g.*, Oral Argument on Remand, Hr'g Tr. 213:12–213:20. Voya's contractual standard is not relevant.

Voya's actions after the confirmation order was entered provide further evidence that Voya did not raise a *Stern* objection to my entry of the confirmation order. Voya immediately appealed the confirmation order, and as reflected in Voya's Statement of the Issues on Appeal, Voya did not identify my entry of a final order as an issue on appeal. Rather, consistent with its theory of the case, Voya appealed my decision that the RICO Lawsuit was "related to" the bankruptcy case (Issue 1), the substantive issue of whether nonconsensual releases are ever permissible (Issue 2), the standard for assessing third party releases if they are permissible (Issue 3), issues surrounding the appropriate financial contribution to support a release; (Issues 4 and 5) and whether I properly applied the correct legal standard to the facts of the case, assuming both subject matter jurisdiction and that releases are permissible (Issue 6). Because Voya appealed every ruling I made, had Voya raised the *Stern* issue prior to the entry of the confirmation order, no doubt its Statement of Issues on Appeal would have included a question of whether I erred in entering a final order confirming the Plan.

Finally, Voya points to its statements, both verbally and in writing, that it "does not consent" to the third party releases as an indication that it was objecting to the entry of a final order on a constitutional basis. It is undisputed that Voya did not assent to the grant of third party releases. That was the crux of Voya's objection, the very issue at the heart of the confirmation hearing, and the reason for evaluating the *Continental* hallmarks and the *Master Mortgage* factors. The question is not whether Voya assented to the third party releases or whether the releases were permissible (a question addressed by any number of reported decisions), but whether Voya objected to the entry by a bankruptcy judge of a final confirmation order approving those releases (an argument rarely made).

As is plain, I believe that Voya simply did not make the argument, which constitutes a forfeiture. The Debtors contend that Voya made a strategic decision to hold the argument in reserve in order to both obtain the consideration under the Plan and to have the ability to ask for a direct certification to the Third Circuit on whether nonconsensual third party releases are ever permissible. In other words, the Debtors contend that Voya's litigation strategy was to get to the Third Circuit as soon as possible. To support their conclusion, the Debtors point to the following: (i) Voya's true argument was that no judge—neither a bankruptcy judge nor a district judge—could impose a release on Voya without its assent because of a lack of subject matter jurisdiction; (ii) Voya never asked in court that I issue proposed findings of fact and conclusions of law; (iii) Voya did not ask the Debtors' counsel to include in his December 14, 2015, letter a request that I issue proposed findings of fact and conclusions of law; and (ix) Voya needed a final order as a predicate for seeking a direct appeal to the Third Circuit.[189]

To the extent that Voya intended to keep its constitutional objection in its back pocket to be used on appeal if it was not successful before me, such gamesmanship is prohibited, establishes intent and implied consent and therefore constitutes waiver.[190] On the other hand, if Voya simply wanted a final order entered to be in a position to file the Certification Motion (without giving thought one way or the other to *Stern's* constitutional proscriptions),

---

[189] Oral Argument on Remand, Hr'g Tr. at 140-157. I note that the Certification Motion was filed on the same day that the confirmation order was entered on the docket.

[190] *See, e.g., Wellness*, 135 S. Ct. at 1948 (implied consent increases judicial efficiency and checks gamesmanship); *see also Roell*, 538 U.S. at 590 ("Inferring consent in these circumstances thus checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority."); *Stern*, 131 S. Ct. at 2608 (the consequences of "a litigant . . . 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and said so promptly." (citations omitted)).

this was also an intentional act resulting in implied consent to my constitutional adjudicatory authority, and therefore constitutes waiver.

But even if I credit Voya's contention that it either preserved its constitutional adjudicatory argument through its modified Local Rule language or made such an argument in its written submission, Voya fares no better. It is beyond dispute that Voya did not make a constitutional adjudicatory authority argument or request that I enter proposed findings of fact and conclusions of law at the confirmation hearing. Voya had plenty of opportunity to do so.[191] To the extent, therefore, that Voya's written submission could ever be considered to evidence an intent not to consent to final orders, its failure to raise the Stern issue at argument constitutes a waiver or abandonment of that right.[192]

To summarize:

- Voya did not include in its Initial Confirmation Objection the statement found in Local Rule 9013-1(h) and so, per the Local Rule, Voya waived the right to contest my authority to enter a final order confirming the Plan;

- Voya did not actually make a constitutional adjudicatory authority argument in either its Initial Confirmation Objection or its Supplemental Confirmation Objection and so Voya forfeited its right to contest my authority to enter a final order confirming the Plan as it did not timely assert that right;

- To the extent Voya made a strategic decision to hold its constitutional authority argument in reserve for appeal in order to receive its Plan consideration and to seek direct certification to the Third Circuit, Voya waived any constitutional right to contest my authority to enter a final order confirming the Plan;

- To the extent that Voya was not acting strategically with respect to a *Stern* argument, but simply wanted a final order so that it could seek direct certification to the Third Circuit, Voya waived any constitutional right to contest my authority to enter a final order confirming the Plan; and

---

[191] Voya's entire oral argument on its confirmation objection was twenty minutes of a five-hour hearing.

[192] *See* n.187, *supra*.

- To the extent that Voya believed it made a constitutional adjudicatory authority argument in its Initial Confirmation Objection, its failure to respond to the Debtors' constitutional argument both in its Supplemental Confirmation Objection and during oral argument at the confirmation hearing constituted a waiver and an abandonment of the right to contest my authority to enter a final order confirming the Plan.

For the above reasons, I conclude that Voya waived or forfeited any argument that it was entitled to have an Article III court enter a final order confirming Millennium's Plan.

## IV. Even if Voya was Entitled to a Hearing on the Merits of the RICO Lawsuit in the Context of Confirmation, Voya Waived that Right

In its Remand Decision, the District Court provided two options in the event that I concluded I did not have constitutional adjudicatory authority to enter the order confirming Millennium's Plan: strike the third party release relative to Voya's claims in the RICO Lawsuit, or submit proposed findings of fact and conclusions of law on them. Because I conclude that I did have such authority, I need not do either.

But, even if I found to the contrary, I would not take either path here. If I am wrong, and I did not have constitutional adjudicatory authority to enter a final order, the district court may treat the confirmation order as proposed findings of fact and conclusions of law.[193] While the district court would have to enter the final order confirming the Plan, the standard for third party releases is still the same. Third party releases may be granted in the context of confirmation if the plan proponent can prove that it meets the *Continental* hallmarks of fairness and necessity to the reorganization. *Stern* does nothing to change that standard; *Stern* speaks only to which judge must enter the final order.

---

[193] United States District Court for the District of Delaware Amended Standing Order of Reference, In re Standing Order of Reference Re: Title 11, February 29, 2012.

Voya consistently and repeatedly took the position—at the confirmation hearing and on remand—that the merits of the claims in its RICO Lawsuit were not before me. Voya's argument at confirmation was that I did not have subject matter jurisdiction over the RICO Lawsuit and therefore could not grant the releases, and in any event, the releases were not warranted under the *Continental* hallmarks and/or the *Master Mortgage* five factor test. As set out in Part II, that standard considers the terms of the plan, the outcome of the solicitation and the necessity of the injunction to the success of the plan; the standard does not look at the merits of the claims being released nor did Voya argue that it does. Thus, the gravamen of Voya's objection did not put the merits of its claims against the Non-Debtor Equity Holders at issue.

In fact, Voya took the exact opposite view. Voya was clear that it was not putting the merits of the RICO Lawsuit at issue in the confirmation hearing, and balked at the Debtors' suggestion that it had to. Voya succinctly summed up its position in its Supplemental Confirmation Objection made the day prior to the confirmation hearing:

> The Plan Proponents' suggestion that [Voya is] somehow required to prove the merits of their claims in the Plan confirmation process in order to avoid having a release imposed against their will is utterly without merit. It is for the District Court to adjudicate the merits of [Voya's] claims. Consistent with fundamental principles of bankruptcy jurisdiction and substantive bankruptcy law, this Court cannot lawfully compel the release of those claims, *regardless of its view as to their likelihood of success.*[194]

The very idea that the merits were before me ran directly counter to the main thrust of Voya's argument that no court (not the bankruptcy court nor the district court) could enter

---

[194] Supplemental Confirmation Objection ¶ 38 n.15 (emphasis added).

an order approving third party releases because Voya was entitled to a hearing on the merits

of its RICO Lawsuit by Judge Sleet in the context of that lawsuit.[195]

On remand, Voya made the same argument—that the merits of its RICO Lawsuit

were not in front of me—and therefore Voya should not, and could not, put on evidence

regarding its claims against the Non-Debtor Equity Holders.  In its recently submitted

proposed findings of fact and conclusions of law,[196] Voya asks me to make the following

finding:

> 48.    As the District Court observed, this Court "did not conduct any
> proceedings on the merits of the [RICO Lawsuit], and [the District] Court is
> not in any position at this point to adjudicate those claims (on which, among
> other things, no discovery has been taken)." Opinion at 27.  The [RICO
> Lawsuit] was not filed in this Court, was not referred to this Court by the
> District Court, and was not (nor could it have been, as no Debtor was a party)
> removed to this Court for adjudication. Simply put, the merits of the [claims
> asserted in the RICO Lawsuit] *have never been presented to* or considered by
> this Court. Accordingly, this Court is not in a position to conduct any
> proceedings on the merits of the [RICO Lawsuit] or to submit to the District
> Court any findings of fact or conclusions of law on the merits, *or any other
> final disposition*, of the [the claims asserted in the RICO Lawsuit].[197]

---

[195]  While perhaps Voya could have asserted an alternate position, it did not do so.

[196]  The parties were invited to submit proposed findings of fact and conclusions of law in support of
their submissions on remand and both parties did.  D.I. 438, 463.  Not surprisingly, the submissions
are widely divergent, not only as to the findings and conclusions themselves, but with respect to the
topics they cover.  The Debtors' submission included findings and conclusions with respect to the
claims asserted in the RICO Lawsuit based on general evidence submitted at confirmation and the
proposition that I could judge the claims based on the survey standard used in the settlement
context.  Of course, the Debtors' proposed findings and conclusions found Voya's claims had no
merit.  Voya's proposed findings and conclusions did not go to the merits of its claims against the
Non-Debtor Equity Holders.  Rather, Voya's findings stated, among other things, that I could not
reach the merits of the claims as they were not before me.

[197]  Voya's Proposed Findings of Fact and Conclusions of Law at 26, Aug. 16, 2017, D.I.
463 (footnote omitted) (emphasis added).  Consistent with its true position, Voya never asked for
discovery nor did it ask that the confirmation hearing be delayed because it needed discovery.

At no time, therefore, did Voya put on, or intend to put on, any evidence with respect to its claims against the Non-Debtor Equity Holders. Instead, Voya asserted that the merits of its claims were not relevant to the confirmation hearing.

As previously discussed, on remand, Voya now maintains that the grant of releases in the confirmation order was an actual adjudication of its claims in the RICO Lawsuit. Voya cannot have it both ways. If the entry of the confirmation order was an actual adjudication of Voya's claims, then it was incumbent on Voya to submit evidence on the merits of its claims at the confirmation hearing.[198] It did not do so.[199]

Based on the foregoing, even if I had concluded that I did not have the constitutional adjudicatory authority to enter a final order confirming the Plan, I would not now submit proposed findings of fact and conclusions of law to the district court on the merits of Voya's RICO Lawsuit. To the extent that Voya was entitled to any hearing on the merits of its claims in connection with the confirmation hearing, it consciously chose not to avail itself of that opportunity. And, it continues to make that choice. To the extent Voya had a right to

---

[198] Debtors cite several cases for the proposition that a party objecting to plan confirmation must provide evidence in support of its objection. *See* [Proposed] Findings of Fact and Conclusions of Law, and Order Granting Third Party Releases and Related Relief Provided in Debtors' Confirmed Chapter 11 Plan and the Confirmation Order ¶ 124, May 19, 2017, D.I. 438 (citing *In re Hercules Offshore, Inc.*, 565 B.R. 732, 766 (Bankr. D. Del. 2016)); *In re All Land Invs., LLC*, 468 B.R. 676, 688 (Bankr. D. Del. 2012); *In re Tribune Co.*, 464 B.R. 126, 151 (Bankr. D. Del. 2011). While I do not know that I agree with this conclusion in every context, I do here. In this case, it is an appropriate conclusion to reach in the face of an argument that the entry of the confirmation order was an adjudication of the merits of Voya's claims. Accordingly, I find that on the facts and arguments made in this case, Voya did not meet its burden of proof to present evidence on the merits of its claims in the RICO Lawsuit.

[199] Voya is also arguing on remand that its asserted right to a jury trial in the RICO Lawsuit supports the position that I could not enter a final order confirming Millennium's Plan. This appears to be yet another after-the-fact argument as Voya did not raise its right to a jury trial during the confirmation hearing or in proceedings before the district court on appeal. *See* Oral Argument on Remand, Hr'g Tr. 76:9–12, 77:13–78:17.

a hearing on the merits of its RICO Lawsuit in connection with plan confirmation, Voya intentionally relinquished that right. It has, therefore, been waived.

## CONCLUSION

The district court remanded this case to me so that I could rule on my constitutional adjudicatory authority to issue Millennium's confirmation order. In doing so, the district court recognized that remanding this case to me "was far from ideal at this stage of the Chapter 11 proceedings," but believed that "given [my] experience and expertise, [I] should rule on this issue first." I trust this Opinion will aid the district court on appeal.


Dated: October 3, 2017

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE