**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC,<br>*et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 15-12284 (LSS)<br><br>(Jointly Administered)<br><br>Hearing Date: March 23, 2020 at 10:30 a.m. (ET)<br>Objection Deadline: February 28, 2020 at 4:00 p.m. (ET) |

**MOTION FOR ENTRY OF AN ORDER (I) REOPENING THE BANKRUTCY
CASES PURSUANT TO BANKRUPTCY CODE SECTION 350 AND RULE 5010
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND (II) ENFORCING
THE PLAN TO REQUIRE MILLENNIUM HEALTH, LLC TO FUND DRAWS ON
LOAN AGREEMENTS APPROVED UNDER THE PLAN**

Marc S. Kirschner, as Trustee (the "**Trustee**") of the Millennium Corporate Claim Trust (the "**Corporate Claim Trust**") and Millennium Lender Claim Trust (the "**Lender Claim Trust**," and together with the Corporate Claim Trust, the "**Claim Trusts**") established under the *Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings, II, LLC, et al.* (the "**Plan**"), the Millennium Corporate Claim Trust Agreement (the "**Corporate Claim Trust Agreement**") and the Millennium Lender Claim Trust Agreement (the "**Lender Claim Trust Agreement**," and together with the Corporate Claim Trust Agreement, the "**Trust Agreements**"), by and through its undersigned co-counsel, respectfully submits this *Motion For Entry Of An Order (I) Reopening These Chapter 11 Cases Pursuant To Bankruptcy Code Section 350 and Rule 5010 Of The Federal Rules Of Bankruptcy Procedure and (II) Enforcing the Plan*

---

[1] The pre-confirmation and pre-effective date Debtors and the last four digits of their respective taxpayer identification numbers were as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

{1089.001-W0060271.}

*to Require Millennium Health, LLC to Fund Draws on Loan Agreements Approved Under the Plan* (the "**Motion**").[2] In support of the Motion, the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

In excess of $2 billion of claims and causes of action of the Reorganized Debtors and Reorganized Debtors' lenders were assigned to the Claim Trusts under the Plan, with the exception of certain claims released under the Plan. The Claim Trusts were key to the prepackaged bankruptcy of the Reorganized Debtors. To assure the viability of the Claim Trusts, the Plan provides for their funding through outright cash contributions by the Reorganized Debtors aggregating $13 million of "initial funding" and a no-interest "Trust Delayed Draw Facility" of $7 million under the Loan Agreements that would kick in when the initial funding contribution was depleted. All of the initial $13 million of "initial funding" has been supplied to the Claim Trusts and permissibly used to effectuate the Claim Trusts' purposes. The Claim Trusts have complied with all their obligations and conditions precedents to draw under the Loan Agreements, but Reorganized Debtor Millennium Health, LLC (the "**Company**"), the lender for the Trust Delayed Draw Facility under the Loan Agreements, has refused to honor draw down requests in December 2019 and January 2020 aggregating $705,320.13.

---

[2]  The Plan is Docket No. 195-1 and the *Findings of Fact, Conclusions of Law and Order (I) Approving the (A) Prepetition Solicitation Procedures, (B) Forms of Ballots, (C) Adequacy of Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, and (D) Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, and (II) Confirming the Prepackaged Joint Chapter 11 Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.*, dated Dec. 14, 2015 ("**Confirmation Order**") is Docket No. 195. The Corporate Claim Trust Agreement and Lender Claim Trust Agreement are Exhibit A (Docket No. 179-1) and Exhibit B (Docket No. 179-2), respectively, to *Third Plan Supplement for the Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al.* [Docket No. 179] (the "**Third Plan Supplement**"). The Corporate Claim Trust Loan Agreement and the Lender Claim Trust Loan Agreement (collectively, the "**Loan Agreements**") for the "Trust Delayed Draw Facility" set forth in the Plan, are Exhibits I (Docket No. 179-9) and Exhibit J (Docket No. 179-10), respectively, to the Third Plan Supplement. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

In March 2018, the Reorganized Debtors obtained an order closing the above-captioned chapter 11 cases (the "**Cases**") to, *inter alia*, save payments of fees to the U.S. Trustee. Such order is expressly without prejudice to the right of the Trustee or any other party in interest to seek to reopen the Cases. As this Court has retained jurisdiction over the Cases to the extent necessary or appropriate to implement the Plan as well as over disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Trustee hereby moves to reopen the Cases and for entry of an order compelling compliance by the Company with the Plan and Loan Agreements.

## JURISDICTION & VENUE

1. The Court has jurisdiction over this proceeding pursuant to the Confirmation Order and Article IX of the Plan, specifically Sections IX.A(vii), (viii), and (xv) thereof which read:

> Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors or this Plan as legally permissible, including, without limitation, jurisdiction to:
>
> (vii) enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement.
>
> (viii) resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;
>
> (xv) resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. See In re A.H. Robbins Co., Inc., 86 F.3d 364, 373 (4th Cit. 2017) (holding that court had

"arising in" and "related to" jurisdiction over dispute the resolution of which would affect the amount each claimant would receive from post-confirmation claims trust); In re FAH Liquidating Corp., 567 B.R. 464, 471 (Bankr. D. Del. 2017) (holding that court had jurisdiction over post-confirmation dispute involving alleged violation of an asset purchase agreement, the terms of which were inseparable from the plan and from the bankruptcy case itself); In re Fruehauf Trailer Corp., 369 B.R. 817 (Bankr. D. Del. 2007) (holding that court had post-confirmation jurisdiction over adversary proceeding against former trustee of liquidating trust who failed to properly execute his duties under the liquidating trust agreement).

3.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.   The statutory predicates for the relief requested herein are sections 105(a) and 350(b) of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and Rule 5010 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## RELIEF REQUESTED

6.   By this Motion, the Trustee seeks entry of an order (i) reopening the Cases pursuant to Bankruptcy Code Section 350 and Bankruptcy Rule 5010, (ii) enforcing the Plan as against the reorganized Company to require it to fund the $7 million Trust Delayed Draw Facility to the Claim Trusts; and (iii) granting such other and further relief to the Claim Trusts as the Court may deem just and proper.[3]

## BACKGROUND

---

[3] The Trust Agreements provide that the Claim Trusts shall be dissolved on December 21, 2020, unless the Trusts are extended by Court order. See Trust Agreements, Art. X. A motion to extend the Claim Trusts, however, cannot be made until within six (6) months prior to December 21, 2020. See Trust Agreements, Art. X; Plan, Art. V.G.i. In addition to the instant Motion, the Trustee anticipates moving to extend the Claim Trusts within the appropriate time period. If the Court grants the Trustee's Motion to reopen the Cases to accord the relief sought herein, the Trustee requests the Cases remain open to permit the Trustee to move to extend the term of the Claim Trusts.

I.   **The Establishment of the Claim Trusts**

7.   Each of the Reorganized Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on November 10, 2015, and thereby commenced chapter 11 cases which were jointly administered under Case No. 15-12284 (collectively, the "**Cases**").

8.   The Reorganized Debtors' prepackaged Plan of reorganization provided, *inter alia*, for the creation of the Lender Claim Trust and the contribution to the Lender Claim Trust of all individual claims and causes of action (except Released Claims) initially belonging to Consenting Lenders (as defined in the Plan), together with certain other assets (the "**Lender Claim Trust Assets**"). The Plan also provided for the creation of the Corporate Claim Trust and the contribution to the Corporate Claim Trust of all claims and causes of action of the Reorganized Debtors (except Released Claims) (the "**Corporate Claim Trust Assets**," the Lender Claim Trust Assets, together with the Corporate Claim Trust Assets, the "**Trust Assets**"). All Lenders (as defined in the Plan) are beneficial holders of the Corporate Claim Trust and all Consenting Lenders (as defined in the Plan) are beneficial holders of the Lender Claim Trust.

9.   The Trust Agreements provide:

> The principal purpose of the [Claims Trusts] is to aid in the implementation of the Plan and the Confirmation Order, and therefore the [Trust Agreements] incorporate[ ] the provisions of the Plan and the Confirmation Order by this reference. To that end, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan that directly affect the interest of the [Claims Trusts], and to seek any orders from the Bankruptcy Court solely in furtherance of th[ese] [Trust Agreements].[4]

10.   Section 4.1 of the Trust Agreements, which details the "role of the Trustee," provides that "[i]n all circumstances, the Trustee shall act in the best interests of all [ ] Claim

---

[4]   Trust Agreements § 2.7

{1089.001-W0060271.}                                               5

Trust Beneficiaries and in furtherance of the purpose of the [Claim Trusts], and shall make timely [distributions] and not unduly prolong the duration of the [Claim Trusts]."[5]

11. Under Sections 4.2 of the Trust Agreements:

The Trustee shall be deemed the appointed representative to, and may, except as otherwise provided in the Plan or the Conformation Order, prosecute, enforce, litigate, settle, compromise, transfer, or assign any such rights, claims, [retained causes of action], suits or proceedings as appropriate in favor of or against the [Claim Trusts], in accordance with the terms of the [Trusts Agreements], the Plan, the Confirmation Order, and in the best interests of the [Claim Trusts] and the [Claim Trusts beneficiaries].[6]

12. Pursuant to Section 4.6(d) of the Trust Agreements:

The Trustee shall, consistent with the Plan, retain Cash and fund one or more reserves, at any time and from time to time, with such amounts as the Trustee, in its reasonable discretion (after consultation with the Trust Advisory Board), deems reasonable and appropriate to ensure the [Claims Trusts] will be able to meet [their] obligations for fees, costs, and expenses as set forth in Section 4.6(a) hereof.[7]

13. Under Sections 4.7 of the Trust Agreements, the Trustee shall make distributions of all trust income and all net proceeds from the Trust Assets, from time to time, subject to establishment of reasonable reserves for ongoing expected fees and expenses.[8]

14. Pursuant to the Plan, the Debtors were reorganized and all Lenders automatically received a pro rata share of all the equity of the Company and a share of a $600 million secured loan to the Company coming due December 21, 2020. The Trustee is not privy to any current activities of the Reorganized Debtors or their financial condition and, as noted above, owes duties solely to the beneficiaries of the Claim Trusts.

---

[5] Trust Agreements § 4.1. Likewise, Section 2.5 of the Trust Agreements provides that the purpose of the Claim Trusts is to benefit the beneficiaries of the Claim Trusts and shall serve as "a mechanism for converting to Cash the Trust Assets for the benefit of the [Claim Trusts] Beneficiaries." Trust Agreements § 2.5.

[6] Trust Agreements § 4.2.

[7] Trust Agreements § 4.6(d).

[8] Trust Agreements § 4.7; see also Plan, Article V.F and V.G; Trust Agreements § 4.11(g).

15. Pursuant to the Plan, the Reorganized Debtors agreed to provide an initial funding of $13 million (the "**Initial Funding**") to the Lender Claim Trust and the Corporate Claim Trust. The Initial Funding consists of the following:

    a. An initial cash contribution to the Corporate Claim Trust in the amount of $1 million; *see* Plan at Article V, Section F (ii);

    b. An initial contribution to the Lender Claim Trust in the amount of $2 million; *see* Plan at Article. V, Section G (ii); and

    c. Reimbursement to the Claim Trusts, upon receipts of invoices, of fees and expenses (including professional fees) in the aggregate amount of $10 million, without interest (the "**Reimbursement Contribution Fund**"); *see id.*

16. The Plan further provides that the Initial Funding "shall *not* be required to be reimbursed."[9]

17. The Claim Trusts, on a monthly basis, through November 2019, submitted invoices, approved by the Trustee and the Trust Advisory Board, to the Company for legal and professional fees incurred in furtherance of the Claim Trusts' purposes. The Company consistently and without objection promptly paid all amounts requested until the Initial Funding was exhausted in December 2019.

18. All activities and financial status of the Claim Trusts were timely made available to the public on the Claim Trusts' website, https://cases.primeclerk.com/millenniumtrusts/, including: (i) detailed descriptions of all litigation and confidential settlements achieved by the Claim Trusts, (ii) an $18 million distribution to the Claim Trusts' beneficiaries in March 2019, and (iii) quarterly and annual unaudited financial statements regularly posted to the Claim Trusts' website.

---

[9] Plan, Art. V.F(ii) and V.G(ii) (emphasis added).

19. In addition to the Initial Funding, the Plan provides for additional $7 million of financing for the Trusts pursuant to a "Trust Delayed Draw Facility." The availability of loans under the Trust Delayed Draw Facility is tied to the exhaustion of the $10 million Reimbursement Contribution Fund, as set forth in the Plan:

> Once this $10,000,000 is exhausted, [the Company] shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both [the Trusts]) in respect of fees and costs of the [Corporate Claim Trust] at the request of the [Corporate Claim Trust] Advisory Board."[10]

The Trust Delayed Draw Facility is also interest free for the Claim Trusts, but, unlike the Initial Funding, is subject to repayment of out of any proceeds recovered from the litigation or settlement of claims and causes of action after the Trust Delayed Draw Facility is effective and loans thereunder have been made.

20. To implement the Plan's provisions for the funding of the Claim Trusts through the Trust Delayed Draw Facility, the Plan provided for the entry by the Company, as Lender, and the Trusts, as Borrowers, into two virtually identical loan agreements: the Lender Claim Trust Loan Agreement and the Corporate Claim Trust Loan Agreement, both dated as of December 21, 2015 (the "**Loan Agreements**"). Both of the Loan Agreements were exhibits to the Plan and constituted parts thereof.[11] The $7 million in aggregate amount of financing provided under Loan Agreements is to be used by the Claim Trust drawing thereunder only to further the "Trust Purpose," defined to mean:

> (x) hold the Trust Assets until liquidation, (y) liquidate (and convert to cash) the [Trusts Assets] on behalf of and for the benefit of, the [ ] Trust Beneficiaries, including without limitation, by pursuing, litigating, and/or settling any claims and/or causes of actions constituting [Trusts Assets], or by assignment, disposition or otherwise, and (z) *distribute*

---

[10] Plan, Article V.F(ii).

[11] For the convenience of the Court, the Corporate Claim Trust Loan Agreement and Lender Claim Trust Loan Agreement are annexed hereto as Exhibits A and B, respectively.

*the Claim Proceeds for the benefit of the [ ] Trust Beneficiaries*, with no objection to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Borrower, as such purpose may be amended, supplemented and/or modified from time to time in accordance with the [Trust Agreements].[12]

21. Borrowing can occur under the Loan Agreements only after the entire amount of the Initial Funding ($13 million) has been made available to the Claim Trusts and used in furtherance of the Trust Purpose (the "**Effective Date**").[13]

22. The Claim Trusts, as Borrowers under the Loan Agreements, are not obligated to pay any amounts drawn thereunder "unless the Borrower has received proceeds from the [Trust Assets], whether from settlement, litigation, settlement, judgment or otherwise ("**Claim Proceeds**")."[14]

23. On December 14, 2015, the Bankruptcy Court confirmed the Plan. The Confirmation Order provides, consistent with the Plan, that the Court "shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article IX.A of the Plan."[15]

## II.    The Closing of the Cases

24. On January 23, 2018, notwithstanding ongoing activity by the Trusts, the Reorganized Debtors moved for the Cases to be closed citing the general absence of activity requiring the involvement of the Bankruptcy Court and pointing to the administrative and

---

[12] Loan Agreements § 6 (emphasis added).

[13] Loan Agreements §§ 1(a), 4.

[14] Loan Agreements § 1(b); see also Loan Agreements § 8(c) ("[T]he Borrower shall not distribute any Claim Proceeds (or any other amounts or Trust Assets) to the [Claim Trusts beneficiaries] before all outstanding Loans and other amounts outstanding hereunder have been paid in full in cash.").

[15] Confirmation Order § 62.

financial burden on the Reorganized Debtors of the Cases remaining open, including the burden of recently increased level of fees imposed by the U.S. Trustee.[16]

25. In support of the requested relief, the Company represented to the Court that the Claim Trusts "have been and continue to be funded by the Reorganized Debtors in accordance with the Plan."[17] In granting the Reorganized Debtors' motion to close the Cases, the Court explicitly noted the possibility that its jurisdiction could be invoked in the future: the Final Decree and Order closing the Cases, which was entered on March 23, 2018, provides that its entry "is without prejudice to the rights of the Reorganized Debtors or other parties in interest to seek to reopen any of the Reorganized Debtors' chapter 11 cases for cause pursuant to section 350(b) of the Bankruptcy Code."[18] An adversary proceeding commenced by the Lender Claim Trust was explicitly excluded from the Final Decree closing the Cases and remains pending.[19]

### III. The Receipt By the Claim Trusts of Settlement Proceeds

26. During the fiscal quarter ended June 30, 2018, the Claim Trusts entered into confidential settlements with two potential defendants (the "**2018 Settlements**"). All of the cash proceeds of the 2018 Settlements (the "**2018 Cash Settlement Proceeds**"), except amounts expended for payment of Clam Trust Expenses, were thereafter held in the Trusts through

---

[16] *Reorganized Debtors' Motion for Entry of A Final Decree and Order Closing the Reorganized Debtors' Chapter 11 Cases Nunc Pro Tunc to January 23, 2018 and Terminating Certain Claims and Noticing Services* [Dkt. No. 514].

[17] Id. at 9.

[18] *Final Decree and Order Closing Reorganized Debtors' Chapter 11 Cases and Terminating Certain Claims and Noticing Services*, dated March 23, 2018 [Dkt. No. 547] ("**Final Decree**") at ¶ 5; see also *Reorganized Debtors' Motion for Entry of a Final Decree and Order Closing the Reorganized Debtors' Chapter 11 Cases Nunc Pro Tunc to January 23, 2018 and Terminating Certain Claims and Noticing Services*, dated Jan. 23, 2018 [Dkt. No. 514] at ¶ 24 ("[T]he entry of a final decree closing the Chapter 11 cases will (a) be without prejudice to creditors' rights to petition the Court to reopen any of the Chapter 11 cases pursuant to section 350(b) of the Bankruptcy Code . . . ."); Tr. of Oral Ruling on Reorganized Debtors' Motion for Entry of a Final Decree and Order Closing the Reorganized Debtors' Chapter 11 Cases Pro Tunc to January 23, 2018 and Terminating Certain Claims and Noticing Services, dated Mar. 20, 2018 [Dkt. No. 546] at 6-9 ("[T]he bankruptcy cases may be reopened for cause . . . .[and] I do not intend to impact, nor am I impacting the confirmation order.").

[19] Id. at ¶ 4.

approximately March 11, 2019. On or about such date, after reserving for ongoing administrative expenses, including fees and expenses of professionals retained by the Trusts, the Trusts made a distribution to its beneficiaries in the amount of $18 million.

27. After giving effect to the $18 million distribution, the Trusts retained approximately $20.8 million. Maintaining such a reserve is consistent with the Trust Agreements, which provide that the Initial Funding shall not be required to be reimbursed and that the Trustee shall retain and fund such a reserve of cash for the Claim Trusts' anticipated obligations for fees, costs and expenses.[20] Both the amount of the 2018 Cash Settlement Proceeds, the making of the $18 million distribution and the reserves established by the Trusts from such proceeds were disclosed publicly on the Claim Trusts' website on a timely basis.

## IV. The Reimbursement Contribution Fund Is Exhausted

28. Both prior to their receipt of the 2018 Cash Settlement Proceeds and thereafter, while the Claim Trusts remained in possession of 2018 Cash Settlement Proceeds and made the $18 million distribution, the Claim Trusts continued to present invoices on a timely basis for Trust Claim expenses to the Company for reimbursement from the Initial Funding. Following receipt of 2018 Cash Settlement Proceeds, as before such time and following the $18 million distribution, the Company continued to reimburse the Claim Trusts on a timely basis for Trust Claim expenses against the Initial Funding. During the third quarter of 2019, Trust Claim Expenses came, in the aggregate, to exceed the amount of $13 million. As a result, by the end of December 2019, the Initial Funding was exhausted and, as noted above, pursuant to the confirmed Plan, the Initial Funding need not be reimbursed by the Claim Trusts.[21]

---

[20] See Plan, Article V.F(ii) and V.G(ii); Trust Agreements § 4.6(d).
[21] See Plan, Article V.F(ii) and V.G(ii).

29. On December 19, 2019, the Trustee, in accordance with the Loan Agreements, requested a loan in the amount of $386,547.69 ("**December Loan Request**"), which loan, had it been made, would have constituted a draw on the Trust Delayed Draw Facility, as implemented pursuant to the Plan and Loan Agreements.[22]

30. On January 21, 2020, the Company refused to fund the December Loan Request claiming, incorrectly, that conditions for the funding of a loan under the Loan Agreements (a "**Loan**") were not satisfied.[23] The Company's position that, as of January 21, 2020, there were unsatisfied conditions precedent to its funding obligations under the Loan Agreements is without merit and inconsistent with the plain language of the Plan and with the Loan Agreements.

31. On January 22, 2020, the Trustee, in accordance with the Loan Agreements, requested another loan in the amount of $318,772.44 ("**January Loan Request**," and collectively with the December Loan Request, the "**Loan Requests**").[24]

## IV. The Company's Erroneous Interpretation of the Plan and Loan Agreements

32. The conditions for draws under the Loan Agreements are set forth in Section 1(a) of each of the Loan Agreements, which section states in pertinent part as follows:

> Loans. The Borrower may borrow amounts under this Agreement . . . ; provided, that (i) the aggregate principal amount of the Loans made hereunder plus the aggregate principal amount of all loans made under the Corporate Claim Trust Loan Agreement shall not exceed the Maximum Loan Amount at any time [*i.e.*, $7,000,000], (ii) the proceeds of all Loans shall be used solely in furtherance of the Trust Purpose (including, but not limited to, for the avoidance of doubt, to fund and/or reimburse any of the fees, costs, and expenses of the professionals retained by the Borrower in connection therewith), (iii) no borrowing request hereunder shall request Loans in an amount that would exceed the Available Amount at such time and (iv) if, after giving effect to the making of a Loan, the aggregate

---

[22] The December Loan Request is annexed hereto as Exhibit C.

[23] Millennium's response to the December Loan Request is annexed hereto has Exhibit D.

[24] The January Loan Request is annexed hereto as Exhibit E.

principal amount of Loans made under this Agreement (including such Loan requested) plus the aggregate principal amount of all loans made under the Corporate Claim Trust Loan Agreement, in each case, as of the date of such Loan, would exceed the Maximum Loan Amount, then the amount of the requested Loan shall be automatically reduced to the Available Amount[25] at such time (for the avoidance of doubt, no Loans may be requested or funded until ($13,000,000 has been contributed to the Trust by the Lender pursuant to Article V.F and Article V.G. of the Plan ("Non Loan Contribution") ***and the entire amount of the Non Loan Contribution has been used by the Trusts in furtherance of the Trust Purpose and/or the trust purpose under the Corporate Claim Trust Agreement, as applicable)***.[26]

33. In rejecting the Trustee's request for a Loan, the Company relies on the provision of the foregoing paragraph (bolded above), stating the requirement that the funding of Loans is conditioned on the depletion of the entire amount of the Non Loan Contribution "in furtherance of the Trust Purpose." According to the position of the Company, due to that requirement, the Claim Trusts cannot borrow under the Loan Agreements at any time when assets of the Claim Trusts include cash *from any source* (including cash proceeds of the liquidation of Trust Assets) which is potentially available for the Trust Purpose or because the Claim Trusts already made a distribution to beneficiaries of the Claim Trusts in March 2019. In other words, according to the Company, a Loan is not being requested for the Trust Purpose so long as the Claim Trust has other funds available to fund the administration of the Claim Trust. This position, however, finds no support in either the Plan provisions setting forth the funding obligations of the Company or in the Loan Agreements and is inconsistent with the Plan and Loan Agreeements.

34. Under the Loan Agreements, the term "Trust Purpose" simply means to "liquidate (and convert to cash)" the Trust Assets, "by pursuing, litigating and/or settling any

---

[25] "Available Amount" is defined under the Lender Claim Trust Loan Agreement as "at any measurement time, the Maximum Loan Amount minus the sum of (i) the aggregate principal amount of the Loans made hereunder and (ii) the aggregate principal amount of the loans made under the Corporate Claim Trust Loan Agreement at such time." Lender Claim Trust Loan Agreement § 6, "Definitions."

[26] Loan Agreements § 1(a) (emphasis added).

claims and/or causes of action." There is nothing in this definition from which it is possible to infer a requirement that the Claim Trusts have depleted all other available sources of funding, including cash proceeds from the liquidation of Trust Assets recovered before the Loan Agreements became effective. Furthermore, the Trust Purpose includes the maintenance of appropriate reserves for the payment of Trust Claim Expenses. As set forth ¶ 12, *supra*, the Trust Agreements provide that the Trustee "shall . . . retain Cash and fund one or more reserves" for the payment of fees and expenses.

35. In addition to being unsupported by the Plan and the Loan Agreements, the Company's current position is inconsistent with its own reimbursement of Trust Claim Expenses from the Reimbursement Contribution Fund. Under the relevant provisions of the Plan, the Company was obligated to reimburse *only* expenses which were incurred for reasons that fall squarely within the definition of "Trust Purpose." Specifically, the Plan provides that "Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Retained [Claims Trusts] Causes of Action." As noted above, since the effective date of the Plan, the Company has reimbursed the Claim Trusts for fees and expenses to the full extent of the Reimbursement Contribution Fund. As a result, the Reimbursement Contribution Fund has been exhausted – a fact that the Company cannot and does not dispute. The consequences of the exhaustion of the $10 million Reimbursement Contribution Fund under the Plan could not be clearer: "[o]nce this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate . . . .)."[27]

36. The Company also asserts that, because the Claim Trusts were successful in recovering Claim Proceeds and made distributions to beneficiaries of Claim Proceeds received

---

[27] Plan, Art. V.F(ii), G(ii).

prior to the Effective Date of the Loan Agreements, the Claim Trusts are precluded from borrowing under the Loan Agreement or, if a borrowing is made, it must be immediately repaid from the Claim Proceeds received before the Effective Date of the Loan Agreements. But the Plan belies this argument: the Initial Funding "shall *not* be required to be reimbursed" by the Claim Trusts.[28] The Company is, simply, incorrect in asserting that "all litigation proceeds," which were received *before* the Effective Date of the Loan Agreement, must be "first used to satisfy the amounts borrowed" under the Loan Agreement.[29]

## ARGUMENT

I. **Cause Exists to Reopen the Chapter 11 Cases**

37. Pursuant to Section 350(b) of the Bankruptcy Code, a bankruptcy "case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b); see also Fed. R. Bankr. P. 5010 ("A case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code."). "Whether to reopen a closed bankruptcy case is committed to the discretion of the bankruptcy court." In re Shifano, Bankr. No. 12-11148(CSS), 2013 WL 85203, at *2 (Bankr. D. Del. Jan. 8, 2013) (quoting In re Canoe Mfg. Co., Inc., 466 B.R. 251, 261 (Bankr. E.D. Pa. 2012)). Bankruptcy courts have broad discretion to reopen cases after an estate has been administered. In re Lazy Days RV Center, Inc., 724 F.3d 418, 423 (3d Cir. 2013).

38. While the Bankruptcy Code does not define "other cause" or specify the type of "relief" sufficient to justify reopening a case, courts "generally look to whether reopening that case will benefit creditors." In re Shifano, 2013 WL 85203, at *2. Courts have also considered a number of nonexclusive factors, including: (1) the length of time that the case was closed; (2)

---

[28] Id. (emphasis added).

[29] Exhibit D.

whether a non-bankruptcy forum has jurisdiction to determine the issue which is the basis for reopening the case; (3) whether prior litigation in the bankruptcy court determined that a state court would be the appropriate forum to determine the rights, post-bankruptcy, of the parties; (4) whether any parties would be prejudiced were the case reopened or not reopened; (5) the extent of the benefit to the movant by reopening; and (6) whether it is clear at the outset that no relief would be forthcoming by granting the motion to reopen. See id.; In re PlusFunds Grp., Inc., 492 B.R. 202, 209-10 (Bankr. S.D.N.Y. 2013).

39. It is well-established that a bankruptcy court may reopen bankruptcy cases to interpret and enforce its prior orders and any agreements it confirmed pursuant to such orders. See Lazy Days' RV Center, 724 F.3d at 423 (finding cause existed to reopen bankruptcy case in order to interpret agreement incorporated into confirmed Chapter 11 plan); In re Landsource Communities Development, LLC, Bankr. No. 08-11111-KJC, 2020 WL 42843, at *7-8 (D. Del. Jan. 3, 2020) (affirming bankruptcy court's order reopening case to resolve dispute regarding injunction and release provisions in its confirmation order); In re Fibermark, Inc., 369 B.R. 761, 768-69 (Bankr. D. Vt. 2007) (reopening bankruptcy case to interpret "key employee severance plan" embodied within the debtors' confirmed plan). "This is consistent with the general principle that bankruptcy courts 'have broad authority under § 1142 to order actions required to ensure compliance with a confirmed plan.'" Fibermark, 369 B.R. at 768 (quoting In re Lacy, 304 B.R. 439, 447 (D. Colo. 2004)).

40. It is equally well-established that reopening a bankruptcy case is appropriate to allow a trustee of the debtors' assets to administer those assets for the benefit of the estate's creditors. See, e.g., In re Sweeny, 275 B.R. 730, 732 (Bankr. W.D. Pa. 2002) (granting trustee's motion to reopen bankruptcy case to entertain trustee's application to retain special counsel in connection with a state court action that constituted property of the debtor's bankruptcy estate);

In re Stewart, 154 B.R. 711, 711 (Bankr. N.D. Ill. 1993) (granting trustee's motion to reopen bankruptcy case to administer assets debtor failed to disclose); see also Mendelsohn v. Ozer, 241 B.R. 503, 506 (E.D.N.Y. 1997) (finding it was an abuse of discretion for the bankruptcy court to deny trustee's motion to reopen bankruptcy cases to administer proceeds from settlement of claim that constituted property of the debtor's bankruptcy estate).

41. Here, there is compelling cause to reopen the Cases. In contravention of the confirmed Plan, and the Trust Agreements and Loan Agreements implementing the Plan, the Company refuses to provide the Loans requested by the Trustee, which the Trustee has deemed necessary to effectuate the Trust Purpose, i.e., administer the Trust Assets. This Court, as the Court that oversaw the Cases and confirmed the Plan and implementing documents, "is well-positioned to adjudicate claims related to those documents in particular, and in the context of this chapter 11 case generally." See Fibermark, 369 B.R. at 769 (granting motion to reopen bankruptcy proceeding to interpret a confirmed employee severance plan where court was "intimately familiar with the issues" from presiding over the chapter 11 cases); see also Lazy Days' RV Center, 724 F.3d at 423 (finding cause existed to reopen bankruptcy case in order to interpret agreement incorporated into confirmed Chapter 11 plan).

42. As noted above, in seeking entry of an order closing the Cases, the Company invoked the fact that it was funding the Claim Trusts as a rationale for why the Court could close the Cases. At that time, there was no dispute over the administration of the Trust Assets. However, that is no longer the case: now, in refusing to honor the Loan Requests, which were made by the Trustee to fund Claim Trust Expenses expressly identified by the Trustee, the Company is interfering with Trustee's administration of the Trust Assets, as contemplated and provided for in the confirmed Plan and implemented by, *inter alia*, the Loan Agreements. Such interference warrants the Court's reopening of the Cases to interpret and enforce the Plan and its

implementing documents and to ensure that the Trust Assets are properly administered for the benefit of the beneficiaries of the Claim Trusts. See Sweeny, 275 B.R. at 732 (granting trustee's motion to reopen bankruptcy case to entertain trustee's application to retain special counsel in connection with a state court action that constituted property of the debtor's bankruptcy estate).

## II. An Order is Warranted Compelling the Company to Comply With the Plan and Loan Agreement by Honoring the Loan Requests

43. "The court may direct the debtor to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan and to perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b). Pursuant to Section 1142(b), a bankruptcy court has broad authority to take such action to ensure implementation of the plan, even post-confirmation. See U.S. Trustee v. Gryphon at Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999).

44. With this broad authority, a bankruptcy court may enter a post-confirmation order necessary to ensure the proper execution and administration of a liquidating trust established by a plan of reorganization. See Fruehauf Trailer, 369 B.R. at 827-28 (finding that adversary proceeding against former trustee of liquidating trust established under plan of reorganization is a dispute arising from conduct "'necessary for the consummation of the plan' under 11 U.S.C. § 1142(b)"); see also In re Consolidated Pioneer Mortg. Entities, 248 B.R. 369, 384 (B.A.P. 9th Cir. 2000) (holding that bankruptcy court did not err in converting chapter 11 case to chapter 7 post-confirmation, pursuant to Section 1142(b), where liquidation entity was not accomplishing the Plan's intended results).

45. Here, the Company's position with respect to the Trustee's request for a Loan violates the confirmed Plan, and the Trust Agreements and Loan Agreements implementing the Plan, and thereby interferes with the implementation and intended results of the Plan. Under these circumstances, the Court can and should enter an order directing the Company to comply with its obligations under the Plan and implementing documents. See Consolidated Pioneer, 248 B.R. at 384 (citing 11 U.S.C. § 1142) ("The bankruptcy court properly asserted its express, equitable, and inherent authority over the [plan-created liquidation entity] and the remaining estate property in order to square the unanticipated result of [the liquidation entity's] intransigence with the Code and Joint Plan provisions.").

**NO PRIOR REQUEST**

46. No prior motion for the relief requested herein has been made to this Court or any other court.

**CONCLUSION**

47. For the foregoing reasons, the Trustee respectfully requests that the Court enter an order: (i) reopening the Cases Bankruptcy Code Section 350 and Bankruptcy Rule 5010; (ii) enforcing the Plan as against the reorganized the Company, by requiring it comply with its obligation under the Loan Agreements to fund the Trustee's Loan Requests; and (iii) granting such other and further relief to the Claim Trusts as the Court may deem just and proper.

## NOTICE

48.  Notice of the Motion and the Proposed Order will be served by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to the following: (i) the Office of the United States Trustee; (ii) the Reorganized Debtors; and (iii) all other persons who have requested notice in the Debtor's Cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

Dated: February 14, 2020
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____
Richard S. Cobb (No. 3157)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com

-and-

**BROWN RUDNICK LLP**
Robert Stark, Esq.
Sigmund S. Wissner-Gross, Esq.
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
        swissner-gross@brownrudnick.com

*Counsel for Marc S. Kirschner, as Trustee of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust*